2023-1162

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO ALIMENTACION, S.L.,**

*Plaintiffs-Appellants*

**ACEITUNAS GUADALQUIVIR, S.L.U.,**

*Plaintiff*

v.

**UNITED STATES, COALITION FOR FAIR TRADE IN RIPE OLIVES,**

*Defendants-Appellees*

---

Appeal from United States Court of International Trade
Court Nos. 1:18-cv-00195-GSK, Judge Gary S. Katzmann

---

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO ALIMENTACION, S.L.

---

Matthew P. McCullough
James C. Beaty
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

January 17, 2023                    *Counsel for ASEMESA et al.*

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1162 |
| **Short Case Caption** | Asociacion de Exportadores e Industriales v. US |
| **Filing Party/Entity** | Asociacion de Exportadores e Industriales de Aceitunas de Mesa; Agro Sevilla Aceitunas S. Coop. And.; Angel Camacho Alimentacion, S.L. |

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 1/17/2023

Signature: /s/ Matthew P. McCullough

Name: Matthew P. McCullough

**FORM 9. Certificate of Interest**

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Asociacion de Exportadores e Industriales de Aceitunas de Mesa | | |
| Agro Sevilla Aceitunas S. Coop. And. | | |
| Angel Camacho Alimentacion, S.L. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Matthew P. McCullough | James C. Beaty | |
| Daniel L. Porter | | |
| James P. Durling | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States,  CIT Co. No. 1:21-cv-00338 | | |
| Agro Sevilla Aceitunas S. Coop. And. et al v. United States, CIT Co. No. 1:22-cv-106 | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE ............................................................. 4

SUMMARY OF THE ARGUMENT ................................................... 16

ARGUMENT ................................................................................. 18

I.  STANDARD OF REVIEW ........................................................ 18

II. COMMERCE'S FRAMEWORK FOR ANALYZING
SUBSTANTIAL DEPENDENCE IS INCONSISTENT WITH THE
STATUTE .............................................................................. 21

    A.  The Meaning of 19 U.S.C. §1677-2(1) is Clear Under *Chevron*
        Step-One ..................................................................... 23

    B.  The Trade Court Erroneously Relied on Post-Codification
        Administrative Proceedings to Sustain Commerce's Remand
        Redetermination .......................................................... 33

    C.  Under the Correct Standard Commerce's Remand
        Redetermination is Inconsistent With the Statute and Therefore
        Unlawful ..................................................................... 40

        1.  Table Olives Do Not Account for All or Substantially All of
            the Consumption of Olive Varietals That Commerce
            Determined Are Suited for Table Olive Production ............. 42

        2.  Commerce's Analysis of the Olive Market in Spain Failed to
            Establish Demand Dependence Required By The Statute ........ 43

        3.  Commerce Failed to Identify A Single Continuous Line of
            Production, Contrary To Law .................................... 44

III. COMMERCE'S FINDING OF SUBSTANTIAL DEPENDENCE IS
NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND
ARBITRARY ....................................................................... 46

A.    The Record Repudiates Commerce's Depiction Of The Raw Olive Market..........................................................................47

B.    The Record Reveals A Latter-Stage Product Dominated By "Dual-use" Olive Varietals With No Use Contingency, Contrary To Commerce's Claims .......................................................52

C.    Data Adjustments Utilized By Commerce In Its Consumption Ratio Calculations Are Not Supported By Substantial Evidence And/Or Are Arbitrary..........................................................................55

    1.    Commerce's inclusion of mill category olives deemed to be dual-use varietals in the numerator of its analysis is arbitrary......................................................................................55

    2.    Commerce's attempt to exclude cacereña from its calculations is ineffective, biased, and without basis in the record........................................................................................57

    3.    Commerce did not control for varietals and their respective volumes in its purported "varietal analysis"..............................60

D.    Commerce's Decision To Discard The Only Varietal-Specific Consumption Data On The Record That Would Permit A Varietal-Specific Dependence Analysis Was Unreasonable ..............62

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ...................65

# TABLE OF AUTHORITIES

## Cases

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S. 359 (1998) ........................................19

*American Grape Growers v. United States,*
  604 F. Supp. 1245 (Ct. Int'l Trade 1985)............................29

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States,* 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) .................................... passim

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States,* 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ..............................6

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States,* 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) .................................... 14, 45

*Atlantic Sugar, Ltd. v. United States,*
  744 F.2d 1556 (Fed. Cir. 1984) ...........................................19

*Burlington Truck Lines, Inc. v. United States,*
  371 U.S. 156 (1962) ..................................................... 20, 50

*Canadian Meat Council v. United States,*
  661 F. Supp. 622 (Ct. Int'l Trade 1987)............................31

*Chevron U.S.A., Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984) ........................................ 21, 24, 34, 35

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) ......................................................18

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2019) ...........................................63

*Gerald Metals, Inc. v. United States,*
  132 F.3d 716 (Fed. Cir. 1997) .................................... 51, 54

*GPX Int'l Tire Corp. v. United States,*
  666 F.3d 732 (Fed. Cir. 2011) ...........................................27

*GPX Int'l Tire Corp. v. United States,*
    678 F.3d 1308 (Fed. Cir. 2012) ...........................................................27

*Huffman v. Office of Pers. Mgmt.,*
    263 F.3d 1341 (Fed. Cir. 2001) ...........................................................34

*In re Cuozzo Speed Techs., LLC,*
    778 F.3d 1271 (Fed. Cir. 2015) ...........................................................27

*Kirk v. Comm'r of Soc. Sec. Admin.,*
    987 F.3d 314 (4th Cir. 2021) ........................................................ 20, 56

*Lorillard v. Pons,*
    434 U.S. 575 (1978) ...........................................................................27

*Marbury v. Madison,*
    5 U.S. 137 (1803) ...............................................................................36

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) ...........................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................... 20, 51, 60

*Nan Ya Plastics Corp. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016) ...........................................................21

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ................................................. passim

*NLRB v. SW Gen., Inc.,*
    580 U.S. 288 (2017) ...........................................................................26

*Oscar Mayer & Co. v. Evans,*
    441 U.S. 750 (1979) ...........................................................................34

*Oshkosh Truck Corp. v. United States,*
    123 F.3d 1477 (Fed. Cir. 1997) ...........................................................25

*Peer Bearing Co. v. United States,*
    766 F.3d 1396 (Fed. Cir. 2014) ...........................................................18

*SeAH Steel VINA Corp. v. United States*,
    950 F.3d 833 (Fed. Cir. 2020) ...............................................................20

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ...................................................... 20, 56

*Smith-Corona Group, Consumer Products Div., SCM Corp. v. United States*,
    713 F.2d 1568 (Fed. Cir. 1983) ...........................................................19

*Steger v. Def. Investigative Serv. Dep't of Def.*,
    717 F.2d 1402 (D.C. Cir. 1983).......................................................... 20, 56

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) ...............................................................19

*Swiff-Train Co. v. United States*,
    793 F.3d 1355 (Fed. Cir. 2015) ....................................................... 18, 60

*Timex V.I. v. United States*,
    157 F.3d 879, 882 (Fed. Cir. 1998) ................................................. 21, 25

*Timken Co. v. United States*,
    699 F. Supp. 300 (1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990) ...........................19

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ...................................................................... 19, 64

## Statutes

19 U.S.C. § 1516a(b) ............................................................................18

19 U.S.C. § 1677-2 ....................................................................... passim

28 U.S.C. §1295(a)(5) ............................................................................2

## Administrative Decisions

*Final Affirmative Countervailing Duty Determination and Countervailing Duty
    Order; Rice from Thailand*,
    51 Fed. Reg. 12,356 (Apr. 10, 1986)................................. 30, 31, 36, 40

*Final Affirmative Countervailing Duty Determination; Live Swine and Fresh,
    Chilled and Frozen Pork Products from Canada*,
    50 Fed. Reg. 25,097 (June 17, 1985)........................................... passim

*Fresh, Chilled, and Frozen Pork from Canada: Final Affirmative Countervailing Duty Determination*, 54 Fed. Reg. 30,774 (July 24, 1989) ............... 36, 37, 38, 39

*Rice from Thailand: Final Results of Countervailing Duty Administrative Review*, 59 Fed. Reg. 8,906 (Feb. 24, 1994) ............................................................. 36, 38

### Legislation

Omnibus Trade and Competitiveness Act of 1988,
Pub. L. No. 100-418, §1313, 102 Stat. 1107 (1988) ............................................22

Technical and Miscellaneous Revenue Act of 1988,
Pub. L. No. 100-647, §9001(4), 102 Stat. 3342 (1988) .......................................22

### Other Authorities

Omnibus Trade and Competitiveness Act of 1988,
H.R. Rep. No. 100-576 (1988) ............................................................................26

133 CONG. REC. 17764 (1987).............................................................. 26, 27, 28, 31

## STATEMENT OF RELATED CASES

This case concerns a U.S. Department of Commerce ("Commerce") original investigation of whether countervailable subsidies were being provided to producers of the subject merchandise. As a result of an affirmative finding, an order was issued. During the pendency of this proceeding two administrative reviews were completed before Commerce and the results also appealed to the Court of International Trade ("Trade Court"). Specifically, those cases are:

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States*, CIT Co. No. 1:21-cv-00338 and *Agro Sevilla Aceitunas S. Coop. And. et al v. United States*, CIT Co. No. 1:22-cv-106. Those cases are both currently stayed pending the result of the instant appeal as both involve affirmative findings under 19 U.S.C. §1677-2 that is the subject matter of this appeal, and which gave rise to order in the original investigation. As such, these cases are related within the meaning of Fed. Cir. R. 47.5(b).

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. §1295(a)(5), this Court has jurisdiction over

"appeal{s} from a final decision of the United States Court of International Trade."

28 U.S.C. §1295(a)(5).  The Trade Court issued its final judgment in this

proceeding on September 14, 2022 sustaining Commerce's Second Remand

Redetermination.  ASEMESA, Agro Sevilla, and Angel Camacho (collectively

referred to as "ASEMESA") timely filed a notice of appeal to the Trade Court on

November 10, 2022.  As such, this Court has jurisdiction over the instant appeal.

## STATEMENT OF THE ISSUES

This case presents two issues related to a single statutory provision, 19 U.S.C. §1677-2(1).  First, this brief argues that Commerce applied an incorrect interpretation of "substantially dependent" as that term is used in the statute. Second, this brief argues that even if Commerce's statutory interpretation is correct, the analysis proffered in its Second Remand Redetermination in rendering its affirmative "substantially dependent" finding is not supported by substantial evidence.

## STATEMENT OF THE CASE

This is an appeal of Commerce's final determination in the original countervailing duty ("CVD") investigation of Ripe Olives From Spain. The sole issue remaining on appeal is whether Commerce lawfully attributed subsidies received by olive growers to the mandatory respondents. The key procedural events and relevant facts are set forth below.

### A. Commerce's Original Determination That Eight Percent Of Raw Olives Consumed In Table Olive Production Render The Demand For Raw Olives Substantially Dependent On the Demand For Table Olives

On June 18, 2018, Commerce published its final determination in the CVD investigation of Ripe Olives from Spain. Appx000265-000268. In a separate memorandum, Commerce presented its individual findings and rationales, concluding, *inter alia*, that the two conditions set forth in 19 U.S.C. §1677-2 were satisfied, permitting it to presume that subsidies received by growers of raw olives were received by table olive processors. Appx000274. In terms of the first condition under 19 U.S.C. §1677-2(1), Commerce affirmed findings made in a memorandum accompanying its preliminary determination where it found that, even though the vast majority of raw olives were consumed to produce oil, because 8 percent of raw olives were consumed in the production of table olives, "the demand for these unprocessed, raw olives, is 'substantially dependent' on the

demand for table olives, including ripe olives, in accordance with section 771B(1) of the Act." Appx010617; Appx000289.

On appeal, the Trade Court remanded Commerce's "substantially dependent" finding under 19 U.S.C. §1677-2(1) for further consideration by the agency, concluding that it was contrary to the unambiguous meaning of the statute and congressional intent. *Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States*, 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020), Appx000242-000243 ("*ASEMESA I*").

## B.    Commerce's First Remand Redetermination And Self-Fulfilling Reading Of The Statute

In remand proceedings following *ASEMESA I*, Commerce reopened the record and collected new information from interested parties. As part of the remand proceedings, information was placed on the record and arguments made by ASEMESA. Certain of the submitted information demonstrated that, in additional to an independent olive oil line of production, two independent lines of production exist from the raw olive stage to distinct ripe and green table olive products, and that green table olive production was larger than ripe table olive production. *See* Appx011607-11724; Appx011790-011791.

On the basis of the expanded record, Commerce reconfigured its analysis under 19 U.S.C. §1677-2(1). First, it created a simple market construct, finding that "certain olive varietals are grown for producing table olives, other olive

varietals are grown as mill olives to be used to produce olive oil, and other olive

varietals can be used for either purpose (so-called 'dual-use' olives)."

Appx000145.  Second, utilizing its new construction of the market and relying on

category-based volume data for table and mill olives that do not distinguish dual-

use olives or identify any specific varietal of olive, Commerce concluded that "the

demand for raw olive varietals principally suitable for use in the production of

table olives (which includes 'table olive' varietals and 'dual-use' varietals) is

substantially dependent on the demand for processed table olives."  Appx000146.

In *ASEMESA II*, the Trade Court again rejected Commerce's "substantially

dependent" finding under 19 U.S.C. §1677-2(1), ruling that Commerce's definition

of the "prior stage product" as those olives "principally suitable" for table olive

production would impermissibly "render the requirements of Section 1677-2

largely self-fulfilling," causing "the statute as a whole to become superfluous."

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United

States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021), Appx000112 ("*ASEMESA II*").

As a result, the Trade Court remanded the redetermination to Commerce for further

consideration.  The Trade Court did not address any other substantive arguments

raised by ASEMESA.  Appx000113-000114.

**C.    Commerce's Second Remand Redetermination And Purported "Varietal Analysis"**

In a second round of remand proceedings, Commerce expanded its analysis under 19 U.S.C. §1677-2(1).  First, it retained its basic market construct focused on table, mill and dual-use categories of raw olives and re-emphasized the basis upon which it found these categories of olives to exist and be utilized in the market.  Specifically, Commerce found that "table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing season."  Appx000077-000078.  According to Commerce dual-use olives grown for table applications "are not interchangeable" with dual-use olives grown for oil applications.  Appx000091.  This conclusion was based on various findings that oil content, cultivation practices, and market prices make cross-purposing olives grown for table applications "less economically viable."  Appx000084-000085 (Second Remand Redetermination at 58-59).

Second, Commerce purported to engage in a varietal-specific analysis within its basic market construct, identifying the five main varietals used for table olive production based on varietal-specific data published by Spain's Ministry of Agriculture Food Information and Control Agency ("AICA") for the 2016/2017 harvest season.  The data were published in a report entitled "Report by AICA on

the Market of Olive Oil and Table Olives." Appx000056. The data were as

follows:

| Varietal | Metric Tons |
|----------|-------------|
| Manzanilla | 137,290 |
| Gordal | 41,250 |
| Hojiblanca | 290,850 |
| Cacereña | 45,420 |
| Carrasqueña | 57,340 |
| Other | 24,700 |
| **TOTAL** | **596,110** |

Appx011639-011645. The AICA report shows the data as "production" within a

column of a broader self-reconciling table showing beginning and ending stocks.

*Id.* The data are further confirmed as data on the volume of these specific varietals

consumed to produce table olives within a separate table of the same AICA report,

which shows distinct production of ripe and green table olives. Production of

596,110 tons shown in the varietal-specific data corresponds to production of

358,220 tons of green and 237,900 of ripe olives, which also totals 596,110.

Appx011657.

Commerce identified manzanilla, gordal, and carrasqueña as table olive

varietals, while hojiblanca and cacereña, which constituted more than half of the

reported AICA volume, were identified as dual-use varietals. Appx000056.

Commerce found that manzanilla, gordal, and carrasqueña are only fit for table

olive production. Appx000056-000057. Other information placed on the record

by ASEMESA demonstrated that manzanilla and gordal were used in oil applications. Appx011617-011621. The record also showed that the carrasqueña varietal was identified as a "mixed use" olive in government documentation that Commerce relied upon to draw dividing lines between table, mill, and dual-use varietals. Appx011140-011141; Appx010995-010997. Commerce recognized that "mixed use" referred to dual-use category olives. Appx000090. The arbequina varietal, a mill category olive, was also shown to have table olive applications. Appx011617; *see also* Appx011720-011724. At verification in the original investigation, Commerce otherwise learned that "some varieties of olives can be used to produce both table olives and olive oil, and that the farmer will decide for which production the olive will be used based on current market conditions." Appx010637. Petitioner Musco also conceded that "a table olive grower faced with substandard olives will generally choose to keep that fruit on the trees for a later harvest, enabling late-season adjustments in irrigation and handling to maximize oil content." Appx010704.

The AICA data show the volume of dual-use hojiblanca and cacereña comprise more than half of all table olive production. The data were consistent with hectare information published by the Government of Spain showing that dual-use hectares were larger than table hectares:

| Category | Hectares |
|----------|----------|
| Table Olives | 76,120 |
| Dual Purpose | 113,674 |
| Olive Oil Olives | 2,543,827 |

Appx011224.  Commerce also conceded that dual-use varietals like hojiblanca would be accounted for not only in the dual-purpose hectare category, but also the olive oil olives category, noting in particular that hojiblanca was associated with at least 265,000 hectares.  Appx000090-000091.

Although Commerce had the AICA varietal-specific consumption data from which to perform its intended varietal-specific analysis, it claimed the AICA data only reported the volume of varietals grown for table olives, but not used for table olive production, and therefore were not suitable.  Appx000078.  On this basis, it continued to rely on category-based data for table and mill olives that do not provide any breakdown by varietal or the dual-use category, but also show substantial volumes of table and mill raw olives being cross-purposed in table and oil applications.  Appx000078-000079.  Those data for 2016, 2017 and 2018 are as follows:

| Harvest 2016 | | | |
| --- | --- | --- | --- |
| | Total Production (Tons) | Industrial Use (Tons) | |
| | | Table Olives | Mill Olives |
| Table Olives | 511,122 | 492,244 | 18,878 |
| Mill Olives | 6,571,428 | 90,404 | 6,481,024 |

| Harvest 2017 | | | |
| --- | --- | --- | --- |
| | Total Production (Tons) | Industrial Use (Tons) | |
| | | Table Olives | Mill Olives |
| Table Olives | 505,046 | 344,147 | 160,899 |
| Mill Olives | 6,044,453 | 226,148 | 5,818,305 |

| Harvest 2018 | | | |
| --- | --- | --- | --- |
| | Total Production (Tons) | Industrial Use (Tons) | |
| | | Table Olives | Mill Olives |
| Table Olives | 555,033 | 431,898 | 123,135 |
| Mill Olives | 9,264,536 | 172,208 | 9,092,328 |

Appx011241.

Commerce relied on the 2016 category-based data for purposes of its analysis under 19 U.S.C. §1677-2(1), which show 582,648 tons of table (492,244 tons) and mill (90,404 tons) category olives were used to produce table olives. Commerce used this figure as the base for the numerator in a consumption ratio calculation to determine whether demand for the "prior stage product" was "substantially dependent" on demand for the "latter stage product" under 19 U.S.C. §1677-2(1). In utilizing these data, Commerce made four significant assumptions and adjustments:

*First*, Commerce assumed that the 492,244 tons of olives used to produce table olives as reflected in its category-based data were comprised of manzanilla,

gordal, carrasquena, and hojiblanca olives that were grown for table olive

production.  Appx000060.

*Second*, Commerce assumed that the 492,244 tons did not include any

volume of the fifth main varietal used in table olive production, dual-use cacereña,

which it claimed to exclude from its analysis based on the conclusion that it lacked

sufficient information on cacereña production and that "the production volume of

cacereña comprises a small percentage of the total volume of olive varietals grown

for table."  Appx000058.  Other record information, however, demonstrated that

cacereña is the main olive varietal in the provinces of Caceres and Badajoz

(Extremadura).  Appx011161.  These provinces account for over 568,000 metric

tons of raw olives on over 287,000 hectares of olive groves overall.  Appx011218;

Appx011237.

*Third*, Commerce assumed that the 90,404 tons of mill olives used to

produce table olives was comprised only of dual-use varietals.  Appx000059.

*Fourth*, in an attempt to isolate dual-use hojiblanca volume and exclude

cacereña and other assumed dual-use varietals in the 90,404 tons of mill category

olives, Commerce relied on the AICA data and found it "reasonable to infer that

the percentage of dual-use varietals grown for table olives on a varietal-by-varietal

basis is the same as the percentage of dual-use varietals grown for mill."

Appx000059-000060.  Using ratios derived from the AICA data, it deducted

18,590 tons from the 90,404 mill category olives and assumed the remaining

71,814 tons were hojiblanca tons that it added to the 492,244 table category olives

used to produce table olives. This resulted in a final total numerator amount of

564,058 tons. *Id.*

With respect to the denominator of its analysis, Commerce began with the

564,058 tons calculated for its numerator, to which it added a calculated volume of

hojiblanca used to produce oil. This calculation was performed using record

information on hojiblanca hectares (265,000 hectares), the AICA data on

hojiblanca volume used to produce table olives (290,850 tons), and yield per

hectare data for table (3.19 tons per hectare) and mill category olives (2.93 tons per

hectare). Appx000061. Using these data, Commerce calculated that "509,304 tons

of hojiblanca olives were grown for mill olives during Harvest 2016." *Id.*. This

resulted in a final total denominator of 1,020,426 tons. Appx000062. Because

Commerce claimed to exclude dual-use cacereña from its analysis, it did not

attempt to include any cacereña volume in its denominator. Appx000061-000062.

Using its calculated numerator of 564,058 tons, that Commerce claimed was

only "manzanilla, gordal, hojiblanca, and carrasquena varietals processed into table

olives," Commerce divided by its denominator of "1,020,426 tons of all the

manzanilla, gordal, hojiblanca, and carrasquena varietals" that it claimed "were

produced during Harvest 2016." Appx000062. The calculation resulted in a

consumption ratio of 55.28 percent that Commerce claimed consisted "of the manzanilla, gordal, hojiblanca, and carrasquena varietals {that} were processed into table olives." *Id.* Based on this result, Commerce found that demand for manzanilla, gordal, hojiblanca, and carrasquena varietals—its designated prior stage product—were "substantially dependent" on the demand for processed table olives, the latter stage product, within the meaning of Section 19 U.S.C. §1677-2(1). *Id.*

As part of the second remand proceeding, ASEMESA repeated arguments from the first remand proceeding that the record showed that two independent lines of production existed from the raw olive stage to distinct ripe and green table olive products, that green olive production was greater than ripe olive production, and that Commerce was required to address these facts in relation to the statutory need to demonstrate a single continuous line of production under Section 19 U.S.C. §1677-2(1). Appx011844.

On November 3, 2021 Commerce filed its second remand redetermination with the Trade Court. On September 14, 2022, the Trade Court issued its third opinion, upholding Commerce's affirmative "substantially dependent" finding under 19 U.S.C. §1677-2(1). *Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022), Appx000024 ("*ASEMESA III*"). In a single footnote of that opinion, the

Trade Court summarily dismissed ASEMESA's arguments regarding the existence of two independent lines of production that existed from the raw olive stage to distinct ripe olive and green olive products, finding that that there was "no statutory basis for this alleged requirement."  Appx000019.

On November 10, 2022, ASEMESA filed their notice of appeal with the Trade Court, commencing this action.

## SUMMARY OF THE ARGUMENT

Commerce's second remand redetermination is flawed in two important ways.  First, Commerce misapplied the standard for "substantially dependent" established by Congress in 19 U.S.C. §1677-2(1).  The legislative history of the provision is extremely clear regarding the nature and level of dependence required between the "prior stage" and "latter stage" products before 19 U.S.C. §1677-2(1) can be affirmatively triggered.  Commerce, however, relied on post-codification administrative decisions to apply a lower standard.  This approach is legally incorrect.  Commerce's decisions must be gauged against the standard laid out in the unambiguous statute and not against its own later decisions.  Permitting otherwise would frustrate the core tenets of U.S. administrative law and allow Commerce to amend legislation through its own administrative process.  Such a result is inherently unlawful and must be reversed.

Second, Commerce failed to support its determination with substantial evidence and engaged in arbitrary decision-making.  After Commerce's initial determination was remanded Commerce adopted an analytical framework that attempted to narrow the universe of the "prior stage product".  That shift, however, and the market construct Commerce adopted, cannot be reconciled with the record.  Commerce's primary error was its rigid approach to the link between the varietal of olive grown, or how it was grown, and its end-use (i.e. whether a specific

- 16 -

varietal was dedicated to table olive or olive oil production).  Commerce's finding that olives were only used for one application or another was contradicted by qualitative evidence, as well as Commerce's own quantitative evidence used to perform its analysis.  The quantitative evidence showed very large volumes of olives grown for table applications being used to make olive oil, and very large volumes of olives grown for oil applications used to make table olives.  Commerce was thereby forced to apply assumptions and make adjustments in its analysis that were either facially and unreasonably biased or that flatly contradicted its view of the market so that it could achieve a computational result that would sustain an affirmative "substantially dependent" finding under its flawed interpretation of the statute.  The result was an analysis not supported by substantial evidence.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews decisions of the Trade Court *de novo* and will "review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International applied in reviewing the administrative record." *Peer Bearing Co. v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014) (citation omitted). Thus this Court will review the Commerce's determination in order to discern whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" and "shall hold unlawful any determination" that fails to meet that standard. 19 U.S.C. §1516a(b)(1)(B)(i).

"Substantial evidence is defined as 'more than a mere scintilla.'" *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)). Any conclusion made by Commerce must be supported by "evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" *Id.* Additionally, Commerce must support its views with "evidence which could reasonably lead to the {the agency}'s conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). These authorities confirm that "substantial evidence review exists precisely to ensure that . . . {the agency} achieves minimal compliance with this

obligation, which is the foundation of all honest and legitimate adjudication."

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378-79 (1998).

In the context of antidumping and countervailing duty proceedings

Commerce's determinations are entitled to "{s}ome degree of deference." *Smith-*

*Corona Group, Consumer Products Div., SCM Corp. v. United States*, 713 F.2d

1568, 1576 (Fed. Cir. 1983). That deference does not, however, result in a weaker

standard of review. A reviewing court must perform its review based on the

"record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351

(Fed. Cir. 2006) (*citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78

(1951)). "The 'whole record' means that the Court must consider both sides of the

record. It is not sufficient to merely examine the evidence that sustains the

agency's conclusion." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (1988),

*aff'd*, 894 F.2d 385 (Fed. Cir. 1990) (*citing Universal Camera*, 340 U.S. at 474).

The reviewing court, in addition to considering the evidence upon which the

agency did rely, must also "take into account whatever in the record fairly detracts

from its weight." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44

F.3d 978, 985 (Fed. Cir. 1994) (*quoting Universal Camera*, 340 U.S. at 488);

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

In addition to basing its findings on the record evidence as a whole,

Commerce must provide a reasoned explanation of its determinations. Commerce's

decision must articulate "a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Fundamentally, an agency's decision is unsupported by substantial evidence where the agency "fail{s} to consider an important aspect of the problem, {or} offer{s} an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, failure to address an important counter argument at all will result in a decision that is unsupported by substantial evidence. *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 846 (Fed. Cir. 2020) (noting that a remand was appropriate where Commerce failed to address respondent's counter arguments).

Commerce must also refrain from treating similar situations differently without explanation in rendering a determination. Indeed, "{a} federal agency 'can be said to be at its most arbitrary' when it 'treat{s} similar situations dissimilarly." *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021) (*quoting Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983)); *see also SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

With respect to an agency interpretation of a statute the Court will determine "whether Commerce's interpretation of the statute is in accordance with law, doing

so within the two-step framework established in Chevron." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016). Under *Chevron*, "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984). In discerning that intent the Court will use traditional tools of statutory interpretation which "include the statute's structure, canons of statutory construction, and legislative history." *Timex V.I. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). The Court will only defer to an agency interpretation of a statute if the statutory term is ambiguous and "the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

## II.   COMMERCE'S FRAMEWORK FOR ANALYZING SUBSTANTIAL DEPENDENCE IS INCONSISTENT WITH THE STATUTE

This appeal centers on the meaning of "substantially dependent" and its attendant standard under 19 U.S.C. §1677-2(1). As the Trade Court found below, this statutory provision is the product of Congress's 1988 codification of Commerce's analytical approach to subsidy attribution in countervailing duty cases involving certain agricultural products. Articulated and applied in a pair of administrative decisions, Commerce modeled its analytical approach on statutory authority granted to the U.S. International Trade Commission ("ITC"). Congress,

deeming Commerce's special methodology for certain types of agricultural products useful, expressly codified Commerce's practice as part of the Omnibus Trade and Competitiveness Act of 1988. *See* Appx0000243-0000246; s*ee also* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, §1313, 102 Stat. 1107, 1185 (enacting 19 U.S.C. §1677-2); Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, §9001(4), 102 Stat. 3342, 3806 (1988) (making certain formatting amendments).

Thirty years later, in the administrative case that gives rise to this appeal, Commerce utilized this statutory provision to attribute olive grower subsidies to downstream processors of table olives in a manner inconsistent with the statutory grant. Through an unlawful interpretation of the meaning of "substantially dependent", as that term is used in 19 U.S.C. §1677-2(1), and a flawed market analysis, Commerce found that it was appropriate to presume that subsidies provided to olive growers are received by table olive processors, a minor end-use for olives grown in Spain.

The Trade Court remanded Commerce's methodology and interpretation of "substantially dependent" twice as inconsistent with the statute before sustaining the remand redetermination that gives rise to this proceeding. Throughout his rulings, Judge Katzmann observed that traditional tools of statutory interpretation, including legislative history, reveal an unambiguous statute. Appx000243 ("{t}he

legislative history of Section 1677-2(1) illuminates Congress's unambiguous intent for the meaning of "substantially dependent.""). ASEMESA agrees with that legal conclusion, but in the course of the remand proceedings considering Commerce's deeply flawed market analysis, the Trade Court applied a lower standard for "substantially dependent" than the one codified in 1988, improperly relying on post-codification agency practice to interpret the relevant statutory term. Even accepting Commerce's flawed market analysis, utilizing a statutorily-correct standard demonstrates that Commerce's "substantially dependent" finding is unlawful and the Trade Court's affirmance of that analysis must be reversed.

## A.     The Meaning of 19 U.S.C. §1677-2(1) is Clear Under *Chevron* Step-One

The central issue in this case is agency interpretation of a statutory provision. Specifically, what circumstances render demand for a "prior stage product" "substantially dependent" on demand for a "latter stage product" within the meaning of 19 U.S.C. §1677-2(1)? In its initial determination, Commerce found it appropriate to exercise its authority under 19 U.S.C. §1677-2 to attribute olive grower subsidies to table olive processors because eight percent of raw olive production was consumed in the production of table olives. Appx010617 (Preliminary IDM at 16); Appx000289 (Final IDM at 21). With respect to its statutory analysis Commerce stated that "nothing in the legislative history or the

language of the statute precludes such an interpretation." Appx000292 (Final IDM at 24). Commerce's implementation of the statute was unlawful. The jurisprudence surrounding *Chevron* is implicated. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843.

The statutory provision at issue states as follows:

In the case of an agricultural product processed from a raw agricultural product in which—

(1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and

(2) the processing operation adds only limited value to the raw commodity,

countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

*See* 19 U.S.C. §1677-2. Of particular import to this case is subsection (1), which contains the key provision for establishing the connection between the prior and latter stage products that allows Commerce to attribute subsidies received by growers of raw agricultural products to downstream processors of those products. This provision queries whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product." 19 U.S.C. §1677-2(1). As demonstrated below, Commerce's interpretation of that provision

and the Trade Court's analysis of that interpretation diverge from the unambiguous meaning of the statutory text.

In the Trade Court's first decision, *ASEMESA I*, the Trade Court performed a *Chevron* analysis. Appx000240-000246. First, the Court offered a lengthy discussion of the plain meaning of "substantially and dependent", resorting to dictionary definitions consistent with traditional tools of statutory construction. Appx000241-000243. Ultimately, the Court found this formulation to mean "largely but not wholly contingent". Appx000242 (citing the Merriam Webster Online Dictionary).

In addition, the Trade Court considered the legislative history accompanying the passage of the Senate Amendment that would become 19 U.S.C. §1677-2. Consideration of legislative history is included among the traditional tools of statutory interpretation that undergird *Chevron* step-one. *See Timex V.I.*, 157 F.3d at 882 ("{b}eyond the statute's text, those 'tools' include the statute's structure, canons of statutory construction, and legislative history."); *see also Oshkosh Truck Corp. v. United States*, 123 F.3d 1477, 1481 (Fed. Cir. 1997) (relying *inter alia* on legislative history to analyze the purpose of a statutory term). Specifically, the Trade Court noted statements by sponsors of the amendment, Senators Baucus and Grassley. Appx000243-000244. The Court found that "{t}he legislative history of Section 1677-2(1) illuminates Congress's unambiguous intent for the meaning of

'substantially dependent.'" Appx000243.  As such, the Trade Court found the

statute unambiguous under *Chevron* step-one.

The legislative history surrounding 19 U.S.C. §1677-2 is incredibly precise

on the question of the standard for "substantially dependent."  In addition to

describing general policy objectives, as is typical of floor statements[1], the Senators

specifically identified the Commerce practice they were seeking to codify,

including the two administrative determinations that deliberately and exhaustively

articulated that practice.  As this Court has stated, "the principle of legislative

ratification is well established.  In the case of a widely known judicial decision or

agency practice, Congress is presumed to be aware of an administrative or judicial

---

[1] ASEMESA acknowledges that "floor statements by individual legislators rank
among the least illuminating forms of legislative history" and are typically
afforded the least weight in discerning Congress's intent through legislative
history. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017).  Here, however,
Senator Baucus' statement makes clear that the reason the legislative history
associated with this provision is found in a floor debate is because the Trade Court
ruling that necessitated the legislative change was issued after the Finance
Committee had concluded its markup of the underlying bill and the only way to
insert the provision was through an amendment offered on the floor.  133 CONG.
REC. 17764 (1987) (Statement of Sen. Baucus).  In addition, Senator Grassley, an
acknowledged expert on trade issues in the Congress, also spoke on the
amendment offering the same rationale put forward by Senator Baucus. *Id.* at
17765 (Statement of Sen. Grassley).  As a result, ASEMESA ask this Court to
view this legislative history as persuasive as to the Congressional intent despite the
fact that the official Committee Report states only that "{t}he Senate amendment
codifies and clarifies Commerce practice by adding a new provision . . . relating to
certain subsidies on processed agricultural products." Omnibus Trade and
Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 588 (1988).

interpretation of a statute." *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732,

739 (Fed. Cir. 2011)[2] (*quoting Lorillard v. Pons*, 434 U.S. 575, 580 (1978)); *see*

*also In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1280 (Fed. Cir. 2015).  Here,

no presumption is required.  The Senators were deeply familiar with the issue.

　　　Mr. Baucus began his introduction of the amendment that would become 19

U.S.C. §1677-2 by explicitly invoking the Trade Court's decision in *Canadian*

*Meat Council v. United States,* stating:

> in determining the degree of countervail that should be assessed against the hog imports into the United States as well as pork {the Trade Court} ruled that it is proper for the Department of Commerce to find the amount of subsidy that Canada provides for hog producers, but, unfortunately, improper for the processing industry, saying that the U.S. Court of International Trade simply did not have the statutory authority to allow the Department of Commerce to go ahead and proceed and find the level of that subsidy.

> The court went on to volunteer that even though it did not have the statutory authority, perhaps it was a problem that the Congress could solve.

> That is the point of this amendment.

133 Cong. Rec. 17764 (1987) (Statement of Sen. Baucus).  Senator Grassley also

spoke in support of the amendment, stating:

> <u>the rule codified in the proposed amendment</u> . . . was most recently applied in the final affirmative countervailing duty determination: Live swine and fresh chilled, and frozen pork products from Canada, 50 FR 25097, and in the final affirmative countervailing duty determination and countervailing duty order: Rice from Thailand, 51

---

[2]  The Court's decision was later superseded by statute.  *GPX Int'l Tire Corp. v. United States*, 678 F.3d 1308 (Fed. Cir. 2012).

> FR 12356. Under the rule, duties would be imposed on the processed
> product when first the processing operation added relatively little
> value-added to the product; and second, where the demand for the raw
> product was dependent upon the demand for the processed product.

133 CONG. REC. 17765 (1987) (Statement of Sen. Grassley) (emphasis added). In

addition to invoking two Commerce administrative decisions by their specific

*Federal Register* citation, the balance of Sen. Grassley's statement goes on to

discuss the Trade Court's ruling in *Canadian Meat Council*. As a result of these

direct statements, the two administrative decisions and the Trade Court's opinion

in *Canadian Meat Council* are part of the legislative history and reflect Congress'

understanding of the practice that they were codifying. Those documents reveal

that the standard codified by Congress for establishing "substantially dependent" is

very different from the one Commerce applied in the proceeding challenged here.

In *Live Swine and Fresh, Chilled and Frozen Pork Production from Canada*,

the administrative decision underlying *Canadian Meat Council*, Commerce found

that it was appropriate to attribute subsidies provided to hog farmers to pork

processors selling fresh, chilled, and frozen pork products at wholesale. *Final

Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled

and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097, 25,100 (June 17,

1985) ("*Pork from Canada*"). In analyzing whether attribution was appropriate,

Commerce stated that "{t}he salient criterion is the degree to which the demand for

the prior stage product is dependent on the demand for the latter stage product."

*Pork from Canada* at 25,098.  Commerce elaborated on the question of "degree" contemplated in its dependence analysis, contrasting the demand linkage in various stages of the mining, steelmaking, and further manufacturing processes:

> steelmakers' demand for sifted iron ore determines the iron ore sifter's demand for mined iron ore. However, it cannot be said that automakers' demand for steel determines the steelmakers' demand for iron. In the first example, the demand for the prior stage good is derived <u>almost exclusively</u> from the demand for the latter stage; in the second example it is not.

*Pork from Canada* at 25,098 (emphasis supplied).  According to Commerce, the role of the processor was paramount, citing examples where the prior stage product was "of little use to anyone" but the processor.  *Id*.

In discussing its analytical framework, Commerce also borrowed concepts from an analogous provision governing injury where the ITC considered whether a product entered "a single continuous line of production resulting in one end product."  *Pork from Canada* at 25,099 (internal citations omitted).  Commerce further observed that the ITC's approach had been upheld by the Trade Court in a narrow circumstance because "{t}he logic of the legislative concern . . . extends only to agricultural products which are <u>completely devoted to the production of the more advanced product</u> under investigation."  *Id.* (quoting *American Grape Growers v. United States*, 604 F. Supp. 1245, 1247-48 (Ct. Int'l Trade 1985)) (emphasis supplied).  It is clear that Commerce incorporated a high standard where the demand for the prior stage product was "almost exclusively" or "completely

devoted to" demand for the downstream processed product and expected to find these types of demand conditions in situations where there was a "single continuous line of production."

In applying these concepts to the live swine industry, Commerce found that "{s}ubstantially all of the raw agricultural product, live swine, is dedicated to the production of unprocessed pork. *Pork from Canada* at 25,099 (emphasis supplied). Commerce further noted that "{t}he demand for the slaughtered and quartered swine is by far the predominant determinant of the demand for live swine." *Id.* (emphasis supplied). Commerce also found that "{t}he primary, if not the sole, purpose of all segments of the industry in this case is to produce a single end product–pork meat. *Id*. (emphasis supplied).

The close ties required in Commerce's analysis were confirmed by its later determination in *Rice from Thailand*, the second administrative determination referenced in Senator Grassley's statement. In that case, Commerce determined to attribute subsidies received by rice farmers to downstream rice millers. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Rice from Thailand*, 51 Fed. Reg. 12,356, 12,358 (Apr. 10, 1986) ("*Rice from Thailand*"). Invoking the standard articulated in *Pork from Canada*, Commerce observed that,

> {t}he primary, if not sole, purpose of all segments of the industry in this case is to produce a single end product—milled rice. Almost all of

> the raw agricultural product, paddy or unmilled rice, is dedicated to the production of milled rice. There is a single, continuous line of production from paddy rice to milled rice.

*Rice from Thailand* at 12,358 (emphasis supplied).  As with the swine case and Commerce's earlier example of the coal sifter, there was no further-processing industry in Thailand consuming paddy rice other than producers of milled rice to whom the subsidies were attributed.

The Trade Court, in an appeal of the *Pork from Canada* decision, found that this new practice had no home in the statute governing Commerce's authority. Specifically, the Court found that the "legislative history make no mention of distinctions to be drawn between products which are agricultural in nature and products which result from a process of manufacture." *Canadian Meat Council v. United States*, 661 F. Supp. 622, 628 (Ct. Int'l Trade 1987).  Further, the Trade Court invited Congress to close the statutory gap stating "{i}f the statutory approach to upstream subsidies is inadequate, it is not the role of Commerce or the Court, but of Congress to remedy any deficiency." *Id.* at 629.  In his remarks introducing the amendment that would become 19 U.S.C. §1677-2, Senator Baucus noted he was taking the Trade Court up on the offer by rehabilitating the practice underlying the *Pork from Canada* decision through legislation codifying the practice the Trade Court had reversed.  133 Cong. Rec. 17764 (1987) (Statement of Sen. Baucus).

As a result of Congress's clear familiarity with both the policy issue and the specific Commerce practice surrounding subsidy attribution in certain agricultural product cases, this Court is presented with a straightforward *Chevron* step-one analysis. That analysis is aided by *Pork from Canada* and *Rice from Thailand*, with a particular focus on the very deliberate and exhaustive discussion of this issue in *Pork from Canada*. These administrative decisions reveal an analysis centered around a narrow type of industry where the demand for the prior stage product and the market for the latter stage product are inextricably linked through a single continuous line of production that causes prior stage product demand to be "substantially dependent" on latter stage product demand. Commerce's initial determination failed to apply that standard, as the Trade Court recognized. In examining and upholding Commerce's second remand redetermination, however, the Trade Court erroneously relied on Commerce interpretations of 19 U.S.C. §1677-2(1) that occurred after codification of Commerce's practice as it stood in 1988. As discussed in the following section, such an analysis is inconsistent with the jurisprudence surrounding *Chevron* and thereby led the Trade Court to an erroneous conclusion.

**B.    The Trade Court Erroneously Relied on Post-Codification Administrative Proceedings to Sustain Commerce's Remand Redetermination**

Upon review of the second remand redetermination, the Trade Court ruled that Commerce's new approach to the definition of prior stage product and its refined consumption ratio analysis resulted in a finding that complied with the law. In reaching that decision the Trade Court made certain analytical errors that warrant reversal. The principal error was the Trade Court's reliance on Commerce's practice after codification of 19 U.S.C. §1677-2 as the relevant standard against which to test the redetermination. Under a *Chevron* step-one analysis the agency's prior practice is irrelevant to whether it has complied with the statute. Such an analysis is reserved for situations where a court is performing a *Chevron* step-two analysis. Here, despite finding that the statute was unambiguous under *Chevron* step-one, the Trade Court nonetheless considered Commerce's post-codification practice in determining whether its interpretation of the statute was lawful. This approach effectively ignored the Trade Court's initial finding that the statute was clear under a *Chevron* step-one analysis. Appx000243 (finding that the legislative history revealed an unambiguous intent that was consistent with the statute's plain meaning).

In its opinion upholding Commerce's second remand redetermination the Trade Court stated:

> {i}n light of the plain meaning of the statute and Commerce's
> established past practice, Plaintiffs are not correct that Commerce's
> 55.28 percent consumption ratio cannot reflect substantial
> dependence. Where more than half of a prior stage product is
> dedicated to the production of a latter stage product, demand for the
> prior stage product is largely but not wholly dependent on the latter
> stage product.

Appx000019 (emphasis supplied) (internal citations omitted). Here, and as discussed further below, the Trade Court appears to have erroneously seized upon language from post-codification practice that shed no light on the appropriate interpretation of 19 U.S.C. §1677-2.

Once a practice is codified, a subsequent interpretation by the agency cannot change the meaning of the provision. That would frustrate the entire purpose of the *Chevron* analysis and delegate authority over the meaning of an unambiguous statutory provision to the agency it is meant to bind. *Chevron*, 467 U.S. at 843 ("the agency, must give effect to the unambiguously expressed intent of Congress"). An agency interpretation cannot change the unambiguous meaning of a statutory provision any more than a subsequent Congress can without an actual change in the statutory language. It is well-established that "the view of a later Congress cannot control the interpretation of an earlier enacted statute." *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1354 (Fed. Cir. 2001) (*quoting O'Gilvie v. United States*, 519 U.S. 79, 90 (1996)); *see also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758 (1979) (holding that even legislative history accompanying an

amendment to a statute that does not amend the portion of the statute at issue

cannot be relied on for interpretation).  The Trade Court's finding, however,

expressly relies on Commerce's post-codification practice for its finding that

Commerce's statutory interpretation was correct in violation of these key

administrative law principles.

In its initial opinion, the Trade Court examined the text of 19 U.S.C. §1677-

2 and the legislative history discussed in the foregoing section and determined that

"Commerce impermissibly applied an interpretation of Section 1677-2(1) that

deviated from the plain language and Congress's unambiguous intent.  In short,

Commerce did not act in accordance with law."  Appx000246.  Under *Chevron*

step-one, the Trade Court's analysis should have ended there.  *Chevron*, 467 U.S.

at 843 ("{i}f the intent of Congress is clear, that is the end of the matter").  The

Trade Court, however, continued its analysis examining Commerce's practice

through the lens of two later Commerce determinations.  Normally, such *dicta*

would not be an issue since the basis for the Trade Court's initial ruling was firmly

grounded in a sound *Chevron* step-one analysis and the practice from two

administrative decisions that was expressly codified by Congress.  Here, however,

the language from the post-codification administrative determinations was relied

on by the Trade Court in its findings concerning the second remand

redetermination.  The effect was to inject elements of agency practice into a pure

issue of statutory interpretation, thus abrogating the Court's responsibility to say "what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

The Trade Court's post-codification analysis from its initial opinion begins with its statement that "Commerce made similar determinations regarding pork and rice after the enactment of Section 1677-2." Appx000246 (citing *Fresh, Chilled, and Frozen Pork from Canada: Final Affirmative Countervailing Duty Determination*, 54 Fed. Reg. 30,774 (Dep't Commerce July 24, 1989)[3]; *Rice from Thailand: Final Results of Countervailing Duty Administrative Review*, 59 Fed. Reg. 8,906 (Dep't Commerce Feb. 24, 1994)[4]). The Trade Court noted that Commerce applied the substantial dependence test in *Rice from Thailand 1994* and found that "substantially all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice." Appx000247. That formulation was consistent with the pre-codification cases. *See Pork from Canada* at 25,099 (finding that "{t}he demand for the slaughtered and quartered swine is by far the predominant determinant of the demand for live swine); *see also Rice from Thailand* at 12,358 ("{a}lmost all of the raw agricultural product, paddy or unmilled rice, is dedicate to the production of milled rice.").

---

[3] This determination was referred to as "*Pork from Canada 1989*" by the Trade Court and is referred to in the same manner in this brief.

[4] This determination was referred to as "*Rice from Thailand 1994*" by the Trade Court and is referred to in the same manner in this brief.

In analyzing, *Pork from Canada 1989*, however, the Trade Court cited the following line from the administrative decision "{s}wine producers raise most swine for slaughter.  Pork constitutes the primary product of the slaughtered pig.  Thus, the demand for pork and for live swine are inextricably linked." Appx000247(citing *Pork from Canada 1989* at 30,775).  The Trade Court then stated that, in the context of the instant case, "Commerce deviated from its past interpretation of 'substantially dependent,' it previously found to include most or at least half of the demand of the raw agricultural product."  *Id.* (citing *Pork from Canada*; *Rice from Thailand*; *Pork from Canada 1989*; *Rice from Thailand 1994*).  The only place where the word "most" appears is in *Pork from Canada 1989*, a post-codification case.  The phrase "at least half" is entirely absent from any of the material considered by the Trade Court much less the statute, or the legislative history.  This subtle shift is important because the Trade Court ultimately applied an "at least half", or perhaps "more than half", standard in upholding Commerce's second remand redetermination.

In the second remand redetermination, Commerce significantly altered its analysis of the Spanish olives market and found that demand for certain varietals of raw olives are substantially dependent on demand for table olives on the basis that "that 55.28 percent of the manzanilla, gordal, hojiblanca,and carrasquena varietals were processed into table olives."  Appx000062.  The Trade Court affirmed that

determination based on its prior determination that "19 U.S.C. § 1677-2 requires a

finding of substantial dependence where the demand for raw olives is 'largely, but

not wholly,' 'contingent' on the demand for table olives.'"  Appx000018 (citing

the dictionary analysis in *ASEMESA I* at 21-22, Appx000241-000242).  The Trade

Court further observed that it had "determined that Commerce's practice is to treat

as substantially dependent any raw agricultural product for which at least half of

the demand depends on the relevant latter stage product."  Appx000018 (citing

*Pork from Canada 1989*; *Rice from Thailand 1994*).

On the basis of that analysis the Trade Court affirmed Commerce's revised

market analysis stating:

> Where <u>more than half</u> of a prior stage product is dedicated to the
> production of a latter stage product, demand for the prior stage
> product is largely but not wholly dependent on the latter stage
> product.  Indeed, Commerce has expressly concluded that <u>where</u>
> <u>"most" of a prior stage product is dedicated to the production of a</u>
> <u>latter stage product, demand for each is "inextricably linked"</u> such that
> a finding of substantial dependence is appropriate.

Appx000019 (citing *Pork from Canada 1989*) (emphasis supplied).

The Trade Court's decision did not gauge Commerce's determination for

consistency with the "substantially dependent" standard as codified.  Rather, the

Trade Court applied a standard of "substantially dependent" that was based on its

interpretation of *Pork from Canada 1989*.  *Pork from Canada 1989* was decided

after the statute was amended and has no place in a legal analysis that is based on

*Chevron* step-one.  Further, the concept of "at least half" or "more than half" does not even appear in the *Pork from Canada 1989* decision but seems to be an erroneous adaptation of Commerce's use of the word "most" in that administrative decision.[5]  As discussed further in the following section, the statute and the legislative history call for a more detailed analysis and deeper ties between the prior and latter stage products than what Commerce relied on in its second remand redetermination.  The test applied by the Trade Court in its decision was based on a flawed legal analysis and must be reversed.

---

[5]  A closer reading of *Pork from Canada 1989* indicates that Commerce's "most" statement was just shorthand for the more precise findings found in *Pork from Canada* that Commerce incorporated by reference earlier in the determination. *Pork from Canada 1989* at  30,775 ("{w}e clearly spelled out in Swine our reasons for determining that benefits to hog producers directly benefit pork producers."). Indeed, Commerce in *Pork from Canada 1989* continued to identify a single, continuous line of production.  *Pork from Canada 1989* at 30,775 ("{t}he demand for live swine to be processed further, e.g., into canned ham or sausage, still requires that the live swine first be processed as fresh, chilled, and frozen pork. In this regard, the demand for fresh, chilled, and frozen pork incorporates both the retail customer who demands fresh, chilled, and frozen pork for consumption and the wholesale customer who demands fresh, chilled, and frozen pork for further processing.").  Such a finding is difficult to disentangle from an affirmative conclusion that all or substantially all live swine are dedicated to the production of processed pork.

**C.    Under the Correct Standard Commerce's Remand Redetermination is Inconsistent With the Statute and Therefore Unlawful**

This Court reviews Commerce's decisions *de novo* utilizing the same standard applied by the Court below.  As a result, the central question to deciding the legal issue addressed in this section centers on this Court's analysis of the meaning of "substantially dependent" in the context of 19 U.S.C. §1677-2(1).  This Court will make its own judgment about whether it is appropriate to make a determination under *Chevron* step-one or *Chevron* step-two and ultimately decide what standard to apply.

As discussed in section II.A, ASEMESA's position is that the Trade Court was correct to find that the meaning of the provision was clear from the text of the statute and associated legislative history.  Appx000242-000243.  The legislative history is precise and describes an attribution test that requires a high degree of connection between the "prior stage product" and the "latter stage product."  There are two key concepts that come from those determinations.  First, the prior and latter stage products must be part of a "single continuous line of production".  Second, "all or substantially all" of the demand for the prior stage product must be driven by demand for the latter stage product.  *Pork from Canada* at 25,098; *Rice from Thailand* at 12,358.  These concepts are mutually reinforcing and identify a

specific character and level of dependence between the prior and latter stage

products.

Commerce's theoretical discussion about the steel industry is especially

instructive in this situation.

> Steelmakers' demand for sifted iron ore determines the iron ore
> sifter's demand for mined iron ore. However, it cannot be said that
> automakers' demand for steel determines the steelmakers' demand for
> iron. In the first example, the demand for the prior stage good is
> derived <u>almost exclusively</u> from the demand for the latter stage; in the
> second example it is not.

*Pork from Canada* at 25,098 (emphasis supplied).  It is thus clear that the test that

Congress codified in 1988 was designed to attribute subsidies received by growers

of a raw agricultural product to processors of a downstream, "latter stage" product

only in instances, as a threshold matter, where the downstream consumption level

is significantly more than half (i.e., "all" or "substantially all").  In Commerce's

hypothetical it is only the relationship between the iron sifter and the iron miner

that warrants application of 19 U.S.C. §1677-2.  Moreover, a review of the relevant

legislative history reveals that purely focusing on the level of use fails to account

for the underlying structure of the market which is a necessary part of the test.

While an iron miner only has one kind of customer, i.e. an iron sifter, a steelmaker

might sell to other industries.  Thus, not only must the market be characterized by

all or substantially all of a prior stage product being consumed by a latter stage

product, that level of consumption must be dictated by a dependence on demand

for the latter stage product. The statute does not refer to substantial use, it refers to

substantial *dependence*. In the context of this analysis, that means that the prior

stage product must be suited for little else, a concept embodied in the existence of

a single continuous line of production.

1.  **Table Olives Do Not Account for All or Substantially All of the Consumption of Olive Varietals That Commerce Determined Are Suited for Table Olive Production**

Applying this test to Spanish olives reveals an industry that does not meet

the attribution standard set forth in 19 U.S.C. §1677-2. As discussed in the

statement of facts, there are two primary end uses for olives in Spain. Olives are

either used for olive oil production or they are used for the production of table

olives (which itself has two independent lines of production from the raw stage).

Here, Commerce initially examined the growing industry as a contiguous whole

and found an eight percent overlap between raw olives produced and that portion

of raw olives used to produce table olives. Appx000289-000291 (Final IDM at 21-

23). As a result of the Trade Court's remand, Commerce revised this calculation to

focus only on a certain subset of varietals of olives that it declared suitable for the

production of table olives. Appx000141-000146. After one further remand to

correct issues in defining the "prior stage product," Commerce found that 55.28

percent of "raw olive varietals principally suitable for use in the production of table

olives (which includes 'table olive' varietals and 'dual-use' varietals)" were

consumed in the production of table olives.  Appx000056, Appx000062.

ASEMESA argued below that, even assuming Commerce's market analysis

was supported by substantial evidence and not otherwise arbitrary, the result still

failed to meet the threshold for invoking 19 U.S.C. §1677-2.  And as discussed

above, the Trade Court's finding that more than half was a sufficient quantitative

legal criteria is based on a flawed *Chevron* step-one analysis and thus is not an

accurate exposition of the threshold codified in 1988.

### 2. Commerce's Analysis of the Olive Market in Spain Failed to Establish Demand Dependence Required By The Statute

In addition to the simple quantitative deficiency of Commerce's analysis,

Commerce fundamentally misconstrued the key question presented by 19 U.S.C. §

1677-2(1).  Specifically, Commerce found that "an analysis of consumption ratios

is a reasonable method to determine whether section 771B(1) of the Act is satisfied

because the concept of demand hinges on use."  Appx000085.  This position

ignores the statute's terms.  The statutory term "dependent" has meaning, both in

plain terms, the history of Commerce practice, and ultimate codification of that

practice by Congress.  The notion of something that is dependent or "contingent"

suggests a unitary capacity of use—that a prior stage product would not exist but

for demand for the latter stage product.  That is the very definition of "dependent."

This construction has further support in the concept of a single continuous line of production featured in Commerce practice prior to codification.  Commerce mixes up the emphasis. Whether or not the concept of demand hinges on use has nothing to do with the question presented by the statute.  The statute is not asking about the relationship between demand and use, but demand and dependence.  Here, the legal error is clear.  Commerce failed to establish the relationship between the use it found in a single year and actual dependence on that use, whether grounded in the presence of a single continuous line of production, or otherwise.  Simply finding a level of use in any given year is not legally sufficient absent a showing that demand is practically confined to that use—a showing Commerce never made.

### 3.     Commerce Failed to Identify A Single Continuous Line of Production, Contrary To Law

Commerce also failed to identify a single continuous line of production between its designated prior and latter-stage products.  Such a determination is required by the legal test and failing to make that finding was an error of law.  In addition to a distinct olive oil line of production, the record demonstrates that there are independent lines of production from the prior-stage product to distinct ripe and green olive products that Commerce failed to analyze.  Appx011844.

The Trade Court did not fault Commerce for this omission, concluding that establishing the existence of a single continuous line of production was not

required by the statute.  Appx000019 (*ASEMESA III* at 18, n. 3).  This conclusion is contrary to law.  As the Trade Court previously addressed in *ASEMESA I*, the concept of a single continuous line of production featured prominently in the legislative history and the standard codified by Congress.  Appx000245.  It was an essential element of the of Commerce's analysis and reinforced the need to find that demand for all or substantially all of the prior-stage product was dependent on demand the latter-stage production.  The single continuous line finding is necessary to give form and meaning to "latter stage product" as that term is used in the statute.  Otherwise, the term could be reduced to a nullity, allowing Commerce to collapse distinct processed forms of the prior-stage product into a single, amorphous latter-stage product, rendering the substantially dependent standard meaningless and self-fulfilling.  Such an approach is not reflected in the legislative history and is flatly rejected in Commerce's own illustration of the distinction between iron ore and steel.  *See Pork from Canada* at 25,098.  The standard codified in 19 U.S.C. §1677-2(1) is clear, and Commerce has not lawfully invoked the provision.  Its determination must, therefore, be remanded for further consideration consistent with the statute.

III.    **COMMERCE'S FINDING OF SUBSTANTIAL DEPENDENCE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ARBITRARY**

In its second remand redetermination, Commerce depicted a raw olive market in which mill and table designations determine end use, while a dual-use designation identified olives of qualified downstream application, either for oil or table. As Commerce stated, "table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing season." Appx000077. More specifically, among the five main varietals used to produce table olives, Commerce found that information proffered by the Government of Spain indicated that the table varietals, consisting of manzanilla, gordal, and carrasqueña were only fit for table olive production. Appx000078. Among the two dual-use varietals identified by Commerce, including hojiblanca and cacereña, Commerce found that dual-use olives grown for table "are not interchangeable" with dual-use olives grown for oil. Appx000091.

This depiction was critical to Commerce's analysis because it informed its assessment of varietal-specific dependence under the statute. Under Commerce's construction of the market for raw olives, if a varietal fell into the table category it is axiomatic that the varietal is dependent on the demand for table olives. If a varietal fell into the dual-use category, and it was "grown for" table olive

- 46 -

production, the varietal in question must be dependent on the demand for table

olives.  Finally, if a varietal fell into the mill category it is necessarily dependent

on oil demand.  But as discussed in detail below, when it came time for Commerce

to apply its construction of the raw olive market to record quantitative evidence it

relied upon to render its "substantially dependent" finding, Commerce confronted a

record, as a whole, that it could not reconcile with its depiction of the market.  This

forced Commerce into contradictory and unsupported assumptions to bend the

record to a pre-ordained outcome.

## A.    The Record Repudiates Commerce's Depiction Of The Raw Olive Market

Qualitatively, the record in this case contains evidence contradicting

Commerce's black and white construction of the market for raw olives.  That

evidence shows that table and mill varietals have demonstrable cross-applications.

This included direct statements in the ASEMESA's questionnaire responses,

supported by examples of table olive varietals used in oil applications, and mill

varietal olives being used in table applications.  Appx011617-011621;

Appx011720-011724.  It also included statements from the Government of Spain

at verification that dual-use varietals can readily be repurposed based on "current"

market conditions.  Appx010637 ("some varieties of olives can be used to produce

both table olives and olive oil, and that the farmer will decide for which production

the olive will be used based on current market conditions."). Commerce's own evidence used to distinguish table, mill and dual-use olives contradicted Commerce by identifying carrasquena as "mixed use" (i.e. dual-use) where Commerce found it to be in the table category. Appx010714- 010740. Even Musco acknowledged the capacity to leave "substandard" olives grown for table production on the tree for a later harvest to maximize oil content to produce oil, Appx010704, a decision clearly not restricted to substandard olives.

But even accepting that Commerce relies upon competing qualitative evidence, quantitatively, Commerce's construction of the raw olive market is completely repudiated by the data it utilizes to perform its consumption ratio calculation to determine substantial dependence. Those data reveal a very fluid market in which raw olives "grown for" table or oil are easily cross-purposed at levels far exceeding coincidental or minor volumes. Commerce's category-based data show that between 2016 and 2017 the volume of table category olives sent to oil production increased by more than 142,000 metric tons ($160,899 - 18,878 = 142,021$). At the same time, the volume of mill category olives sent to table olive production increased by more than 135,000 metric tons ($226,148 - 90,404 = 135,744$). In total, these shifts in volume in and out of table olive production amounted to over 277,000 metric tons. This was nearly 81 percent of the volume of table category olives actually used to produce table olives ($277,765 / 344,147 =$

80.7 percent), and nearly 55 percent of the total volume of all raw olives produced used to produce table olives (277,765 / 505,046 = 54.9 percent). In addition, the data show that the total amount of table category olives used to produce oil, and mill category olives used to produce table olives in 2017 – 387,047 metric tons – was larger than the volume of table category olives used to produce table olives – 344,147 metric tons. Similar shifts can be seen between 2016 and 2018. These massive shifts occurred in the span of a single harvest year; they are not the end result of some long transition over a period of years. Appx011241.

It is impossible to reconcile Commerce's depiction of the raw olive market and what it views as siloed end uses based on category designations with the actual data it utilized to perform its substantial dependence analysis. For its part, Commerce effectively acknowledges the capacity to cross-purpose olives on large a scale, but claimed that shifts in cross-application between 2016 and later years were caused by market reaction to countervailing duties. Appx000089 (Second Remand Redetermination at 63) ("{w}e also note that only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill."). Commerce's explanation does not inform how raw olives can be and are used. Moreover, presented as a cause of cross-purposing, the explanation fails. The CVD petition was filed in July 2017. Appx000366. Any "grown for" decisions occurred before the petition was even filed and any decision

on actual use happened either before the petition was filed or within a matter of months after the petition was filed.  In any event, what causes an olive to flow to a particular end-use is not the question presented by the statute.  The question is whether the production of the prior-stage product is so intertwined with the latter-stage product that all or substantially all of the production of the prior-stage product must flow to that specific end-use.  The trends shown in Commerce's own data answer that question with a resounding "no" and undermine Commerce's entire depiction of siloed end uses.

Despite arguments made before the Trade Court on the significance of the conflict in Commerce's data with its depiction of the raw olive market or the meaning of the statute, the Trade Court itself did not address Commerce's failure to address the matter beyond merely concluding that "a degree of fungibility between table and mill olives does not invalidate Commerce's determination." Appx000021.

While deference is due to Commerce's weighing of evidence in an administrative proceeding, Commerce must still perform an analysis of the whole record and state a connection between all of the facts found and the choices made. *Burlington Truck Lines, Inc.*, 371 U.S. at 168.  An agency decision is unsupported by substantial evidence where the agency "fail{s} to consider an important aspect of the problem, {or} offer{s} an explanation for its decision that runs counter to

the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Here, Commerce premised its determination on an analytical framework in which olive varietals are confined to a specific use.  The record shows that this is not true.  As a result, Commerce failed to meet its burden to support its findings with substantial evidence.

For its part, the Trade Court's review must reach beyond the facial aspects of the record and the agency's proffered analysis. *See, e.g.*, *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 721 (Fed. Cir. 1997) (remanding the lower court's decision because it "failed to evaluate {market share} data in conjunction with the fact that all Russian magnesium originated from only two producers.").  The Trade Court's affirmance of Commerce's remand redetermination in this proceeding fails to meet that standard.  Rather, the Trade Court accepted Commerce's characterizations of the record without appearing to perform its own analysis. Indeed, the "degree of fungibility" in the market is directly relevant to whether Commerce has supported its legal conclusion regarding the application of 19 U.S.C. §1677-2 with substantial evidence.  The Trade Court was, therefore, compelled to address arguments raised regarding the evidence upon which Commerce relied in making its determination.  It did not do so.

**B.     The Record Reveals A Latter-Stage Product Dominated By
        "Dual-use" Olive Varietals With No Use Contingency, Contrary
        To Commerce's Claims**

Dual-use varietals are, by definition, equally suited to either table or olive oil

applications.  This fact is otherwise confirmed by Commerce's own substantial

dependence analysis which shows that the volume of dual-use hojiblanca used to

produce oil (509,304 tons) exceeds the volume of hojiblanca used to produce table

olives (290,850 tons) by 75 percent.  *See* Appx000061 (First Remand

Redetermination at 33).  Although Commerce sought to depict the possible end-

uses of dual-use varietals as restrained based on decisions made at the beginning of

the growing season, *see* Appx000077-000078; Appx000091, that depiction is

proven false by Commerce's own data.  As discussed above, the data show

substantial volumes of mill category olives (*i.e.*, grown for mill) and table category

olives (*i.e.*, grown for table) that were cross-purposed to produce table olives and

olive oil.  Appx011241.  As important, Commerce found that dual-use olives are

inter-mixed between the table and mill categories and are therefore likely to

contribute to the volumes of these categories that are cross-purposed for table olive

and oil production.  Appx000078.  Indeed, <u>Commerce found that the entire volume</u>

<u>of mill category olives cross-purposed to produce table olives is comprised of dual-</u>

<u>use olives.</u>  *Id.* (Second Remand Redetermination at 52) ; Appx000145 (First

Remand Redetermination at 29).  This admission both undermines Commerce's

depiction of the raw olive market generally and establishes the lack of dependence

or contingency associated with dual-use varietals specifically.

As it stands, more than one data set on the record show that dual-use

varietals with no dependence on any particular downstream demand dominate table

olive production.  This includes GoS hectare information showing 113,674

hectares of dual-use varietals relative to just 76,120 hectares of table varietals

along with Commerce's own concession that still more dual-use hectares are

included within the hectare numbers reported for "olive oil olives."  Appx000090;

Appx000145.  Similarly, AICA data relied upon by Commerce at the periphery of

its substantial dependence analysis show that, among the five main varietals used

to produce table olives, the volume of dual-use hoijiblanca and cacereña olives

$(290{,}850 + 45{,}420 = 336{,}270)$  exceeds the combined volume associated with the

remaining three varietals, manzanilla, gordal, and  carrasqueña $(137{,}290 + 42{,}250$

$+ 57{,}340 = 235{,}880)$.  Appx011639-011645.  Given an oil market consuming as

much as 9 million tons of olives a year it is implausible to expect these dual-use

volumes would not simply be absorbed in that market if the table market

evaporated.  Appx011241.  Again, these data do not permit an affirmative

"substantially dependent" finding.

Commerce, again, did not address the contrary evidence in its depiction of

the raw olive market that, by its own admission and data, show substantial mobility

among dual-olive varietals.  Commerce failed to address the lack of dependence revealed in the record data it relied upon, and how other data on the record demonstrate that the volume of dual-use varietals with no dependence on any one source of demand is significantly larger than the volume of other varietals used to produce table olives.  As a result of its failure, Commerce did not consider the record as a whole.  *See Nippon*, 458 F.3d at 1351.  Its determination is, therefore, unsupported by substantial evidence.

For its part, the Trade Court also did not address the matter beyond the same conclusion that "a degree of fungibility between table and mill olives does not invalidate Commerce's determination."  Appx000021.  As such, the Trade Court failed to adduce an analysis of this aspect of the record that could support Commerce's conclusion that olive varietals are effectively siloed into specific end-uses with record evidence showing massive volumes of olives switching end-uses, including a dominant volume of dual-use olives with no dependence on any single source of demand.  Again, the Trade Court's review must reach beyond the facial aspects of the record and the agency's proffered analysis.  *See Gerald Metals*, 132 F.3d at 721.  Its failure to do so means this Court must reverse the Trade Court's affirmance and remand this case for further proceedings.

### C.     Data Adjustments Utilized By Commerce In Its Consumption Ratio Calculations Are Not Supported By Substantial Evidence And/Or Are Arbitrary

Commerce's computational decisions in calculating a consumption ratio for purposes of its analysis further exposed the deep flaws in its construction of the olive market.  As discussed below, in its effort to show that demand for more than half of its defined prior stage product was substantially dependent on demand for the latter stage product, Commerce engaged in adjustments that contradicted its construction of the olive market.  Commerce also ignored the heavily biased and unreasonable implications of excluding a key dual-use varietal, relying on unsupported assumptions in effecting what was at best an incomplete exclusion.  As a whole, the computational exercise demonstrated that Commerce, in claiming to perform a varietal-based analysis, had no ability to control for the varietals it was attempting to analyze.

### 1.     Commerce's inclusion of mill category olives deemed to be dual-use varietals in the numerator of its analysis is arbitrary

By including 71,814 tons of "Mill" category olives deemed to be dual-use hojiblanca in the numerator of its substantial dependence calculation, Commerce threw out its entire depiction of the raw olive market and the restraints it found on end use.  This included a purported restraint on dual-use olives determined at the beginning of the growing season.  Appx000077-000078.  Yet, Commerce's

quantitative analysis rejects this paradigm by including dual-use olives "grown for" oil in the numerator of its dependence analysis ratio calculation. Appx000058-000060 (adding certain dual-use and mill olives that were "grown for mill but used as table olives" and making certain other corrections). The volume of the dual-use olives included in this manner is significant, amounting to more than 12.7 percent of its numerator (71,814 / 564,058 = 12.7 percent). This exception added seven percentage points to Commerce's consumption ratio, pushing it from 48.23 percent (492,244 / 1,020,426 = 48.23 percent) to 55.28 percent (564,058 / 1,020,426 = 55.28 percent). In other words, but for this adjustment, Commerce would not meet even its own erroneous more than half "substantially dependent" standard under the statute.

By utilizing opposite positions between its depiction of dual-use olives and its consumption ratio calculation, Commerce was able to satisfy an erroneous standard for finding substantial dependence of "at least half." Appx000083. But Commerce cannot have it both ways with dual-use varietals. "{A} federal agency 'can be said to be at its most arbitrary' when it 'treat{s} similar situations dissimilarly." *Kirk*, 987 F.3d at 321 (*quoting Steger*, 717 F.2d at 1406); *see also SKF USA Inc.*, 263 F.3d at 1382 ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently"). If Commerce accepts that dual-use olives grown for oil can be used to produce table

olives in more than inconsequential amounts, and its own data show that the order

magnitude in any given year could be as high as 65 percent of the volume of

"table" category olives used to produce table olives, then it must accept that no

dependence or contingency of demand is associated with dual-use varietals.

Appx011241.  Given the predominance of dual-use olives in table olive production

this means Commerce cannot reach an affirmative "substantially dependent"

finding.

Alternatively, if Commerce believes that dual-use olives grown for oil and

dual-use olives grown for table are generally not interchangeable, then it should

not add the 71,814 tons it finds to be dual-use hojiblanca grown for oil in the

numerator of its substantial dependence calculation, also demanding a negative

"substantially dependent" finding.  Commerce's determination, reflecting

conclusions on both sides of the issue, is internally inconsistent, and thus arbitrary.

### 2.   Commerce's attempt to exclude cacereña from its calculations is ineffective, biased, and without basis in the record

Commerce determined that it should exclude dual-use cacereña from its

calculations based on the conclusion that it lacked sufficient information on

cacereña production.  Appx000058.  The resulting exclusion is ineffective, biased,

and without basis in the record.

First, the exclusion is fashioned from Commerce's finding that it is reasonable to infer that dual-use varietal volume residing in the 90,404 tons of mill category olives used to produce table olives is proportionate to the percentage of dual-use varietals grown for table olives on a varietal-by-varietal basis. Appx000059-000060. On the basis of this inference, Commerce made a modest overall adjustment of just 18,590 tons to the 90,404 figure to account for cacereña and other dual-use varietals it claimed to exclude, adding the remaining 71,814 tons to its numerator. Appx000060.

Commerce has merely performed math. Commerce never substantiates why it is reasonable to assume proportionality on the basis that it did. Commerce's finding is simply conclusory. Moreover, even the inference misses the mark. The question is not proportionality between varietals grown for table and grown for oil, but proportionality (if any) between olives grown for table and olives grown for oil but used for table. Finally, it ignores the 41,250 tons that Commerce itself claims is cacereña "grown for" table. Appx000059-000060. Commerce does not explain how it addressed this volume in its deduction of 18,590 tons, or how that deduction reflected a full exclusion of cacereña from the numerator of its analysis.

Second, Commerce's rationale for excluding cacereña on the basis that it comprises a small percentage of the total volume of olive varietals grown for table is not persuasive. The volume of cacereña Commerce surmised was grown for

table is larger than the volume of gordal it surmised was grown for table, which

Commerce included in its analysis without any information on the volume of

gordal grown for oil.  Appx000078.  More importantly, cacereña's contribution to

the volume of olives grown for table is not the central issue.  Commerce

acknowledges that cacereña is a dual-use olive equally suited to table or oil

applications.  Appx000056.  Thus, the critical question issue is not so much

cacereña's contribution to table olive production and the numerator of Commerce's

calculation, but cacereña's contribution to oil production and the denominator of

Commerce's calculation.  Given Commerce's approach to dual-use olives in its

calculations and the relative volumes of dual-use hojiblanca used for table and oil

applications, it is obvious that excluding cacereña has a disproportionate impact on

Commerce's denominator, and thus inflates Commerce's consumption ratio.  As

noted above, the volume of dual-use hojiblanca used to produce oil was 175

percent of the volume used to produce table olives.  The record also showed that

cacereña is the main varietal in the provinces of Caceres and Badajoz

(Extremadura).  Appx011161.  These provinces account for over 568,000 metric

tons of raw olives on over 287,000 hectares of olive groves overall.  Appx011218;

Appx011237.  As a result, Commerce's assumption that dual-use cacereña would

not have similar contributions to table and oil production as dual-use hojiblanca

was unreasonable and inconsistent with the record, leaving its consumption ratio calculation fundamentally and unreasonably biased.

Commerce's determination with respect to the treatment of cacereña olives is unsupported by substantial evidence because its correction methodology does not comport with the "record as a whole." *Nippon*, 458 F.3d at 1351. Further, Commerce's approach fails to consider an important aspect of the problem, namely that the record demonstrates that its calculation of the amount of cacereña to deduct from its calculations is built upon pure conjecture, is incomplete, and would otherwise bias the calculation. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The agency must support each element of its determination with "evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" *Swiff-Train Co.*, 793 F.3d at 1359 (internal citation omitted). Here, Commerce has failed to do so.

### 3.    Commerce did not control for varietals and their respective volumes in its purported "varietal analysis"

For all its claims, Commerce did not engage in a varietal analysis to determine substantial dependence. Commerce mentioned varietals by name, and conducted some calculations on a varietal-specific basis on the periphery of its analysis with respect to hojiblanca, but the core of Commerce's analysis and calculations remained wedded to generic, category-based data where it did not

have data for specific varietals. The analysis was, in essence, no different than the

analysis rejected by the Trade Court for failing to properly define the "latter stage"

product under the statute. Appx000249. In order to fit the data it did have into a

varietal analysis, Commerce relied on thinly supported assumptions about how

different varietals can be used and are used, Appx000077-000078 ("table and mill

varietals are fit for one use or the other and are generally not interchangeable, and

growers of dual-use varietals also determine whether their olives are to be used for

table or mill at the beginning of the growing season") that were contradicted by its

own data. Commerce also simply assumed that its data consisted only of

manzanilla, gordal, carrasquena, and hojiblanca olives. Appx000058. These

assumptions, however, lacked record support or were disproven by other elements

of the record. In fact, in almost every instance Commerce did not know where

varietals were present in each of the data points of its chosen data, and in what

order of magnitude. It reached a varietal-specific finding on "substantially

dependent" using data not susceptible to a varietal-specific analysis. As such,

Commerce's finding is flawed at the most fundamental level and therefore is not

supported by substantial evidence. Again, an agency determination must be upheld

based on a review of the "record as a whole." *Nippon*, 458 F.3d at 1351. In this

case, the record as a whole shows that Commerce made various assumptions that

were inconsistent with information it collected, using data sets that would not

permit the analysis it sought to undertake.  As a result, its determination in not

supported by substantial evidence.

**D.    Commerce's Decision To Discard The Only Varietal-Specific Consumption Data On The Record That Would Permit A Varietal-Specific Dependence Analysis Was Unreasonable**

Despite its stated intention to perform a varietal-specific analysis of

substantial dependence, Commerce eschewed the only data set permitting that

analysis and that was ideally suited to exercise, the AICA data.  Indeed, with the

AICA data there is no need for any of Commerce's unsupported assumptions

applied to its category-based data.  Specifically, Commerce declined to utilize

varietal-specific consumption data for table olive production published by AICA,

claiming that the data only reported the volume of varietals grown for table olive

production, not used for that production.  Appx000218-000219 (First Remand

Redetermination at 102-103); Appx000078 (Second Remand Redetermination at

52).  On the face of the record, that claim is false.  Specifically, neither Commerce

nor the Trade Court addressed evidence from the AICA data demonstrating that the

AICA data was consumption data.  This included the fact that the AICA data was

presented on the basis of opening and ending inventories of the varietals concerned

within a table that fully reconciled.  Appx011639-011645.  Other data on

production of green and ripe table olives from the same AICA report matched

exactly the aggregate production figure for the varietals concerned.  Appx011639-

011645; Appx011649-011686 (*compare* Ex. NFI-2 showing individual varietal

volumes at 60,202,000 tons, *with* Ex. NFI-4 showing total production of ripe and

green table olives 60,202,000 tons). These facts are impossible to reconcile with

Commerce's conclusion that the AICA data only show "grown for" volumes.

Appx000090. The AICA data provide actual insight on varietal use for table olive

production and show very different circumstances than Commerce attempted

depiction, such as the fact that dual-use varietals with no dependence or

contingency on use dominated table olive production.

    This Court will not "reweigh" the evidence. *Downhole Pipe & Equip., L.P.*

*v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2019). It must, however, ensure

that Commerce's determination reflects "the record as a whole." *Nippon*, 458 F.3d

at 1351. Commerce's failure to address the contrary elements of the AICA data

when it proved to be the only data set suitable for Commerce's analysis fall short

of its obligation to examine the record as a whole. For its part, the Trade Court

merely adopted Commerce's position that that AICA data represented only "grown

for" volume and therefore could not be used. Appx000024. It did not even

address the underlying elements of the record indicating otherwise and cited only

the arguments of the parties below without elaboration. *Id.* Both Commerce and

the Trade Court are under an affirmative obligation to address whatever in the

record fairly detracts from the weight of the evidence upon which the agency

relied. *Universal Camera*, 340 U.S. at 488.  Commerce's failure to address an argument made by the parties in the administrative proceeding and the Trade Court's failure to address such an argument do not comport with this standard of substantial evidence.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For the reasons set forth above, ASEMESA, Angel Camacho, and Agro Sevilla, respectfully request that this Court hold Commerce's determination unlawful and otherwise inconsistent with the record, reverse the Trade Court's decision affirming the Second Remand Redetermination, and remand the matter to the Trade Court for further proceedings consistent with appropriate legal standard for attribution of subsidies under 19 U.S.C. §1677-2 and the record developed before Commerce.

Respectfully submitted,

/s/ Matthew P. McCullough

Matthew P. McCullough
James C. Beaty

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Counsel for ASEMESA et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1162

**Short Case Caption:** Asociacion de Exportadores e Industriales v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,668 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 1/17/2023

Signature: /s/ Matthew P. McCullough

Name: Matthew P. McCullough

Asociacion de Exportadores e Industriales v. US

CAFC Ct. No. 2023-1162

**Addenda of Required Documents**

| No. | Document Title | Date of Document | Appx No. |
|---|---|---|---|
| 1 | Judgement pursuant to Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 22-108 | September 14, 2022 | Appx000001 |
| 2 | Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 22-108 | September 14, 2022 | Appx000002-Appx000024 |
| 3 | Dept. of Commerce's Second Remand Redetermination pursuant to Remand Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 21-76 (Nov. 3, 2021) (CIT ECF 73,74) | November 3, 2021 | Appx000025-Appx000093 |
| 4 | Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 21-76 | June 17, 2021 | Appx000094-Appx000114 |
| 5 | Dept. of Commerce's Final Remand Results of Redetermination pursuant to Remand Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 20-8 (June 1, 2020) (CIT ECF 47) | June 1, 2020 | Appx000115-Appx000220 |
| 6 | Asociacion de Exportadores e Industriales de Aceitunas de Mesa et al v. United States, Ct. No. 18-00195, Slip Op. 20-8 | January 17, 2020 | Appx000221-Appx000261 |

| No. | Document Title | Date of Document | Appx No. |
|---|---|---|---|
| 7 | Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination | August 1, 2018 | Appx000262-Appx000264 |
| 8 | Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination | June 18, 2018 | Appx000265-Appx000268 |
| 9 | Dept. of Commerce's Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain | June 11, 2018 | Appx000269-Appx000355 |
| 10 | USCIT Docket for Case No. 18-00195 | December 15, 2022 | Appx000356-Appx000365 |

ADDENDUM 1

# UNITED STATES COURT OF INTERNATIONAL TRADE

ASOCIACIÓN DE EXPORTADORES E
INDUSTRIALES DE ACEITUNAS DE
MESA, ACEITUNAS GUADALQUIVIR,
S.L.U., AGRO SEVILLA ACEITUNAS S.
COOP. AND., and ANGEL CAMACHO
ALIMENTACIÓN, S.L.,

              **Plaintiffs,**

       **v.**

UNITED STATES,

            **Defendant,**

       **and**

COALITION FOR FAIR TRADE IN
RIPE OLIVES,

         **Defendant-Intervenor.**

**Before: Gary S. Katzmann, Judge**
**Court No. 18-00195**

## JUDGMENT

This case having been submitted for decision, and the court, after due deliberation, having

rendered an opinion; now, in conformity with that opinion, it is hereby

**ORDERED** that the United States Department of Commerce's Final Results of Remand

Redetermination (Dep't Commerce Nov. 3, 2021), ECF No. 73-1, are sustained; and it is further

**ORDERED** that judgment be, and hereby is, entered for Defendant the United States.

                /s/     *Gary S. Katzmann*
                      Judge

Dated: September 14, 2022
     New York, New York

ADDENDUM 2

Slip Op. 22-108

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 18-00195** |
| **Defendant,** | ***PUBLIC VERSION*** |
| **and** | |
| **COALITION FOR FAIR TRADE IN RIPE OLIVES,** | |
| **Defendant-Intervenor.** | |

## OPINION

[Commerce's Second Remand Results are sustained.]

Dated: September 14, 2022

Matthew P. McCullough, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for Plaintiffs Asociación De Exportadores E Industriales De Aceitunas De Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentación, S.L.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the briefs were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Sonia W. Murphy, Trial Attorney. Of counsel on the briefs were Elio Gonzalez and Saad Y. Chalchal, Senior Attorneys, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

David J. Levine and Raymond Paretzky, McDermott Will & Emery LLP, of Washington, D.C.,

argued for Defendant-Intervenor Coalition for Fair Trade in Ripe Olives.

Katzmann, Judge:  The court again returns to an investigation by the United States Department of Commerce ("Commerce") into subsidies received by the Spanish olive industry. The U.S. domestic olive industry claims that the Government of Spain and European Union unfairly subsidized Spanish olives that were then imported into the United States to the detriment of the U.S. industry.  Before the court are Commerce's <u>Final Results of Remand Redetermination</u> (Dep't Commerce Nov. 3, 2021), Nov. 3, 2021, ECF No. 73-1 ("<u>Second Remand Results</u>"), which the court ordered in <u>Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States</u>, 45 CIT __, 523 F. Supp. 3d 1393 (2021) ("<u>Asemesa II</u>").  In <u>Asemesa II</u>, the court determined that Commerce's interpretations of 19 U.S.C. § 1677(5A)'s de jure specificity test and 19 U.S.C. § 1677-2's substantial-dependence requirement were unreasonable and not in accordance with law, and remanded Commerce's <u>Final Results of Remand Redetermination</u> (Dep't Commerce May 29, 2020), June 1, 2020, ECF No. 47-1 ("<u>First Remand Results</u>") for reconsideration.  523 F. Supp. 3d at 1407-08.  Commerce's <u>Second Remand Results</u> accordingly apply a revised interpretation of each statutory provision.

Plaintiffs Asociación de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Gudalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alementación, S.L. (collectively, "Plaintiffs" or "Asemesa") now challenge the <u>Second Remand Results</u>, arguing that the subsidy program at issue is not de facto specific under 19 U.S.C. § 1677(5A)(D)(iii), and that Commerce's determination that demand for certain raw olive varietals is substantially dependent on the demand for table olives pursuant to 19 U.S.C § 1677-2 is unsupported by substantial evidence and contrary to law.  Pls.' Cmts. on Commerce's Second Remand Redetermination at 3–4, 6, Dec. 3, 2021, ECF No. 76 ("Pls.' Br.").  Defendant United States ("the

Government") and Defendant-Intervenor Coalition for Fair Trade in Ripe Olives ("Coalition")

request that the court affirm Commerce's <u>Second Remand Results</u>.  Def.'s Reply to Cmts. on the

Second Remand Redetermination at 33, Jan. 12, 2022, ECF No. 79 ("Def.'s Br."); Reply Cmts. of

Def.-Inter. Addressing Second Remand Results at 24, Jan. 12, 2022, ECF. No. 81 ("Def.-Inter.'s

Br.").  The court concludes that Commerce's findings of de facto specificity and substantial

dependence are supported by substantial evidence and in accordance with law, and sustains the

<u>Second Remand Results</u>.

## BACKGROUND

The court set out the legal and factual background of the proceedings in further detail in its

previous opinions, <u>Asemesa I</u> and <u>Asemesa II</u>.  <u>Asociación de Exportadores e Industriales de</u>

<u>Aceitunas de Mesa v. United States</u>, 44 CIT __, __, 429 F. Supp. 3d 1325, 1330–38 (2020)

("Asemesa I"); <u>Asemesa II</u>, 523 F. Supp. 3d at 1397–1401.  Information relevant to the instant

opinion is set forth below.

### I.       *Legal and Regulatory Framework*

To empower Commerce to offset economic distortions caused by countervailable subsidies

and dumping, Congress promulgated the Tariff Act of 1930.  <u>Sioux Honey Ass'n v. Hartford Fire</u>

<u>Ins.</u>, 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); <u>ATC Tires Private Ltd. v. United States</u>, 42 CIT

__, __, 322 F. Supp. 3d 1365, 1366 (2018).  Under the Tariff Act, Commerce may -- upon petition

by a domestic producer or sua sponte -- initiate an investigation into potential countervailable

subsidies and, where such subsidies are identified, issue orders imposing duties on the subject

merchandise.  <u>Sioux Honey</u>, 672 F.3d at 1046–47; <u>ATC Tires</u>, 322 F. Supp. 3d at 1366–67;

19 U.S.C. §§ 1671, 1673.  A countervailable subsidy exists when (1) a government or public

authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient

of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign

industry, or a group of such enterprises or industries.  19 U.S.C. § 1677(5).

Where, as here, a domestic subsidy is at issue, such subsidy may be either de jure or de

facto specific.  19 U.S.C. § 1677(5A)(D).  A domestic subsidy is de jure specific "[w]here the

authority providing the subsidy, or the legislation pursuant to which the authority operates,

expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).

It is de facto specific if:

(I)     The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
(II)    An enterprise or industry is a predominant user of the subsidy.
(III)   An enterprise or industry receives a disproportionately large amount of the subsidy.
(IV)   The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).  In assessing these factors, Commerce must "take into account the

extent of diversification of economic activities within the jurisdiction of the authority providing

the subsidy, and the length of time during which the subsidy program has been in operation."  Id.

If Commerce determines that the government of a country is providing, directly or

indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a

class or kind of merchandise imported, sold, or likely to be sold for import, into the United States,

and the International Trade Commission ("ITC") determines that an industry in the United States

is materially injured or threatened with material injury thereby, then Commerce imposes CVDs

upon the merchandise equal to the amount of the net countervailable subsidy.  See 19 U.S.C.

§ 1671(a).  When the investigated merchandise involves a processed agricultural product,

Commerce also considers subsidies received by producers or processors of the raw agricultural

product, and imputes the benefit of those subsidies to the manufacture, production, or export of

the processed product where (1) the demand for the prior stage, or raw, product is substantially

dependent on the demand for the processed product, and (2) the processing operation adds only

limited value to the raw commodity.  19 U.S.C. § 1677-2.

## II.    *Procedural History*

On July 12, 2017, Commerce initiated a CVD investigation into ripe olives from Spain in

response to a petition from Coalition.  Ripe Olives from Spain: Initiation of Countervailing Duty

Investigation, 82 Fed. Reg. 33,050 (Dep't Commerce July 19, 2017), P.R. 126; Petition for

Imposition of AD and CVD Duties, Vol. I (June 21, 2017), P.R. 7 ("Pet. Vol. I").  Plaintiffs

Guadalquivir, Agro Sevilla, and Angel Camacho were selected as mandatory respondents.[1]  In its

petition, Coalition alleged that the European Union ("EU"), through the Government of Spain

---

[1] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
>> (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—
>>
>>> (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
>>>
>>> (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
>>
>> (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.
>
> The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

("GOS"), provided countervailable subsidies to raw olive growers that should properly be attributed to processors of ripe olives.   Petition for the Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 58 ("Pet. Vol. III").  Ripe olives -- the product at issue in this litigation -- are a type of edible table olive produced by curing, rinsing, and brining raw olives.  Asemesa I, 429 F. Supp. 3d at 1335.  Raw olives are a raw and unprocessed agricultural product which can be transformed into an edible consumer product through processing into table olives or olive oil.  Id.

Through its investigation, Commerce determined that countervailable subsidies indeed existed with respect to ripe olive producers from Spain.  See id. at 1337–38; see also Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain (Dep't Commerce June 11, 2018), P.R. 1300 ("IDM"); Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 1417 ("Amended Final Determination").  Commerce further found that the subsidies provided to olive growers through the EU's Common Agricultural Policy ("CAP") were de jure specific domestic subsidies under 19 U.S.C. § 1677(5A) and could be attributed to the production of table olives (as a latter-stage product of raw olives) under 19 U.S.C. § 1677-2.  IDM at 33.

As discussed in Asemesa I, the CAP subsidies at issue are provided to Spanish olive growers through the Basic Payment Scheme ("BPS"): the most recent iteration of EU agricultural subsidy programs.  429 F. Supp. 3d at 1333.  Because portions of the current BPS subsidy program are based on prior EU (and European Community) subsidy programs, Commerce "traced the history of these programs in making its determination that the current program is de jure specific." Id.  That history begins in 1997 with the Common Organization of Market in Oils and Fats ("the

Common Market Program"), which was an annual grant-to-farmer program applicable to Spanish olive growers. Id. In 2003, the Single Payment Scheme ("SPS") replaced the Common Market Program and remained in effect until 2014. Id. The SPS program was replaced in 2015 by the current BPS program, which provides subsidies to those Spanish olive growers both that meet the eligibility requirements and apply for subsidies. Id.

While the BPS program provides subsidy payments based on geographical indicators of farmland productivity, those indicators are based on data collected by the GOS under the Common Market Program. First Remand Results at 7. This data reflects the hectares of farmland, quantity of crop produced per hectare, and type of crop produced in each hectare, for each qualifying farm. Id.; Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 19–22 (Dep't Commerce Nov. 20, 2017), P.R. 1075 ("PDM"). For olive growers, a value per hectare was calculated depending on whether the olives were grown for olive oil production or table olive production. PDM at 22–23. Under the SPS, this value was multiplied by a farm's area in hectares to determine the amount of aid that a particular farmer would receive. Id. at 22; First Remand Results at 8. The BPS then relied upon data collected under the SPS to allocate subsidy payments using regional rates based on the "productive potential and . . . productive orientation" of a particular region. First Remand Results at 8. The rates ultimately assigned to participating farmers do not expressly vary with the type and volume of crop produced but do reflect historic data regarding the agronomic practices carried out in the region, including whether a specific region historically produced permanent crops -- among them, olives. IDM at 33–34.

Commerce concluded that because the SPS program relied upon Common Market Program data, and in turn provided the basis for the BPS program, "the annual grant amount provided under

BPS [is] based on annual grant amounts that were crop-specific," and the BPS subsidy payments are de jure specific to olive growers.  PDM at 24.  Commerce further determined that the relevant "prior stage product" for purposes of its investigation was raw olives, and that demand for raw olives is substantially dependent upon demand for table olives because table olives constitute 8 percent of the market for raw olives.  Id.; see 19 U.S.C. § 1677-2.  Upon determining that the BPS subsidies were both specific to olive growers and properly attributable to the production of table olives, Commerce imposed countervailing duties.  First Remand Results at 20–21.

Plaintiffs challenged Commerce's determination on September 28, 2018, arguing in relevant part that that the subsidies are not de jure specific (and therefore are not countervailable), and that the demand for raw olives is not substantially dependent upon the demand for table olives (such that subsidies to olive growers cannot be imputed to table olive production).  Asemesa I, 429 F. Supp. 3d at 1339.  The court concluded that Commerce's finding that the subsidies at issue were de jure specific and thus countervailable failed to include a reviewable interpretation of 19 U.S.C. § 1677(5A).  Id. at 1340–41.  The court also determined that Commerce applied an impermissible interpretation of the statutory term "substantially dependent," and that its interpretation of the term constituted an unexplained and arbitrary deviation from past practice, such that Commerce's interpretation of 19 U.S.C. § 1677-2 was arbitrary and not in accordance with law.  Id. at 1339, 1344.  Accordingly, the court remanded to Commerce for further proceedings consistent with its opinion.  Id. at 1352.

On June 1, 2020, Commerce submitted its First Remand Results to the court.  On remand, Commerce first reiterated and clarified its finding that the EU subsidy payments at issue are de jure specific to olive growers, and thus countervailable.  First Remand Results at 10.  Consistent with the Amended Final Determination, Commerce then determined that "the demand for the prior

stage product is substantially dependent on the demand for the latter stage product," but clarified that it interprets "'prior stage product' to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" -- in this case, raw olives "principally suitable for . . . the production of table olives." First Remand Results at 27, 29.

The court remanded Commerce's <u>First Remand Results</u>, concluding that they were in accord with neither 19 U.S.C. § 1677(5A) nor 19 U.S.C. § 1677-2.  Reviewing Commerce's finding of de jure specificity, the court concluded that its interpretation of 19 U.S.C. § 1677(5A)'s de jure specificity inquiry "reduce[d] the de jure specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation," and thus diverged from the unambiguous text of the statute.  Asemesa II, 523 F. Supp. 3d at 1403.  The court likewise rejected Commerce's interpretation of 19 U.S.C. § 1677-2.  Id. at 1407.  In so doing, the court first affirmed Commerce's determination that "'prior stage product' and 'raw agricultural product' are not coextensive in the context of [19 U.S.C. § 1677-2]."  Id. at 1406–07.  However, the court explained that by defining "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product," Commerce impermissibly rendered the substantial-dependence test self-fulfilling.  Id. at 1407.  Accordingly, the court remanded Commerce's determination for further proceedings consistent with its opinion.  Id. at 1408.

On November 3, 2021, Commerce submitted its <u>Second Remand Results</u> to the court.  In response to the court's instructions in <u>Asemesa II</u>, Commerce reconsidered both "its de jure specificity finding" and "its interpretation of 'raw agricultural product' and 'prior stage product.'"

Second Remand Results at 2.  On remand, Commerce first determined "that the subsidies provided by the GOS to olive growers are de facto specific pursuant to [19 U.S.C. § 1677(5A)(D)(iii)(III)]," given the disproportionately greater subsidy payments awarded to olive farmers.  Id. at 2, 19–22. Consistent with its substantial-dependence findings in the Amended Final Determination and First Remand Results, Commerce then determined that the demand for "four table and dual-use raw olive varietals," namely "manzanilla, gordal, hojiblanca, and carrasquena," is "substantially dependent on [the demand for] processed table olives."  Id. at 32, 36.

Following the issuance of the Second Remand Results, Plaintiffs filed comments on December 3, 2021, opposing Commerce's finding that the at-issue subsidy program is de facto specific and reiterating their position that Commerce has failed to identify substantial dependence as required by law.  Pls.' Br.  The Government and Coalition each submitted replies to Plaintiffs' comments on January 12, 2022, requesting that the court sustain the Second Remand Results. Def.'s Br.; Def.-Inter.'s Br.  On January 6, 2021, the court issued questions prior to oral argument. Letter Concerning Qs. for Oral Arg., Apr. 26, 2022, ECF No. 89.  The parties filed their responses to the oral argument questions on May 6, 2022.  Pls.' Resps. to Ct.'s Written Qs. Before Oral Arg., ECF No. 92 ("Pls.' OAQ Resps."); Def.'s Resps. to Qs. in Adv. of Oral Arg, ECF 93 ("Def.'s OAQ Resps."); Resp. of Def.-Inter. to Apr. 26, 2022 Qs. for Oral Arg., ECF No. 94 ("Def-Inter.'s OAQ Resps.").  Oral argument was held on May 11, 2022.  Oral Arg., ECF No. 96.  On May 19, 2022, the parties filed supplemental briefs following oral argument.  Pls.' Final Cmts. After Oral Arg., ECF No. 97 ("Pls.' Post-Arg. Br."); Def.'s Post Oral Arg. Submission, ECF. No. 99 ("Def.'s Post-Arg. Br."); Post-Arg. Subm. of Def.-Inter., ECF No. 98 ("Def.-Inter.'s Post-Arg. Br.").

### JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK

The court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c). The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) which provides "[t]he court should hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). The court also reviews the determinations pursuant to remand "for compliance with the court's remand order." Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

As laid out in Asemesa I, 429 F. Supp. 3d at 1338–39, and Asemesa II, 523 F. Supp. 3d at 1401, the court reviews Commerce's interpretation of a statute by application of the two-step Chevron test. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–45 (1984); see also Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Under Chevron, the court first determines "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue," the court must then determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. If the agency's interpretation of the statute is reasonable, it must be upheld. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

### DISCUSSION

Plaintiffs argue that Commerce's de facto specificity finding is unsupported by substantial evidence because it relies on data from "past programs" and because its attempt at corroboration fails to support its analysis. Pls.' Br. at 3–6. Plaintiffs also oppose Commerce's finding of substantial dependence, arguing that the consumption ratio used by Commerce is unsupported by substantial evidence and, even if it were not, fails to rise to the level of substantial dependence. Id. at 16–32. The Government and Coalition contend that Commerce's de facto specificity finding is adequately supported by the record, and that Commerce reasonably concluded from consumption data that the demand for certain varietals of raw olives is substantially dependent on the demand for table olives. Def.'s Br. at 7–15, 17–26; Def.-Inter.'s Br. at 4–7, 8–22. The court concludes that Commerce's findings of de facto specificity and substantial dependence are supported by substantial evidence and in accordance with law and accordingly sustains the Second Remand Results.

### I.         *De Facto Specificity Finding*

On remand, Commerce "examined whether the BPS program is de facto specific" and determined that it is. In reaching this conclusion, Commerce requested certain information from the GOS: namely, "the number of recipient companies and industries and the amount of assistance approved under [the BPS] program for the year in which any mandatory respondent was approved for assistance, as well as each of the preceding three years." Second Remand Results at 17. The GOS "replied with general information regarding the amount of total assistance" but declined to provide any per-industry data, noting instead that "the payments are decoupled" such that such specific data was unavailable. Id. at 17–18 (quoting Resp. of GOS to the Dept's Aug. 3, 2017 Initial Questionnaire at 16 (Sept. 18, 2017), P.R. 836 ("GOS IQR")). Commerce, finding that

information regarding "amounts of assistance provided to the agricultural sector . . . on an industry basis is necessary to determine whether the BPS [program] is de facto specific," resorted to facts otherwise available to support its analysis.  Id. at 18–19; see generally 19 U.S.C. § 1677e.

The information relied upon by Commerce as facts otherwise available is drawn from Coalition's petition and corroborated by the general information provided by the GOS.  See Second Remand Results at 19–22 (citing Pet. Vol. III at 9–17, Exs. III-13, III-15).  Commerce highlighted Coalition's estimate of BPS payments received by olive growers (€ 1.28 billion annually) in comparison to the approximate total BPS payments (€ 5 billion annually), and the resultant conclusion that "the olive industry in Spain received about one-fourth of all [BPS] payments" during the period of investigation.  Id. at 21.  In corroboration of this estimate, Commerce relied on the usage data provided by GOS, including "the total amount of assistance provided under the BPS program during the [period of investigation] and the total number of approved applications," in combination with Plaintiffs' reported subsidy usage during that same period.  Id. at 21–22.  Because Commerce calculated the approximate average BPS assistance per applicant to be [[              ]], while the average assistance reported by Plaintiffs Guadalquivir, Agro Sevilla, and Angel Camacho was between [[              ]] and [[                  ]], Commerce determined that record information supported Coalition's allegations and concluded that the BPS program was "de facto specific within the meaning of [19 U.S.C. § 1677(5A)(D)(iii)(III)]."  Id. at 22.

Section 1677e of Chapter 19 of the U.S. Code provides, in relevant part, that if:

(1) necessary information is not available on the record, or

(2) an interested party or any other person –

> (A) withholds information that has been requested by the administering authority or the Commission under this subtitle, [or]

       (B) fails to provide such information by the deadlines for submission of the
          information or in the form and manner requested,

      . . .

then Commerce "shall, subject to section 1677m(d) of this title, use the facts otherwise available
in reaching the applicable determination under this subtitle." 19 U.S.C. § 1677e(a). Section
1677m(d) provides that, to the extent deficient information is provided, Commerce "shall promptly
inform the person submitting the response of the nature of the deficiency and shall, to the extent
practicable, provide that person with an opportunity to remedy or explain the deficiency." 19
U.S.C. § 1677m(d). Where Commerce "relies on secondary information rather than information
obtained in the course of an investigation or review" in making its determination, it must also, "to
the extent practicable, corroborate that information from independent sources that are reasonably
at [its] disposal." 19 U.S.C § 1677e(c)(1).

      It is not contested that the GOS failed to provide the information requested by Commerce:
namely, data reflecting the amount of BPS assistance distributed on a per-recipient and per-
industry basis during the period of review. Second Remand Results at 17–18, see also Pls.' OAQ
Resps. at 2 (summarizing the information provided by GOS). It is also apparent that Commerce
provided an opportunity for GOS to explain or remedy its deficient submission. See GOS Suppl.
Questionnaire (Dep't Commerce Oct. 25, 2017), P.R. 240. Accordingly, Commerce was permitted
by 19 U.S.C § 1677e to rely upon facts otherwise available on the record to determine whether
BPS subsidy payments to olive growers were de facto specific. Because "the only information on
the record regarding the distribution of assistance under the BPS on an industry basis" was
therefore Coalition's petition, Commerce reasonably relied upon the petition as facts otherwise
available. Def.'s Br. at 10 (quoting Second Remand Results at 41); see also Pls.' OAQ Resps. at
2.

Commerce's analysis of the facts otherwise available is sufficient to support its finding of de facto specificity. Although the facts available consisted of secondary information -- namely, estimations by Coalition of the current industry-wide BPS subsidy payments -- Coalition supported its estimates with publicly available information, including statements by the European Commission that BPS funding would remain stable from 2014 (under the SPS program) to 2020. Second Remand Results at 20–21 (citing Pet. Vol. III at Ex. III-15). Commerce likewise confirmed Coalition's estimates "to the extent practicable" using the GOS's submissions, which suggested that the olive farmers under investigation -- together the three most-prolific producers of ripe olives during the period of investigation -- received many times the average BPS subsidy payments during that period. Id. at 22 (citing GOS IQR at 53–54); Asemesa I, 429 F. Supp. 3d at 1332. Accordingly, Commerce satisfied its statutory obligation to corroborate Coalition's petition. See 19 U.S.C. § 1677e(c)(1).

Nor is it the case that, as Plaintiffs argue, Commerce improperly relied upon data relating to "past programs." Pls.' Br. at 4. While Coalition's petition incorporates the publicly reported subsidy data regarding the SPS program and the Common Market Program, it expressly assesses, and Commerce expressly considered, that data as it informs the current BPS program. See Second Remand Results at 20–21 (citing Pet. Vol. III at Ex. III-15). Nor does Commerce's conclusion that Guadalquivir, Agro Sevilla, and Angel Camacho received "between double and 83 times the average amount of assistance" facially support a proportionate allocation of benefits on a per-hectare basis or undermine the assertions in the petition. Pls.' Br. at 5. Rather, as Commerce concludes, the markedly higher subsidies received by key players in the Spanish olive industry could just as easily indicate that the industry as a whole receives a disproportionate amount of the

total BPS subsidy payments.[2]  Second Remand Results at 21; see Def.'s Br. at 13–15 (explaining

in relevant part that the GOS data was used for purposes of corroboration, not an initial specificity

analysis).  As there is no basis to conclude that Commerce's analysis or corroboration of the

petition was in error, and as "a reasonable mind might accept" the petition as sufficient to support

Commerce's de facto specificity finding, that finding is supported by substantial evidence and

sustained.  Maverick Tube, 857 F.3d at 1359 (citing Consol. Edison Co., 305 U.S. at 229).

### II.        *Substantial Dependence*

Applying 19 U.S.C. § 1677-2 on remand, Commerce again concluded that table olives

satisfied the statute's substantial-dependence analysis such that BPS subsidy payments to olive

growers can be attributed to producers of table olives.  Second Remand Results at 36.  However,

in light of the court's conclusion in Asemesa II that "prior stage product" cannot be defined as "the

raw agricultural product that the industry under examination considers principally suitable for use

in the prior stage of production of the latter stage product," Commerce revised its application of

the statute.  523 F. Supp. 3d at 1400.  Specifically, Commerce determined that the "prior stage

product" in this case is "table and dual-use raw olive varietals that are biologically distinct from

other raw olive varietals" -- namely, the manzanilla, gordal, hojiblanca, and carrasquena varietals

-- while the latter stage product is all table olives.  Second Remand Results at 30.  Commerce then

concluded that "[b]ecause 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena

varietals, the prior stage product, were processed into table olives, the latter stage product, we find

that the demand for these varietals is substantially dependent on processed table olives."  Id. at 36.

---

[2] Indeed, as both the Government and Defendant-Intervenor note, the fact that olive production constitutes only three percent of Spain's agricultural output further supports Commerce's conclusion and is notably not addressed by the Plaintiffs in their comments on the Second Remand Results.  See Second Remand Results at 19–20 n.86; Def.'s Br. at 11, Def.-Inter.'s Br. at 6–7.

Plaintiffs oppose Commerce's substantial-dependence determination, arguing that Commerce's consumption ratio (calculated by comparing the total amount of manzanilla, gordal, hojiblanca and carrasquena olive varietals processed into table olives with the total amount harvested) does not reflect substantial dependence, and in any case is not supported by substantial evidence. Pls.' Br. at 6–7. The Government and Defendant-Intervenor argue in favor of Commerce's determination, contending that Commerce reasonably identified specific olive varietals as the prior stage product, and reasonably assessed the dependence of those varietals on the production of table olives. Def.'s Br. at 17–21; Def.-Inter.'s Br. at 13–22.

### A.    The Legal Standard is Satisfied

As a threshold matter, the court reiterates its conclusions in <u>Asemesa I</u>, where it determined that the plain meaning of 19 U.S.C. § 1677-2 requires a finding of substantial dependence where the demand for raw olives is "'largely, but not wholly,' 'contingent' on the demand for table olives." <u>See</u> 429 F. Supp. 3d at 1341–42 (citations omitted). The court further determined that Commerce's practice is to treat as substantially dependent any raw agricultural product for which at least half of the demand depends on the relevant latter stage product. <u>See id.</u> at 1341–46 (noting that Commerce has developed a practice of finding substantial dependence where the latter-stage product comprises "almost exclusively, almost all, most, or substantially all the demand" for the prior-stage product); <u>see also</u> <u>Final Affirmative Countervailing Duty Determination: Fresh, Chilled, and Frozen Pork from Canada</u>, 54 Fed. Reg. 30,774 (Dep't Commerce July 24, 1989) ("<u>Pork from Canada 1989</u>"); <u>Rice from Thailand; Final Results of Countervailing Duty Administrative Review</u>, 59 Fed. Reg. 8,906 (Dep't Commerce Feb. 24, 1994) ("<u>Rice from Thailand 1994</u>").

In light of the plain meaning of the statute and Commerce's established past practice, Plaintiffs are not correct that Commerce's 55.28 percent consumption ratio cannot reflect substantial dependence.  Pls.' Br. at 21–22.  Where more than half of a prior stage product is dedicated to the production of a latter stage product, demand for the prior stage product is largely but not wholly dependent on the latter stage product.  Indeed, Commerce has expressly concluded that where "most" of a prior stage product is dedicated to the production of a latter stage product, demand for each is "inextricably linked" such that a finding of substantial dependence is appropriate.  Pork from Canada 1989 at 30,775.  Accordingly, Plaintiffs' argument that "[e]ven assuming" the accuracy of Commerce's consumption ratio, "its stated 55 percent figure does not meet the legal standard" is unavailing.[3]  Pls.' Br. at 20.

> **B.      Commerce's Consumption Ratio is Supported by Substantial Evidence and in Accordance with Law**

Having concluded that the legal standard would be satisfied by Commerce's 55.28 percent consumption ratio, the court next assesses whether the calculation of that ratio was supported by substantial evidence and in accordance with law.  In the Second Remand Results, Commerce first reassessed the appropriate prior stage product for its substantial-dependence analysis, concluding that "[b]ecause manzanilla, gordal, hojiblanca, and carrasquena account for 87 percent of olive production grown for table during the [period of investigation], we are relying on these four table and dual-use raw olive varietals as the 'prior stage product.'"  Second Remand Results at 32.  It rejected as potential prior stage products "strictly mill varietals," as "typically only 1 percent of

---

[3] The court likewise rejects Plaintiffs' argument that a "single continuous line of production" is required for a finding of substantial dependence.  Pls.' Br. at 32.  Plaintiffs identify no statutory basis for this alleged requirement, and like the threshold for substantial dependence, the court has already addressed the treatment of substantial dependence where there is no single continuous line of production in its prior opinion.  Asemesa I, 429 F. Supp. 3d at 1345; see also First Remand Results at 70; Second Remand Results at 58–59.

mill olives are sent to table" as well as dual-use cacerena olives, as "the production volume of cacarena comprises a small percentage of the total volume of olive varietals grown for table." Id. at 32–33. Next, Commerce calculated a consumption ratio where the "492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table, plus the 71,814 tons of hojiblanca grown for mill but used for table olive production" constituted the numerator (i.e., the amount of prior stage product used in the production of the latter stage product) and the "1,020,426 tons of manzanilla, gordal, carrasquena, and hojiblanca olive varietals" grown for any purpose (i.e., the total amount of prior stage product) constituted the denominator. Id. at 33–36. These numbers were drawn from Plaintiffs' responses and comments on the draft remand redetermination and adjusted (1) to exclude non-hojiblanca mill olives used for table olive production in the numerator, and (2) to include hojiblanca mill olives used for mill olive production in the denominator. Id. These adjustments were intended to accurately reflect the dual-use nature of hojiblanca olives and to avoid incorporating in Commerce's analysis any dual-use olive varietals for which there was inadequate evidence on the record. Id. at 33–34. Using the adjusted numerator and denominator, Commerce's consumption ratio indicated that 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals were processed into table olives. Id. at 36.

The court first concludes that Commerce's reassessment of the appropriate prior stage product on remand is supported by substantial evidence and in accordance with law. In Asemesa II, the court rejected Commerce's conclusion that the prior stage product, for purposes of a substantial-dependence analysis, was such raw olives "[as] the industry under examination considers principally suitable for use in" the production of table olives. 523 F. Supp. 3d at 1407. The court noted that such a definition would render 19 U.S.C. § 1677-2 "largely self-fulfilling" such that the section would have little remaining meaning. Id. On remand, Commerce identified

specific varietals as the appropriate prior stage product and explained that the excluded varietals were biologically distinct.  Second Remand Results at 31.  Specifically, Commerce explained that the "table olive varietals" it identified "have a lower oil content, are larger in size, are more symmetrical in shape, and generally are characterized as having a higher pulp-to-bone ratio." Id. This revised approach remedies the statutory inconsistency identified by the court in Asemesa II, and is supported by record evidence, including by the submissions of the GOS.  Id.; see also Musco's February 25 Resp. at Ex. 2A (Feb. 25, 2020), R.P.R. 4; GOS Suppl. Questionnaire (Dep't Commerce Oct. 25, 2017), P.R. 240.

That there is a degree of fungibility between table and mill olives does not invalidate Commerce's determination.  As Plaintiffs acknowledge, it is an undisputed fact that "almost all" of certain varietals are used for either mill or table olive production.  Pls.' OAQ Resps. at 10–11. Furthermore, Commerce directly addresses the risk that fungibility might muddy the waters of its substantial-dependence analysis by adjusting the raw numbers of manzanilla, gordal, hojiblanca, and carrasquena olives incorporated in the numerator and denominator of its consumption ratio to avoid distorting that ratio by overestimating the dependence of dual-use olives (like hojiblanca) on table olive production.  Second Remand Results at 33–36.  Accordingly, the court concludes that Commerce's reevaluation of the appropriate prior stage product is supported by substantial evidence and complies with the court's determination in Asemesa II.  See Beijing Tianhai Indus., 106 F. Supp. 3d at 1346–47 (citations omitted) (setting out standard for compliance with court remand).

Next, the court considers Commerce's reliance on a consumption ratio to determine substantial dependence.  Plaintiffs argue that 19 U.S.C. § 1677-2 requires that "but for demand for table olives, largely all of the raw olive varietals [Commerce] identifies as substantially dependent

would not exist," and that the use of a consumption ratio therefore erroneously fails to "emphasize[] the relationship between demand and dependence, not demand and use." Pls.' Br. at 16–17. This is incorrect. First, the statute requires that "demand for the prior stage product [be] substantially dependent on the demand for the latter stage product," not that a prior stage product could only ever be employed to produce the latter stage product at issue. 19 U.S.C. § 1677-2. As noted above, such requirement is satisfied where more than half of a prior stage product is dedicated to the production of a latter stage product. Second, where -- as here -- a prior stage product is used almost exclusively in the production of latter stage products, and not sold in its raw form, it is not apparent on what basis "demand" is distinct from "use" for purposes of a substantial dependence analysis. Finally, as Defendant-Intervenors note, "Commerce's use of consumption as a proxy for . . . demand is consistent with . . . its past practice." Def.-Inter.'s Br. at 13. For example, Commerce has found substantial dependence where "almost all . . . paddy or unmilled rice is dedicated to the production of milled rice," Rice from Thailand 1986 at 8,909, and where "most swine" is dedicated to slaughter, and "pork constitutes the primary product of the slaughtered pig," Pork from Canada 1989 at 30,775. Commerce's use of a consumption ratio to assess substantial dependence is thus in accordance with law.

Finally, the court considers the calculations underlying Commerce's consumption ratio. Addressing Commerce's adjustments to the consumption ratio, discussed supra, Plaintiffs argue "Commerce's analysis is built upon a series of mischaracterizations and unsupported assumptions that bias the results, all in reliance on data that do not permit a true varietal analysis." Pls.' Br. at 22. Plaintiffs specifically contest both Commerce's exclusion of certain non-hojiblanca dual-use varietals (namely cacerena) from the denominator of the ratio, and Commerce's inclusion of

hojiblanca olives grown for mill in the numerator.[4]  Id. at 27–32.  Plaintiffs further argue that Commerce unreasonably decided not to rely on certain record data, including GOS's hectare data. Id. at 32–34.

Again, Plaintiffs' arguments are unavailing.  First, as both the Government and Defendant-Intervenor explain, Commerce excluded the cacerena olives from its analysis because, while it had access to data conveying "the total tonnage of cacerena olives used to produce table olives," it lacked any information regarding the amount of cacerena olives not used to produce table olives. Def.'s Br. at 30; see Def.-Inter.'s Br. at 18; Second Remand Results at 66.  Thus, inclusion of the cacerena data would have inflated the numerator of the consumption ratio (amount of table and dual-use varietals used for table olive production) without similarly accurately increasing the denominator (total amount of such varietals produced).  Second, Commerce adequately explained its inclusion of the hojiblanca data and its adjustment of that data to include in the ratio denominator hojiblanca grown for both table and mill.   Second Remand Results at 33–36. Plaintiffs' argument that the hojiblanca grown for mill but used for table should nevertheless be subtracted from the ratio numerator would render Commerce's inclusion of the hojiblanca olives grown for mill in the ratio numerator unnecessary and inaccurate.  Id.; see also Def.-Inter.'s Br. at 20.  Finally, with respect to Plaintiffs' arguments that Commerce was obligated to rely upon specific record data -- namely the GOS's hectare production data and the GOS agency (AICA) consumption data -- Commerce reasonably declined to rely on both the GOS hectare data and AICA data to adjust its consumption ratio.  The GOS hectare data was considered by Commerce,

---

[4] As the Government notes, Plaintiffs have waived their argument that Commerce should have derived the total tonnage of cacerena olives used to produce olive oil using the hojiblanca ratio by failing to raise such argument before Commerce.  Def.'s Br. at 31; Pls.' Br. at 28.  Accordingly, the court need not address Plaintiffs' argument.

but ultimately rejected because it was unpublished, non-contemporaneous, and lacked any supporting documentation. Second Remand Results at 66. Similarly, the AICA data could not have been used (as Plaintiffs argue) to alter Commerce's consumption ratio because it represents olive production data only, and would therefore require Commerce to make the unsupported assumption that all olives grown for table are ultimately consumed in the production of table olives. Pls.' Br. at 25–26; Def.'s Br. at 32. Commerce thus reasonably supported its calculation of the 55.28 percent consumption ratio with record evidence, and its substantial-dependence determination must be sustained.

## CONCLUSION

For the foregoing reasons, Commerce's Second Remand Results are sustained. Judgment will enter accordingly in favor of the Government.

**SO ORDERED.**

/s/ *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: September 14, 2022
     New York, New York

ADDENDUM 3

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C.  20230

November 3, 2021

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY  10278-0001

Re:     Redetermination Pursuant to Court Remand Order in
        *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
        Court No. 18-00195

Dear Mr. Toscano:

        Pursuant to the Court's orders of June 17, 2021 and September 3, 2021, please find
attached the U.S. Department of Commerce's Redetermination Pursuant to Court Remand in the
above-captioned action.  The remand redetermination is a business proprietary document.  I am
also filing a public version of the remand redetermination.

        In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the
remand proceeding will follow under separate cover.  Should you have any questions concerning
the matter, please contact me at (202) 482-2327.

                        Respectfully submitted,


                        /s Saad Y. Chalchal
                        Saad Y. Chalchal
                        Senior Attorney
                        Office of the Chief Counsel
                            for Trade Enforcement & Compliance

Attachment

Mr. Mario Toscano
November 3, 2021
Page 2


cc:

Matthew Paul McCullough
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 452-7327
mmccullough@curtis.com

Sonia W. Murphy
U.S. Department of Justice
Commercial Litigation Branch – Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 305-3067
sonia.murphy@usdoj.gov

Raymond Paul Paretzky
McDermott, Will & Emery, LLC
500 N. Capital Street, N.W.
Washington, D.C. 20001
(202) 756-8619
rparetzky@mwe.com

C-469-818
Remand
Slip Op. 21-76
POI:  01/01/2016 – 12/31/2016
**Public Version** ~~Business Proprietary Document~~
E&C/OI:  Team

### FINAL REMAND REDETERMINATION
*Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. COOP. And., and Angel Camacho Alimentacion, S.L. v. United States*, **Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021)**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021) (*Second Remand Order*). These final results of redetermination concern Commerce's final determination in the countervailing duty investigation of ripe olives from Spain.[1]

In the *Second Remand Order*, the Court remanded:  (1) Commerce's finding that certain subsidies provided by the Government of Spain (GOS) to olive growers are *de jure* specific pursuant to section 771(5A)(D)(i) of the Tariff Act of 1930, as amended (the Act); and (2) Commerce's analysis pursuant to section 771B(1) of the Act and finding that the demand for raw olives principally suitable for the production of table olives is substantially dependent on the demand for table olives.[2]  With regard to the *de jure* specificity finding, the Court held that

---

[1] *See Ripe Olives from Spain:  Final Affirmative Countervailing Duty Determination*, 83 FR 28186 (June 18, 2018) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Ripe Olives from Spain:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 83 FR 37469 (August 1, 2018) (*Amended Final Determination and Countervailing Duty Order*).

[2] *See Second Remand Order* at 9-21; *see also* Final Results of Remand Redetermination:  *Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacion, S.L. v. United States*, Court No. 18-00195, Slip Op. 20-8 (CIT January 17, 2020), dated May 29, 2020 (First Remand Redetermination).

Commerce's interpretation "to permit a finding of *de jure* specificity where 'by law, there is no uniform treatment across the agricultural sector in the provision of benefits, is impermissible" and "deviates from the plain meaning... and thus from Congress's unambiguous intent."[3]  With regard to the analysis under section 771B(1) of the Act, the Court held that although "Commerce's determination that 'prior stage product' and 'raw agricultural product' are not coextensive... is both reasonable and in accordance with law," Commerce relied on an impermissible interpretation of "prior stage product" that "causes the statute as a whole to become superfluous."[4]  The Court remanded these two issues "to Commerce for further proceedings consistent with" the *Second Remand Order*.[5]

Consistent with the Court's *Second Remand Order*, Commerce:  (1) reconsidered its *de jure* specificity finding and finds that the subsidies provided by the GOS to olive growers are *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act; and (2) reconsidered its interpretation of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act and finds that the demand for distinct biological varietals of raw olives is substantially dependent on the demand for table olives.  These final results of redetermination pursuant to court remand resulted in no changes to the net countervailable subsidy rates determined in the *Amended Final Determination and Countervailing Duty Order*.

## II.    BACKGROUND

On June 18, 2018, Commerce published the *Final Determination* in the investigation of ripe olives from Spain.[6]  In the *Final Determination*, Commerce determined that subsidies provided to growers of raw olives were *de jure* specific under section 771(5A)(D)(i) of the Act

---

[3] *See Second Remand Order* at 15.
[4] *Id.* at 18-19.
[5] *Id.* at 21.
[6] *See Final Determination*.

and, pursuant to section 771B of the Act, we deemed those subsidies to have been provided with respect to the production of the processed product.[7]  On August 1, 2018, following the correction of certain ministerial errors, Commerce published the *Amended Final Determination and Countervailing Duty Order*, which established net countervailable subsidy rates of 27.02 percent *ad valorem* for Aceitunas Guadalquivir, S.L.U., 7.52 percent *ad valorem* for Agro Sevilla Aceitunas S. Coop. And., 13.76 percent *ad valorem* for Angel Camacho Alimentacion, S.L., and 14.97 percent *ad valorem* for all other producers or exporters of ripe olives from Spain.[8]

The three mandatory respondents in the investigation, together with Asociacion de Exportadores e Industriales de Aceitunas de Mesa (hereinafter collectively referred to as the ASEMESA), challenged Commerce's *Final Determination* and argued, among other things, that Commerce improperly concluded that certain grants provided to olive growers by the GOS are *de jure* specific under section 771(5A)(D)(i) of the Act and that Commerce improperly interpreted and applied section 771B(1) of the Act in concluding that the demand for raw olives is substantially dependent on the demand for processed table olives.[9]

On January 17, 2020, the Court issued a decision sustaining, in part, and remanding, in part, Commerce's *Final Determination*.  Relevant here, the *First Remand Order* remanded Commerce's *de jure* specificity finding under section 771(5A)(D)(i) of the Act and finding that the "substantially dependent" criterion under section 771B(1) of the Act had been satisfied.[10] With regard to Commerce's *de jure* specificity finding, the Court held that Commerce did not sufficiently explain its determination "because Commerce did not provide an interpretation of the

---

[7] *See Final Determination* IDM at Comments 1 and 3.
[8] *See Amended Final Determination and Countervailing Duty Order.*
[9] *See Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, Court No. 18-00195, Slip Op. 20-08 (CIT January 17, 2020) (*First Remand Order*) at 17-18.
[10] *Id.* at 18-29.

statute in reaching its determination based on the record."[11]  Specifically, the Court held that

Commerce's explanation was insufficient because it did not "explain how references to past

subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the

statute."[12]  As a result, the Court remanded for Commerce to explain its interpretation of the

statute.  With regard to Commerce's finding that the demand for raw olives is substantially

dependent on the demand for processed table olives, the Court concluded that Commerce applied

an impermissible interpretation of the term "substantially dependent" in section 771B(1) of the

Act and deviated from its past practice without adequate explanation.[13]

On June 1, 2020, Commerce filed the First Remand Redetermination with the Court.  On

remand, Commerce further explained its interpretation of section 771(5A)(D)(i) of the Act for

the *de jure* specificity finding.[14]  Commerce also reconsidered its interpretation of "prior stage

product" for purposes of the analysis under section 771B(1) of the Act and found that the

demand for the raw olives principally suitable for use in the production of table olives is

substantially dependent on the demand for table olives.[15]  No changes were made to the rates

determined in the *Amended Final Determination and Countervailing Duty Order* as a result of

the First Remand Redetermination.

On June 17, 2021, the Court issued its *Second Remand Order* remanding the matter a

second time.  With regard to the *de jure* specificity finding, the Court held that Commerce's

interpretation of section 771(5A) of the Act to permit a finding of *de jure* specificity where "by

law, there is no uniform treatment across the agricultural sector in the provision of benefits," is

---

[11] *Id.* at 18.
[12] *Id.* at 20.
[13] *Id.* at 20-29.
[14] *See* First Remand Redetermination at 6-20.
[15] *Id.* at 20-41.

impermissible.[16]  The Court concluded that the BPS legislation's "failure to provide uniform treatment in the distribution of subsidies is not equivalent to its <u>explicit restriction</u> of those benefits to a specific enterprise or industry."[17]  With regard to Commerce's finding that the criterion under section 771B(1) of the Act had been satisfied, the Court rejected Commerce's definition of "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product."[18]  The Court held that "prior stage product" cannot be both distinct from the "raw agricultural product" and also a subset of the raw agricultural product, and further, concluded that such a definition of "prior stage product" renders the requirements of section 771B self-fulfilling because raw olives principally suitable for use in table olive production are likely processed into table olives.[19]  The two issues were remanded for a second time for proceedings consistent with the *Second Remand Order*.

On October 7, 2021, we released the draft results of remand redetermination to interested parties for comment.[20]  On October 12, 2021, we partially granted requests by the GOS and the respondents for an extension of time to submit comments on the draft redetermination.[21]  On October 18, 2021, we received comments from the GOS, ASEMESA, and Musco Family Olive Company (Musco).[22]

---

[16] *See Second Remand Order* at 13 (quoting First Remand Redetermination at 14).

[17] *Id.* at 13 (emphasis in original).

[18] *Id.* at 18.

[19] *Id.* at 19.

[20] *See* Draft Results of Redetermination Pursuant to *Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. COOP. And., and Angel Camacho Alimentacion, S.L. v. United States*, Court No. 18-00195, Slip Op. 21-76 (CIT June 17, 2021) (Draft Redetermination).

[21] *See* Commerce's Letter, Extension of Comment Deadline, dated October 12, 2021.

[22] *See* GOS's Letter, "Government of Spain Response to the Draft Results of Remand Redetermination issued by the Department of Commerce on October 7, 2021," dated October 18, 2021 (GOS's Comments); ASEMESA's Letter, "Comments on the Department's Draft Redetermination on Remand, Slip Op. 21-76, Court No. 18-00195, *Asociacion de Exportadores de Aceitunas de Mesa et al. v. United States*," dated October 18, 2021 (ASEMESA's Comments); Musco's Letter, "Ripe Olives from Spain; Remand, Slip Op. 21-76; Comments on Draft Results of

5

## III.    DISCUSSION

### A.  Commerce's Determination that Certain Subsidies to Olive Growers Are Specific Pursuant to Section 771(5A)(D) of the Act

#### 1.  Commerce's *Final Determination*

In the investigation, Commerce examined how Spain implemented Pillar I of the European Union (EU)'s Common Agricultural Policy (CAP), also known as the Basic Payment Scheme (BPS), to determine whether the subsidy program was specific to olive growers.[23]  We found that the manner in which Spain implemented the BPS program, as it relates to the provision of and the amount of benefits to olive growers, relied heavily on the provision of benefits under two predecessor programs:  the Common Organization of the Market in Oils and Fats (the Common Market Program), which was in place from 1997 to 2003 and provided annual grants only to Spanish olive growers on the basis of olive production volume (*i.e.*, olive growers received a grant amount in Euros (€) per kilogram of olives produced with different rates applied to olives grown for olive oil and olives grown for processing into table olives), and the Single Payment Scheme (SPS), which replaced the Common Market Program and was in place from 2003 through 2014.[24]  The BPS took effect in 2015 as the successor to the SPS and provided grants during the period of investigation (POI) to Spanish farmers, including olive growers, that met the eligibility requirements and applied for subsidies.  The EU claimed, during the

---

Remand Redetermination," dated October 18, 2021.  In its comments, Musco noted that Commerce has treated Attachment 1 of Commerce's memorandum entitled "Analysis of the Draft Remand Results for Finding the BPS Program *De Facto* Specific and the First Criterion of Section 771B is Satisfied" as business proprietary, but that it appears to contain only public information.  We agree with this comment and will treat this information as public in the memorandum issued in connection with these final results of redetermination.

[23] The BPS encompasses three subprograms under which farmers can receive payments:  Direct Payment, Greening, and Aid to Young Farmers.  *See Ripe Olives from Spain:  Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 82 FR 56218 (November 28, 2017) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 18-21.

[24] *See Final Determination* IDM at 32-36; *see also Preliminary Determination* PDM at 21-23.

6

investigation, that because the benefits paid under the BPS were "decoupled" from production (*i.e.*, the payment of benefits was no longer contingent on the production of a particular product), Commerce could not find them to be specific.[25]  However, in the *Final Determination*, we found that Council Regulation 1307/2013, which implemented the BPS program, expressly relied on the amount of assistance a grower received under SPS to determine BPS grant amounts.[26]

The payments provided to farmers during the POI were based on a geographical indicator of farmland productivity prior to the implementation of these programs.[27]  Under the Common Market Program, which operated between 1999 and 2002, the EU required each Member State (including Spain) to collect information regarding the hectares, volume, and value (which depended on whether the olives were grown for the production of olive oil or the production of table olives) for each farm.[28]  Commerce observed that "{b}oth olive oil and table olives were specifically identified as products eligible to receive production aid under {the Common Market Program}, and the payments provided {between 1999 and 2002} were based on whether the olives were used to produce olive oil or table olives."[29]  Under the SPS, which operated from

---

[25] *See Final Determination* IDM at 33.

[26] *See* EU Council Regulations 1307/2013, Article 26 "Calculation of the initial unit value."  (1) "The unit value of payment entitlements referred to in Article 25(2) in Member States *which apply the single payment scheme in calendar 2014* and which have not decided to keep their existing payment entitlements in accordance with Article 21(3) shall be set in accordance with either of the methods set out in paragraphs 2 or 3.  (2) A fixed percentage of the payments the farmers *received for 2014 under the single payment scheme* in accordance with Regulation No. 73/2009, before reductions and exclusions provided for in Chapter 4 of Title II of that Regulation, shall be divided by the number of payment entitlements he is allocated in 2015, excluding those allocated from the national reserve or regional reserves in 2015.

[27] *See Final Determination* IDM at 33-36 (citing, *inter alia*, European Commission's Letter, "Countervailing Duty Investigation of Ripe Olives from Spain – CVD Questionnaire Response," dated September 18, 2017 (EU IQR) at Annex 12 "Council Regulation (EC) No. 1782/2003"; EU IQR at Annex 13 "Council Regulation (EC) No. 1307/2013"; and GOS QR at Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014"); *see also Preliminary Determination* PDM at 19.

[28] *See Final Determination* IDM at 32-33; *see also Preliminary Determination* PDM at 19 (citing EU IQR Annex 11 "Council Regulation (EC) No. 1638/98").

[29] *See Final Determination* IDM at 32 (citing EU IQR Exhibit 11 "Council Regulation (EC) No. 1638/98" and GOS's Letter, "Response of the Government of Spain to the Department's October 25, 2017 Supplemental Questionnaire," dated November 7, 2017 (GOS 1SQR) at  Exhibit 21 "Council Regulation (EC) No. 1782/2003" at Article 33 and Annex VI, which references production aid given to the olive oil sector during the reference period pursuant to "Council Regulation (EC) No. 136/66") (internal footnote omitted).

2003 through 2014, the amount of aid each farmer was eligible to receive was calculated by multiplying the value per hectare by the area in hectares.[30] By reference to the value per hectare calculated using data collected during the operation of the Common Market Program, Commerce found that the SPS program preserved the access of olive farmers to the assistance previously available to them, on a *de jure* specific basis, under the Common Market Program.

In implementing the BPS, Spain used the data collected under the SPS to create 50 agricultural regions to facilitate payments.[31] Each region was assigned a rate based on its productive potential and its productive orientation (*i.e.*, rainfed, irrigated, permanent crops, and permanent pasture).[32] Olive groves are considered "permanent crops," and this designation is factored into the calculation of the regional rate, which, in turn, is used to determine each hectare of farmland's "basic payment entitlement" and whether, and to what extent, a farmer was eligible to receive grants under the BPS.[33] Therefore, Commerce concluded that the regional variations in BPS payments were a result of the use of the historical regional data that had been used to calculate the crop-specific subsidy payments under the SPS.

Similar to the BPS program, SPS grant amounts were calculated using a value of entitlements per hectare.[34] To determine the SPS entitlement per hectare value, the calculation relied on a "reference amount,"[35] which was the three-year average of the total amounts of payments in place from 2000-2002. However, the reference period for olives was slightly longer and referred to the marketing years 1999/2000 through 2002/2003. The reference amount for the

---

[30] *See Final Determination* IDM at 32-33; *see also Preliminary Determination* PDM at 22 (citing EU IQR at Annex 10 "Council Regulation (EC) No. 864/2004" and Annex 12 "Council Regulation (EC) No. 1782/2003").

[31] *See Final Determination* IDM at 33 (citing GOS 1SQR at 26 and EU IQR at Exhibit 13 "Council Regulation (EC) No. 1307/2013"); *see also Preliminary Determination* PDM at 19-20.

[32] *See Final Determination* IDM at 33-34; *see also Preliminary Determination* PDM at 19-20.

[33] *See Final Determination* IDM at 34; *see also Preliminary Determination* PDM at 20.

[34] *See* EU IQR at 11-12 and Annex 12, Council Regulation (EC) No. 1782/2003 at Article 43.

[35] *See* EU IQR at Annex 12, Council Regulation (EC) No. 1782/2003 at Article 37.

olive sector was calculated using the four-year average of payments a farmer was granted under the olive oil support scheme, which was when the Common Market Program was in effect.[36] Both olive oil and table olives were identified as products to receive production aid under this program. Specifically, hectares dedicated to olive oil production received assistance of 132.25 ECU/100kg.[37] Assistance to farmers who produced table olives was calculated using a different calculation, in which the ratio of 100 kg of processed table olives was equal to 11.5 kg of olive oil eligible for production aid.[38]

Commerce's analysis is summarized:

> In summary, the annual grant amount provided to olive farmers under BPS is based on the annual grant amount provided to olive farmers under SPS. The grant amount provided to olive farmers under SPS is based on the average grant amount olive farmers received in 1999 through 2002 under the {Common Market Program}. The grant amount provided in 1999 through 2002 to eligible farmers, which included olive farmers, was based on the type of crop grown and the production value created from the crop. Therefore, the annual grant amount provided under BPS {is} based on annual grant amounts that were crop-specific, thus the grant amounts received by olive growers under BPS in 2016 are directly related to the grant amount only olive growers received under the {Common Market Program}.[39]

This analysis was the basis of Commerce's finding that the BPS provided subsidies that are *de jure* specific to olive growers. Because the Common Market Program was available only to olive growers (*i.e.*, access to its benefits was "expressly limited" to the olive sector); the SPS calculated the grant amount based on data regarding the type of crop, and the volume and value of production collected under the Common Market Program (*i.e.*, preserving the limited access to benefits available to the olive sector under the Common Market Program); and, by law, access to

---

[36] *Id.* at Annex 12, Article 37.
[37] *See Preliminary Determination* PDM at 22.
[38] *Id.* at 22 (citing EU IQR at 11); *see also* European Commission's Letter, "Countervailing Duty Investigation on Ripe Olives from Spain – CVD Supplemental Questionnaire Response," dated November 8, 2017 at response to Question 26 and GOS 1SQR at 20.
[39] *See Preliminary Determination* PDM at 24.

9

the SPS grants provided the foundation of the BPS subsidy payments, the BPS retained the *de jure* specificity inherent in the Common Market Program.[40]

## 2.  The Court's *First Remand Order*

In its opinion, the Court stated "Commerce did not set forth an interpretation of {section 771(5A)(D)(i) of the Act} in determining that BPS subsidies to olive growers are *de jure* specific, and thus, without more, the Court cannot determine whether it was supported by substantial evidence and in accordance with law."[41]  The Court articulated its concern about what it identified as Commerce's failure to explain how, in administering the BPS program, the authority "expressly limits" access to the subsidy to an enterprise or industry, as required by section 771(5A)(D)(i) of the Act.[42]  In addition, the Court cited the respondents' argument that the "payments are not dependent on the production of specific crops under {the BPS} program, and thus they have been decoupled from the olive industry."[43]  The Court held that Commerce's *de jure* specificity finding was not sufficiently explained, stating, in relevant part:

> {T}he Government fails to explain how a program expressly based on a program that limited access of payments to a specific crop is equivalent to a statement that BPS itself 'expressly limit[ ]' access of payments to a specific crop, as the statute requires … Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.  This does not constitute a sufficient explanation of why the BPS subsidies are expressly limited as the statute requires.  Without such an explanation of Commerce's interpretation of the statute, the Court cannot analyze whether Commerce made a decision supported by substantial evidence and in accordance with law.[44]

---

[40] *Id.* at 18-27; *Final Determination* IDM at Comment 3.
[41] *See First Remand Order* at 18.
[42] *Id.* at 20.
[43] *Id.* at 19.
[44] *Id.* at 20.

The Court therefore remanded the *de jure* specificity determination for Commerce to provide an explanation of its interpretation of the statute.[45]

### 3. Commerce's First Remand Redetermination

In its redetermination, Commerce further clarified its interpretation of section 771(5A)(D)(i) of the Act in support of its finding that the BPS provides benefits to Spanish olive producers that are *de jure* specific.[46]  Commerce explained that the statute makes no provision for Commerce to examine whether a subsidy is coupled to or decoupled from production.[47]  We further explained that the relevant inquiry for specificity under section 771(5A)(D)(i) of the Act is whether access to the subsidy is expressly limited by law to an enterprise or industry.[48]  Moreover, we underscored that, under section 771(5A)(D)(ii) of the Act, a program is not *de jure* specific when the government or the legislation pursuant to which the program is administered establishes criteria or conditions governing the eligibility for, and the amount of, a subsidy that do not favor one enterprise or industry over another.[49]  Commerce also consulted the SAA to explain Congress's intent and the purpose of the specificity test, which informs the *de jure* specificity analysis.[50]

We also addressed the regulatory framework for analyzing whether an agricultural subsidy is specific within the meaning of section 771(5A)(D) of the Act.  Commerce regulations at 19 CFR 351.502(e) provide a special rule for specificity relating to agricultural subsidies.[51]  Specifically, 19 CFR 351.502(e) stipulates that "{t}he Secretary will not regard a subsidy as

---

[45] *Id.*
[46] *See* First Remand Redetermination at 6-20.
[47] *Id.* at 10-11.
[48] *Id.* at 11.
[49] *Id.*
[50] *See* First Remand Redetermination at 11-12; *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 929-30.
[51] *See* First Remand Redetermination at 11-12.

being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to the

agricultural sector." We noted that the *Preamble* expands on this regulation, stating that "the

Secretary will find an agricultural subsidy to be countervailable only if it is specific within the

agricultural sector.[52] As directed by the *Preamble*, we focused on determining whether the BPS

program is specific to a particular subset of the agricultural sector, how the agriculture sector

writ large was treated by the BPS program, and whether any sub-sector of the agricultural sector

was afforded special treatment by an express limitation on access to the subsidy.[53]

We explained that, in the investigation, we found that the Common Market Program

provided benefits that were expressly limited to olive growers.[54] Benefits to olive growers under

the subsequent SPS program were determined not by any neutral or objective criteria, but by

using the average amount of grants provided from 1999 to 2002 under the Common Market

Program, which entrenched the crop-specific nature of the subsidy.[55] We found that due to the

manner in which the GOS implemented the BPS program with reference to predecessor program,

the agricultural sector was not afforded uniform treatment, nor was the program implemented

pursuant to neutral or objective criteria. Rather, we determined that the BPS subsidy for olive

growers was, as a matter of law, based on eligibility for assistance provided under the Common

Market Program, which expressly limited access to olive growers. As a result, we concluded that

farmers holding BPS entitlements with values determined based on historical olive production

were expressly provided limited access to benefit amounts that retain the crop-specific

differences and favorable treatment to olive production under the Common Market Program.[56]

---

[52] *See Preamble*, 63 FR at 65357-58.
[53] *See* Final Remand Redetermination at 13-14.
[54] *Id.* at 15.
[55] *Id.* at 16.
[56] *Id.* at 18.

12

### 4.  Second Remand Order

In its opinion, the Court concluded that Commerce's interpretation of section 771(5A) of the Act to permit a finding of *de jure* specificity where "by law, there is no uniform treatment across the agricultural sector in the provision of benefits," is impermissible.[57]  The Court held that, under step one of the two-step framework set forth in *Chevron*,[58] the statutory language is unambiguous and "the plain meaning of the statute is that a subsidy is *de jure* specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry."[59]  The Court's plain meaning analysis was informed by dictionary definitions for the terms "express" and "limit."[60]  The Court concluded that the BPS legislation's "failure to provide uniform treatment in the distribution of subsidies is not equivalent to its <u>explicit restriction</u> of those benefits to a specific enterprise or industry."[61]

According to the Court, it is not sufficient for the legislation under consideration to merely reference or incorporate prior legislation which itself may favor a specific sector and Commerce's reading of the requirement under the statute "reduces the *de jure* specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation."[62]  To illustrate its concerns, the Court provided the following example:

> {I}t is conceivable that a prior subsidy scheme could be constructed to explicitly favor cabbage growers, and that the current scheme incorporates a regional

---

[57] *See Second Remand Order* at 13 (quoting First Remand Redetermination at 14).
[58] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).
[59] *Id.* at 12-13.
[60] *Id.*
[61] *Id.* at 13 (emphasis in original).
[62] *Id.*

13

implementation of the prior favorable rates (as the BPS program does) - – but that changes in soil composition, weather patterns, or consumer demand has since caused most cabbage fields to be replaced by a wide range of alternative crops. In such a case, Commerce's reading would require a finding of *de jure* specificity even where the historic data included in the statute has no relationship to current production and might even correspond to equal treatment across the agricultural sector despite what appears to be "non-uniform" distribution of subsidies.[63]

The Court further stated that the plain meaning of the statute provides that "subsidies are only *de jure* specific where the authority providing the *current* subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry."[64]  As a result, the Court disagreed that it is "sufficient for the current scheme to exhibit 'a linkage between eligibility for... crop-specific payments provided under the prior legislation' and the payments currently provided, without more."[65]

Although the Court held that Commerce's reading of section 771(5A)(D)(i) deviated from the plain meaning of the provision and Congress's unambiguous intent, the Court explained that "Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds."[66]  Therefore, the Court remanded the issue for further proceedings consistent with its opinion.[67]

### 5. Analysis

As an initial matter, Commerce respectfully disagrees with the Court's view that our interpretation of the statute as it relates to *de jure* specificity is unreasonable or insufficient.  The BPS provides annual grants to farmers and is expressly limited to the agricultural sector; however, 19 CFR 351.502(e) states that an agricultural subsidy will not be considered specific

---

[63] *Id.* at 14.
[64] *Id.* (emphasis added).
[65] *Id.* at 13 (quoting First Remand Redetermination at 48-49).
[66] *Id.* (citing section 771(5A)(B)–(C), (D)(iii)–(iv) of the Act).
[67] *Id.* at 15.

14

under section 771(5A)(D) of the Act because the subsidy is limited to the agricultural sector. This regulation codified Commerce's longstanding practice of considering the agricultural sector, as a whole, to constitute more than a single group of industries,[68] which has been upheld by the Court.[69]  Commerce's *Preamble* provides the following:

> {T}he Secretary will not consider a domestic subsidy to be specific solely because it is limited to the agricultural sector.  Instead, as under prior practice, the Secretary will find an agricultural subsidy to be countervailable only if it is specific within the agricultural sector, *e.g.*, a subsidy is limited to livestock, or livestock receives disproportionately large amounts of the subsidy.  *See, e.g., Lamb Meat from New Zealand*, 50 FR 37708, 37711 (September 17, 1985).[70]

However, as we explained in the First Remand Redetermination, for an agricultural subsidy to qualify for this regulatory exception and not be considered specific, "the agricultural subsidy must include all agricultural products and there must be uniform treatment across all agricultural products."[71]  Thus, consistent with section 771(5A)(D) of the Act, the regulatory framework, and past practice of analyzing specificity of agricultural subsidies, Commerce examined whether the BPS benefits were uniformly available across the agricultural sector such that the subsidy provided would qualify for the exception under 19 CFR 351.502(e).

Information provided by the GOS and the EU demonstrated that access to, and the amount of, benefits provided to olive growers under the BPS, as a matter of law, relied for reference on the provision of benefits under the SPS and, in turn, access to and the amounts of benefits provided to olive growers under the SPS were determined by reference to the benefits provided under the Common Market Program.  Because the BPS legislatively incorporated by

---

[68] *See Final Negative Countervailing Duty Determination; Fresh Asparagus from Mexico*, 48 FR 21618, 21621 (May 14, 1983); *Fresh Cut Roses from Israel; Final Results of Administrative Review of Countervailing Duty Order*, 48 FR 36635, 36636 (August 12, 1983); and *Certain Fresh Cut Flowers from Mexico*, 49 FR 15007, 15008 (April 16, 1984).
[69] *See Roses Inc. v. United States*, 774 F. Supp. 1376, 1383-84 (CIT 1991).
[70] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65355 (November 25, 1998) (*Preamble*).
[71] *See* First Remand Redetermination at 48 n.157.

reference the eligibility criteria and benefits provided under the SPS and the Common Market Program, Commerce appropriately investigated those precursor programs to determine whether the BPS subsidies were uniformly available across the Spanish agricultural sector.

Notwithstanding our disagreement with the Court's decision, Commerce is complying with the Court's *Second Remand Order* and concludes that the BPS program is not *de jure* specific.[72] Because the CIT held that a subsidy is *de jure* specific only where the authority, or legislation pursuant to which the authority operates, explicitly restricts the distribution of subsidies to an enterprise or industry, and that a finding of non-uniform treatment in the distribution of benefits or linkage to crop-specific subsidies under predecessor programs is insufficient grounds for determining *de jure* specificity, Commerce no longer finds the BPS program to be *de jure* specific. However, as noted above, in remanding the matter the Court stated that "Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds."[73] Therefore, in accordance with Commerce's sequential analysis and normal practice of analyzing specificity,[74] on remand we have examined whether the BPS program is *de facto* specific.

Section 771(5A)(D)(iii) of the Act provides that a subsidy is *de facto* specific if any one of the following four factors exist:

---

[72] As explained in the First Remand Redetermination, Commerce's *de jure* analysis relied on additional elements. Namely, the context in which this specificity analysis was conducted, *e.g.*, the so-called "agricultural exception" to the specificity rule, how the *de jure* specificity test operates in conjunction with the corollary to the *de jure* test as outlined in section 771(5A)(D)(ii) of the Act in the context of agricultural subsidies, and prior Commerce practice with respect to agricultural subsidies and finding that non-uniform treatment within the agricultural sector could render such a subsidy to be specific. We also respectfully disagree with the Court's decision not to consider these additional factors and context in its ruling.

[73] *See Second Remand Order* at 13 (citing sections 771(5A)(B)–(C), (D)(iii)–(iv) of the Act).

[74] *See, e.g., Alloy Magnesium from Canada: Final Results of Countervailing Duty New Shipper Review*, 68 FR 22359 (April 28, 2003), and accompanying IDM at Comment 2 ("{B}ecause our specificity analysis is performed sequentially, we may examine *de facto* specificity when we fail to find *de jure* specificity."); *see also Preamble*, 63 FR at 65355 ("{I}f a subsidy is *de jure* specific or meets any one of the enumerated *de facto* specificity factors, in order of their appearance in section 771(5A)(D)(iii) of the Act, further analysis is unnecessary and is not undertaken.").

16

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

As set forth under 19 CFR 351.502(a), in determining whether a subsidy is *de facto* specific, Commerce will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially in order of appearance. If a single factor warrants a finding of specificity, Commerce will not undertake further analysis.

During the course of the investigation, we asked the GOS and the EU to provide usage information relevant for determining whether the BPS program may be *de facto* specific. In our initial questionnaire, we asked the GOS the following:

> Please provide the following information, in table form, regarding the number of recipient companies and industries and the amount of assistance approved under this program for the year in which any mandatory respondent was approved for assistance, as well as each of the preceding three years (*e.g.*, if a respondent was approved for assistance in 2014 and 2015, provide this information, by year, for 2011 through 2015).[75]

In response, the GOS replied with general information regarding the amount of total assistance approved under the BPS Basic Payment, Greening, and Young Farmers schemes during the POI and the number of applications submitted under each program.[76] The GOS also provided information regarding the amount of assistance approved for the respondent companies and their cross-owned affiliates, but the GOS did not provide any information as to the amount of

---

[75] *See* Commerce's Letter, "Countervailing Duty Investigation on Ripe Olives from Spain: Initial Questionnaire," dated August 4, 2017 (GOS Initial Questionnaire) at Section II, Standard Questions Appendix at question M.7.
[76] *See* GOS's Letter, "Response of Government of Spain to the Department's August 3, 2017 Initial Questionnaire," dated September 18, 2017 (GOS IQR) at 54.

17

assistance approved on a per industry basis.[77]  Specifically, in response to the question asking for total assistance amounts provided to the olive industry and all other industries, the GOS responded as follows:

> This question is not applicable as the payments are decoupled; it is not possible to determinate {sic} payments for the industry of table olives....  From the moment that subsidies on a sector have been decoupled (olive oil sector payments are fully decoupled since 2010); it is not possible to determine the share of this component which has been paid to a particular sector since there is no link between the specific crop and the payment.[78]

Following this response to our initial request for *de facto* usage information, we issued a supplemental questionnaire to the GOS and asked additional questions to obtain the necessary usage information for the BPS program.  Commerce asked for the total amount of CAP payments (Pillar I and II) made during the POI to the agricultural districts within Andalusia and for the total amount of CAP payments made to olive and table olive growers during the POI to the agricultural districts with Andalusia.[79]  In response, the GOS provided information as to the total amount of CAP assistance (Pillar I and II) but reiterated its previous response that decoupled payments are not product specific and it is not possible to differentiate by productive orientation, crop, or type of product.[80]

The GOS did not provide information in response to Commerce's initial or supplemental questionnaire as to the amount of assistance provided to the olive industry and other industries within the agricultural sector.  The requested information, such as amounts of assistance provided to the agricultural sector under this program on an industry basis, is necessary to determine whether the BPS is *de facto* specific and is not available on the record.  Because the

---

[77] *Id.* at 53-55.
[78] *Id.* at 55.
[79] *See* Commerce's Letter, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain:  Supplemental Questionnaire to the Government of Spain," dated October 25, 2017 at 3 (GOS Supplemental Questionnaire).
[80] *See* GOS 1SQR at 16.

GOS did not provide the requested information necessary for our *de facto* specificity analysis, we must resort to the facts otherwise available on the record to conduct the analysis, pursuant to sections 776(a)(1) and 776(a)(2)(B) of the Act.[81]  As explained below, we find, based on the facts otherwise available, that the BPS is *de facto* specific in accordance with section 771(5A)(D)(iii)(III) of the Act.

We initiated an investigation of this program based on an allegation in the Petition that was supported by adequate information that was available to the petitioner.[82]  For specificity, the petitioner alleged that under the SPS program, the predecessor to the BPS program, olive farmers in Spain received € 468 per hectare, per year.  This amount was based on a report that Spain's former Minister of Agriculture, Food and Environmental Affairs provided to Spain's National Parliament,[83] whereas, according to a published GOS report on the implementation of the SPS campaign for 2014, the average Spanish farmer received € 258.03 per hectare, per year.[84]  Moreover, the petitioner estimated that Spanish agricultural producers received € 4.9 billion in Pillar I SPS payments annually, based on a study by the U.S. International Trade Commission,[85] with Spanish olive producers receiving € 1.28 billion of those payments, or approximately 25 percent of the total annual agricultural aid to Spain, despite accounting for only 3 percent of

---

[81] Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person: (A) withholds information that has been requested; (B) fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; (C) significantly impedes a proceeding; or (D) provides information that cannot be verified as provided by section 782(i) of the Act.

[82] The petitioner is the Coalition for Fair Trade in Ripe Olives, which consists of domestic olive processors Bell-Carter Foods and Musco.

[83] *See* Petitioner's Letter, "Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended," dated June 22, 2017 (Petition) at Volume III at 16 (citing Olive Oil Times, *Olive Regions Work on Joint Strategy to Maintain EU Subsidies*, April 2, 2012).

[84] *See* Petition at Volume III at 17 (citing Government of Spain, Report on the Implementation of Regional Payments in Spain-2014 Campaign, March 2015).

[85] *See* Petition at Volume III at 9.

Spain's agricultural output.[86]  The petitioner estimated that Spain's olive industry receives € 1.28 billion in annual benefits under the BPS program.  To calculate this estimate, the Petitioner relied on EC Council Regulations 1638/98 and EC Regulation 1415/2001, which established the guaranteed quantities of production levels of olive oil for which assistance shall be granted in each Member State and estimated that the average guaranteed quantities of production of olive oil for which Spain granted assistance during 1999 to 2003 was 1,089,159 tons.[87]  The guaranteed quantities also includes table olives, which can be expressed as an olive oil equivalent.[88]  Multiplying the average guaranteed quantity of production of olive oil, 1,089,159 tons, by the per unit benefit of ECU 132.225/100 kilograms of olive oil established under the Common Market Program, equals € 1,440,412,777.50.[89]  The petitioner then multiplied the € 1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive groves,[90] to derive a total of € 864,247,667 as an estimate of the direct SPS aid for olive growers.  To the € 864,247,667, the petitioner added an additional € 412 million, which it claims was

---

[86] The petitioner alleged that the average olive production in Spain from 1999 to 2003 was 1,089,159 tons.  *See* Petition at Volume III at 15 (citing Exhibit III-13, Council Regulation 1415/2001).  Multiplying this average by the amount of assistance olive growers received under the Common Market Program for Oils and Fats, EC Council Reg. 1638/98 of € 132.225/100 kilogram equals € 1,440,412,777.50.  *See* Petition at Volume III at 15.  The petitioner then multiplied the € 1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive groves, totaling € 864,247,667 as the direct SPS aid for olive growers.  *Id.*  To the € 864,247,667, the petitioner estimates that an additional € 412 million was provided under the Aid to Olive Groves payment, which was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.

[87] *See* Petition at Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1; *see also* Petition at Exhibit III-13.

[88] *See* Petition at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).

[89] *See* Petition at Volume III at 15.

[90] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance, the olive industry received during the period from which the CMP was in effect, by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector, during the reference period 2000 to 2002, should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each farmer should be based on the marketing years 1999/2000 to 2002/2003.  *See* GOS IQR at 17 and EU IQR at Annex 12, EC Regulation, 1782/2003, establishing the Single Payment Scheme.  Articles 36 and 37 discuss payment per entitlement and Annex VII discuss the calculation of a reference amount upon which the entitlement is based.  Chapter 10B of this regulation establishes aid for Olive Groves, Article 110i, (3) which discusses that 60 percent of the SPS aid was granted on the basis of the value of entitlements per hectare held by olive growers and 40 percent of SPS was granted for maintaining olive groves.

annual assistance that was provided under the Aid to Olive Groves payment that was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.

According to the European Commission (EC), funding for the BPS direct payment program in Spain is expected to remain at levels similar to SPS levels. The EC maintained that the budget for Spanish farmers would remain stable during 2014 (when SPS was still in effect) through 2020, at just under € 5 billion a year,[91] closely approximating SPS levels cited by the petitioner. Because the facts otherwise available indicate that the olive industry in Spain received about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS program, we find, as facts otherwise available, that the BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

The information above can be corroborated and supported by the limited *de facto* usage data that the GOS provided on the record.[92] Although the GOS did not provide a breakdown on the amount of assistance on an industry or a crop-specific basis, the GOS provided the total amount of assistance provided under the BPS program during the POI and the total number of approved applications.[93] The GOS reported that they approved [          ] in assistance under the BPS program, including the Basic Payment and Greening programs during campaign

---

[91] *See* Petition at Volume III at Exhibit III-15, "CAP in Your Country."

[92] Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is defined as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise." *See* SAA at 870. Examples of independent sources include, "for example, published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review." *Id.* The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value. *Id.* To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used. However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.

[93] *See* GOS IQR at 53-54.

2015/financial year 2016,[94] and that the total number of approved applications under this program during this period was [      ];[95] thus, the average amount of assistance per application was [      ].  We divided the total amount of assistance received by the total number of applications received per year as a proxy for the total number of companies because the GOS indicated that farmers submit a single application to the Member State per application period.[96] We compared this average to the amount of assistance respondents and their cross-owned affiliates were approved for during this period and found that these respondents were approved for between [      ] to [      ] under the program, which was between double and 83 times the average amount of assistance.  We find that the information from the petitioner that we have relied upon as facts otherwise available in our *de facto* analysis is reliable and relevant because independent information submitted by the GOS in its questionnaire responses similarly show that the respondents, who operate within the olive industry, received considerably higher levels of assistance than the average.  Accordingly, we have corroborated the *de facto* information from the Petition to the extent practicable.  Taken together, the information from the Petition and the information provided by the GOS support a finding that the BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act and is a countervailable subsidy.

### B.  Commerce's Interpretation and Analysis of Section 771B(1) of the Act

#### 1.  Commerce's *Final Determination*

In the *Final Determination*, we relied on section 771B of the Act to examine and measure subsidies provided to olive growers (such as the CAP Pillar I programs) as though they were

---

[94] *Id.*
[95] *Id.*
[96] *See* GOS IQR at 50.

provided to the olive processors (*i.e.*, the respondents in this case).[97]  Section 771B of the Act

addresses the calculation of countervailable subsidies on certain processed agricultural products:

> In the case of an agricultural product processed from a raw agricultural product in which –
>> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>> (2) the processing operation adds only limited value to the raw commodity,
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

Commerce found that section 771B of the Act applied in this investigation because the

two-pronged test was satisfied.[98]  Regarding section 771B(1) of the Act, we found that the

demand for raw olives (*i.e.*, the prior stage product) was substantially dependent on the demand

for table olives (*i.e.*, the latter stage product, which includes ripe olives and other olives that are

eaten as processed), and we relied on record information showing that eight percent of all raw

olives are used to produce table olives.[99]  In our analysis, we explained that Congress has not

specified, nor has Commerce otherwise established through rulemaking or practice, a minimum

threshold requirement to satisfy the "substantially dependent" criterion.[100]

## 2.  The Court's *First Remand Order*

The Court held that Commerce's conclusion regarding the first criterion under section

771B(1) of the Act is not in accordance with the law because "Commerce applied an

impermissible interpretation of the statutory term 'substantially dependent' based on its plain

language and legislative history."[101]  The Court determined that, while Commerce found the

---

[97] *See Final Determination* IDM at 6-7.
[98] *Id.* at 21.
[99] *See Preliminary Determination* PDM at 16, unchanged in *Final Determination*.
[100] *Id.* at 16, unchanged in *Final Determination*.
[101] *See First Remand Order* at 21.

amount of raw olives used for processing into table olives, eight percent of all raw olives, to be

substantial and that the demand for raw olives was dependent on the demand for table olives,

Commerce failed to assess whether the demand for raw olives was "substantially dependent"

because "an analysis of 'substantially dependent' that does not link those two terms is an

impermissible interpretation of the statute."[102]  According to the Court, Commerce did not read

the terms "substantially" and "dependent" in conjunction, but separated the terms to reach its

conclusion that the demand for raw olives is substantially dependent upon the demand for table

olives.[103]

Furthermore, the Court did not defer to Commerce's interpretation of "substantially

dependent" because the Court concluded that "the statutory language is unambiguous regarding

the threshold of demand required to satisfy {section 771B(1) of the Act}."[104]  In reaching this

conclusion, the Court explained that the legislative history of section 771B of the Act illuminates

Congress's unambiguous intent for the meaning of "substantially dependent," citing *Pork from

Canada*[105] and *Rice from Thailand Inv.*[106] as the administrative cases that contain the analysis

that Congress intended to adopt with the enactment of the statute.[107]  The Court observed that, in

*Pork from Canada*, Commerce found that the first criterion would be satisfied if the demand for

the prior stage good is derived almost exclusively from the demand for the latter stage product.[108]

The Court noted that, in *Pork from Canada*, "Commerce also relied on the {International Trade

Commission's} industry analysis, which determined that producers of a raw agricultural product

---

[102] *Id*. at 22.
[103] *Id*.
[104] *Id*. at 22-23.
[105] *See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled, and Frozen Pork Products from Canada*, 50 FR 25097 (June 17, 1985) (*Pork from Canada*).
[106] *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Rice from Thailand*, 51 FR 12356 (April 10, 1986) (*Rice from Thailand Inv.*).
[107] *See First Remand Order* at 23-26.
[108] *Id*. at 24 (quoting from *Pork from Canada*, 50 FR at 25098).

24

and producers of the processed product could be collapsed into a single industry where the raw product enters a single continuous line of production resulting in one end product."[109]  Similarly, the Court observed that, in *Rice from Thailand Inv.*, Commerce found that almost all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice and stated that there was a single continuous line of production from paddy rice to milled rice.[110]

The Court further concluded that after the enactment of section 771B of the Act, Commerce developed a consistent practice of finding the first criterion satisfied when the demand for the latter stage product is "most or at least half of the demand of the raw agricultural product."[111]  However, the Court determined that Commerce deviated from its past interpretation of "substantially dependent" in the *Final Determination*.[112]  The Court acknowledged that Commerce previously found that 44.7 percent satisfied the "substantially dependent" criterion in *Shrimp from China*,[113] but stated that "44.7 percent is significantly higher than eight percent."[114]

In sum, the Court concluded that Commerce deviated from the plain language of the statute, Congress's unambiguous intent, and Commerce's practice in determining that the demand for raw olives is substantially dependent on the eight percent of raw olives used to produce table olives.  The Court therefore remanded Commerce's analysis under section 771B(1) of the Act for further proceedings consistent with the Court's decision.[115]

---

[109] *Id.* at 24-25 (quoting *Pork from Canada*, 50 FR at 25099 (internal quotations omitted)).
[110] *Id.* at 25 (quoting *Rice from Thailand Inv.*, 51 FR at 12358).
[111] *Id.* at 27 (citing *Fresh, Chilled, and Frozen Pork from Canada:  Final Affirmative Countervailing Duty Determination*, 54 FR 30774 (July 24, 1989); and *Rice from Thailand:  Final Results of Countervailing Duty Administrative Review*, 59 FR 8906 (February 24, 1994) (*Rice from Thailand 1994*)).
[112] *Id.* at 26-28.
[113] *Id.* at 28 (discussing *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*)).
[114] *Id.*
[115] *Id.* at 40.

### 3.    Commerce's First Remand Redetermination

In the first remand, Commerce reopened the record and new factual information on the record established that there is recognition by the GOS and the Spanish olive industry that certain raw olive varietals are grown specifically for producing table olives, other raw olive varietals are grown as mill olives to produce olive oil, and other raw olive varietals can be used for either purpose, *i.e.*, dual-use olives.[116]  Based on the information, and in the absence of a statutory definition, we reconsidered the meaning of "prior stage product" and interpreted the term to include "raw olive varietals principally suitable for use in the production of table olives."[117]  We found that redefining "prior stage product" in this way was supported by the manner in which GOS agencies collect and publicize data on Spanish olive production, and by Spanish industry data sources demonstrating it is accepted in the olive sector that, at their source, raw olives, based on their varietal and specific cultivation practices for dual-use olives, are grown for use as either table olives or olive oil.[118]  Information from the Ministry of Agriculture demonstrated that certain raw olive varietals (both table and dual-use) are grown specifically for table olive production[119] and that 96 percent of raw table and dual-use olive varietals principally suitable for use in the production of table olives were processed into table olives during the POI.[120]  Therefore, Commerce continued to find section 771B(1) of the Act to be satisfied because the demand for the prior stage product, varietals of raw olives principally suitable for use in the production of table olives, is substantially dependent on the demand for the latter stage product, table olives.

---

[116] *See* First Remand Redetermination at 24, 29.
[117] *Id.*
[118] *See* First Remand Redetermination at 29-30.
[119] *See* Final Remand Redetermination at 33.
[120] *Id.*

26

#### 4.  The Court's *Second Remand Order*

The Court held that Commerce's conclusion that "prior stage product" and "raw agricultural product" are not coextensive in the context of section 771B of the Act is both reasonable and in accordance with law.[121]  The Court agreed that Commerce's construction of section 771B of the Act ensures that both "raw agricultural product" and "prior stage product" are given meaningful effect.[122]  However, the Court rejected Commerce's definition of "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product."[123]  The Court held that "prior stage product" cannot be both distinct from the "raw agricultural product" and also a subset of the raw agricultural product, and concluded that such a definition of "prior stage product" renders the requirements of section 771B of the Act self-fulfilling because raw olives principally suitable for use in table olive production are likely processed into table olives.[124]  Because the Court rejected Commerce's interpretation and definition of "prior stage product," it declined to rule on Commerce's application of its interpretation of that term in its revised analysis of section 771B(1) of the Act and remanded the issue for further proceedings.[125]

#### 5.  Analysis

Section 771B of the Act directs Commerce to deem countervailable subsidies provided to producers of a raw agricultural product as though they have been provided with respect to the manufacture, production, or exportation of the processed agricultural product, if two criteria are met.  Relevant for purposes of this remand, the first criterion of the analysis under section

---

[121] *See Second Remand Order* at 18-19.
[122] *Id.*
[123] *Id.* at 19-20.
[124] *Id.* at 19.
[125] *Id.* at 20.

771B(1) of the Act requires determining whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product."

For the reasons stated in the First Remand Redetermination, we continue to respectfully disagree with the Court's holding in the *First Remand Order* that, under step one of the two-step framework set forth in *Chevron*, the statutory language is unambiguous regarding the threshold of demand required to satisfy the "substantially dependent" criterion and that Commerce applied an impermissible interpretation of that term in the *Final Determination*.[126]  In compliance with the *First Remand Order*, we reexamined whether this criterion is satisfied and revised our analysis.[127]  However, the Court held in the *Second Remand Order* that Commerce's revised interpretation of "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" is an impermissible construction of 771B(1) of the Act.[128]  The Court explained that Commerce's interpretation results in an impermissible construction of the provision because an interpretation that allows the "prior stage product" to be a subset of the "raw agricultural product" causes the statute as a whole to become superfluous.[129]  As explained below, in compliance with the *Second Remand Order*, we have reconsidered the meaning of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act in this case and find that the demand for distinct biological varietals of raw olives (the relevant raw agricultural product that is also the prior stage product) is substantially dependent on the demand for table olives (the latter stage product).

---

[126] *See* First Remand Redetermination at 34-41.
[127] *Id.* at 20-41.
[128] *See Second Remand Order* at 16-20.
[129] *Id.* at 19.

In the First Remand Redetermination, we explained that the Act does not define "raw agricultural product," "prior stage product," and "latter stage product" as those terms are used in section 771B of the Act.[130]  For purposes of identifying the relevant industry for the domestic like product, the Act defines "raw agricultural product" as "*any* farm or fishery product."[131] Commerce has, through practice, adopted a similar definition of the term "raw agricultural product" for purposes of section 771B of the Act.[132]  Although in the *Final Determination* and the First Remand Redetermination Commerce identified all raw olives as the raw agricultural product, the information on the record discussed below demonstrates that there are distinct biological varietals of raw olives and only those varietals that the GOS and the Spanish olive industry recognize as table or dual-use olive varietals represent the relevant raw agricultural product in this investigation on ripe olives.[133]  We continue to identify table olives as the latter stage product, for the reasons previously explained in the *Final Determination* and the First Remand Redetermination.[134]  Further, because there is no intermediate stage of production between table olives and their raw form, we consider it appropriate in this case to define the "prior stage product" to be the same as the "raw agricultural product" (*i.e.*, table and dual-use raw olive varietals).  Therefore, Commerce is conducting the analysis under section 771B(1) of the Act by using a "raw agricultural product" and "prior stage product" that is defined as table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals and a "latter stage product" that is defined as table olives.

---

[130] *See* First Remand Redetermination at 25-26.
[131] *See* section 771(4)(E)(iv) of the Act (emphasis added).
[132] *See* First Remand Redetermination at 25 (citing *Shrimp from China*; *Rice from Thailand 1994*).
[133] The Court acknowledged the possibility that a "distinct biological varietal can be considered a distinct raw agricultural product under the definition Commerce employs . . . ."  *See Second Remand Order* at 20 n.5.
[134] *See Final Determination* IDM at 21; First Remand Redetermination at 26, 84-85 n.229.

Data from both the respondents' and the petitioner's submissions demonstrate that there are only five biological varietals of raw olives that the GOS considers suitable for table olive production. The GOS confirmed that it tracks table olive production statistics by variety because the production process and marketing differ by varietals for table olive production whereas statistics are not collected by varietal for olives grown for olive oil because the production process is similar for mill olive varietals and there is no differentiation in the market based on mill olive varietals.[135]

According to Spain's Ministry of Agriculture Food Information and Control Agency (AICA) and Interaceituna, a Spanish interprofessional organization for the table olive industry, the five principal raw olive varietals are manzanilla, gordal, hojiblanca, cacerena, and carrasquena, which accounted for 602,020 tons of table olives production,[136] or 95 percent of total table olive production during the 2015/2016 campaign, which most closely corresponds with the POI.[137] The record indicates that Spain considers three of these varietals, manzanilla, gordal, and carrasquena, as table olive varietals,[138] and two of these varietals, hojiblanca and cacerena, as dual-use olive varietals.[139] The GOS's Ministry of Agriculture indicates that the

---

[135] *See* First Remand Redetermination at 98 (citing the GOS's Letter, Countervailing Duty Investigation of Ripe Olives from Spain-Department of Commerce's Draft Remand Redetermination," dated April 17, 2020 at 11 and 13; and Musco's Letter, "Ripe Olives from Spain; 1st Administrative Review; Response to Request for Additional Information," dated February 25, 2020 (Musco's February 25 Response) at 8).

[136] *See* ASEMESA, Agro Sevilla Aceitunas S.Coop.And. (Agro Sevilla), and Angel Camacho Alimentacion, S.L. (Camacho)'s Letter, "Factual Information Submission of 'Substantial Dependence,'" dated January 15, 2020 at Exhibit NFI-5; *see also* ASEMESA, Agro Sevilla, and Camacho's Letter, "Response to the Request for Additional Information on Substantial Dependence-Ripe Olives from Spain (C-469-818)," dated February 21, 2020 (ASEMESA's February 21 Response) at Exhibit NFI-3; Musco's February 25 Response at Exhibits 10 and 11.

[137] *See* GOS IQR at 33. "Usually, table olives are collected from September to November, but it takes three or four months to prepare before consuming. The production is collected at the end of the year and is marketed the following year. Then, production of POI (2016) corresponds to the production of the 2015/2016 season." The GOS does not collect production data on a calendar year. Because they explained that the marketing year 2015/2016 that most closely corresponds to the POI, we are using production data for the 2015/2016 campaign which includes data through June 30, 2016. *See* ASEMESA's February 21 Response at NFI-2.

[138] *See* Musco's Letter, "Ripe Olives from Spain; 1st Administrative Review; Submission of New Factual Information," dated February 5, 2020 (Musco's February 5 Response) at 4 and Exhibit 2; *see also* GOS 1SQR at 4.

[139] *See* Musco's February 5 Response at Exhibit 2

Seville Camomile, otherwise known as manzanilla de Sevilla or carrasquena,[140] and gordal

varietals are fit solely for table production.[141]  Further, the GOS reported that almost 90 percent

of the manzanilla olives were processed into green olive production.[142]  Because the GOS states

that almost all manzanilla olives are used as table olives and makes no mention of them being

dual-use in its discussion of dual-use olives, we are considering manzanilla as fit for table.[143]

Unlike mill varietals, these table olive varietals have a lower oil content, are larger in size, are

more symmetrical in shape, and generally are characterized as having a higher pulp-to-bone

ratio.[144]  Information from the GOS website and industry sources indicate that table olive

varietals tend to be larger than mill olive varietals.[145]  Additionally, orchards dedicated to

growing table and dual-use olive varietals for table olive production (*e.g.*, hojiblanca) require

larger amounts of water than mill olive orchards and often are located in the south and western

regions of Spain where there is high rainfall.[146]  In comparison, growers of mill olives minimize

water consumption in order to maximize oil content.[147]  The pruning practices for table and dual-

use olive varietals grown for table also are distinctly different than those for growing mill

olives.[148]  Growers of table olive varietals and dual-use olive varietals grown for table

intensively prune the orchard branches to maximize their size and follow more stringent pest

management practices.[149]  Moreover, olives must pass the International Olive Council (IOC)

---

[140] *Id.* at 4.

[141] *See* Musco's February 25 Response at Exhibit 2A.

[142] *See* GOS's Letter, "Response of the Government of Spain in the Department's October 25, 2017 Supplemental Questionnaire," dated November 7, 2017 at 4.

[143] *Id.*

[144] *See* Musco's February 5 Response at 5 and Exhibit 2.

[145] *Id.* at 2; *see also* and Musco's February 25 Response at Exhibit 13.

[146] *See* Musco's February 25 Response at Exhibit 5A.

[147] *Id.*; *see also* Musco's February 5 Response at 7.

[148] *See* Musco's February 5 Response at 7; *see also* Musco's February 25 Response at Exhibit 13.

[149] *Id.*

standards and industry requirements for table olive production.[150]  The IOC emphasizes that table

olives can only be produced from certain varietals.  Specifically, the IOC states that "the table

olive is the fruit of *certain varieties* of the cultivated healthy olive tree, taken in the state of

adequate maturity and quality that, subject to the appropriate preparations, gives a product of

consumption and good conservation as commercial merchandise."[151]  Mill olive varietals

generally do not meet the IOC standards referenced above.[152]  For Harvest 2016 (corresponding

to the 2015/2016 campaign), only 1 percent of mill varietals were processed into table olives.[153]

Because manzanilla, gordal, hojiblanca, and carrasquena account for 87 percent of olive

production grown for table during the POI, we are relying on these four table and dual-use raw

olive varietals as the "prior stage product" in our "substantial dependence" analysis.  Cacerena is

also considered a dual-use raw olive varietal, as explained above.[154]  However, the record does

not contain sufficient information regarding the total production volumes, mill production

volumes, or the total hectares dedicated to the production of cacerena that would allow us to

include this varietal in the substantial dependence calculation.  Furthermore, the evidence on the

record suggests that the production volume of cacerena comprises a small percentage of the total

volume of olive varietals grown for table.[155]

To conduct this analysis, the numerator consists of the manzanilla, gordal, carrasquena,

and hojiblanca varietals of olives processed into table olives (the latter stage product), and the

denominator consists of total tonnage of manzanilla, gordal, carrasquena, and hojiblanca

produced (the prior stage product).  We are not considering strictly mill varietals that were used

---

[150] *See* Musco's February 5 Response at Exhibit 3.
[151] *See* Musco's February 25 Response at Exhibit 2A.
[152] *Id.*
[153] *Id.* at Exhibit 7B.
[154] *See* Musco's February 25 Response at Exhibit 2 and Musco's February 5 Response at Exhibit 1.
[155] *See* ASEMESA's February 21 Response at Exhibit NFI-2.

as table in the numerator because of their biological differences, higher oil content, smaller size, and the fact that mill olives generally do not meet IOC standards. In addition, GOS statistics demonstrate that typically only 1 percent of mill olives are sent to table.[156]

In the draft redetermination, we relied on record evidence showing the actual volume the prior stage product used for table olives and found that 582,648 tons of manzanilla, gordal, carrasquena, and hojiblanca varietals were processed into table olives during Harvest 2016. The 582,648 tons include the 492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table plus 90,404 tons of mill olives used for table olive production.[157] We included the 90,404 tons of dual-use and mill olives grown for mill but used as table.[158] However, in the calculation, we stated that we presumed that a portion of these mill olives used as table may be hojiblanca, because this varietal is often used as table and it is a dual-use olive which makes it more likely than mill olives to have the inherent physical characteristics to be used as table because strictly mill olives are even less likely to meet the IOC standards.[159] Since the issuance of the draft redetermination, Commerce has received comments from ASEMESA that the 90,404 tons of mill olives used for table olive production may not only be hojiblanca grown for mill, but could also be cacerena and other varietals grown for the mill.[160] We agree that, other than hojiblanca, these dual-use olives grown for mill and used for table olive production should not be included in the numerator because the record does not contain sufficient data regarding these varietals and we have not accounted for them in the denominator. Because we do not have data on cacerena and other dual-use olives grown for mill, we find it reasonable to infer that the

---

[156] *See* Musco's February 25 Response at Exhibit 7B.
[157] *See* ASEMESA's February 21 Response at Exhibit NFI-2.
[158] *See* Memorandum to the File from Mary Kolberg, "Countervailing Duty Investigation of Ripe Olives from Spain: Analysis of the Draft Remand Results for Finding the BPS Program de facto Specific and the First Criterion of Section 771B is Satisfied," dated October 7, 2021.
[159] *Id.*; *see also* Musco's February 5 Response at 3 and Exhibit 2.
[160] *See* ASEMESA's Comments at 17.

percentage of dual-use varietals grown for table olives on a varietal-by-varietal basis is the same as the percentage of dual-use varietals grown for mill.[161] Subtracting the estimated amount of cacerena and "other" dual-use varietals grown for mill but used for table olive production, which is 18,590 tons, from the numerator, we arrive at a revised numerator of 564,058 tons, which includes 492,244 tons of manzanilla, gordal, carrasquena, and hojiblanca grown for table, plus the 71,814 tons of hojiblanca grown for mill but used for table olive production in Harvest 2016.[162]

For the denominator, the record evidence shows that 511,122 tons of manzanilla, gordal, carrasquena, and hojiblanca olives are grown for table olives.[163] However, hojiblanca olives are a dual-use olive varietal that is also used to produce olive oil. Therefore, we find that the hojiblanca mill olives should also be included in the denominator of the substantial dependence varietal analysis. Because the record does not include a figure that represents the total volume of hojiblanca olives used to produce olive oil, we need to derive this information based on the production volume data and hectare data on the record.

We begin our analysis by calculating yield rates for table olives (and dual-use olives grown for table) and mill olives. Data from the GOS's Annual Crop Surfaces and Productions publication illustrates that 511,122 tons of table and dual-use olive varietals grown for table were produced during Harvest 2016.[164] Dividing the 511,122 tons of table and dual-use olive varietals by 160,400 hectares,[165] the total number of cultivated hectares dedicated to the production of table olives during Harvest 2016 (a change from the draft redetermination where we used total

---

[161] *See* Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain: Analysis of the Final Remand Results for Finding the First Criterion of Section 771 is Satisfied," dated November 3, 2021 (Final Calculation Memorandum).
[162] *See* Musco's February 25 Response at Exhibit 7B.
[163] *Id.*
[164] *Id.* at Exhibit 7B.
[165] *See* ASEMESA's February 21 Response at Exhibit NFI-1.

hectares), we arrive at a 3.19 tons per hectare yield rate for table olives.  Similarly, we calculate a yield rate for mill olives, taking the total production of mill olives, 6,571,428 tons,[166] and divide by the number of cultivated hectares dedicated to mill olive production, 2,243,700[167] hectares, resulting in a yield rate for mill olives of 2.93 tons per hectare.

Having derived the yield rate for table and mill olives, we can determine the number of cultivated hojiblanca hectares dedicated to table and mill olive production.  Data from Spain's AICA indicate that 290,850 tons of hojiblanca grown for table olives were produced during the 2015/2016 campaign.[168]  To determine the number of cultivated hojiblanca hectares dedicated to table olives, we divided the 290,850 tons grown for table olives by the yield rate for table olives, 3.19 tons per hectare, and determined that 91,176 hojiblanca hectares were dedicated to table olives.[169]  To determine the number of cultivated hojiblanca hectares dedicated to mill olives, we took the total number of hojiblanca hectares, 265,000 hectares,[170] and subtracted the 91,176 hojiblanca hectares dedicated to table olives and concluded that 173,824 hojiblanca hectares were dedicated to mill olives during Harvest 2016.[171]  To determine the total volume of hojiblanca olives grown for use as mill olives, we multiplied the number of hojiblanca hectares dedicated to growing mill olives, 173,824, by the yield rate for mill olives, 2.93 tons per hectare, and found that 509,304 tons of hojiblanca olives were grown for mill olives during Harvest 2016.

To calculate the number of tons of manzanilla, gordal, carrasquena, and hojiblanca produced during the POI (used in the denominator of our calculation), Commerce added the 509,304 tons of hojiblanca mill olives and the 511,122 tons of manzanilla, gordal, carrasquena,

---

[166] *See* Musco's February 25 Response at Exhibit 7B.
[167] *See* ASEMESA's February 21 Response at Exhibit NFI-1.
[168] *Id.* at Exhibit NFI-2.
[169] *See* Final Calculation Memorandum.
[170] *See* Musco's February 25 Response at Exhibit 2A.
[171] *See* Final Calculation Memorandum.

35

and hojiblanca grown for table olives to determine that 1,020,426 tons of manzanilla, gordal, carrasquena, and hojiblanca olive varietals were produced in Harvest 2016.[172]  Finally, we conducted our substantial dependence analysis, using the 564,058 tons of manzanilla, gordal, hojiblanca, and carrasquena varietals processed into table olives as the numerator and divided by 1,020,426 tons of all the manzanilla, gordal, hojiblanca, and carrasquena varietals produced during Harvest 2016, which revealed that 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals were processed into table olives.[173]  Because 55.28 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals, the prior stage product, were processed into table olives, the latter stage product, we find that the demand for these varietals is substantially dependent on processed table olives.  Thus, we find that section 771B of the Act applies in this investigation because the two-pronged test in this provision is satisfied.  Because we have determined that subsidies provided to growers of raw olives under the BPS program are *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act, and that the criteria in section 771B of the Act are satisfied, we deemed the subsidies provided under this program to have been provided with respect to the production of the processed product (table olives).  Our findings here have not resulted in any changes to the net countervailable subsidy rates determined in the *Amended Final Determination and Countervailing Duty Order*.

---

[172] *Id.*
[173] *Id.*

IV.    **SUMMARY AND ANALYSIS OF COMMENTS FROM INTERESTED PARTIES**

**Comment 1:  Whether Commerce Correctly Determined that the BPS/Greening Program
is *De Facto* Specific**

*GOS's Comments:*[174]

*Information Relied Upon as Facts Otherwise Available*

- Commerce indicates that the BPS budget for Spanish farmers remained constant with
  respect to the SPS.  However, there is no linearity in the aid received between the two
  programs.  The national ceiling for BPS is much lower than the ceiling for SPS.

- The integration of direct aid in the SPS program for olive groves was carried out in 2006
  with 93.61 percent decoupling to reach 100 percent in 2010 and not 60-40 percent as
  indicated in the calculations.

- The average value of the SPS entitlement per hectare (258.03 €/ha) is reduced to 144.78
  €/ha in 2019.

*Corroboration*

- Commerce calculated the average amount of assistance received under the BPS program
  by dividing the total budget allocated to Pillar I aid by the number of applications and
  compared this average BPS amount with amounts received by suppliers to the olives
  respondents under investigation to conclude that the respondents' benefits are much
  higher than the national average, and therefore the aid is *de facto* specific.  However, this
  is erroneous given that:  (1) the amounts received by farmers are total amounts and not
  unit amounts per hectare, so it is not possible to draw any conclusions from them since
  the sector receiving the aid is not specified; (2) the aid is the result of multiplying the
  total area of each beneficiary by its unit value and, consequently, we cannot know what

---

[174] *See* GOS's Comments at 1-5.

the unit value of the entitlements of the beneficiaries are – whether they are lower or higher than the average value, nor do we know which sectors were integrated into the SPS or BPS entitlement system when these benefits were allocated; the aid received lacks traceability by crop and is allocated according to eligible hectares. This means that recipients receive aid irrespective of the type of area; and it is not known what type of production gave rise to the entitlement; (3) it is also not certain that the olive trees were present at the time of the allocation of entitlements and that the entitlements derive from the allocation to that holder and not from transfer of entitlements.

*ASEMESA's Comments:*[175]

*Information Relied Upon as Facts Otherwise Available*

- In determining that the BPS/Greening program is *de facto* specific, Commerce relied on calculations included in the Petition. Specifically, Commerce relied upon the petitioner's allegation that the average olive production in Spain from 1999 to 2003 was 1,089,159 tons, from which the petitioner derived € 1.28 billion in assistance is provided to olive farmers each year. However, the 1,089,159 tons refers to tons of processed olive oil not tons of raw olives, as the source of the document referred to by the petitioner is entitled "fixing the actual production of olive oil and the unit amount of the production aid for the 1999/2000 marketing year." Other record evidence demonstrates that annual olive production in Spain beginning in 2007 ranges anywhere between 4 to 9 million tons.

- Secondly, the petitioner's purported per unit benefit used in the calculation of total benefits to the olive sector is mischaracterized. Commerce multiplies the mischaracterized average olive production of 1,089.159 tons by the average amount of

---

[175] *See* ASEMESA's Comments at 1 and 5-8.

assistance olive growers received under the Common Market Program of EUR 132.225/100 kilograms. However, this figure is nearly two decades old and expressed in terms of the volume of olive oil production, not olive production.

- Lastly, Commerce relies on past programs, such as the Common Market Program, to render its final calculation of the total benefits to olive growers for the existing BPS/Greening program. Commerce's selection of "facts available" does not concern facts attributable to the BPS/Greening program and should not be used.

- Even assuming the 25 percent figure is reasonable, Commerce does not demonstrate how this figure is disproportionate within the meaning of section 771(5A)(D)(iii)(III) of the Act. It merely presumes disproportionality from the figure itself.

*Corroboration*

- Commerce claims to have corroborated its facts that the Spanish olive industry received a disproportionate amount by comparing the average amount of assistance under the BPS/Greening programs per application using the total applications and benefits reported by the GOS with benefits received under the program by the respondents. Based on this comparison, Commerce concludes that the respondents received benefits between double and 83 times the average amount.

- Commerce's analysis of GOS data does not corroborate disproportionality of BPS/Greening benefits because it does not analyze benefits on the basis on which they were administered. The level of BPS/Greening benefits is not determined on an application basis, but on the number of entitlements declared in the application.

- To calculate the benefit amount to a farmer, one must multiply the entitlement value by the number of hectares reported in the application.

39

- It is not surprising to find the large operations possessed by the respondents receiving higher levels of per-application benefits than the average because the average would be driven by the numerous smaller farmers with fewer hectares and, therefore, fewer entitlements reported in their applications.

- Commerce's attempt to corroborate highlights that BPS/Greening benefits are scalable based on the size of operation, and therefore, fundamentally proportionate, not disproportionate.  Therefore, Commerce should decline to find this program *de facto* specific.

**Commerce's Position**:

*Information Relied Upon as Facts Otherwise Available*

We disagree with the respondents and continue to find that the BPS program is *de facto* specific because the olive industry received a disproportionately large amount of assistance under the program.  During the investigation, we asked the GOS and the EU to provide usage information relevant for determining whether the BPS program may be *de facto* specific.  We asked for information on the number of companies and industries and the amount of assistance approved for this program to the olive industry and to every other industry in which companies were approved for assistance under the program.[176]  In response, the GOS replied with general information regarding the amount of total assistance approved under the BPS Basic Payment, Greening, and Young Farmers schemes during the POI and the number of applications submitted under each program.[177]  The GOS also provided information regarding the amount of assistance approved for the respondent companies and their cross-owned affiliates, but despite our request, the GOS did not provide any information as to the amount of assistance approved on a per

---

[176] *See* GOS Initial Questionnaire at Section II, Standard Questions Appendix at question M.7.
[177] *See* GOS IQR at 54.

industry basis.[178]  In a supplemental questionnaire to the GOS, we asked additional questions to

obtain the necessary usage information for the BPS program, specifically asking for the total

amount of CAP payments (Pillar I and II) made during the POI to the agricultural districts within

Andalusia and for the total amount of CAP payments made to olive and table olive growers

during the POI to the agricultural districts within Andalusia.[179]  In response, the GOS provided

information as to the total amount of CAP assistance (Pillar I and II) but reiterated its previous

response that decoupled payments are not product specific and it is not possible to differentiate

by productive orientation, crop, or type of product.[180]

The GOS did not provide information in response to Commerce's initial or supplemental

questionnaire as to the amount of assistance provided to the olive industry and other industries

within the agricultural sector.  The requested information, such as amounts of assistance

provided to the olive and other industries under this program, is necessary to determine whether

the BPS is *de facto* specific and is not available on the record.  Because the GOS did not provide

the requested information necessary for our *de facto* specificity analysis, we must resort to the

facts otherwise available on the record to conduct the analysis, pursuant to sections 776(a)(1) and

776(a)(2)(B) of the Act.  As explained below, we continue to find, based on the facts otherwise

available, that the BPS is *de facto* specific in accordance with section 771(5A)(D)(iii)(III) of the

Act.

The facts underlying our *de facto* specificity determination come from the Petition, the

only information on the record regarding the distribution of assistance under the BPS on an

industry basis.  We initiated an investigation of this program based on an allegation in the

---

[178] *Id.* at 53-55.
[179] *See* GOS Supplemental Questionnaire at 3.
[180] *See* GOS 1SQR at 16.

Petition that was supported by adequate information that was available to the petitioner.  For

specificity, the petitioner alleged that under the SPS program, the predecessor to the BPS

program, olive farmers in Spain received € 468 per hectare, per year.  This amount was based on

a report that Spain's former Minister of Agriculture, Food and Environmental Affairs, provided

to Spain's National Parliament,[181] whereas, according to a published GOS report on the

implementation of the SPS campaign for 2014, the average Spanish farmer received € 258.03 per

hectare, per year.[182]  Moreover, the petitioner estimated that Spanish agricultural producers

received € 4.9 billion in Pillar I SPS payments annually, based on a study by the U.S.

International Trade Commission,[183] with Spanish olive producers receiving € 1.28 billion of

those payments, or approximately 25 percent of the total annual agricultural aid to Spain.[184]  As

explained above, the petitioner estimated that Spain's olive industry receives € 1.28 billion in

annual benefits under the BPS program.  To calculate this estimate, the petitioner relied on EC

Council Regulations 1638/98 and EC Regulation 1415/2001, which established the guaranteed

quantities of production levels of olive oil for which assistance shall be granted in each Member

State,[185] and estimated that the average guaranteed quantities of production of olive oil for which

Spain granted assistance during 1999 to 2003 was 1,089,159 tons.[186]  The guaranteed quantities

also includes table olives, which can be expressed as an olive oil equivalent.[187]  Multiplying the

average guaranteed quantity of production of olive oil, 1,089,159 tons, by the per unit benefit of

ECU 132.225/100 kilograms of olive oil established under the Common Market Program, equals

---

[181] *See* Petition at Volume III at 16 (citing Olive Oil Times, *Olive Regions Work on Joint Strategy to Maintain EU Subsidies*, April 2, 2012).
[182] *See* Petition at Volume III at 17 (citing Government of Spain, Report on the Implementation of Regional Payments in Spain-2014 Campaign, March 2015).
[183] *See* Petition at Volume III at 9.
[184] *See* Petition at Volume III at 15.
[185] *See* Petition at Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1.
[186] *See* Petition at Exhibit III-13.
[187] *See* Petition at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).

€ 1,440,412,777.50.[188]  The petitioner then multiplied the € 1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive groves,[189] to derive a total of € 864,247,667 as an estimate of the direct SPS aid for olive growers.  To the € 864,247,667, the petitioner added an additional € 412 million, which it claims was annual assistance that was provided under the Aid to Olive Groves payment and was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.  While the GOS claims there is no linearity between the SPS and BPS programs, the EC reported that the annual budget for the CAP direct payment program (for Spanish farmers) was to remain at levels similar to SPS levels, at just under € 5 billion, from 2014 (when SPS was still in effect) through 2020,[190] closely approximating SPS levels cited by the petitioner.  The facts otherwise available indicate that the olive industry in Spain received about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS program, which is a disproportionately large amount of assistance relative to other industries within Spain's agricultural sector considering that olives account for only 3 percent of the country's total agricultural output.[191]  Therefore, we find, as facts otherwise available, that the BPS program is *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.

---

[188] *See* Petition at Volume III at 15.
[189] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance the olive industry received during the period from which the CMP was in effect by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector during the reference period 2000 to 2002 should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each individual farmer should be based on the marketing years 1999/2000 to 2002/2003.  GOS IQR at 17 and EU IQR at Annex 12, EC Regulation 1782/2003, establishing the Single Payment Scheme.  Article 36 and Article 37 discuss payment per entitlement and Annex VII discusses the calculation of the reference amount upon which the entitlement is based.  Chapter 10B of this regulation establishes, Aid for Olive Groves, Article 110i,( 3 ) which discusses that 60 percent of the SPS aid was granted on the basis of the value entitlements held by olive growers and 40 percent of SPS aid was granted for maintaining olive groves.
[190] *Id.* at Exhibit III-15, "Spain-CAP in Your Country" at 2.
[191] *See* Petition at Volume III at 15, citing "Spain-CAP in Your Country."

Commerce acknowledges that recent annual olive production in Spain is greater than the 1,089,159 tons included in the benefit calculation.[192]  However, EC Council Regulation 1638/98 established the maximum production levels of olive oil for which assistance shall be granted in each Member State.[193]  To determine the amount of assistance granted to the olive industry, Commerce used the average of the guaranteed quantities of production of olive oil for which Spain granted assistance during 1999 to 2003.[194]  The 1,089,159 tons used by Commerce in the draft redetermination refers to the average of the guaranteed quantities of production of olive oil for which aid would be granted during this period.[195]  The guaranteed quantities also includes table olives, which can be expressed as an olive oil equivalent.[196]  We use this guaranteed quantity of olive oil for which assistance was given under the Common Market Program to estimate the amount of aid provided to the olive industry.  We multiplied the average guaranteed quantity of production of olive oil, 1,089,159 tons, by the per unit benefit of ECU 132.225/100 kilograms of olive oil established under the Common Market Program, which equals € 1,440,412,777.50.[197]  We then multiplied the € 1,440,412,777.50 by 60 percent, the portion of direct SPS aid for olives excluding aid for olive groves.[198]  We multiplied the amount of assistance that the olive industry received under the Common Market Program by 60 percent

---

[192] *See* Musco February 25 Response at Exhibit 7B; *see also* ASEMESA February 21, 2020 at Exhibit NFI-1.
[193] *See* Petition at 11 and Exhibit III-5 referring to EC Council Regulation 1638/98 at Article 1.
[194] *Id.* at Exhibit III-13.
[195] *Id.* at 15.
[196] *Id.* at Exhibit III-13, Commission Regulation No. 1415/2001 at Clause (2).
[197] *Id.* at Volume III at 15.
[198] *See* EU IQR and Annex 10, referring to EC Council Regulation 864/2004.  We are multiplying the amount of assistance the olive industry received during the period from which the CMP was in effect by 60 percent owing to Clause (11) of this regulation.  Clause (11) explains that at least 60% of the average of the production aid payments in the olive sector during the reference period 2000 to 2002 should be converted into entitlements under the single payment scheme, and the calculation of entitlements for each farmer should be based on the marketing years 1999/2000 to 2002/2003.  GOS IQR at 17 and EU IQR at Annex 12, Single Payment Scheme at Chapter 10B, Aid for Olive Groves, Article 110i, 3, which discusses that 60 percent of the SPS aid was granted based on the value entitlements held by olive growers and 40 percent of SPS aid was granted for maintaining olive groves.

based on clause (11) of EC Council Regulation 864/2004, which stipulates that at least 60 percent of the average production payments made to the olive sector during 1999 to 2002 should be converted to entitlements under the single payment scheme. This calculation of SPS benefits is also discussed in EC Regulation 1782/2003, which established the single payment scheme. Article 36 of this regulation stipulates that assistance under the single payment scheme is based on entitlements which are calculated based on a reference amount, which is calculated based on aid olive growers received for production during 2000 to 2002. According to Annex VII, to calculate the amount of assistance received under the single payment plan one would base their calculation on the amount of assistance received under the Common Market Program multiplied by 60 percent to derive a total of € 864,247,667 under SPS aid for olive growers. To the € 864,247,667, we estimated that an additional € 412 million[199] was provided under the Aid to Olive Groves program, which was folded into the SPS payments to olive growers after the grove payments were terminated, making the annual payments to the olive sector approximately € 1.28 billion.[200] We disagree with the GOS comments that aid for maintenance for olive groves under the SPS program was decoupled in 2010, and therefore should not be included in our calculation of assistance to the olive industry.[201] In the investigation, we found that, while aid to farmers for maintenance of olive groves was terminated in 2010, olive growers continued to receive assistance for maintaining their groves under the general SPS program through 2015.[202] The amount olive growers received under SPS in 2014 was based on both entitlements per hectare

---

[199] *See* EU IQR at Annex 10, EC Council Regulation 864/2004, at Article 110i, which discusses Aid for Olive Groves. Paragraph 3 under this article specifies that the maximum amount of aid for Spain would be € 412.45 million.
[200] *See* Petition at Volume III at 13 (citing USITC study saying that starting in 2010, all payments to olive oil growers in the EU were integrated into the SPS program).
[201] *See* GOS's Comments at 3.
[202] *See Preliminary Determination* PDM at 22.

under SPS and assistance for maintaining olive groves, and the BPS program uses the amount farmers received under SPS in 2014.

Moreover, we disagree with the respondents that benefits received by the Spanish olive industry under the Common Market Program should not be used to determine benefits to the olive industry under the BPS program. As we explained in the investigation, the annual grant amount provided to olive growers under BPS relied for reference on the amount of benefits under the SPS,[203] and, in turn, access to and the amount of benefits provided to olive growers under SPS was determined by reference to the amount of benefits provided under the Common Market Program from 1999 to 2002.[204]

We continue to find that our calculation of the amount of assistance provided to the Spanish olive industry is reasonable. The Act does not mandate a specific methodology in conducting a *de facto* specificity analysis and Commerce has the discretion to apply any reasonable methodology in light of the facts and circumstances in each case.[205] We reiterate that despite parties' comments regarding, among other things, the age of the data, it is the inability of the GOS to provide information on amounts received by the olives industry and other industries that has resulted in a record that does not contain the information that is necessary to analyze whether the BPS is *de facto* specific, and which leaves Commerce in the position where it must rely on the Petition as facts otherwise available for this analysis. The parties have not pointed to

---

[203] *See* EU IQR at Exhibit 13, Article 26, "Calculation of the initial unit value- The initial unit value of payment entitlements referred to in Article 25(2) in Member States which apply the single payment scheme in calendar year 2014…."

[204] *See* EU IQR at Exhibit 12, Council Regulation 1782/2003 establishes the Single Payment Scheme (SPS). Article 37 of this regulation states that "for olive oil the reference amount shall be the four-year average of the total amounts of payments which a farmer was granted under the olive oil support scheme referred to in Annex VI, calculated and adjusted according to Annex VII, during the marketing years 1999/2000, 2000/01, 2001/02, 2002/03." Annex VI states that direct payments should be based on production aid.

[205] *See, e.g.*, *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (stating that "determinations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case").

46

any other information on the record disputing the amounts we have relied on above, nor did any of the parties supplement the record with information other than that provided in the Petition at any point during the investigation.

While the GOS reports that the average value of the SPS entitlement per hectare (258.03 €/ha) was reduced to (144.78 €/ha) under BPS, this is based on information for 2019, three years after the POI, and therefore, is not pertinent to our analysis. Therefore, because the GOS has not provided information on the amount of assistance under the BPS program provided to the olive industry and all other industries in the POI or pointed to any other record evidence that speaks to this issue,[206] we must rely on information in the Petition to calculate BPS assistance to the olives industry as facts otherwise available.

*Corroboration*

Information from the GOS's original submission corroborates that the olive industry received a disproportionate amount of benefits under this program. The GOS reported that the average amount of assistance received was [          ] per application, whereas the respondents and their cross-owned affiliates received between double and 83 times the average amount.

The GOS and ASEMESA argue that the level of BPS Direct Payment and Greening benefits should not be determined on total amounts received by growers, but based on unit amounts per hectare, or entitlements, *etc.* We disagree. As an initial point, it is worth noting that in their comments, neither the GOS nor ASEMESA point to any data on the record that would allow Commerce to corroborate the information from the Petition relied upon as facts otherwise available in the manner they suggest, such as unit amounts per hectare received under each

---

[206] *See* GOS IQR at 54-55.

application.  That is because, as we have noted previously, the GOS failed to provide the information necessary for a fulsome analysis of *de facto* specificity.

As explained above, Commerce requested information regarding assistance given to the olive industry under the BPS program relative to other industries.  However, the GOS responded that it did not have specific information related to the olive industry or other industries because the BPS program was purportedly "decoupled."  Because the GOS did not provide the requested information, we relied on facts available and were able to compare the total average payment under the program to the total received by the respondents.  Using the limited information available, we continue to find that determining the average amount of assistance received under the program and comparing this amount to the amount of assistance the respondents received is appropriate for this corroboration exercise.  Because the respondents and their cross-owned affiliates received between double and 83 times the average amount, we continue to find our *de facto* specificity finding with respect to the BPS program to be corroborated.  In addition, our analysis of the amount of funding for the respondents relative to the average user was done for corroboration and not the disproportionality analysis itself.  Our *de facto* specificity finding is supported by information from the Petition showing that the olive industry received about one-fourth of all payments that the GOS provided to farmers during the POI under the BPS program even though olives account for only 3 percent of the country's total agricultural output, as explained above.  We have corroborated this information to the extent practicable based on independent information submitted by the GOS in its questionnaire responses showing that the respondents, which operate within the olive industry, received considerably higher amounts of assistance under the program compared to the average amount of assistance.

Furthermore, we disagree with ASEMESA's contention that "the average would be driven by the numerous smaller farmers with fewer hectares and, therefore, fewer entitlements reported in their applications" and that large farms, such as the respondents, receiving more benefits is not surprising, and in fact demonstrates that assistance is proportionate. First, ASEMESA has identified no record evidence suggesting that the average is "driven by smaller farmers." Furthermore, if the average is indeed driven by a large amount of smaller farmers, it is unclear how this is supportive of their position, rather than even greater support for Commerce's findings that the respondents are receiving benefit amounts many times greater than the average farmer. Finally, there is nothing in the Act or the SAA suggesting that Commerce is required to consider *why* a firm may have received more benefits than others in its *de facto* analysis of disproportionality. That an industry or firm *did*, *in fact*, receive a disproportionate level of benefits demonstrates specificity, and the reason for the disproportionate distribution of assistance to those that operate in a particular industry is immaterial to Commerce's analysis. It appears ASEMESA is of the view that a subsidy that would otherwise be *de facto* specific under section 771(5A)(D)(iii)(III) of the Act is not countervailable if the reason for the disproportionately large amount of assistance is based on objective criteria or conditions, such as the size of the enterprise. A similar principle is established under section 771(5A)(D)(ii) of the Act; however, that statutory provision is explicitly limited in application to the *de jure* specificity analysis. The Act does not call on Commerce to inquire further into why an industry has received a disproportionately large amount of the subsidy for purposes of the *de facto* specificity analysis, nor has Commerce adopted such a requirement through practice. In addition, information on the size of enterprises benefiting from BPS is not on the record for Commerce to consider, even if it deemed it appropriate to do so.

**Comment 2:  Whether Commerce Correctly Calculated both the Numerator and the
Denominator in its Substantial Dependence Analysis**

*ASEMESA's Comments:*

- Commerce's presumption that table and mill varietals have only one use is not supported
  by the record.

- Although dual-use varietals have broad application for both oil and table olive
  production, that does not mean they are the only varietals that can be used in both
  applications.

- Commerce's assumption that the 90,404 tons of raw mill olives used to produce table
  olives are simply hojiblanca dual-use olives is unsupported.  They could very well be
  other olives.

- Commerce's exclusion of the cacerena varietal also unreasonably biases its analysis.  The
  volume of cacerena used to produce table olives in Harvest Year 2016 was not small.  In
  fact, it was larger than the production of gordal, which Commerce included in its
  analysis.

- The exclusion of cacerena olives is self-serving and biased given that cacerena is a dual-
  use olive equally suited for table or oil production and therefore, could have
  disproportionate effects on the analysis as for Commerce's denominator.

- Commerce cannot include the 90,404 mill olives in its numerator as this may include
  cacerena olives and these were not included in the denominator.

- The fact that 90,404 tons of raw olives were categorized as mill olives is important.
  Commerce places significance on the fact that these olives were ultimately used to
  produce table olives.  However, statistics show that by categorizing them as mill that they
  had initial disposition toward mill production.  The fact that they were used for table

production, whether they were classified as table, dual-use, or mill varietals, demonstrates that there was no contingency associated with this volume.

- Commerce has erroneously calculated yield rates. Commerce should have used yield rates based on the total cultivated areas of table and mill olives, not the total surface area, which includes cultivated and non-cultivated areas. Uncultivated land is not used in the production of olives and must be excluded.

- Commerce's substantial dependence analysis has created an impermissible subset of the raw agricultural product that under a reconfigured, lawful analysis demonstrates no substantial dependence. Commerce's substantial dependence calculation examines only 87 percent of olive production grown for table during the POI. This approach is defective for a number of reasons: (1) it is predicated on a false assumption that data from both the respondents and the petitioner's submission demonstrate that there are only five biological varietals of raw olives that the GOS considers suitable for table olive production; and (2) it excludes the dual-use cacerena varietal that Commerce expressly identified as part of the raw agricultural prior stage product, accounting for another 8 percent of table olive production. To correct this legal error, Commerce would need to consider the entire volume of the raw agricultural /prior stage product in its denominator—the total olive production used to produce table olives, plus dual-use olives used to produce oil.

**Commerce's Position**: Commerce continues to conclude that table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing

51

season.  The GOS publishes information on different olive varietals including their fitness.[207]

The GOS indicates that some are only fit for table; others are fit for the mill, and other varietals

are considered dual use.[208]  As explained further above, we find that the 90,404 tons of mill

olives represent dual-use varietals that were originally grown as mill but were instead used as

table olives mill.  In the draft remand, we treated the 90,404 tons of olives designated as mill but

were used as table as if they were all from the hojiblanca varietal, the most prevalently used

dual-use varietal.  We acknowledge that our treatment of the 90,404 tons of olives grown for mill

but used for table olive production as hojiblanca olives may have been inaccurate, to a certain

extent.  Judging from the information provided by the GOS concerning the high olive content of

mill varietals and their inability to meet IOC standards, we continue to find that it is unlikely that

a strictly mill olive varietal was used for table.  We therefore continue to consider it reasonable

that these amounts of olives grown for mill and used for table olive production were dual-use

olives, though we also acknowledge that these may have been of the cacerena varietal and a

small amount of other dual-use varietals grown for mill but used as table olive production, as the

respondents note in their comments.  And, as noted elsewhere in this remand, we have not

included the total production data for the cacerena varietal grown for mill in the denominator of

our substantial dependence analysis because the Spanish government does not track production

of olives grown for mill by varietal and the production information needed to include the

cacerena varietal in the analysis is not available on the record.  Therefore, to avoid any distortion

in our substantial dependence analysis, we are estimating the percentage of these 90,404 tons that

may have been cacerena, or the very small amount of "other" dual-use varietals grown for mill

but used for table olive production in campaign 2015/2016 and deducting this amount from the

---

[207] *See* Musco's February 5 Response at Exhibit 2.
[208] *Id.*

90,404 tons mill tons in the numerator of our substantial dependence analysis.  Because we do not know the amount of hojiblanca, cacerena, and other dual-use varietals grown for the mill, we are considering that the percentage of hojiblanca, cacerena, and the small amount of "other" dual-use varietals grown for mill is comparable to the amounts of each varietal that are grown for table olive production.  Data from the AICA for the 2015/2016 campaign year show that the production of hojiblanca, cacerena, and other varietals grown for table equal 366,140 tons, with hojiblanca accounting for 79.44 percent of the total amount, cacerena accounting for 12.41 percent, and the other dual-use varietals accounting for 8.16 percent.[209]  Adding the 12.41 percent of cacerena and the 8.16 percent of "other" dual-use varietals together, we find that cacerena and "other" dual-use varietals account for 20.57 percent of the dual-use varietal production for table.  We multiply the 20.57 percent by the 90,404 tons of dual-use olives grown for mill used for table olive production and estimate that 18,590 tons of this amount were cacerena and "other" dual-use varietals grown for mill but used as table olives.  Subtracting the 18,590 tons from the 90,404 tons, we are left with 71,814 tons of olives that we consider to be hojiblanca olives grown for mill but used as table.  By adding the 71,814 tons of hojiblanca to the 492,244 tons of table olives, our revised numerator for our substantial dependence analysis is now 564,058 tons.

We also agree with ASEMESA that to calculate more accurate table and mill olive yield rates, Commerce should divide the total production of the table or mill olives by the total cultivated area rather than the total surface area.  We have recalculated the yield rates using total cultivated area and the result is a total of 800,154 tons of hojiblanca olives in the denominator of the calculation.  After removing an estimated amount of potential cacerena and "other" dual-use

---

[209] *See also* ASEMESA's February 21 Response at Exhibit NFI-2.

varietals grown for mill and used for table from our numerator and using corrected yield rates, our revised substantial dependence analysis demonstrates that 55.28 percent of manzanilla, gordal, carrasquena, and hojiblanca varietals were used to produce table olives during the relevant period.

**Comment 3:  Whether Commerce's Analysis of Distinct Biological Varietals of Olives Processed into Table Olives Satisfies the "Substantially Dependent" Standard Under Section 771B(1) of the Act**

*ASEMESA's Comments:*

- Commerce offers no legal standard as to why its findings meet the substantial dependence standard.  Commerce merely asserts that "because 59 percent of the manzanilla, gordal, hojiblanca, and carrasquena varietals, the prior stage product, were processed into table olives, the latter stage product, we find that the demand for these varietals is substantially dependent on processed table olives."  It is not legally sufficient for Commerce to assert a consumption figure and conclude substantially dependent demand, nor does Commerce's biased calculation of 59 percent support such a conclusion.

- Consumption is not a proxy for substantially dependent demand.  The statutory standard is not "substantial volume."  The statute does not specify that all Commerce needs to show is that some ascertained volume of the prior stage product is consumed in the production of the latter stage product.  To the contrary, the statute requires that there be a *dependence* on the demand for that volume.  Commerce needs to show that, but for demand from table olives, largely all the raw olive varietal volume it identifies as substantially dependent would not exist for some other purpose; that the demand for those biological varietals is contingent on table olive demand.  Commerce must

54

demonstrate that the demand for the prior stage good is derived *almost exclusively* or *substantially all* from the demand for the latter stage,[210] or that *almost all* the raw agricultural product … is dedicated to the production of milled rice.[211]

- Section 771B(1) of the Act is a codification of Commerce practice established in two prior cases—*Pork from Canada* and *Rice from Thailand Inv.*.  To meet the substantial dependence standard, the raw product can only be sold in one market; it enters a single, continuous line of production resulting in one end product.

**Commerce's Position:**  ASEMESA has selectively referenced prior cases to claim that Commerce has not satisfied the legal standard for "substantially dependent" demand because a 59 percent consumption ratio (the ratio calculated in the draft remand) is insufficient.  We will address these past cases and ASEMESA's arguments in turn.

Before the enactment of section 771B of the Act, Commerce conducted a number of countervailing duty investigations of agricultural products in which it included subsidies to prior stage products in determining the benefit to producers of the processed product.  In *Pork from Canada*, Commerce considered subsidies to producers of live swine, the prior stage product, in determining the benefit to producers of the latter stage product, slaughtered swine.  In that case, Commerce found that it was inappropriate to consider live swine an "input" because there was a low level of value added and the processor was merely making the product ready for the next consumer.  In *Pork from Canada*, Commerce did not establish a finding that the demand for live swine was "almost exclusively" dependent on a latter-stage product; rather, Commerce stated that the "salient criterion is the degree to which the demand for the prior stage product is

---

[210] *See* ASEMESA's Comments at 12 (quoting *Pork from Canada*, 50 FR at 25098-99).
[211] *Id.* (quoting *Rice from Thailand Inv.*, 51 FR at 12358).

dependent on the demand for a latter-stage product,"[212] but we did not establish a minimum threshold requirement of demand to satisfy the demand criterion.  Similarly, in *Rice from Thailand Inv.* , Commerce determined that the prior stage product, paddy, or unmilled rice, was dedicated to the production of the latter stage product, milled rice, but we did not establish a minimum threshold of demand to satisfy the "substantial dependence" criterion.

In the enactment of section 771B of the Act, it is evident that Congress's main concern was to prevent producers of minimally processed agricultural products from circumventing remedies provided by the countervailing duty law on raw agricultural products.[213]  Congress discussed raspberries as an example of a potential agricultural product where circumvention could easily occur merely by minimally processing the raw agricultural product.[214]  Congress considered how foreign producers could easily circumvent a duty on fresh raspberries by simply freezing the raspberries before shipping to the United States.[215]  We highlight for purposes of this redetermination that there is nothing in the legislative history demonstrating that demand for fresh raspberries is derived "almost exclusively" from the demand for frozen raspberries or that "almost all" fresh raspberries are dedicated to the production of frozen raspberries.  Rather, Congress's principal concern was to prevent producers of minimally processed agricultural products from circumventing the order on raw agricultural products regardless of whether the product was almost wholly contingent on demand for one particular end-use product.

Furthermore, while ASEMESA notes that Commerce found the substantial dependence criterion to be satisfied in *Pork from Canada* and *Rice from Thailand Inv.* because the prior stage product was dedicated almost exclusively to the latter stage product, the Court explained that the

---

[212] *See Pork from Canada*, 50 FR 25098.
[213] *See* 133 Senate Congressional Record S. 8787.
[214] *Id.*
[215] *Id.*

plain meaning of "substantially dependent" requires the demand for the prior stage product to be "largely, but not wholly" or "contingent" on the demand for the latter stage product to satisfy the statutory standard.[216]  The Court further explained the contours of the statutory standard and looked to Commerce's determinations regarding pork and rice after the statute's enactment.[217] The Court observed that prior cases satisfied the "substantially dependent" standard where the latter stage product accounted for "most or at least half" of the demand of the prior stage product.[218]  Therefore, we find that the 55.28 percent of table and dual-use varietals used for table olive production satisfies the "substantially dependent" standard because it comports with the Court's statements that the demand for the latter stage product must be "largely, but not wholly," or must account for "most" of, the demand for the prior stage product.

Notably absent from ASEMESA's comments are any references to Commerce's findings in *Shrimp from China*, a more recent case where Commerce utilized section 771B of the Act.  In that investigation, Commerce found that the "substantially dependent" criterion under section 771B(1) of the Act was satisfied because 44.7 percent of the fresh shrimp market depends upon the demand for frozen shrimp.[219]  Nowhere in this case does Commerce articulate a requirement the demand for the prior stage product be "almost all" or "almost exclusively" dependent.

Therefore, while we acknowledge ASEMESA's citations to *Pork from Canada* and *Rice from Thailand Inv.*, where Commerce noted that demand for the prior stage product was "almost all" or "almost exclusively" dependent on the demand for the latter stage product, we disagree with their claims and attempts to articulate a universally applicable threshold that must be met in all cases, with respect to all products and all situations.  Even these cases cited by ASEMESA do

---

[216] *See First Remand Order* at 21-22.
[217] *Id.* at 26-27.
[218] *Id.* at 27.
[219] *See Shrimp from China* IDM at 47.

not articulate a numerical threshold or standard to be applied in *all* cases. Rather, the findings expressed in *Pork from Canada* and *Rice from Thailand Inv*. reflect the specific facts and circumstances of the agricultural products and industries at issue. Furthermore, nowhere in section 771B of the Act or the legislative history is a requirement that demand for the prior stage product be "almost all" or "almost exclusively" dependent on the demand for the latter stage product. Congress did not intend to establish such a requirement for substantial dependence. This is evident from the reference to raspberries in the legislative history, a reference which makes no mention of a threshold of "almost all" or "almost exclusively." Congress also did not prescribe specific factors that Commerce must consider. Therefore, we also disagree with the respondents' attempts to mandate that products under consideration be in a "single, continuous line of production." While this scenario may have been present in *Pork from Canada* or *Rice from Thailand Inv.*, neither these cases nor the statute or legislative history mandate that this be a factor under consideration in all cases utilizing section 771B of the Act going forward. As is appropriate for this provision, the analyses of substantial dependence are done on a case-by-case basis and may necessarily be different depending on the product being investigated. Here, for instance, we examined other factors that would determine an olive's end destination (*e.g.*, oil versus table olives). Based on characteristics of the olive varietals, only some portion of dual-use olive varietals would potentially swing over to olive oil usage if table olive demand were to cease. Table olive varietals do not have the characteristics desired by the industry for olives used to make olive oil. Table olive varietals have a lower oil content than mill olives. The growing of table olives is more labor intensive, requires more water consumption, more pruning, and more money spent on pest management.[220] Also, growers of table olives command higher prices so

---

[220] *Id.* at 7.

58

table olive varietals are a less economically viable source of oil for Spain's olive oil producers.[221] Finally, *Shrimp from China* also rebutted the notion that a "single, continuous line of production" need be a characteristic present in the market of all agricultural products being investigated. There, we acknowledged that examining whether a single, continuous line of production exists might contribute to the analysis but is not a necessary condition to satisfy the "substantially dependent" criterion.[222]  Therefore, we reject ASEMESA's attempt to establish an unreasonably high threshold for agricultural products to meet the "substantially dependent" criterion; an attempt at odds with the statute, legislative history, and Commerce practice.

Moreover, ASEMESA's argument that consumption cannot be used as a proxy for establishing demand is without merit.  Section 771B(1) of the Act requires Commerce to determine whether the demand for the prior stage product substantially depends on the demand for the latter stage product, but the provision does not specify how Commerce must determine whether the demand for the prior stage product is "substantially dependent."  We find that an analysis of consumption ratios is a reasonable method to determine whether section 771B(1) of the Act is satisfied because the concept of demand hinges on use.  The usage of products is driven by the demand of its consumers; therefore, it is fair to use consumption as a measure of a product's demand.  The degree to which the prior stage product is used in the production of the latter stage product is a corollary of the prior stage product's dependence on the latter stage product.  This argument is, once again, an attempt by ASEMESA to establish an extraordinarily high standard for demand to be considered "substantially dependent," an attempt with no basis in the statute or legislative history.

---

[221] *See* Musco February 5 Response at 10.
[222] *See Shrimp from China* IDM at 47.

Even though the demand for manzanilla, gordal, carrasquena, and hojiblanca varietals were not wholly contingent on the demand for processed table olives, this does not signify that these varietals can be interchangeably used for oil.  As mentioned earlier, manzanilla, gordal, and carrasquena are considered solely fit for table use and not fit for use as olive oil.  These varietals tend to have lower oil content and are larger than mill olives.  Similarly, dual-use olives grown for one application generally are not used for another.  For example, hojiblanca grown for table, would tend to be larger, free of blemishes unlike its mill counterparts, and represent a greater investment in resources to produce table-olive quality olives.[223]  While such olives could be used as mill olives, we find it reasonable to conclude that a farmer would generally seek to sell such olives as table olives to recuperate the greater growing costs and maximize profits,[224] and not view them as interchangeable *per se*.

In this remand, we find that the demand for the prior stage product (*i.e.*, table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals) is substantially dependent on the demand for the latter stage product (*i.e.*, table olives) because 55.28 percent of the prior stage product is used for table olive production.  Therefore, we find that the first criterion of section 771B of the Act to be satisfied.

**Comment 4:  Whether Commerce's Analysis of Dual-Use Varietals was Proper**

*ASEMESA's Comments:*

- By treating all olives used to produce table olives the same within the numerator of its analysis, regardless of whether they are "table," "dual-use," or "mill," Commerce effectively determined that this volume of olives is necessarily dependent, or contingent,

---

[223] *See infra* at 63-64.
[224] *Id.*

60

on table olive demand. This determination is fundamentally contradicted by the facts and is not consistent with the statute.

- Given that Commerce acknowledges that dual-use varietals are equally suited for table and oil applications, and that raw olive consumption for oil production dwarfs raw olive consumption for table olive product, and fluctuations in raw olive production of oil product also dwarfs total raw olive consumption for table production, it is implausible to presume that 290.85 thousand tons of dual-use hojiblanca that happen to be used to produce table olives would not simply be absorbed into olive oil production in the absence of table olive production.

- Between 2016 and 2017, the volume of "table raw olives sent to oil production increased by more than 142,000 metric tons. At the same time, the volume of "mill" raw olives sent to table olive production increased by more than 135,000 metric tons.

- Shifts in the volume in and out of table olive production by "table" raw olives and "mill" raw olives amounted to over 277,000 metric tons, or nearly 81 percent of the volume of table raw olives used to produce table olives and nearly 55 percent of the total volume of raw olives produced and placed in the table raw olive category.

- Massive shifts occurred in the span of a single harvest year between 2016 and 2017. The volume of "table" raw olives sent to oil production increased by more than 142,000 metric tons. At the same time, the volume of mill raw olives sent to table olive production increased by more than 135,000 metric tons. These shifts in volume in and out of table olive production amounted to over 277,000 metric tons, or nearly 81 percent of the volume of "table" raw olives used to produce table olives and nearly 55 percent of the volume of raw olives produced and placed in the table olive statistical category.

61

These massive shifts occurred in the span of a single harvest year; they are not the result of a long transition over a period of years, demonstrating the flexibility of dual-use olives.

- By definition, "dual-use" varietals are not contingent on any single demand source—that is precisely the point of dual use.

- Far more hectares of land are devoted to "dual-use" varietal olive production than "table" olive varietal production.

- Commerce conceded that the information provided in its initial remand that 113,674 hectares of farmland are dedicated to producing dual-use varietals is incorrect, because in the second remand it acknowledged that 265,000 hectares are devoted to the hojiblanca varietal.

- The majority of table olive production in harvest year 2016—56.9 percent—is attributable to dual-use hojiblanca, whereas only 36.3 percent of hojiblanca production is used to produce table olives and the remainder is used for oil. This data completely undercuts Commerce's affirmative finding of substantially dependent demand.

**Commerce's Position:**  As mentioned in Comment 2, while it is true that dual-use varietals can be used for both table and oil production, record evidence demonstrates that, at their source, dual-use olives are grown for one purpose or other.  Once grown, they are not used interchangeably as a table or mill olive.  We acknowledge that the largest varietal grown for table olives in harvest year 2016 is the dual-use varietal, hojiblanca.  However, as we have noted in this remand redetermination, dual-use olives, such as hojiblanca, grown for use as table olives require different cultivation practices than hojiblanca grown for mill use.[225]  Olive growers of

---

[225] *Id.* at 7.

hojiblanca and cacerena for example, will spend more resources on their orchards, installing more irrigation systems, spending more resources on pruning, and pest management than olive growers of hojiblanca grown for use as mill olives.[226]  Moreover, farmers wishing to purchase insurance for dual-use olives must establish in advance the number of hectares that will be dedicated to mill production versus the number of hectares dedicated for table olive production as separate premiums are established for hojiblanca grown for table versus mill.[227]  For example, farmers are paid more for hojiblanca grown for table olives than hojiblanca grown for the mill.[228] Moreover, hojiblanca or cacerena grown for table olives must meet certain trade standards for table olives that are not necessary if they were grown for the mill.

We also disagree with ASEMESA that there are massive shifts in the volume of raw table olive production over the years, rather, we find the data to be stable.  As can be seen from the published GOS statistics, from harvest year 2010 through harvest year 2016, only one or two percent of olives grown for the mill were sent to table olive use, and that from year to year, farmers tend to continue to harvest olives for the same end use.  This is largely because, as we have established elsewhere in this remand redetermination, mill olives do not meet IOC standards,[229] and at their source, dual-use olives are grown for one purpose or other.  We also note that only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill.

The data that ASEMESA uses from the GOS's Survey (to purportedly demonstrate that there are far more hectares of dual-use olives and, therefore, there is much opportunity for the olive grower to alter production from table to mill olives or vice versa) is incorrect.  We wish to

---

[226] *Id.*
[227] *See* Musco February 5 Response at Exhibit 1.
[228] *Id.*
[229] *Id.*

emphasize that, in the First Remand, we substantiated that the 113,674 hectares that ASEMESA is referring to as dual use were not actually used as dual use hectares.[230]  Rather, these dual-use hectares identified in the GOS's Survey on Area on Yield were grown for table olives.  In the First Remand, published data in this Survey indicated that there were 76,120 hectares of farmland dedicated to the production of raw table olives and 113,674 hectares dedicated to the production of dual-use olives for 2019.[231]  Multiplying the number of hectares dedicated for each use by the yield per hectare statistics provided in the GOS Statistical Yearbook,[232] we conclude that 228,360 MT of raw table olives and 341,022 MT of dual-use olives were produced in 2019, totaling 569,382 MT of olives.  We compared the volume of table and dual-use olives produced in 2019 with data from the AICA for the 2018/2019 campaign.  Data from the AICA revealed that 587,800 MT of raw table varietals identified as for processing into table olives were produced during this time,[233] closely following the estimated production figures that we derived from the hectare data.  We also substantiated the accuracy of our estimated production figures against the production and end-use data published by the Ministry of Agriculture.[234]  We find that it is logical to determine that the dual-use olive hectare information included in the GOS's Survey on Areas and Yield solely refers to production grown for table olives because the GOS insurance regulations provide different premiums for hojiblanca as a mixed-use, (meaning dual-use varietal) and hojiblanca grown for the mill.[235]  Moreover, both the GOS and Musco confirmed that the GOS does not publish production information on mill olives by varietals, which would include the portion of hojiblanca identified as grown for mill.  Finally, we continue

---

[230] *See* Musco's February 25, 2020 Response at Exhibit 7B.
[231] *See* Musco's February 25, 2020 Response at Exhibit 4A.
[232] *See* ASEMESA's February 21 Response at Exhibit NFI-1.
[233] *Id.* at Exhibit NFI-2.
[234] *See* Musco's February 25 Response at Exhibit 7B.
[235] *See* Musco's February 5 Response at Exhibit 1.

Appx000090

to maintain that there is no discrepancy in our statistics between the first and second remand.  As stated above, the number of hectares of dual-use varietals dedicated to table olives for 2019 was 113,674 and the total number of hojiblanca hectares for use as table *or* mill olives is estimated at 265,000 hectares.[236]  The 265,000 hectares includes hectares of hojiblanca olives dedicated to both table and mill olives.  Similarly, the fact that the majority of olives used for table olive production is of the hojiblanca varietal has no impact on our substantial dependence analysis.  As mentioned above, hojiblanca grown for table olive production are not interchangeable with those grown for the mill.  Record evidence indicates that it is less feasible from an economic standpoint for farmers to bear the additional expense to grow larger, lower oil content hojiblanca that are free of blemishes and use them for mill olives when they could be sold for a higher price as table olives.  Conversely, growers of hojiblanca to be used as mill olives would not try to sell their olives for table olive production because they would be smaller, most likely be of a higher oil content, have more blemishes, and would not meet IOC standards.

**Comment 5:  Whether Commerce Should Rely on the Respondents' Submitted Varietal Hectare Data**

*ASEMESA's Comments:*

- Commerce requested that the Spanish industry provide production data by the main varietals used in table olive production, regardless of end use.

- The provided data demonstrate that less than 40 percent of the volume of these varietals, in total, are used in table olive production

- Commerce needs to consider and address the record evidence as a whole and cannot simply pick and choose the bits of evidence that support its narrative.

---

[236] *See* Musco's February 25 Response at Exhibit 4A.

**Commerce's Position:**  We do not intend to rely on the respondents' proposed data, nor alter our substantial dependence analysis regarding the varietal hectare data used to calculate table olive production by varietal.  As stated in the First Remand Redetermination, the respondents' data was unpublished and extrapolated from different sources:  the BPS data for the 2018/2019 campaign and an internal report dating from 2008.[237]  ASEMESA did not provide the underlying source data.  Moreover, ASEMESA has not provided supporting documentation demonstrating that the number of hectares dedicated to the production of each varietal is accurate.  In particular, ASEMESA reported that the number of hectares of hojiblanca produced for table totaled 311,429 hectares, whereas Musco provided information from the GOS stating that 265,000 hectares of farmland were dedicated to growing hojiblanca olives.[238]  Additionally, ASEMESA's estimate of the total surface area of the main varieties used for table production totaled 490,529 hectares, whereas Musco provided published GOS data showing the surface area dedicated to olive production for 2019 in Spain for table and dual-use olives is 189,794 hectares.[239]  Further, ASEMESA incorrectly titles the table olive production data from Spain's AICA as production used for table instead of total table production.  Therefore, we continue to find ASEMESA's varietal information unreliable and not suitable for our substantial dependence analysis.

---

[237] *See* First Remand Redetermination at Comment 12.
[238] *See* Musco's February 25 Response at Exhibit 2A at 58; *see also* ASEMESA's February 21 Response at 7.
[239] *See* Musco's February 25 Response at 5; *see also* ASEMESA's February 21 Response at 7.

## IV.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Second Remand Order*, Commerce:  (1) reconsidered its *de jure* specificity finding and finds that the BPS subsidies provided by the GOS to olive growers are *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act; and (2) reconsidered its interpretation of "raw agricultural product" and "prior stage product" for purposes of the analysis under section 771B(1) of the Act and finds that the demand for distinct biological varietals of raw olives (table and dual-use olive varietals) is substantially dependent on the demand for table olives.

11/3/2021

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
**Deputy Assistant Secretary**
  for Policy and Negotiations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance

67

**Appx000093**

ADDENDUM 4

Slip Op. 21-76

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Gary S. Katzmann, Judge** |
| **UNITED STATES,** | **Court No. 18-00195** |
| **Defendant,** | |
| **and** | |
| **COALITION FOR FAIR TRADE IN RIPE OLIVES,** | |
| **Defendant-Intervenor.** | |

## <u>OPINION</u>

[The court declines to affirm Commerce's <u>Remand Results</u> and remands for further action.]

Dated: <u>June 17, 2021</u>

<u>Matthew P. McCullough</u>, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs.

<u>Sonia W. Murphy</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were <u>Ethan P. Davis</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Tara K. Hogan</u>, Assistant Director. Of counsel on the brief was <u>Saad Y. Chalchal</u>, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>David J. Levine</u> and <u>Raymond Paretzky</u>, McDermott Will & Emery LLP, of Washington, D.C., for defendant-intervenor.

Katzmann, Judge: The court returns to an investigation by the United States Department of Commerce ("Commerce") into subsidies received by the Spanish olive industry. The case involves a claim from the U.S. domestic olive industry that the Government of Spain ("GOS") and European Union ("EU") unfairly subsidized Spanish olives that were then imported into the U.S. to the detriment of the U.S. industry. Before the court is Commerce's <u>Final Results of Remand Redetermination</u> (Dep't Commerce Jun. 1, 2020), ECF No. 47 ("<u>Remand Results</u>"), which the court ordered in <u>Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States</u>, 44 CIT __, 429 F. Supp. 3d 1325 (2020) ("<u>Asemesa I</u>") so that Commerce could further consider and explain its attribution of subsidies to ripe olives under 19 U.S.C. § 1677-2 ("Section 1677-2") and could provide a reviewable interpretation of 19 U.S.C. § 1677(5A)(D)(i) ("Section 1677(5A)"). Plaintiffs Asociación de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Gudalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alementación, S.L. (collectively, "Plaintiffs" or "Asemesa") challenge the <u>Remand Results</u>, arguing that the subsidy program at issue is not de jure specific under Section 1677(5A), and that Commerce's determination of the appropriate "prior stage product" under Section 1677-2 is unsupported by substantial evidence and contrary to law. Pls.' Cmts. on the Commerce Dep't's Final Results of Remand Redetermination, Jun. 30, 2020, ECF No. 49 ("Pls.' Br."). Defendant United States ("the Government") and Defendant-Intervenor Coalition for Fair Trade in Ripe Olives ("Coalition") request that the court affirm Commerce's <u>Remand Results</u>. Def.'s Reply to Cmts. on the Remand Redetermination, July 31, 2020, ECF No. 52 ("Def.'s Br."); Reply Cmts. of Def.-Inter. Addressing Remand Results, July 31, 2020, ECF. No. 51 ("Def.-Inter.'s Br."). The court remands both Commerce's finding of de jure specificity under Section 1677(5A) and its prior stage product analysis under Section 1677-2 for further proceedings consistent with this opinion.

# BACKGROUND

The court set out the relevant legal and factual background of the proceedings in further detail in its previous opinion, <u>Asemesa I</u>, 429 F. Supp. 3d at 1330–38. Information relevant to the instant opinion is set forth below.

## I.   *Legal and Regulatory Framework*

To empower Commerce to offset economic distortions caused by countervailable subsidies and dumping, Congress promulgated the Tariff Act of 1930. <u>Sioux Honey Ass'n v. Hartford Fire Ins.</u>, 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); <u>ATC Tires Priv. Ltd. v. United States</u>, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018). Under the Tariff Act, Commerce may -- upon petition by a domestic producer or of its own initiative -- initiate an investigation into potential countervailable subsidies and, where such subsidies are identified, issue orders imposing duties on the subject merchandise. <u>Sioux Honey</u>, 672 F.3d at 1046–47; <u>ATC Tires</u>, 322 F. Supp. 3d at 1366–67; 19 U.S.C. §§ 1671, 1673. A countervailable subsidy exists when (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5). Where, as here, a domestic subsidy is at issue, such subsidy may be either de jure or de facto specific. 19 U.S.C. § 1677(5A)(D). In particular, a domestic subsidy is de jure specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i).

If Commerce determines that the government of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import, into the United States,

and the International Trade Commission ("ITC") determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce shall impose CVD upon such merchandise equal to the amount of the net countervailable subsidy. See 19 U.S.C. § 1671(a). When the investigated merchandise includes a processed agricultural product for which (1) the demand for the prior stage, or raw, product is substantially dependent on the demand for the processed product, and (2) the processing operation adds only limited value to the raw commodity, Commerce further analyzes countervailable subsidies received by producers or processors of the raw agricultural product and will deem such subsidies to be received by manufacturers, producers, and exporters of the processed product. See 19 U.S.C. § 1677-2.

## II.    *Factual and Procedural History*

On July 12, 2017, Commerce initiated a CVD investigation into ripe olives from Spain in response to a petition from Coalition. Ripe Olives from Spain: Initiation of Countervailing Duty Investigation, 82 Fed. Reg. 33,050 (Dep't Commerce July 19, 2017), P.R. 63; Petition for Imposition of AD and CVD Duties, Vol. I (June 21, 2017), P.R. 1 ("Pet. Vol. I"). In its petition Coalition alleged that the EU, through the GOS, provided countervailable subsidies to raw olive growers that should properly be attributed to processors of ripe olives. Petition for the Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 1 ("Pet. Vol. III"). Ripe olives -- the product at issue in this litigation -- are a type of edible table olive produced by curing, rinsing, and brining raw olives. Asemesa I, 429 F. Supp. 3d at 1331. Raw olives are a raw and unprocessed agricultural product which can be transformed into an edible consumer product through processing into table olives or olive oil. Id.

At the conclusion of its initial investigation, Commerce determined that countervailable subsidies indeed existed with respect to ripe olive producers from Spain. Id. at 1337–38; see also

Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain (Dep't Commerce June 11, 2018), P.R. 594 ("IDM"); Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 622 ("Amended Final Determination").  In reaching this conclusion, Commerce determined that the subsidies provided to olive growers through the EU's Common Agricultural Policy ("CAP") are de jure specific domestic subsidies under Section 1677(5A), and further determined that the subsidies could be attributed to producers of table olives as a latter stage product of raw olives under Section 1677-2.  IDM at 32–36.

As discussed in Asemesa I, the CAP subsidies at issue are provided to Spanish olive growers through the Basic Payment Scheme ("BPS"): the most recent iteration of EU agricultural subsidy programs.  429 F. Supp. 3d at 1333.  Because portions of the current BPS subsidy program are based on past iterations of EU (and European Community) subsidy programs, Commerce "traced the history of these programs in making its determination that the current program is de jure specific." Id.  That history begins in 1997 with the Common Organization of Market in Oils and Fats ("the Common Market Program"), which was an annual grant-to-farmer program applicable to Spanish olive growers.  Id.  In 2003 the Single Payment Scheme ("SPS") replaced the Common Market Program and remained in effect until 2014.  Id.  The SPS program was replaced in 2015 by the current BPS program, which provides subsidies to those Spanish olive growers both that meet the eligibility requirements and apply for subsidies.  Id.

While the BPS program provides subsidy payments based on geographical indicators of farmland productivity, those indicators are based on data collected by the GOS under the Common Market Program.  Remand Results at 7.  This data reflects the hectares of farmland, quantity of

crop produced per hectare, and type of crop produced in each hectare, for each qualifying farm. Id.; Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 19–22 (Nov. 20, 2017), P.R. 329 ("Preliminary Decision Memo"). For olive growers, a value per hectare was calculated depending on whether the olives were grown for olive oil production or table olive production. Preliminary Decision Memo at 22–23. Under the SPS, this value was then multiplied by a farm's area in hectares to determine the amount of aid that a particular farmer would receive. Id. at 22; Remand Results at 8. In this way, the SPS program provided subsidy payments with reference to the value per hectare calculated under the Common Market Program. Preliminary Decision Memo at 23; Remand Results at 8. The BPS then relied upon data collected under the SPS to allocate subsidy payments using regional rates based on the "productive potential and . . . productive orientation" of a particular region. Remand Results at 8. The resultant rates assigned to participating farmers do not vary with the type and volume of crop produced but do reflect historic data regarding the agronomic practices carried out in the region, including whether it historically produced permanent crops -- among them, olives. IDM at 33–34. Commerce concluded that, as "the annual grant amount provided under BPS [is] based on annual grant amounts that were crop-specific . . . the grant amounts received by olive growers under BPS . . . are directly related to the grant amount only olive growers received under the [Common Market Program]," and are therefore de jure specific to olive growers. Preliminary Decision Memo at 24.

In further determining that the subsidies to olive growers are properly attributable to producers of table olives, Commerce identified the relevant "prior stage product" as raw olives. Remand Results at 20–21. Noting that table olives constitute eight percent of the market for raw olives, Commerce concluded that demand for raw olives is substantially dependent upon demand

for table olives, and that the subsidies to olive growers may therefore be attributed to ripe olive producers pursuant to Section 1677-2.  Id.

Plaintiffs challenged Commerce's determination on September 28, 2018, arguing in relevant part that that the subsidies cannot properly be attributed to ripe olive producers because the demand for raw olives is not substantially dependent upon the demand for table olives as required by Section 1677-2, and that the subsidies are not de jure specific (and therefore are not countervailable).  Compl., Sept. 28, 2018, ECF No. 7; Asemesa I, 429 F. Supp. 3d at 1340–41. The court determined that Commerce's interpretation of Section 1677-2 was arbitrary and not in accordance with law, concluding that Commerce applied an impermissible interpretation of the statutory term "substantially dependent," and that its interpretation of the term constituted an unexplained and arbitrary deviation from past practice.  Asemesa I, 429 F. Supp. 3d at 1339, 1344. The court also concluded that Commerce's finding that the subsidies at issue were de jure specific and thus countervailable failed to include a reviewable interpretation of Section 1677(5A).  Id. at 1339.  Accordingly, the court remanded to Commerce for further proceedings consistent with its opinion.  Id. at 1352.

## A.    The Remand Results

On June 1, 2020, Commerce submitted its Remand Results to the court.  Pursuant to the court's instructions in Asemesa I, Commerce "reconsidered its interpretation and analysis of [Section 1677-2]."  Remand Results at 2.  On remand, Commerce first reiterated and clarified its finding that the EU subsidy payments at issue are de jure specific to olive growers, and thus countervailable.  Id. at 10.  Consistent with the Amended Final Determination, Commerce then determined that "the demand for the prior stage product is substantially dependent on the demand for the latter stage product," but clarified that it interprets "'prior stage product' to be the raw

agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" -- in this case, raw olives "principally suitable for . . . the production of table olives." Id. at 27, 29.

Following the issuance of the Remand Results, Plaintiffs filed comments on June 30, 2020, reiterating their original arguments and opposing Commerce's findings on remand. Pls.' Br. Defendant-Intervenor Coalition also filed comments on the Remand Results requesting that the court affirm Commerce's determination and dismiss the action. Def.-Inter.'s Br. The Government and Coalition each submitted replies to the Plaintiff's comments on July 31, 2020. Reply to Cmts. on Remand Results, Jul. 31, 2020, ECF No. 51 ("Def.-Inter.'s Reply"); Reply to Cmts. on Remand Results, July 31, 2020, ECF No. 52 ("Def.'s Reply"). On January 6, 2021, the court issued questions prior to oral argument. Letter Concerning Questions for Oral Arg., Jan. 6, 2021, ECF No. 59. The parties filed their responses to the oral argument questions on January 19, 2021. Resp. to Ct.'s Req. Regarding Questions for Oral Arg., Jan. 19, 2021, ECF No. 61 ("Pls.' OAQ Resp."); Resp. to Ct.'s Req. Regarding Questions in Advance of Oral Arg, Jan. 19, 2021, ECF 64 ("Def.'s OAQ Resp."); Resp. to Ct.'s Req. Regarding Questions for Oral Arg., Jan. 19, 2021, ECF No. 63 ("Def-Inter.'s OAQ Resp."). Oral argument was held on February 9, 2021. Oral Arg., Feb. 9, 2021, ECF No. 66. On February 19, 2021, the parties filed supplemental submissions following oral argument. Resp. to Ct.'s Req. Regarding Cmts. After Oral Arg., Feb. 19, 2021, ECF No. 68 ("Pls.' Post-Arg. Br."); Resp. to Ct.'s Req. for Post-Arg. Submission, Feb. 19, 2021, ECF. No. 69 ("Def.'s Post-Arg. Br."); Resp. to Ct.'s Req. for Post-Arg. Submission, Feb. 19, 2021, ECF No. 67 ("Def.-Inter.'s Post-Arg. Br.").

**JURISDICTION, STANDARD OF REVIEW, AND INTERPRETIVE FRAMEWORK**

The court has jurisdiction over this action pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c). The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i) which provides "[t]he court should hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." The court also reviews the determinations pursuant to remand "for compliance with the court's remand order." See Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

As laid out in Asemesa I, 429 F. Supp. 3d at 1338–39, the court reviews Commerce's interpretation of a statute by application of the two-step test laid out in Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Dupont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Under Chevron, the court first determines "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. However, "if the statute is silent or ambiguous with respect to the specific issue," the court must then determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. If the agency's interpretation of the statute is reasonable, it must withstand judicial scrutiny. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994).

**DISCUSSION**

Plaintiffs argue that (1) Commerce misinterpreted Section 1677(5A) such that Commerce's de jure specificity finding is not responsive to the court's remand order; and (2) Commerce's finding that the demand for raw olives principally suitable for the production of table olives is

substantially dependent on the demand for table olives is unsupported by substantial evidence and not in accordance with law.  Pls.' Br. at 4, 13.  The Government and Coalition respond in support of Commerce's <u>Remand Results</u> by arguing that (1) Commerce's construction of Section 1677(5A) is permissible and accompanied with a reasonable explanation of BPS's de jure specificity; and (2) Commerce's interpretation of Section 1677-2, and particularly its distinction between prior stage and raw agricultural products, is reasonable and not unlawful.  Def.'s Br. at 11, 17; Def.-Inter.'s Br. at 4, 10, 15–19.  The court concludes that Commerce's interpretations of de jure specificity under Section 1677(5A), and of the meaning of "prior stage product" under Section 1677-2, are unreasonable and not in accordance with law.

> ### I. *Commerce's Interpretation of Section 1677(5A)'s De Jure Specificity Inquiry is Unreasonable and Not in Accordance with Law.*

The court determined in <u>Asemesa I</u> that Commerce's finding that the BPS program constituted a de jure specific subsidy did not include a reviewable interpretation of the statute.  <u>429 F. Supp. 3d</u> at 1339–40.  In relevant part, the court stated that:

> Neither Commerce nor the Government provides an explanation or interpretation of the statute to support its conclusion that the BPS program is de jure specific. Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the "express" requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.

<u>Id.</u> at 1340.  Accordingly, the court remanded the de jure specificity determination to Commerce for explanation of its interpretation of the statute.

On remand, Commerce "further explain[ed] its interpretation of [Section 1677(5A)] for the de jure specificity finding."  <u>Remand Results</u> at 2.  In so doing, Commerce emphasized Congress's legislative intent, noting that the specificity test was "intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread

availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy" and

not to provide "a loophole through which narrowly [focused] subsidies provided to or used by

discrete segments of an economy could escape the purview of the [countervailing duty] law." Id.

at 12 (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103-316, Vol. 1, 929 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4163).  Commerce

concluded that, although the limitation of the BPS to the agricultural sector is itself not sufficient

basis to deem it a de jure specific subsidy program, its non-uniform application across the

agricultural sector does constitute an express limitation of the subsidy to an enterprise or industry.

Id. at 14–15.  Finding that the legislation implementing the BPS incorporates by reference

eligibility data arising from the SPS, further finding that the SPS itself incorporated eligibility data

from the Common Market Program, and finding that the Common Market program expressly

limited access to olive growers, Commerce redetermined on remand that the BPS provides de jure

specific subsidies to olive growers.  Id. at 15.

Plaintiffs argue that Commerce's interpretation of the statute is incorrect because it fails to

account for the unambiguous language of Section 1677(5A). Pls.' Br. at 4.  In particular, Plaintiffs

argue that the phrase "expressly limits access" requires Commerce to "show that the BPS program

(through the administering authority or the legislation under which it operates) makes clear that its

purpose is to control eligibility for BPS payments such that olive growers have a right to, or use,

BPS payments in a manner that is limited to them."  Id. at 5 (emphasis in original).  Plaintiffs

conclude that, because BPS subsidy payments are made available without reference to specific

crops or farmers, Commerce's determination that the BPS program "'limited [subsidy] access' to

'olive growers,'" disregards the unambiguous meaning of the statute and is therefore unlawful. Id.

at 9–10.  The Government and Coalition respond that Commerce correctly interpreted the meaning

of "expressly limits access" to permit a finding of de jure specificity where "by law, there is no uniform treatment across the agricultural sector in the provision of benefits." Remand Results at 14; see Def.'s Br. at 9–10; Def.-Inter.'s Br. at 5. The Government contends that the statute is clearly ambiguous, and that the court is therefore obligated to defer to Commerce's reasonable interpretation of the de jure specificity analysis. Def.'s Br. at 7–8. Both the Government and Coalition conclude that Commerce reasonably determined that the incorporation of historical production data in the BPS program's implementing legislation resulted in the law's non-uniform treatment of olive growers, and therefore in de jure specificity under Section 1677(5A). Id. at 9–11; Def.-Inter.'s Br. at 11–12.

Chevron requires that the court begin with the plain meaning of the statute, for "if the text answers the question [of Congress's intent], that is the end of the matter." Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citations omitted). Thus, in determining whether step one of Chevron is satisfied, the court looks first to the statute's text, and employs the "traditional tools of statutory construction." Id. (quoting Chevron, 467 U.S. at 843 n.9). Here, Section 1677(5A) provides that "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." The dictionary definition of the adjective "express" is "directly, firmly, and explicitly stated." Express, Merriam-Webster, https://www.merriam-webster.com/dictionary/express (last visited June 8, 2021). The dictionary definition of the adjective "limit" is "to assign certain limits to" or "to restrict the bounds or limits of," while the noun is defined as "something that bounds, restrains, or confines." Limit, Merriam-Webster, https://www.merriam-webster.com/dictionary/limit (last visited June 8, 2021). Thus, the plain meaning of the statute is that a subsidy is de jure specific when the authority providing the

subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry.  There is no ambiguity in this reading.[1]

The court therefore rejects Commerce's interpretation of Section 1677(5A) as permitting a finding of de jure specificity when "by law, there is no uniform treatment across the agricultural sector in the provision of benefits." Remand Results at 14.  The law's failure to provide uniform treatment in the distribution of subsidies is not equivalent to its explicit restriction of those benefits to a specific enterprise or industry.  It is not sufficient, as Commerce and the Government suggest, for the legislation underlying the subsidy under consideration to merely "reference[] and incorporate[]" prior legislation which itself may favor a specific sector. Remand Results at 48; see Def.'s Br. at 10–11.  Such reading reduces the de jure specificity test to a general finding of non-uniform treatment, without any determination that the subsidy in question be explicitly limited to a specific enterprise or industry by the administering authority or its implementing legislation. See Pls.' Post-Arg. Br. at 2–3.  As Plaintiffs note, it therefore fails to give meaning to the statute's requirement that a de jure specific subsidy must exhibit explicit restriction to an enterprise or industry.  Id. (citing Colautti v. Franklin, 439 U.S. 379, 392 (1979)).  Nor is it sufficient for the current scheme to exhibit "a linkage between eligibility for . . . crop-specific payments provided under the prior legislation" and the payments currently provided, without more. Remand Results

---

[1] While the Government contends that "[b]y directing Commerce to explain its interpretation of the statute, the [c]ourt acknowledged that the statute is silent on whether 'a program expressly based on programs that limited access of payments to a specific crop' is de jure specific," this is not correct.  Def.'s Br. at 11.  Rather, the court is unable to make any determination as to whether Commerce's determination is supported by substantial evidence and in accordance with law if neither Commerce nor the Government provide any explanation for that determination. Asemesa I, 429 F. Supp. 3d at 1340–41.  Conclusory statements without more are not reviewable even where the statute applied by Commerce is unambiguous.

at 48–49. For example, it is conceivable that a prior subsidy scheme could be constructed to explicitly favor cabbage growers, and that the current scheme incorporates a regional implementation of the prior favorable rates (as the BPS program does) -- but that changes in soil composition, weather patterns, or consumer demand has since caused most cabbage fields to be replaced by a wide range of alternative crops. In such a case, Commerce's reading would require a finding of de jure specificity even where the historic data included in the statute has no relationship to current production and might even correspond to equal treatment across the agricultural sector despite what appears to be "non-uniform" distribution of subsidies.[2] Under the plain meaning of Section 1677(5A), subsidies are only de jure specific where the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry.

As both Plaintiffs and the Government acknowledge, the purpose of the specificity test is to "function as an initial screening mechanism" to avoid the imposition of duties on subsidies which are truly generally available across the agricultural sector. Pls.' Br. at 5 (quoting SSA at 929); Def.'s Br. at 9 (quoting SSA at 913). As such, the test contemplates a number of avenues for determining specificity. Where, as here, a subsidy is not directly and expressly limited in its application, and is therefore not de jure specific, Commerce is not precluded from further analyzing the distribution of benefits to determine whether the subsidy is specific on other grounds. See, e.g., 19 U.S.C. § 1677(5A)(B)–(C), (D)(iii)–(iv). There is therefore no basis to conclude that, as

---

[2] Coalition makes much of the BPS program's express provision of favorable subsidy rates to permanent crops as defined under the Common Market Program. See Def.-Inter.'s Post-Arg. Br. at 3–6. However, neither Commerce nor Coalition provides sufficient evidence for the court to conclude that identified "'permanent crop' regions of Spain" meaningfully correspond to those regions engaged in olive farming for any period beyond the specific period during which the Common Market Program data was gathered. Id.; see Remand Results at 8. Without more, this is not enough to constitute an express limitation to an industry or enterprise.

the Government and Coalition suggest, that application of the plain meaning of Section 1677(5A) risks allowing "shielding [from duties] subsidies that on their face provide differentiated treatment to subsets of the agricultural sector," or otherwise undermining the purpose of the statute.[3]  Def.-Inter.'s Br. at 8; see also Def.'s Br. at 11.

In sum, Commerce's interpretation Section 1677(5A) to permit a finding of de jure specificity where "by law, there is no uniform treatment across the agricultural sector in the provision of benefits," is impermissible.  Remand Results at 14.  Interpreting "expressly limits" to require the uniform provision of benefits statute deviates from the plain meaning of Section 1677(5a) and thus from Congress's unambiguous intent.  The court concludes that Commerce's interpretation of the statute is unreasonable and not in accordance with law.

Accordingly, the court does not consider whether Commerce's application of the statute to the BPS program was in accordance with law and supported by substantial evidence.[4]  The court remands the question of de jure specificity in the instant case to Commerce for further proceedings consistent with this opinion.

---

[3] The Government argues, in line with the Remand Results, that "[a]n interpretation that would 'require the BPS program to restate the entirety of the laws and regulations pursuant to which the SPS and Common Market Program were implemented would create a loophole through which foreign governments could provide countervailable subsidies in the guise of a "new" program and avoid the imposition of countervailing duties.'" Def.'s Br. at 11 (quoting Remand Results at 20). However, if the favorable treatment of olive growers is indeed fully incorporated in the BPS by reference to the prior schemes, neither Commerce nor the Government provides any basis for the court to conclude it would survive an analysis of its de facto specificity.  The court therefore rejects this argument as without merit.

[4] Although the Government argues that the BPS is nevertheless de jure specific under a plain language reading of Section 1677(5A), the explanation provided by the Government in large part overlaps with Commerce's impermissible reading of the statute.  See Def.'s Br. at 11–15.  The court has accordingly considered and rejected the Government's contentions that "express limitation need not be in terms of a particular crop or farmer," and that express reference to prior legislation which itself codifies non-uniform treatment is sufficient for a finding of de jure specificity.  Id. at 15.

**II.** ***Commerce's Interpretation of Section 1677-2's "Substantially Dependent" Requirement is Not in Accordance with Law.***

The court determined in <u>Asemesa I</u> that Commerce applied an impermissible interpretation of Section 1677-2, and that its deviation from past practice with respect to the meaning of "substantially dependent" was arbitrary and not in accordance with law. <u>429 F. Supp. 3d</u> at 1341, 1344. The court's determination was rooted in Commerce's failure to acknowledge the unambiguous language of the statute, and its unexplained deviation from past practice in finding that table olives' control of eight percent of the market for raw olives constituted substantial dependence. <u>Id.</u> at 1342–44. The court ultimately remanded to Commerce for further analysis and for explanation of its interpretation of the statute.

Commerce's analysis of Section 1677-2 on remand raises two questions before the court: first, whether Commerce permissibly interpreted the statute on remand, and second, whether Commerce reasonably found substantial dependence in the present case. Accordingly, the court begins by considering whether Commerce set out a permissible construction of Section 1677-2.

> **A.** ***Commerce Permissibly Concluded that "Prior Stage Product" is Not Coextensive with "Raw Agricultural Product," but Applied an Impermissible Interpretation of Section 1677-2 in Determining that "Prior Stage Product" is Properly Defined as "the Raw Agricultural Product that the Industry Under Examination Considers Principally Suitable for Use in the Prior Stage of Production of the Latter Stage Product."***

In its <u>Remand Results</u>, Commerce identified a statutory ambiguity that satisfies the first step of the <u>Chevron</u> analysis. <u>Remand Results</u> at 25–26. Section 1677-2 provides that:

> In the case of an agricultural product processed from a raw agricultural product in which--
> > (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
> > (2) the processing operation adds only limited value to the raw commodity,
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

19 U.S.C. § 1677-2. Neither the term "raw agricultural product" nor the term "prior stage product" is defined by the statute, although Commerce noted that it has, "through its practice, adopted a . . . definition of the term 'raw agricultural product'" similar to that provided in 19 U.S.C. § 1677(E)(iv), namely, "any farm or fishery product." Remand Results at 25. With respect to the term "prior stage product," Commerce acknowledged that it has, "in past cases and in the Final Determination, . . . defined the raw agricultural product and the prior stage product to be the same." Id. at 25–26. However, Commerce explained on remand that it concluded that continuing to treat the two terms as coterminous in the context of its investigations "would give 'raw agricultural product' and 'prior stage product' the same meaning," in conflict with the text of the statute. Id. at 26–27.

Accordingly, Commerce explained that it revised its interpretation of "prior stage product" so that it is meaningfully distinct from "raw agricultural product" in reflection of the "strong presumption that Congress expresses its intent through the language it chooses and that the choice of words in a statute is therefore deliberate and reflective." Id. at 26 (quoting KYD, Inc. v. United States, 35 CIT 475, 479, 779 F. Supp. 2d 1361, 1367 (2011)). Rather, Commerce found that "[t]he language used in the statute . . . shows that Congress contemplated that a raw agricultural product could undergo several stages of production and that each stage of production may produce a distinct processed agricultural product." Id. at 27. Ultimately, Commerce determined that "[t]he plain language and structure of the statute signals that Congress intended the 'prior stage product' to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product." Id.

Plaintiffs argue that this determination constitutes an impermissible attempt to limit the denominator of its substantial dependence analysis on remand. Pls.' Br. at 13–16. In particular,

Plaintiffs argue that (1) "raw agricultural product" and "prior stage product" are not distinct and exclusive, and (2) that even if the terms are in fact distinct, "prior stage product" cannot merely be a subset of "raw agricultural product. Id. The Government responds that the use of both "raw agricultural product" and "prior stage product" in the statute supports an interpretation of Section 1677 that distinguishes between the terms so as to avoid rendering either superfluous. Def.'s Br. at 18–19. The Government and Coalition together argue that, in the instant case, Commerce correctly found that the appropriate prior stage product is olive varietals suitable for the production of table olives, and not all raw olives varietals inclusive of raw mill olives suitable only for the production of olive oil. Id. at 19–21; Def.-Inter.'s Br. at 21–22.

The court concludes that, while Commerce has reasonably determined that "prior stage product" and "raw agricultural product" are not coextensive, its decision to define "prior stage product" as "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product" represents an impermissible construction of Section 1677-2. Remand Results at 27.

Commerce's determination that "prior stage product" and "raw agricultural product" are not coextensive in the context of Section 1677-2 is both reasonable and in accordance with law. It is well-established that "[t]he language of the statute is the best indication of Congress's intent." Shoshone Indian Tribe of Wind River Res. v. United States, 364 F.3d 1339, 1345 (Fed. Cir. 2004) (citing Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 (1980)). In the present case, while the meaning of the term "prior stage product" is left ambiguous in the statutory text, Commerce's construction of Section 1677-2 is well-reasoned and ensures that both "raw agricultural product" and "prior stage product" are given meaningful effect. As Chevron requires deference to Commerce's interpretation of the law, so long as that interpretation is reasonable, 407

U.S. at 843, the court finds that Commerce's determination that "prior stage product" is distinct from "raw agricultural product" is in accordance with law.

However, the court rejects Commerce's determination that the intended definition of "prior stage product" is "the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product." Remand Results at 27. It does not follow from the conclusion that "prior stage product" is distinct from "raw agricultural product" that a prior stage product may also be a subset of the raw agricultural product. Rather, such a definition of "prior stage product" seems to render the requirements of Section 1677-2 largely self-fulfilling, insofar as raw olives principally suitable for use in table olive production are likely processed into table olives, or tomatoes principally suitable for canning are likely processed into canned tomatoes. Commerce's interpretation cannot be "consistent with language and structure of the statute" if, by giving meaning to the term "prior stage product," it simultaneously causes the statute as a whole to become superfluous. See Def.'s Br. at 19 (citing Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1032 (Fed. Cir. 2007)). Thus, Commerce's interpretation of "prior stage product" as used in Section 1677-2 is unreasonable and not in accordance with law.

Arguments by the Government and Coalition to the contrary are unavailing. The Government asserts that interpreting the prior stage product to be a subset of the raw agricultural product "avoids a construction that would render either term superfluous." Id. at 19. As the court has explained, Commerce's interpretation risks superfluity of a different kind. While Chevron obligates the court to defer to Commerce's interpretation of a statute so long as it is reasonable -- even if it is not "the only possible interpretation, nor even the interpretation deemed most reasonable by the courts" -- it does not require the court to accept one erroneous interpretation to

avoid another.  Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009).  Nor is the court

convinced by Coalition's argument that the rejection of Commerce's interpretation of "prior stage

product" necessarily risks "preclud[ing] . . . CVD remed[ies] for processed products" and thereby

undermining Congressional intent.  Def.-Inter.'s Br. at 18.  Such risk is only present to the extent

that Commerce has determined that "raw agricultural product" cannot itself be delimited; for

example, if the appropriate raw agricultural product in the production of diced, canned tomatoes

is necessarily "all tomatoes."  As no such determination is apparent from the Remand Results,[5]

the court declines to consider Coalition's argument further.

       Accordingly, the court finds that Commerce's interpretation of Section 1677-2 is not in

accordance with law, and remands for further proceedings consistent with this opinion.

> **B.**     ***The Court Does Not Reach Commerce's Conclusion that the Demand for Olive Varietals Principally Suitable for the Production of Table Olives is Substantially Dependent on the Demand for Table Olives.***

       Commerce concludes, pursuant to its interpretation of Section 1677-2, that the appropriate

prior stage product for analysis of substantial dependence in the instant case is those raw olive

varietals principally suitable for the production of table olives.  Remand Results at 29, 81–82.

Applying this construction to the record, Commerce ultimately determined that the demand for

raw olive varietals principally suitable for the production of table olives is substantially dependent

on the demand for table olives.  Remand Results at 30–34.  In light of the foregoing, the court

declines to reach this determination on the basis that it relies on an impermissible interpretation of

Section 1677-2.

---

[5] Indeed, Plaintiffs argue, and Commerce acknowledged, that "a distinct biological varietal can be considered a distinct raw agricultural product under the definition Commerce employs, specifically, 'any farm or fisheries product' as used in 19 U.S.C. § 1677(4)(E)(iv)."  Pls.' Br. at 17; see Remand Results at 80–81.

## CONCLUSION

For the foregoing reasons, the court concludes that Commerce's interpretations of Section 1677(5A)'s de jure specificity test and of Section 1677-2's prior stage product analysis are not in accordance with law.  The court therefore remands to Commerce for further proceedings consistent with this opinion.  Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

                                                            */s/    Gary S. Katzmann*
                                                            Gary S. Katzmann, Judge

Dated:  June 17, 2021
           New York, New York

ADDENDUM 5

**UNITED STATES DEPARTMENT OF COMMERCE**
Office of the General Counsel
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

June 1, 2020

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:    Redetermination Pursuant to Court Remand Order in
*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
Court No. 18-00195

Dear Mr. Toscano:

Pursuant to the Court's orders of January 17, 2020 and April 9, 2020, please find attached the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand in the above-captioned action. The remand redetermination is a public document.

In accordance with Rule 56.2(h)(1) of the Rules of this Court, filing of the administrative record index for the remand proceeding will follow under separate cover. Should you have any questions concerning the matter, please contact me at (202) 482-2327.

Respectfully submitted,

/s Saad Y. Chalchal
Saad Y. Chalchal
Senior Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance

Attachment

Mr. Mario Toscano
June 1, 2020
Page 2


cc:

Matthew Paul McCullough
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 452-7327
mmccullough@curtis.com

Sonia W. Murphy
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-3067
sonia.murphy@usdoj.gov

Raymond Paul Paretzky
McDermott, Will & Emery, LLC
500 N. Capitol Street, N.W.
Washington, DC 20001
(202) 756-8619
rparetzky@mwe.com

C-469-818
Remand
Slip Op. 20-8
POI:  01/01/2016 – 12/31/2016
**Public Document**
E&C/OI:  DSM/MK

### FINAL RESULTS OF REMAND REDERTERMINATION
*Asociación de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. COOP. And., and Angel Camacho Alimentación, S.L. v. United States*
Court No. 18-00195, Slip Op. 20-8 (Ct. Int'l Trade January 17, 2020)

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, Court No. 18-00195, Slip. Op. 20-08 (Ct. Int'l Trade January 17, 2020) (*Remand Order*).  These final results of redetermination concern Commerce's final determination in the countervailing duty investigation of ripe olives from Spain.[1]

In the *Remand Order*, the Court remanded two issues to Commerce:  (1) Commerce's determination that certain subsidies provided by the Government of Spain (GOS) to olive growers are *de jure* specific pursuant to section 771(5A)(D)(i) of the Tariff Act of 1930, as amended (the Act); and (2) Commerce's analysis pursuant to section 771B(1) of the Act and finding that the demand for raw olives is "substantially dependent" on the demand for table olives.[2]  With regard to the first issue, the Court held that Commerce's *de jure* specificity

---

[1] *See Ripe Olives from Spain:  Final Affirmative Countervailing Duty Determination,* 83 FR 28186 (June 18, 2018) (*Final Determination*) and accompanying Issues and Decision Memorandum; *see also Ripe Olives from Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 83 FR 37469 (August 1, 2018) (*Amended Final Determination and Countervailing Duty Order*).
[2] *See Remand Order* at 40.

determination "has not been sufficiently explained because Commerce did not provide an interpretation of the statute in reaching its determination based on the record."[3]  With regard to the second issue, the Court held that Commerce applied an impermissible interpretation of the term "substantially dependent," pursuant to section 771B(1) of the Act, and deviated from its past practice without adequate explanation in determining that the demand for raw olives is substantially dependent on the demand for table olives.[4]  The Court remanded these issues "to Commerce for further proceedings consistent with this opinion."[5]  The Court sustained all other challenged aspects of Commerce's final determination, concluding that:  Commerce's application of section 771B(2) of the Act, that the processing of raw olives into ripe olives adds only "limited value," was supported by substantial evidence on the record and in accordance with law; Commerce's calculation methodology regarding the attribution of subsidy benefits to ripe olive producers was supported by substantial evidence on the record and in accordance with law; and, Commerce's determination that the raw olive purchase data reported by Aceitunas Guadalquivir, S.L.U. (AG) was sufficiently indicative of its purchases of raw olives used to produce ripe olives is supported by substantial evidence.[6]

Consistent with the Court's *Remand Order*, Commerce:  (1) reopened and placed information on the record and provided interested parties an opportunity to comment or provide additional rebuttal or clarifying information; (2) further explains its interpretation of section 771(5A)(D)(i) of the Act for the *de jure* specificity finding; and, (3) reconsidered its interpretation and analysis of section 771B(1) of the Act.  We made no changes to the *Amended Final Determination and Countervailing Duty Order* with this redetermination.

---

[3] *Id.* at 18.
[4] *Id.*
[5] *See Remand Order* at 40.
[6] *See Remand Order* at 29.

2

## II.    BACKGROUND

On June 18, 2018, Commerce published the *Final Determination* in the investigation of ripe olives from Spain.[7]  In the *Final Determination*, Commerce determined that subsidies given to growers of raw olives were *de jure* specific under section 771(5A)(D)(i) of the Act and, pursuant to section 771B of the Act, we deemed those subsidies to have been provided with respect to the production of the processed product.[8]  Therefore, using information collected from interested parties during its investigation, Commerce calculated countervailing duty rates applicable to imports of ripe olives from Spain.

On June 19, 2018, two of the mandatory respondents and the Coalition for Fair Trade in Ripe Olives (the petitioner) alleged that the *Final Determination* contained ministerial errors. Specifically, AG alleged that Commerce used the incorrect volume of olives purchased for purposes of calculating the benefit to AG from subsidies provided to the non-affiliated growers that supplied it with raw olives.[9]  Angel Camacho Alimentacion, S.L. (Camacho) alleged that Commerce used an incorrect value in calculating the benefit for one subsidy program.[10]  The petitioner alleged that Commerce used the incorrect sales value for one of Camacho's growers and that, for two of the programs, Commerce incorrectly attributed the benefit from Camacho's cross-owned input suppliers.[11]  Commerce reviewed the record and, on July 12, 2018, agreed that certain allegations referenced in the petitioner's and Camacho's allegations constituted ministerial errors and disagreed that AG's allegation identified a ministerial error, within the

---

[7] *See Final Determination*.

[8] *See Final Determination* and accompanying Issues and Decision Memorandum at Comments 1 and 3.

[9] *See* AG's Letter, "Aceitunas Guadalquivir S.L.U. ("Guadalquivir") Ministerial Error Comments for the Final Determination," dated June 19, 2018.

[10] *See* Camacho's Letter, "Angel Camacho Alimentacion, S.L. ("Camacho") Ministerial error Comments for the Final Determination," dated June 19, 2018.

[11] *See* Petitioner's Letter, "CVD Investigation on Ripe Olives from Spain; Petitioner's Comments on Ministerial Errors in the Final Determination," dated June 19, 2018.

3

meaning of section 705(e) of the Act and 19 CFR 351.224(f).[12]  On August 1, 2018, Commerce

published the *Amended Final Determination and Countervailing Duty Order*, which reflected the

corrections of the ministerial errors.[13]

The three mandatory respondents, Agro Sevilla Aceitunas S. COOP. And. (Agro Sevilla),

Camacho, and AG, together with Asociacion de Exportadores e Industriales de Aceitunas de

Mesa (ASEMESA) (hereafter collectively referred to as the respondents), challenged

Commerce's final determination arguing before the Court that:  (1) Commerce improperly

concluded that certain grants provided to olive growers by the Government of Spain are *de jure*

specific subsidies under section 771(5A)(D)(i) of the Act; (2) Commerce improperly interpreted

and applied section 771B(1) of the Act in concluding that the demand for raw olives is

"substantially dependent" on the demand for processed table olives; (3) Commerce improperly

interpreted and applied section 771B(2) of the Act in concluding that the processing operation

for table olives adds only "limited value"; (4) Commerce improperly deviated from its general

attribution practice for calculating the countervailing duty rates by attributing subsides received

by growers of raw olives "to sales of ripe olives rather than to sales of raw olives"; and, (5)

Commerce improperly determined that AG's reported raw olive purchase data were sufficiently

indicative of its purchases of raw olives used to produce ripe olives.[14]

On January 17, 2020, the Court issued its decision sustaining, in part, and remanding, in

part, Commerce's final determination in the countervailing duty investigation of ripe olives from

Spain.  The Court upheld Commerce's determination as it related to:  Commerce's application of

section 771B(2) of the Act in determining that processing raw olives into table olives adds only

---

[12] *See* Memorandum, ''Ripe Olives from Spain:  Amended Final Determination of Countervailing Duty
Investigation Pursuant to Ministerial Error Allegation,'' dated July 12, 2018 (Ministerial Error Memorandum).
[13] *See* Amended Final Determination and Countervailing Duty Order.
[14] *See Remand Order* at 17-18.

"limited value"; Commerce's calculation methodology regarding the attribution of subsidy benefits to ripe olive producers; and, Commerce's determination that AG's reported olive purchase data were sufficiently indicative of its purchases of raw olives used to produce ripe olives.[15]  However, the Court remanded Commerce's determination that certain grants provided to olive growers by the GOS are *de jure* specific pursuant to section 771(5A)(D)(i) of the Act and Commerce's determination that the demand for raw olives is substantially dependent on the demand for processed table olives, pursuant to section 771B(1) of the Act.[16]  With regard to Commerce's *de jure* specificity determination, the Court found that Commerce did not sufficiently explain its determination "because Commerce did not provide an interpretation of the statute in reaching its determination based on the record."[17]  Specifically, the Court found Commerce's explanation insufficient because it did not "explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the statute."[18]  As a result, the Court remanded for Commerce to explain its interpretation of the statute.  With regard to Commerce's determination that the demand for raw olives is substantially dependent on the demand for processed olives, the Court found that Commerce applied an impermissible interpretation of the term "substantially dependent" in section 771B(1) of the Act and deviated from its past practice without adequate explanation.[19]

---

[15] *Id.* at 29-40.
[16] *Id.* at 18-29.
[17] *Id.* at 18.
[18] *Id.* at 20.
[19] *Id.* at 20-29.

## III. ANALYSIS

### A. Commerce's Determination that Certain Subsidies to Olive Growers are *De Jure* Specific Pursuant to Section 771(5A)(D)(i) of the Act

#### 1. Commerce's *Final Determination*

In the investigation, Commerce examined programs implemented pursuant to the European Union's Common Agricultural Policy (CAP), which provided subsidies to olive growers, particularly under the Basic Payment Scheme (BPS).[20] The manner in which Spain implemented the BPS as it relates to the provision of, and the amount of benefits to, olive growers relied heavily of the provision of benefits under two predecessor programs: the Common Organization of the Market in Oils and Fats (the Common Market Program), which was in place from 1997 to 2003 and provided annual grants only to Spanish olive growers (the grants were provided on the basis of the volume of olive production, *i.e.*, olive growers received a grant amount in Euros per kilogram of olives produced with different rates applied to olives grown for olive oil and olives grown for processing into table olives); and the Single Payment Scheme (SPS), which replaced the Common Market Program and was in place from 2003 through 2014.[21] The BPS took effect in 2015 as the successor to the SPS, and provided grants during the period of investigation (POI) to Spanish farmers, including olive growers, that met the eligibility requirements and applied for subsidies.

The European Union (EU) claimed, during the investigation, that because the benefits paid under the BPS were "decoupled" from production (*i.e.*, the payment of benefits was no

---

[20] The BPS encompasses three subprograms under which farmers can receive payments: Direct Payment, Greening (payments for farmers that undertake agricultural practices beneficial for the climate and the environment), and Aid to Young Farmers. *See Ripe Olives from Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 82 FR 56218 (November 28, 2017) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum at 18-21.

[21] *See Final Determination* and accompanying Issues and Decision Memorandum at 32-36; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 21-23.

longer contingent on the production of a particular product), Commerce could not find them to be specific.[22] However, because the statute does not provide Commerce with the authority to dismiss as not specific subsidies that are claimed by an authority to be "decoupled,"[23] Commerce fulfilled its responsibility under the statute to investigate the provision of benefits under the BPS to determine whether they were provided on a specific basis pursuant to section 771(5A) of the Act.

The payments provided to farmers during the POI are based on a geographical indicator of farmland productivity prior to the implementation of these programs.[24] Under the Common Market Program, which operated between 1999 and 2002, the EU required each Member State (including Spain) to collect information regarding the hectares, volume, and value (which depended on whether the olives were grown for the production of olive oil or the production of table olives) for each farm.[25] Commerce observed that "{b}oth olive oil and table olives were specifically identified as products eligible to receive production aid under {the Common Market Program}, and the payments provided {between 1999 and 2002} were based on whether the olives were used to produce olive oil or table olives."[26] Under the SPS, which operated from 2003 through 2014, the amount of aid each farmer was eligible to receive was calculated by

---

[22] *See Final Determination* and accompanying Issues and Decision Memorandum at 33.

[23] Indeed, neither the statute nor the legislative history uses the terms "coupled" or "decoupled" in the context of specificity or otherwise.  *See* Section 771(5A) of the Act; *See also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1(1994) (SAA) at 929-932.

[24] *See Final Determination* and accompanying Issues and Decision Memorandum at 33-36 (citing, *inter alia*,  EU IQR at Exhibit 12 "Council Regulation (EC) No. 1782/2003"; EU IQR at Exhibit 13 "Council Regulation (EC) No. 1307/2013"; and GOS QR at Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014"); *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 19.

[25] *See Final Determination* and accompanying Issues and Decision Memorandum at 32-33; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 19 (citing EU IQR Exhibit 11 "Council Regulation (EC) No. 1638/98").

[26] *See Final Determination* and accompanying Issues and Decision Memorandum at 32 (citing EU IQR Exhibit 11 "Council Regulation (EC) No. 1638/98" and GOS SQR Exhibit 21 "Council Regulation (EC) No. 1782/2003" at Article 33 and Annex VI, which references production aid given to the olive oil sector during the reference period pursuant to "Council Regulation (EC) No. 136/66") (internal footnote omitted).

multiplying the value per hectare by the area in hectares.[27]  By reference to the value per hectare

calculated using data collected during the operation of the Common Market Program, Commerce

found that the SPS program preserved the access of olive farmers to the assistance previously

available to them, on a *de jure* specific basis, under the Common Market Program.

In implementing the BPS, Spain used the data collected under the SPS to create 50

agricultural regions to facilitate payments.[28]  Each region was assigned a rate based on its

productive potential and its productive orientation (*i.e.*, rainfed, irrigated, permanent crops, and

permanent pasture).[29]  Olive groves are considered "permanent crops" and this designation is

factored into the calculation of the regional rate, which, in turn, is used to determine each hectare

of farmland's "basic payment entitlement" and whether, and to what extent, a farmer was eligible

to receive grants under the BPS.[30]  Thus, Commerce concluded that the regional variations in

BPS payments were a result of the use of the historical regional data that had been used to

calculate the crop-specific subsidy payments under the SPS.  Commerce's analysis is

summarized:

> In summary, the annual grant amount provided to olive farmers under BPS is
> based on the annual grant amount provided to olive farmers under SPS.  The grant
> amount provided to olive farmers under SPS is based on the average grant amount
> olive farmers received in 1999 through 2002 under the {Common Market
> Program}.  The grant amount provided in 1999 through 2002 to eligible farmers,
> which included olive farmers, was based on the type of crop grown and the
> production value created from the crop.  Therefore, the annual grant amount
> provided under BPS {is} based on annual grant amounts that were crop-specific,

---

[27] *See Final Determination* and accompanying Issues and Decision Memorandum at 32-33; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 22 (citing EU IQR at Exhibit 10 "Council Regulation (EC) No. 864/2004" and Exhibit 12 "Council Regulation (EC) No. 1782/2003").

[28] *See Final Determination* and accompanying Issues and Decision Memorandum at 33 (citing GOS SQR at 26 and EU IQR at Exhibit 13 "Council Regulation (EC) No. 1307/2013"); *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 19.

[29] *See Final Determination* and accompanying Issues and Decision Memorandum at 33-34; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 19-20.

[30] *See Final Determination* and accompanying Issues and Decision Memorandum at 34; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 20.

thus the grant amounts received by olive growers under BPS in 2016 are directly related to the grant amount only olive growers received under the {Common Market Program}.[31]

This analysis was the basis of Commerce's finding that the BPS provided subsidies that are *de jure* specific to olive growers. Because: the Common Market Program was available only to olive growers (*i.e.*, access to its benefits was "expressly limited" to the olive sector); the SPS calculated the grant amount based on data regarding the type of crop, and the volume and value of production collected under the Common Market Program (*i.e.*, preserving the limited access to benefits available to the olive sector under the Common Market Program); and, by law, access to the SPS grants provided the foundation of the BPS subsidy payments, the BPS retained the *de jure* specificity inherent in the Common Market Program.[32]

### 2. The Court's *Remand Order*

In its opinion, the Court stated "Commerce did not set forth an interpretation of {section 771(5A)(D)(i) of the Act} in determining that BPS subsidies to olive growers are *de jure* specific, and thus without more the court cannot determine whether it was supported by substantial evidence and in accordance with law."[33] The Court articulated its concern about what it identified as Commerce's failure to explain how, in administering the BPS program, the authority "expressly limits" access to the subsidy to an enterprise or industry, as required by section 771(5A)(D)(i) of the Act.[34] In addition, the Court cited the respondents' argument that the "payments are not dependent on the production of specific crops under {the BPS} program,

---

[31] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 24.
[32] *Id.* at 18-27; *Final Determination* and accompanying Issues and Decision Memorandum at Comment 3
[33] *See Remand Order* at 18.
[34] *Id.* at 20.

and thus they have been decoupled from the olive industry."[35]  The Court held that Commerce's *de jure* specificity finding was not sufficiently explained, stating, in relevant part:

> {T}he Government fails to explain how a program expressly based on a program that limited access of payments to a specific crop is equivalent to a statement that BPS itself 'expressly limit[s]' access of payments to a specific crop, as the statute requires. . . . Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the 'express' requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.  This does not constitute a sufficient explanation of why the BPS subsidies are expressly limited as the statute requires.  Without such an explanation of Commerce's interpretation of the statute, the court cannot analyze whether Commerce made a decision supported by substantial evidence and in accordance with law.[36]

The Court therefore remanded the *de jure* specificity determination for Commerce provide an explanation of its interpretation of the statute.[37]

### 3.    Analysis

Commerce further clarifies for the Court the finding that the BPS provides benefits to Spanish olive producers that are *de jure* specific and explains how the authority "expressly limits" access to the subsidy, within the meaning of section 771(5A)(D)(i) of the Act.  At the outset of this discussion, Commerce first wishes to express our concern that the Court is relying on the respondents' characterization of the BPS subsidies as "decoupled" from production of a particular product as having meaning for the purposes of Commerce's specificity analysis, or even as an indication of non-specificity.[38]  A subsidy is specific as a matter of law if "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  The statute makes no

---

[35] *Id.* at 19.
[36] *Id.* at 20.
[37] *Id.*
[38] *See Remand Order* at 4 ("Specific subsidies are also referred to as 'coupled' subsidies.  'Decoupled' refers to the fact that a subsidy does not encourage production of a specific agricultural product, *i.e.*, is not a specific subsidy.").

provision for Commerce to examine whether a subsidy is coupled to or decoupled from production.  Indeed, those terms are not used in the statute; they are terms used by the EU in describing the provision of benefits under the CAP Pillar I programs. Sections 771(5A)(D)(i) and (ii) of the Act address *de jure* specificity.[39]  The relevant inquiry is not whether the subsidy is "coupled" to or "decoupled" from current production of a particular crop.  Rather, the relevant inquiry for specificity under section 771(5A)(D)(i) of the Act is whether access to the subsidy is expressly limited by law to an enterprise or industry.  Moreover, under section 771(5A)(D)(ii) of the Act, a program is not *de jure* specific when the government or the legislation pursuant to which the program is administered establishes criteria or conditions governing the eligibility for, and the amount of, a subsidy, *i.e.*, criteria that do not favor one enterprise or industry over another.  In any case, a respondent's claim that a program is not specific is not a sufficient basis for Commerce to reach such a determination.  Commerce is obligated by the statute to investigate each program and to determine, on the basis of record evidence, whether a program provides subsidies on a specific basis, whether *de jure* or *de facto*.  Commerce did so in conducting its countervailing duty investigation of ripe olives from Spain.

As stated above, a subsidy is *de jure* specific under section 771(5A)(D)(i) of the Act if "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."[40]  The SAA explains Congress's intent for Commerce "to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign

---

[39] *See SAA* at 929 – 930.
[40] *See* section 771(5A) of the Act ("{A}ny reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.").

subsidies which truly are broadly available and widely used throughout an economy."[41]  The

SAA further explains the purpose of the specificity test:

> The specificity test was intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy.  Conversely, the specificity test was not intended to function as a loophole through which narrowly focussed {*sic*} subsidies provided to or used by discrete segments of an economy could escape the purview of the {countervailing duty} law.[42]

Regarding *de jure* specificity, the SAA states that "specificity exists where a government

expressly limits eligibility for a subsidy to an enterprise, industry, or group thereof."[43]

Moreover, there is no "mathematical formula for determining when the number of enterprises or

industries eligible for a subsidy is sufficiently small so as to properly be considered specific" and

"Commerce can only make this determination on a case-by-case basis."[44]

Commerce's implementing regulation regarding specificity is 19 CFR 351.502.

However, as explained in the *Preamble* issued in conjunction with Commerce's countervailing

duty regulations, Commerce's regulation on specificity is not extensive because of the level of

detail and clarity provided in section 771(5A) of the Act and the SAA.[45]  As a result, Commerce

limited its regulation "to those aspects of the specificity test that are not addressed explicitly in

the statute or the SAA."[46]  Commerce's regulations, at 19 CFR 351.502(d), do, however, provide

a special rule for specificity applicable to agricultural subsidies:

---

[41] *See* SAA at 929; *see also* Uruguay Round Agreements Act, P.L. 103-465, Title I, Subtitle A, § 102(d), 108 Stat. 4815, 4819 (1994) (codified at 19 U.S.C. § 3512(d)) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

[42] *See* SAA at 929.

[43] *Id.* at 930.

[44] *Id.*

[45] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65355 (November 25, 1998) (*Preamble*).

[46] *Id.*

> *Agricultural Subsidies*. The Secretary will not regard a subsidy as being specific under section 771(5A)(D) of the Act solely because the subsidy is limited to the agricultural sector (domestic subsidy).

This regulation codified Commerce's longstanding practice of considering the agricultural sector to constitute more than a single group of industries.[47] The *Preamble* provides the following:

> Paragraph (d) . . . provides that the Secretary will not consider a domestic subsidy to be specific solely because it is limited to the agricultural sector. Instead, as under prior practice, the Secretary will find an agricultural subsidy to be countervailable only if it is specific within the agricultural sector, *e.g.*, a subsidy is limited to livestock, or livestock receive disproportionately large amounts of the subsidy. *See, e.g.*, *Lamb Meat from New Zealand*, 50 FR 37708, 37711 (September 17, 1985).[48]

Commerce's rule concerning specificity in the case of agricultural subsidies was upheld by the Court in *Roses Inc. v. United States*, in which the Court stated:

> Commerce's determination that a group composed of all agriculture, that is, whatever is not services or manufacturing, is not within the meaning of the statutory words "industry or group of industries" is a reasonable interpretation of the statute. While there is room for debate on the meaning of the stated words, Commerce's interpretation is within the realm of acceptable definitions.[49]

Against this backdrop, Commerce undertakes its specificity analysis of a program that is available only to the agriculture sector. Commerce must be especially rigorous in its application of the so-called "agricultural exception," lest a domestic industry be deprived of the remedy to which it is entitled under the Act. Commerce's analysis is focused on determining whether a subsidy is specific to any subset of the agricultural sector. As articulated in *Asparagus from*

---

[47] *See Final Negative Countervailing Duty Determination; Fresh Asparagus from Mexico*, 48 FR 21618, 21621 (May 14, 1983) (*Asparagus from Mexico*); *Fresh Cut Roses from Israel; Final Results of Administrative Review of Countervailing Duty Order*, 48 FR 36635, 36636 (August 12, 1983) (*Fresh Cut Roses from Israel*); and *Certain Fresh Cut Flowers from Mexico*, 49 FR 15007, 15008 (April 16, 1984).
[48] *See Preamble*, 63 FR at 65357-58.
[49] *See Roses Inc. v. United States*, 774 F Supp. 1376, 1383-1384 (Ct. Int'l Trade 1991).

*Mexico*,[50] *Certain Fresh Cut Flowers from Mexico*,[51] and *Fresh Cut Roses from Israel*,[52] "benefits uniformly available to the agricultural sector did not constitute {countervailable subsidies} because the Department 'consider[s] the agricultural sector to constitute more than a single group of industries.'"[53]

At the outset of its examination of the BPS, and despite the EU's repeated contention that the programs were "decoupled" and were therefore not specific and not countervailable, Commerce sought to understand how the agricultural sector, writ large, was treated by the program, and whether any sub-sector of the agricultural sector was afforded special treatment by an express limitation on access to the subsidy. This examination required Commerce to develop a record, requesting information from the EU and the GOS, that would demonstrate olive growers' eligibility to receive benefits under the BPS, and how their access to and the amount of benefits they are eligible to receive was established. The goal of the inquiry was to determine whether there was evidence that demonstrated that the GOS or the EU, either in implementing the program or otherwise, had taken action that "expressly limits" access to the subsidy. When examining the agricultural sector, Commerce can find that the express limitation required by the statute is manifest when, by law, there is no uniform treatment across the agricultural sector in the provision of benefits. In other words, consistent with the framework described above for analyzing specificity of agricultural subsidies, Commerce was seeking to answer the question, "are benefits under the BPS uniformly available across the agricultural sector?" The answer that Commerce arrived at is that, as a matter of law, benefits under the BPS are not uniformly

---

[50] *See Asparagus from Mexico*, 48 FR at 21621.
[51] *See Certain Fresh Cut Flowers from Mexico*, 49 FR at 15008.
[52] *See Fresh Cut Roses from Israel*, 48 FR at 36636.
[53] *Id.* (quoting *Asparagus from Mexico*, 48 FR at 21621).

14

available across the agricultural sector in Spain and therefore, in the words of the statute, "the authority providing the subsidy . . . expressly limits access to the subsidy to an enterprise or industry . . . ."[54]

Information provided by the GOS and the EU indicated that access to, and the amount of, benefits provided to olive growers under the BPS, as a matter of law, relied for reference on the provision of benefits under the SPS and, in turn, access to and the amount of benefits provided to olive growers under the SPS was determined by reference to the benefits provided under the Common Market program. Because the BPS legally incorporated by reference the eligibility criteria and benefits provided under the SPS and the Common Market Program, Commerce appropriately investigated those precursor programs to determine whether the BPS subsidies were uniformly available across the agricultural sector in Spain.[55] In this case, Commerce found that, as a result of the actions of the GOS and the EU in implementing the program, BPS subsidies were not uniformly available across the agricultural sector in Spain because access to the BPS subsidy for olive growers was, as a matter of law, based on eligibility for assistance provided under the Common Market Program, which expressly limited access to olive growers.[56]

The Common Market Program provided benefits on a *de jure* specific basis because access to the subsidy was expressly limited to olive growers. The benefits provided under this program were calculated with a rate of Euros per kilogram of a farmer's production of olives for oil and olives for table olive production (different rates were applied to olives for oil and olives

---

[54] Section 771(5A)(D)(i) of the Act.

[55] " . . . the regulations that govern the current annual grant-to-farmer program for olive growers {the BPS} state that the grant amount calculation is essentially based on an earlier form of the annual grant-to-farmer program. Because this earlier program determined annual grant amounts based on the type of crop and volume of production, the calculation of the current annual grant amount is effectively still based on the type of crop and the volume of production." *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 18.

[56] Because our analysis of this program indicated that it was *de jure* specific with respect to Spanish olive growers, there was no need to analyze whether the entire CAP program was specific under section 771(5A)(D) of the Act.

for table olive production).  This value is unique to, and only accessed by, farms that grow

olives.  When this program transitioned into the SPS program, the SPS benefits were based on

the value of each hectare in a farm, which was determined using the average amount of grants

provided to that area from 1999 through 2002 (*i.e.*, when the Common Market Program was in

operation).[57]  The grant amounts under SPS were not based on the total value of a farm's overall

production, or given a flat rate based only on the size of the farm in hectares, or a combination of

the two, or any other neutral or objective criteria pursuant to section 771(5A)(D)(ii) of the Act.[58]

Instead, the SPS grant amounts were based on the amount of grants provided under the Common

Market Program that were available only to olive growers, thereby entrenching the crop-specific

nature of the subsidy under the Common Market Program into the criteria for determining the

assistance that a farmer would be eligible to receive under the SPS.  In this manner, the value of

the grants provided under the Common Market Program (the access to which was expressly

limited to the olive sector) was preserved in calculating the grants paid under the SPS.  Thus,

under the SPS, access to a subsidy based on the Common Market Program subsidies was

expressly limited to olive growers.  In implementing the SPS, the GOS and the EU developed a

system that applied conditions that were not neutral or objective such that Commerce can

consider the program to be not specific under section 771(5A)(D)(ii) of the Act; if a farm

---

[57] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 22-23.
[58] Section 771(5A)(D)(ii) of the Act provides:
    (ii)  Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if –
        (I)        eligibility is automatic
        (II)      the criteria or conditions for eligibility are strictly followed, and
        (III)    the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document, so as to be capable of verification.
For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

produced a product that received certain amounts of assistance prior to the implementation of SPS, those amounts were factored into, and therefore preserved in, the calculation of the grant amounts to which farmers had access under the SPS. In this way, the SPS did not apply uniform treatment across the agricultural sector;[59] olive growers continued to benefit as they had, relative to other sub-sectors of the agricultural sector, under the Common Market Program, under which access to the subsidy was expressly limited to olive growers.

In implementing the BPS, the GOS again legislatively implemented a methodology regarding the distribution of benefits that relied on the access to grants provided under the SPS, not on any other neutral or objective criteria such as the total value of all crops produced on a farm, the area of the farm, the farmer's farm income, *etc.*, to determine the access to grants to provide under the BPS. The calculations incorporated adjustments to account for differences in productive orientation (whether rainfed land, irrigated land, permanent crops, and permanent pasture), and as well, a "convergence factor" that was to be applied in each of the five years of the operation of the BPS in order to bring the assistance provided to all recipients closer to a regional average.[60] However, the fact remains that under the Common Market Program, access to the subsidies was expressly limited to olive growers, and this limited access was legislatively

---

[59] As explained above, uniform treatment across the agricultural sector is necessary to find non-specificity for a program that is limited to the agricultural sector. *See, e.g., Asparagus from Mexico*, 48 FR at 21622 ("{W}e found that water rates were provided to the entire agricultural sector as uniform rates. . . . Thus, we found that a specific industry or group of industries was not provided with special water rates as a result of any government-sponsored development program.").

[60] Although the convergence factor was intended to bring the value of assistance to each farmer closer to the regional averages, it will not completely eliminate the differences in assistance. The BPS, as developed by the EU, gave Member States options for how to effect convergence; Spain elected not to use a flat rate multiplied by the number of eligible hectares, but rather elected to use the convergence step that it recognized would gradually reduce, but would not eliminate, the disparity in grant amounts. Commerce found unavailing the argument that the application of a convergence factor eliminated the possibility of finding the assistance specific to olive growers. *See Final Determination* and accompanying Issues and Decision Memorandum at 33-36; *see also* Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain, Verification Report: European Commission," dated April 2, 2018, at 3.

preserved in the implementation of the SPS and the BPS.[61]  Commerce is required to evaluate

this evidence, pursuant to 19 CFR 351.502(d), in examining whether there is uniform treatment

in the provision of benefits across the agriculture sector.  Commerce can find a subsidy to the

agricultural sector to be not specific only if there is record evidence of such uniform treatment,

or record evidence of neutral and objective criteria pursuant to section 771(5A)(D)(ii) of the Act.

As Commerce concluded in the investigation, the result of the application of the legislatively

preserved methodology regarding access to, and the distribution of, benefits was that "two farms

of the same size can have two different total entitlement values if there is a historical difference

in the amount of grant money the different regions previously received under SPS."[62]  In its

implementation of the BPS, the GOS, just as it did with the SPS program, the eligibility criteria

that limited access to benefits provided under the Common Market Program were incorporated

as a matter of law and embedded the historical differences in crop entitlement amounts among

different agricultural products.  As a result, farmers who received larger relative amounts of

assistance under SPS continue to receive larger amounts of assistance under BPS.  Therefore, the

entitlement values under the BPS for those farmers that grow olives retain the historical

difference, *relative to other farmers*, that was inherent in the Common Market Program.

　　Finally, the Court expressed concern that Commerce relied on the operation of the

predecessor programs to examine the specificity of the BPS.[63]  Commerce examines specificity

on a case-by-case basis;[64] every case presents unique facts and Commerce has an obligation to

develop an approach to the analysis that fits those facts.  In this case, because access to, and the

---

[61] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 23 ("The current BPS program uses the amount farmers received under SPS in 2014, and this amount is based on the average amount a farmer received under {the Common Market Program}, which determined the grant amount on the type of crop.").
[62] *Id.* at 21.
[63] *Remand Order* at 20.
[64] *See* SAA at 930.

amount of, subsidies provided under the BPS program was by law determined based on the access to, and the amount of, benefits under the SPS and Common Market Program, it was necessary for Commerce's analysis to examine and understand how the BPS program's reliance on those predecessor programs affected a farmer's access to benefits and whether benefits were uniformly available. Commerce would not have fulfilled its statutory duty to investigate if it were to conclude that the program was not specific based on the respondents' claim that benefits provided under the BPS are "decoupled" from production, or in the absence of an analysis of the eligibility for and the provision of benefits under the precursor programs, which underpin the access to assistance under the BPS. Such a conclusion would have ignored the fact that BPS legislatively incorporated by reference eligibility criteria from these earlier programs.

Additionally, we recall the purpose of the specificity test, as explained in the legislative history, "to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy."[65] As explained above, benefits under the BPS were by law based on the benefits provided under the predecessor programs, which preserved the eligibility criteria for access to benefits provided under the Common Market Program and the historical differences in crop entitlement amounts among different agricultural products. An explicit reference to and reliance on another legal instrument, which sets forth the provision of subsidies for an earlier or separate program on a *de jure* specific basis, can satisfy the "expressly limits" requirement in section 771(5A)(D)(i) of the Act. To find a subsidy not specific merely because the *de jure* specific element of the program is set forth in a more detailed manner in other legal instruments would elevate form over substance. Interpreting the "expressly limits"

---

[65] *See* SAA at 929-30.

language of the statute to require the BPS program to restate the entirety of the laws and regulations pursuant to which the SPS and Common Market Program were implemented would create a loophole through which foreign governments could provide countervailable subsidies in the guise of a "new" program and avoid the imposition of countervailing duties. We decline to adopt such a stringent interpretation of section 771(5A)(D)(i) of the Act because "the specificity test was not intended to function as a loophole through which narrowly focussed {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the {countervailing duty} law."[66] Therefore, for the foregoing reasons, we continue to conclude that the BPS is *de jure* specific within the meaning of section 771(5A)(D)(i) of the Act.

### B.    Commerce's Interpretation and Analysis of Section 771B(1) of the Act

#### 1.    Commerce's *Final Determination*

The petitioner alleged that certain subsidies to olive growers in Spain should be treated as countervailable with respect to ripe olives because the criteria set forth in section 771B of the Act are satisfied.[67] In accordance with section 771B of the Act, Commerce is directed to deem countervailable subsidies provided to producers of a raw agricultural product as though they have been provided with respect to the manufacture, production, or exportation of the processed agricultural product, if two criteria are met: (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product; and (2) the processing operation adds only limited value to the raw commodity.[68] Commerce therefore analyzed

---

[66] *See* SAA at 929-30.
[67] *See* Petitioner's Letter, "Ripe Olives from Spain: Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, as Amended, Volume III Countervailable Subsidies," dated June 21, 2017, at 2-6.
[68] Section 771B of the Act reads as follows:
      In the case of an agricultural product processed from a raw agricultural product in which –
            (1) the demand for the prior stage product is substantially dependent on the
            demand for the latter stage product, and

whether section 771B of the Act applied in the countervailing duty investigation of ripe olives from Spain to determine if countervailable subsidies provided to producers of raw olives should be treated as though the countervailable subsidies have been provided with respect to producers of the processed product.

The first criterion of the analysis under section 771B(1) of the Act requires determining whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product." In the investigation, we identified the "prior stage product" as raw olives for purposes of the analysis under section 771B(1) of the Act, because we found that raw olives are simply processed into either of two next-stage olive products, olive oil or table olives.[69] Commerce explained that processed table olives, the next-stage olive product that includes ripe olives, should be considered the "latter stage product" for purposes of the analysis of the criterion under section 771B(1) of the Act in this investigation.[70] Commerce found that the demand for the prior stage product, raw olives, is substantially dependent on the demand for the latter stage product, table olives, because if the demand for table olives were to cease, then, at a minimum, eight percent of the market, which accounts for millions of dollars in export sales to the United States and roughly 600,000 tons of raw olives, would be negatively affected.[71]

---

(2) the processing operation adds only limited value to the raw commodity, countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

[69] *See Final Determination* and accompanying Issues and Decision Memorandum at 21-22; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 15.

[70] *See Final Determination* and accompanying Issues and Decision Memorandum at 21-22; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 15.

[71] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 16.

## 2.    The Court's *Remand Order*

The Court held that Commerce's conclusion regarding the first criterion under section 771B(1) of the Act is not in accordance with the law because "Commerce applied an impermissible interpretation of the statutory term 'substantially dependent' based on its plain language and legislative history."[72]  The Court determined that, while Commerce found the amount of raw olives used for processing into table olives, eight percent of all raw olives, to be substantial and that the demand for raw olives was dependent on the demand for table olives, Commerce failed to assess whether the demand for raw olives was "substantially dependent" because "an analysis of 'substantially dependent' that does not link those two terms is an impermissible interpretation of the statute."[73]  According to the Court, Commerce did not read the terms "substantially" and "dependent" in conjunction, but separated the terms to reach its conclusion that the demand for raw olives is substantially dependent upon the demand for table olives.[74]

Furthermore, the Court did not defer to Commerce's interpretation of "substantially dependent" because the Court concluded that "the statutory language is unambiguous regarding the threshold of demand required to satisfy {section 771B(1) of the Act}."[75]  In reaching this conclusion, the Court explained that the legislative history of section 771B of the Act illuminates Congress's unambiguous intent for the meaning of "substantially dependent," citing *Pork from Canada*[76] and *Rice from Thailand*[77] as the administrative cases that contain the analysis that

---

[72] *See Remand Order* at 21.
[73] *Id.* at 22.
[74] *Id.*
[75] *Id.* at 22-23.
[76] *See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled, and Frozen Pork Products from Canada*, 50 FR 25097 (June 17, 1985) (*Pork from Canada*).
[77] *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Rice from Thailand*, 51 FR 12356 (April 10, 1986) (*Rice from Thailand*).

Congress intended to adopt with the enactment of the statute.[78]  The Court observed that, in *Pork from Canada*, Commerce found that the first criterion would be satisfied if the demand for the prior stage good is derived almost exclusively from the demand for the latter stage product.[79]  The Court noted that, in *Pork from Canada*, "Commerce also relied on the {International Trade Commission's} industry analysis, which determined that producers of a raw agricultural product and producers of the processed product could be collapsed into a single industry where the raw product enters a single continuous line of production resulting in one end product."[80]  Similarly, the Court observed that, in *Rice from Thailand*, Commerce found that almost all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice and stated that there was a single continuous line of production from paddy rice to milled rice.[81]

The Court further explained that after the enactment of section 771B of the Act Commerce developed a consistent practice of finding the first criterion satisfied when the demand for the latter stage product is "most or at least half of the demand of the raw agricultural product."[82]  However, the Court determined that Commerce deviated from its past interpretation of "substantially dependent" in the *Final Determination*.[83]  The Court acknowledged that Commerce previously found that 44.7 percent satisfied the "substantially dependent" criterion in *Shrimp from China*,[84] but stated that "44.7 percent is significantly higher than eight percent."[85]

---

[78] *See Remand Order* at 23-26.
[79] *Id.* at 24 (quoting *Pork from Canada*, 50 FR at 25098).
[80] *Id.* at 24-25 (quoting *Pork from Canada*, 50 FR at 25099) (internal quotations omitted).
[81] *Id.* at 25 (quoting *Rice from Thailand*, 51 FR at 12358).
[82] *Id.* at 27 (citing *Fresh, Chilled, and Frozen Pork from Canada:  Final Affirmative Countervailing Duty Determination*, 54 FR 30774 (July 24, 1989); and *Rice from Thailand:  Final Results of Countervailing Duty Administrative Review*, 59 FR 8906 (February 24, 1994)).
[83] *Id.* at 26-28.
[84] *Id.* at 28 (discussing *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*)).
[85] *Id.*

In sum, the Court concluded that Commerce deviated from the plain language of the statute, Congress's unambiguous intent, and Commerce's practice in determining that the demand for raw olives is substantially dependent on the eight percent of raw olives used to produce table olives.  The Court therefore remanded Commerce's analysis under section 771B(1) of the Act for further proceedings consistent with the Court's decision.[86]

### 3.    Analysis

In accordance with the Court's *Remand Order*,  Commerce:  (1) reopened and placed information on the record and provided interested parties an opportunity to comment or provide additional rebuttal or clarifying information; and (2) reexamined whether the "substantially dependent" criterion under section 771B(1) of the Act is satisfied and revised the analysis in a manner that is supported by substantial evidence on the record and consistent with the statutory language, Congress's intent, Commerce's practice, and the Court's decision.  We conclude that section 771B(1) of the Act is satisfied because, as explained in greater detail below, the demand for the prior stage product is substantially dependent on the demand for the latter stage product and we continue to deem countervailable subsidies provided to producers of raw olives as though the countervailable subsidies have been provided with respect to the manufacture, production, or exportation of ripe olives.  Accordingly, we made no changes to our calculations from the *Amended Final Determination and Countervailing Duty Order* for purposes of this redetermination.

---

[86] *Id.* at 40.

a.    **Section 771B(1) is Satisfied Because the Demand for the Prior Stage Product is Substantially Dependent on the Demand for the Latter Stage Product**

Section 771B of the Act directs Commerce to deem countervailable subsidies provided to producers of a raw agricultural product as though they have been provided with respect to the manufacture, production, or exportation of the processed agricultural product, if two criteria are met.  The first criterion of the analysis under section 771B(1) of the Act requires determining whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product."  In prior cases, Commerce has defined the "prior stage product" to be coterminous with the raw agricultural product.[87]  Similarly, in the *Final Determination*, we defined the raw agricultural product and the prior stage product to be the same (*i.e.*, all raw olives).[88]  However, as explained below, on remand we have reconsidered the definition of the prior stage product in our analysis of section 771B(1) of the Act in this investigation based on the language in the statute and new evidence submitted on the record of the remand proceeding.

The Act does not provide a specific definition of the term "raw agricultural product," as that term is used in section 771B of the Act.  For purposes of identifying the relevant industry for the domestic like product, section 771(4)(E)(iv) of the Act defines "raw agricultural product" as "any farm or fishery product."  Commerce has, through its practice, adopted a similar definition of the term "raw agricultural product" for purposes of section 771B of the Act.[89]

Similarly, there is no statutory definition of "prior stage product."  As noted above, in past cases and in the *Final Determination*, Commerce defined the raw agricultural product and

---

[87] *See, e.g.*, *Shrimp from China* and accompanying Issues and Decision Memorandum at Comment 5.

[88] *See Final Determination* and accompanying Issues and Decision Memorandum at 22; *see also Preliminary Determination* and accompanying Preliminary Decision Memorandum at 15-16.

[89] *See generally Shrimp from China*; *Rice from Thailand*; *Final Results of Countervailing Duty Administrative Review*, 59 FR 8906 (February 24, 1994).

the prior stage product to be the same. However, there is a "strong presumption that Congress expresses its intent through the language it chooses and that the choice of words in a statute is therefore deliberate and reflective."[90] Therefore, in construing the statute, we endeavor to give effect to every word because different terms used in the same statute presumptively have different meanings.[91]

Commerce recognized and applied this fundamental rule of statutory construction in defining the "latter stage product" in the *Final Determination*. In defining "latter stage product" as table olives, Commerce observed that section 771B(1) of the Act uses the term "latter stage product" rather than "subject merchandise" or "foreign like product," and, for that reason, found that "the statutory language does not require the latter stage product to be the subject merchandise or the foreign like product."[92] Congress would have used the words "subject merchandise" or "foreign like product" if it intended the analysis under Section 771B(1) to be limited to the demand for the class or kind of merchandise that is the subject of the investigation. Thus, Commerce declined to adopt a definition of "latter stage product" to include only subject merchandise or the foreign like product, and instead explained that table olives, the next-stage olive product inclusive of ripe olives, should be considered the latter stage product for purposes of the analysis under section 771B(1) of the Act.

Applying the same fundamental rule of statutory construction to the term "prior stage product," for purposes of this redetermination, we no longer consider it accurate to define this term as necessarily encompassing all raw olives, because doing so would give "raw agricultural

---

[90] *See KYD, Inc. v. United States*, 779 F. Supp. 2d 1361, 1367 (Ct. Int'l Trade 2011) (quoting *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1347 (Fed. Cir. 2004)) (internal quotes omitted).
[91] *See Kalle USA, Inc. v. United States*, 923 F.3d 991, 997 (Fed. Cir. 2019) (citing *Reiter v. Sonotone Corp.*, 442 US 330, 339 (1979)).
[92] *See Final Determination* and accompanying Issues and Decision Memorandum IDM at 21.

26

product" and "prior stage product" the same meaning, which is inconsistent with the language chosen by Congress. The language used in the statute (*i.e.*, prior stage product and latter stage product) shows that Congress contemplated that a raw agricultural product could undergo several stages of production and that each stage of production may produce a distinct processed agricultural product. The plain language and structure of the statute signals that Congress intended the "prior stage product" to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product. Accordingly, we have relied on this understanding of the term "prior stage product" for purposes of our analysis under section 771B(1) of the Act in this redetermination.

In the ongoing first administrative review of the order, ASEMESA, Agro Sevilla, and Camacho (collectively, ASEMESA) and Musco Family Olive Company (Musco) each submitted new factual information related to the analysis of whether the demand for the prior stage product is substantially dependent on the demand for the latter stage product. The information also addressed the appropriate identification of the prior stage product when the latter stage product is table olives. Given the relevance of that information to this remand proceeding, as noted above, we placed the information on the record of the remand and we invited interested parties to provide additional factual information to rebut or clarify the record information.[93] Both ASEMESA and Musco provided additional information for the remand record.[94]

---

[93] *See* Memorandum, "Placing Factual Information on the Record," dated February 20, 2020. Attachment 1 to this memorandum is ASEMESA's Letter, "Factual Information on 'Substantial Dependence," dated January 15, 2020 (ASEMESA's January 15 Submission); Attachment 2 to this memorandum is Musco's Letter, "Ripe Olives from Spain: 1st Administrative Review, Submission of New Factual Information," dated February 5, 2020 (Musco's February 5 Submission).

[94] *See* Musco's Letter, "Ripe Olives from Spain; 1st Administrative Review; Response to Request for Additional Information," dated February 25, 2020 (Musco's February 25 Submission) at Exhibit 7B*; see also* ASEMESA's Letter, "Response to the Request for Additional Information on Substantial Dependence, Ripe Olives from Spain (C-469-818)," dated February 21, 2020 (ASEMESA's February 21 Submission) at Exhibit NFI-7.

27

ASEMESA provided an article about olives indicating that all olive varietals are dual use and there is no varietal explicitly grown for purpose of processing into table olives.[95]  In addition, ASEMESA provided production volumes, by varietal, extrapolated from the Regional Government of Andalusia's BPS data and internal 2008 GOS reports, as well as statistics from the GOS's Food Information and Control Agency (AICA), which they explain provides the volume of production of each olive varietal used for table olive purposes by campaign year.[96]  Analyzing the production and end-use data, ASEMESA concluded that there are no olive varietals inherently dedicated to table olive use.

In contrast, Musco provided information from:  the Spanish Ministry of Agriculture, Fisheries, Food and Environment (Ministry of Agriculture) on the fitness of the different olive varietals for different purposes;[97] the GOS agricultural insurance regulations on olive crops;[98] the Ministry of Agriculture's 2019 Survey on Areas and Yield;[99] and the Ministry of Agriculture's Statistical Yearbook.[100]  According to Musco, this information and data demonstrate that:  (1) certain raw olive varieties and their planted hectares are dedicated to table olive production; (2) certain raw olive varieties and their planted hectares are grown for dual use; and (3) certain raw olive varieties and their planted hectares are grown entirely for the purpose of producing olive oil.[101]  Musco provided price data from the Junta de Andalusia's publication, *Observatorio de Precios y Mercados*, to support their contention that table olive varietals, dual-use varietals, and mill olives are distinct; these data demonstrate that olive growers of table and dual-use varietals

---

[95] *See* ASEMESA's January 15 Submission at 10-11 and Exhibit 4, Jamonarium, "The Olive Oil, the Spanish Golden Liquid."
[96] *See* ASEMESA's February 21 Submission at 7-10.
[97] *See* Musco's February 5 Submission at 4-5 and Exhibit 2
[98] *Id.* at Exhibit 1.
[99] *See* Musco's February 25 Submission at Exhibit 4A.
[100] *Id.* at Exhibit 7B.
[101] *See* Musco's February 5 Submission at 2.

receive consistently higher farm gate prices than growers of mill olives.[102]  In summary, Musco concludes that these data, when considered together, firmly demonstrate that for purposes of the analysis under section 771B(1) of the Act in this case, it is appropriate to consider the prior stage product to be the raw olives grown for the purpose of processing into table olives (the table olive varietals and the dual use varietals), and on this basis the demand for raw table olives is substantially dependent on the demand for processed table olives.

In light of the information provided by ASEMESA and Musco, Commerce has gained a better understanding of the Spanish olive industry.  Specifically, the record now contains information and data from the GOS that confirms that the different olive varietals are grown for specific end uses.  As in the *Final Determination*, we continue to identify the "latter stage product" as table olives.  Information on the remand record demonstrates that there is recognition by the Spanish olive industry and by the GOS that certain olive varietals are grown for producing table olives, other olive varietals are grown as mill olives to be used to produce olive oil, and other olive varietals can be used for either purpose (so-called "dual use" olives).[103]  Musco provided data from a GOS source that details the volume of table olive varietals and dual use olive varietals actually used to produce table olives; these data also report the volume of table olive varietals and the volume of dual-use olive varietals actually used to produce olive oil.[104]  As a result of this new information and data, for the section 771B(1) analysis in this redetermination pursuant to remand, we identify the "prior stage product" in this investigation as the varietals of raw olives principally suitable for use in the production of table olives.  This conclusion is supported by the manner in which GOS agencies collect and publicize data on

---

[102] *Id.* at Exhibit 9.
[103] *See* Musco's February 5 Submission at 3-5, Exhibits 1 and 2.
[104] *See* Musco's Letter, "Ripe Olives from Spain; 1ˢᵗ Administrative Review; Response to Request for Additional Information," dated February 25, 2020 (Musco's February 25 Submission) at Exhibit 7B.

Spanish olive production and by Spanish industry data sources and reporting, both of which demonstrate that it is accepted in the olive sector that, at their source, raw olives, based on their varietal, are grown for one purpose or the other. For example, the GOS agricultural insurance regulations indicate that higher insurance premium rates apply to growers of table olive varietals than to growers of mill olive varietals, and, in general, those insuring dual-use varietals also pay higher premium rates than growers of mill olive varietals;[105] the International Olive Oil Council (IOC) has separate trade standards for table olives;[106] Spain's Ministry of Agriculture published a report on trends in Spain's table olive industry entitled "Diagnostics on the table olive sector in Spain";[107] and a chart from Interaceituna, a Spanish trade publication that tracks table olive production chart, by varietal.[108]

Next, we consider whether the demand for the prior stage product (the raw olives principally suitable for use in the production of table olives) is substantially dependent on the demand for the latter stage product (table olives). We have examined the production volume data, by varietal,[109] and we find that the demand for raw olive varietals principally suitable for use in the production of table olives (which includes "table olive" varietals and "dual use" varietals) is substantially dependent on the demand for processed table olives.[110] Based on this evidence, we find that section 771B(1) of the Act is satisfied.

---

[105] *See* Musco's February 5 Submission at Exhibit 1.
[106] *Id.* at Exhibit 3.
[107] *See* Musco's February 25 Submission at Exhibit 8.
[108] *Id.* at Exhibit 11.
[109] *See* Musco's February 25 Submission at Exhibit 11.
[110] Based on the information provided from the GOS's statistics on crop surfaces and production, we find that 96 percent of the raw olives principally suitable for use in the production of table olives were used to produce table olives in harvest year 2016, the POI. *See* Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain: Analysis of the Draft Remand Results for Finding the First Criterion of Section 771B is Satisfied," dated April 2, 2020 (Draft Remand Analysis Memorandum).

In making this finding, Commerce reviewed the production information provided by each party and finds that ASEMESA's conclusions, drawn from the production data it provided, are unreasonable for several reasons. First, the production data that ASEMESA provided were not taken directly from a specific source; rather, these data were extrapolated using GOS statistics on surface area farmed by olive varietal. In addition, the data were extrapolated from two different sources: the BPS data for the 2018/2019 campaign, and an internal report dating from 2008. The mixing of data from two sources, one of which is significantly outdated, diminishes the reliability of the resulting production data. Second, although ASEMESA identified the source of these data, ASEMESA did not provide the underlying source data. Third, ASEMESA's estimate of the surface area dedicated to the production of table and dual-use olive varietals reports a total area of 490,529 hectares.[111] However, Musco provided published GOS data showing the surface area dedicated to olive production for 2019,[112] revealing that the total planted area in Spain for table olives and dual-use olives is 189,794 hectares. This includes 76,120 hectares for table olives and 113,674 hectares for dual-use olives. Thus, ASEMESA's *estimate* of the total surface area dedicated to the production of table and dual-use olive varietals is well over twice the area reported by published GOS data.[113] The use of this overstated surface area as a variable in calculating the production volume based on yield per hectare leads to the overstatement of production data.

Further, ASEMESA incorrectly places the total production data for table olive varietals and dual-use olive varietals in the columns titled "Production Used as Table." This is confirmed

---

[111] *See* ASEMESA's February 21 Submission at 7. ASEMESA reports the surface area for each of the five principal varietals used in the production of table olives. The total is 490,529 hectares.
[112] *See* Musco's February 25 Submission at Exhibit 4A.
[113] *See* ASEMESA's February 21 Submission at 7.

by examining the AICA production data submitted by ASEMESA[114] as well as production data in the Interaceituna Publication[115] provided in Musco's submission.  ASEMESA contends that there is a difference between these two figures, yet ASEMESA appears to use them interchangeably.  This, combined with an overestimation of the hectare data to calculate the total production used as the denominator in this calculation, results in an incongruous substantial dependence calculation.  In summary, ASEMESA's calculation methodology vastly overestimates the production volume of the prior stage product in a way that is favorable to their argument but inconsistent with other data ASEMESA placed on the record and with data provided by Musco.  As demonstrated below, the data from Musco rely almost exclusively on GOS sources and contradict ASEMESA's calculations that rely on data from inconsistent sources and draw unreasonable conclusions.

To determine whether the information from Musco was reliable, we analyzed several tables that they provided from the Ministry of Agriculture's Statistical Yearbook for 2018 on Surfaces and Crop Productions for Olive Groves.  We substantiated raw table olive production data in harvest 2016[116] by multiplying the area of hectares dedicated to raw table olive production,[117] as provided in ASEMESA's February 21 submission, by the yield per hectare.  We conducted the same calculation to substantiate the production volume of mill olive varietals.[118]  Similarly, we examined the Ministry of Agriculture's end-use production data, by

---

[114] *See* ASEMESA's February 21 Submission at Exhibit NFI-2.
[115] *See* Musco's February 25 Submission at Exhibit 11.
[116] *See* Musco's February 25 Submission at Exhibit 7B.
[117] *See* ASEMESA's February 21 Submission at Exhibit NFI-1.
[118] *Id.*

region, of raw olives used for table and raw olives used for oil[119] and found that this data corresponded to the end-use production levels reported in other tables published by the GOS.[120]

Therefore, Commerce finds the data provided by Musco to be reliable. Information from the Ministry of Agriculture demonstrates that there are certain olive varietals (both table and dual-use) that are grown specifically for table olive production.[121] Information from the Ministry of Agriculture demonstrates that nearly all of the raw table olive varietals are used as table olives.[122] Likewise, the data show that only a small volume of the raw olive varietals grown as table olive varietals is used in the production of olive oil, and even a smaller proportion of raw olive varietals identified as mill olive varietals is used in the production of table olives.[123] Moreover, even if we were to rely on ASEMESA's proposed data, we find that the percentage of raw table olive varietals processed into table olives to be very similar to the percentage of raw shrimp processed into frozen shrimp in *Shrimp from China*, in which we found the demand for fresh shrimp to be substantially dependent on the demand for frozen shrimp.[124]

In summary, for purposes of this redetermination pursuant to remand, we reopened and placed information on the record related to the analysis of whether the demand for the prior stage product is substantially dependent on the demand for the latter stage product and provided

---

[119] *See* Musco's February 25 Submission at Exhibit 7.

[120] *See* Musco's February 25 Submission at Exhibit 7B.

[121] *Id.* at Exhibit 2A and Exhibit 4A.

[122] *Id.* at Exhibit 7B. GOS data from this chart indicate that 96 percent of raw table olive varietals are processed into table olives during the POI. *See* Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain: Analysis of the Draft Remand Results for Finding the First Criterion of Section 771B is Satisfied," dated March 31, 2020.

[123] *Id*. at Exhibit 7B. The data reveal that only four percent of the olives grown as table varietals were used to produce olive oil, and only one percent of the mill varietals was processed into table olives during harvest year 2016.

[124] In *Shrimp from China*, Commerce found that because 44.7 percent of fresh shrimp were processed into frozen shrimp, the demand for fresh shrimp was substantially dependent on the demand for frozen shrimp. *See Shrimp from China* and accompanying IDM at 47. ASEMESA's data indicates that 39.56 percent of raw table olive varietals were processed into table olives during the 2016/2017 campaign which closely corresponds to the percentage of raw shrimp used as frozen shrimp in *Shrimp from China*. *See* ASEMESA's February 21 Submission at 10.

33

interested parties an opportunity to comment or provide additional rebuttal or clarifying information.  We reconsidered the definition of the term "prior stage product" in our analysis of section 771B(1) of the Act based on the language and structure of the statute and on the new evidence submitted on the record of the remand proceeding; in addition, we identified raw olive varietals principally suitable for use in the production of table olives as the appropriate "prior stage product."  Based on the information on the remand record, we find that section 771B(1) of the Act is satisfied because the demand for the prior stage product (raw olive varietals principally suitable for use in the production of table olives) is substantially dependent on the demand for the latter stage product (table olives).  Because the Court affirmed Commerce's finding in the *Final Determination* for the second criterion under section 771B(2) of the Act, regarding the limited value added,[125] both requirements of section 771B of the Act are satisfied, and we continue to apply this provision of the statute that requires that "countervailable subsidies found to be provided to either the producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product." Therefore, for this redetermination, we have made no change to our identification and measurement of subsidies provided to olive growers and our determination that such subsidies benefit the production of ripe olives.

> **b.** **Section 771B(1) of the Act, the Legislative History, and Commerce's Practice Do Not Establish an Unambiguous Threshold of Demand Required to Satisfy the "Substantially Dependent" Criterion**

Our revised analysis of section 771B(1) of the Act in this remand proceeding satisfies the meaning of "substantially dependent," pursuant to the Court's *Remand Order*.  However, given the importance of section 771B of the Act in addressing unfair subsidies that injure U.S.

---

[125] *See Remand Order* at 29-33.

34

agricultural producers and processors, we now explain why we respectfully disagree with the Court's holding that, under step one of the two-step framework set forth in *Chevron*,[126] the statutory language is unambiguous regarding the threshold of demand required to satisfy the "substantially dependent" criterion and that Commerce applied an impermissible interpretation of the statute in the *Final Determination*.

In passing the Trade Agreements Act of 1979, Congress gave express recognition to the "special nature of agriculture," foreseeing that the analysis in antidumping and countervailing duty cases involving agricultural products would differ from the analysis in cases pertaining to industrial products.[127] Prior to the enactment of section 771B of the Act, Commerce included benefits to the producers of a raw agricultural product when determining the benefits to the producers of a processed agricultural product, where appropriate.[128] Although these past determinations involving the treatment of subsidies provided to producers or processors of raw agricultural products may be relevant to some degree, they cannot be interpreted as having established strict requirements for determining whether section 771B(1) of the Act is satisfied.

In *Pork from Canada*, Commerce considered subsidies to producers of live swine for purposes of determining the benefit to producers of fresh, chilled, and frozen pork products. In that case, Commerce found that it is inappropriate to consider something as an "input" into something else (for purposes of applying the upstream subsidy provision of the statute) when (a) there is a low level of value added at a given stage of processing and (b) if the processor was merely making the product ready for the next consumer.[129] Applying this test, Commerce found,

---

[126] *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 US 837, 842-45 (1984).
[127] *See* S. Rep. No. 249. 96th Cong. 1st Sess. 88, 91.
[128] *See Pork from Canada*, 50 FR at 25098-100; *see also Rice from Thailand*, 51 FR at 12357-58.
[129] *See Pork from Canada*, 50 FR at 25098.

*inter alia*, that the demand for the slaughtered and quartered swine, the next-stage product, is the predominant determinant of the demand for live swine.[130]  However, while Commerce found the demand for the prior stage product, live swine, to be predominantly dependent on the demand for the latter stage product, slaughtered swine, we did not articulate a finding that the demand for live swine was "almost exclusively" dependent on a specific end-use product, such as pork meat, ham, or bacon.  Commerce stated that "{t}he salient criterion is the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product."[131]  Commerce explained by way of example that this criterion would be satisfied if the demand for the prior stage product is derived almost exclusively from the demand for the latter stage product,[132] but we did not establish a minimum threshold of demand required to satisfy this criterion.  Similarly, in *Rice from Thailand*, Commerce determined that the prior stage product, paddy or unmilled rice, was dedicated to the production of the latter stage product, milled rice,[133] but did not establish a minimum threshold of demand required to satisfy the demand criterion.

Additionally, in *Pork from Canada*, Commerce referenced the International Trade Commission's (ITC) two-part test for determining whether to collapse producers and processors of a raw agricultural product into a single industry, for purposes of conducting the injury analysis.[134]  Commerce did so because, at that time, section 771B of the Act did not exist and the ITC had more experience dealing with agricultural products.[135]  Commerce simply noted that the ITC's industry analysis for agricultural products provided further support, but made it clear that the purpose of the ITC's test was to determine the relevant industry for purposes of the ITC's

---

[130] *Id.*, 50 FR at 25099.
[131] *See Pork from Canada*, 50 FR at 25098.
[132] *See Pork from Canada*, 50 FR at 25098.
[133] *See Rice from Thailand*, 51 FR at 12358.
[134] *See Pork from Canada*, 50 FR at 25099.
[135] *Id.*

36

injury analysis, it was not to address the distinct issue of whether countervailable subsidies provided to producers of a raw agricultural product should be considered for purposes of determining the benefit to the producers of a processed agricultural product.[136]

Commerce also recognized in *Pork from Canada*, that in the case of agricultural products, such as pork, producers can shift, very easily, to the production of the processed latter-stage products by making only minor changes to the product.[137]  As Commerce explained in that case, it would be reasonable to assume that if countervailing duties were imposed only on live swine, those swine producers would be able to circumvent the imposition of countervailing duties by selling to pork packers in Canada, who simply slaughter and trim the swine, and then export the product to the United States in the form of pork meat.  For this additional reason, Commerce considered subsidies that benefitted live swine producers to provide an equal benefit to the next-stage product and declined to treat live swine as an input product for which Commerce would need to conduct an upstream subsidy analysis.

In *Canadian Meat Council v. United States*, the Court held that Commerce's determination in *Pork from Canada* was not in accordance with the law and determined that if the statutory construct regarding the analysis of upstream subsidies is inadequate or inapplicable, it is the role of Congress to remedy any deficiency.[138]  Shortly thereafter, Congress observed what Commerce had predicted.  Rather than exporting the live swine to the United States for processing, Canadian producers of live swine began to send their live swine for slaughter in Canada and to export pork meat to the United States.  As a result, U.S. producers of live swine experienced no relief from subsidized products, and the U.S. pork industry suffered injury from

---

[136] *Id.*
[137] *Id.*
[138] *See Canadian Meat Council v. United States,* 661 F. Supp. 622, 623-29 (Ct. Int' Trade 1987).

the diversion of the business to Canadian pork processors.[139]  Congress also voiced strong

concerns that circumvention would occur absent a change to the countervailing duty law.

According to Congress, "the upstream subsidy test, if applied to agricultural commodities, would

understate the magnitude of the subsidy and permit wholesale circumvention of the

countervailing duty statute.  *The trade statute would be rendered essentially useless in the case*

*of subsidized agricultural commodities.*"[140]

      Before enacting section 771B of the Act, Congress referenced raspberries to highlight its

concern that foreign producers could avoid U.S. countervailing duties on agricultural products

merely by minimally processing the raw agricultural product.[141]  Congress referred to raspberries

as an example of how the countervailing duty law could be circumvented if subsidies provided to

raspberry farmers were not attributed to a further processed product, such as frozen

raspberries,[142] and Congress stated that a duty on raspberries could be avoided by simply

freezing the raspberries before they are shipped to the United States.[143]  However, in this

example, it is questionable whether the "substantially dependent" criterion under section 771B(1)

of the Act would be satisfied if we examined only whether the demand for fresh raspberries was

"almost exclusively" dependent on the demand for frozen raspberries.  Indeed, the demand for

fresh raspberries would also be dependent on the demand for other end-use products, such as

raspberry jam.  Further, we highlight for purposes of this redetermination that there is nothing in

the legislative history or any prior countervailing duty case on raspberries that demonstrated that

the demand for fresh raspberries is derived "almost exclusively" from the demand for frozen

---

[139] *See* Senate Congressional Record, S. 8815.
[140] *Id.* (emphasis added).
[141] *Id.*
[142] *Id.*
[143] *Id.*

raspberries or that "almost all" fresh raspberries are "dedicated to the production" of frozen raspberries. In drafting this legislation, Congress's intent was to close the gap in the law so that foreign growers or farmers of raw agricultural products could not avoid the application of countervailing duties to exports by merely marginally processing those products and having them reclassified as another product for export to the United States.[144]

In addition to raspberries, Congress also referenced countervailing duty cases on fish, lamb, "and many other products."[145]  Therefore, the facts referenced in both *Pork from Canada* and *Rice from Thailand* should not be considered to have established a specific threshold for what is considered "substantially dependent" under section 771B(1) of the Act because Congress intended that subsidies provided to raspberries, fish, and lamb should be actionable under the new provision.  In *Groundfish from Canada* and *Lamb Meat from New Zealand*, both of which took place after *Pork from Canada*, Commerce simply aggregated the subsidies provided to both the producers of the raw product and the processors, without performing any analysis of the percentage of demand of the raw product that was derived from the demand for the processed product.[146]

In *Shrimp from China*, a more recent case, Commerce found that the "substantially dependent" criterion under section 771B(1) of the Act was satisfied, even though the demand for the prior stage product was not almost exclusively dependent on the demand for the latter stage product.  In that case, Commerce found that 44.7 percent of the fresh shrimp market depends upon the demand for frozen shrimp, which satisfies section 771B(1) of the Act.[147]  In addressing

---

[144] *Id.*
[145] *See* 133 Senate Congressional Record S. 8787.
[146] *See Final Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish from Canada*, 51 FR 10041 (March 24, 1986); *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Lamb Meat from New Zealand*, 50 FR 37708 (September 17, 1985).
[147] *See Shrimp from China* and accompanying Issues and Decision Memorandum at 47.

39

claims that 25 percent of fresh shrimp is ultimately used for processing into frozen shrimp, Commerce stated that section 771B(1) of the Act would still be met because a ratio of 25 percent constitutes a demand that is substantially dependent upon the demand for the latter stage (processed) product.[148]  More specifically, Commerce determined that "where one quarter of the market depends upon the demand for frozen shrimp, we find it reasonable to consider this 'substantial' . . . we consider this proportion to demonstrate that the market for fresh shrimp is 'dependent' upon the demand for frozen shrimp in the sense that, were the demand for frozen shrimp to cease, one quarter of the fresh shrimp market would collapse."[149]

Thus, while we agree with the Court that the term "substantially" modifies the term "dependent" in section 771B(1) of the Act, we believe the Court has misapplied, and too narrowly construed, the meaning of this section of the statute in a manner that is inconsistent with Congressional intent as evident in the cases and agricultural products cited by Congress when it enacted that section of the statute.  The statute was enacted by Congress to capture subsidies provided to raw agricultural products that are processed into a next-stage product.  In this investigation, a raw olive is simply processed into a next-stage olive product.  In the *Preliminary Determination*, Commerce determined that the demand for the prior stage product, raw olives, is substantially dependent on the demand for the latter stage product, processed table olives, because if the demand for table olives were to cease, a sizeable sector of the raw olives market, which consists of only two next-stage olive products (*i.e.*, table olives and olive oil), would be negatively impacted.[150]  Therefore, Commerce's determination to deem subsidies provided to producers of raw olives as having been provided to the production of ripe olives

---

[148] *Id.* at 46.
[149] *Id.*
[150] *See Preliminary Determination* and accompanying Preliminary Decision Memorandum at 16.

under section 771B of the Act was fully consistent with both congressional intent and the prior cases in which Commerce analyzed the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product. While the Court states that "it would be more reasonable to consider the demand for raw olives to be 'substantially dependent' on the demand for olive oil, which constitutes 92 percent of the demand for raw olives," the Court does not address whether olive oil, an olive product in a different form, would meet the second criterion under section 771B(2) of the Act. In the event that olive oil would not meet that criterion, the entire Spanish olive industry could avoid the application of countervailing duties on its exports to the United States and the U.S. olive industry may be deprived of the remedy to which it is entitled under the countervailing duty law in general and under section 771B of the Act in particular. The discussion of several agricultural products and industries in the legislative history (as noted above), all of which are different in structure and makeup, suggests that this possible result of the Court's ruling, *i.e.*, deeming an entire agricultural industry outside the purview of the provision, is contrary to Congress's intent.

The results of this redetermination pursuant to remand comport with the Court's *Remand Order*. However, as noted in detail above, Commerce respectfully disagrees with the Court's holding that the meaning of "substantially dependent" is unambiguous and establishes a minimum threshold of demand, based on the statutory language, the legislative history, and prior Commerce practice.

IV.    **Analysis of Comments**

On April 2, 2020, Commerce released the draft results of redetermination and we invited comments from the interested parties.[151]  We received timely filed comments from Musco, ASEMESA, and the Government of Spain.[152]  We address the parties' comments below.

A.    **Commerce's Determination that Certain Subsidies to Olive Growers are *De Jure* Specific Pursuant to Section 771(5A)(D)(i) of the Act**

**Comment 1:   Whether Commerce's Finding that the BPS program is *De Jure* Specific is Not Supported by Substantial Evidence and is Contrary to Law**

*ASEMESA's Comments*

- Commerce's draft redetermination ignores the plain meaning of the terms used in section 771(5A) of the Act and jumps to the legislative history and practice without grounding either in a plain reading of the statute.

- Section 771(5A) of the Act is unambiguous in its use of the term "expressly limits access": "expressly" is defined as "in a way that is clear," "for a particular purpose," and "in a way that shows intention or choice"; "limit," when used as a verb, is defined as "to control something so that it is less than a particular amount or number"; the noun "access" is defined as "the right or opportunity to look at something," while as a verb, "access" is defined as "to be able to use or obtain something such as a service."

- Thus, under a plain reading of the statute, for the BPS program to be *de jure* specific to *olive growers*, Commerce must show that the purpose of the BPS program is to control eligibility

---

[151] *See* Draft Results of Remand Redetermination:  *Asociacion de Exportadores e Industriales de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacion, S.L. v. United States*, Court No. 18-00195, Slip Op. 20-8 (CIT January 17, 2020), dated April 2, 2020.

[152] *See* Musco's Letter, "Ripe Olives from Spain; Remand, Slip Op. 20-8; Comments on Draft Results of Remand Redetermination," dated April 17, 2020 (Musco's Comments); ASEMESA's Letter, "Comments on the Department's Draft Redetermination on Remand, Slip Op. 20-8, Court No. 18-00195, *Asociación de Exportadores de Aceitunas de Mesa et al. v. United States*, dated April 17, 2020 (ASEMESA's Comments); Government of Spain's Letter, "Countervailing Duty Investigation of Ripe Olives from Spain-Department of Commerce's Draft Remand Determination," dated April 17, 2020 (GOS's Comments).

42

for BPS payments such that *olive growers* have a right to, or use, BPS payments in a manner that is limited and more favorable than to another enterprise or industry.

*Musco's Comments*

- Section 771(5A)(D)(i) directs Commerce to treat a domestic subsidy as *de jure* specific "where the authority providing the subsidy, or the legislation pursuant to which the authority operates, <u>expressly limits access</u> to the subsidy to an enterprise or industry."

- Commerce has addressed the Court's question by clarifying in the Draft Redetermination how its finding of *de jure* specificity squarely comports with the statutory requirement.

- Commerce rightly noted that it must be especially rigorous in the application of the "agricultural exception," which was established in a line of CVD cases involving agricultural products, and pursuant to which Commerce articulated that benefits uniformly available to the entire agricultural sector are not countervailable subsidies.

- Commerce identified the abundant record evidence that supports its conclusions regarding specificity.

- The proper inquiry is not whether BPS is "coupled" or "decoupled," but whether BPS benefits in Spain are uniformly provided across Spain's agricultural sector.

- Commerce has demonstrated that Spain's BPS benefits are by law tied back to Common Market Program subsidies that explicitly limited access to enterprises engaged in the production of table olives and olives for oil.

- SPS payments were expressly based on the prior Common Market Program subsidies; BPS subsidies in turn have been inextricably pegged by law to SPS subsidies.

- By expressly embedding these Common Market Program crop-specific subsidies into BPS, and by expressly locking those payments into regions based on agronomic type (*i.e.*,

43

permanent crops, rain fed land, irrigated land), the EU and the GOS have created a system that on its face preserves favorable subsidy access for Spain's olive growers, and more broadly, established non-uniform subsidy access across Spain's agricultural sectors.

- Commerce properly found that because BPS by law enables the differentiated provision of benefits for equal-sized farms depending on the agronomic type the GS established for the region in which the farm is located, it is *per se* not uniform in the provision of benefits across agriculture, and thereby satisfies section 771(5A)(D)(i) of the Act.

- That BPS entitlements might be available to a producer of non-permanent crops in a region designated as a non-permanent crop region does not sever the express reliance on Common Market Program olive-specific benefits to farms in permanent crop regions built into the law.

- Commerce has fulfilled its statutory obligation by analyzing the BPS's explicit reference to, and express reliance on, the *de jure* subsidy entitlements of the SPS and Common Market Programs.

**Commerce's Position:**  As a fundamental legal matter, we take issue with ASEMESA's sole focus on the phrase "expressly limits access" in section 771(5A)(D)(i) of the Act in a manner that is separate, and thus divorced, from both the entire statutory language of section 771(5A)(D)(i) and the interpretation and application of the *de jure* specificity provision that is set out in the SAA.  We turn to the SAA because Congress declared it "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."[153]  Therefore, we must disagree with ASEMESA that our draft

---

[153] *See* Uruguay Round Agreements Act, P.L. 103-465, Title I, Subtitle A, § 102(d), 108 Stat. 4815, 4819 (1994) (codified at 19 U.S.C. § 3512(d)).

redetermination inappropriately overlooks a plain reading of the statute in favor of relying on the legislative history and practice.

The remand order from the Court instructed Commerce to provide further explanation of how the BPS program satisfies the "expressly limits access" requirement of the statute. In compliance with the Court's remand order, Commerce exercised its authority and fulfilled its obligation to consider several factors, including: the context of section 771(5A)(D)(i) and (ii) of the Act and its relationship with other provisions related to *de jure* specificity; the interpretation of the statute as articulated in the SAA; the regulations and the *Preamble*; prior administrative cases in which Commerce analyzed whether agricultural subsidies are *de jure* specific; and, the court decisions that underlie it. Thus, in the draft redetermination, and now in this final redetermination, Commerce undertook its due diligence to review and apply all of the applicable foundational documents. Commerce refused to end its analysis, during the investigation and in this remand redetermination, by accepting as true the declarative statement offered by the EU and the GOS that the assistance that once was "coupled" is now "decoupled" and therefore is not countervailable. To have accepted this statement would have allowed respondent government authorities to pronounce non-countervailability based on terms and concepts not contemplated by the statute and without a thorough examination by Commerce of the operation of a program. The petitioner alleged that Spanish olive growers were receiving countervailable subsidies through the BPS, and supported that allegation with reasonably available information.[154] Therefore, Commerce had a statutory obligation to initiate and to conduct a countervailing duty

---

[154] Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 And 731 of the Tariff Act of 1930, as Amended; Volume III: Countervailable Subsidies, dated June 21, 2017, at pages 19-27.

investigation to determine whether the BPS provided Spanish olive growers with a countervailable subsidies (*i.e.*, financial contribution, benefit, specificity).[155]

We further disagree with ASEMESA that the only way Commerce may reach a finding of *de jure* specificity is to show that the BPS program "makes clear" that its *purpose* is to provide payments to a group of enterprises in a manner that is limited and more favorable than to other enterprises or industries. Under the argument made by ASEMESA, *de jure* specificity can exist only if the GOS explicitly states an intent in the legislation that targets olive growers to receive subsidies or that indicates that olive growers are to receive a higher benefit than other agricultural producers. This contention is at odds with the definition and analysis of *de jure* specificity that is set forth in both the statute and the SAA. Under Section 771(5A)(D)(i) of the Act, Commerce is required to find a subsidy to be *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law." Therefore, because the investigated subsidy is provided pursuant to legislation under which the authority operates, the determination of *de jure* specificity is based upon the laws and regulations enacted by the government that created the subsidy. When finding that a subsidy is *de jure* specific, Commerce, as explicitly instructed by the SAA, must make this determination on a case-by-case basis.[156] The SAA states:

> Although it has long been established that intent to target benefits is not a prerequisite for a countervailable subsidy, the *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual use of a subsidy is unnecessary.

> As under existing law, clause (i) does not attempt to provide a precise mathematical formula for determining when the number of enterprises or

---

[155] *See* section 702(b) of the Act.
[156] *See* SAA at 930.

46

> industries eligible for a subsidy is sufficiently small so as to properly be
> considered specific.  A proposal to establish such quantitative criteria was made
> during the Uruguay Round negotiations, and was quickly rejected by the United
> States and many other participants.  Commerce can only make this determination
> on a case-by-case basis.

In other words, the SAA recognizes that once the "expressly limits access" requirement of the *de jure* prong of the specificity test has been met, Commerce is not required to assess whether a foreign government or administering authority has an "intent to target benefits" by analyzing use data.

Commerce also undertakes the analysis of *de jure* specificity based upon the language set forth in section 771(5A)(D)(ii) of the Act.  Under clause (ii) of section 771(5A)(D) of the Act, where the authority providing the subsidy (or the legislation pursuant to which the authority operates), establishes "objective criteria or conditions" governing the eligibility for, and the amount of the subsidy, the subsidy is not specific as a matter of law.  These criteria are if: eligibility is automatic, the criteria or conditions for eligibility are strictly followed, and the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.  The statute states that "the term 'objective criteria or conditions' means criteria or conditions that are neutral and that do not favor one enterprise or industry over another."  The SAA states that clause (ii) is a corollary of the *de jure* test.  Under clause (ii), a subsidy would not be *de jure* specific merely because it was bestowed pursuant to certain eligibility criteria; however, "the objective criteria or conditions must be neutral, and not favor certain enterprises or industries over another."

Therefore, in our analysis of whether the BPS program is *de jure* specific, consistent with the explicit statutory language and SAA language, Commerce analyzed whether the legislation pursuant to which the GOS operates in administering this subsidy expressly limited access to the

subsidy as a matter of law and whether the criteria or conditions for eligibility set forth in the legislation of this subsidy are neutral and do not favor one enterprise or industry over another. Under the statute, in the context of an agricultural program such as BPS, the analysis and the application of the term "expressly limits" necessarily involve an examination pursuant to both section 771(5A)(D)(i) and (ii) because both clauses (i) and (ii) focus on the criteria governing access to the subsidy and define the test for *de jure* specificity.[157]

Under our analysis of whether the BPS program is *de jure* specific under section 771(5A)(D)(i) and (ii) of the Act, Commerce was required by the statute to base its analysis on the legislation governing the provision of that subsidy. ASEMESA is legally incorrect when it states that, in order to meet the statutory definition of *de jure* specificity, the BPS has to make clear that its purpose is to control the access to payments so that olive producers have limited access to higher payments. The term "expressly limits access" is not that narrowly construed. The statute requires only that the authority or the legislation pursuant to which the authority operates expressly limits access to the subsidy to an enterprise or industry, or a group of enterprises or industries. To determine access to payments under the BPS, and the criteria or conditions governing the eligibility for, and the amount of the subsidy, the BPS legislation expressly refers to prior legislation and incorporates by reference the eligibility criteria from the prior legislation. An examination of the prior legislation explicitly referenced in and incorporated by the BPS demonstrates a linkage between eligibility for the crop-specific

---

[157] In most instances of *de jure* specificity, clause (ii) need not be referenced because the language in the legislation creating the subsidy clearly does not include "objective criteria or conditions," as defined by the statute, *e.g.*, the legislation enacting the program provides subsidies solely to the iron and steel industry, the high tech industry, or to state-owned enterprises, *etc.* Here, we are investigating an agricultural program, and 19 CFR 351.502(d) provides that agricultural subsidies will not be specific, either *de jure* or *de facto*, solely because the subsidy is limited to the agricultural sector. As explained in this redetermination, for the agricultural exception to apply, the agricultural subsidy program must include all agricultural products and there must be uniform treatment across all agricultural products. Therefore, the clause (ii) corollary of the *de jure* specificity test is critical for agricultural subsidies when it may not be necessary for examining subsidies to industries that do not have a regulatory exception for specificity.

48

payments provided under the prior legislation and the current payments provided under the BPS. This link continued to entrench limited access and favored the olive industry.  Thus, the statutory definition of *de jure* specificity set forth under 771(5A)(D)(i) and (ii) is met.

In addition, because the BPS references the prior legislation to dictate the access to and amount of payments to be made under the BPS, even using the separate dictionary definitions used by ASEMESA individually for the terms "expressly," "limits," and "access" outside the context of the entire statutory language of section 771(5A)(D) of the Act, the BPS does "expressly limits access."  The legislation governing the BPS program may not have explicitly stated that it intended to benefit olive growers; however, the BPS program expressly references prior legislation that dictates the access to and amount of BPS payments that, by law, provides expressly limited access to subsidies to olive growers.  The SPS and BPS programs, by law, rely on "historical" reference periods to preserve the benefit amounts provided to growers of certain crops under predecessor programs.  The GOS, as required by legislation, relied on volume, value, and area data, and prior subsidy amounts that were developed on a product-specific basis for the purpose of determining the amount of the subsidies provided to olive growers under the SPS, thereby preserving access to the subsidy that was expressly limited under the Common Market Program.  Similarly, the GOS once again, by law, relied on a historical reference period to determine benefits under the BPS program, and therefore, once again, by law, entrenched benefits received under these past programs on a crop-specific basis.  By designing two consecutive benefit schemes in this manner, the express terms of the legislation pursuant to which the GOS operates demonstrate that the GOS administers the current BPS payments to limit access to certain benefits to a subsector of the Spanish agricultural industry, olives.

As stated above, Commerce can find that the express limitation required by the statute is manifest when, by law, there is not uniform treatment across the agricultural sector in the provision of benefits.  Commerce appropriately examined the legal design of the program and the criteria governing whether, and to what extent, a farmer receives benefits, to determine whether the program is *de jure* specific.  We undertook such an analysis in this case, and we found that, despite the assertions of non-countervailability by the GOS and ASEMESA, BPS subsidies were not uniformly available across the agricultural sector in Spain because access to the BPS subsidy for olive growers was, as a matter of law, based on access to benefits under the Common Market Program, which expressly limited access to the subsidy to olive growers.  We therefore affirm the finding that we made in the *Final Determination* that the BPS provides benefits that are *de jure* specific to olive growers.

**Comment 2:   Whether Commerce's Interpretation of Section 771(5A)(D) is Flawed**

*ASEMESA's Comments*

- The words "coupled" and "decoupled" speak to the issue of limited access as those terms are used in section 771(5A)(D)(i); subsidies linked to production of a specific product necessarily limit access to a subsidy, while subsidies available to any farmer and not linked to production do not limit access.

- Contrary to Commerce's contention that these words are offered to subvert the text of the statute, these words are offered because they speak directly to the text and the plain meaning of "expressly limits access" to a subsidy.

- Commerce appears to imply an inverse presumption in the statute's prescription of what is <u>not</u> *de jure* specific, while ignoring the broader context of section 771(5A)(D)(ii) of the Act: "{w}here the authority providing the subsidy, or the legislation pursuant to which the

authority operates, establishes objective criteria governing eligibility for, and the amount of a subsidy, the subsidy is not specific as a matter of law, if certain conditions are found."

- Section 771(5A)(D)(ii) of the Act is not a means of finding *de jure* specificity.

- Traditional rules of statutory construction do not countenance reading a statutory presumption of what is not something to suggest or claim an *a contrario* result.

- Commerce itself has argued that section 771(5A)(D)(ii) of the Act does not provide a test for *de jure* specificity in establishing what is *not de jure* specific:

  > Petitioners have misconstrued the structure of (D)(ii) and a finding of *de jure* specificity set forth under section 771(5A)(D)(i) of the Act. Section 771(5A)(D)(ii) of the Act does not mean that if one or more of the criterion listed under this section of Act is not met then the program is specific as a matter of law. To be specific as a matter of law the program must meet the standard set forth under section 771(5A)(D)(i) of the Act: the legislation under which the program operates expressly limits access to the subsidy to an enterprise or industry. Petitioners have failed to sufficiently allege or support a claim that this program is de jure specific under section 771(5A)(D)(i) of the Act.[158]

- Section 771(5A)(D)(ii) of the Act is not the test for *de jure* specificity; it speaks only to that test in terms of eligibility criteria or conditions that "favor one industry over another," as in the case of "coupled" support, which is not a criterion or condition found in the BPS program.

- Commerce's reliance on the SAA is equally misplaced in that it references language concerning Commerce's authority to examine subsidies on a *de facto* specific basis, under section 771(5A)(D)(iii) of the Act, when Commerce finds that a subsidy is not *de jure* specific under section 771(5A)(D)(i) of the Act.

---

[158] *See* ASEMESA's comments at 7, citing *Certain Coated Paper Suitable for High-quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Initiation of Countervailing Duty Investigation*, 74 FR 53704 (October 30, 2009).

- Commerce's reference to the "rule of reason" comprises both the *de jure* and *de facto* elements of the specificity test, as reflected in the SAA.

- The SAA addresses the concept that subsidies that are generally available (*i.e.*, those that do not "limit access") are not countervailable, as reflected in *Carlisle Tire & Rubber Co. v. United States*.

- The SAA explains that the purpose of the specificity test is to function as an "initial screening mechanism to winnow out only those subsidies which *truly are* broadly available and widely used throughout an economy."[159]

- The SAA distinctly explains the *de jure* specificity test first, and then the *de facto* test.

- The *de jure* test is the beginning of the analysis – the identification of subsidies that on their face do not expressly limit access to an enterprise or industry.  In the absence of such limitation, Commerce may continue its examination on a *de facto* basis to ensure that subsidies, as the SAA expresses it, truly are broadly available and used – in this case within the agricultural sector.

- In "declining to adopt such a stringent interpretation of section 771(5A)(D)(i) of the Act,"[160] Commerce declines to apply the statute according to its plain meaning based on a textual analysis and legislative history that simply do not inform the interpretation of section 771(5A)(D)(i) of the Act, but instead concern section 771(5A)(D)(iii) of the Act.

**Commerce's Position:**  We disagree with ASEMESA's contention that the terms "coupled" and "decoupled" have meaning for Commerce's specificity analysis.  In this investigation, and before this Court, parties have repeatedly claimed that assistance under the CAP, and BPS specifically,

---

[159] *See* ASEMESA's comments at 8, citing SAA at 929 (emphasis added).
[160] *See* Draft Redetermination at 19.

is "decoupled" from production and therefore not countervailable; however, the terms "coupled" and "decoupled" are not mentioned in any statutory or regulatory documents, in the SAA, or in the legislative history.[161]  While the term "decoupled" may speak to ASEMESA's proposed interpretation of limited access, that does not mean Commerce must consider the term equally, or at all, relevant for our specificity analysis of this program.  Commerce was instructed by the Court to put forth an interpretation of section 771(5A)(D)(i) and provide further explanation of how the BPS program satisfies the "expressly limits" requirement in the statute.  Commerce was not required to consider the term "decoupled" as dispositive evidence that this program is not specific.  We continue to find in this redetermination that, despite claims that it is "decoupled," the BPS program is *de jure* specific.  As discussed above, when examining a subsidy provided to the agricultural sector, Commerce must adhere to its regulations and is necessarily guided by past practice and legislative history; as such, Commerce appropriately focuses its analysis on whether a program provides uniform treatment in the provision of benefits across the agricultural sector.  Moreover, Commerce is not prohibited from finding that a subsidy is expressly limited, under section 771(5A)(D)(i) of the Act, to an enterprise or industry, or a group of enterprises or industries, even when the language of the implementing legislation does not identify recipients that are exclusively eligible or ineligible for benefits under a program.  The "expressly limits" requirement in the statute can be satisfied in a number of ways.[162]  It is completely within

---

[161] Presumably, the term "decoupled" is a reference to "decoupled income support" under Annex 2 of the World Trade Organization Agreement on Agriculture.  Section 771(5B)(F) of the Act states that Commerce shall not treat as countervailable "domestic support measures that are provided with respect to products listed in Annex 1 to the Agreement on Agriculture, and that the administering authority determines conform fully to the provisions of Annex 2 to that Agreement."  As explained in the *Final Determination*, section 771(5B)(G)(ii) of the Act implements a time limit for the application of subparagraph (F) and the requirement to treat agricultural subsidies as not countervailable ceased to apply after January 1, 2004.  *See Final Determination*, and accompanying Issues and Decision Memorandum at 5-6.

[162] *See, e.g., Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and

Commerce's authority to examine the manner in which benefits are provided under a program to determine whether the program is specific. This finding, as has been discussed at length in the *Final Determination* and in this redetermination, is based on the manner in which benefits are determined for provision to olive growers, and on how the methodology for determining benefits incorporates the product-specific nature of the benefits that were provided, on a per unit basis, to olive growers under the Common Market Program. We have set forth an interpretation that the express limitation required by the statute can be manifest when, by law, there is no uniform treatment across the agricultural sector in the provision of benefits. The BPS subsidies are not uniformly available across the agricultural sector in Spain and, therefore, "the authority providing the subsidy… expressly limits access to the subsidy to an enterprise or industry." Thus, the BPS program is *de jure* specific.

ASEMESA argues that it was inappropriate, in the draft redetermination, for Commerce to examine section 771(5A)(D)(ii) of the Act to inform its specificity analysis under section 771(5A)(D)(i) of the Act. However, the Court ordered Commerce to put forth an interpretation of section 771(5A)(D)(i) to enable its review of Commerce's determination that the BPS is *de jure* specific to olive growers. The role and importance of clause (ii), particularly in the analysis of agricultural subsidies, is described in great detail above in Comment 1. The Court did not prohibit Commerce from using all of the available analytical tools in presenting its interpretation. While failure to meet the criteria enumerated in section 771(5A)(ii) of the Act, according to ASEMESA, is not indicative of *de jure* specificity, Commerce can certainly consider it an important contextual factor to inform its specificity analysis because the analyses under both clauses (i) and (ii) focus on the criteria governing access to the subsidy. Both Commerce's past

---

accompanying Issues and Decision Memorandum at Comment 68 (finding a tax program to be *de jure* specific on the basis of an activity-based restriction).

practice analyzing agricultural subsidies and the corollary to section 771(5A)(D)(i) of the Act support the notion that favoring certain enterprises or industries over others (*i.e.*, "non-uniform treatment") is a key element of the specificity analysis for subsidies provided to the agricultural sector.  Indeed, it is often the case that enterprises or industries, or group of enterprises or industries, are afforded favorable treatment by virtue of their limited access to the subsidy, regardless of the parties' claims that the eligibility criteria are neutral and objective.[163] Commerce must be as rigorous in examining the purported non-specificity of a program as it is in examining the alleged specificity.  If one or more of the non-specificity criteria are not met, Commerce is obligated to continue examining whether a program is specific, on either a *de jure* basis under section 771(5A)(D)(i) of the Act, or on a *de facto* basis under section 771(5A)(D)(iii) of the Act.  Respondent authorities and companies cannot merely incant the language of section 771(5A)(D)(ii) of the Act and expect Commerce to reach a finding of non-specificity without a thorough examination of the facts.  Similarly, Commerce must examine all available information about a program before determining that it is not *de jure* specific and moving to an examination of *de facto* specificity.

ASEMESA also objects to our reliance on the SAA, claiming that 1) the language we cited refers to the *de facto* specificity analysis within the meaning of section 771(5A)(D)(iii); and 2) the "rule of reason" we refer to applies to both the *de jure* and the *de facto* provisions of the Act, and it is therefore inapplicable to this redetermination, in which the Court ordered Commerce to focus on the *de jure* specificity provision of the Act.  As an initial matter,

---

[163] *See, e.g.*, *Silicon Metal from Australia:  Final Affirmative Countervailing Duty Determination*, 83 FR 9834 (March 8, 2018), and accompanying Issues and Decision Memorandum at Comment 4; *see also*, *Supercalendered Paper from Canada:  Final Results of Countervailing Duty Expedited Review*, 82 FR 18896 (April 24, 2017), and accompanying issues and Decision Memorandum at Comments 8 and 32.

ASEMESA's first claim is plainly incorrect. The language ASEMESA appears to take issue

with, on page 12 of Commerce's draft redetermination and included in this final redetermination,

is presented in the SAA under the *de jure* specificity heading. The language, in full, reads,

> As under existing law, clause (i) does not attempt to provide a precise
> mathematical formula for determining when the number of enterprises or
> industries eligible for a subsidy is sufficiently small so as to properly be
> considered specific. A proposal to establish such quantitative criteria was made
> during the Uruguay Round negotiations, and was quickly rejected by the United
> States and many other participants. Commerce can only make this determination
> on a case-by-case basis.

This language clearly refers to "clause (i)," or the *de jure* specificity provision in the Act.

Therefore, ASEMESA's objection that we are relying on language from the SAA for a *de facto*

analysis is misplaced.

In reference to ASEMESA's second objection, it is always appropriate for Commerce to

look for guidance to the SAA, which Congress has declared to be the authoritative interpretation

of the Act. Repeating here the language of the SAA, the "purpose of the specificity test . . . is to

function as an initial screening mechanism to winnow out *only* those foreign subsidies which

truly are broadly available and widely used throughout an economy."[164] This introductory

language in the SAA applies to the specificity test, writ large, and it articulates a high standard

that must be met in order for Commerce to determine that a subsidy is *not* specific. In

accordance with the SAA, Commerce reaches a finding of non-specificity only for subsidies that

are truly broadly available and widely used throughout an economy. The language of the SAA

indicates that the "initial screening mechanism" of the specificity test has a fine mesh, and

Commerce will sift out only those subsidies that are truly broadly available, widely used, and

spread throughout the economy; the rest are subject to further examination and the application of

---

[164] *See* SAA at 929-30 (emphasis added).

countervailing duties, if other statutory criteria are met.  In the case of the BPS, the application of the law to the facts supports a determination that the BPS expressly limits access to the subsidy to olive growers, in accordance with section 771(5A)(D)(i) of the Act, and is therefore *de jure* specific.

**Comment 3:   Whether, by the Plain Meaning of Section 771(5A)(D)(i) of the Act, the BPS is Not *De Jure* Specific**

*ASEMESA's Comments*

- Commerce is not entitled to a "chain of specificity" based on the coupled support, *i.e.*, the express limitation on the access to subsidies, under a program terminated 14 years earlier.

- The Court acknowledged that neither the SPS program nor the BPS program links support to the production of any crop or the status or classification of any farmer.

- Commerce's draft redetermination merely repeats the flawed logic of its final determination: benefits under SPS and BPS were based directly or indirectly on average disbursements made during a reference period in which the crop-specific Common Market Program was operational.

- Commerce's finding conflates distinct concepts – how the amount of an entitlement is determined on the one hand, and who has access to that entitlement on the other; only the second is relevant for purposes of examining *de jure* specificity.

- Commerce wrongly asserts that how the BPS payments are valued, regardless of who may access them, is tantamount to "limited access" to "olive growers."

- Commerce has made no reference to the BPS program and its authorizing legislation regarding who may access the subsidies, as required by section 771(5A)(D)(i) of the Act. Rather, Commerce wrongly concludes that retaining the vestige of the subsidy valuation two

degrees removed, "preserves" the limited access "to the olive sector under the Common Market Program."

- However, eligibility for and the amount of the subsidies are not determined by the Common Market Program, the crop produced, or the farmer; they are determined by the land owned by the farmer and the BPS entitlement attached thereto, which are transferable and not contingent on production.

- Thus, Commerce cannot lawfully conclude that the BPS program is *de jure* specific within the meaning of section 771(5A)(D)(i).

**Commerce's Position:** We disagree with ASEMESA that the analysis laid out in the final determination and in the draft redetermination impermissibly conflates the concepts of "access" to the entitlements under the BPS and the value of the entitlement. As noted in the draft redetermination and at several points in this final redetermination, the history of the so-called "agricultural exception" and Commerce's past analysis of subsidy programs provided broadly to the agricultural sector show that our analysis should focus on whether the agricultural sector writ large was treated on a uniform basis or whether certain sub-sectors were treated more favorably than others. In the specific facts of this case, access to benefits was limited to olive growers under the Common Market Program. Subsequent schemes replaced the Common Market Program and thus, in this case, the examination of whether the treatment is "uniform" across the entire agricultural sector necessarily encompasses an analysis of the manner in which benefits are determined under the two successor programs, one of which was in operation during the POI. As has been discussed at length elsewhere in this redetermination, in identifying that the value of entitlements under the BPS incorporates the value of olive production per hectare (in that it relies on the calculation of benefits provided under the SPS), as recorded under the Common Market

Program, the BPS continues to treat the agricultural sector on a non-uniform basis and thus limits access to certain benefits to olive growers. Specifically, farmers on lands that produced olives during the reference period continue to have limited access to entitlement values, and therefore benefit amounts, that retain the historical difference, relative to other farmers on other lands, that was inherent in the crop-specific subsidies provided under the Common Market Program. Thus, we find that this program is *de jure* specific to olive growers within the meaning of section 771(5A)(D)(i) of the Act.

**Comment 4:   Whether Commerce's Factual Analysis of the BPS is Accurate and Correct**

*Government of Spain's Comments*

- Commerce continues to substantiate its assessment on mistaken assumptions and interpretations of the European, Spanish, and Andalusian legislation.

- Commerce's draft redetermination incorrectly stated that under the Common Market Program, "the EU required each Member State to collect information regarding the hectares, volume, and value," and that reference to this value per hectare in the calculation of benefits preserved the access of olive farmers to assistance previously available on a *de jure* specific basis under the Common Market Program."

- There was no value per hectare under the Common Market Program. As explained by the GOS in response to the initial questionnaire: "Aids were granted on the basis of the quantity of olive oil produced . . . Spain allocated part of its olive oil production aid to support for table olives . . . total funds devoted for table olives were much lower than olive oil . . . and depending {on} production level of each year."[165]

---

[165] *See* Government of Spain Comments on the Draft Redetermination, at PDF 1, citing Government of Spain Initial Questionnaire Response (IQR), dated September 18, 2020, at page 16.

**Commerce's Position:** The GOS's comments address the factual bases for Commerce's determination in the investigation, to the extent that they were reiterated in the draft redetermination. The remand order from the Court asked Commerce to provide a legal interpretation of section 771(5A) of the Act so that the Court may analyze Commerce's application of that legal interpretation and whether Commerce's *de jure* specificity finding is supported by substantial evidence and in accordance with law. Nonetheless, we address the factual arguments made by the GOS to demonstrate, as we did in the *Final Determination* and the draft redetermination, that the facts support finding *de jure* specificity based on our interpretation of section 771(5A)(D)(i), as set forth in this remand redetermination.

> On page 7 of the draft redetermination, Commerce stated that:
>
> Under the Common Market Program, which operated between 1999 and 2002, the EU required each Member State (including Spain) to collect information regarding the hectares, volume, and value (which depended on whether the olives were grown for the production of olive oil or table olives) for each farm…. By reference to the value per hectare calculated under the Common Market Program Commerce found that the SPS program preserved the access of olive farmers to the assistance previously available to them, on a *de jure* specific basis, under the Common Market Program.[166]

In making the statement cited by the GOS, which Commerce made in its final determination, and in the draft redetermination, specifically the phrase "calculated under the Common Market Program," Commerce did not conclude or intend to suggest that this value per hectare data was *used* in determining the amount of Common Market Program benefits provided to olive growers, whether for olive oil or table olives. Common Market Program benefits were based on olive production volume and were provided on a per unit basis to all producers of olives. In this

---

[166] *See* Draft Redetermination at 7-8.

redetermination, we are highlighting, as we did in the *Final Determination*,[167] that this value per hectare data (which incorporates the volume, the value, and the area of production) was *collected* under the Common Market Program. This value per hectare data establish the starting value for the determination of the benefit amount under the SPS. In this way, the SPS payments were based on the value of olive crops produced during the period in which the Common Market Program operated. Therefore, contrary to the claims of the parties that, under the SPS, payments are decoupled from production, the calculation of SPS payments uses olive-specific production volume, value, and area data as important variables. In this manner, the foundation of the calculation of the SPS payment was the value per hectare data of the olives produced. The value of olive production is therefore preserved in, and determinative of, both the access to and the amount of the subsidy under SPS for olive growers. This approach to implementing the SPS preserved the relationship between the volume, value, and area of *olive production* and the amount of benefits that were given to olive growers under the Common Market Program, and thus preserved the *de jure* specificity of the Common Market Program. As discussed throughout this redetermination, the GOS implemented the BPS in a manner that relied on the access to benefits provided under the SPS and, in this way, the BPS preserved the eligibility criteria for access to benefits provided under the Common Market Program and the historical differences in crop entitlement amounts among different agricultural products.

**Comment 5:   Whether Commerce's References to Regional Variations are Correct**

*Government of Spain's Comments*

- There was no regionalization under the SPS. Payments were made to individual farmers based on the average amount of various supports received in previous reference periods

---

[167] *See Final Determination* and accompanying Issues and Decision Memorandum at 33.

under the crop-specific programs that were integrated into the SPS. Spain decided to implement the SPS based on a historical model, not a regional model.

- The model used for the application of BPS is based on the areas declared in 2013, not on information about the crop grown in the period when the Common Market Program was in force. The BPS regions were established on the basis of declarations made in 2013, when the SPS was in force, and a wide range of products are grouped together.

**Commerce's Position:** The GOS misconstrues the purpose of Commerce's discussion of the regional variations in BPS payments. In the *Final Determination*, Commerce concluded that there were regional variations in BPS payments, and that these variations were a result of their reliance on the historic regional data that had been used to calculate the crop-specific subsidy payments under the Common Market Program. This statement remains true as demonstrated by the information on the record. In implementing the SPS and subsequently the BPS, the GOS identified regions across Spain and relied on the value per hectare data collected during the reference period (*i.e.*, when the Common Market Program was in operation, and therefore based on the volume, value, and area under cultivation for olives) to determine the basis for allocating across the regions the total amount budgeted for SPS, and subsequently BPS. As the GOS says in its comments on the draft redetermination, "{i}n Spain, the BPS regime is regionalized in compliance with Article 23(1) of EU regulation 1307/2013. For each region an average unit value of BPS entitlement is calculated, taking into account the global amount of support received by all farmers in that region prior to the BPS." As such, in the region of Spain where the majority of olives are grown, Andalusia, the volume, value, and area of olive production were important variables in the GOS's determination of the regional distribution of benefits under the SPS and the BPS. In this manner, the geographic distribution of crop production and the

attendant crop-specific payments under the Common Market Program resulted in regional variations in agricultural value, and reliance on these historical values to determine benefits under the SPS and the BPS preserved these regional variations.

**Comment 6:   Eligibility Criteria vs. BPS Payment Amounts**

*Government of Spain's Comments*

- Commerce mixes up eligibility criteria (or access to the scheme benefits) with the calculation of the BPS amounts.

- BPS is a direct payment scheme accessible to all farmers and decoupled from production; therefore, it is independent of the type of crop grown in each agricultural year, provided that the criteria for eligible hectares set out in Article 32(2) of EU regulation 1307/2013 are met.

- These criteria include being an active farmer; having been entitled to benefits under SPS; to apply for the allocation through the single application; and, to hold eligible hectares.

- The entitlement must be activated by the farmer each year, by demonstrating that the land is maintained in good environmental condition (which is not necessary to grow a particular crop, or even that the land is cultivated).

- For calculation of the amount, Spain opted for the historic model defined in Article 43 of regulation 1782/2003:  each farmer was granted payment entitlements whose value was the average amount of aid payments received during the . . . reference period.

- The number of payment entitlements under SPS was equal to the average number of hectares farmed during the reference period under the former coupled support schemes.  SPS is based on all the sectorial aids received by the farmer during the reference period; it is therefore impossible to draw any link between the SPS and the Common Market Program.  The reference amount of each payment entitlement for each farmer is based on the total amounts

63

of payments the farmer received under the previous schemes during the reference period, which were decoupled and integrated into the SPS. For a farmer with a mixed crop production, all the payments for the sectors decoupled at the moment of introduction of the SPS and received during the reference period were taken into account and would be incorporated in the determination of the value of the farmer's payment entitlements.

- Since the single payment allocation in 2006, the regulations provide for various financial adjustments, such as modulation, financial discipline, the ceiling, and the national reserve. These elements further disconnect the amounts paid to farmers under SPS from the amounts paid during the reference period 1999-2002.

- A subsequent budget cut of 8.64 percent was applied across all SPS entitlements in 2014. This further decoupled the amounts received by farmers through the BPS in comparison to both the value of the 2006 single payment entitlements and the aid received in the reference period 1999-2002.

- Since the establishment of the SPS in 2006, entitlements are subject to purchase, sales, lease, or inheritance, or can be obtained by the national reserve, regardless of the crop grown by the new owner. As such, it is not possible to link an entitlement to the sector from which the initial value was calculated. Hence the amount of support provided to a farmer cannot be said to mirror what the farmer received prior to the introduction of the SPS under the different product-specific schemes in force at that time.

- The subsequent application of the convergence factor to the BPS entitlements aims to bring all BPS payments closer to the regional average. An increase in payments to farmers whose payments are less than 90 percent of the regional average is financed by a reduction in

64

payments to farmers whose payment is above the regional average.  Both the increases and the decreases are applied incrementally.

- Convergence further demonstrates that the amount of support under SPS and BPS are not equivalent.  In addition, it refutes the existence of the link between the value of the entitlement under the BPS and the production sector for which amounts were allocated in 2006 under the SPS, contrary to Commerce's claim.

*Musco's Comments*

- The EU and the GOS would not have included a convergence factor to be implemented over time if BPS payments were not *per se* differentiated among enterprises in Spain.

**Commerce's Position:**  Under Section 771(5A)(D)(i) of the Act, a subsidy is *de jure* specific if the authority expressly limits access to the subsidy to an enterprise or industry.  As discussed above, historically, when examining a program that is available only to the agriculture sector, Commerce's analysis has focused on determining whether a subsidy is specific to any subset of the agricultural sector.  Therefore, Commerce's analysis here appropriately considered both the eligibility criteria and the process by which benefits were determined in analyzing the BPS for purposes of the *Final Determination* and this redetermination.  We disagree with the GOS that our analysis must end with the consideration of the eligibility criteria.  We also stated above that, "{w}hen analyzing the agricultural sector, Commerce can find that the express limitation required by the statute is manifest when, by law, there is no uniform treatment across the agricultural sector in the provision of benefits."  Thus, Commerce sought to understand how this program treated the agricultural sector, writ large, and whether any sub-sector was afforded special treatment.  Our analysis therefore appropriately drove further into the question of whether the manner in which subsidies were determined for across the agricultural sector under the BPS

65

was uniform, or whether certain sub-sectors were afforded different treatment that constituted limitations on the access to the subsidy such that the BPS would be *de jure* specific to olive growers. We found in the *Final Determination*, and we continue to find in this redetermination, that the reliance on factors specific to olive growers (*i.e.*, the volume, value, and area of olive production) in determining the amount of assistance provided to olive growers under the SPS and subsequently the BPS resulted, to an important degree, in the preservation of the product-specific basis on which benefits had been provided to olive growers under the Common Market Program. As noted at several points, benefits under the Common Market Program were available only to olive growers, and therefore incorporation of the non-uniform treatment of olive growers and the benefits they received into subsequent schemes also results in the provision of non-uniform benefits under the SPS and BPS programs. On this basis, we continue to find that the BPS limits access to the subsidy, on a *de jure* specific basis, to olive growers in Spain.

The application of several adjustment factors, including the convergence factor and the across-the-board budgetary reduction cited by the GOS, seeks to align all farmers' payments with a regional average. However, as we did in the *Final Determination*, we continue to find parties' arguments on this matter to be unavailing.[168] The GOS's explanation only serves to highlight the fact that even through the end of the operation of the BPS in its current form, at the end of 2019, there will continue to be broad disparities in the assistance provided to farmers under the BPS. Farmers whose payments are above the average will have their payments reduced over time by 30 percent; farmers whose payments are less than 60 percent of the average will have their payments increased over time to reach the 60 percent target. In application, farmers who historically received the highest payments will continue to receive the highest

---

[168] *See* IDM at 36.

payments (which, although even when reduced by the full 30 percent applicable, could remain well above the target of 60 percent of the average), and farmers who historically received the lowest payments will continue to receive the lowest payments, capped at 60 percent of the average. We continue to find that these factors support our conclusion in the *Final Determination*, and in this redetermination, that access to the subsidy for olive growers is limited such that the BPS program is *de jure* specific.

### B.     Commerce's Interpretation and Analysis of Section 771B(1) of the Act

### Comment 7:   Whether Commerce Has Met the Standard Established by Section 771B(1) of the Act for Determining "Substantially Dependent" Demand

*ASEMESA's Arguments:*

- Section 771B of the Act is a codification of Commerce practice as set forth in *Pork from Canada* and *Rice from Thailand*.

- The concepts embedded in section 771B of the Act were borrowed from the ITC's analysis for agricultural industries to determine whether producers of a raw product and processors of that raw product can be considered a single industry for purposes of determining injury.[169] The fundamental purpose of collapsing industries was to determine whether the operational and financial integration of two industries is so extensive as to eliminate the line between them. To be considered a single industry, "the raw product can be sold in only one market; it enters a single, continuous line of production resulting in one end product." When Commerce collapsed industries, it noted that "substantially *all* of the raw product was dedicated to the production of the product under investigation."[170] Commerce has failed to

---

[169] *See* ASEMESA's Comments at 12.
[170] *Id.* at 13.

establish that there was a single continuous line of production from raw table olives to processed table olives.

- In *Pork from Canada* and *Rice from Thailand*, *almost all* of the demand for the prior stage product was derived from the demand for the latter stage product.[171]

- Commerce's concern that applying too "narrow" an interpretation of "substantial dependence" could lead to an entire agriculture industry falling outside the application of the countervailing duty law is without merit.[172]

*Musco's Arguments:*

- Commerce correctly disavowed strict numerical or minimum thresholds in establishing substantial dependence.[173]

- The Congressional drafters of section 771B(1) of the Act highlighted how they envisioned section 771B(1) of the Act would apply in their discussion of frozen raspberries. Even though frozen raspberries are only one downstream product for fresh raspberries, because fresh raspberries can also be used as dried, in jams and jellies, pureed, or in concentrate, Congress had no intention of creating strict minimum thresholds for establishing substantial dependence. Rather, Congress sought to prevent minimally processed next stage agricultural products that had been subsidized at the prior stage from escaping trade remedies. Moreover, Commerce's determinations in *Groundfish, Lamb Meat,* and other products support Commerce's finding that there is no specific threshold for determining substantial dependence under section 771B(1) of the Act.[174]

---

[171] *Id.*
[172] *Id.* at 15.
[173] *See* Musco's Comments at 8.
[174] *Id.*

**Commerce's Position:** We find that the "substantially dependent" criterion under section 771B(1) is satisfied. The statute does not prescribe a specific methodology or analytical framework as to how Commerce should conduct the substantial dependence analysis. The "single continuous line of production" analysis is a part of the ITC's statutory test for determining whether to collapse producers and processors of a raw agricultural product into a single industry, for purposes of conducting the ITC's injury analysis.[175] Commerce is not statutorily required to examine whether there is a "single continuous line of production" between the prior stage product and the latter stage product to determine whether section 771B(1) of the Act is satisfied. Commerce and the ITC are U.S. government agencies that operate independently and pursuant to distinct statutory mandates and authorities.[176]

We acknowledge that in past cases we have referenced the ITC's test and assessed whether a single continuous line of production exists as part of the analysis. In *Pork from Canada*, we considered whether there was a single continuous line of production from the raw agricultural product to the processed agricultural product because section 771B of the Act did not yet exist and the ITC had more experience dealing with agricultural products.[177] In that case, Commerce had to examine whether live swine should be considered an input into unprocessed pork, as the basis for an upstream subsidy analysis, or whether live swine was a prior stage product of pork meat, in which case, subsidies to both producers of live swine and to pork processors could be simply aggregated to calculate the countervailable subsidy rate. To assist in that analysis, Commerce referenced the ITC's single continuous line of production framework that the ITC developed for determining whether producers and processors of a raw agricultural

---

[175] *See* section 771(4)(E) of the Act.
[176] *See Mitsubishi Elec. Corp. v. United States*, 898 F.2d 1577, 1584 (Fed. Cir. 1990) ("Under the statutory scheme, {Commerce} and the Commission have separate and different, although related, duties and responsibilities.").
[177] See Pork from Canada, 50 FR at 25099.

product could be collapsed into a single industry for purposes of examining injury. While Commerce found that the primary, if not the sole, purpose of live swine is to produce a single end product, pork meat,[178] Commerce did not rely solely on the continuous line of production analysis.[179] Indeed, Commerce stated that "{t}he salient criterion is the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product."[180] Commerce also made it clear that the purpose of the ITC's framework was to determine the relevant industry and not to address the distinct issue of whether subsidies to producers of a raw agricultural product should be considered for purposes of determining the benefit to the producers of a processed agricultural product.[181]

Congress codified, as a distinct injury provision, the ITC's single continuous line of production framework in the same legislation that enacted section 771B of the Act.[182] However, the single continuous line of production framework is not mentioned at any point in the legislative history for section 771B of the Act. Raspberries are specifically mentioned in the legislative history, yet there is no discussion of the requirement that there be a "single continuous line of production" between fresh raspberries and frozen raspberries, for example. The legislative history also mentions lamb, fish, and other products in the creation of section 771B of the Act. Further, in *Lamb Meat from New Zealand*,[183] which was issued shortly after *Pork from Canada* and prior to the enactment of section 771B of the Act, Commerce did not analyze

---

[178] *Id.*

[179] *Id.* ("Given the congressional mandate to acknowledge the special nature of agriculture, our practice, which is now sanctioned by the Court of International Trade, and the reasonableness of treating the raw and next-stage product together for purposes of the subsidy analysis, we do not consider live swine to be an input into unprocessed pork.").

[180] *Id.* at 25098.

[181] *Id.*

[182] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418 § 1326, 102 Stat. 1107 (1988).

[183] *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Lamb Meat from New Zealand*, 50 FR 37708 (September 17, 1985).

whether lamb enters a single, continuous line of production resulting in one end-use product.

Commerce did not distinguish between subsidies provided to livestock owners and subsidies

provided to lamb meat processors/producers.  We simply aggregated the subsidies provided to

both livestock owners and lamb meat processors to calculate the countervailable subsidy rate

applicable to lamb meat.  More recently, in *Shrimp from China*, we acknowledged that the

examination of the single continuous line of production can contribute to our analysis of whether

section 771B of the Act applies, but made clear that it was not a necessary condition to satisfy

the substantially dependent criterion under section 771B(1) of the Act.[184]  We found that, even if

"25 percent of fresh shrimp is ultimately used for processing into frozen shrimp, {Commerce}

would, nonetheless, preliminarily determine that the criterion under section 771B(1) of the Act is

met on the grounds that a ratio of 25 percent constitutes a demand that is substantially dependent

upon the demand for the latter stage (processed) product."[185]  Therefore, we do not agree with

ASEMESA's contention that Commerce has "adopted" the ITC's single continuous line of

production framework or with ASEMESA's suggestion that section 771B of the Act can apply

only when it is appropriate for the ITC to collapse producers and processors of a raw agricultural

product into a single industry for purposes of conducting the ITC's injury analysis.  Neither the

statute, the legislative history, nor Commerce's limited practice in examining agricultural

products, both before and after the enactment of section 771B of the Act, places such importance

on this consideration, let alone establishes a requirement that a single continuous line of

production exist as a precondition to the applicability of section 771B of the Act.

　　　　ASEMESA repeatedly points to what it perceives as "an extremely high standard" both in

the ITC's single continuous line of production analysis and correspondingly Commerce's

---

[184] *See Shrimp from China* and accompanying Issues and Decision Memorandum at 47.
[185] *Id.* at 46.

analysis of section 771B(1) of the Act.  To this point, we have explained in great detail in this final redetermination that, while in *Pork from Canada* we found that "substantially all" live swine are dedicated to the production of unprocessed pork[186] and in *Rice from Thailand* we found that paddy or unmilled rice was dedicated to the production of milled rice,[187] section 771B(1) of the Act does not establish a minimum threshold of demand to satisfy the criterion. The statutory provision itself does not include phrases such as "almost all" "predominant determinant," or "derived almost exclusively."  Instead, the statute requires that the demand for the raw agricultural product be "substantially dependent" on the demand for the processed product.

Congress drafted section 771B of the Act to prevent foreign producers from evading subsidies by performing a minimal amount of processing to a raw agricultural product before exporting it to the United States,[188] regardless of whether the demand for the raw product was derived "almost exclusively" from the demand for the processed latter stage product.  As noted above, in the legislative history Congress made repeated references to fresh raspberries and their concern that the countervailing duty law could be circumvented if subsidies provided to raspberry farmers were not attributed to a further processed product, such as frozen raspberries. Neither the legislative history nor any countervailing duty case on raspberries demonstrates that the demand for fresh raspberries is derived "almost exclusively" from the demand for frozen raspberries, or that "almost all" raspberries are dedicated to the production of frozen raspberries. Indeed, it was Congress's intent to apply countervailing duties to a multitude of agricultural products, such as frozen raspberries made from subsidized fresh raspberries.  Likewise, based on

---

[186] *See Pork from Canada*, 50 FR at 25099.
[187] *See Rice from Thailand*, 51 FR at 12358.
[188] *See* Congressional Record-Senate S. 8815, June 26, 1987.

our affirmative findings for the criteria under section 771B of the Act, it is consistent with Congress's intent that subsidies received by olive growers, such as those provided under the EU Common Agricultural Policy, the BPS, rural development program, etc., should be attributed to processors of minimally processed products, such as table olives, so that such subsidies may not escape the purview of the countervailing duty law.

The Court concluded in its *Remand Order* that "the statutory language is unambiguous regarding the threshold of demand required to satisfy {section 771B(1) of the Act}"[189] and indicated that the criterion would be satisfied when the demand for the latter stage product is "most or at least half of the demand of the raw agricultural product."[190]  Although for the reasons explained above we respectfully disagree with the Court's conclusion that there is an unambiguous threshold of demand required by the statute, Commerce's revised analysis and finding on remand regarding the substantially dependent criterion complies with the Court's *Remand Order*.[191]  Specifically, we relied on published statistics from the foreign government for our analysis in determining whether the demand for olive varietals principally suitable for use in table olive production is substantially dependent on the demand for table olives. We analyzed production data for all raw olive varietals (*i.e.,* table, dual-use, and mill)  and industrial end use data from the GOS Ministry of Agriculture Agricultural Statistics on Annual Crop Surfaces and Productions, provided by Musco, and raw table olive production data from the GOS's Statistical Yearbook 2018, provided by ASEMESA, to determine that 96 percent of raw table and dual use olive varietals identified as for table are processed into table olives.  Therefore, the demand for

---

[189] *See* Remand Order at 22-23.
[190] *Id.* at 27.
[191] Based on the information provided from the GOS's statistics on crop surfaces and production, we find that 96 percent of the raw olives principally suitable for use in the production of table olives were used to produce table olives in harvest year 2016, the POI.  *See* Draft Remand Analysis Memorandum.

73

raw table and dual-use varietals identified as for table is substantially dependent on the demand for table olives.

We also take issue with ASEMESA's characterization of Commerce's circumvention concerns as "speculative fear" that are "without merit."  In the draft redetermination and this final redetermination, we did not "fault" the Court for failing to analyze section 771(B)(2), as ASEMESA claims.  Commerce did, however, point out a legitimate concern and potential consequence of what we view as an overly narrow interpretation of "substantial dependence" under section 771B(1) of the Act – that an entire agricultural industry avoids the purview of the provision.  ASEMESA did not specifically rebut the concerns we expressed to this point.  Our discussion of the legislative history above makes clear that circumvention of the countervailing duty law by minimally processed agricultural products was a very real concern by Congress when enacting this provision.  Therefore, we do not agree that the concerns noted here are "speculative fear" that are "without merit"; rather, they are the same concerns Congress expressed three decades ago.

**Comment 8:   Whether Commerce's Analysis of "Substantially Dependent" Demand Must Begin with the "Raw Agricultural Product"**

*ASEMESA's Arguments:*

- Commerce misinterprets Congressional intent by arguing that Congress sought to differentiate between "prior-stage product" and "raw agricultural product."

- Commerce's treatment of "raw agricultural product" as distinct and exclusive from "prior stage product" is problematic.  Commerce wrongly believes that it can choose any two stages to determine substantially dependent demand within the meaning of Section 771B(1) of the Act, irrespective of whether there is 1) "substantially dependent" demand between the raw

74

agricultural product and the "prior stage product" and 2) a single continuous line of production.[192]

- By establishing "raw olives suitable for use in the production of table olives" as the "prior stage product" and raw olives as the "raw agricultural product," Commerce must show that table olive processors' demand for raw olive varietals suitable for table olive production determines the demand for raw olives.[193]

**Commerce's Position**: We disagree with ASEMESA that we have interpreted section 771B(1) of the Act in a manner that is contrary to Congress's intent. As we stated earlier, Congress expresses its intent through the language it chooses in the drafting of a statute. We observed that both "prior stage product" and "raw agricultural product" are used in the statute and the Act does not provide definitions for these terms, as they are used in section 771B of the Act. Nor does the legislative history reveal definitions for these terms as they are used in this context. Therefore, it is within Commerce's discretion to interpret these terms, as long as it is reasonable.[194] In construing a statute, we endeavor to give effect to every word because different terms used in the same statute presumptively have different meanings.[195] This is consistent with normal rules of statutory construction that require that a statute be interpreted so as to avoid rendering superfluous any provision of that statute.[196] According to the plain language and structure of the

---

[192] *See* ASEMESA's Comments at 16.

[193] *Id.* at 17.

[194] *See Ad Hoc Shrimp Trade Action Committee v. United States*, 596 F.3d 1365, 1368 (Fed. Cir. 2010) ("Commerce's interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." (internal quotations and citation omitted)); *see also Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (recognizing deference where a statute is ambiguous and an agency's interpretation is reasonable).

[195] *See Kalle USA, Inc. v. United States*, 923 F.3d 991, 997 (Fed. Cir. 2019) (citing *Reiter v. Sonotone Corp.*, 442 US 330, 339 (1979)).

[196] *See Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1032 (Fed. Cir. 2007) (following the "cardinal principal of statutory construction that a statute ought … to be so construed that … no clause, sentence, or word shall be superfluous" (internal quotations and citation omitted)).

statute, we interpret the "prior stage product" to be the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product. This analysis and determination will necessarily be based on the specific nature of the product we are investigating. For purposes of this redetermination, we are defining "raw agricultural product" as raw olives and defining the "prior stage product" as those raw olive varietals principally suitable for use as table olives.

In *Pork from Canada* and *Rice from Thailand,* Commerce identified the prior stage product as the same product as the raw agricultural product. However, these determinations were made based on the specific facts on the record of the products and industries at issue. A hog is a hog, and all hogs are principally suitable to be slaughtered into unprocessed pork.[197] No evidence to the contrary was presented in that case. Therefore, it logically follows that all live swine are considered the "prior stage product" in that particular analysis of substantial dependence. However, as noted previously, the legislative history of this provision references several kinds of agricultural products, all of which are different in makeup and structure. Therefore, we can surmise that section 771B of the Act was meant to be applied to a multitude of agricultural products on a case-by-case basis, as opposed to a one-size-fits-all rule. Therefore, we do not find that the "raw agricultural product," in its entirety, must *always* be the prior stage of any substantial dependence analysis, as ASEMESA claims. That claim is in clear opposition to the statute, which uses both "raw agricultural product" and "prior stage product" separately.

ASEMESA claims that section 771B(2) of the Act reinforces their argument in that the second criterion states that "the processing operation must add 'only limited value to the <u>raw commodity</u>,' in reference to a 'raw agricultural product.'" We disagree with ASEMESA's

---

[197] *See Pork from Canada*, 50 FR at 25099.

76

reading of the statute and find that the term "raw commodity" in section 771B(2) of the Act does not undermine our interpretation of "prior stage product." The term "raw commodity" is a general reference to the raw agricultural good identified as the "prior stage product" for purposes of section 771B(1) of the Act. In other words, the raw agricultural good identified as the "prior stage product" and the processed good identified as the "latter stage product" determine the start and end point for the limited value analysis in section 771B(2) of the Act. We have interpreted "prior stage product" to mean the raw agricultural product that the industry under examination considers principally suitable for use in the prior stage of production of the latter stage product. This interpretation does not conflict with the term "raw commodity" as it is used in section 771B(2) of the Act.

In cases involving a processed agricultural product, section 771B(1) of the Act directs Commerce to determine whether the demand for the prior stage product is substantially dependent on the demand for the latter stage product. The statute does not mandate that the "raw agricultural product" and "prior stage product" always be coterminous, nor does it prescribe a specific methodology for analyzing substantial dependence. Rather, Commerce conducts this analysis on a case-by-case basis. In this final redetermination, we have reconsidered the definition of the term "prior stage product" in our analysis of section 771B(1) of the Act and identified raw olive varietals principally suitable for use in the production of table olives as the appropriate "prior stage product." This interpretation is based on the language and structure of the statute, as well as the new evidence submitted on the record of the remand. As in the *Final Determination*, we continue to identify the "latter stage product" as table olives. On this basis, we find section 771B(1) of the Act to be satisfied because the demand for the prior stage product,

77

varietals of raw olives principally suitable for use in the production of table olives, is substantially dependent on the demand for the latter stage product, table olives.

### Comment 9:   Whether "Prior Stage Product" Can be a Subset of the "Raw Agricultural Product"

*ASEMESA's Arguments:*

- Commerce fails to define the varietals to which it refers by the term "principally suited for use." It offers no qualitative or quantitative guidance regarding what it considers "principally suited for use" beyond stating that it includes table olive varietals and dual use varietals.[198] Commerce's definition of the prior stage product as "olive varietals principally suitable for use in the production of table olives" is not administrable because Commerce has not explained how this term should be interpreted.[199]

- If "raw agricultural product" and "prior stage product" are given exclusive meanings, a "prior stage product" cannot be a subset of the "raw agricultural product." Commerce's definition of "prior stage product" as varietals of raw olives principally suitable for use in the prior stage of production of the latter stage product is contrary to statute. A "prior stage product" must be a distinct step in a process of development beyond the "raw agricultural product." A "prior stage product" can encompass a "raw agricultural product" where it is the first stage in the line of production of the "latter stage product."[200] Raw olives principally suitable for use in the production of table olives are still raw olives, not a product at a different stage. Because raw olives principally suitable for use in the production of table olives are not manufactured or processed into being, they cannot be a "prior stage product."[201]

---

[198] *See* ASEMESA's Comments at 34.
[199] *Id.* at 36.
[200] *Id.* at 19.
[201] *Id.*

- This interpretation of "prior stage product" as precluding a subset of a "raw agricultural product" is substantiated by Congressional intent. In discussing section 771B of the Act, Senator Grassley identified the objective of section 771B of the Act as to prevent circumvention of countervailing duties, stating "a subsidy could be paid to the *commodity* producer and the countervailing duty be evaded by merely changing the form of the product – by subjecting it, for example to an added stage of production…."[202]

- Thus, Congressional intent of what constitutes a "stage of production" is clear, it must be at least one step further in the line of production from the raw agricultural product.[203]

*Musco's Arguments:*

- Commerce properly reconsidered the definition of the "prior stage product" in its analysis of section 771B(1) of the Act, based on the language in the statute. Commerce was correct in finding that "prior stage product," and "latter stage product" have their own meanings distinct from "raw agricultural product." Commerce revised its "substantial dependence" analysis in a manner that is consistent with the statutory language, Congress's intent, Commerce's practice, and the Court's decision.[204]

**Commerce's Position:** As an initial matter, we disagree with ASEMESA's contention that, to the extent "prior stage product" and "latter stage product" have different meanings, the prior stage product must be a step *in between* the raw agricultural product and the latter stage product. We set forth an interpretation that, based on the plain language and structure of the statute, Congress intended the "prior stage product" to be the raw agricultural product that the industry under examination considers principally suitable for use in the production of the latter stage

---

[202] *Id.* at 20.
[203] *Id.* at 20-21.
[204] *See* Musco's Comments on page 6.

product.  Even using ASEMESA's own "plain reading" of the statute using dictionary definitions of terms, the prior stage product need only be a product in an earlier step in the process of the manufacture of the latter stage product.  This understanding does not conflict with Commerce's interpretation of "prior stage product."  *Raw* olive varietals principally suitable for use in the production of table olives are indeed a product at an earlier step in the production of table olives.  ASEMESA is at once trying to claim that the "raw agricultural product" must always be the same as the prior stage product, as discussed in Comment 8, while also claiming that the prior stage product must be a product at a separate and distinct step of processing *between* the raw product and the latter stage product.  ASEMESA cannot have it both ways.

Indeed, the statute recognizes the connection between the prior stage product and the latter stage product in the production process.  This analysis and determination will necessarily be based on the specific nature of the product we are investigating.  We agree that in some cases the prior stage product is coterminous with the raw agricultural product.[205]  Such a result is not *per se* contrary to the statute.  However, we disagree that the "prior stage product" must *always* be interpreted as the entirety of the "raw agricultural product."  As explained above, such an interpretation would give "raw agricultural product" and "prior stage product" the same meaning, which is inconsistent with the language chosen by Congress.  The statute gives Commerce the authority and the discretion to identify and examine the prior stage product on a case-by-case basis based on the facts of the industry at issue.  Even in cases where the prior stage of production for the latter stage product involves a raw agricultural product, the specific nature of the processed product under investigation may require use of a "prior stage product" that does not encompass all of the "raw agricultural product."  For example, if we were investigating diced

---

[205] *See, e.g.*, *Pork from Canada*; and *Rice from Thailand*.

80

red tomatoes, in theory, we would likely consider the prior stage product to be raw red tomatoes. However, we would not include raw green tomatoes because raw green tomatoes have no role in the prior stage of production of diced red tomatoes.

Likewise, it would be illogical to include in our identification of the prior stage product mill olive varietals that are solely suitable in the production of olive oil. These mill olive varietals have virtually no role in the prior stage of production of table olives. Information on the remand record demonstrates that there is recognition by the Spanish olive industry and by the GOS that certain olive varietals are identified as suitable for producing table olives, other olive varietals are grown as mill olives to be used only to produce olive oil, and other olive varietals can be used for either purpose (so-called "dual use" olives).[206]

Specifically, the GOS's Ministry of Agriculture's website reveals that olive varietals are identified as for specific fitnesses, *i.e.*, table, dual-use, or mill.[207] According to the GOS, Seville Camomile, Granada Gordal, and Seville Gordal are identified as for use as table olives.[208] Information from the GOS website and industry sources indicate that table olive varietals tend to be larger than mill olive varietals.[209] Additionally, both the table olive varietals and dual-use varietals, such as hojiblanca and camomile cacerena, have a lower oil content than mill olive varietals.[210] Both the GOS and Musco report that table olive orchards and dual-use orchards growing olives for table require larger amounts of water than mill orchards, which Musco claims is due to differences in cultivation practices and quality requirements.[211] Data from the Ministry of Agriculture show that table olives often are grown in the south and western regions of Spain

---

[206] *See* Musco's February 5 submission at 3-5, Exhibits 1 and 2.
[207] *See* Musco's February 25 submission at Exhibit 2.
[208] *Id.* at Exhibit 2A.
[209] *Id.* at Exhibit 2A and Exhibit 13.
[210] *Id.* at Exhibit 2A and Exhibit 2B.
[211] *See* GOS Verification Report at 3 and Musco's February 5 Submission at 7.

81

where Musco explains there is higher rainfall.[212]  Musco contends that table olive growers seek to maximize the water content of their fruit in order to increase the fruit size.[213]  Industry sources indicate that the table olive orchards are pruned more extensively than mill orchards.[214]  According to Musco, mill orchards do not prune trees so rigorously because more orchard branches equate to more olives per tree and smaller, more oil-dense olives for crushing.[215]

GOS insurance regulations provide further evidence that the GOS separates raw olive production into these three end-use categories.[216]  The regulations reveal that the GOS delineates specific varietals as table, dual-use, or mill.  Farmers purchase these policies in advance of the actual harvest,[217] and produce specific varietals for an intended end use. We find that the GOS agricultural insurance policy differentiates between dual-use olives, such as hojiblanca, grown as table olives and those grown as mill olives.[218]  There is little interchangeability between their intended use and their actual use.  This is evident in the GOS statistics on annual crop surfaces and production for olive groves during the POI.[219]

Additionally, the GOS Ministry of Agriculture collects data from farmers on the production volumes of their olive varietals identified as for table, including both table and dual-use varietals, and their destination.[220]  Relatedly, the GOS explained that it tracks the production of dual-use olive varietals that are identified as for table olive use.[221]  In other words, the GOS

---

[212] *See* Musco's February 25 submission at Exhibit 5A.
[213] *See* Musco's February 5 submission at 7.
[214] *See* Musco's February 25 submission at Exhibit 13.
[215] *See* Musco's February 5 submission at 7.
[216] *Id.* at Exhibit 1.
[217] *See* GOS's Comments at 9.
[218] *See* Musco's February 5 submission at Exhibit 1.
[219] *See* Musco's February 25 submission at Exhibit 7B.
[220] *See* ASEMESA's February 21 Submission at Exhibit NFI-1; see also Musco's February 25 Submission at 7A, Annual Crop Surfaces and Productions.
[221] *See* GOS's Comments at 11; *see also* Musco's February 25 Submission at 7 and Exhibit 10B; ASEMESA's February 21 Submission at 5-7 and Exhibit NFI-2.

tracks the production of all olive varietals identified as for use as table olives, including

manzanilla, gordal, hojiblanca, camomile cacerena, and carrasquena, and are included in the

"table" production figures, whereas all olive varietals identified as for use as olive oil are

included in the "mill" production figures. Therefore, Commerce can determine the volume of

raw olives identified as for table use, which encompasses the olives that are principally suitable

for use in the production of table olives, the prior stage product.[222] From these data, Commerce

can determine whether the demand for raw table olives is substantially dependent on the demand

for processed table olives. The data demonstrate that 99 percent of mill olive varietals and dual-

use olives identified as for use as mill olives were used to produce olive oil, and 96 percent of

table olive varietals and dual-use olives identified as for table were used to produce table olives

    As a result of this information and data, for the section 771B(1) analysis in this

redetermination, we identify the "prior stage product" in this investigation as the varietals of raw

olives principally suitable for use in the production of table olives. This conclusion is supported

by the language and structure of the statute, as well as the evidence on the record of the remand.

**Comment 10: Commerce Should Consider Only Ripe Olives as the "Latter Stage Product"**

*GOS's Arguments:*

- Commerce should consider only ripe olives as the latter stage product because there are
  different treatments of table olives and only ripe olives are the subject of investigation.[223]

---

[222] *See* Comment 12 for additional discussion on the separation of dual-use varietals into the "table" and "mill" categories in the GOS data.

[223] *See* Government of Spain's Letter, "Countervailing Duty Investigation of Ripe Olives-Department of Commerce's Draft Remand Determination," dated April 17, 2020 (GOS's Comments) at 8.

- There are different lines of production from raw olives to green olives and from raw olives to ripe olives, distinguished by different processes and equipment effecting the physical and chemical changes in the raw olive.[224]

*ASEMESA's Arguments:*

- Commerce fails to account for the fact that there are two independent and continuous lines of production from its "prior stage product" (*i.e.*, raw olives principally suitable for use in the production of table olives) that encompass what Commerce defines as the "latter stage product," *i.e.*, table olives.[225]

- Commerce can find table olives constitute a single "latter stage product" only if they share common processes after the raw stage along a single, continuous line of production, as evidenced in *Pork from Canada*.  In *Pork from Canada*, Commerce found there was a single continuous line of production from live swine to pork meat.[226]

**Commerce's Position:**  Commerce identified table olives as the "latter stage product" in the *Final Determination* and no change has been made to the "latter stage product" for purposes of the section 771B(1) analysis on remand.  The GOS wishes to revisit this aspect of Commerce's *Final Determination*, but the GOS is a nonparty in the litigation and it is inappropriate to consider an argument on remand where a party could have sought judicial review in the first instance and raised the argument in the initial appeal.[227]  ASEMESA also makes arguments that

---

[224] *Id.*
[225] *See* ASEMESA's Comments on page 21.
[226] *See* ASEMESA's Comments on page 21.
[227] *See Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382-83 (Fed. Cir. 1999) (declining to allow "the untenable result that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost") (internal quotations and citation omitted)); *see also Northwestern Indiana Telephone Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989) (explaining that the waiver doctrine "prevents the bizarre result that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost" (internal quotations and citation omitted)).

84

attempt to undercut Commerce's identification of the "latter stage product," but its challenge to

this aspect of Commerce's *Final Determination* was waived and dismissed by the Court.[228] [229]

## Comment 11: Whether Commerce's Use of Statistical Categories to Define End Uses is Devoid of Context and is Deeply Flawed

*GOS's Arguments:*

- Commerce's change in the "prior stage product" is clear evidence that the previous analysis

  failed to demonstrate Commerce's desired results on "substantial dependence."[230]

- There is no criterion defined by Commerce to describe qualitatively or quantitatively this

  subset of raw olives. The GOS and ASEMESA have repeatedly made clear that all varieties

  of raw olives are suitable for both olive oil and table olive production. Therefore, it is not

---

We note that ASEMESA, a party to the litigation, sought to challenge the same aspect of Commerce's *Final Determination*, but the challenge was waived and dismissed by the Court. *See Remand Order* at 29.

[228] *See Remand Order* at 29.

[229] Nonetheless, for the benefit of the Court, as discussed in the *Final Determination* and restated above, we note that the statute does not require Commerce to consider ripe olives as the latter stage product. The statute does not provide a definition for the term "latter stage product" as used within section 771B(1) of the Act; as such, the statutory language does not require the latter stage product to be the "subject merchandise" or the "foreign like product." Therefore, the "latter stage product" is not defined narrowly to include only subject merchandise, ripe olives. Consistent with the legislative history of the Act (*see* 133 Congressional Record S. 8814 (1987)), section 771B of the Act was enacted by Congress to capture the subsidies provided to raw agricultural products that are processed into a next-stage product, such as live swine into pork and paddy rice into milled rice. *See Pork from Canada*; and *Rice from Thailand*. In this investigation, similarly, a raw olive is simply processed into the next-stage olive product. Therefore, we find that all processed table olives should be included when considering the latter stage product in this context.

      ASEMESA argues that the "latter stage product" must be the product after the raw stage along a single continuous line of production. As explained in greater detail above in Comment 7, Commerce is not statutorily required to examine whether there is a continuous line of production between the prior stage product, raw olives principally suitable for use in the production of table olives, and the latter stage product, table olives. Additionally, we disagree with ASEMESA's argument that Commerce may identify the "latter stage product" as table olives only if the table olives share common processes after the raw stage along a single, continuous line of production. The statute contains no such requirement. Even in the few cases in which Commerce has considered whether a single continuous line of production exists, Commerce first identified the "prior stage product" and the "latter stage product" and then assessed whether a single continuous line of production exists. *See, e.g.*, *Pork from Canada*, 50 FR at 25099. The single continuous line of production analysis was not applied as a method for identifying the "latter stage product."

[230] *See* GOS's Comments at 7.

possible to differentiate a portion of the raw agricultural product as more suitable for use in table olive production.[231]

- Information on the GOS webpage does not establish "dedicated" end uses for olive varietals. All olive varieties can be used interchangeably and without distinction for the production of either table olives or olive oil depending on the timing of the harvest and the methodology for extracting the oil.[232]

- The classification of raw olive groves into different varieties or categories is intended for statistical purposes only and does not correspond necessarily with the actual and final destination of olives. Thus, these publications do not reflect the reality of production[233] and Commerce cannot use this information to determine that the demand for raw table olives is substantially dependent on the demand for table olives.

- While Spain's insurance regulations classify olive orchards into three categories—mill, table, and dual use–this is for the purpose of determining the capital insured regardless of the market price of the olive at the time of harvesting.[234]

- The IOC trade standard applies to the fruit of the cultivated olive tree which has been suitably treated or processed and which is offered for trade and for final consumption as table olives. Therefore, there is no restriction on the application of IOC standards to certain varietals of raw olives, only that they must have undergone the necessary treatment or processing.[235]

*ASEMESA's Arguments:*

---

[231] *Id.*
[232] *Id.* at 9.
[233] *Id.* at 8.
[234] *Id.*
[235] *Id.* at 11.

- Commerce altered its examination of "substantially dependent" demand from considering the demand for raw olives derived from the demand for table olives because it found that, under this framework, demand for raw olives was far below the "substantially dependent" standard.[236]

- Even if the analysis is narrowed to focus on only those main varietals of raw olives consumed in table olive production, the same negative conclusion must be rendered because the Spanish industry demonstrated with hard data that no more than 30 to 39 percent, by volume, of such varietals are consumed in table olive production.[237]

- Olive varietals generally understood to have a "fitness" for oil production are also used in table olive production, and table olives are also used to produce oil. Therefore, Commerce needs to examine varietals by all their end uses.[238]

- The fact that the IOC has separate standards for table olives is of little probative value. IOC standards do not list specific varietals as belonging to a "table olive" classification, nor do they establish that once an olive is classified as a table olive, it cannot be used for oil. The criteria established by the IOC are objective and can be applied to all varietals so long as the fruit is in accordance with the standards.[239]

- Data placed on the record by Musco demonstrate that, between 2016 and 2017, the volume of "table" raw olives sent to oil production increased by more than 142,000 metric tons (MT).[240] At the same time, the volume of "mill raw olives sent to table olive production increased by more than 135,000 MT. These massive shifts occurred in the span of a single year; they did

---

[236] *See* ASEMESA's Comments at 22.
[237] *Id*. at 23.
[238] *Id.* at 25.
[239] *Id.*
[240] *See* ASEMESA's Comments at 26.

not occur over a period of years.  Finally, the total amount of "table" raw olives actually used to produce oil, 160,899 MT, and "mill" olives actually used to produce table in 2017, 226,148 MT, equals 387,047 MT, which is larger than the volume of "table" raw olives actually used to produce table olives, 344,147 MT.  These data expose the limits of blindly relying on statistical categories as a means to establish "substantially dependent" demand rather than an examination of actual olive varietals and their end uses.[241]

- Spain's insurance regulations create different olive categories, including table, oil mill, and mixed.  Oil mill olives are defined as olives produced on an orchard "where more than 85 percent of the produced olives are used for oil production."  This raises the possibility that production associated with "mill" olive hectares reported in Spanish government statistics include a portion, as high as 14.9 percent, that are processed into table olives.  Putting that into perspective, in 2016, the period of investigation, there were 2,243,700 "mill" olive hectares in Spain in production, producing 6,571,400 MT of raw mill olives.  If 14.9 percent of those olives are used to produce table olives, that would amount to 979,138 MT table olives being produced, amounting to over 198 percent of the total production of processed table olives in 2016 found by Commerce.  This leaves open the possibility that the entire production of processed table olives in 2016 was grown from raw mill olives.[242]

**Commerce's Position:**  We disagree with ASEMESA and the GOS that Commerce's reconsideration of its interpretation and analysis of section 771B(1) of the Act on remand is intended to achieve a certain outcome and is result oriented.  On the contrary, Commerce reconsidered its interpretation and analysis of section 771B(1) of the Act in response to the Court's *Remand Order*.  The revised interpretation and analysis gives effect to the intent of

---

[241] *Id.*
[242] *Id.* at 27.

Congress, as reflected in the plain language of the statute, and is based on the new factual information Commerce received from interested parties (both ASEMESA and Musco), which demonstrates that there is recognition by the Spanish olive industry and by the GOS that certain olive varietals are identified as table used for producing table olives, other olive varietals are identified as mill olives to be used to produce olive oil, and other olive varietals that can be identified as either table used for producing table olives or mill olives to be used to produce olive oil (dual-use olives). As such, Commerce has reached a finding that is supported both by the law and the facts of the case.

We also disagree with ASEMESA and the GOS that Commerce used statistical information provided by the Government of Spain out of context. Commerce finds the GOS's argument that the information published on its websites and in its publications was published for statistical purposes only and, therefore, does not reflect the reality of production to be unpersuasive. It is our practice to not scrutinize official government statistics and publications. We presume information from the foreign government to be reliable and credible, unless shown otherwise. Therefore, we find GOS agricultural statistics on annual crop surfaces and productions, indicating that, during harvest year 2016, 492,244 of the 511,122 metric tons of raw table and dual-use varietals identified as for table were sent to table olive production to be accurate.[243] The production data directly corresponds to the table production volume in the GOS Statistical Yearbook for 2016,[244] and the regional chart on the destination of table olives for 2016. The data demonstrate that 96 percent of the raw table and dual-use varietals identified as for table were processed as table olives, and, therefore, the demand for processed table olives is substantially dependent on the demand for those raw olives principally suitable for use in the

---

[243] See Musco's February 25 submission at Exhibit 7B.
[244] See ASEMESA's February 21 submission at NFI-1, and Musco's February 25 submission at Exhibit 7A.

production of table olives. Commerce found no indication in the record information that this data is incorrect, and therefore we will continue to rely on the published information.

We disagree with the GOS's and ASEMESA's argument that all olive varietals can be used interchangeably such that all raw olive varietals are principally suitable for use in the production of table olives. Factual information provided on the record of this remand proceeding by both ASEMESA and Musco indicates that olive varietals are identified as for a specific "fitness," either for processing into table olives or for use in the mill for production of olive oil. We disagree with ASEMESA's and the GOS's claim that the fact that olive varietals that have a "fitness" for oil production can also be used in table olive production, and that olive varietals with a table olive "fitness" are used as olive oil, invalidates our conclusion regarding substantial dependence. This occurs in only rare circumstances. Data from the GOS's Ministry of Agriculture clearly demonstrate that the vast majority of mill olive varietals, *i.e.*, picual, arbequina, etc. are used in olive oil.[245]  According to the GOS Statistical Yearbook, 99 percent of mill olive varietals were used as olive oil, and 96 percent of table olive varietals and dual-use varietals identified as for table were used as table olives; thus, these data demonstrate that there is little interchangeability between mill and table olive varietals and their end uses.[246]  In addition, evidence on the record demonstrates that the GOS itself distinguishes between and separately tracks table and mill olive production and end use. Moreover, the significantly higher farm gate prices for table olive varietals make these varietals a less economically viable source of oil for Spain's olive oil producers.[247]  Furthermore, the IOC considers the "table olive to be only the fruit of <u>certain varieties</u> of cultivated healthy olive trees."[248]

---

[245] *Id*. at Exhibit 7B.
[246] *Id.*
[247] *See* Musco's February 5 Submission at Figure 5.
[248] *See* Musco's February 25 Response at Exhibit 2A.

We are unpersuaded by the GOS's argument that the IOC trade standard "applies to the fruit of the cultivated olive tree which has been suitably treated or processed and which is offered for trade and for final consumption as table olives," and therefore there is no restriction on the application of IOC standards to certain varieties of the raw olive.  Information on the record of this investigation from the GOS's Ministry of Agriculture states that the Quality Standard of the International Olive Council defines a table olive in the following manner:  "A table olive is the fruit of certain *varieties* of the cultivated, healthy olive tree, taken in the state of adequate maturity and quality that, subject to the appropriate preparations, gives a product of consumption and good conservation as commercial merchandise."[249]  Therefore, we continue to find that only certain varieties of olives are considered for table.

We do not find ASEMESA's argument that, based on the GOS insurance regulations, all olives used for table may have been mill olive varietals to be persuasive.  The GOS records mill olive varietals that are used for table separately from raw table varietals used as table olives.[250] From the record, we know that only 90,404 MT of mill olive varietals were used in table olive production during the POI as opposed to the 979,138 MT figure proposed by ASEMESA.[251] This is because, in general, mill olives do not meet the IOC standards.[252]  Table olive varietals tend to be larger and are produced in the wetter regions of Spain than mill olive varietals.[253]

There are also important differences in cultivation practices.[254]  According to the GOS, table olive orchards are often irrigated,[255] and are located in the southern and western areas,[256]

---

[249] *Id.*
[250] *Id.*
[251] *Id.*
[252] *Id.*
[253] *Id.* at Exhibit 2A and Exhibit 5A.
[254] *See* Musco's February 5 submission at 7; *see also* Musco's February 25 submission at Exhibit 13.
[255] *See* GOS Verification Report at 3; see also Musco's February 5 submission at 7.
[256] *See* Musco's February 25 submission at Exhibit 5A.

which, according to Musco, are the areas receiving higher amounts of rainfall.  Table olive

growers seek to maximize the water content of their fruit in order to increase the fruit size.[257]

Industry sources indicate that the table olive orchards are pruned more extensively than mill

orchards in order to increase the size of the fruit.[258]  According to Musco, for raw table olive

varietals to meet the IOC table olive standards, growers must follow specific irrigation, pruning,

and pest management practices that are distinctly different from the cultivation practices for mill

olives.  Industry sources also indicate that the table olive orchards are pruned more extensively

than mill orchards to increase the size of the fruit.[259]  In contrast, growers of olives to be used as

olive oil strive to maximize the oil content rather than produce large-size olives.  Therefore, the

olives identified as for mill use require less pruning as farmers seek to provide smaller, oil-dense

olives that are ideal for use as oil.  While the GOS argues that the insurance policies for olive

groves do not reflect the market price of the olive,  the GOS insurance regulations reveal that

Spain separates its olive orchards according to their end use, designates certain olive varietals as

table, mill, or dual-use olives, and provides a higher maximum unit price for damaged table olive

varietals than for mill varietals.[260]  This confirms that even the GOS considers there to be

important value differences between the raw olive varietals.

ASEMESA notes that there was a significant shift in the volume of raw table olives sent

to oil production from harvest year 2016 to 2017 and claims that this shift exposes the limits of

Commerce's analysis.  We disagree with this assessment.  In harvest 2016, four percent of table

olives were used in the production of olive oil.  The percent climbed to 32 percent in harvest

---

[257] *See* Musco's February 5 submission at 7.
[258] *See* Musco's February 25 submission at Exhibit 13, citing El Cultivo del Olivo, by Diego Barranco Navero, Rocardo Fernandez Escobar, and Luis Rallo Romero.
[259] *Id.*
[260] *See* Musco's February 5 Submission at Exhibit 1.

2017.  We attribute this increase, at least in part, to the antidumping and countervailing duty investigations on ripe olives, which were initiated in 2017.  Spanish olive processors sought to avoid the potential imposition of antidumping and countervailing duties on ripe olives by sending a substantially larger volume of raw table olive varietals to oil production.  It is important to note that the portion of raw table olives sent to oil production remained at less than 10 percent during each harvest year from 2010 through 2016, and the portion of mill varietal olives sent to table production remained at one or two percent.[261]  Thus, absent the investigations, there has been little shift in the volume of raw table olives sent to oil production, and *vice versa*.

Finally, even if Commerce were to rely on the varietal production data extrapolated by ASEMESA as accurate, it demonstrates that 39 percent of raw table olives are processed into table olives.  This percentage establishes that the demand for raw table olives is substantially dependent on the demand for table olives.  In past cases, Commerce has found the demand for a prior stage product to be substantially dependent on the latter stage product when close to 40 percent of the demand for the raw product is dependent on the demand for the processed product.  For example, in *Shrimp from China*, Commerce established that 44.7 percent of the demand for fresh shrimp is dependent on the demand for frozen shrimp.  In that case, we concluded that, even if only 25 percent of the fresh shrimp market depends upon the demand for frozen shrimp, it was reasonable to consider this demand substantially dependent.[262]  Therefore, we do not consider ASEMESA's arguments on this point to be convincing.

---

[261] *Id.* at Exhibit 7B.
[262] *See Shrimp from China* and accompanying Issues and Decision Memorandum at 46.

93

**Comment 12: Whether Commerce Wrongly Dismissed the GOS Varietal Hectare Data Utilized in the Spanish Industry's Varietal Analysis**

*GOS's Arguments:*

- Commerce's calculation of substantial dependence must include dual-use varietals as well as those most suitable for table olives because it is not possible to differentiate their final destination until the last moment. The dual-use variety can always be used in its entirety to produce table olives.[263]

- ASEMESA's data on the surface area dedicated to production of table olive varietals is based on official sources.[264] The information on manzanilla, gordal, and hojiblanca was sourced from the regional government of Andalusia's Basic Payment Database. The area data are incomplete, as they only cover Andalusia, and farmers are not required to communicate this information. Data for the two remaining varieties, cacerena and carrasquena, have been obtained from an internal government report, which although not published, can be accessed if necessary.

- ASEMESA's analysis of the surface area dedicated to the production of table olive varietals reveals that none of the olive varietals is intrinsically involved in table olive production. Specifically, table olive varietals used for table olives account for less than 40 percent of total table olive production.[265]

---

[263] *See* GOS's Comments at 13.
[264] *Id*.
[265] *Id.* at 14.

*ASEMESA's Arguments:*

- Commerce's criticism of mixed data sets and concerns over "diminished reliability" of ASEMESA's production data are without merit. Commerce could have focused on the more recent data sourced from Andalusia's BPS data for the 2018/2019 campaign year.[266]

- BPS data show that 952,360 MT of hojiblanca olives were grown in 2016. If there were 492,244 MT of table olives produced in 2016 from all varietals and 952,360 MT of hojiblanca produced in the same year, Commerce must conclude that raw table olive varietals are not substantially dependent on table olives.[267]

- While the data on manzanilla, gordal, and hojiblanca are not included in a statistical publication that could be provided, they were compiled by the regional government of Andalusia, which collects information on variety and surface area through BPS applications. Commerce ignores that the GOS expressly confirmed the accuracy of the data, and they are verifiable.[268]

- The idea that the varietal hectare data provided by the Spanish industry is merely an "estimate" is not supported by the record. The data on manzanilla, gordal, and hojiblanca is conservative because it comes from Andalusia.[269]

- Commerce claims that data on the record show that the total planted area in Spain for table and dual use olives is 189,794 hectares. Based on this data, Commerce contends that the Spanish industry's data is overstated.[270]

---

[266] *See* ASEMESA's Comments at 28.
[267] *Id.*
[268] *Id.*
[269] *Id.*
[270] *See* ASEMESA's Comments at 30.

- Commerce relies upon data that do not reflect an examination of varietals and all their end uses, but that merely represent a statistical category that offers no insight on varietals or how they are used.[271]

- In the 2018/2019 campaign year 587,000 MT of raw olives were sent to table production and the yield data for raw table olives has been in excess of 3 MT per hectare.  These data lead to the following analysis:  76,120 hectares were dedicated to the production of raw table varietals multiplied by a yield of 3 MT per hectare demonstrates that 228,360 MT of raw table olive varietals were produced in the 2018/2019 campaign; 113,674 hectares were dedicated to growing dual use varietals, multiplied by a yield of 3 MT per hectare, shows that 341,022 MT of dual use olive varietals were produced.  This suggests that the dual use statistical category exists in name only, and that "dual use" varietals are used almost entirely in table production.  This defeats the need or purpose for such a statistical breakout since it is otherwise proven that both raw table olives and raw dual use olives are used to produce olive oil.  Therefore, Commerce is misstating the facts.[272]

- Commerce considers the hojiblanca olive to meet its definition of prior stage product, because it is a varietal understood to be a dual use olive.  Hojiblanca is the largest single varietal used for table olive production each year, Commerce has not considered how its analysis should change in light of the fact that a larger volume of hojiblanca olives is consumed in the production of olive oil than is used to produce table olives.[273]

---

[271] *Id.*
[272] *Id.*
[273] *Id.* at 35.

- According to Musco's own evidence, the hojiblanca olive "occupies more than 265,000 hectares in the provinces of Cordoba, Malaga, Seville, and Granada." This clearly indicates that the GOS data are in fact quite accurate.[274]

- Further, more hojiblanca olives are consumed in the production of oil than the entire volume of raw olives used in the production of table olives. This casts doubt on Commerce's conclusion that hojiblanca is "principally suitable for use in the production of table olives."[275]

- These observations demonstrate that Commerce's definition of prior stage product is far afield from establishing that the demand for the prior stage product is substantially dependent on the demand for table olives.[276]

**Commerce's Position:** Commerce continues to find it is appropriate to not rely on the hectare data provided by ASEMESA. Our filing instructions require that respondents include in their questionnaire responses the source of their information to establish the accuracy of the response.[277] ASEMESA provided no supporting evidence to substantiate its claim that the surface area dedicated to the production of each table olive varietal was collected by the Government of Spain or the Regional Government of Andalusia, or another reliable source. There is no explanation as to what exactly is collected in the BPS application or why, or whether ASEMESA is assuming that crops, and olives specifically, are grown on every single hectare claimed in the application. ASEMESA acknowledged that the data were incomplete, had been extrapolated,[278] and are not published.[279] Furthermore, the data were not obtained from one

---

[274] *Id.* at 31.
[275] *Id.*
[276] *Id.*
[277] *See* Commerce's Letter, "Countervailing Duty Investigation on Ripe Olives from Spain: Initial Questionnaire," dated August 4, 2017, Section I, Part III, Filing Requirements and Guidelines
[278] *See* ASEMESA's February 21 Submission at 6.
[279] *Id.* at 6.

specific source, but from two, one of which was an "internal" report from 2008, rendering the information obsolete.[280] Attempting to combine data from two different sources from two different time periods diminishes the reliability of the data. Even if we dismissed the data presented in the 2008 internal report and only focused on the more recent information as ASEMESA suggests we should, ASEMESA provided no evidence to substantiate its claim that the data gathered from the BPS applications was accurate.

In comparison, Musco provided published statistics from the GOS's Ministry of Agriculture 2019 Survey on Areas and Yield, which included data on the number of hectares dedicated to the production of table, dual use, and mill olives, as well as statistics from the Ministry of Agriculture Statistical Yearbook on Crop Surfaces and Production on the volume of raw table olive varietals and mill olive varietals produced each year, and the end use of the table and mill olive varietals. Because we do not have data from these publications as to the end-use of each specific table or mill olive varietal produced, it was reasonable for us to rely on the GOS published statistical information at hand.

ASEMESA has not provided evidence that 952,360 MT of hojiblanca olives were produced in 2016. ASEMESA claims to have "extrapolated" this production figure based on the volume of hectares dedicated to the production of the hojiblanca olive during the 2018/2019 campaign. ASEMESA has not provided supporting documentation demonstrating that the number of hectares dedicated to the production of the hojiblanca olive is accurate. Both the GOS and Musco confirmed that the GOS does not publish information on mill olive varietals, which would include the portion of hojiblanca varietals that are identified as for the mill.[281] Therefore, we had no manner in which to verify the area in hectares, by varietal, identified as for processing

---

[280] *See* ASEMESA's February 21 Submission at 7.
[281] *See* GOS's Comments at 11 and 13; *see also* Musco's February 25 Submission at 8.

into olive oil.  The GOS publishes production data, by varietal, only for table olive varietals identified as for table use.

In an effort to determine the volume of table and dual-use olive varietals identified as for processing into table olives, Commerce relied on information provided in the GOS's Survey on Areas and Yield which includes information on the area in hectares of farmland dedicated to the production of raw table olives as well as the area dedicated to the production of dual-use olives.[282]  We agree with ASEMESA that the information reported in the GOS's Survey on Areas and Yield indicates that 76,120 hectares of farmland were dedicated to the production of raw table olives and 113,674 hectares were dedicated to the production of dual-use olives.  Using this data, together with the yield per hectare statistics provided in the GOS Statistical Yearbook, we arrive at the same conclusion as ASEMESA, that 228,360 MT of raw table olives and 341,022 MT of dual use olives were produced in 2019, totaling 569,382 MT of olives.[283]  We compared the volume of table and dual use olives produced in 2019 with data from the AICA for the 2018/2019 campaign.  Data from the AICA revealed that 587,800 MT of raw table varietals identified as for processing into table olives were produced during this time, including 273,150 MT of hojiblanca.[284]  Therefore, olives classified by the GOS as dual-use varietals are reported in GOS reports as olive varietals identified as for processing into table olives.

ASEMESA is correct that Spain's Ministry of Agriculture website, cited by Musco, identifies that there are 265,000 hectares of hojiblanca olives in Spain.[285]  However, the GOS

---

[282] *See* Musco's February 25 Submission at Exhibit 4A.
[283] *Id.*
[284] *See* ASEMESA February 21 Submission at Exhibit NFI-1.  Because the only data on the record regarding the hectares of farmland dedicated to table, dual-use, and mill olives was based on 2019, after the POI, Commerce examined AICA data from the 2018/2019 campaign as facts otherwise available pursuant to section 776(a)(1) of the Act.
[285] *See* Musco's February 25 Submission at Exhibit 2A.

Survey on Areas and Yield lists only 113,674 hectares for dual-purpose olives, which would include the hojiblanca varietal.[286] This apparent discrepancy partially identified by ASEMESA leads us to conclude that a certain number of hectares of hojiblanca olives are identified in the official GOS data as hectares of "mill olives." That certain hectares of hojiblanca olives would be identified as for mill olives in the GOS data comports with our understanding of the differences in cultivation practices between table olives and mill olives. Commerce has explained in this redetermination that there are differences in oil content, size, quality, pruning, water levels, etc. between those olives identified as for table and those grown to be crushed for oil. The differences in pruning, cultivation, and irrigation practices lead to obvious differences in quality, size, and oil content. There is no dispute that the hojiblanca varietal can technically be identified as for either, but the differences in cultivation practices and the manner in which the GOS collects data, as demonstrated above, indicate that certain hectares are identified as for oil production. Those hojiblanca olive hectares identified as for oil production undergo different cultivation practices during the growing season, and thus are not principally suitable for use in the production of table olives, the latter stage product at issue. However, the hectares of hojiblanca olives subjected to more intensive pruning and irrigation *are* principally suitable for use in the production of the latter stage product. We conclude that the GOS data being used in this redetermination has separated hojiblanca hectares of production and use into "table" and "mill" categories. Thus, those principally suitable for use in the production of table olives were considered part of the prior stage product and included in the analysis as such.

---

[286] *Id.* at Exhibit 4A.

**Comment 13: Whether Commerce Properly Concluded that the Spanish Industry's Varietal Analysis Wrongly Reported Total Production Data of Varietals Used in Table Olive Production**

*ASEMESA's Arguments:*

- Commerce dismissed the Spanish industry's varietal analysis on the basis that the analysis "incorrectly places the total production data for table olive varietals and dual use varietals in the column titled 'Production Used as Table,' thereby, vastly overestimating the production volume of the prior stage product." This is untrue.[287]

- Data on the record from two sources indicate that the area in hectares devoted to hojiblanca production is in excess of 260,000, with hard GOS data that Commerce unreasonably declined to verify indicating that the figure is at least 311,000 hectares.[288]

- Unless Commerce is prepared to unreasonably conclude that hojiblanca yields are at or below one MT per hectare (figures reported as "production used as table" for hojiblanca are between 260,000 and 290,000 MT, which would be one-third the yield of either the raw "table" or raw "mill" statistical categories), Commerce's finding cannot be reconciled with the record.[289]

- Even if Commerce accepts that the "dual use" raw olives can be used for either table olive production or olive oil production, Commerce must accept that only 40 percent of the hectares it finds "principally suited" for table olive production are actually "dependent" on that production, because the remaining portion could easily be used in oil production.[290]

- Data used by the Spanish industry for reporting the volume of specific varietals used in table olive production is sourced from a government report focused on end products not on the raw

---

[287] *Id*. at 33.
[288] *See* ASEMESA's Comments at 33.
[289] *Id.* at 33.
[290] *Id.* at 32.

products.  The data are reported on an inventory basis of the volume, by variety, of olives *within* the table olive production chain, not total production of the raw olive varietals in question.[291]

**Commerce's Position**:  Commerce continues to conclude that ASEMESA's production data are unreliable.  ASEMESA supplied Commerce with information stating that 490,529 hectares of cropland were dedicated to the production of olive varietals used in table production, but, as stated above, provided no supporting documentation demonstrating the accuracy of the information.  Furthermore, ASEMESA incorrectly reported the total production of table olive varietals used in table olive production by placing the volume of total production for each table olive varietal identified as for table use in the column titled "Production Used as Table."  The data that ASEMESA relied on for "production used as table" directly correlate with the GOS's AICA report on the total production of table olive varietals and dual-use varietals identified as for table olive production.[292]  The report includes the origin and destination of table olive varietals identified for use as table and indicates that, in total, 596,110 MT of table olive varietals were grown during the 2016/2017 campaign year,[293] which corresponds to the data entered by ASEMESA for "Production Used as Table."

Moreover, in certain situations, ASEMESA reports that the volume "Used in the Production of Table," is higher than the total volume of table olive production.  For instance, ASEMESA reports that, in the 2016/2017 campaign year, 32,960 MT of raw gordal olives were produced, but 47,400 MT of gordal olives were used in the production of table olives.[294]  Furthermore, as stated above, ASEMESA has failed to substantiate the production volume data

---

[291] *Id.* at 33.
[292] *See* ASEMESA's January 15, submission at Exhibit 6; see also February 21 submission at Exhibit NFI-2.
[293] *See* ASEMESA's January 15 submission at Exhibit 6.
[294] *See* ASEMESA February 21 Submission at 10.

that they have reported.  Using this unsubstantiated total production data and incorrect data for the volume of table varietals sent to table production, ASEMESA found that 39.59 percent of raw table olive varietals were processed into table olives.[295]  Because of these apparent inconsistencies, we relied on the information provided by Musco.

Because we determined the information provided by ASEMESA to be unreliable, Commerce relied on published GOS data on the record indicated that the area of hectares dedicated to the production of table and dual-use varietals was significantly smaller.  The GOS Survey on Areas and Yield established that 189,794 hectares were dedicated to the production of table and dual-use olives (76,120 hectares for table plus 113,674 hectares for dual-use olives).[296]  Because the GOS expressly collected and published this information, we consider it to be accurate.  As discussed above, based on GOS information, almost all of the hectares identified as dual-use olive orchards were actually used to produce table olives.  Hojiblanca varietals that were identified as for use as olive oil were included in the data identifying the area in hectares dedicated to mill production.

Commerce relied on a multitude of evidence before concluding that the demand for raw olive varietals principally suitable for use in the production of table olives is substantially dependent on demand for table olives.  In determining that the criterion of section 771B(1) of the Act has been met, Commerce examined information from AICA as well as the GOS Survey on Areas and Yield, and information on Crop Surfaces and Production.  Only the "Industrial Use" table found in the Ministry of Agriculture's agricultural statistics on annual crop surfaces and production focused on the end use of the olive varietals.

---

[295] *Id.*

[296] These data relate to the 2019 campaign.  Commerce did not receive published information showing the planted area for table and dual use olives during the POI, 2016.

ASEMESA has not provided any information to validate its argument that the data contained in the GOS Statistical Yearbook on Annual Crop Surfaces and Production is reported on an inventory basis of the volume, by variety, of olives *within* the table olive production chain, not total production of the raw olive varietal in question.  Therefore, for this redetermination, Commerce stands by the analysis presented in the draft redetermination.

## V.    Final Results of Redetermination

Pursuant to the Court's *Remand Order*, Commerce has addressed how the BPS expressly limits access to the subsidy such that it is *de jure* specific under section 771(5A)(D) of the Act. In addition, Commerce has addressed, through the application of section 771B(1) of the Act, how the demand for the prior stage product is substantially dependent on the demand for the latter stage product.

5/29/2020

X _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

ADDENDUM 6

Slip Op. 20-8

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ASOCIACIÓN DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, ACEITUNAS GUADALQUIVIR, S.L.U., AGRO SEVILLA ACEITUNAS S. COOP. AND., and ANGEL CAMACHO ALIMENTACIÓN, S.L., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> COALITION FOR FAIR TRADE IN RIPE OLIVES, <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 18-00195 |

## <u>OPINION</u>

[Plaintiffs' motion for judgment on the agency record is granted in part and Commerce's <u>Final Determination</u> is remanded consistent with this opinion.]

Dated: January 17, 2020

<u>Matthew P. McCullough</u>, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for plaintiff. With him on the joint brief were <u>Christopher A. Dunn</u> and <u>Tung Nguyen</u>.

<u>Tara K. Hogan</u>, Assistant Director, and <u>Sonia W. Murphy</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director. Of counsel was <u>Saad Y. Chalchal</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>David J. Levine</u> and <u>Raymond Paretzky</u>, McDermott Will & Emery LLP, of Washington, DC, argued for defendant-intervenor.

Katzmann, Judge:  This case presents two issues of first impression under Sections 771 and 771B of the Tariff Act of 1930,[1] respectively: (1) the interpretation and application of the term "expressly limits" in the countervailable domestic subsidy provision, 19 U.S.C. § 1677(5A)(D)(i) ("Section 1677(5A)"); and (2) the interpretation and application of the term "substantially dependent" in the agricultural countervailable subsidies provision, 19 U.S.C. § 1677-2 ("Section 1677-2").[2]  The case involves a claim from the U.S. domestic olive industry that the governments of the European Union ("EU") and Spain unfairly subsidized Spanish olives that were then imported into the U.S. to the detriment of the U.S. industry.  See Petition for Imposition of AD and CVD Duties, Vol. I (June 21, 2017), P.R. 7 ("Pet. Vol. I").  Based on a petition filed by the Coalition for Fair Trade in Ripe Olives ("Coalition" or "Defendant-Intervenor"), the Department of Commerce ("Commerce") initiated an investigation into subsidies received by the Spanish olive industry.  Commerce's investigation resulted in a determination that subsidies given to growers of raw olives were de jure specific to olive growers under Section 1677(5A) and those subsidies were attributable to downstream processors of those raw olives into ripe olives under Section 1677-2.  Therefore, using information collected from interested parties during its investigation, Commerce calculated countervailing duties ("CVDs") for imports of ripe olives from Spain.  See Ripe Olives

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2018 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1677e (2012) by the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015).  The TPEA amendments are applicable to all determinations made on or after August 6, 2015, and therefore, are applicable to this proceeding.  See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793, 46,794 (Dep't Commerce Aug. 6, 2015).

[2] Further citations to Section 1677-2 denote the specific subsection of that provision, if applicable. See 19 U.S.C. § 1677-2(1) ("Section 1677-2(1)"); 19 U.S.C. § 1677-2(2) ("Section 1677-2(2)").

From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 83 Fed. Reg. 37,469 (Dep't Commerce August 1, 2018), P.R. 1417 ("Amended Final Determination").

Asociación de Exportadores e Industriales de Aceitunas de Mesa ("Asemesa"),[3] Aceitunas Guadalquivir, S.L.U. ("Guadalquivir"), Agro Sevilla Aceitunas S. Coop. And. ("Agro Sevilla"), and Angel Camacho Alimentación, S.L. ("Angel Camacho") (collectively, "Plaintiffs"), major producers and/or exporters of ripe olives from Spain, brought this action against the United States ("the Government") in opposition to Commerce's CVD determination and moved for judgment on the agency record pursuant to Rule 56.2 of the Rules of the Court of International Trade. The court grants, in part, Plaintiffs' motion for judgment on the agency record.

## BACKGROUND

### I.    *Legal and Regulatory Framework for Countervailing Duty Determinations*

To empower Commerce to offset economic distortions caused by countervailable subsidies and dumping, Congress enacted the Tariff Act of 1930. Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); ATC Tires Private Ltd. v. United States, 42 CIT __, __, 322 F. Supp. 3d 1365, 1366 (2018). Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential countervailable subsidies and, if appropriate, issue orders imposing duties on the subject merchandise. Sioux Honey, 672 F.3d at 1046–47; ATC Tires, 322 F. Supp. 3d at 1366–67; 19 U.S.C. §§ 1671, 1673. A subsidy is countervailable if the following elements are satisfied: (1) a government or public authority has provided a financial contribution; (2) a benefit is thereby

---

[3] Asemesa describes itself as an interested "business association a majority of the members of which are producers, exporters, or importers of [subject] merchandise" as defined by Section 771(9)(A) and 516A(f)(3) of the Tariff Act of 1930. Compl. at 2, Sept. 28, 2018, ECF No. 7 (citing 19 U.S.C. §§ 1677(9)(A), 1516a(f)(3)).

conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. 19 U.S.C. § 1677(5). Specific subsidies are also referred to as "coupled" subsidies. "Decoupled" refers to the fact that a subsidy does not encourage production of a specific agricultural product, i.e. is not a specific subsidy. At issue here, a domestic subsidy is de jure specific "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i).

If Commerce determines that the government of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import, into the United States, and the International Trade Commission ("ITC") determines that an industry in the United States is materially injured or threatened with material injury thereby, then Commerce shall impose CVD upon such merchandise equal to the amount of the net countervailable subsidy. <u>See</u> 19 U.S.C. § 1671(a). However, when the merchandise subject to investigation involves a processed agricultural product that meets the criteria under Section 1677-2, Commerce will include in its analysis countervailable subsidies received by producers or processors of the raw agricultural product and will deem such subsidies to be received by manufacturers, producers, and exporters of the processed product. <u>See</u> 19 U.S.C. § 1677-2. Because the Tariff Act is silent on the calculation methodology for imposing CVDs, Commerce calculates a duty rate by formulating a calculation methodology in line with the statutory language and purpose. <u>See</u> <u>Solarworld Americas, Inc. v. United States</u>, 40 CIT __, __ 182 F. Supp. 3d 1372, 1376 (2016).

### II.    *Factual and Procedural History of This Case*

On June 22, 2017, Commerce received a CVD petition, filed on behalf of Coalition, regarding imports of ripe olives from Spain. <u>See</u> Pet. Vol. I. Raw olives become edible and ready

for consumers by either becoming table olives or olive oil.  See Pet. Vol. I at 7.  Ripe olives are

one type of table olive, commonly referred to black olives.[4]  See Id. at 1−2; Agro Sevilla's

Affiliations Questionnaire Response at 8 (August 18, 2017), P.R. 344.  To produce ripe olives, raw

olives "are cured for multiple days in a de-bittering solution, usually alkaline," then rinsed in water

several times, followed by possible pitting, slicing, chopping, or wedging, as applicable.  Pet. Vol.

I at 7.  Ripe olives are then packaged in a container and topped with salt brine.  Id.  In its petition,

Coalition alleged that the EU through the Government of Spain provided countervailable subsidies

to raw olive growers that must then be attributed to processors of ripe olives.  Petition for the

Imposition of Antidumping and Countervailing Duties, Vol. III at 10 (June 21, 2017), P.R. 58.

Coalition claims these "subsidized imports of ripe olives . . . from Spain have materially injured

the U.S. domestic industry producing ripe olives and threaten to cause further material injury if

remedial action is not taken."  Pet. Vol. I at 1.

On July 12, 2017, based on Coalition's petition, Commerce initiated a CVD investigation

on ripe olives from Spain.  Ripe Olives from Spain: Initiation of Countervailing Duty Investigation

82 Fed. Reg. 33050 (Dep't Commerce July 19, 2017), P.R. 126.  Commerce selected as mandatory

respondents[5] three producers that accounted for the largest volume of ripe olives during the period

---

[4] Commerce described with specificity the ripe olives that were subject to investigation.  That description and more detail on Commerce's subject merchandise is discussed in detail below.  See Background infra Sec. B. ii.

[5] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—

of investigation: Guadalquivir, Agro Sevilla, and Angel Camacho, all of which are plaintiffs in this action.[6]  Respondent Selection Memo at 1 (July 28, 2017), P.R. 132.  Commerce then issued questionnaires to these respondents regarding their use of subsidy programs as well as information about their sources of raw olives that were used to produce ripe olives.  Questionnaire on Sources of Raw and Ripe Olives Aceitunas Guadalquivir at 1 (August 4, 2017), P.R. 139 ("Guadalquivir Questionnaire").  Commerce simultaneously issued questionnaires to the European Commission and the Government of Spain regarding the subsidy programs applicable to respondents.  Initial CVD Questionnaire to European Commission (Aug. 4, 2017), P.R. 160; Initial CVD Questionnaire to Spain Embassy (Aug. 4, 2017), P.R. 227.  Commerce used the data and information collected through the questionnaire responses (1) in determining whether subsidies provided to imported Spanish olives were countervailable as de jure specific domestic subsidies under Section 1677-2; (2) in determining whether the subsidies could be attributed to ripe olives as the latter stage product; and (3) in calculating applicable duties under 19 U.S.C. § 1671(a).  See Issues and

---

> (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
>
> (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
>
> (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

The individual countervailable subsidy rates determined under subparagraph (A) shall be used to determine the all-others rate under section 1671d(c)(5) of this title.

[6] As noted above, Asemesa joins the respondents as a plaintiff in this action.

Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 33 (Dep't Commerce June 11, 2018), P.R. 1300 ("IDM").

### A. Commerce's Determination That EU Subsidy Payments Are De Jure Specific to Olive Growers.

In the investigation, Commerce examined the EU's Common Agricultural Policy ("CAP"),[7] which includes the subsidy programs applicable to Plaintiffs, in order to determine whether these domestic subsidies were specific to the olive industry pursuant to Section 1677(5A). The Basic Payment Scheme ("BPS") is the most recent iteration of EU (and its predecessor the European Community) agricultural subsidy programs that apply to Spanish olives. Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 18–19 (November 20, 2017), P.R. 1075 ("Preliminary Decision Memo"). Because parts of the current BPS program are based on past iterations of the EU's agricultural subsidy program, Commerce traced the history of these programs in making its determination that the current program is de jure specific. See id.

From 1997 to 2003, the Common Organization of Market in Oils and Fats ("the Common Market Program") was the annual grant-to-farmer program applicable to Spanish olive growers. Preliminary Decision Memo at 22. The Single Payment Scheme ("SPS") replaced the Common Market Program in 2003 and remained in effect until 2014. Id. at 19, 22. The SPS program was then replaced by BPS, which took effect in 2015 and is the current grant-to-farmer program

---

[7] CAP includes various "Pillars," or categories of subsidy programs. See Preliminary Decision Memo at 23. The Basic Payment Scheme ("BPS") and Single Payment Scheme ("SPS") are part of Pillar I of CAP. Preliminary Decision Memo at 19. BPS includes three subprograms: Direct Payment, Greening, and Aid to Young Farmers. Preliminary Decision Memo at 18. Commerce also examined subsidies under CAP Pillar II. Preliminary Decision Memo at 27. However, Plaintiffs did not challenge Commerce's determination regarding the Aid to Young Farmers program nor Pillar II subsidies. See Pls.' Br. at 47–53. Thus, they will not be addressed here. All references to BPS are inclusive of the Direct Payment and Greening subprograms.

applicable to those Spanish olive growers that meet the eligibility requirements and apply for

subsidies.  European Union's CVD Questionnaire Response at 20 (September 18, 2017), P.R. 383.

Both the SPS and BPS subsidies are based on a geographical indicator system created from

information requested by the EU and provided by Spain regarding farmland productivity prior to

the implementation of those programs.  Preliminary Decision Memo at 19, 22.  During the

Common Market Program, between 1999 and 2002, Spain collected data on farmland per hectare,

the type of crop produced in each hectare, and the amount of crop each hectare produced.  Id. at

19.  For olive growers, a value per hectare was calculated depending on whether the olives were

grown for olive oil production or table olive production.  Id. at 22−23.  This value was then

multiplied by a farm's number of hectares to determine the amount of aid that the farmer would

receive.  Id. at 22.  In this way, the SPS program specifically identified certain crops and benefitted

their producers by providing individual payments based on historical reference to the value per

hectare calculated from the period of the Common Market Program.  Id. at 23; see European

Union's CVD Questionnaire Response at 12.  Put simply, the SPS program distributed subsidies

to farmers based on the type and amount of crop their land historically produced.

As the EU explained in its questionnaire response to Commerce, the SPS system was

decoupled from production of a particular crop between 2006 and 2010, when Spain began

providing subsidies to farmers regardless of the crop or amount of crop produced.  European

Union's CVD Questionnaire Response at 11–12.  The implementation of the BPS program

continued this decoupled model.  Id. at 20.  Under the EU's Council Regulation (EC) No.

1307/2013 and Spain's accompanying implementing legislation Section 6(1) of Royal Decree

1076/2014, Spain used the data previously used to create the SPS program to then create fifty

agricultural regions to facilitate payments under the new BPS program.  IDM at 33; see also Ripe

Olives from Spain: Final Affirmative Countervailing Duty Determination, 83 Fed. Reg. 28,186

(Dep't Commerce June 18, 2018), P.R. 1394 ("Final Determination"). Each region was assigned a rate based on its productive potential and its productive orientation.[8] Preliminary Decision Memo at 19. Commerce found that these regions facilitated the determination of payments distributed under BPS. IDM at 33−34.

Therefore, Commerce attributed regional variations in current BPS payments to the use of crop-specific, historic regional data originally used to calculate subsidy rates under the SPS program. See Preliminary Decision Memo at 24. Commerce summarized its finding of a chain of specificity:

> In summary, the annual grant amount provided to olive farmers under BPS is based on the annual grant amount provided to olive farmers under SPS. The grant amount provided to olive farmers under SPS is based on the average grant amount olive farmers received in 1999 through 2002 under the Common Organization of Markets in Oil program. The grant amount provided in 1999 through 2002 to eligible farmers, which included olive farmers, was based on the type of crop grown and the production value created from the crop. Therefore, the annual grant amount provided under BPS are based on annual grant amounts that were crop specific, thus the grant amounts received by olive growers under BPS in 2016 are directly related to the grant amount only olive growers received under Common Organization of Markets in Oil program. All respondents and many of the olive growers that supply them, received benefits under this program during the [period of investigation].

Id. at 24. Commerce thus determined that, under Section 1677(5A), BPS subsidy payments as provided by the EU through the Spanish government were de jure specific to olive growers because the two predecessor programs to BPS -- SPS and the Common Market Program -- calculated annual grant amounts based on the type of crop and the volume of production; those amounts provided the foundation for the current BPS subsidy determination via express reference in the current regulation. Id. at 18−27.

---

[8] "[P]roductive orientation is categorized as rainfed land, irrigated land, permanent crops, and permanent pastures. Olive groves are considered permanent crops." Preliminary Decision Memo at 19–20 (quotations omitted).

In sum, Commerce preliminarily determined that BPS subsidy payments were countervailable as a government provided financial benefit to a specific industry, here olive growers.  See id.

### B.  Commerce's Determination Under Section 1677-2

Having determined that Spain's BPS program constituted countervailable subsidies, Commerce next determined that those subsidies could be attributed to ripe olive producers. Section 1677-2 provides that Commerce may treat countervailable subsidies provided to producers of a raw agricultural product as though the subsidies have been provided to processors of the raw agricultural product, if two criteria are met.  The statute states:

> In the case of an agricultural product processed from a raw agricultural product in which –
>
> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>
> (2) the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

19 U.S.C. § 1677-2.

Commerce's investigation covered whether countervailing duties applied to the "subject merchandise," ripe olives, which Commerce defined as follows:

> The subject merchandise includes all colors of olives; all shapes and sizes of olives, whether pitted or not pitted, and whether whole, sliced, chopped, minced, wedged, broken, or otherwise reduced in size; all types of packaging, whether for consumer (retail) or institutional (food service) sale, and whether canned or packaged in glass, metal, plastic, multilayered airtight containers (including pouches), or otherwise; and all manners of preparation and preservation, whether low acid or acidified, stuffed or not stuffed, with or without flavoring and/or saline solution, and including in ambient, refrigerated, or frozen conditions.
>
> Included are all ripe olives grown, processed in whole or in part, or packaged in Spain.  Subject merchandise includes ripe olives that have been further processed

> in Spain or a third country, including but not limited to curing, fermenting, rinsing, oxidizing, pitting, slicing, chopping, segmenting, wedging, stuffing, packaging, or heat treating, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in Spain.
>
> Excluded from the scope are: (1) specialty olives (including "Spanish-style," "Sicilian-style," and other similar olives) that have been processed by fermentation only, or by being cured in an alkaline solution for not longer than 12 hours and subsequently fermented; and (2) provisionally prepared olives unsuitable for immediate consumption (currently classifiable in subheading 0711.20 of the Harmonized Tariff Schedule of the United States (HTSUS)).

Preliminary Decision Memo at 6−7.

Ripe olives are a type of processed table olive. Agro Sevilla's Affiliations Questionnaire Response at 8. Data from the Food Information and Control Agency, which is within Spain's Ministry of Agriculture, shows that of the 7.4 million tons of raw olives produced in Spain in 2016, only eight percent were used for table olives. Id. at 9. Of the 7.4 million tons of raw olives produced, only three percent were used for the subject merchandise, ripe olives. See Supplier Supplemental Response of Aceitunas Guadalquivir S.L.U. at 3 (November 8, 2017), P.R. 1057. Raw olives become ripe olives through the processing and packaging described above. See Pet. Vol. I at 7. The remaining ninety-two percent of raw olives produced in Spain are used for olive oil production. Id.

Applying both prongs of Section 1677-2, Commerce determined that demand for the prior stage product, raw olives, was substantially dependent on demand for the latter stage product, which Commerce defined as all table olives, and that the processing of raw olives into table olives added only limited value to the raw commodity. Preliminary Decision Memo at 15. In so concluding, Commerce relied on the legislative history of Section 1677-2,[9] as well as its prior

---

[9] For example, during debate over the bill, Senator Baucus explained that without Section 1677-2 "a foreign nation could avoid a U.S. countervailing duty on an agricultural product merely by doing some minor processing of the agricultural product before it is exported to the United States.

determinations,[10] to find that the term "latter stage product" is not limited to the subject merchandise of ripe olives, but rather encompasses the next-stage product of processed olives. Id. at 15.

Under Section 1677-2(1), Commerce determined that the eight percent of raw olives grown in Spain that are processed into table olives was a substantial amount and that the demand for raw olives is dependent on the demand for table olives. Id. at 16. Commerce reasoned that eight percent of raw olives in Spain were grown for the purpose of producing table olives and that if this demand were to cease, then eight percent of the market, or millions of dollars in export sales to the United States, would be negatively affected. Id. Based on this reasoning, Commerce concluded that the demand for raw olives was "substantially dependent" on the demand for table olives. Id.

Under Section 1677-2(2), Commerce determined that the three percent value in processing raw olives represented a "limited value" added to the raw commodity. Id. Although Plaintiffs submitted data in their response questionnaires that total processing costs, including packaging, equaled sixty percent of the cost of the delivered product, Commerce relied on its prior determinations on agricultural subsidies to not include packaging costs in determining the value added by processing the raw product. Id.; see also Supplier Supplemental Response of Guadalquivir at 5. Commerce also noted that regardless of the relationship between cost and value,

---

For example, a duty on raspberries could be avoided by merely freezing the raspberries before they are shipped to the United States." 133 Congressional Record S8814 (June 6, 1987) ("Statement of Senator Baucus").

[10] Specifically, Commerce referred to Live Swine and Fresh, Chilled and Frozen Pork Products from Canada; Final Affirmative Countervailing Duty Determination, 50 Fed. Reg. 25097-01 (Dep't Commerce June 17, 1985), Rice from Thailand; Final Results of Countervailing Duty Administrative Review, 51 Fed Reg. 12356 (Dep't Commerce April 10, 1986), and Rice from Thailand; Final Results of Countervailing Duty Administrative Review, 59 Fed. Reg. 8906 (Dep't Commerce Feb. 24, 1994) in making its determination. These determinations are discussed in further detail below. See Discussion, infra Sec. II. A.

the processing of raw olives to table olives did "not change the essential character of the olive" and, therefore, satisfied Section 1677-2(2).  Preliminary Decision Memo at 16.

Thus, Commerce concluded that BPS subsidies provided to Spanish olive growers could be attributed to ripe olive producers pursuant to Section 1677-2.

### C.  Commerce's Countervailing Duty Calculation

In accordance with these statutory threshold determinations, Commerce next calculated the duty rate that should apply to each producer of ripe olives as attributed recipients of countervailable subsidies.  Commerce calculates CVD rates based on the authority provided to it by 19 U.S.C. § 1671(a).  However, the statute does not specify how a CVD rate should be calculated.  Commerce thus promulgated a regulation which governs the calculation of this rate.  See 19 C.F.R. § 351.525.  Generally, Commerce "calculate[s] an CVD rate by dividing the amount of the benefit allocated to the period of investigation . . . by the sales value during the same period of the product or products to which [Commerce] attributes the subsidy under paragraph (b)."  19 C.F.R. § 351.525.

In this case, in its preliminary determination of Plaintiffs' CVD rate, Commerce attributed the subsidy in question to all raw olives.  Preliminary Determination Calculation Memoranda for Aceitunas Guadalquivir, S.L.U.; Angel Camacho Alimentacion, S.L.; and Agro Sevilla Aceitunas S.Coop. (November 20, 2017), P.R. 1109.  The equation used by Commerce is demonstrated as:

$$\frac{\text{Weighted Average Per Kilogram Benefit} \times \text{Kilograms of Raw Olives Purchased}}{\text{Sales of Olives and Olive Products}}$$

See id. at 2−3.  Applying this equation in its preliminary CVD calculation, Commerce calculated CVD rates of 2.31 percent for Guadalquivir, 2.47 percent for Agro Sevilla, 7.24 percent for Angel Camacho, and an all-others rate of 4.47 percent.  Ripe Olives From Spain: Preliminary Affirmative Countervailing Duty Determination, 82 Fed. Reg. 56,218, 56,218 (Dep't Commerce Nov. 28,

2017), P.R. 1160 ("Preliminary Determination").   In its final determination, Commerce changed

its methodology, concluding that:

> the applicability of section 771B of the Act . . . requires us to refine our
> methodology with regard to measuring the benefit provided to the production of
> subject merchandise . . . .  This methodology comports with the statutory intent set
> forth within section 701 of the Act, because we have accurately measured the
> subsidy conferred upon the subject merchandise.

IDM at 44.

Commerce changed both the numerator and the denominator of the equation in order to

reflect only purchases and sales of the subject merchandise rather than all raw olives and their

subsequent processed products.   The equation used by Commerce in its final determination is

demonstrated as:

$$\frac{\text{Weighted Average Per Kilogram Benefit} \times \text{Kilograms of Raw Olives Purchased for Subject Merchandise}}{\text{Sales of Subject Merchandise}}$$

See id.  Based on this new equation and in response to ministerial error comments, Commerce

calculated a final CVD rate of 27.02 percent for Guadalquivir, 7.52 percent for Agro Sevilla, 13.76

percent for Angel Camacho, and an all-others rate of 14.97 percent.   Amended Final Determination

at 37,470.

In calculating these rates, Commerce used data from Plaintiffs' questionnaire responses

regarding their sources of raw olives.  Preliminary Decision Memo at 17−18.  The parties dispute

whether the initial questionnaires requested data on Plaintiffs' sources of all raw olives or strictly

sources of raw olives that were processed into ripe olives.  See Pls.' Mot. for J. on Agency R. and

Supp. Opening Br. at 30, February 28, 2018, ECF No. 25 ("Pls.' Br."); Def.'s Resp. in Opp'n to

Pls.' Mot. for J. on the Agency R. at 34, ECF No. 30 ("Def.'s Br.").  The dispute arises because

Commerce used this initially requested data in the altered CVD equation it applied in the Final

Determination to calculate Plaintiffs' respective CVD rates.  One of the plaintiffs, Guadalquivir,

contends that, in contrast to the other plaintiffs, its sole submission to Commerce was data on its purchases of all raw olives and thus Commerce used an incorrect input for data on purchases of raw olives processed into ripe olives. See Pls.' Br. at 31−37. Commerce nonetheless relied on Guadalquivir's submitted data in its final CVD calculation. Amended Final Determination of Countervailing Duty Investigation Pursuant to Ministerial Error Allegation at 5 (July 12, 2018), P.R. 1406 ("Amended Final Investigation").

### D. Commerce's Investigation Results

On November 28, 2017, Commerce published its preliminary affirmative CVD determination. Preliminary Determination. Commerce determined that producers of ripe olives benefitted from the countervailable subsidies provided to growers of raw olives during the period of investigation. Preliminary Decision Memo at 1. As such, Commerce calculated preliminary CVD rates for each plaintiff. Preliminary Determination at 56,218.

On June 18, 2018, following receipt of case and rebuttal briefs submitted by interested parties, Commerce published its final CVD determination, affirming its preliminary findings. Final Determination. However, both Coalition and Plaintiffs alleged ministerial errors, which Commerce accounted for by amending the Final Determination on August 1, 2018. Amended Final Investigation; Amended Final Determination. On July 25, 2018 the ITC informed Commerce of its requisite determination of material injury to the domestic olive industry because of the subsidies provided to ripe olives imported from Spain. ITC Notification, July 25, 2018, P.R. 1415. As noted above, on August 8, 2018 Commerce then applied CVD rates of 27.02 percent for Guadalquivir, 7.52 percent for Agro Sevilla, and 13.76 percent for Angel Camacho, as well as an all-others rate of 14.97 percent. Amended Final Determination at 37,470.

Plaintiffs challenge the Amended Final Determination before the court. Compl., Sept. 28, 2018, ECF No. 7. Coalition moved for and the court granted its intervention as a defendant-

intervenor on October 17, 2018.  Consent Mot. to Intervene as Def.-Inters., ECF No. 10; Court's Order, ECF No. 14.  Plaintiffs filed a motion for judgment on the agency record on February 28, 2019.  Pls.' Br.  The Government and Coalition filed their responses on May 31, 2019.  Def.'s Br.; Def.-Inter.'s Resp. to Pls.' Mot. for J. on the Agency R., ECF No. 29 ("Def.-Inter.'s Br.").  Plaintiffs replied on July 1, 2019.  Pls.' Reply Br. in Supp. of Mot. for J. on Agency R., ECF No. 31 ("Pls.' Reply").  The court held oral argument on November 6, 2019.  ECF No. 38.

**JURISDICTION, STANDARD OF REVIEW, AND INTERPRETATIVE FRAMEWORK**

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) because the action arises from a CVD determination by Commerce.  The court reviews determinations by Commerce according to 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

"A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (citing Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

To determine whether Commerce's interpretation and application of a statute is in accordance with the law, the court must apply the two-step test laid out in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).  See also Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1329 (Fed. Cir. 2017).  Under Chevron, the court first asks "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If yes,

"that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. Deference to the agency's interpretation of a statute is only required by Chevron when that interpretation is reasonable. Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994). The court must give Chevron deference to an agency's policy changes, but if an agency changes its prior practice, it must provide an "adequate explanation" for its change or reversal of a policy. SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011). See also Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007). If Commerce's methodology is arbitrary and capricious, it is contrary to law and will be set aside. Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012). See also Shandong Rongxin Import & Export Co. v. United States, 42 CIT __, __ 331 F. Supp. 1390, 1405 (2018). "Agencies act contrary to law if decision-making is not reasoned." Burlington Truck Lines, 371 U.S. at 167−168.

## DISCUSSION

Plaintiffs moved for judgment on the agency record, arguing that: (1) Commerce improperly concluded that Spain's CAP Pillar I payments are de jure specific subsidies under Section 1677(5A), Pls.' Br. at 47; (2) Commerce improperly interpreted and applied Section 1677-2(1) in concluding that the demand for raw olives is "substantially dependent" on the demand for processed table olives, id. at 7; (3) Commerce improperly interpreted and applied Section 1677-2(2) in concluding that the processing operation that transforms raw olives into processed table olives adds only "limited value," id. at 17; (4) Commerce improperly deviated from its general attribution practice for calculating the CVD rate by attributing subsidies received by growers of raw olives to sales of ripe olives rather than to sales of raw olives, id. at 23; and (5) Commerce

improperly determined that Guadalquivir's reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives, id. at 29.

The Government responds that: (1) Commerce properly found that Spain's CAP Pillar I subsidy payments are de jure specific, Def.'s Br. at 40; (2) Commerce properly determined that Section 1677-2 applied to ripe olives from Spain, id. at 10; (3) Commerce's calculation methodology for determining the benefit attributable to Plaintiffs from subsidies provided to growers of raw olives is supported by substantial evidence on the record and in accordance with law, id. at 25; and (4) Commerce properly determined the benefit to Guadalquivir by using Guadalquivir's reported purchase volume of raw olives that were processed into ripe olives, id. at 33.

The court grants Plaintiffs' motion for judgment on the agency record with respect to two issues. First, the court holds that Commerce's conclusion that BPS subsidy payments provided by the EU and Spain are de jure specific to the olive industry has not been sufficiently explained because Commerce did not provide an interpretation of the statute in reaching its determination based on the record. Second, the court holds that Commerce applied an impermissible interpretation of the term "substantially dependent," pursuant to Section 1677-2(1), given the plain meaning and legislative history of the statute. Despite the court's decision to remand these two issues alone, the court addresses the remaining issues in the interest of judicial efficiency to ensure that Commerce makes its determination on remand consistent with the court's findings.

## I.  *Commerce's Finding That the BPS Program Constitutes De Jure Specific Subsidies Did Not Include a Reviewable Interpretation of the Statute.*

Commerce did not set forth an interpretation of Section 1677(5A) in determining that BPS subsidies to olive growers are de jure specific, and thus without more the court cannot determine whether it was supported by substantial evidence and in accordance with law. For a subsidy to be

countervailable, it must be specific under Section 1677(5A).  Under Section 1677(5A), a subsidy is de jure specific where the authority providing the subsidy "expressly limits access to the subsidy to an enterprise or industry" (emphasis added).

In determining that the subsidies at issue are de jure specific, Commerce analyzed the specificity of three separate programs -- BPS, SPS, and the Common Market Program.  In summary, Commerce determined that: (1) the Common Market Program, in place from 1999−2002, was de jure specific; (2) SPS, in place from 2003−2014, retained this specificity; and (3) BPS, in place since 2015, relied on data from both programs and as a result is also de jure specific.  See supra Background, Sec. II. A.  The Government contends that Commerce correctly determined that the subsidies were de jure specific under Section 1677(5A) to olive growers because "[t]he reliance on the annual grant amounts under the Common Market Program as a historical basis for the annual grants provided during the period of investigation results in variations in individual payments and, thus, access to the subsidies received by the olive farmers is expressly limited to olive farmers."  Def.'s Br. at 47.

Plaintiffs argue that even if BPS payments are linked to a land region and its historical production of crops, the payments are not dependent upon the production of specific crops under the present program, and thus they have been decoupled from the olive industry.  Pls.' Br. at 51–52.  Under BPS, any farmer that was entitled to payments under the Common Market Program or SPS is entitled to payments under BPS, regardless of the type of crop or volume produced.  See id.  In other words, BPS payments reflect data of a farm that grew olives from 1999−2002 and that historical data does not change even if the same farm changed the crop it grew or the amount it produced.  Plaintiffs thus argue that "[b]y definition, . . . these programs are not expressly limited to an enterprise or industry, and therefore Commerce lacks evidence to reach a finding of specificity under 19 U.S.C. § 1677(5A)(D)(i)."  Pls.' Br. at 50.  In responding to this argument,

the Government says that Commerce's determination that the subsidies were by operation of Spanish law "expressly based on the annual grant amounts provided on a de jure specific basis" is sufficient to support their conclusion.  Def.'s Br. at 47.

However, the Government fails to explain how a program expressly based on programs that limited access of payments to a specific crop is equivalent to the statement that BPS itself "expressly limit[s]" access of payments to a specific crop, as the statute requires.  See 19 U.S.C. § 1677(5A)(D)(i).  The Government merely repeats Commerce's logic in responding to Plaintiff's argument that expressly based does not equate to the statutory requirement that a subsidy be expressly limited.  See Def.'s Br. at 45–47.  Neither Commerce nor the Government provides an explanation or interpretation of the statute to support its conclusion that the BPS program is de jure specific.  Nor does the Government explain how references to past subsidy programs as part of a larger subsidy calculation satisfy the "express" requirement of the statute because neither Commerce nor the Government makes more than a conclusory statement about the application of the statute to the facts of this subsidy program.  This does not constitute a sufficient explanation of why the BPS subsidies are expressly limited as the statute requires.  Without such an explanation of Commerce's interpretation of the statute, the court cannot analyze whether Commerce made a decision supported by substantial evidence and in accordance with law.

Because Commerce did not set forth an interpretation of the statute in determining that the BPS subsidy payments are de jure specific, the court remands this determination to Commerce so that it may provide an explanation of its interpretation of the statute.

### II.  *Commerce's Application of Section 1677-2(1) Is Not in Accordance with Law and Is Arbitrary.*

The court concludes that Commerce's determination that processors of raw to ripe table olives could be attributed subsidies received by olive growers pursuant to Section 1677-2(1) is not

in accordance with law because Commerce applied an impermissible interpretation of the statutory term "substantially dependent" based on its plain language and legislative history. Furthermore, Commerce's interpretation of "substantially dependent" is arbitrary because it constitutes an unexplained and unjustified deviation from its past practice. Finally, the court dismisses count two of the complaint as waived.

### A. Commerce Applied an Impermissible Interpretation of Section 1677-2(1) in Determining That the Production of Raw Olives Is Substantially Dependent on the Production of Table Olives.

Section 1677-2(1) states the first of two requirements in determining whether countervailable subsidies apply to an agricultural product processed from a raw product: "the demand for [a] prior stage product is substantially dependent on the demand for [a] latter stage product." Under Chevron, the court must look to the "traditional tools of statutory construction" in determining the reasonableness of the agency's interpretation of the statute. Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (quoting Chevron, 467 U.S. at 843 n.9). Plaintiffs argue that the plain meaning and the legislative history of Section 1677-2(1) support their claim that Commerce applied an impermissible interpretation of the statute to its CVD determination of ripe olives. Pls.' Br. at 10–13. The court finds Plaintiffs' argument to be persuasive.

The court begins with the statute's plain meaning and, accordingly looks to the dictionary definition of "substantially" and "dependent" and the structure of the phrase where "substantially" modifies the adjective "dependent." "Substantial" is defined as "[o]f, relating to, or involving substance," "[i]mportant, essential, and material," and "[c]onsiderable in amount or value." Substantial, BLACK'S LAW DICTIONARY (10th ed. 2009). "Substantial" is also defined as "being largely but not wholly that which is specified." Substantial, MERRIAM-WEBSTER (Jan. 14, 2020, 3:30 PM), https://www.merriam-webster.com/dictionary/substantial. "Dependent" is defined as

"determined or conditioned by another: contingent" and "relying on another for support."

Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.  The plain meaning thus requires the demand for the prior stage product must be "largely, but not wholly," "contingent" on the demand for the latter stage product. See Substantial, MERRIAM-WEBSTER (Jan. 14, 2020, 3:30 PM), https://www.merriam-webster.com/dictionary/substantial; Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.   The meaning of this phrase is determined by reading the terms "substantially" and "dependent" in conjunction because "substantially" is an adverb that modifies the adjective "dependent."  The court thus concludes that an analysis of "substantially dependent" that does not link those two terms is an impermissible interpretation of the statute.

In interpreting Section 1677-2(1), Commerce did not read these two terms in conjunction, but instead separated those terms to reach its conclusion that the demand for raw olives is substantially dependent upon the demand for table olives.  Commerce found the amount of raw olives used for processing into table olives, eight percent of all raw olives, to be substantial.  Def.'s Br. at 16; Preliminary Decision Memo at 16; IDM at 21–22.  Commerce then found the demand for raw olives was dependent on the demand for table olives because eight percent of the market, or millions of dollars in export sales to the United States, depends upon the demand for table olives. Id.  Commerce's interpretation was impermissible under the plain meaning of the statute because it failed to assess whether the demand for raw olives was "substantially dependent," or "largely, but not wholly," "contingent" on the demand for table olives.  See Substantial, MERRIAM-WEBSTER (Jan. 14, 2020, 3:30 PM), https://www.merriam-webster.com/dictionary/substantial; Dependent, MERRIAM-WEBSTER (Jan. 14, 2020, 3:35 PM), https://www.merriam-webster.com/dictionary/dependent.   Under step one of Chevron, the statutory language is

unambiguous regarding the threshold of demand required to satisfy Section 1677-2(1).[11] Therefore, the court need not defer to Commerce's interpretation of the statute.

The legislative history of Section 1677-2(1) illuminates Congress's unambiguous intent for the meaning of "substantially dependent." Plaintiffs argue that the legislative history of Section 1677-2(1) is consistent with the statute's plain meaning. Pls.' Br. at 13. The court agrees. Congress enacted Section 1677-2 in response to Canadian Meat Council v. United States, in which the court held that Commerce had no statutory authority to impose CVDs on a processed agricultural product where the raw agricultural product was being subsidized.[12] 11 CIT 362, 661 F. Supp. 622 (1987), vacated on other grounds, 12 CIT 108, 680 F. Supp. 390 (1988). Plaintiffs

---

[11] Although the court finds that Section 1677-2(1) is unambiguous under Chevron step one, the court will address the Government's arguments pursuant to Chevron step two. See supra, Jurisdiction, Standard of Review, and Interpretative Framework. The Government does not cite to case law interpreting the specific statute in question but rather argues that case law supports Commerce's interpretation of the word "substantial". Def.'s Br. at 17–18 (citing Committee for Fairly Traded Venezuelan Cement v. United States, 372 F.3d 1284, 1289–1290 (Fed. Cir. 2004) ("[The word substantial] does not imply a specific number or cut-off. What may be substantial in one situation may not be in another situation. The very breadth of the term 'substantial' undercuts [Plaintiff's] argument that Congress spoke clearly in establishing a standard for the Commission's regional antidumping and countervailing duty analyses. It therefore supports the conclusion that the Commission is owed deference in its interpretation of 'substantial proportion.'")). This view of "substantial" is inapposite in light of the legislative history specific to this statute, discussed below. As such, Commerce's application of the term "substantially dependent" is not reasonable and not in accordance with law under step two of Chevron.

[12] As Senator Baucus noted:

> The court said, "If the [current] statutory approach is inadequate, it is not the role of Commerce or the court, but the Congress to remedy any deficiency." . . . The glitch must be dealt with through a floor amendment. That is why Senator Grassley and myself, with the support of Senator Pryor, are today offering an amendment to the trade bill that directs the Commerce Department to place duties on processed agricultural products if the raw agricultural product is being subsidized.

Statement of Senator Baucus.

correctly argue that the enactment of Section 1677-2 affirmed Commerce's past practice as applied in Live Swine and Fresh, Chilled and Frozen Pork Products from Canada: Final Affirmative Countervailing Duty Determination, 50 Fed. Reg. 25,097 (Dep't Commerce June 17, 1985) ("Pork from Canada 1985") and Rice from Thailand: Final Results of Countervailing Duty Administrative Review, 51 Fed. Reg. 12,356 (Dep't Commerce April 10, 1986) ("Rice from Thailand 1986"). Pls.' Br. at 13–14; see 133 Cong. Rec. S8814 (June 26, 1987).[13]    Therefore, Commerce's understanding and application of this analysis in both determinations is persuasive in understanding Congress's intent in enacting Section 1677-2.

In Pork from Canada 1985, Commerce noted that, due to the agricultural nature of the products, a distinct approach from its typical analysis of upstream manufactured products would be required to determine whether producers of processed fresh, chilled, and frozen pork from hogs could be attributed subsidies offered to Canadian hog farmers. See Pork from Canada 1985 at 25,098. Specifically, Commerce focused on two criteria: (1) "the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product" and (2) whether the processed product "contribute[s] significantly to the value" of the raw product. See id. at 25,098–99. In explaining the first criterion, Commerce stated that it would be met where "demand for the prior stage good is derived almost exclusively from the demand for the latter stage . . . ." Id. at 25,098 (emphasis added). Commerce relied on the ITC's industry analysis, which determined that producers of a raw agricultural product and producers of the processed product could be collapsed into a single industry where the raw product "enters a single continuous line of

---

[13] "[T]he Department of Commerce developed the rule codified in the proposed amendment. The rule was most recently applied in the final affirmative countervailing duty determination: [Pork from Canada 1985], and in the final affirmative countervailing duty determination and countervailing duty order: Rice from Thailand [1986] . . . ." Statement of Senator Grassley, 133 Cong. Rec. S8814 (June 26, 1987) ("Statement of Senator Grassley").

production resulting in one end product." Id. at 25,099 (internal quotations omitted). Commerce

went on to cite a decision by this court upholding an ITC finding that grape growers and wine

producers could not be combined into a single industry because grapes were not "completely

devoted to the production of the more advanced product under investigation." See id. (quoting

American Grape Growers v. United States, 9 CIT 103, 104, 604 F. Supp. 1245 (1985)). Based on

this reasoning, Commerce found in Pork from Canada 1985 that the "primary, if not the sole,

purpose of all segments of the industry in this case is to produce a single end product – pork meat."

Id.

    Prior to the enactment of Section 1677-2, Commerce also issued a final determination for

Rice from Thailand 1986, relying on the standard developed in Pork from Canada 1985. See Rice

from Thailand 1986 at 12,358. Commerce attributed subsidies for growers of paddy rice to

producers of milled rice because "[a]lmost all of the raw agricultural product, paddy rice, is

dedicated to the production of milled rice." See Rice from Thailand 1986 at 12,358. Commerce

also used the same language it used in Pork from Canada 1985 in stating that there was a "single,

continuous line of production from paddy rice to milled rice," which was offered as evidence that

the demand for milled rice is substantially dependent on the demand for paddy rice. See Rice from

Thailand 1986 at 12,358.

    The consistency in reasoning and analysis of Commerce's agricultural subsidy attributions

in Pork from Canada 1985 and Rice from Thailand 1986 is strong support for Plaintiffs' argument

that Commerce's determination that the demand for raw olives substantially depends on the

demand for table olives was not in accordance with the law enacted by Congress adopting these

two decisions. Here, eight percent of raw olives used to produce table olives cannot reasonably

be considered "[a]lmost all" of raw olives produced, see Rice from Thailand 1986 at 12,358, nor

can it be said that the demand for raw olives "is derived almost exclusively" from the demand for

table olives, see Pork from Canada 1985 at 25,098.  Therefore, in determining that the demand for

table olives was substantial and that the demand for raw olives was dependent on the demand for

table olives, Commerce impermissibly applied an interpretation of Section 1677-2(1) that deviated

from the plain language and Congress's unambiguous intent.  In short, Commerce did not act in

accordance with law.

### B. Commerce's Deviation From its Past Practice Was Arbitrary and Thus Not in Accordance with Law.

Furthermore, Commerce's interpretation and application of the term "substantially

dependent" deviated from its past practice and was arbitrary and capricious.  Commerce may

"enjoy[] wide latitude" in its application of Section 1677-2, but this discretion is not unlimited.

See Def.'s Br. at 21.  Commerce deviated from its past interpretations of Section 1677-2(1) but

failed to provide an "adequate explanation" for this deviation, and thus its treatment of similar raw

agricultural subsidy attribution was arbitrary.  See SKF USA Inc. v. United States, 263 F.3d 1369,

1382 (Fed. Cir. 2001), aff'd, 332 F.3d 1370 (Fed. Cir. 2003) ("[A]n agency action is arbitrary

when the agency offer[s] insufficient reasons for treating similar situations differently." (quoting

Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)); see also  Huzhou Muyun

Wood Co. v. United States, 42 CIT __, __, 324 F. Supp. 3d 1364, 1375 (2018), as amended (July

27, 2018).  In stating that eight percent of the market would be negatively affected if the demand

for table olives were to cease, Commerce did not explain why the olive industry should be treated

distinctly from its previous investigations into pork and rice.  See Def.'s Br. at 16.

In addition to the determinations in Pork from Canada 1985 and Rice from Thailand 1986

detailed above, Commerce made similar determinations regarding pork and rice after the

enactment of Section 1677-2.  See Fresh, Chilled, and Frozen Pork from Canada: Final Affirmative

Countervailing Duty Determination, 54 Fed. Reg. 30,774 (Dep't Commerce July 24, 1989) ("Pork

from Canada 1989"); Rice from Thailand: Final Results of Countervailing Duty Administrative Review, 59 Fed. Reg. 8,906 (Dep't Commerce Feb. 24, 1994) ("Rice from Thailand 1994"). In 1989, Commerce applied the newly enacted Section 1677-2 to the same Canadian pork industry and again determined that "the demand for live swine depends substantially upon the demand for fresh, chilled, and frozen pork" because "[s]wine producers raise most swine for slaughter[,] [p]ork constitutes the primary product of the slaughtered pig[, and] [t]hus, the demand for pork and for live swine are inextricably linked." Pork from Canada 1989 at 30,775. In 1994, Commerce published a further order on rice applying Section 1677-2 that stated "substantially all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice" in explaining its determination that the demand for paddy rice is substantially dependent upon the demand for milled rice. See Rice from Thailand 1994 at 8,909. Thus, Commerce developed a consistent practice in these decisions that it then deviated from here by concluding that the eight percent of raw Spanish olives processed into table olives constituted a substantially dependent demand upon table olives, despite not being almost exclusively, almost all, most, or substantially all the demand for raw olives. See, e.g., Ranchers-Cattlemen Action Legal Found. v. United States, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1374 (1999) ("An action . . . becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure.") (citations omitted); Huvis Corp. v. United States, 31 CIT 1803, 525 F. Supp. 2d 1370, 1378 (2007) (same) (citations omitted).

First, Commerce deviated from its past interpretation of "substantially dependent," which it previously found to include most or at least half of the demand of the raw agricultural product. See, e.g., Pork from Canada 1985; Rice from Thailand 1986; Pork from Canada 1989; Rice from Thailand 1994. Second, it is significant that there is not a "single continuous line of production"

resulting in one end product, as previously considered by Commerce in <u>Pork from Canada 1985</u> and <u>Rice from Thailand 1986</u>.  Rather there are at least two clear end products, olive oil and table olives.  Of the two, it would be more reasonable to consider the demand for raw olives to be "substantially dependent" on the demand for olive oil, constituting ninety-two percent of the demand for raw olives.  These two end products make this industry more like the grape industry under investigation in <u>American Grape Growers</u>, which Commerce relied on in formulating the substantially dependent prong later adopted by Congress.  <u>See</u> 604 F. Supp. at 1247–48 (affirming the ITC's decision not to treat the grape industry in a continuous line with the wine industry because raw grapes were used to produce both wine and fruit).

Notably, the Government relies on Commerce's analysis of Section 1677-2(1) in the Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Frozen Warmwater Shrimp from the People's Republic of China, C-570-98978 (August 19, 2013) ("Shrimp from China IDM"), where Commerce applied the same deconstructed analysis of "substantially dependent" as it did here.  In the Shrimp from China IDM, Commerce attributed subsidies provided to growers of fresh shrimp to producers of frozen shrimp, finding that 44.7 percent of fresh shrimp used for processing into frozen shrimp was "substantial" and that the demand for fresh shrimp is "dependent" on the demand for frozen shrimp.  ¶ 195.  Even considering the Shrimp from China IDM, 44.7 percent is significantly higher than eight percent; therefore, Commerce's current finding with respect to table olives cannot be considered consistent with its past determinations.

In sum, based on its previous findings of countervailable subsidies on processed products, Commerce's finding that the demand for raw olives is substantially dependent on the demand for table olives is an arbitrary deviation from its past practice and thus is not in accordance with law.

### C. Plaintiffs' Argument That Commerce Improperly Defined "Latter Stage Product" Under Section 1677-2(1) as Table Olives Is Waived as a Matter of Law.

Plaintiffs also alleged in count two of their complaint that Commerce's finding under Section 1677-2(1) that the "latter stage product" comprises all table olives is not supported by substantial evidence and is otherwise contrary to law. See Amended Compl. ¶¶ 15−17. The Government correctly argues in its responding brief that under this court's well-established law, arguments that a plaintiff does not raise in its opening brief are considered waived. See Def.'s Br. at 15 n.4 (citing SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006)). Accordingly, the court dismisses count two of the complaint.[14]

### III.    Remaining Questions

Apart from the previously discussed issues regarding the interpretation and application of Section 1677A and Section 1677-2(1), Plaintiffs raise three other questions which, while arguably could be deferred, the court now addresses in the interest of judicial and litigation economy. The court concludes the following: (A) Commerce's application of Section 1677-2(2), that processing adds only "limited value," was supported by substantial evidence on the record and in accordance with law; (B) Commerce's calculation methodology regarding the attribution of subsidy benefits to ripe olive producers was supported by substantial evidence on the record and in accordance with law and; and (C) Commerce's determination that Guadalquivir's reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives is supported by substantial evidence.

---

[14] Further, at oral argument on November 6, 2019, Plaintiffs acknowledged that they did not raise count two in its opening brief and took no issue with dismissal of the argument.

### A. Commerce's Application of Section 1677-2(2) Was Supported by Substantial Evidence and in Accordance with Law.

The court concludes that Commerce's application of Section 1677-2(2) to determine that the processing of ripe olives added only limited value to raw olives was supported by substantial evidence on the record and in accordance with law as evidenced by legislative history citing two CVD determinations issued by Commerce.

### i. Commerce Applied the Unambiguous Intent of Congress in Finding That the Processing of Ripe Olives Added Only Limited Value to Raw Olives in Accordance with Law.

After determining that the demand for raw olives was substantially dependent upon table olives under Section 1677-2(1), Commerce then concluded that the processing of raw olives into table olives added only limited value to the prior stage product under Section 1677-2(2).  IDM at 6, 22−23.  Commerce applied a permissible interpretation of Section 1677-2(2) consistent with the legislative intent behind the statute and Commerce's prior determinations on which the statute is based.  The second requirement for a finding of countervailable subsidies on processed agricultural products, codified under 19 U.S.C. § 1677-2(2), states that where an agricultural product is processed from a raw agricultural product, "the processing operation [must] add only limited value to the raw commodity . . . ."  Plaintiffs argue that Commerce's finding that processing table olives from raw olives added only limited value to ripe olives is unsupported by substantial evidence and contrary to law because (1) Commerce failed to address Plaintiffs' argument that processing changes the essential character of the raw olive and (2) Commerce failed to consider that packaging of table olives is an inherent part of processing the raw product.  Pls.' Br. at 19−23.  The Government argues that the legislative history and record evidence support Commerce's determination that processing for table olives added only limited value to the raw olive.  Def.'s Br. at 21−25.  The court agrees.

Applying <u>Chevron</u>, the court notes that the legislative history of Section 1677-2 reveals the unambiguous intent of Congress in the meaning of "limited value" under Section 1677-2(2). <u>See</u> <u>Chevron</u>, 467 U.S. at 842−43. The legislative history evidences that the purpose of the statute is to prevent a foreign nation from circumventing a CVD on an agricultural product "merely by doing some minor processing of the agricultural product before it is exported to the United States." Statement of Senator Baucus, 133 Cong. Rec. S8814 (June 26, 1987). Senator Baucus mentions pork and raspberries as two examples of this. Specifically, he states that "[h]ogs and pork are both the same product" and that the process of freezing raspberries created the "same raspberries -- they[]'re just frozen." <u>Id.</u>

Plaintiffs argue that "Commerce did little more than state that 'an olive, is an olive, is an olive.'" Pls.' Br. at 22. In fact, Commerce concluded that ripe olives "are olives when they are raw and olives when they are processed." IDM at 23. In coming to this conclusion, Commerce reasoned that the processing operations that convert raw olives into ripe olives "do not change the 'essential character' of the raw product." <u>Id.</u> Plaintiffs further argue that processing of ripe olives does change the "essential character" of raw olives because "processing renders the raw olive edible and ready for its intended use." Pls.' Br. at 22.

The court finds that this argument is without merit. As discussed above, Congress relied on Commerce's <u>Pork from Canada 1985</u> decision in enacting Section 1677-2. <u>See</u> Discussion <u>supra</u> Sec. II. A. There, Congress adopted Commerce's limited value analysis. <u>See</u> 133 Cong. Rec. S8814 (June 26, 1987). A hog is not edible until it becomes pork, yet Congress believed such processing only added limited value to the raw product. <u>See</u> 133 Cong. Rec. S8814 (June 26, 1987); <u>Pork from Canada 1985</u>. In <u>Pork from Canada 1985</u>, Commerce found that the processing of the subject merchandise, fresh, chilled pork, which consisted of "immobilizing, stunning, dehairing, eviscerating, and splitting," constituted only ten percent of the value added to the final

product. <u>Pork from Canada 1985</u> at 25,099. As such, Commerce determined that processing added only limited value to latter stage product. <u>Id.</u> Although the process in <u>Pork from Canada 1985</u> is not identical to the process of producing ripe olives from raw olives, <u>see</u> Background <u>supra</u> Sec. II, the number of steps and value added by these operations is comparable. Since Congress relied on this CVD determination in enacting 19 U.S.C. § 1677-2, the determinations indicating Commerce's prior analysis of processing operations for the purposes of Section 1677-2(2) are persuasive. Given this legislative history, Commerce's finding that the processing operations of ripe olives added only limited value to the raw product is in accordance with law.

    ii. ***Commerce Relied on Substantial Evidence in Determining That Processing of Ripe Olives Added Only Limited Value to Raw Olives.***

   Commerce's application of Section 1677-2(2) to Plaintiffs' processing operations is permissible and consistent with Commerce's prior determinations and supported by record evidence. Commerce determined that forty percent of the product value of ripe olives is attributable to the cost of the raw product, that only three percent is attributable to processing, and that the remaining fifty-seven percent is "attributable to post-processing operations, including packaging." Def.'s Br. at 23. Plaintiffs do not dispute that a total of sixty percent of the value of ripe olives is attributable to processing <u>and</u> packaging. Pls.' Br. at 20 (emphasis added). Rather, Plaintiffs argue that Commerce failed to consider that the packaging of ripe olives is an inherent part of the processing operations; however, Plaintiffs have not cited any precedent or authority that would require Commerce to make such a consideration. Pls.' Br. at 20−21. The Government points to its prior determinations to support Commerce's position that it need not consider packaging costs. <u>See</u> Def.'s Br. at 23 (citing <u>Pork from Canada 1989</u> at 30,776; <u>Rice from Thailand 1994</u> at 8,909). In neither of these determinations did Commerce consider packaging as part of the processing operations used to determine the added value to the raw product. <u>See</u> <u>Pork from</u>

<u>Canada 1989</u> at 30,775; <u>Rice from Thailand 1994</u> at 8,909. Plaintiffs, in support of their contention that packaging of ripe olives is inseparable from the processing of ripe olives, argue that "[r]ipe olives are not delivered to the consumer in a truck and then dumped at their doorstep. Packaging is an inherent part of the processed product." Pls.' Br. at 20.

Under the Plaintiffs' rationale, Commerce would have to include packaging in its analysis of value added to the raw product for every agricultural product sold. For example, pork is packaged and then sold to purchasers – the meat is not "dumped at their doorstep." <u>See</u> Pls.' Br. at 20. Yet, Commerce cannot, and did not, consider this packaging as inherent to the processing operations of pork simply because it would be inconsistent with Congress's intent.[15] See <u>Pork from Canada 1989</u> at 30,776. In excluding the fifty-seven percent of processing attributable to packaging from its analysis of value added to raw olives in the production of ripe olives, Commerce acted consistently with its prior practice. As such, Commerce's finding that three percent of added value to the raw product is considered "limited value" under Section 1677-2(2) is reasonable and supported by substantial evidence. <u>See Maverick Tube</u>, 857 F.3d at 1359; <u>Consol. Edison</u>, 305 U.S. at 217.

> ### B. Commerce's Calculation Methodology for Determining the Benefit Attributable to Plaintiffs from Subsidies Provided to Growers of Raw Olives Is Supported by Substantial Evidence and in Accordance with Law.

The court concludes that Commerce applied a permissible methodology in calculating Plaintiffs' CVD rates given its attribution of subsidies pursuant to Section 1677-2. When calculating a CVD rate, Commerce will divide the amount of benefit allocated to the period of investigation by the sales value during the same period of the product or products to which

---

[15] The legislative history of Section 1677-2 explained that countervailable duties should not be evaded "merely by changing the form of the product" by subjecting it to packing or processing, citing examples of frozen raspberries or fresh, chilled pork. <u>See</u> Statement of Senator Grassley.

Commerce attributes the subsidy. 19 C.F.R. § 351.525. In general, "if a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product." 19 C.F.R. § 351.525(b)(5)(i). Plaintiffs argue that Commerce improperly deviated from its general attribution practice for calculating the CVD rate by attributing subsidies received by growers of raw olives to sales of ripe olives rather than to sales of raw olives. Pls.' Br. at 24. The Government argues that 19 C.F.R. § 351.525 does not "strictly govern" Commerce's attribution of agricultural subsidies for the purposes of its CVD calculation because the typical attribution or "tying" rules under the regulation do not comport with the application of Section 1677-2. Def.'s Br. at 31, 33. The court agrees.

Commerce stated that its authority in selecting a calculation methodology stemmed from 19 U.S.C. § 1671, which states, "[if] the administering authority determines that the government of a country . . . is providing . . . a countervailable subsidy[,] . . . then there shall be imposed upon such merchandise a countervailing duty . . . equal to the amount of the net countervailable subsidy." IDM at 43. In order to ensure that any methodology used to determine the amount of countervailable subsidy accurately measures the subsidies conferred upon the subject merchandise, Commerce implemented attribution rules under 19 C.F.R. § 351.525. Id. However, the Government argues that "[t]he Preamble also states that [Commerce's] intent is to apply these attribution rules as harmoniously as possible, recognizing that unique and unforeseen factual situations may make complete harmony among these rules impossible." Def.'s Br. at 28 (citing IDM at 43); see also Countervailing Duties: Final Rule, 63 Fed. Reg. 65,348, 65,400 (Dep't Commerce November 25, 1998)). It is Commerce's position that the application of Section 1677-2 was a "unique factual scenario" that required a deviation from the rules of 19 C.F.R. § 351.525. Def.'s Br. 28. Specifically, neither Section 1677-2 nor 19 C.F.R. § 351.525 provided an attribution methodology for agricultural subsidies under Section 1677-2. The Government cites Solarworld

Americas, Inc. v. United States for the proposition that "'Commerce has considerable discretion

to develop a methodology' when 'neither the statute nor the regulation' dictate a methodology."

Def.'s Br. at 29 (quoting Solarworld Americas, Inc., 40 CIT __, __ 182 F. Supp. 3d 1372, 1376

(2016)). The Government further contends that Commerce's methodology was a "reasonable

means of effectuating the statutory purpose . . . ." Ceramica Regiomontana, S.A. v. United States,

10 CIT 399, 404–405 636 F. Supp. 961, 966 (1986).

Plaintiffs first argue that Commerce's reliance on 19 U.S.C. § 1671 is misplaced because

Commerce offered no explanation for why its altered methodology is more accurate than its

traditional tying practice. Pls.' Br. at 26–27. Plaintiffs state that "[h]igher subsidy margins are

not a benchmark for accuracy." Id. at 27. However, as the Government asserts, Commerce

changed both the numerator and the denominator in the final calculation to reflect "the same

universe of goods," ripe olives, in order to avoid "over- or understat[ing] the subsidy attributable

to the subject merchandise." See Def.'s Br. at 30 (quoting Certain Iron-Metal Castings from India:

Final Results of Countervailing Duty Administrative Review, 62 Fed. Reg. 32,297, 32,302 (Dep't

of Commerce June 13, 1997)). Commerce explained that by changing both the numerator and

denominator to ripe olive data, Commerce's calculation more accurately reflected subsidies

attributed to the subject merchandise pursuant to Section 1677-2. IDM at 44. The court concludes

this was a reasonable adjustment to the calculation methodology in line with the statute's purpose

of countervailing attributed subsidies.

Plaintiffs next argue that Commerce's reliance on Section 1677-2 is misplaced because the

statute does not explicitly include an attribution methodology for agricultural subsidies. Pls.' Br.

at 28. Specifically, Plaintiffs argue that nothing in the statute or the regulation, 19 C.F.R. §

351.525(b), expressly applies to agricultural subsidies. Id. The Government responds that

Commerce is entitled to deference in constructing a new methodology to calculate CVD rates for

agricultural subsidies that comports with Congress's intent. Def.'s Br. at 29. The court agrees and notes that it is precisely because the statute and regulation are silent on what methodology Commerce should use in calculating CVD rates for agricultural subsidies that Commerce has "considerable discretion" in selecting a particular methodology. See Solarworld Americas, 182 F. Supp. 3d at 1376.

In sum, Commerce's methodology for calculating the CVD rate, in this instance, by attributing subsidies received by growers of raw olives to sales of table olives is supported by substantial evidence and in accordance with law.

### C. Commerce's Determination That Guadalquivir's Reported Raw Olive Purchase Data Was Sufficiently Indicative of its Purchases of Raw Olives Used to Produce Ripe Olives Is Supported by Substantial Evidence.

Commerce acted permissibly in calculating Guadalquivir's CVD rate given the evidence on the record, which, as in all cases, Plaintiffs were responsible for providing. Commerce issued questionnaires to each Plaintiff regarding their sources of raw olives that were processed into ripe olives during the period of investigation. See, e.g., Guadalquivir Questionnaire. Commerce used the data submitted by Plaintiffs in the numerator of its calculation for the CVD rate.[16] Def.'s Br. at 36. Plaintiffs contend that the initial purchase data submitted by Guadalquivir was for all raw olives and that this data was never updated with its purchase data for only raw olives that were then processed into ripe olives. Pls.' Br. at 33–35. According to Plaintiffs, Commerce found that the original data submitted by Guadalquivir on its raw olive purchases was "indicative" of its purchases of raw olives used for production of ripe olives in the Final Determination. Pls.' Br. at 36. Plaintiffs argue that this finding is not supported by substantial evidence. Pls.' Br. at 38–46. Plaintiffs' main contentions are that (1) Commerce failed to adequately limit its request for

---

[16] The numerator referred to is the amount, in kilograms, of raw olives purchased for processing into ripe olives. See Background supra Sec. C. ii.

purchase data from Guadalquivir to raw olives used for ripe olive production; (2) Commerce failed

to give Guadalquivir notice of the data it required for its CVD calculation; and (3) Commerce's

finding that Guadalquivir's reported purchases of raw olives is indicative of its purchases of raw

olives produced into ripe olives is unreasonable.  Id.  The Government and Defendant-Intervenor

respond that Commerce made reasonable conclusions regarding data submitted by Guadalquivir

based on the evidence of record.  Def.'s Br. at 37–40; Def-Inter.'s Br. at 37–39.  The court agrees.

It is Plaintiffs' position that Commerce failed to request data from Guadalquivir on its

purchases of raw olives limited to those produced into ripe olives.  Pls.' Br. at 40.  However, the

Government is correct in its response that "Commerce has not 'hidden the ball' in this case."

Def.'s Br. at 37–38 (citing Allegheny Ludlum Corp. v. United States, 24 CIT 1424, 1443 215 F.

Supp. 2d 1322, 1339 (2000)).  In the cover letter to the initial questionnaire sent to Guadalquivir,

Commerce requested "information on [Guadalquivir's] sources of raw olives that were processed

into ripe olives during the period of investigation . . . ."  Guadalquivir Questionnaire at 1.  Plaintiffs

argue that Commerce's request regarding "sources" is not equal to a request regarding "purchases"

because supplier-specific information is not the same as use-specific information.  Pls.' Br. at 41.

The court finds this argument to be misleading because it ignores that Guadalquivir must purchase

raw olives from its sources in order to process them into ripe olives.

Plaintiffs further argue that the cover letter directed Guadalquivir to answer questions that

did not limit the raw olive data requested to only data of raw olives processed into ripe olives.  Id.

While Plaintiffs point to multiple questions from Commerce asking for data in raw olive inputs,

Plaintiffs highlight the portions of these questions that support their theory yet fail to consider the

portions in context of the whole question.  See Pls.' Br. at 30−31.  For example, Question 5 asks

that "processors" of ripe olives complete a questionnaire on their raw olive suppliers.  Guadalquivir

Questionnaire, Attach. 1 at ¶5.  Data of a ripe olive processor's raw olive suppliers inherently

refers to the purchase of raw olives for processing into ripe olives. This analysis can be applied to all the questions cited by Plaintiffs in support of their theory. See Pls.' Br. at 30–31. The cover letter and questions sent by Commerce in the initial questionnaire are sufficient evidence such that a "reasonable mind might accept as adequate" to support the Government's argument that Commerce made clear requests for data on Guadalquivir's raw olive purchases for processing into ripe olives. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison, 305 U.S. at 229 (1938)).

Next, Plaintiffs point to the Clarification Letter sent by Commerce on September 27, 2017, which requested information on volume and value of all raw olive purchases by Plaintiffs. Pls.' Br. at 42–43 (citing Clarification of the Department's September 26, 2017 Letter at 2 (September 27, 2017), P.R. 984 ("Clarification Letter")). Specifically, Plaintiffs argue that this request reflects Commerce's "original expectation" in the initial questionnaire for data regarding all raw olive sources and that, by not submitting updated responses, Guadalquivir implied that its original responses reflected data on all raw olive sources. Id. However, these contentions support the Government's argument that its request was clear from the beginning in two ways. See Def.'s Br. at 38. First, Commerce issued the Clarification Letter to receive new information on raw olive sources, regardless of the processed product for which the raw olives were used. See Clarification Letter. Commerce's original expectation is irrelevant when its revised understanding of the initial data submitted by Plaintiffs was that the original data reflected raw olive purchases used to process ripe olives. Based on this understanding, the court agrees with the Government that it is "reasonable for Commerce to find that Guadalquivir's reported purchase volume was responsive to the original questionnaire . . . ." Def.'s Br. at 39. Plaintiffs contend that Commerce failed to provide Guadalquivir with notice of what data it required in its investigation, Pls. Br. at 43, but it is Guadalquivir that "had a statutory obligation to prepare an accurate and complete record in

response to questions plainly asked by Commerce," Def.'s Br. at 38 (quoting Allegheny, 215 F. Supp. 2d at 1339−1340). Nothing in the record evidence suggests that Guadalquivir reached out to Commerce in an attempt to clarify its understanding of what data Commerce requested nor was there any reason for Commerce to believe that Guadalquivir misunderstood what data it needed to provide.

Commerce further gave Guadalquivir another opportunity to clarify the data it provided to Commerce in its initial questionnaire during Commerce's verification of Guadalquivir's responses. Verification of the Questionnaire Responses of Aceitunas Guadalquivir, S.L.U. (March 22, 2018), P.R. 1222 ("Verification"). Upon verification, Commerce "discovered a considerable volume of additional unreported olive purchases." Amended Final Investigation at 5. Guadalquivir explained this discrepancy by reminding Commerce that "[Guadalquivir] explained that because Commerce requested only purchases of ripe olives, [Guadalquivir] reported only olives purchased in acetic acid." Id.at 7.

This explanation provided by Guadalquivir itself suggests that it understood that Commerce required data on raw olives that would ultimately become ripe olives. Guadalquivir made specific distinctions in the data it reported based on whether the resulting product was subject or non-subject merchandise, which supports the Government's argument that Commerce had no reason to doubt Guadalquivir's understanding of what data Commerce required.

Plaintiff reiterates that the missing data on Guadalquivir's raw olive purchases used to process into ripe olives created a significant disparity in calculated subsidy margins. Pls.' Br. at 46. However, "[w]hen either necessary information is not available on the record or a respondent (1) withholds information that has been requested by Commerce, (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested, (3) significantly impedes an antidumping proceeding, or (4) provides information that

cannot be verified, then Commerce shall use the facts otherwise available in reaching the applicable determination." Shandong Rongxin Import & Export Co. v. United States, 43 CIT __, __ 355 F. Supp. 3d 1365, 1370 (2019) (quoting Dillinger France S.A. v. United States, 42 CIT __, __ 350 F. Supp. 3d 1349, 1356 (2018) (additional citations omitted)).(2018)).  Commerce's initial request for the parties' purchase data was clear, and Commerce provided additional opportunities in the Clarification and Verification for Guadalquivir to submit the requested data, despite Commerce not being required to do so.  See Shandong Rongxin, 355 F. Supp. 3d at 1374 (quoting ABB Inc. v. United States, 43 CIT __, __ 355 F. Supp. 3d 1206, 1222 (2019) ("Commerce is not obligated to issue a supplemental questionnaire to the effect of, 'Are you sure?'")).  Guadalquivir's continuous failure to correct its submitted data on its sources of raw olives, or to even clarify what data Commerce required gives rise to "reasonable inferences" that support the reasonableness of Commerce's conclusions.  See Matsushita Elec. Ind. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).  Given the reasoning set forth above, Commerce's finding that Guadalquivir's original reported raw olive purchase data was sufficiently indicative of its purchases of raw olives used to produce ripe olives is supported by substantial evidence.

## CONCLUSION

The court remands to Commerce for further proceedings consistent with this opinion. Specifically, the court remands to Commerce on issues of (1) Commerce's determination that the EU and Spain's subsidies to olive growers are de jure specific pursuant to Section 1677(5A); and (2) Commerce's analysis of subsidies attributed to ripe olives pursuant to Section 1677-2(1). Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>January 17, 2020</u>
          New York, New York

ADDENDUM 7



| Exporter/producer | Weighted-average dumping margins (percent) |
|---|---|
| Shanxi Guanjiaying Flange Forging Group Co., Ltd ...................... | 257.11 |
| China-wide Entity .......... | 257.11 |

## Notification to Interested Parties

This notice constitutes the antidumping duty order with respect to stainless steel flanges from China, pursuant to section 736(a) of the Act. Interested parties can find a list of antidumping duty orders currently in effect at *http://enforcement.trade.gov/stats/iastats1.html.*

This order is issued and published in accordance with section 736(a) of the Act and 19 CFR 351.211(b).

Dated: July 25, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

**Scope of the Order**

The products covered by this order are certain forged stainless steel flanges, whether unfinished, semi-finished, or finished (certain forged stainless steel flanges). Certain forged stainless steel flanges are generally manufactured to, but not limited to, the material specification of ASTM/ASME A/SA182 or comparable domestic or foreign specifications. Certain forged stainless steel flanges are made in various grades such as, but not limited to, 304, 304L, 316, and 316L (or combinations thereof). The term "stainless steel" used in this scope refers to an alloy steel containing, by actual weight, 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements.

Unfinished stainless steel flanges possess the approximate shape of finished stainless steel flanges and have not yet been machined to final specification after the initial forging or like operations. These machining processes may include, but are not limited to, boring, facing, spot facing, drilling, tapering, threading, beveling, heating, or compressing. Semi-finished stainless steel flanges are unfinished stainless steel flanges that have undergone some machining processes.

The scope includes six general types of flanges. They are: (1) Weld neck, generally used in butt-weld line connection; (2) threaded, generally used for threaded line connections; (3) slip-on, generally used to slide over pipe; (4) lap joint, generally used with stub-ends/butt-weld line connections; (5) socket weld, generally used to fit pipe into a machine recession; and (6) blind, generally used to seal off a line. The sizes and descriptions of the flanges within the scope include all pressure classes of ASME

B16.5 and range from one-half inch to twenty-four inches nominal pipe size. Specifically excluded from the scope of this order are cast stainless steel flanges. Cast stainless steel flanges generally are manufactured to specification ASTM A351.

The country of origin for certain forged stainless steel flanges, whether unfinished, semi-finished, or finished is the country where the flange was forged. Subject merchandise includes stainless steel flanges as defined above that have been further processed in a third country. The processing includes, but is not limited to, boring, facing, spot facing, drilling, tapering, threading, beveling, heating, or compressing, and/or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the stainless steel flanges.

Merchandise subject to the order is typically imported under headings 7307.21.1000 and 7307.21.5000 of the Harmonized Tariff Schedule of the United States (HTSUS). While HTSUS subheadings and ASTM specifications are provided for convenience and customs purposes, the written description of the scope is dispositive.

[FR Doc. 2018–16348 Filed 7–31–18; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–469–818]**

### Ripe Olives From Spain: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (Commerce) and the International Trade Commission (the ITC), Commerce is issuing a countervailing duty (CVD) order on ripe olives from Spain. In addition, Commerce is amending its final CVD determination with respect to ripe olives from Spain to correct ministerial errors.

**DATES:** Applicable August 1, 2018.

**FOR FURTHER INFORMATION CONTACT:** Mary Kolberg or Lana Nigro, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1785 or (202) 482–1779, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

In accordance with sections 705(a), 705(d), and 777(i)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(c), on June 18, 2018, Commerce published in the **Federal Register** an affirmative final determination in the CVD investigation of ripe olives from Spain.[1] Interested parties submitted timely filed allegations that Commerce made certain ministerial errors in the final CVD determination of ripe olives from Spain. Section 705(e) of the Act and 19 CFR 351.224(f) define ministerial errors as errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the Commerce considers ministerial. We reviewed the allegations and determined that we made certain ministerial errors. *See* "Amendment to the Final Determination" section below for further discussion.

On July 25, 2018, the ITC notified Commerce of its affirmative determination pursuant to sections 705(b)(1)(A)(i) and 705(d) of the Act, that an industry in the United States is materially injured by reason of subsidized imports of ripe olives from Spain.[2]

## Scope of the Order

The merchandise covered by this order is ripe olives from Spain. For a complete description of the scope of this order, *see* the Appendix to this notice.

## Amendment to the Final Determination

On June 19, 2018, the petitioner,[3] Aceitunas Guadalquivir S.L.U. (Aceitunas Guadalquivir), and Angel Camacho Alimentación, S.L. (Angel Camacho) timely alleged that the *Final Determination* contained certain ministerial errors and requested that Commerce correct such errors. On June 25, 2018, the petitioner filed rebuttal comments.

Commerce reviewed the record and, on July 12, 2018, agreed that certain errors referenced in the petitioner's and Angel Camacho's allegations constitute ministerial errors within the meaning of section 705(e) of the Act and 19 CFR

---

[1] *See Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination,* 83 FR 28186 (June 18, 2018) (*Final Determination*) and accompanying Issues and Decision Memorandum.

[2] *See* Letter from the ITC to Commerce, dated July 25, 2018; *see also Ripe Olives from Spain* (Investigation Nos. 701–TA–582 and 731–TA–1377 (Final), USITC Publication 4805, July 2018).

[3] The petitioner to this investigation is the Coalition for Fair Trade in Ripe Olives, whose individual member are BellCarter Foods, Inc. and Musco Family Olive Co.

351.224(f).[4] Commerce did not agree that the error alleged in Aceitunas Guadalquivir's submission constituted a ministerial error. Commerce found that it made errors in calculating Angel Camacho's benefit under the European Union Common Agricultural Policy Pillar I: Basic Payment Scheme—Greening program, and in attributing to Angel Camacho subsidies received by its cross-owned input suppliers.[5] Pursuant to 19 CFR 351.224(e), Commerce is amending the *Final Determination* to reflect the correction of the ministerial errors described above. Based on our correction of the ministerial errors in Angel Camacho's calculation, the subsidy rate for Angel Camacho increased from 13.22 percent *ad valorem* to 13.76 percent *ad valorem*.[6] Because in the *Final Determination* we based the "all-others" rate, in part, on Angel Camacho's *ad valorem* subsidy rate,[7] the correction described above also required that we recalculate the "all-others" rate. This recalculation increases the "all-others" rate determined in the *Final Determination* from 14.75 percent *ad valorem* to 14.97 percent *ad valorem*.[8]

### Countervailing Duty Order

On July 25, 2018, in accordance with sections 705(b)(1)(A)(i) and 705(d) of the Act, the ITC notified Commerce of its final determination in this investigation, in which it found that an industry in the United States is materially injured by reason of subsidized imports of ripe olives from Spain. Therefore, in accordance with section 705(c)(2) of the Act, we are issuing this CVD order. Because the ITC determined that imports of ripe olives from Spain are materially injuring a U.S. industry, unliquidated entries of such merchandise from Spain, entered or withdrawn from warehouse for consumption, are subject to the assessment of countervailing duties.

Therefore, in accordance with section 706(a) of the Act, Commerce will direct United States Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, countervailing duties equal to the net countervailable subsidy rates, for all relevant entries of ripe olives from Spain. Upon further instruction by Commerce, countervailing duties will be assessed on unliquidated entries of ripe olives from Spain entered, or withdrawn from warehouse, for consumption on or after November 28, 2017, the date of publication of the *Preliminary Determination*.[9]

### Cash Deposits and Suspension of Liquidation

In accordance with section 706 of the Act, we will instruct CBP to suspend liquidation on all relevant entries of ripe olives from Spain, as further described below. These instructions suspending liquidation will remain in effect until further notice. Commerce will also instruct CBP to require cash deposits equal to the amounts as indicated below. Accordingly, effective on the date of publication of the ITC's final affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the subsidy rates listed below.[10] The all-others rate applies to all producers or exporters not specifically listed, as appropriate.

| Company | Subsidy rate (%) |
|---|---|
| Aceitunas Guadalquivir S.L.U[11] | 27.02 |
| Agro Sevilla Aceitunas S.Coop.And | 7.52 |
| Angel Camacho Alimentación, S.L[12] | 13.76 |
| All-Others | 14.97 |

### Provisional Measures

Section 703(d) of the Act states that the suspension of liquidation pursuant to an affirmative preliminary CVD determination may not remain in effect for more than four months. In the underlying investigation, Commerce published the *Preliminary Determination* on November 28, 2017. Therefore, the four-month period beginning on the date of the publication of the *Preliminary Determination* ended on March 27, 2018, the final day on which provisional measures were in effect. Furthermore, section 707(b) of the Act states that definitive duties are to begin on the date of publication of the ITC's final injury determination. Therefore, in accordance with section 703(d) of the Act and our practice, we instructed CBP to terminate the suspension of liquidation of and to liquidate, without regard to duties, unliquidated entries of ripe olives from Spain made on or after March 28, 2018. Suspension of liquidation will resume on the date of publication of the ITC's final determination in the **Federal Register**.

### Notification to Interested Parties

This notice constitutes the CVD order with respect to ripe olives from Spain pursuant to section 706(a) of the Act.

Interested parties can find a list of CVD orders currently in effect at *http://enforcement.trade.gov/stats/iastats1.html.*

This order and amended final determination are published in accordance with section 705(d)–(e), 706(a), and 777(i)(1) of the Act and 19 CFR 351.211(b).

---

[4] *See* Memorandum, "Ripe Olives from Spain: Amended Final Determination of Countervailing Duty Investigation Pursuant to Ministerial Error Allegation," dated July 12, 2018 (Ministerial Error Memorandum).

[5] *Id.*

[6] *Id.*

[7] *Final Determination,* 83 FR at 28187.

[8] *See* Ministerial Error Memorandum.

[9] *See Ripe Olives from Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,* 82 FR 56218 (November 28, 2017) (*Preliminary Determination*) and accompanying Preliminary Decision Memorandum (Preliminary Decision Memorandum). However, as described further below, entries that occurred after the final day on which provisional measures were in effect, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**, are not subject to countervailing duties.

[10] *See* section 706(a)(3) of the Act.

[11] Commerce found the following companies to be cross-owned with Aceitunas Guadalquivir S.L.U.: Coromar Inv., S.L., AG Explotaciones Agricolas, S.L.U., and Grupo Aceitunas Guadalquivir, S.L. *See* Preliminary Decision Memorandum at 9, unchanged in *Final Determination.*

[12] Commerce found the following companies to be cross-owned with Angel Camacho Alimentación, S.L.: Grupo Angel Camacho Alimentación, S.L.: Cuarterola S.L., and Cucanoche S.L. *See* Preliminary Decision Memorandum at 11, unchanged in *Final Determination.*

Dated: July 25, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**Scope of the Order**

The products covered by this order are certain processed olives, usually referred to as "ripe olives." The subject merchandise includes all colors of olives; all shapes and sizes of olives, whether pitted or not pitted, and whether whole, sliced, chopped, minced, wedged, broken, or otherwise reduced in size; all types of packaging, whether for consumer (retail) or institutional (food service) sale, and whether canned or packaged in glass, metal, plastic, multilayered airtight containers (including pouches), or otherwise; and all manners of preparation and preservation, whether low acid or acidified, stuffed or not stuffed, with or without flavoring and/or saline solution, and including in ambient, refrigerated, or frozen conditions.

Included are all ripe olives grown, processed in whole or in part, or packaged in Spain. Subject merchandise includes ripe olives that have been further processed in Spain or a third country, including but not limited to curing, fermenting, rinsing, oxidizing, pitting, slicing, chopping, segmenting, wedging, stuffing, packaging, or heat treating, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in Spain.

Subject merchandise includes ripe olives that otherwise meet the definition above that are packaged together with non-subject products, where the smallest individual packaging unit (*e.g.,* can, pouch, jar, etc.) of any such product—regardless of whether the smallest unit of packaging is included in a larger packaging unit (*e.g.,* display case, etc.)—contains a majority (*i.e.,* more than 50 percent) of ripe olives by net drained weight. The scope does not include the non-subject components of such product.

Excluded from the scope are: (1) Specialty olives [13] (including "Spanish-style,"

[13] Some of the major types of specialty olives and their curing methods are:

• "Spanish-style" green olives: Spanish-style green olives have a mildly salty, slightly bitter taste, and are usually pitted and stuffed. This style of olive is primarily produced in Spain and can be made from various olive varieties. Most are stuffed with pimento; other popular stuffings are jalapeno, garlic, and cheese. The raw olives that are used to produce Spanish-style green olives are picked while they are unripe, after which they are submerged in an alkaline solution for typically less than a day to partially remove their bitterness, rinsed, and fermented in a strong salt brine, giving them their characteristic flavor.

• "Sicilian-style" green olives: Sicilian-style olives are large, firm green olives with a natural bitter and savory flavor. This style of olive is produced in small quantities in the United States using a Sevillano variety of olive and harvested green with a firm texture. Sicilian-style olives are processed using a brine-cured method, and undergo

"Sicilian-style," and other similar olives) that have been processed by fermentation only, or by being cured in an alkaline solution for not longer than 12 hours and subsequently fermented; and (2) provisionally prepared olives unsuitable for immediate consumption (currently classifiable in subheading 0711.20 of the Harmonized Tariff Schedule of the United States (HTSUS)).

The merchandise subject to this order is currently classifiable under subheadings 2005.70.0230, 2005.70.0260, 2005.70.0430, 2005.70.0460, 2005.70.5030, 2005.70.5060, 2005.70.6020, 2005.70.6030, 2005.70.6050, 2005.70.6060, 2005.70.6070, 2005.70.7000, 2005.70.7510, 2005.70.7515, 2005.70.7520, and 2005.70.7525 HTSUS. Subject merchandise may also be imported under subheadings 2005.70.0600, 2005.70.0800, 2005.70.1200, 2005.70.1600, 2005.70.1800, 2005.70.2300, 2005.70.2510, 2005.70.2520, 2005.70.2530, 2005.70.2540, 2005.70.2550, 2005.70.2560, 2005.70.9100, 2005.70.9300, and 2005.70.9700. Although HTSUS subheadings are provided for convenience and U.S. Customs purposes, they do not define the scope of the order; rather, the written description of the subject merchandise is dispositive.

[FR Doc. 2018–16449 Filed 7–31–18; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–580–839]**

**Polyester Staple Fiber From the Republic of Korea: Rescission of Antidumping Duty Administrative Review; 2017–2018**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) is rescinding the administrative review of the antidumping duty order on polyester staple fiber (PSF) from the Republic of Korea (Korea), based on the timely withdrawal of requests for review. The period of review (POR) is May 1, 2017, through April 30, 2018.

**DATES:** Applicable August 1, 2018.

**FOR FURTHER INFORMATION CONTACT:** Robert Brown, AD/CVD Operations, Office I, Enforcement and Compliance,

a full fermentation in a salt and lactic acid brine for 4 to 9 months. These olives may be sold whole unpitted, pitted, or stuffed.

• "Kalamata" olives: Kalamata olives are slightly curved in shape, tender in texture, and purple in color, and have a rich natural tangy and savory flavor. This style of olive is produced in Greece using a Kalamata variety olive. The olives are harvested after they are fully ripened on the tree, and typically use a brine-cured fermentation method over 4 to 9 months in a salt brine.

• Other specialty olives in a full range of colors, sizes, and origins, typically fermented in a salt brine for 3 months or more.

International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3702.

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 1, 2018, Commerce published a notice of opportunity to request an administrative review of the antidumping duty order on PSF from Korea for the POR of May 1, 2017, through April 30, 2018.[1] On May 31, 2018, pursuant to 19 CFR 351.213, Commerce received a timely-filed request from DAK Americas LLC and Auriga Polymers, Inc. (collectively, the petitioners) for an administrative review of, among others, Huvis Corporation (Huvis).[2] Also on May 31, 2018, Huvis Corporation (Huvis) requested an administrative review of its POR sales.[3] On July 12, 2018, in accordance with 19 CFR 351.221(c)(1)(i), Commerce published a notice of initiation of an administrative review of Huvis.[4] On July 17 and 18, 2018, respectively, pursuant to 19 CFR 351.213(d)(1), both the petitioners and Huvis timely withdrew their requests for an administrative review of Huvis.[5]

**Rescission of Review**

Pursuant to 19 CFR 351.213(d)(l), Commerce will rescind an administrative review, in whole or in part, if the party, or parties, that requested a review withdraw(s) the request(s) within 90 days of the publication date of the notice of initiation of the requested review. As noted above, both the petitioners and Huvis withdrew their requests for review of Huvis within 90 days of the publication date of the notice of

[1] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 83 FR 19047 (May 1, 2018).

[2] *See* Letter from the petitioners, "Polyester Staple Fiber from Korea—Request for Annual Administrative Review" (May 31, 2018). The petitioners also requested an administrative review of Toray Chemical Korea, Inc. (Toray). However, the petitioners withdrew their request for Toray before the review was initiated. *See* Letter from the petitioners, "Polyester Staple Fiber from Korea—Withdrawal of Review Request for Toray Chemical Korea" (June 26, 2018). Thus, a review was not initiated for Toray.

[3] *See* Letter from Huvis, "Certain Polyester Staple Fiber from Korea; Request for Administrative Review for 2017–2018 Period" (May 31, 2018).

[4] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 83 FR 32270 (July 12, 2018) (Notice of Initiation).

[5] *See* Letter from the petitioners, "Polyester Staple Fiber from Korea—Withdrawal of Review Request for Huvis Corporation" (July 17, 2018); *see also* Letter from Huvis, "Certain Polyester Staple Fiber from Korea; Withdrawal of Request for Administrative Review for 2017–2018 Period" (July 18, 2018).

ADDENDUM 8

Case: 23-1162    Document: 13    Page: 351    Filed: 01/17/2023

**28186**    Barcode:3719087-01 C-469-818 INV - Investigation -
**Federal Register**/ Vol. 83, No. 117 / Monday, June 18, 2018 / Notices

(FACA), that a meeting of the Maryland Advisory Committee to the Commission will convene by conference call at 11:00 a.m. (EDT) on Thursday, July 12, 2018. The purpose of the meeting is to continue discussion of speaker selection and logistics for the August briefing on education disparity.

**DATES:** Thursday, July 12, 2018, at 11:00 a.m. (EDT).

Public Call-In Information: Conference call-in number: 1–877–741–4240 and conference ID: 4020227.

**FOR FURTHER INFORMATION CONTACT:** Evelyn Bohor at *ero@usccr.gov* or by phone at 202–376–7533.

**SUPPLEMENTARY INFORMATION:** Interested members of the public may listen to the discussion by calling the following toll-free conference call-in number: 1–877–741–4240 and conference ID: 4020227. Please be advised that before placing them into the conference call, the conference call operator will ask callers to provide their names, their organizational affiliations (if any), and email addresses (so that callers may be notified of future meetings). Callers can expect to incur charges for calls they initiate over wireless lines, and the Commission will not refund any incurred charges. Callers will incur no charge for calls they initiate over land-line connections to the toll-free conference call-in number.

Persons with hearing impairments may also follow the discussion by first calling the Federal Relay Service at 1–800–877–8339 and providing the operator with the toll-free conference call-in number: 1–877–741–4240 and conference ID: 4020227.

Members of the public are invited to make statements during the open comment period of the meeting or submit written comments. The comments must be received in the regional office approximately 30 days after each scheduled meeting. Written comments may be mailed to the Eastern Regional Office, U.S. Commission on Civil Rights, 1331 Pennsylvania Avenue, Suite 1150, Washington, DC 20425, faxed to (202) 376–7548, or emailed to Evelyn Bohor at *ero@usccr.gov*. Persons who desire additional information may contact the Eastern Regional Office at (202) 376–7533.

Records and documents discussed during the meeting will be available for public viewing as they become available at *https://facadatabase.gov/committee/meetings.aspx?cid=253,* click the "Meeting Details" and "Documents" links. Records generated from this meeting may also be inspected and reproduced at the Eastern Regional Office, as they become available, both before and after the meetings. Persons interested in the work of this advisory committee are advised to go to the Commission's website, *www.usccr.gov,* or to contact the Eastern Regional Office at the above phone numbers, email or street address.

## Agenda

*Thursday, July 12, 2018 at 11:00 a.m. (EDT)*

- Rollcall
- Planning Meeting to Discuss Speaker Selection and Logistics for August Briefing
- Other Business
- Open Comment
- Adjourn

Dated: June 12, 2018.

**David Mussatt,**

*Supervisory Chief, Regional Programs Unit.*

[FR Doc. 2018–12917 Filed 6–15–18; 8:45 am]

**BILLING CODE P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–469–818]**

### Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of ripe olives from Spain. The period of investigation (POI) is January 1, 2016, through December 31, 2016.

**DATES:** Applicable June 18, 2018.

**FOR FURTHER INFORMATION CONTACT:** Mary Kolberg or Lana Nigro, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1785, or (202) 482–1779, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 28, 2017, Commerce published the *Preliminary Determination* of this countervailing duty investigation, as provided by section 705 of the Tariff Act of 1930, as amended (the Act), in which Commerce found that countervailable subsidies are being provided to producers and exporters of ripe olives from Spain.[1] A summary of the events that have occurred since Commerce published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum which is hereby adopted by this notice.[2]

### Scope of the Investigation

The product covered by this investigation is ripe olives from Spain. For a complete description of the scope of this investigation, *see* Appendix I.

### Scope Comments

In accordance with the preamble to Commerce's regulations,[3] the *Initiation Notice* set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope). No interested party commented on the scope of the investigation as it appeared in the *Initiation Notice* during the scope comment period.[4] For the *Preliminary Determination,* Commerce did not modify the scope language as it appeared in the *Initiation Notice.* However, the issue of cocktail mixes arose in the context of the companion antidumping duty (AD) investigation on ripe olives from Spain. In the April 3, 2018, post-preliminary we issued with respect to the scope of the investigation, we found that: (i) Ripe olives contained in cocktail mixes are in the scope, but that the remaining ingredients are not in the scope, and (ii) we clarified the scope by adding language concerning ripe olives contained in cocktail mixes.[5] As a result of our analysis of comments received in response to this post-preliminary analysis, we have modified the scope of this investigation for this final determination. For a summary of the product coverage comments and rebuttal responses submitted to the record for this final determination, and accompanying discussion and analysis

---

[1] *See Ripe Olives from Spain: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination,* 82 FR 56218 (November 28, 2017) and accompanying Preliminary Decision Memorandum (Preliminary Decision Memorandum) (collectively, *Preliminary Determination).*

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination for Ripe Olives from Spain," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[4] *See Ripe Olives from Spain: Initiation of Countervailing Duty Investigation,* 82 FR 33050 (July 19, 2017) (*Initiation Notice*).

[5] *See* Memorandum, "Ripe Olives from Spain: Post-Preliminary Scope Clarification Decision Memorandum," dated April 3, 2018.

of all comments timely received, *see* the Issues and Decision Memorandum.[6]

## Methodology

Commerce is conducting this CVD investigation in accordance with section 701 of the Act. For each of the subsidy programs found to be countervailable, we determine that there is a subsidy (*i.e.,* a financial contribution by an ''authority'' that gives rise to a benefit to the recipient) and that the subsidy is specific. For a full description of the methodology underlying our final determination, *see* the Issues and Decisions Memorandum.

## Verification

As provided in section 782(i) of the Act, in February and March 2018, we conducted verification of the information submitted by the European Commission, the Government of Spain, and the mandatory respondents Aceitunas Guadalquivir S.L. (AG), Agro Sevilla Aceitunas S.COOP.And. (Agro Sevilla) and Angel Camacho Alimentacion S.L. (Camacho) for use in Commerce's final determination. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by the respondents.

## Analysis of Comments Received

The subsidies programs under investigation and all issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of these issues is attached to this notice as Appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov,* and to all parties in the Central Records Unit, room B8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/.*

## Adverse Facts Available

If necessary information is not available on the record, or an interested party withholds information, fails to provide requested information in a timely manner, significantly impedes a proceeding by not providing

information, or information provided cannot be verified, Commerce will apply facts available, pursuant to section 776(a)(1) and (2) of the Act. For purposes of this final determination, Commerce relied, in part, on facts available and, because certain respondents did not cooperate by not acting to the best of their ability to respond to the Commerce's requests for information, we drew an adverse inference, where appropriate, in selecting from among the facts otherwise available.[7] A full discussion of our decision to rely on adverse facts available is presented in the ''Application of Facts Otherwise Available and Use of Adverse Inferences'' section of the Issues and Decision Memorandum.

## Changes Since the Preliminary Determination

Based on Commerce's analysis of the comments received and its findings at verification, Commerce made certain changes to the subsidy rate calculations for AG, Agro Sevilla and Camacho.[8] In addition, Commerce revised the subsidy rate calculations for the respondents to reflect the reliance on partial facts available with an adverse inference pursuant to section 776(b) of the Act. Because of these changes to the estimated subsidy rate for each mandatory respondent we have also revised the subsidy rate applicable to all other prrroducers and exporters (the all-others rate).

## All-Others Rate

Section 705(c)(5)(A) of the Act provides that in the final determination, Commerce shall determine an estimated subsidy rate for all exporters or producers not individually examined. This rate shall be an amount equal to the weighted average of the estimated subsidy rates established for those exporters and producers individually examined, excluding any zero and *de minimis* countervailable subsidy rates, and any rates based entirely under section 776 of the Act. In this investigation, we calculated individually estimated countervailable subsidy rates for AG, Agro Sevilla and Camacho, that are not zero, *de minimis,* or based entirely on facts otherwise available. Because there are three estimated subsidy rates available and doing so would not reveal business proprietary information, we calculated

the all-others rate using a weighted-average of the individually estimated subsidy rates calculated for the examined respondents using each respondent's business proprietary data for the merchandise under consideration.[9]

## Final Determination

We determine that the following estimated countervailable subsidy rates exist:

| Exporter/producer | Subsidy rate (percent) |
|---|---|
| Aceitunas Guadalquivir S.L.[10] .... | 27.02 |
| Agro Sevilla Aceitunas S.COOP.And.[11] ...................... | 7.52 |
| Angel Camacho Alimentacion S.L. ...................................... | 13.22 |
| All-Others ................................... | 14.75 |

## Disclosure

We intend to disclose to interested parties the calculations and analysis performed in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

## Suspension of Liquidation

As a result of our *Preliminary Determination,* and pursuant to sections 703(d)(1)(B) and (2) of the Act, we instructed U.S. Customs and Border Protection (CBP) to suspend liquidation of all entries of merchandise under consideration from Spain that were entered or withdrawn from warehouse, for consumption, on or after November 28, 2017, the date of publication of the *Preliminary Determination* in the **Federal Register.** In accordance with section 703(d) of the Act, effective March 28, 2018, we instructed CBP to discontinue the suspension of liquidation of all entries at that time, but to continue the suspension of liquidation of all entries between November 28, 2017, and March 27, 2018.

If the U.S. International Trade Commission (ITC) makes a final affirmative injury determination we will issue a CVD order, reinstate the

---

[6] *See* Issues and Decision Memorandum at Comment 30.

[7] *See* sections 776(a) and (b) of the Act.

[8] *See* the ''Discussion of the Issues'' section of the Issues and Decision Memorandum and the company-specific analysis memoranda dated concurrently with, and hereby incorporated by, this notice.

[9] For a complete analysis of the data, s*ee* Memorandum, ''Countervailing Duty Investigation of Ripe Olives form Spain: Calculation of the All-Others Calculation Rate for the Final Determination,'' dated concurrently with this notice.

[10] In the companion AD investigation, this company's name is spelled as Aceitunas Guadalquivir S.L.

[11] In the companion AD investigation, this company's name is spelled as Agro Sevilla Aceitunas S.Coop Andalusia.

suspension of liquidation under section 706(a) of the Act, and require a cash deposit of estimated CVDs for such entries of subject merchandise in the amounts indicated above. If the ITC determines that material injury or threat of material injury does not exist, the proceeding will be terminated and all estimated duties deposited as a result of the suspension of liquidation will be refunded or cancelled.

## International Trade Commission Notification

In accordance with section 705(d) of the Act, Commerce will notify the ITC of its final determination. Because the final determination in this proceeding is affirmative, in accordance with section 705(b)(2)(B) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of ripe olives from Spain no later than 45 days after Commerce's final determination.

## Notification to Interested Parties

This notice serves as a reminder to parties subject to an administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a violation subject to sanction.

This determination and this notice are issued and published pursuant to sections 705(d) and 777(i)(1) of the Act.

Dated: June 11, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix I—Scope of the Investigation

The products covered by this investigation are certain processed olives, usually referred to as "ripe olives." The subject merchandise includes all colors of olives; all shapes and sizes of olives, whether pitted or not pitted, and whether whole, sliced, chopped, minced, wedged, broken, or otherwise reduced in size; all types of packaging, whether for consumer (retail) or institutional (food service) sale, and whether canned or packaged in glass, metal, plastic, multilayered airtight containers (including pouches), or otherwise; and all manners of preparation and preservation, whether low acid or acidified, stuffed or not stuffed, with or without flavoring and/or saline solution,

and including in ambient, refrigerated, or frozen conditions.

Included are all ripe olives grown, processed in whole or in part, or packaged in Spain. Subject merchandise includes ripe olives that have been further processed in Spain or a third country, including but not limited to curing, fermenting, rinsing, oxidizing, pitting, slicing, chopping, segmenting, wedging, stuffing, packaging, or heat treating, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in Spain.

Subject merchandise includes ripe olives that otherwise meet the definition above that are packaged together with non-subject products, where the smallest individual packaging unit (*e.g.*, can, pouch, jar, etc.) of any such product—regardless of whether the smallest unit of packaging is included in a larger packaging unit (*e.g.*, display case, etc.)—contains a majority (*i.e.*, more than 50 percent) of ripe olives by net drained weight. The scope does not include the non-subject components of such product.

Excluded from the scope are: (1) Specialty olives[12] (including "Spanish-style," "Sicilian-style," and other similar olives) that have been processed by fermentation only, or by being cured in an alkaline solution for not longer than 12 hours and subsequently fermented; and (2) provisionally prepared olives unsuitable for immediate consumption (currently classifiable in subheading 0711.20 of the Harmonized Tariff Schedule of the United States (HTSUS)).

The merchandise subject to this investigation is currently classifiable under subheadings 2005.70.0230, 2005.70.0260, 2005.70.0430, 2005.70.0460, 2005.70.5030, 2005.70.5060, 2005.70.6020, 2005.70.6030, 2005.70.6050, 2005.70.6060, 2005.70.6070,

---

[12] Some of the major types of specialty olives and their curing methods are:

• "Spanish-style" green olives: Spanish-style green olives have a mildly salty, slightly bitter taste, and are usually pitted and stuffed. This style of olive is primarily produced in Spain and can be made from various olive varieties. Most are stuffed with pimento; other popular stuffings are jalapeno, garlic, and cheese. The raw olives that are used to produce Spanish-style green olives are picked while they are unripe, after which they are submerged in an alkaline solution for typically less than a day to partially remove their bitterness, rinsed, and fermented in a strong salt brine, giving them their characteristic flavor.

• "Sicilian-style" green olives: Sicilian-style olives are large, firm green olives with a natural bitter and savory flavor. This style of olive is produced in small quantities in the United States using a Sevillano variety of olive and harvested green with a firm texture. Sicilian-style olives are processed using a brine-cured method, and undergo a full fermentation in a salt and lactic acid brine for 4 to 9 months. These olives may be sold whole unpitted, pitted, or stuffed.

• "Kalamata" olives: Kalamata olives are slightly curved in shape, tender in texture, and purple in color, and have a rich natural tangy and savory flavor. This style of olive is produced in Greece using a Kalamata variety olive. The olives are harvested after they are fully ripened on the tree, and typically use a brine-cured fermentation method over 4 to 9 months in a salt brine.

• Other specialty olives in a full range of colors, sizes, and origins, typically fermented in a salt brine for 3 months or more.

---

2005.70.7000, 2005.70.7510, 2005.70.7515, 2005.70.7520, and 2005.70.7525 HTSUS. Subject merchandise may also be imported under subheadings 2005.70.0600, 2005.70.0800, 2005.70.1200, 2005.70.1600, 2005.70.1800, 2005.70.2300, 2005.70.2510, 2005.70.2520, 2005.70.2530, 2005.70.2540, 2005.70.2550, 2005.70.2560, 2005.70.9100, 2005.70.9300, and 2005.70.9700. Although HTSUS subheadings are provided for convenience and US Customs purposes, they do not define the scope of the investigation; rather, the written description of the subject merchandise is dispositive.

## Appendix II—List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Investigation
IV. Scope Comments
V. Subsidies Valuation
VI. Loan Interest Rate Benchmarks and Discount Rates
VII. Application of Facts Otherwise Available and Use of Adverse Inference
VIII. Analysis of Programs
IX. Discussion of the Issues
  Comment 1: Whether Section 771B of the Act is Applicable in This Investigation
  Comment 2: Whether a Pass-Through Analysis is Required
  Comment 3: Whether the EU CAP Pillar I –BPS, SPS, and Greening Programs are Countervailable
  Comment 4: Whether EU CAP Pillar II Agricultural Fund for Rural Development is Specific
  Comment 5: Whether Commerce Should AFA to the Non-Cooperating Growers
  Comment 6: Whether Commerce used the Correct Calculation Methodology to Measure Subsides Received by the Respondents
  Comment 7: Whether Commerce Should Remove Non-Growers and Adjust the Calculation of Benefits to Exclude the Olive Volume of Non-Producing Suppliers
  Comment 8: Whether Commerce Should Apply AFA to Agro Sevilla Regarding Cross-Ownership with its First-Tier Suppliers
  Comment 9: Whether Grant Funding Sourced From the ERDF is Regionally Specific
  Comment 10: Whether the EU Sustainable Energy Development of Andalusia Scheme Program is Specific
  Comment 11: Whether the PROSOL Program is Specific
  Comment 12: Whether the EU Regional Development Fund and IDEA Program is Specific
  Comment 13: Whether the EU Environment and Climate Action (LIFE) Program is Specific
  Comment 14: Whether the SAIS Program is Specific
  Comment 15: Whether Financing Sourced from the Spanish Official Credit Institute (ICO) is Countervailable
  Comment 16: Whether Commerce Should Adjust the Interest Rate Used in Certain

Long-Term ICO Financing to Angel Camacho

Comment 17: Whether Commerce Should Adjust the Calculation of European Investment Bank (EIB) Financing Received by Agro Sevilla

Comment 18: Whether To Apply AFA to the CDTI Program

Comment 19: Whether the CDTI Program is Export Specific

Comment 20: Whether Commerce Should Apply AFA to Angel Camacho's Unreported Grant Presented at Verification

Comment 21: Whether Commerce Should Rely on ''Unverified'' Information

Comment 22: Whether Commerce Should Adjust the Volume of Raw Olives Purchased to Account for Waste Loss

Comment 23: Whether Commerce Should Accept Rejected Submission from the GOS and the Respondents

Comment 24: Comments on the Verification Reports

Comment 26: Whether Commerce's Conduct in This Investigation Meets the Requirements of the ASCM

Comment 26: Whether Other Discovered Subsidies Should be Included in this Investigation and Whether Other Assistance Can Form the Basis for Applying AFA

Comment 27: Whether Commerce Should Include the Corrections of the Alleged Ministerial Errors

Comment 28: Commerce Must Use Corrected and Revised Data in the Calculations

Comment 29: Whether To Clarify the Scope of the Investigation to Include Ripe Olives Contained in Cocktail Mixes

Comment 30: The Product to Which the Countervailing Duty Applies

X. Recommendation

[FR Doc. 2018–12990 Filed 6–15–18; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

[C–570–087]

**Steel Propane Cylinders From the People's Republic of China: Initiation of Countervailing Duty Investigation**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable June 11, 2018.

**FOR FURTHER INFORMATION CONTACT:** Samuel Brummitt, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone (202) 482–7851.

**SUPPLEMENTARY INFORMATION:**

### The Petition

On May 22, 2018, the U.S. Department of Commerce (Commerce) received a countervailing duty (CVD) petition concerning imports of steel propane cylinders from the People's Republic of China (China), and antidumping duty (AD) petitions concerning imports of steel propane cylinders from China, Taiwan, and Thailand filed in proper form on behalf of Worthington Industries and Manchester Tank & Equipment Co. (the petitioners).[1] The petitioners are domestic producers of steel propane cylinders.[2]

The petitioners amended the scope of the petitioners on May 24, 2018.[3] On May 25, 2018, Commerce requested supplemental information pertaining to certain areas of the petition.[4] The petitioners filed responses to these requests on May 30, 2018.[5] On May 30, 2018, the petitioners submitted certain revisions to the scope.[6]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that the Government of China (GOC) is providing countervailable subsidies, within the meaning of sections 701 and 771(5) of the Act, to producers of steel propane cylinders in China and imports of such products are materially injuring, or threatening material injury to, the domestic steel propane cylinders industry in the United States. Consistent with section 702(b)(1) of the Act and 19 CFR 351.202(b), for those alleged programs on which we are initiating a

CVD investigation, the petition is accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the petition on behalf of the domestic industry because the petitioners are interested parties as defined in section 771(9)(C) of the Act. We also find that the petitioners demonstrated sufficient industry support with respect to the initiation of this CVD investigation that the petitioners are requesting.[7]

### Period of Investigation

Because the petition was filed on May 22, 2018, the period of investigation is January 1, 2017, through December 31, 2017.[8]

### Scope of the Investigation

The products covered by this investigation are steel propane cylinders from China. For a full description of the scope of the investigation, *see* the Appendix to this notice.

### Comments on Scope of the Investigation

During our review of the petition, Commerce issued questions to, and received responses from, the petitioners pertaining to the proposed scope to ensure that the scope language in the petition is an accurate reflection of the product for which the domestic industry is seeking relief.[9] As a result of these exchanges, the scope of the petition was modified to clarify the description of merchandise covered by the petition. The description of the merchandise covered by this initiation, as described in the Appendix to this notice, reflects these clarifications.

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (scope), including comments on whether it is appropriate to refer to the subject merchandise as ''steel *propane* cylinders'' (emphasis added) or just as ''steel cylinders,'' given that the petitioners intend to cover all products that meet the physical description of the scope regardless of whether they ultimately contain or transport compressed or liquefied propane gas.[10]

---

[1] *See* Petitioners' Letter, ''Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand: Petition for the Imposition of Antidumping and Countervailing Duties,'' dated May 22, 2018 (the Petitions). For the purposes of the instant notice, all references to 'the Petition,' herein, refer specifically to the CVD Petition, and all references to ''AD Petitions,'' herein refer specifically to the petitioners filed in the companion AD proceedings.

[2] *See* Petition at Volume I at 1–2.

[3] *See* Petitioners' Letter, ''Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand: Petitioners' Amendment to Volume I Relating to General Issues,'' dated May 24, 2018 (Scope Amendment).

[4] *See* Department Letter re: Petition for the Imposition of Countervailing Duties on Imports of Steel Propane Cylinders from the People's Republic of China: Supplemental Questions, dated May 25, 2018; and Department Letter re: Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand: Supplemental Questions, dated May 25, 2018 (Petition Supplemental Questions).

[5] *See* Petitioners' Letter, ''Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand—Petitioners' Supplement to Volume I Relating to General Issues,'' dated May 30, 2018 (General Issues Supplement); *see also* Petitioners' Letter, ''Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand—Petitioners' Amendment to Volume V Relating to the People's Republic of China Countervailing Duties,'' dated May 30, 2018 (China CVD Petition Supplement).

[6] *See* General Issues Supplement at 11–12.

[7] *See* ''Determination of Industry Support for the Petition'' section, *infra*.

[8] *See* 19 CFR 351.204(b)(2).

[9] *See* Petition Supplemental Questions; *see also* General Issues Supplement at 11–12.

[10] *See Antidumping Duties; Countervailing Duties, Final Rule*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*); *see also* General Issues Supplement, at 4 and 8–9. On June 11, 2018, the petitioners filed proposed revisions to the scope language for Commerce's consideration. *See* letter

Continued

ADDENDUM 9

Barcode:3717366-01 C-469-818 INV - Investigation



UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

C-469-818
Investigation
POI: 01/01/2016 – 12/31/2016
**Public Document**
E&C AD/CVD OI: JAS/LN/MJK

**DATE:** June 11, 2018

**MEMORANDUM TO:** Gary Taverman
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations,
 performing the non-exclusive functions and duties of the
 Assistant Secretary for Enforcement and Compliance

**FROM:** James Maeder
Associate Deputy Assistant Secretary
 for Enforcement and Compliance
 performing the duties of Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for the Final Determination in
the Countervailing Duty Investigation of Ripe Olives from Spain

---

## I.    Summary

The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of ripe olives from Spain, as provided in section 705 of the Tariff Act of 1930, as amended (the Act).[1]  Below is the complete list of issues in this investigation for which we received comments from interested parties:

Comment 1:   Whether Section 771B of the Act is Applicable in this Investigation
Comment 2:   Whether a Pass-Through Analysis is Required
Comment 3:   Whether the EU CAP Pillar I –BPS, SPS, and Greening Programs are Countervailable
Comment 4:   Whether EU CAP Pillar II Agricultural Fund for Rural Development is Specific
Comment 5:   Whether Commerce Should Apply AFA to the Non-Cooperating Growers
Comment 6:   Whether Commerce used the Correct Calculation Methodology to Measure Subsides Received by the Respondents
Comment 7:   Whether Commerce Should Remove Non-Growers and Adjust the Calculation of Benefits to Exclude the Olive Volume of Non-Producing Suppliers

---

[1] *See also* section 701(f) of the Act.

Comment 8:    Whether Commerce Should Apply AFA to Agro Sevilla Regarding Cross-Ownership with its First-Tier Suppliers
Comment 9:    Whether Grant Funding Sourced from the ERDF is Regionally Specific
Comment 10:   Whether the EU Sustainable Energy Development of Andalusia Scheme Program is Specific
Comment 11:   Whether the PROSOL Program is Specific
Comment 12:   Whether the EU Regional Development Fund and IDEA Program is Specific
Comment 13:   Whether the EU Environment and Climate Action (LIFE) Program is Specific
Comment 14:   Whether the SAIS Program is Specific
Comment 15:   Whether Financing Sourced from the Spanish Official Credit Institute (ICO) is Countervailable
Comment 16:   Whether Commerce Should Adjust the Interest Rate Used in Certain Long-Term ICO Financing to Angel Camacho
Comment 17:   Whether Commerce Should Adjust the Calculation of European Investment Bank (EIB) Financing Received by Agro Sevilla
Comment 18:   Whether to Apply AFA to the CDTI Program
Comment 19:   Whether the CDTI Program is Export Specific
Comment 20:   Whether Commerce Should Apply AFA to Angel Camacho's Unreported Grant Presented at Verification
Comment 21:   Whether Commerce Should Rely on "Unverified" Information
Comment 22:   Whether Commerce Should Adjust the Volume of Raw Olives Purchased to Account for Waste Loss
Comment 23:   Whether Commerce Should Accept Rejected Submission from the GOS and the Respondents
Comment 24:   Comments on the Verification Reports
Comment 26:   Whether Commerce's Conduct in this Investigation Meets the Requirements of the ASCM
Comment 26:   Whether Other Discovered Subsidies Should Be Included in this Investigation and Whether Other Assistance Can Form the Basis for Applying AFA
Comment 27:   Whether Commerce Should Include the Corrections of the Alleged Ministerial Errors
Comment 28:   Commerce Must Use Corrected and Revised Data in the Calculations
Comment 29:   Whether to Clarify the Scope of the Investigation to Include Ripe Olives Contained in Cocktail Mixes
Comment 30:   The Product to Which the Countervailing Duty Applies

## II.    Background

### A.    *Case History*

The selected mandatory company respondents in this investigation are Angel Camacho Alimentacion S.L. (Angel Camacho), Aceitunas Guadalquivir S.L.U. (Aceitunas Guadalquivir), and Agro Sevilla Aceitunas S.Coop.And (Agro Sevilla).  On November 28, 2017, Commerce published its *Preliminary Determination* and, at the petitioner's request, we aligned the final

Barcode:3717366-01 C-469-818 INV - Investigation  -

countervailing duty (CVD) determination with the final determination in the antidumping duty investigation of ripe olives from Spain.[2]

Following the *Preliminary Determination*, we requested additional information from the European Commission (EC), the Government of Spain (GOS), Angel Camacho, Agro Sevilla, and Aceitunas Guadalquivir. We received timely responses from all parties.[3] From February 5, 2018, through February 23, 2018, we conducted verification of the questionnaire responses from the EC, the GOS, Angel Camacho, Agro Sevilla, and Aceitunas Guadalquivir. The EC, GOS, Angel Camacho, Agro Sevilla, and Aceitunas Guadalquivir submitted verification corrections and verification exhibits.[4] We released the verification reports on March 23, 2018, for Aceitunas Guadalquivir and on April 4, 2018, for the EC, the GOS, Agro Sevilla, and Angel Camacho.[5] On April 24, 2018, Commerce issued a Post-Preliminary Analysis Memorandum.[6]

---

[2] *See Ripe Olives from Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,* 82 FR 56218 (November 28, 2017) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM). On January 28, 2018, Commerce issued a memorandum regarding ministerial error allegations, finding that the alleged errors were not "significant" within the meaning of 19 CFR 351.224(g). *See* Memorandum, "Countervailing Duty Investigation of Ripe Olives from Spain: Allegations of Ministerial Errors," January 8, 2018 (Ministerial Error Memorandum).

[3] *See* Aceitunas Guadalquivir's December 21, 2017 Supplemental Questionnaire Response; *see* Angel Camacho's December 22, 2017 Supplemental Questionnaire Response; *see* Agro Sevilla's December 22, 2017 Supplemental Questionnaire Response; *see* GOS' December 22, 2017 Supplemental Questionnaire Response (GOS December 22 SQR); *see* GOS January 17, 2018 Supplemental Questionnaire Response; *see* EC's December 26, 2017 Supplemental Questionnaire Response; *see* Angel Camacho's December 29, 2017 Supplemental Questionnaire Response; *see* Aceitunas Guadalquivir's December 29, 2017 Supplemental Questionnaire Response; *see* Agro Sevilla's January 5, 2018 Supplier Questions Supplemental Questionnaire Response (Agro Sevilla January 5 SQR); *see* Agro Sevilla's January 5, 2018 Supplemental Questionnaire Response (Agro Sevilla January 5 Supplier SQR); *see* Angel Camacho's January 5, 2018 Supplemental Questionnaire Response; *see* Aceitunas Guadalquivir's January 5, 2018 Supplemental Questionnaire Response; *see* GOS' January 10, 2018 Supplemental Questionnaire Response; *see* EC February 20, 2018 Supplemental Questionnaire Response; *see* GOS' February 20, 2018 Supplemental Questionnaire Response.

[4] *See* EC's Letter, "Verification Exhibits collected by the Department During Verification in Brussels," March 13, 2018; *see* GOS' Letter, "Documents Requested During the Verification Visit," February 14, 2018; *see* Angel Camacho's Letter, "Minor Corrections and Verification Exhibits of Angel Camacho Alimentación, S.L.," February 20, 201; *see* Agro Sevilla's Letter, "Minor Corrections and Verification Exhibits of Agro Sevilla S.Coop. And.," February 20, 2018; *see* Aceitunas Guadalquivir's Letter, "Minor Corrections and Verification Exhibits of Aceitunas Guadalquivir," February 26, 2018.

[5] *See* Memorandum, "Verification of the Questionnaire Responses of Aceitunas Guadalquivir, S.L.U.," March 22, 2018 (Aceitunas Guadalquivir Verification Report); *see* Memorandum, "Verification Report: European Commission," April 2, 2018 (EC Verification Report); *see* Memorandum, "Verification Report: Government of Spain," March 29, 2018 (GOS Verification Report); *see* Memorandum, "Verification of the Questionnaire Response of Agro Sevilla Aceitunas S.Coop.And.," March 29, 2018 (Agro Sevilla Verification Report); and *see* Memorandum, "Verification of the Questionnaire Responses of Angel Camacho Alimentación S.L.," March 29, 2018 (Angel Camacho Verification Report).

[6] *See* Memorandum, "Decision Memorandum for the Post-Preliminary Analysis in the Countervailing Duty Investigation of Ripe Olives from Spain," April 24, 2018 (Post-Preliminary Analysis).

On December 18, 2017, the petitioner and the three respondent companies requested that Commerce hold a hearing.[7]  On May 16, 2018, Commerce held a hearing.  Interested parties submitted case and rebuttal briefs between April 23, 2018, and May 8, 2018.[8]

### B.    Period of Investigation

The period of investigation (POI) is January 1, 2016, through December 31, 2016.

## III.    Scope of the Investigation

The products covered by this investigation are ripe olives from Spain.  For a complete description of the scope of this investigation, *see* the "Scope of the Investigation" in Appendix I of the *Federal Register* notice.

## IV.    Scope Comments

In accordance with the preamble to Commerce's regulations,[9] the *Initiation Notice* set aside a period of time for parties to raise issues regarding product coverage (*i.e.*, scope).[10]  No interested party commented on the scope of the investigation as it appeared in the *Initiation Notice* during the scope comment period.[11]  For the *Preliminary Determination*, we did not modify the scope language as it appeared in the *Initiation Notice*.  For a summary of events since the *Preliminary Determination*, including product coverage comments and rebuttal responses submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* Comment 30, below.[12]

---

[7] *See* Angel Camacho, Agro Sevilla, and Aceitunas Guadalquivir's Letter, "Request for Hearing," December 18, 2017; and *see* the petitioner's Letter, "Request for Hearing," December 18, 2017.

[8] *See* EC's April 23, 2018 Case Brief (EC's Case Brief A); *see* GOS' April 27, 2018 Case Brief (GOS Case Brief A); *see* the petitioner's April 23, 2018 Case Brief (Petitioner's Case Brief A); *see* Angel Camacho, Agro Sevilla, Aceitunas Guadalquivir and ASEMESA's April 23 Case Brief (Respondent's Case Brief A); *see* EC's May 3, 2018 Case Brief (EC's Case Brief B); *see* GOS' May 10, 2018 Case Brief (GOS' Case Brief B); *see* GOS' May 10, 2018 Verification Case Brief; *see* the petitioner's May 3, 2018 Case Brief (Petitioner's Case Brief B); *see* Angel Camacho, Agro Sevilla, Aceitunas Guadalquivir and ASEMESA's May 3, 2018 Case Brief (Respondent's Case Brief B); *see* EC May 8, 2018 Rebuttal Brief (EC's Rebuttal Brief); *see* GOS May 10, 2018 Rebuttal Brief (GOS Rebuttal Brief); *see* the petitioner's May 8, 2018 Rebuttal Brief (Petitioner's Rebuttal Brief); *see* Angel Camacho, Agro Sevilla, Aceitunas Guadalquivir and ASEMESA's May 10, 2018 Rebuttal Brief (Respondent's Rebuttal Brief); and *see* Association of Food Industries, Inc., Acme Food Sales, Inc., Mario Camacho Foods, Rema Foods Inc., Atlanta Corporation, Acorsa USA Inc., Schreiber Foods International, Inc., and Mitsui Foods, Inc (AFI) May 8, 2018 Rebuttal Brief (AFI Rebuttal Brief).

[9] *See Antidumping Duties; Countervailing Duties*, *Final Rule*, 62 FR 27296, 27323 (May 19, 1997).

[10] *See Ripe Olives from Spain:  Initiation of Countervailing Duty Investigation, 82 FR 33050 (July 19, 2017) (Initiation Notice)*.

[11] *Id.*

[12] *See* Comment 30.

## V.     Subsidies Valuation

### A.     Allocation Period

Commerce has made no changes to the allocation period methodology used in the *Preliminary Determination* and no issues were raised by interested parties in briefs regarding this topic.  For a description of the allocation period and the methodology used for this final determination, *see* the *Preliminary Determination*.[13]

### B.     Attribution of Subsidies

Commerce has made no changes to the methodology for attributing to the respondents subsidies provided to the respondents' cross-owned input suppliers, as applied in the *Preliminary Determination* and no issues were raised by interested parties in briefs regarding the attribution of subsidies methodology.  For a description of the methodologies used for all programs in the final determination, *see* the *Preliminary Determination*.[14]  However, as discussed in Comment 6, below, we have revised our calculation methodology for applying section 771B of the Act and measuring the benefit to the respondents of subsidies provided to the unaffiliated olive growers who supply them.

### C.     Denominators

In accordance with 19 CFR 351.525(b)(1)-(5), Commerce considers the basis for a respondent's receipt of benefits under each program when considering the appropriate denominator for purposes of measuring the countervailable subsidy, *e.g.*, the respondent's total sales, sales of subject merchandise, or export sales.  The denominators we used to calculate the countervailable subsidy rates for the various subsidy programs in this investigation are explained in further detail in the "Discussion of the Issues," section below and in the final calculation memoranda, dated concurrently with this final determination.[15]

### D.     Applicability of Section 771(5B)(F) of the Act

Commerce is guided by the statute in conducting this investigation.  Section 771(5B)(F) of the Act, which addresses the implementation of the World Trade Organization (WTO) Agreement on Agriculture, states the following:

> Domestic support measures that are provided with respect to products listed in Annex 1 to the Agreement on Agriculture, and that the administering authority determines conform fully to the provisions of Annex 2 to that Agreement, shall be treated as non-countervailable.

---

[13] *See Preliminary Determination* and accompanying PDM at 8.

[14] *See Preliminary Determination* and accompanying PDM at 8-11.

[15] *See* Memoranda, dated concurrently with this memorandum, "Final Determination Calculations for Aceitunas Guadalquivir, S.L.U." (Aceitunas Guadalquivir Final Calculation Memorandum); "Final Determination Calculations for Agro Sevilla Aceitunas S.Coop.And," (Agro Sevilla Final Calculation Memorandum); and, "Final Determination Calculations for Angel Camacho" (Angel Camacho Final Calculation Memorandum).

However, section 771(5B)(G)(ii) of the Act implements a time limit for the application of this provision, stating, in relevant part, "{s}ubparagraph (F) shall not apply to imports from a WTO member country at the end of the 9-year period beginning on January 1, 1995."

As further explained in the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act,[16] the Act is consistent with the obligations under Article 31 of the Agreement on Subsidies and Countervailing Measures (ASCM):

> Under Article 31 of the {ASCM}, Article 8 {"Identification of Non-Actionable Subsidies"} expires in five years unless there is an agreement to extend its application . . . . Pursuant to Article 13 of the Agreement on Agriculture, Annex 2 domestic support measures are non-actionable only for the duration of the implementation period, which, pursuant to Article 1(f) of that Agreement, is the nine-year period commencing in 1995.

Thus, for purposes of administering the Act, the requirement to treat agricultural subsidies as not countervailable no longer applies to imports from WTO Member countries – in this case, Spain – after January 1, 2004. With regard to the European Union, a similar interpretation applies. As of the expiration of the nine-year period, Commerce is not required under the Act to consider assistance provided by the EU or the GOS to agricultural products as not countervailable. As such, Commerce initiated, and has conducted, this investigation under the authority granted by the Act.

### E. Applicability of Section 771B of the Act

Section 771B of the Act addresses the calculation of countervailable subsidies on certain processed agricultural products:

> In the case of an agricultural product processed from an agricultural product in which—
>
> (1)   the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
>
> (2)   the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

In the *Preliminary Determination*, Commerce analyzed the applicability of section 771B of the Act, and found that both prongs were satisfied.[17] Therefore, we found that the benefits provided to olive growers benefit the processors of ripe olives, in accordance with section 771B of the

---

[16] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I at 870 (1994), reprinted at 1994 U.S.C.C.A.N. 4040, 4199 (SAA) at 870.

[17] *See Preliminary Determination* and accompanying PDM at 12-17.

Act, and preliminarily calculated a weighted-average per kilogram benefit using the information provided by all of the reporting olive growers.

Interested parties submitted comments in their case and rebuttal briefs regarding the application of section 771B of the Act.  We have addressed these comments below in Comment 1.  Commerce continues to find that both prongs of section 771B of the Act have been met, based on record evidence.

## VI.    Loan Interest Rate Benchmarks and Discount Rates

Commerce has made no change to the interest rate benchmarks and discount rates used in the Post-Preliminary Analysis except in regard to certain loans financed by the Spanish Official Credit Institute (ICO) for Angel Camacho, *see* below at Comment 17.  For a description of the interest rate benchmarks and discount rates used for the final determination, *see* the *Preliminary Determination* and Post-Preliminary Analysis.[18]

## VII.    Application of Facts Otherwise Available and Use of Adverse Inferences

   *A.    Legal Standard*

Sections 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person:  withholds information that has been requested; fails to provide information within the deadlines established, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides information that cannot be verified as provided by section 782(i) of the Act.  Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party with an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available (adverse facts available or AFA) when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In so doing, Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Furthermore, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the countervailing duty investigation, a previous administrative review, or other information placed on the record.

Under section 776(d) of the Act, Commerce may use AFA as a countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if

---

[18] *See Preliminary Determination* and accompanying PDM at 17; *see* Post-Preliminary Analysis at 4-5.

there is no same or similar program, a CVD rate for a subsidy program from a proceeding that the administering authority considers reasonable to use, including the highest of such rates. Additionally, when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act, or any other purpose, to estimate what the countervailable subsidy rate would have been if the non-cooperating interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[19]

Consistent with section 776(d) of the Act and our established practice, for each of the programs discussed below, we selected as AFA the highest calculated rate for the same or similar program.[20] When selecting rates in an investigation, we first determine if there is an identical program in the investigation and use the highest calculated rate for the identical program (excluding zero rates). If no such identical program with a rate above zero exists in the investigation, we then determine if an identical program was examined in another CVD proceeding involving the same country, and apply the highest calculated rate for the identical program (excluding rates that are *de minimis*).[21] If no such identical program exists, we then determine if there is a similar/comparable program (based on the treatment of the benefit) in another CVD proceeding involving the same country and we apply the highest calculated rate for the similar/comparable program, excluding *de minimis* rates. Where there is no comparable program, we apply the highest calculated rate from any non-company specific program in any CVD case involving the same country, but we do not use a rate from a program if, based on eligibility criteria, the industry under investigation cannot use that program.[22]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is defined as "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 concerning the subject merchandise."[23] The SAA provides that to "corroborate" secondary information, Commerce will satisfy itself that the secondary information to be used has probative value.[24]

Due to the failures of the GOS, Angel Camacho, Agro Sevilla, and Aceitunas Guadalquivir to cooperate to the best of their ability for certain information requested by Commerce, for each of the programs discussed below, Commerce has applied AFA, in accordance with section 776(b) of the Act. Because the rates on which we are relying as AFA rates are subsidy rates calculated in this proceeding, they are primary information and the corroboration requirement of section 776(c) of the Act does not apply.

---

[19] *See* section 776(d)(1) of the Act.

[20] *See, e.g., Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*) and accompanying Issues and Decision Memorandum (IDM) at 13; *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-1374 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").

[21] *See Pre-Stressed Concrete Steel Wire Strand from China, Final Affirmative Countervailing Duty Determination*, 75 FR 28557 (May 21, 2010) and accompanying IDM at 13-14.

[22] *See Shrimp from China* and accompanying IDM at 13-14.

[23] *See* SAA at 870.

[24] *Id.*

Barcode:3717366-01 C-469-818 INV - Investigation -

*B.*    *Application of AFA and Selection of AFA Rates*

1.    Unreported Rural Development Grants to Agro Sevilla's First-Tier Member
Cooperatives

On January 29, 2018, and February 2, 2018, the GOS and the respondents, respectively,
reported that they had inadvertently omitted additional Pillar II payments made to Agro
Sevilla's first-tier suppliers from their questionnaire responses.  In these submissions, they
claimed that this information was found on an older database that had not been used in years.
Because of the number and magnitude of the grants, and the fact that they were reported well
after the deadline as outlined in 19 CFR 351.30l(c)(5), we rejected the additional information.

We find that the GOS and Agro Sevilla failed to provide complete information in response to
our questions regarding Agro Sevilla's first-tier members' use of this program.  Pursuant to
section 776(a)(2)(B) of the Act, when a party fails to provide requested information by the
deadlines established by Commerce, Commerce uses facts otherwise available.  Additionally,
by not reporting the complete receipt of this assistance in a timely manner, as well as the
magnitude of the additional information submitted, the GOS and respondents failed to cooperate
to the best of their ability by not timely submitting this information when requested.
Accordingly, pursuant to section 776(b) of the Act, we find that it is appropriate to apply AFA
to the Pillar II payments received by Agro Sevilla's first-tier suppliers.

As AFA, we find that a benefit within the meaning of section 771(5)(E) of the Act is conferred.
To calculate the benefit to Agro Sevilla resulting from the first-tier suppliers' receipt of benefits
under Pillar II, we are using the highest rate that was calculated as the weighted per kilogram
benefit for a first-tier supplier member in the *Preliminary Determination* as the AFA weighted
per kilogram benefit for each of the first-tier members.[25]  As a result, we have calculated a
program rate of 0.96 percent *ad valorem for* Agro Sevilla.  *See* Comment 23 for further
discussion on Commerce's use of AFA for Agro Sevilla's first-tier suppliers.

2.    Unreported Rural Development Grants to Aceitunas Guadalquivir's Unaffiliated
Suppliers and to Angel Camacho's Cross-Owned Affiliates

As discussed in detail in Comment 23 below, because the information provided by the GOS and
the respondents could not properly be considered a minor correction to previously submitted
information, the additional Pillar II payments reported by the GOS and the respondents
represented new factual information.  As new factual information, it is subject to the 19 CFR
351.301, which is the regulatory provision that governs the time limits for the submission of
factual information.  Subsection 351.301(c)(1) of Commerce's regulations states that "the
Secretary will not consider or retain in the official record of the proceeding unsolicited
questionnaire responses or untimely filed questionnaire responses.  The Secretary will reject any
untimely filed or unsolicited questionnaire response …."  Given that the GOS and respondents
did not submit the new factual information at issue until well after November 20, 2017, when

---

[25] *See* Agro Sevilla Final Calculation Memorandum for a discussion of this proprietary rate.

Commerce issued its *Preliminary Determination* – the deadline for filing such information clearly had expired.

Therefore, we find that necessary information is not available on the record, and that Aceitunas Guadalquivir and Angel Camacho withheld information requested by Commerce.  In accordance with sections 776(a)(1) and 776(a)(2)(A) of the Act, we determine that the use of facts otherwise available is warranted in calculating each companies' benefit from this program.  Moreover, because these companies failed to provide complete details regarding the usage of this program, we find that these companies failed to cooperate to the best of their ability in providing requested information that was in their possession; thus, the application of AFA is warranted, pursuant to section 776(b) of the Act, in determining the benefit.  Relying on AFA, we find, as discussed below under Comment 23, that these companies each benefited from this program at the rate of 0.96 percent *ad valorem*, the rate calculated for the identical program used by Agro Sevilla in this proceeding.

### 3.   Unreported Grant Provided to Angel Camacho in 2008

Angel Camacho and the GOS presented information about a grant that was previously unreported.  Commerce declined to accept this information.[26]  At verification, Commerce officials did not collect information concerning the amount of the grant described as being for a research project and provided in 2008 by the Andalusia Energy Agency.[27]  Commerce's initial questionnaire response requests respondents to report "other subsidies" and it is clear in instructing respondents to report "any other forms of assistance to your company."[28]  Angel Camacho and the GOS provided information regarding other assistance, and in doing so, Angel Camacho and the GOS demonstrated that they have the tools to identify such assistance.  However, the disclosure at the outset of verification that a grant should have been previously reported in response to the question about other forms of assistance demonstrates Angel Camacho's efforts to identify and report other forms of assistance were incomplete.  Indeed, Angel Camacho reported other assistance it had received over the AUL in its initial questionnaire response.[29]

We find that Angel Camacho failed to provide complete information in response to our questions about other forms of assistance provided by the GOS.  By not divulging the receipt of this unreported assistance prior to verification in the initial and subsequent questionnaire responses requesting information on "other subsidies," Angel Camacho precluded Commerce from an adequate examination of the grant (*e.g.* Commerce did not receive timely, complete responses to the questions in the relevant appendices regarding this grant and was unable to issue a supplemental questionnaire to the GOS concerning the extent to which this program constituted a financial contribution or are specific under sections 771(5)(D) and 771(5A) of the

---

[26] *See* Angel Camacho Verification Report at 4.
[27] *See* Angel Camacho Verification Report at 4; *see* GOS Verification Report at 2.
[28] *See* Letter to the GOS, "Countervailing Duty Investigation on Ripe Olives from Spain:  Initial Questionnaire," August 4, 2017 (IQR), at Section III at 19.
[29] See Letter from Angel Camacho, "Initial Questionnaire Response of Angel Camacho Alimentación, S.L. Ripe Olives from Spain (C-469-818)," September 19, 2017, at 64-76.

10

Appx000278

Act).  Therefore, consistent with prior determinations,[30] we find that Angel Camacho has not cooperated to the best of its ability.  Pursuant to section 776(a)(2)(B) of the Act, when a party fails to provide requested information by the deadlines established by Commerce, Commerce uses facts otherwise available.  Further, pursuant to section 776(b) of the Act, we find that Angel Camacho, by virtue of its failure to provide timely information and complete answers to Commerce's inquiries, failed to cooperate by not acting to the best of its ability.  Pursuant to Commerce's authority under section 775 of the Act and 19 CFR 351.311(b), we have included this grant in our investigation and we determine the application of AFA to be warranted.  We are finding that, as AFA, this discovered form of assistance provides a financial contribution and is specific within the meaning of sections 771(5)(D) and 771(5A) of the Act, respectively.  A benefit is conferred, pursuant to section 771(5)(E) of the Act.

Under our AFA hierarchy, we would first look to a rate from an identical program in the current investigation.  However, because the record indicates that the grant was given by the Andalusia Energy Agency in 2008, but not the specific program under which it was given, we cannot identify the identical program from the current investigation.  Next, we would consider a rate for an identical program in another CVD proceeding involving the same country, but again, we cannot select a rate under this step of the hierarchy because the record does not identify under which program the unreported grant was given.  As such, we would then look to a rate for a similar/comparable program (based on the treatment of the benefit) in another CVD proceeding involving the same country.  Although Commerce has investigated similar/comparable programs in Spain in other CVD proceedings, we find that those rates are not appropriate here, because they were calculated using a prior methodology.  However, because this step of the hierarchy contemplates using a similar or comparable program based on the treatment of benefit, we have evaluated whether there are similar or comparable programs in this investigation that might serve as the source of an AFA rate.  We find that the rate for another program administered by the Andalusia Energy Agency, *the Andalusia Energy Agency Sustainable Energy Development of Andalusia Scheme*, is the most appropriate source for an AFA rate for Angel Camacho's unreported grant, because it is not a grower program to which section 771B of the Act applies.  Therefore, based on the hierarchy for selecting rates for purposes of applying AFA, we are using the highest company-specific rate in this investigation for grants provided under the *Andalusia Energy Agency Sustainable Energy Development of Andalusia Scheme*, which is 0.07 percent *ad valorem*.  Therefore, we are applying a rate of 0.07 percent *ad valorem* for Angel Camacho's unreported grant.

---

[30] *See Countervailing Duty Investigation of Certain Polyethylene Terephthalate Resin from the People's Republic of China:  Final Affirmative Determination*, 81 FR 13337 (March 14, 2016) and accompanying IDM at 19; *see Supercalendered Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015) and accompanying IDM at 12-13 and 153-155; *see also Shrimp from China* and accompanying IDM at 75-78.

Barcode:3717366-01 C-469-818 INV - Investigation  -

## VIII.  Analysis of Programs

### A.    Programs Determined to Be Countervailable

*1.  European Union (EU) Common Agricultural Policy (CAP) Pillar I– Basic Payment Scheme (BPS)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed below in Comment 3.

| | |
|---|---|
| Angel Camacho | 7.66 percent *ad valorem* |
| Aceitunas Guadalquivir | 17.29 percent *ad valorem* |
| Agro Sevilla | 4.26 percent *ad valorem* |

*2.  EU CAP – Greening*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 3.

| | |
|---|---|
| Angel Camacho | 4.24 percent *ad valorem* |
| Aceitunas Guadalquivir | 8.72 percent *ad valorem* |
| Agro Sevilla | 2.14 percent *ad valorem* |

*3.  EU CAP Pillar II – Agricultural Fund for Rural Development (Rural Development)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 4.  Modifications to the calculation methodology are discussed in Comments 8 and 23.

| | |
|---|---|
| Angel Camacho | 0.96 percent *ad valorem* |
| Aceitunas Guadalquivir | 0.96 percent *ad valorem* |
| Agro Sevilla | 0.96 percent *ad valorem* |

*4.  Spanish Agricultural Insurance System (SAIS)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 14.

| | |
|---|---|
| Angel Camacho | 0.11 percent *ad valorem* |
| Aceitunas Guadalquivir | 0.04 percent *ad valorem* |

*5.  EU Program for the Environment and Climate Action (LIFE)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 13.

Angel Camacho                                    0.06 percent *ad valorem*

6.  *EU Regional Development Fund (ERDF) and Andalusia Energy Agency Sustainable Energy Development of Andalusia Scheme (Sustainable Energy Development of Andalusia Scheme)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comments 9 and 10.

Angel Camacho                                    0.07 percent *ad valorem*

7.  *EU ERDF and Agency of Innovation and Development of Andalusia (IDEA)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 12.

Agro Sevilla                                    0.02   percent *ad valorem*

8.  *EU ERDF and Andalusian Promotion of Renewable Energy Installations (PROSOL)*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comment 11.

Agro Sevilla                                    0.03 percent *ad valorem*

9.  *Centre for the Development of Industrial Technology (CDTI) Financing*

Interested parties submitted comments in the case briefs and rebuttal briefs regarding this program.  The countervailability of the program is discussed in Comments 18 and 19.

Aceitunas Guadalquivir                          0.01 percent *ad valorem*

10. *ICO – Exporters*

We have not changed our methodology from the Post-Preliminary Analysis and no parties commented regarding this program.

Angel Camacho                                    0.04 percent *ad valorem*

11. *ICO – International Financing*

In the Post-Preliminary Analysis, we found that the loans that Angel Camacho received under this program provided benefits that were not measurable, and we did not examine the countervailability of this program.[31]  However, the petitioner commented that we erred in our calculation by using a benchmark interest rate from the incorrect year.  As discussed in

---

[31] *See* Post-Preliminary Analysis at 21.

Barcode:3717366-01 C-469-818 INV - Investigation  -

Comment 16, we agree with the petitioner and we have corrected the interest rate benchmark. This correction results in a benefit that is measurable. Therefore, we are examining the countervailability of this program.

We noted in the Post-Preliminary Analysis that the criteria vary for each ICO financing program.[32] For the "ICO International Financing," the purpose of such financing is to "provide self-employed people and Spanish companies with the financing needed to make investments in Spain and meet the liquidity needs to enter a foreign market."[33] As discussed in more detail in Comment 15 below, ICO is an authority within the meaning of section 771(5)(B) of the Act; as such, loans provided by ICO constitute a direct transfer of funds under section 771(5)(D)(i) of the Act. As discussed in more detail in Comment 15 below, ICO is an authority within the meaning of section 771(5)(B) of the Act; as such, loans provided by ICO constitute a direct transfer of funds under section 771(5)(D)(i) of the Act. The loans for international financing are available only to exporters, and they are specific as an export subsidy under section 771(5A)(A) and (B) of the Act. Finally, these loans provide a benefit in the amount of the difference between the interest that is paid on the loan and the interest that would be paid on a comparable commercial loan, in accordance with section 771(5)(E)(ii) of the Act. To calculate the benefit, we used as a benchmark the interest rates on short-term commercial loans provided to Angel Camacho as discussed above at "Loan Interest Benchmarks Discount Rates." We compared the effective interest that the companies paid to the effective interest the companies would have paid using the company-specific interest rate benchmarks. We summed the difference between the interest paid and divided each company's benefit amount by its total FOB export sales, in accordance with 19 CFR 351.525(b)(2).[34]

|  |  |
|---|---|
| Angel Camacho | 0.01 percent *ad valorem* |

*12. Income Tax Credit for Foreign Trade Fair Expenses*

At verification, the team examined Agro Sevilla's tax return and saw that Agro Sevilla benefitted from a tax credit applied relating to the costs of attending international trade fairs and the costs of international marketing. Information on the tax return demonstrates that, in each year from 2001 through 2013, Agro Sevilla earned these tax credits. The tax credits earned under this program are valid for a period of 15 years.

The tax return shows the amount of each year's credit that remains available, the amount of the available credit that is being applied to the current year's tax liability, and the remaining available balance of each year's credit for use in future years. Agro Sevilla provided a worksheet generated from the accounting system showing the total tax credits earned in the years 2001 through 2008 (credit balances from these years were used to reduce the tax liability in the current year). The 2015 tax return, filed during the POI, was provided in the initial

---

[32] *Id.*, at 8.
[33] *See* GOS December 22 SQR at Appendix 8 at 14-16.
[34] *See* Angel Camacho Final Calculation Memorandum.

questionnaire response and indicates that Agro Sevilla benefitted from this tax credit during the POI.[35]

We determine that the tax credit confers a countervailable subsidy within the meaning of section 771(5) of the Act. The tax credit provides a financial contribution under section 771(5)(D)(ii) of the Act in the form of revenue foregone by the GOS and confers a benefit in the amount of the tax credit used by Agro Sevilla during the POI to reduce its tax obligation. We find the tax credit is export specific within the meaning of section 771(5A)(A) and (B) of the Act because it is granted for expenses incurred to attend international trade fairs and for international marketing, activities by which companies seek to expand their export sales. In accordance with 19 CFR 351.524(c), we treated the tax credit as a recurring benefit. To calculate the countervailable subsidy, we divided the amount of the tax credit applied to reduce Agro Sevilla's tax obligation during the POI, by Agro Sevilla's export sales during the POI.[36]

Agro Sevilla                                    0.11 percent *ad valorem.*

### 13. Unreported Grant to Angel Camacho Presented at Verification

At verification, Angel Camacho and the GOS presented information about a grant received in 2008 that was not previously reported in questionnaire and supplemental questionnaire responses. As discussed above in the section. "Use of Facts Otherwise Available and Adverse Inferences," Commerce declined to accept this information as a minor correction, and we are relying on AFA to determine that this grant is countervailable and are applying an AFA rate to determine the subsidy rate, as discussed in Comment 20.

Angel Camacho                                  0.07 percent *ad valorem*

## B. Programs Determined to Be Not Used or to Not Confer a Measurable Benefit During the POI

### 1. EU CAP Single Payment Scheme (SPS)

At verification, Commerce noted that the companies' reported SPS payments were actually residual BPS – Direct Payments from prior years.[37] We have included these payments in the subsidy rate calculated for BPS – Direct Payment program.

2. *EU Promotion Aid Scheme*
3. *EU CAP Pillar I – Aid to Young Farmers*
4. *EU Producer Organization Work Programs*
5. *Occupational Safety and Health Investments for Micro and SME Grants provided by the Department of Employment*
6. *Programa de Incentivo al Vehiculo Eficiente (PIVE) (Grants to acquire vehicles)*

---

[35] *See* Letter from Agro Sevilla, "Initial Questionnaire Response of Agro Sevilla S.Coop.And. Ripe Olives from Spain (C-469-818)," September 19, 2017 (Agro Sevilla IQR), at Exhibit AS-12.
[36] *See* Agro Sevilla Final Calculation Memorandum.
[37] *See* Aceitunas Guadalquivir Final Calculation Memorandum.

    7.  *CDTI Grants*
    8.  *Agencia Andaluza de Promocion Exterior (EXTENDA)*
    9.  *Technical Corporation of Andalusia (CTA)*
    10. *Andalusia Employment Service*
    11. *Collective Layoff Procedure 2005/2015*
    12. *Creation for Employment for Youth*
    13. *Andalusia Workplace Health and Safety*
    14. *Andalusia Equine Sector*
    15. *Spanish Electricity Special Tax Reduction*
    16. *EU Investment Fund Financing*
    17. *Fundacion Corporation de Andalusia Financing*

**C.**    **Programs Determined to Be Tied to Non-Subject Merchandise**

    1.  *Voluntary Coupled Support (VCS)*
    2.  *Canary Island Supply Regime*
    2.  *Market Measures*

These three programs provide assistance only to a list of eligible products. For these programs, the list of eligible products does not include ripe olives. Therefore, any benefits provided under these programs are tied to non-subject merchandise.[38]

**D.**    **Programs Determined to Be Not Countervailable**

    1.  *ICO – Company and Entrepreneur Financing*

In the Post-Preliminary Analysis, we found that the loans that Angel Camacho received under this program provided benefits that were not measurable, and we did not examine the countervailability of this program. However, the petitioner commented that we erred in our calculation by using a benchmark interest rate from the incorrect year. As discussed in Comment 16, we agree with the petitioner and we have corrected the interest rate benchmark. This correction results in a benefit that is measurable. Therefore, we are examining the countervailability of this program. This loan program provides financing to all sectors on the same financing terms, and there is no limitation in the program's administration on the availability of loans by industry or enterprise. Therefore, the loans are not provided on a *de jure* specific basis. With respect to *de facto* specificity, the program provided more than 231,000 loans, valued at more than €16 billion, in 2014. We find that this does not represent a limited number of recipients. Moreover, the fruit and vegetable processing sector received just 581 loans, valued at €123 million, for the years 2013, 2014, and 2016. This does not represent a dominant or disproportionate share of the loans given to the sector that includes olive processors. As such, we also find that this program is not *de facto* specific; therefore, we determine that this program is not countervailable.

---

[38] *See* EU IQR Exhibit "Commission Delegated Regulation (EU) No. 639/2014" Chapter 3, Article 38; *see also* Aceitunas Guadalquivir October 10, 2017 supplier QR at AG Annex IV-7; Angel Camacho October 10, 2017 supplier QR at Camacho Annex I-12-13, Camacho Annex IV-9-10, Camacho Annex V-6-7; Agro Sevilla October 10, 2017 Supplier SQR at Exhibit I.G. *See also* EU Verification Report at 7-9.

16

Barcode:3717366-01 C-469-818 INV - Investigation    -

**D.    Program for Which we are Deferring Examination**

*European Investment Bank (EIB) Loans*

Agro Sevilla and Angel Camacho, in response to our question about their receipt of assistance under other subsidy programs, reported receiving loans financed by the EIB, an international financial institution owned by the European Member States.  In the Post-Preliminary Analysis, we found that the benefits received by Agro Sevilla and Camacho were not measurable, and we did not analyze the countervailability of the EIB loans.  However, as discussed in Comment 17 below, the petitioner identified an error in the calculation that, when corrected, results in a measurable benefit for Agro Sevilla.  As a result, we have examined the information in the record for purposes of analyzing the countervailability of the EIB loans.  The EC provided some information, but not all of the information we need, to conduct a full *de facto* specificity analysis, and we did not identify the need for this additional information until we corrected our calculations in response to the petitioner's comment.  At this stage of the investigation, we do not have sufficient time to gather the additional information; therefore, in accordance with 19 CFR 351.311(c)(2), we are deferring our examination of this this program until a subsequent administrative review, should this investigation result in the issuing of a CVD order, and a review is requested.

**IX.    Discussion of the Issues**

**Comment 1:  Whether Section 771B of the Act is Applicable in this Investigation**

*GOS' Comments*[39]
- Given that section 771B of the Act does not define "the latter stage product," it is unreasonable that Commerce defines this term as any processed product obtained from raw olives rather than as ripe olives.
- "[T]he" latter stage product is singular, indicating that Congress intended it to apply to only the product under investigation.  If "any processed product" was intended, as Commerce suggests, then "the latter stage product" would have been plural.
- If "the latter stage product" is not limited to the product under investigation, then this prong of section 771B of the Act will always be met.
- Additionally, if "the latter stage product" is not limited to subject merchandise, Commerce is in violation of WTO rules that require a pass-through analysis.
- Commerce is incorrect in concluding that there is substantial dependence between raw olive and ripe olive demand.  The GOS has provided information to show that table olives represent only eight percent of all the olives grown in Spain, and ripe olives represent only three percent.
- The olive must be fully transformed from the raw olive into either a ripe olive or olive oil.
- Even though all raw olives can be used for the production of olive oil, certain varieties can be used for either olive oil or table olives, and prevailing market conditions may determine their use.  The lack of dependence of demand between raw and ripe olives is also

---

[39] *See* GOS Case Brief A at 28-32.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

demonstrated by the production of ripe olives, which varies each marketing year both in volume and in percentage of production as a portion of Spanish table olives.

- Even if Commerce finds that a dependency exists, between either raw olives and table olives or raw olives and ripe olives, it is not substantial, neither eight nor three percent are "substantial" amounts.

- Furthermore, *Shrimp from China* does not support this assertion, because 25 percent of fresh shrimp were processed into frozen shrimp – the product under investigation.  There is a large difference between 25 percent and eight percent and an even larger difference between 25 percent and three percent.

- The second prong of section 771B of the Act, that the processing operation adds only limited value to the raw commodity, is also not met.  There is a big difference between raw olives and ripe olives:  raw olives are inedible; it takes significant processing to make them edible.  Although both products are olives, they are very different in nature and, therefore, distinguishable products.

- Packaging is a relevant and essential element of production.  Commerce is unreasonable in disregarding such costs.

- Each type of processed olive involves different preparations and these should be assessed on a case-by-case basis.

- Commerce notes that only the petitioners have provided evidence on manufacturing costs; however, this ignores claims made by the GOS and respondents that the added value of the processed product is higher.  The GOS also provided information on the manufacturing costs at verification.

*Respondents' Comments*[40]

- The facts on the record fully support a finding that:  the demand for raw olives is not substantially dependent on the demand for ripe olives; and, the processing operation for ripe olives adds more than limited value to the raw olive.

- Although Commerce may interpret the statute at its discretion, substantial evidence supports a very different conclusion from how Commerce defined "the latter stage product."  Although section 771B of the Act does not define "the latter stage product" to be the subject merchandise, it also does not require that the "latter stage product" encompass all processed forms of raw olives.

- While the petitioner argues that Congress would have used more specific language if it intended subject merchandise only, the petitioner ignores the language that Congress did use.  If Congress meant for a broad interpretation it would not have used the language "the latter stage product."  If it meant *all* later stage products Congress would have used such language.

- The latter stage product is singular, and the legislative history offers no guidance to the contrary.

- In the case that led to the adoption of section 771B of the Act, *Live Swine from Canada*,[41] the subject processed products were all meat cuts of the live hog.  In contrast, this

---

[40] *See* Respondent's Case Brief A at 11-17.
[41] *See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50 FR 25097 (June 17, 1985) (*Live Swine from Canada*).

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

investigation targets a small processing segment, ripe olives; *Live Swine from Canada* was not a case against pork chops, hams or another discrete processed product of the hog.

- In *Rice from Thailand*,[42] the scope of the investigation included "all Thai rice including rice in the husk (paddy or rough); husked (brown) rice including basmati and other; semi-milled or wholly-milled rice, whether or not polished or glazed, including parboiled and other; and broken rice."[43]

- The processed product in *Live Swine from Canada* and *Rice from Thailand*, aligned the definition with the scope in question, and covered demand for the raw agricultural product in question.

- Here, the scope is just ripe olives, which is a narrower by comparison with *Rice from Thailand* or *Live Swine from Canada*.

- The Petition notes that "all olives must be processed to be edible."[44]  Processing, namely de-bittering and, in most cases, oxidization makes ripe olives edible for consumption.  Clearly this is a change in the "the essential character" of the raw olives – going from an inedible olive to an edible olive.

- Additionally, the value added by processing is also greater than the "limited value" required by the statute.  Consumers cannot make use of ripe olives outside of their packaging, which includes the olives, their solution, and the container; the packaging is essential.  In the antidumping duty investigation, the packaging is a product characteristic.

- The petitioner itself claims that the total processing costs including packaging constitute 60 percent of the cost of the delivered product, substantially more than the cost of the raw olives.

- Commerce noted in the *Preliminary Determination* that, in prior cases, it did not include in its analysis of value added any costs associated with packaging, labeling or "similar post-processing activities" when considering the value added.[45]  However, packaging is not a "post-processing activity," it is part of the production process of ripe olives.  Without the packaging, consumers cannot make use of the ripe olives.  It is an inherent characteristic of the product and includes sterilization.  Here, precedent is not a constraint, Commerce can explain its change in practice.

*European Commission Comments*[46]

- Section 771B of the Act is also not applicable, because the demand for raw olives is dependent on the demand for olive oil, which represents more than 90 percent of the demand for raw olives.

---

[42] *See Rice from Thailand; Final Results of Countervailing Duty Administrative Review*, 59 FR 8906 (February 24, 1994) (*Rice from Thailand*).

[43] *Id.*

[44] *See* Letter from the petitioners, "Petition for the Imposition of Antidumping and Countervailing Duties Volumes I through III Countervailable Subsidies, Ripe Olives from Spain," June 21, 2017 (Petition), at 2.

[45] *See Preliminary Determination* at 16.

[46] *See* EC's Case Brief A at 12-14.

Barcode:3717366-01 C-469-818 INV - Investigation  -

*Petitioner's Rebuttal Comments*[47]

- In the *Preliminary Determination*, Commerce correctly determined that the demand for the prior stage product – raw olives – is entirely dependent on demand for the latter stage product – processed olives.
- There is no statutory requirement or statutory intent that the latter stage product be interpreted to mean only the subject merchandise.
- The respondents argue that, because only some raw olives are processed into ripe olives, the prior stage product is not dependent on the latter stage product – but this claim overlooks Commerce's past practice, the statutory intent, and the clear text of section 771B of the Act.
- The respondents argue that Congress must have intended for "the latter stage product" to refer to a singular product, because the text uses the singular "the" – however, this ignores that "latter stage product" itself is a general non-specific term. "The latter stage product" of any raw agricultural commodity must include all of the processed versions of that raw commodity, not just one subset.
- If Congress intended the restrictive meaning that the respondents suggest, it would have used well-defined terms as it does elsewhere in countervailing duty law, such as "foreign like product" or "subject merchandise."[48] Instead, Congress chose the term "latter stage product" to permit Commerce to attribute subsidies on raw agricultural products to subject merchandise without requiring that subject merchandise be the only or even majority "latter stage product" processed from the raw commodity.
- The respondents ignore the Congressional intent of section 771B of the Act, to ensure that Commerce is legally able to address in any countervailing duty action involving a processed agricultural product the full measure of countervailable subsidies provided to the raw agricultural product used to make the processed product. Senator Baucus made this clear when he stated that this provision allows Commerce to "place duties on processed agricultural products if the raw agricultural product is subsidized."[49]
- Interpreting "latter stage product" as only subject merchandise ignores the plain language of the statute and would deny relief to products like ripe olives, no matter how substantial the subsidies.
- In *Shrimp from China*, Commerce attributed subsidies on the raw product to subject merchandise processed from that raw product regardless of whether the raw product could be processed into other non-subject merchandise.
- The respondents' attempt to distinguish this case from *Live Swine from Canada* and *Rice from Thailand*, because more subject merchandise was made from the raw products in those cases, is misguided. Similar to those cases, here too, the raw agricultural product (raw olives) has no use or outlet other than as a processed product (processed olives). The demand for the prior stage product – raw olives – is 100 percent dependent on the demand for the latter stage product – processed olives.
- The U.S. International Trade Commission also confirmed there is a continuous line of production from raw olives – Commerce has correctly recognized this as strong evidence that demand for the prior stage product is dependent on the demand for the latter stage product.

---

[47] *See* Petitioner's Rebuttal Brief at 11-20.
[48] *See* section 771 of the Act.
[49] *See* Congressional Record, S. 8814, June 26, 1987.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation    -

- Commerce was correct to determine that processing raw olives into ripe olives adds limited value because the cost of processing is minimal. Processing is limited to cleaning and curing olives which amounts to about three percent of the total cost of the finished product.[50] The respondents have not refuted this. Rather they acknowledge that processing involves merely de-bittering and in most cases oxidization.

- The respondents argue that value of processing should include all packaging operations. Commerce was correct to reject this argument in the *Preliminary Determination* and should do so again. The plain language of the statute refers to "the processing operation," not to all the activities that occur between harvesting the raw product and its end use.

- Commerce precedent has not included canning, labeling or packaging in its consideration of "processing operations." In *Shrimp from China*, Commerce stated it looked to "the nature of the processing operation itself" in determining whether an operation should be included in the second prong of section 771(B) of the Act.[51] In *Live Swine from Canada*, Commerce considered only the operations that directly involved the raw product, such as the killing, evisceration and splitting of the hog, not any packaging or labeling.[52] Similarly, in *Rice from Thailand* Commerce did not consider packaging or labeling costs.[53]

- Commerce should also not consider the product characteristics used in the antidumping duty investigation, because what is considered relevant in that proceeding for matching sales is not relevant to what constitutes "processing operations."

- Processing raw olives into ripe olives adds limited value, because it does not change the essential character of the olives. The legislative history makes clear that the raw agricultural product and the processed agricultural product should be considered the same for countervailing duty attribution purposes.

- In *Rice from Thailand*, Commerce found that, after processing, the processed agricultural product (milled rice), while not identical to the raw agricultural product (paddy rice), remained essentially unchanged in composition.[54]

- The respondents argue that because an olive is processed from inedible to edible, the essential character is changed. However, there is no mistaking an olive for another type of fruit or another type of food product, whether raw or processed. They are olives when they are raw and olives when they are processed into ripe olives. Raw olives retain their essence after processing into ripe olives, just as paddy rice retains its essence after processing into milled rice and just as hogs retain their essence after processing into pork.

**Commerce's Position:** There is no new or additional information on the record that would lead us to change our preliminary finding that section 771B of the Act is applicable in this investigation. As we explained in the *Preliminary Determination,* we find both prongs of section 771B of the Act satisfied. First, the statute does not provide a definition for the term "latter stage product" as used within section 771B of the Act; as such, the statutory language does not require the latter stage product to be the subject merchandise or the foreign like product. Therefore, "the latter stage product" is not defined narrowly to include only subject

---

[50] *See* Petition Volume III at 5-6.
[51] *See Shrimp from China* and accompanying IDM at 50.
[52] *See Live Swine from Canada*.
[53] *See Rice from Thailand*.
[54] *See Rice from Thailand*, 59 FR at 8909.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

merchandise, ripe olives.  Consistent with the legislative history of the Act,[55] section 771B of the Act was enacted by Congress in order to capture the subsidies provided to raw agricultural products that are processed into a next-stage product, such as live swine into pork and paddy rice into milled rice.[56]  In this investigation, similarly, a raw olive is simply processed into the next-stage olive product.  Therefore, we find that all processed olives should be included when considering the latter stage product in this context.

The GOS also contends that, in *Shrimp from China*, Commerce established a 25 percent threshold for determining whether the demand for the raw agricultural product is dependent upon the demand for the latter stage product.  This assertion is incorrect.  Section 771B does not provide a statutory threshold, nor does it provide the analysis to be applied by Commerce in determining whether the demand for the prior stage product is substantially dependent on the demand for the latter stage product.  The legislative history demonstrates that Congress enacted section 771B of the Act to ensure that Commerce can "place duties on processed agricultural products if the raw agricultural product is subsidized."[57]  Commerce's determination in *Shrimp from China* was based on the facts and record evidence present in that proceeding.  With respect to the raw olives at issue here, we find based on the facts and the circumstances present, that the demand for those olives is substantially dependent on the demand for both table and ripe olives.

Consistent with the *Preliminary Determination,* we also continue to find, in accordance with section 771B(2) of the Act, that record evidence shows that there is a three percent value for processing the raw input and that this level represents a limited value added to the raw commodity,.  Further, we continue to find that, irrespective of the relationship between cost and value, the processing operation does not change the essential character of the olive.

While the GOS contends that it provided information on the manufacturing costs at verification, based on information on the record, we find that the information provided by the GOS does not support a change in our determination.  The GOS verification report stated that, according to GOS officials, processing operations add value "such that the processed olives have a value that is 40 to 60 percent higher than the value of the raw olive, which includes the processing accomplished from the harvest to the canning."[58]  The GOS verification report notes that, "{w}hen we asked GOS officials to support that level of value added, they explained that this data is based on estimates prepared by olive industry experts and it is not based on official collection, analysis or reporting of data."[59]  Thus, it was apparent at verification that this information was not developed by the GOS in the course of its normal monitoring of the olive industry or for any other purpose, and there was no basis for a further discussion of this information or an examination of the reliability of its underlying sources during the verification.  As such, the only reliable information demonstrating the value of processing is the information submitted by the petitioner in the CVD petition.[60]  We, therefore, continue to find that record

---

[55] *See* CVD Petition at Exhibit III-19 (citing 133 Congressional Record S8814 (1987)).
[56] *See Live Swine from Canada*.
[57] *See* Congressional Record, S. 8814, June 26, 1987.
[58] *See* GOS Verification Report at 3.
[59] *Id.*
[60] *See* "Countervailing Duty Investigation Initiation Checklist:  Ripe Olives from Spain," July 12, 2017 (Initiation Checklist) at 6-7.

evidence shows that there is a three percent value for processing the raw input and that this level represents a limited value added to the raw commodity, in accordance with section 771B(2) of the Act.[61]

The GOS and the respondents continue to argue that Commerce should include packaging as an essential element of the processing operation; however, they have not provided information that would support a departure from our practice in this case. We also disagree with respondents that, because packaging is used as a product characteristic for matching purposes in the antidumping context, it must be used here. This is not a meaningful comparison to our consideration of the value added by processing and does not demonstrate that we should consider the value added by processing to include the costs of packaging operations and packaging materials. The matching criteria in the antidumping analysis do not affect our consideration in a CVD proceeding (which is conducted in accordance with section 701 of the Act) of what may or may not constitute a processing operation in terms of a section 771B of the Act analysis, and our analysis of whether the value added to the raw commodity is limited, for the purposes of measuring subsidy benefits to subject merchandise. Therefore, in line with the precedent of *Pork from Canada* and *Rice from Thailand*, we continue to exclude packing and packaging activities from our analysis.[62]

We are also not persuaded by the respondents' claim that rendering an olive edible changes its essential character and continue to find that the processing operation does not change the essential character of the olive. As stated in our *Preliminary Determination*, Commerce has found the second prong of section 771B of the Act to be met where processing operations do not change the "essential character" of the raw product. In this case, while processing may remove bitterness and add flavor and tenderness, it does not change the essence of the product – they are olives when they are raw and olives when they are processed.[63]

Finally, the respondents' attempt to draw a distinction between the narrow scope of this investigation and the broader scopes at issue in *Rice from Thailand* or *Live Swine from Canada*, is unavailing. The differences in the breadth of the scopes are immaterial. Section 771B of the Act does not require a scope analysis, nor does the scope of the investigation determine how Commerce defines "the latter stage product" for the purposes of the Act. The legislative history of section 771B of the Act also does not address the scope of the investigation with relation to the latter stage product. Rather, as explained in the legislative history, "a foreign nation could avoid a U.S. countervailing duty on an agricultural product merely by doing some minor processing of the agricultural product before it is exported to the United States…{we} are today offering an amendment to the trade bill that directs the Commerce Department to place duties on processed agricultural products if the raw agricultural product is being subsidized."[64] Consistent with the legislative history of the Act, section 771B of the Act was enacted by Congress to capture the subsidies that are provided to raw agricultural products that are processed into a next-stage product. As stated in the *Preliminary Determination*, here, the raw

---

[61] *Id.*

[62] *See Final Affirmative Countervailing Duty Determination:  Fresh, Chilled and Frozen Pork from Canada,* 54 FR 30774, 30775 (July 24, 1989) (*Pork from Canada*); *see also Rice from Thailand* at 8909.

[63] *See Preliminary Determination* and accompanying PDM at 15-16.

[64] *See* Petition at Exhibit III-19 (citing 133 Congressional Record S8814 (1987)).

olives are simply processed into a next-stage product, and nothing in the legislative history or the language of the statute precludes such an interpretation.

**Comment 2:  Whether a Pass-Through Analysis is Required**

*European Commission Comments*[65]
- Even if SPS, BPS and the Greening program provide countervailable subsidies, the amounts received by the producers of the input product, raw olives, cannot automatically be attributed to the subject merchandise.  In order to proceed with attribution, Commerce must first prove that the subsidies granted to the Spanish olive growers were passed through and reflected in the prices of ripe olives exported to the United States.
- Article 10 of the ASCM and Article VI:3 of the General Agreement on Tariffs and Trade (GATT) require a pass-through analysis.  In *U.S. Softwood Lumber IV*,[66] the WTO Appellate Body required a pass-through analysis.  Furthermore, the Appellate Body noted that it is the obligation of the investigating authority to establish the precise amount of the subsidy.
- Even if section 771B of the Act is applicable, according to the WTO, a pass-through analysis is required.  The WTO Panel concluded that, even though Commerce determined that the conditions of 771B of the Act were met, that could not be considered a determination based on all facts necessary to meet the requirements of Article VI:3 of the GATT.[67]  Specifically, section 771B of the Act could not justify the conclusions that the subsidies granted to swine producers had led to a decrease in prices for swine paid by pork producers below the prices for swine from other commercially available sources of supply, and that this decrease was equivalent to the full amount of the subsidy.[68]
- In addition, because raw olives must be transformed into ripe olives, there is a change between the input product and the subject merchandise.  The WTO, in its *Airbus* panel decision, noted that a pass-through analysis was not required where an input product and a further manufactured product are both covered by the definition of the product subject to the countervailing duty investigation.

*GOS' Comments*[69]
- Even if aid granted to EU farmers is countervailable, section 771B of the Act does not meet the standard set by WTO jurisprudence, which requires a pass-through analysis.
- According to *U.S.-Softwood Lumber IV* and *US-Washing Machines*, the investigating authority must demonstrate that the aid granted to the producers of raw materials is transferred, and that it confers a benefit on the final processor.  The administering authority is also required to show that this benefit is reflected in the price of the product under investigation.  Finally, the administering authority must determine the exact benefit of the

---

[65] *See* EC's Case Brief A at 12-14.
[66] *See* Appellate Body Report, *United States – Final Countervailing Duty Determination with Respect to Certain Softwood Lumber from Canada*, WT/DS257/AB/R (adopted Feb. 17, 2004) (*U.S. Softwood Lumber IV*).
[67] *See* Panel Report, United States – Countervailing Duties on Fresh, Chilled and Frozen Pork from Canada, SS7/R/38S/30, (adopted July 11, 1991) (*U.S. – Pork from Canada*).
[68] *See U.S. – Pork from Canada*, DS7/R – 38S/30, pages 12-15.
[69] *See* GOS' Case Brief A at 25 -32.

aid that has been transferred to the final producer for the purpose of quantifying the countervailing duties.

- In *Mexico – Olive Oil*, the WTO makes clear that pass-through cannot be assumed, especially when different sectors are being considered or there is a change between the input product and the product under investigation. In this investigation, the raw olives are changed to ripe olives after processing.

- Section 771B of the Act assumes a pass-through analysis has already taken place when it has not. Section 771B of the Act assesses only whether there is substantial dependence between the raw and processed product and the amount of value added. It does not look at the elements of a transfer of a subsidy between the parties and a necessary quantification of the benefit that is passed through, as the WTO requires.

*Respondents' Comments*[70]

- Section 771B of the Act is inconsistent with WTO obligations, because it presumes a complete pass-through of subsidies from the recipient of the subsidies to companies under investigation without any examination of whether such pass-through occurs.

- In *U.S. – Pork from Canada*, the GATT Panel determined that authorities must examine price effects when determining whether a downstream industry benefits from subsidies received by an upstream industry. The Panel found that the two factors of section 771B of the Act, "could not justify the conclusion that the subsidies granted to swine producers had led to a decrease in the level of prices for Canadian swine paid by Canadian pork producers below the level they have to pay for swine from other commercially available sources of supply and that this decrease was equivalent to the full amount of the subsidy."[71]

- In *U.S. – Softwood Lumber III*, the Panel cited to the Appellate Body in *U.S. Lead and Bismuth II*, and stated that an authority "may not assume that a subsidy provided to producers of the 'upstream' input product automatically benefits unrelated producers of downstream products, especially if there is evidence on the record of arm's-length transactions between the two."[72]

- In *U.S. Softwood Lumber IV*, the Appellate Body confirmed that if "countervailing duties are intended to offset a subsidy granted to the producer of an input product, but the duties are to be imposed on the processed product (and not on the input product), it is not sufficient for an investigating authority to establish only for the input product the existence of a financial contribution and the conferral of a benefit to the input producer."[73]

- For a subsidy to exist, there must be a financial contribution by the government that confers a benefit to the recipient. If the subsidy is conferred on an input product, the producer of the processed product can be the indirect recipient of such benefit only if the administering authority can prove that the benefit flows through to the processed product.

---

[70] *See* Respondents' Case Brief A at 6-11.

[71] *See U.S. – Pork from Canada*, para. 4.10.

[72] *See* Panel Report, *United States – Preliminary Determinations with Respect to Certain Softwood Lumber from Canada*, WT/DS236/R, para 7.71 (adopted Nov. 1, 2002) (citing Appellate Body Report, *United States – Imposition of Countervailing Duties on Certain Hot-Rolled lead and Bismuth Carbon Steel Products originating in the UK*, WT/DS138/AB/R, para. 68 (adopted June 7, 2000)).

[73] *See U.S. Softwood Lumber IV* at para. 142 (adopted Feb. 17, 2004).

*AFI Rebuttal Comments*[74]
- Section 771B of the Act is not consistent with U.S. obligations under the GATT 1994 and WTO ASCM.

*Petitioner's Rebuttal Comments*[75]
- The respondents' WTO arguments are designed to divert attention. Long-standing Commerce practice makes clear that it is bound to apply current U.S. law, regardless of the WTO assertions that are made.[76]
- Courts have consistently upheld this principle. In *Corus Staal.* the Federal Circuit held that, "{n}either the GATT nor any enabling international agreement outlining compliance therewith…trumps domestic legislation; if United States statutory provisions are inconsistent with the GATT or an enabling agreement, it is strictly a matter for Congress."[77]

*GOS' Rebuttal Comments*[78]
- There should be no presumption that aid granted to olive farmers has been passed directly and entirely to ripe olive produces.
- No direct transfer exists and Commerce must conduct a pass-through analysis.
- Commerce must quantify the exact benefit that has been transferred from the producer of the raw olives to the responding companies.

**Commerce's Position:** The GOS, EC and respondents argue that Commerce must conduct a pass-through analysis in order to establish that benefits provided to olive growers also benefitted the respondent olive processing companies. However, the statutory scheme contains distinct provisions for the investigation of upstream subsidies, *see* section 771A of the Act,[79] and the subsidies provided to raw agricultural products that are manufactured into a processed product, *see* section 771B of the Act. In light of the applicability of section 771B of the Act, *see* Comment 1, above, a pass-through analysis that would be conducted in the context of an upstream subsidy investigation is not relevant to whether the respondents received a benefit. Therefore, we disagree that we are required to conduct such an analysis in this investigation.

Parties in favor of Commerce conducting a pass-through analysis cited to numerous WTO Panel and Appellate Body decisions. We do not find these decisions relevant to the instant investigation. Commerce has conducted this investigation in accordance with the Act and Commerce's regulations, and our CVD laws are consistent with our WTO obligations. Moreover, it is the Act and Commerce's regulations that have direct legal effect under U.S. law, and not the WTO Agreements or WTO reports.[80] In this regard, WTO reports "do not have any power to change U.S. law or to order such a change."[81]

---

[74] *See* AFI Rebuttal Brief at 2-3.
[75] *See* Petitioner's Rebuttal Brief at 11-13.
[76] *Id.* at 13 note 52 citing numerous Commerce decisions.
[77] *See Corus Staal BV v. Department of Commerce*, 395 F.3d 1343, 1348 (Fed. Cir. 2005) (*Corus Staal BV*).
[78] *See* GOS Rebuttal Brief at 5-6, 11.
[79] *See also* 19 CFR 351.523 (governing the investigations of upstream subsidies).
[80] *See Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from India: Final Affirmative Determination*, 83 FR 3122 (January 23, 2018) and accompanying Issues and Decision Memorandum (*PSF from India* IDM) at Comment 1.
[81] *See id.*; SAA at 659.

Barcode:3717366-01 C-469-818 INV - Investigation  -

**Comment 3:  Whether the EU CAP Pillar I – BPS, SPS, and Greening Programs are Countervailable**

*European Commission Comments*[82]

- Commerce's finding that the BPS, SPS, and Greening programs are specific is based on the erroneous reasoning that "the current annual grant amount is effectively still based on the type of crop and the volume of production" and "{t}he crop type determines the grant amounts provided under this program due to the direct reliance on the grant amounts provided under previous programs, which based grant amounts on the crop type."
- Commerce's conclusion that there is a continuity and causality link between the Common Organisation of Markets in Oil and Fats[83] (Common Market) program and SPS is not tenable, because the SPS program was different in design, rationale, and payment format.
- New CAP "direct income support" is provided in accordance with the WTO Agreement on Agriculture, Annex 2 paragraph 6.
- In accordance with Council Regulation 1782/2003 Article 37(1), farmers received an amount of aid under SPS based on a reference period, which averages the payments the farmer was granted under the Common Market program in marketing years 1999/2000 through 2002/2003.
- The aid received by farmers under the Common Market program was converted into entitlements, rights granted to receive aid that is an average of the aid received during marketing years 1999/2000 through 2002/2003; this support is decoupled.
- The entitlement is not automatic; it has to be activated annually by documenting that there is agricultural activity or that the land is kept in the required condition.
- Olive growers received rights to an amount of aid calculated based on olive production in the reference period (1999 through 2003), but the aid is provided regardless of future olive production and even olive production is partially or completely replaced with other activities.
- The payment is linked to the activating of entitlements and not to production.
- Payment entitlements during 2016 through 2017 were based on previous forms of payments and the decoupling process ended in 2010.
- The reliance on coupled payments that were provided during the historical reference period does not convert the grants provided under the SPS program into a product-specific subsidy, because the assistance under the program is no longer coupled to any product or production.
- Coupled payments for the olive sector were discontinued in 2010.
- The SPS program was replaced by the BPS program, and by extension the Greening program, in 2015.  The BPS program is a new scheme which is not a continuation of SPS or any other previous EU aid schemes that have been terminated.
- The BPS program provides better distribution of support across the EU through external and internal convergence.
- The BPS and Greening programs are decoupled direct payment schemes that do not require production of crops, do not categorize types of farmers, and provide general support

---

[82] *See* EC's Case Brief A at 7-10.
[83] The EC describes this program as the "Common Organisation of Markets in Oil," but the full name is the "Common Organisation of Markets in Oil and Fats."

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

throughout the agricultural sector.  Therefore, the payments are not beneficial to a processing industry or exporters.

- The BPS entitlements were allocated in 2015 for each eligible hectare declared by a farmer; eligibility of a hectare is not linked to production or any sector.
- The value of each entitlement was determined using different principles than those used under the SPS program.  The overall policy objective is to narrow the gap between the values of entitlements allocated to different farmers by 2019.  Differences in the value of entitlements may exist among farmers due to the calculation method applied.  The calculation method divides a reference amount for the farmer by the number of entitlements allocated in 2015 and then an additional calculation is applied for internal convergence, to increase or decrease the final value to move it toward a flat rate by 2019.  The reference amount used in the BPS entitlement calculation is a percentage of the payments received by the farmer in 2014 under the SPS program, per EU Regulation 1307/2013 Article 26(2).
- The value of the BPS entitlements does not reflect the value of SPS entitlements due to many factors and it is not possible to make general approximations.  The result of these changes is that the payments per hectare, while very different depending on the crop produced in the reference period, have converged over the years.
- Type of crop is not an eligibility criterion for the aid and, therefore, is not a pre-condition for granting support under the BPS program.
- The application form submitted by the farmer states the type of crop intended to be cultivated, but this information is used only for administrative purposes and is not linked to the concession or granting of payments under the BPS program.
- The Greening program is available to all farmers who are eligible for payments under the BPS program and undertake practices that are environmentally beneficial, such as crop diversification and maintaining existing permanent grassland.
- EU Regulation 1307/2013 Article 43.1 does not state that payments under the Greening program are explicitly limited to olive groves.  The Greening program is not specific under the WTO ASCM Article 2.1(a) and section 771(5A)(D)(i) of the Act.
- Under BPS, the EU direct payments to farmers is more distant from any production references than under the SPS program.
- It is not possible to compare benefits by crop type at the EU level for the SPS, BPS, or Greening programs, because the subsidies are not provided by crop type and, therefore, the data are not available.  The only available information regarding subsidies provided to specific crop sectors relates to the 10 percent of direct payments that are provided under the Voluntary Coupled Support program.  Spain chose not to provide funding to the olive sector under the Voluntary Coupled Support program.
- The record contains sufficient information for a comprehensive assessment of whether the subsidies under the SPS, BPS, and Greening programs are specific in accordance with the ASCM Article 2.1(a); Commerce's *Preliminary Determination* was based on a biased analysis that focused only on certain aspects of the program.
- Commerce failed to prove that the SPS, BPS, and Greening programs are specific within the meaning of ASCM Article 2.1(a) and section 771(5A)(D)(i) of the Act.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

*GOS' Comments*[84]

- The SPS program replaced the previous coupled-payment systems with a new format of payment, "direct income support." The program operated in Spain from 2006 through 2014 in accordance with WTO Agreement on Agriculture, Annex 2, paragraph 6. The BPS program was implemented in 2015.
- Neither payments provided to farmers under the BPS or SPS programs are linked to a specific product or a specific level of yield or production. Neither the BPS nor Greening programs require farmers to produce certain crops or any crops; in these decoupled programs, the assistance is not categorized by types of farmers or crops; it is not possible to determine the amount of assistance provided to a particular crop sector.
- Under the Common Market program, before 2003, aid was linked to specific crops; in the replacement programs, SPS and BPS, aid is linked to entitlements, which are an administrative concession to the farmer that guarantees income support, regardless of farming activity or type of crop grown. The use of entitlements, which is a right to receive aid, decoupled payments from crop type because the payment received is linked to activating the entitlements on the designated land area and not to the production of a product or a volume of production.
- Entitlements were initially allocated under SPS to farmers who had received aid during a reference period, generally from 2000 through 2002, and for the olive sector from 1999 through 2002. Farmers with entitlements, which are associated with eligible areas, receive a grant annually if the farmer "activates" the entitlement and demonstrates that the land associated with the entitlement continues to meet the eligibility criteria, *i.e.*, is kept in the required environmental condition.
- In Spain, the SPS program was applied as a historical model, where the SPS entitlements were calculated for each individual farmer based on a reference period, per Council Regulation 1782/2003 Article 37(1). The BPS program was applied under a regional model in 2015.
- The value of the entitlements held by a farmer is based on the crops grown by the farmer during the reference period for each crop. The overall value of all entitlements may be adjusted for national reasons, such as the 2014 national budget reduction.
- A farmer may sell, buy, or rent entitlements. An olive farmer may own an entitlement associated with land that produces cereal crops and, thus, the aid value corresponds with the reference period average amount for cereal crops.
- The entitlement reference periods are not linked to the Aid to Olive Groves program. There is no evidence that the respondents received amounts derived from the aid to olives groves program.
- Entitlement values are not reviewed after allocation.
- Grants provided under the Voluntary Coupled Support scheme are coupled to specific crops; olive crops are not included. Coupled payments to the olive sector ceased in 2010.
- Commerce is not able to prove that the value of an entitlement held and activated by a current olive grower is from the aid provided under the Common Market program, because that program ended, and any entitlements held by olive farmers could have been bought, rented, or inherited.

---

[84] *See* GOS' Case Brief A at 19.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

- The GOS demonstrated at verification the lack of a link between the entitlement held by an olive grower and the product grown, because the type of crop is not considered in the calculation or the approved payment amount.
- There were variations in the SPS amounts received by farmers based on the activated entitlements but these payments were not linked to a specific crop or crop production.

*Respondents' Comments*[85]
- Commerce found specificity under section 771(5A)(D)(i) of the Act, where the government "expressly limits access to the subsidy to an enterprise or industry," but the SPS and BPS programs are not limited to olive growers.
- Commerce found *de jure* specificity based on the current programs' use of grant amounts provided that were based on particular crops, but the current programs provide assistance that is decoupled from particular crops.
- The SPS and BPS programs' reliance on a reference period during which assistance was provided on a coupled basis, does not make the SPS and BPS programs crop-specific.
- The BPS and SPS programs are not linked as directly as Commerce suggests. Programs subsequent to the Common Market program underwent a significant transformation.
- The SPS program replaced the coupled payment program, the Common Market program, with a form of "direct income support." In accordance with Council Regulation 1782/2003, Article 37(1), the amount of the grant under this program was based on the average of total payments granted to a farmer under the olive oil support program from 1999 through 2003.
- The right to receive aid is not automatic; it must be activated.
- Activation of the entitlement does not require olive production, only that the land is kept in good environmental condition. Verification proved that a farmer's current production or lack of production was not a factor in the process or evaluation of a farmer's application for an income grant under SPS.
- BPS is also a decoupled support program that does not require farmers to produce certain crops or any crops to receive aid. Farmers may access benefits under the SPS and/or BPS program regardless of whether they grow olives or any crop.
- Commerce's attempt to illustrate "daisy chain linkage" from the Common Market program to SPS and BPS is unavailing, because the SPS and BPS programs are new, decoupled, programs with no crop production obligations.
- Convergence, introduced under the BPS program, is used to ensure a flat rate per hectare (entitlement) by the year 2019, to narrow the gap between the values of entitlements allocated to different farmers.
- Added factors ensure that BPS entitlements do not reflect the value of SPS entitlements held by the farmer.

---

[85] *See* Respondent Company's Case Brief A at 18-22.

Filed By: Mary Kolberg, Filed Date: 6/13/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

*Petitioner's Rebuttal Comments*[86]

- In the *Preliminary Determination*, Commerce found *de jure* specificity in accordance with section 771(5A)(D)(i) of the Act for the CAP I programs.  Similarly, in *LTP from China*,[87] *Geogrids from China*,[88] and *Pneumatic OTR Tires from India*,[89] Commerce found *de jure* specificity under section 771(5A)(D)(i) of the Act, where the government maintains a policy to encourage and support the growth and development of an industry.

- Commerce identified a clear regulatory and operational link tying the BPS program's subsidy entitlements for olive growers during the POI to entitlements established in the SPS program, which were tied to payments provided under the "coupled" grant program that operated during the reference period 1999 through 2002.

- The "coupled" grant program, the Common Market program, operated from 1997 through 2003, provided an annual grant to farmers based on crop type, and production levels, and expressly including olives.

- Commerce properly concluded that "the crop type determines the grant amounts provided under (these programs) due to the direct reliance on the grant amounts provided under the previous program, which based grant amounts on the crop type."

- The respondents, the GOS, and the EC argue that the subsidies are "generally available agricultural subsidies;" that Commerce's reasoning is "overly simplistic;" that recipients of the grants do not need to produce any crops; and, that convergence will end the disparate subsidy levels across crops and regions.  These arguments fail to disprove the clear textual and operation linkage that ties subsidy eligibility and payments under the SPS and BPS programs to the product-specific, coupled subsidy payment criteria of the predecessor program.

- Case briefs submitted by the respondents, the GOS, and the EC restate the linkage between SPS, BPS, and the olive grower-specific predecessor program using a historical reference period in the calculation of the entitlement value for the SPS and BPS programs.  Commerce confirmed the linkage across the three programs at verification.

- Programs are limited to olive growers because the programs remain specific to olives through the implementing regulations which tie the current program, BPS, to the predecessor programs that provided coupled support to olive growers.

- The respondents and the governments have not demonstrated that BPS's use of a convergence methodology has "converged" the disproportionately large subsidy benefits historically provided to olive farmers.

- Commerce determined and verified that the regulatory procedures establishing the funding levels across the 50 designated agricultural regions in Spain have been designed to protect the disproportionately higher payment amounts for olive farms.

- The absence of industry-specific data is not evidence that specificity cannot be established but, rather, is evidence of the non-transparency of these payments.  The contention that crop- or industry- specific data are unavailable does not reconcile with the grant applications

---

[86] *See* Petitioner's Rebuttal Brief at 4-10.

[87] *See Lightweight Thermal Paper from China, Preliminary Countervailing Determination*, 73 FR 13850 (March 14, 2008).

[88] *See Final Determination in Countervailing Duty Investigation on Certain Biaxial Integral Geogrid Products from China*, 82 FR 3282 (January 11, 2017) (*Geogrids from China*) and accompanying IDM at 21.

[89] *See Final Determination in Countervailing Duty Investigation on Certain New Pneumatic Off-the-Road Tires from India*, 82 FR 2946 (January 10, 2017) (*Pneumatic OTR Tires from India*) and accompanying IDM at 38.

which require farmers to identify and quantify their specific crops as demonstrated in the Petition and the petitioner's October 10 submission.

- Commerce is correct in finding that the BPS and SPS programs are specific to olive growers and the record supports this finding. The respondents have not discredited the regulatory analysis and identification of explicit textual language linking payments under the governing subsidy rules to payments made from 1997 to 2003 on the basis of crop type.

- CAP Pillar I programs that still expressly link payments to annual grant amounts that were crop-specific are specific to the olive sector, within the meaning of section 771(5A)(D)I of the Act.

- The BPS and SPS programs are also specific under sections 771(5A)(D)(iii)(II), (III), and 771(5A)(D)(iv) of the Act because Spanish olive growers located in Andalusia receive a disproportionately large amount of CAP Pillar I subsidies compared to other agricultural industries located in other regions.

- Information provided in the Petition confirms that each of Spain's 50 agricultural regions has an assigned 'unit of value' which varies based on differences in the amounts farmers received under SPS in those agricultural regions. The agricultural regions are defined by "agroeconomic, socioeconomic, regional potential, productive purpose, and agrarian potential. This information was verified by Commerce.

- Olive growers remain the predominant user, regardless of the decoupled status of the BPS program, due to the factors used to assign a 'unit of value' to each of the 50 agricultural regions. Olive growers received an estimated 20 percent of total EU CAP aid to Spain, but represent three percent of Spain's total agricultural output.

- The SPS and BPS programs are regionally specific per 771(5A)(D)(iv) of the Act, because they are administered on a regional basis.

**Commerce's Position:** We continue to find, for purposes of this final determination, that assistance provided under the CAP Pillar I programs Basic Payment Scheme (BPS) and Greening is *de jure* specific and, therefore, countervailable. As we explained in the *Preliminary Determination*,[90] our finding of *de jure* specificity is based on the manner in which Spain implemented the Pillar I programs with reference to the operations of its two predecessor programs, the Single Payment Scheme and the Common Organisation of Markets in Oils and Fats (the Common Market Program), and the manner in which the amount of assistance was determined under these two programs. The earliest of these programs, the Common Organisation of Markets in Oils and Fats, was in place from 1999 through 2003, and provided production aid in the form of annual grants to farmers on the basis of type of crop and the volume of production.[91] Both olive oil and table olives were specifically identified as products eligible to receive production aid under this program,[92] and the payments during this period were based on whether the olives were used to produce olive oil or table olives. Specifically, the payment for hectares that grew olives for olive oil production used the equation "132.25/100kg" to calculate the value of the payment per hectare; the payment for hectares that

---

[90] *See* PDM at 18-23.

[91] *See* CVD Petition Exhibit III-7, and *see* EU IQR at Exhibit 10 "Council Regulation (EC) No. 864/2004."

[92] Olive oil is listed in Annex VI and references Council Regulation (EEC) No. 136/66 Article 5 and notes "production aid." *See* EU IQR Exhibit 11 "Council Regulation (EC) No. 1638/98," and GOS SQR Exhibit 21, which references Council Regulation (EC) No. 1782/2003 Annex VI.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

grew olives to produce table olives used a different calculation, in which the ratio of 100 kg of processed table olives was equal to 11.5 kg of olive oil eligible for production aid.[93]  Once the value per hectare was determined using this calculation, a farmer would apply for aid in the amount of the number of hectares multiplied by the value of each hectare.

We recognize that the Common Market Program is no longer in operation and ceased providing benefits to olive growers in 2003, and we are not rendering a decision regarding whether the assistance provided under this program was specific under section 771(5A) of the Act. However, because the amount of assistance provided to olive farmers and the methodology for determining it under this program forms the foundation for determining the amount of assistance provided to olive farmers under the successor programs SPS and CAP Pillar I BPS and Greening, it is necessary to evaluate the specificity of this program separately.  In doing so, we consider that, because the Common Market Program provided annual payments only to producers of oilseed crops, including olives, we would find this program to be *de jure* specific, as explained in further detail below.

As the EC points out, when the SPS program was implemented in Spain, the aid provided to farmers was converted into "entitlements," rights to receive payments, that were linked to land area and completely decoupled from production.[94]  That is, under SPS, the amount of the payment is dependent on the annual activation of the entitlement, and is not dependent on the type or volume of crop produced.[95]  Crucially, however, the amount of each farmer's payment was calculated as a percentage of the average annual grant payments previously provided over a reference period.[96]  In the case of olives and olive oil, this reference period was from 1999 through 2002, when the Common Market Program was in operation.  Because the Common Market Program provided benefits on a *de jure* specific basis, the benefits provided under the SPS retained the *de jure* specificity inherent in the Common Market Program.

According to the EU, the BPS program implemented in 2015 is a new scheme, not a continuation of the SPS program, that aims to provide a better distribution of assistance that is decoupled from crop type or production volume, and does not categorize farmers by the crops they produce.  As we discussed in more detail in the *Preliminary Determination*, in implementing this program, Spain created 50 regions, using farmland data that were collected in 2003 for purposes of implementing the SPS.[97]  These data included the area in hectares, the types of crops, and the volume of production during the period 1999 to 2002 or 2000 to 2002, and the amount provided under the annual grant-to-farmer program for those same periods.[98] These 50 agricultural regions were created to facilitate the identification and distribution of

---

[93] *See* EU IQR at 11, *see* EU SQR at response to Question 26, and *see* GOS SQR at 20.

[94] *See e.g.*, EU IQR Exhibit 9 and 12.

[95] *See Preliminary Determination* and accompanying PDM at 21-23; *see also* EU IQR at Exhibit 10.

[96] *Id*.

[97] The GOS states that the regional application model of BPS in Spain was implemented based on Article 23.1 of Council Regulation (EC) No. 1307/2013. *See* GOS SQR at 26; *see also* EU IQR at Exhibit 13"Council Regulation (EC) No 1307/2013."

[98] *See* EU IQR at Exhibit 12 "Council Regulation (EC) No 1782/2003;" *see also* GOS SQR at 26.  Also, Spain's GIS system is called "the geographic identification system of agricultural plots (SIGPAC).  *See* GOS SQR at Exhibit 18.

payments under BPS.  The characteristics of each region, which were categorized to reflect "the traditional agronomic practices being carried out in them…have, as an indicative element, a reference value represented by a regional rate," are used in the calculation of the grant amount a farmer is eligible to receive under the BPS – Direct Payment and BPS- Greening programs.[99]

Each region has shared agronomic characteristics[100] and a territorial definition based on its "productive potential and the productive orientation determined in the 2013 campaign…." This "productive orientation" is categorized as "rainfed land, irrigated land, permanent crops and permanent pastures;"[101] olive groves are considered permanent crops.[102]  This territorial definition determines each region's "regional rate," which is used to determine the value of each hectare of farmland's "basic payment entitlement."  As a result, each basic payment entitlement amount is weighted by the regional reference value to which it corresponds.  In addition, the entitlement value used to determine the amount of funds beneficiaries received in 2014 under the SPS is used in determining the amount of funds Spain should receive under BPS Direct Payment and Greening by using each region's "regional rate."[103]

As we noted above, a regional rate is used to calculate the eligible grant amount under BPS and Greening.  The calculation begins with determining an "initial value," as instructed by Council Regulation (EC) 1307/2013 Article 26 and implemented by Royal Decree 1076/2014.[104]

Under Regulation (EU) 1307/2013, Article 26 (3), the initial value is

> {a} fixed percentage of the *value of the entitlements*, including special entitlements, which the farmer held on the date of submission of his application for 2014 *under the single payment scheme*, in accordance with Regulation (EC) No 73/2009, shall be divided by the number of payment entitlements he is allocated in 2015, excluding those allocated from the national or regional reserves in 2015.[105]

---

[99] Specifically, the "entitlement payment," which is also described as the "basic payment right" is determined using the region's rate.  *See* GOS SQR Exhibits 18 "Official Spanish Gazette: Order AAA/544/2015," 19 "Newsletter No 2: Basic Payment Entitlement Allocation," 19, and 20 "Official Spanish Gazette: Order AAA/1747/2016."

[100] *See* GOS SQR at 26 and Exhibits 18 "Official Spanish Gazette: Order AAA/544/2015," and 20 "Official Spanish Gazette: Order AAA/1747/2016," which states that Royal Decree 1076/2014, of December 19th, implemented the allocation of BPS rights and established a "uniform national implementation model based on agricultural regions, which took into account the three basic criteria cited in Council Regulation (EC) No. 1307/2013…."  The "basic criteria" cited are administrative criteria, agronomic characteristics, and socioeconomic impact of crops on agricultural districts.

[101] The "2013 campaign" refers to the SPS program.  The weights assigned to each characteristic are: rainfed land (0.568), irrigated land (1,717), permanent crop (1), and permanent pastures (0.376).  *See* GOS IQR at 8-9, and *see* GOS SQR at 26 and Exhibit 18 "Official Spanish Gazette: Order AAA/544/2015" and 19.

[102] *See* GOS IQR at 44.

[103] *See* GOS SQR at 26 and Exhibits 18 "Official Spanish Gazette: Order AAA/544/2015" and 19.

[104] *See* EU IQR Exhibit 13 "Council Regulation (EC) No 1307/2013," *see* EU IQR Exhibit 9 "Council Regulation (EC) No. 73/2009, and *see* GOS QR at 20-22 and Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014."

[105] Emphasis added.

Barcode:3717366-01 C-469-818 INV - Investigation -

The Spanish regulations regarding the implementation of BPS, Royal Decree 1076/2014, state that

> {f}or the calculation of the initial unitary value, the level of payments received in the 2014 campaign, before deduction and exclusions, corresponding to the aid schemes paid in that campaign, amounts of which remain uncoupled or are partially or totally decoupled from 2015 onwards, shall be taken as a reference. These amounts correspond to the single payment scheme as a decoupled payment . . . .[106]

Based on these regulations, a region's value is the initial value multiplied by an adjustment coefficient divided by the number of hectares with entitlement values. These regulations also state that the initial value is based on the amounts provided under SPS.[107] These regulations also state that the adjusted coefficient incorporates into the equation the amount of payments received in 2014 under SPS.[108] Therefore, the value that a farmer received per hectare in 2014 under SPS is used in calculating each region's value. In Spain, this value is also multiplied by the "productive orientation" weight, *e.g.* permanent crops and permanent pasture classifications receive weights of 1 percent and 0.376 percent, respectively.[109] Using this methodology, each of Spain's 50 regions has an assigned "unit of value" which varies based on the differences in the amounts farmers received under SPS in those regions. The Council Regulation (EC) 1307/2013 (22) acknowledges these variations in individual payments and that the differences are based on the use of historical references, stating:

> Due to the successive integration of various sectors into the single payment scheme and the subsequent period of adjustment granted to farmers, it has become increasingly difficult to justify the existence of significant individual differences in the level of support per hectare, resulting from use of historical references.[110]

The application to receive grants under the BPS Direct Payment and Greening programs includes the total entitlement value for the farm and this determines the amount of assistance the farmer will receive under these two BPS subprograms. To calculate a farm's total entitlement value, the number of hectares is multiplied by that location's regional value.[111] Therefore, two farms of the same size can have two different total entitlement values if there is an historical

---

[106] *See* GOS IQR Exhibit A002 "Royal Decree 1076/2014."

[107] *See* EU IQR Exhibit 13 "Council Regulation (EC) No 1307/2013," *see* EU IQR Exhibit 9 "Council Regulation (EC) No. 73/2009, and *see* GOS QR at 20-22 and Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014."

[108] *See* GOS IQR Exhibit A002 "Royal Decree 1076/2014" Section 9, and *see* GOS SQR at Exhibit 18 "Official Spanish Gazette: Order AAA/544/2015," 19 "Newsletter No 2: Basic Payment Entitlement Allocation," and 20 "Official Spanish Gazette: Order AAA/1747/2016."

[109] *See* GOS QR at Exhibit A002 "Royal Decree 1076/2014," and *see* GOS SQR at Exhibit 18 "Official Spanish Gazette: Order AAA/544/2015."

[110] *See* EU IQR Exhibit 13 "Council Regulation (EC) No 1307/2013, and *see* EU IQR Exhibit 9 "Council Regulation (EC) No. 73/2009."

[111] *See* GOS QR Exhibits A001 "Royal Decree 1075/2014" and A002 "Royal Decree 1076/2014." and *see* GOS SQR at Exhibit

Barcode:3717366-01 C-469-818 INV - Investigation -

difference in the amount of assistance provided in the different regions previously received under SPS.[112]

In summary, the annual grant amounts provided to olive farmers under BPS Direct Payment and Greening derive from the amount of SPS grants that were provided to each farmer in 2013.[113] As explained above, the calculation of the grant amount under SPS retains the *de jure* specificity inherent in the Common Market Program. Therefore, the annual grant amounts provided under BPS Direct Payment and Greening in 2016 are directly related to, and continue to retain the *de jure* specificity of, the grants provided to olive growers under the Common Market Program.

Despite the arguments from the EC, the GOS, and the respondents, that because the BPS programs provide benefits that have been decoupled from production, they are not specific, we continue to find that the reliance on earlier assistance programs that were specific to determine the amounts of assistance under the current program, renders specific the benefits under the BPS programs. Moreover, we find unavailing the arguments that the application of a convergence factor over time is eliminating the disparities in payments among recipients and, therefore, the possibility of finding the assistance specific to olive growers. We understand that the application of the convergence factor results in adjustments to individual payments to bring them closer to an average over time by reducing the highest payments and increasing the lowest payments. However, the convergence factor is applied to payments to olive growers that retain the specificity inherent in the Common Market Program. Therefore, while any adjustments resulting from convergence may ultimately affect the final amount of assistance, the grant amounts awarded to farmers under the BPS program are still based on, and thus retain, the *de jure* specificity of prior programs as explained above.

**Comment 4: Whether EU CAP Pillar II Agricultural Fund for Rural Development is Specific**

*GOS' Comments*[114]
- The aim of the EU's Rural Development policy is to reduce social disparities by seeking and maintaining the best quality of life in EU rural areas, with attention to areas with special needs. The EU rural development policy also contributes significantly to the environment and to the climate.
- The EU regulatory framework for rural development policy provides a menu of available measures that the EU Members can tailor to their particular needs. These regulations establish the maximum percentages of aid to be granted and the conditions, eligibility requirements, and the selection criteria that must be met to receive benefits.
- To ensure that the measures to be implemented are adapted to the local needs, studies and evaluations analyze the strengths, weaknesses, threats and opportunities, to determine the

---

[112] *See* EU IQR Exhibit 13 "Council Regulation (EC) No 1307/2013, and *see* EU IQR Exhibit 9 "Council Regulation (EC) No. 73/2009."
[113] *See* EU IQR Exhibit 13 "Council Regulation (EC) No 1307/2013" (22), and *see* EU IQR Exhibit 9 "Council Regulation (EC) No. 73/2009."
[114] *See* GOS Case Brief A at 22-25.

Filed By: Mary Kolberg, Filed Date: 6/13/18 2:35 PM, Submission Status: Approved

needs at the regional level.  These needs will be addressed through measures that are designed specifically for the needs of the different regions of Europe.

- Therefore, Commerce cannot conclude that the measures are specific to certain rural regions of Europe, because all measures are available for programming in all regions of the EU and are accessible to all companies in rural areas.

- The PDM indicates that aid provided under the thematic subprogram of the olive grove is coupled with the production of olives.  The measures and operations of this subprogram are the same as those included in the EU Rural Development policy and are mainly oriented toward agri-environment-climate purposes, organic farming, investment in physical assets, knowledge transfer, and cooperation activities to promote systems respectful to the environment, as well as the best management of natural resources, among others.

- None of the operations that constitute the subprogram are linked to the production of olives, because aid is based on grants to cover a percentage of eligible expenses as established in annex II of Regulation 1305/2013.  Furthermore, area-related payments under the rural development program are granted on the basis of multiannual commitments to practices that are respectful of the environment and the climate, and not on the basis of the productive activity.

- Therefore, the PDM is incorrect in stating that support granted under this thematic subprogram was aimed at providing assistance to beneficiaries, with the purpose of "improving the competitiveness of their holding and/or production and, in particular, for enlarging their facilities and improving their manufacturing process and the quality of their products."

- Commerce did not demonstrate that the thematic sub-program is tied to the production of olives as stated in the PDM.  The majority of the measures under the thematic subprogram areas are related to agri-environment and climate purposes, set at the EU level, and are not specific to the production of olives.  Few or none of the Pillar II payments received by the mandatory respondents or their suppliers during the AUL were granted under this sub-program.

- The EU rural development policy complies with WTO requirements and is a Green Box measure as defined by Article 1 of Annex 2 of the Agreement on Agriculture.  Measures taken under Annex 2 are, by definition, non-trade distorting and, therefore, not countervailable.

*Respondents' Comments*[115]

- Commerce's *Preliminary Determination* that the availability of assistance under the Agricultural Fund for Rural Development was limited to companies in rural regions of the EU and, therefore, was *de jure* specific under section 771(5)(D)(i) of the Act was over-simplistic, focusing on language devoid of context.  "Rural regions" is simply another basis for referring to agricultural regions.  Thus, the program is a generally available agriculture subsidy that is not countervailable under Commerce's regulations.

---

[115] *See* Respondent's Case Brief A at 23.

*Petitioner's Rebuttal Comments*[116]

- In its *Preliminary Determination*, Commerce correctly found that the rural development program is specific with the meaning of section 771(5A)(D)(iv) of the Act, because funds under the program are limited by the regulations to enterprises located in designated regions of Spain.
- Commerce further determined that, because the Regional Government of Andalusia administers aspects of the program that specifically identify olive growers for assistance, the program is also *de jure* specific under section 771(5A)(D)(i) of the Act.
- The respondents' argument that Commerce was "over-simplistic" in its focus on the language of the implementing regulations and its claim that "rural regions" is simply another basis for referring to agricultural regions is incorrect. As the EC itself stated, the EU's rural development policy is aimed at areas affected by industrial transition, and regions with severe and permanent natural or demographic handicaps.
- Because the respondents do not point to any evidence on the record to refute Commerce's proper reading of this policy and the Regional Government of Andalusia's administration of the rural development program, Commerce must affirm in the final determination that the CAP Pillar II rural development policy programs are specific under subsections 771(5A)(D)(i) and/or (iv) of the Act.

**Commerce's Position:** We continue to find that the EC's CAP Pillar II, rural development program is specific within the meaning of section 771(5A)(D)(iv) of the Act, because funds under this program are limited to enterprises located in rural areas, which are designated geographical regions within the EC. Contrary to the GOS' claim that the program is not specific because all measures are available for programming in all regions of the EU, the EC rural development regulations in effect during the AUL, EC Regulations 1257/1999, 1698/2005, and 1305/2013, demonstrate that support is available only to companies operating in specific locations that the EC has designated as rural areas. EC officials reiterated this point at verification when stating that the EU Rural development program has always provided assistance to farmers or enterprises located in specific areas identified as "rural" based on certain socioeconomic and environmental criteria.[117] EU officials explained that the EU generally adopts the Organisation for Economic Co-operation and Development's definition of "rural," but each Member has the discretion to adopt its own definition of "rural."

We continue to find the rural development program of 2014-2020 to be specific under 771(5A)(D)(i) of the Act, because there is a thematic subprogram that provides assistance only to olive groves and enterprises involved in the processing of olives.[118] For example, Operation 4.1.2., provides assistance for farmers who invest in physical assets to improve the performance and overall sustainability of olive farms; Operation 4.2.2. provides support for investments in the processing, marketing, or development of new agricultural products in the olive oil and table olive sector.[119]

---

[116] *See* Petitioner's Rebuttal Brief at 10-11.
[117] *See* EC Verification Report.
[118] *See* Letter from the GOS, "Response of Government of Spain to the Department's August 3, 2017 Initial Questionnaire," September 18, 2017 (GOS IQR), at 71.
[119] *Id.* at 72.

Barcode:3717366-01 C-469-818 INV - Investigation  -

We, therefore, find that the Regional Government of Andalusia's sub-thematic program for olives is specific to the olive sector for the 2014-2020 period, as the GOS is providing assistance to beneficiaries with the purpose of improving the competitiveness of the olive industry and its products. Because we find the sub-thematic program to be specific to the olive sector during the 2014-2020 period, and tied, not to production, but to investment in the olive sector, we are continuing to conduct the 0.5 percent test for non-recurring benefits provided during this period using the recipient's sales of olives.

### Comment 5:  Whether Commerce Should Apply AFA to the Non-Cooperating Growers

*Petitioner's Comments*[120]
- Commerce required each respondent to provide production, sales, and subsidy benefit information from selected affiliated and unaffiliated olive suppliers, and, where such suppliers were not themselves growers, to provide the relevant information from the top five actual growers who supplied them with raw olives.
- Because each respondent failed to provide this requested information for some suppliers and/or growers, Commerce correctly decided to rely on facts otherwise available to calculate a per kilogram benefit received by those olive growers.
- Commerce was unduly lenient under the statutory and policy purposes for applying AFA.
- The respondents clearly had an incentive to omit information from the record that demonstrated higher than average benefits received by any of their olive suppliers, because the per kilogram grower benefit is a critical component of the subsidy rate calculation for each respondent.
- Commerce's extremely lenient approach flies in the face of the AFA statutory directive and case precedent, which requires Commerce to employ AFA to ensure respondents do not obtain more favorable results "by failing to cooperate than if they had cooperated fully" and to deter future non-cooperation.
- Given the incentive the respondents had to report olive supplier information that minimized the calculation of grower subsidy benefits in this investigation, the proper application of AFA for this aspect of the investigation is critical to ensuring that the respondents are neither rewarded for failing to provide complete olive grower data nor encouraged to do the same in future administrative reviews.
- In the *Preliminary Determination*, Commerce's use of facts available did not meaningfully affect the overall subsidy rates for respondents, thereby rewarding their failure to respond and encouraging their future non-cooperation.
- Commerce should assign to each non-responding grower/supplier as AFA a subsidy benefit rate equal to the highest rate determined for any responding grower/supplier and should then assign the average volume of olive sales from the reporting suppliers and include these companies as part of the overall allocation.

*Respondents' Comments*[121]
- Commerce requested substantial information on the raw olive suppliers of the three respondents. In all instances, the company respondents fully cooperated and provided

---

[120] *See* Petitioner's Case Brief A at 16-18.
[121] *See* Respondent's Rebuttal Brief at 12-14.

Barcode:3717366-01 C-469-818 INV - Investigation -

extensive information, as well as documented their efforts to obtain the information from the unaffiliated suppliers, over which they had no control.
- The petitioner's claim that the respondents selectively filtered grower responses is unfounded.
- In difficult circumstances, the respondents provided substantial information across a wide range of suppliers. The sample collected and used by Commerce to calculate subsidy benefits was greater than in other cases.[122]
- In this investigation, even after being required to go back to their unaffiliated suppliers with multiple questionnaires at the height of harvest season, the respondents were still able to provide the majority of the information that Commerce required for its calculations.
- This record does not demonstrate non-cooperation by the respondents or lack of information. The petitioner has not produced any evidence to the contrary. Therefore, Commerce must dismiss the petitioner's call for the application of AFA.

**Commerce's Position:** As we explain in Comment 8, the record of this investigation shows that Agro Sevilla is not cross-owned with its olive growers and non-grower suppliers. Likewise, Angel Camacho and Aceitunas Guadalquivir are not cross-owned with their unaffiliated growers. In some cases, the growers are more than two or three steps removed in the supply chain of the mandatory respondent. As a result, we do not consider that the mandatory respondent has the ability to induce cooperation from these suppliers. In addition, the mandatory respondents documented their effort to obtain the requested information from the olive growers and suppliers. Moreover, because of the time required over the course of the proceeding to develop an understanding of the steps in the production process between the olive grower, non-producing supplier, and respondent, we made only one request for this information.[123] This is because we only had time to make one request for this information prior to the *Preliminary Determination*. Therefore, we do not find that the incomplete reporting by the unaffiliated suppliers warrants the application of AFA under section 776(b) of the Act. Finally, we do not find persuasive the petitioner's claim that the respondents provided information only for suppliers that received small amounts of subsidies. The petitioner has not identified record information to support its argument. In addition, because of the unusual fact patterns in this investigation, there was no way for any party to anticipate, prior to the issuance of the *Preliminary Determination*, the calculation methodology we would employ to measure the benefit to the mandatory respondents from the subsidies provided to olive growers, and to cherry-pick the reporting suppliers to influence the outcome of the calculations.

---

[122] *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam:  Final Affirmative Countervailing Duty Determination*, 78 FR 50387 (August 19, 2013) and accompanying IDM.
[123] See Letter to Agro Sevilla, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain: Supplemental Questionnaire to Agro Sevilla S.Coop.And.," October 25, 2017; *see also* Letter to Angel Camacho, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain:  Supplemental questionnaire to Angel Camacho Alimentacion S.L.," October 25, 2017; *see also* Letter to Aceitunas Guadalquivir, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain:  Supplemental Questionnaire to Aceitunas Guadalquivir, S.L.U.," October 25, 2017.

Barcode:3717366-01 C-469-818 INV - Investigation -

**Comment 6:  Whether Commerce Used the Correct Calculation Methodology to Measure Subsides Received by the Respondents**

*Petitioner's Comments*[124]

- In order to calculate BPS and SPS subsidy benefits attributable to respondents as fully and accurately as possible, Commerce should do so exclusively for subject merchandise.
- Commerce's practice requires it to calculate CVD rates applicable to subject merchandise as accurately as possible.  Commerce should ensure that its calculations do not dilute the subsidy benefit actually received for ripe olives.
- The respondents provided incomplete and confusing data regarding their growers' subsidies. Given the uncertainty, the most accurate way for Commerce to match the data in the numerator and denominator of its grower subsidy attribution calculations is to do so exclusively for subject merchandise.
- Agro Sevilla and Angel Camacho appear to have properly provided relevant data for their olive purchases and sales of subject merchandise that can be used for this calculation.
- The calculation methodology used in the *Preliminary Determination* distorted downward the calculated subsidy rates.  To correct this inaccuracy, Commerce must base its calculations exclusively on subject merchandise.
- Commerce should apply AFA in the final determination for benefits received by respondents' suppliers under CAP Pillar II; in the alternative Commerce should follow the ripe olives-only methodology.
- Aceitunas Guadalquivir has not reported its purchased olive volumes used only for making ripe olives.  In the absence of this information, Commerce should derive an approximation for Aceitunas Guadalquivir using a yield ratio based on Angel Camacho's purchases.
- In the alternative, Commerce should make sure that the numerator and denominator used to measure the benefit to the olive respondents from the subsidies received by the olive growers includes *all* olives purchased by the respondent.
- For Aceitunas Guadalquivir, this would include the additional volume of semi-processed olive purchases, previously unreported and discovered at verification; for Angel Camacho, the appropriate volume would include all of the olives used to make processed olive products.
- Aceitunas Guadalquivir explained that it had not reported this additional volume of olive purchases because Commerce requested only purchases of ripe olives and, therefore, Aceitunas Guadalquivir reported only olives that can be processed into ripe olives. However, Commerce later requested all three respondents to report, "the volume and value of all raw olives purchased from each supplier, regardless of the processed olive product for which the raw olives were used."  Although Agro Sevilla and Angel Camacho updated their data, Aceitunas Guadalquivir did not.
- This omission highlights the mismatching of the numerator and denominator, and further supports the notion that both should be limited to subject merchandise.
- Angel Camacho's verification exhibit makes clear that additional purchases of olives were not reported.[125]  However, the total unreported amount is not given.  To overcome this

---

[124] *See* Petitioner's Case Brief A at 6-15.
[125] *See* Angel Camacho Verification Report at Exhibit VE-5 p.4.

Barcode:3717366-01 C-469-818 INV - Investigation    -

mismatch, Commerce should limit the numerator and denominator to subject merchandise only.
- Commerce should also limit the numerator and denominator used in the calculation to measure the benefit to the respondent companies from benefits received by the olive growers under the Spanish agricultural insurance program. [126]

*Respondents' Comments*[127]
- Commerce asked the mandatory respondents to report their "raw olive" purchases. Specifically, Commerce asked "that you respond to the questions outlined in Attachment I to this letter and provide the requested information on your company's sources of raw olives that were processed into ripe olives during the period of investigation."[128]
- Commerce later clarified and required respondents to report "{i}nformation regarding its suppliers of raw olives to include the volume and value of all raw olives purchased from each supplier, regardless if the processed olive product for which the raw olives were used."[129]
- To the extent that Commerce continues to apply section 771B of the Act, Commerce should limit any countervailing measure to exclude olive purchases tied to the production of non-subject olives, consistent with its initial instructions to the mandatory respondents.
- There are three types of olive purchases: (1) raw olives as harvested from trees that can be used for more various applications, (2) raw olives stored in acetic acid or similar solution; and (3) "green olives" that already reflect an initial stage of processing that makes it impossible to use them in the production of ripe olives.
- Commerce should apply its traditional tying rules and exclude purchases of fermented green olives when calculating the benefit to the respondents. Commerce's practice is to attribute the benefit from a subsidy based on the stated purpose of the subsidy or the purpose Commerce determined based on record evidence at the time of bestowal. At the time a "green olive" is purchased, it is not intended for the production of subject merchandise. Commerce should not measure benefits on these purchases.
- Additionally, section 771B of the Act concerns the attribution of subsidies received by the raw product to the processed product. Green olives are semi-processed, they are not a raw agricultural product, and, therefore, Commerce cannot measure benefits from the purchases of "green olives" on the basis of section 771B of the Act.
- Including green olives would also be contrary to Commerce's own requests, which consistently referred to "raw olives." Green olives are not raw olives.

*Petitioner's Rebuttal Arguments*[130]
- The "ripe olives-only" approach is both fair and reasonable. It recognizes that ripe olives are distinguishable from other olive products and that the subsidies received by olive

---

[126] *See* Petitioner's Case Brief B at 3-4
[127] *See* Respondent's Case Brief A at 24-28.
[128] *See* Letter to the Mandatory Respondents, "Countervailing Duty (CVD) Investigation on Ripe Olives from Spain: Questionnaire on Sources of Raw and Ripe Olives," August 4, 2017, at 1 (Sources of Raw Olives Questionnaire).
[129] *See* Memorandum, "Ripe Olives from Spain Countervailing Duty Investigation: Clarification of the Department's September 26, 2017 Letter," September 27, 2017 (Clarification Memorandum).
[130] *See* Petitioner's Rebuttal Brief at 20-23.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation    -

growers benefit ripe olive production and sales at different levels than the production and sales of other olive products.

- Although the respondents agree with the ripe olives only approach and urge Commerce to measure subsidies only for those olives that are used to make ripe olives, they mislead Commerce by urging it to allocate the subsidies over the sales of all olive products, which would result in gross undercounting of the subsidies provided to the responding companies.

- It appears that neither Agro Sevilla nor Angel Camacho reported "green olive" purchases as defined by the respondents.

- To satisfy its statutory obligation to determine subsidy levels as accurately as possible, Commerce must ensure that the numerator and denominator are properly matched in the allocation of subsidies to the respondents' sales.

**Commerce's Position:** Section 701 of the Act directs Commerce to measure the countervailable subsidy provided to the subject merchandise. Specifically, it states that if "the administering authority determines that the government of a country …is providing…a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported or sold…for importation…then there shall be imposed upon such merchandise a countervailing duty . . . equal to the amount of the net countervailable subsidy."[131] Thus, the basic statutory requirement imposed by Congress is that the administering authority of the CVD law must ensure that any methodology used to determine the amount of the net countervailable subsidy accurately measures the subsidies conferred upon the subject merchandise. Toward that end, Commerce implemented a set of attribution rules at 19 CFR 351.525. However, the *Preamble* to our attribution rules makes clear that our tying rules are an attempt at a simple, rational set of guidelines for reasonably attributing the benefit from a subsidy based on the stated purpose of the subsidy or on the purpose of the subsidy at the time of bestowal, as evinced by the record evidence.[132] The *Preamble* also makes clear that our attribution rules do not account for all situations that may arise, because if Commerce tried to account for all possible permutations, the result would be an extremely lengthy set of rules that could prove unduly rigid.[133] The *Preamble* also states that our intent is to apply these attribution rules as harmoniously as possible, recognizing that unique and unforeseen factual situations may make complete harmony among these rules impossible.[134] Tellingly, while 19 CFR 351.525 addresses the treatment of input products, and the *Preamble* references both input products and upstream subsidies, neither directly references or addresses the treatment of agricultural subsidies that are analyzed under section 771B of the Act. However, in this investigation, we have found that section 771B of the Act is applicable. When this provision applies, it directs Commerce to deem the subsidies provided to the producers of a raw agricultural product as provided with respect to the manufacture, production, or exportation of the processed product.

Based upon the explicit language within section 701 of the Act, and the lack of clear regulatory language provided under 19 CFR 351.525 with respect to the attribution of agricultural subsidies analyzed under section 771B of the Act, Commerce first determined the amount of

---

[131] *See* section 701(a)(1) and (2) of the Act.
[132] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65401 (November 25, 1998) (*Preamble*) at 65403.
[133] *Id.* at 65399.
[134] *Id.* at 65400.

subsidies conferred upon the raw olive.  In the *Preliminary Determination*, when calculating the weighted average per kilogram benefit using the information provided by all the reporting olive growers, we did not limit our calculations to the raw olives used to produce ripe olives.  For this final determination, we have calculated the weighted average per kilogram benefit in a similar manner.  However, for this final determination, we recognize that the applicability of section 771B of the Act, combined with the intent of section 701 of the Act to measure the countervailable subsidies provided to the subject merchandise, requires us to refine our methodology with regard to measuring the benefit provided to the production of subject merchandise.  We find it to be an appropriate application of the statutory provisions to measure the benefit by multiplying the weighted average per kilogram benefit by the volume of each respondent's purchases of raw olives to produce subject merchandise, and to divide the resulting benefit by the sales of subject merchandise.  This methodology comports with the statutory intent set forth within section 701 of the Act, because we have accurately measured the subsidy conferred upon the subject merchandise.

The petitioner contends that Aceitunas Guadalquivir did not report all of its purchases of raw olives that ultimately became ripe olives and, as a result, we are missing information that is necessary to calculate the benefit to Aceitunas Guadalquivir.  This is incorrect.  As the respondents noted, Commerce asked all companies to provide information on their "sources of raw olives that were processed into ripe olives during the period of investigation."[135]  All companies responded to this questionnaire by reporting their raw olive purchases.  Later, we asked that Agro Sevilla resubmit the information regarding its suppliers of raw olives to include the volume and value of all raw olives purchased from each supplier, regardless of the processed olive product for which the raw olives were used.[136]  We further stated, "*{i}f* it is necessary to correct the reporting in this manner for the other two mandatory respondents, we request that the information be resubmitted."[137]  While Agro Sevilla and Angel Camacho found it necessary to submit additional information, Aceitunas Guadalquivir did not.  Thus, Aceitunas Guadalquivir's originally reported information is indicative of its raw olives purchases that were used to produce subject merchandise.[138]  This information was verified,[139] and it is this information that we will be using as updated by minor corrections.

Because we are electing to measure the benefit to the respondents based on their purchases of raw olives for the production of subject merchandise, we need not evaluate the alternative option put forth by the petitioner – to include all olive purchases in the calculation regardless of the ultimate end product.

---

[135] *See* Sources of Raw Olives Questionnaire at 1.
[136] *See* Clarification Memorandum at 2.
[137] *Id.*
[138] *See* Letter from Aceitunas Guadalquivir, "Fourth Supplemental Questionnaire Response of Aceitunas Guadalquivir S.L.U. Ripe Olives from Spain (C-469-818)," January 5, 2018, at 6.
[139] *See* Aceitunas Guadalquivir Verification Report at 7.

Barcode:3717366-01 C-469-818 INV - Investigation -

**Comment 7: Whether Commerce Should Remove Non-Growers and Adjust the Calculation of Benefits to Exclude the Olive Volume of Non-Producing Suppliers**

*Respondents' Comments*[140]

- In the *Preliminary Determination*, Commerce found countervailable subsidies received by suppliers of raw olives who are not the growers of those olives.

- Section 771B of the Act pertains to the attribution of subsidies received by "producers" of the raw agricultural product (*i.e.*, growers) to the processors of that product. Countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.[141] The statute does not contemplate attribution of subsidies to processors received by suppliers of the raw product who are not themselves producers (*i.e.* growers), contrary to the methodology applied by Commerce in the *Preliminary Determination*.

- However, this does not mean that Commerce can exclude non-grower sales volume from its per-unit subsidy calculation for olive purchases. While section 771B of the Act directs Commerce to exclude non-grower subsidies, sales volume is still relevant based on Commerce's per-unit methodology, both directly and in the calculation of the facts available rate for growers who did not supply sufficient information. Commerce cannot arbitrarily eliminate from the per-unit calculation olive purchase volume simply because a supplier is not a grower, whether or not it receives subsidies.

- In its *Preliminary Determination*, Commerce adopted methodologies in its calculation of supplier subsidies attributable to the mandatory respondents that do not comport with its duty under the statute. In particular, its approach to the calculation of a per-unit subsidy for raw olive purchases made by the three mandatory respondents was biased and distortive. Subsidy rates were determined using arbitrary criteria for keeping cooperating non-grower supplier volume in or excluding it from the per-unit calculation based on whether they reported subsidies rather than relying on an assessment of the extent to which the raw olives they sold generated grower subsidies.

- The outcome of these calculations was higher calculated subsidy rates where a supplier did not report subsidies than in situations where the supplier did report subsidies. The result was punitive and disregarded the full cooperation of the reporting parties, contrary to the statute governing the use of facts available.

- Commerce should not eliminate cooperating supplier volumes because the supplier is not a grower and did not receive a subsidy. In a countervailing duty investigation, both the existence and non-existence of subsidies is relevant.

- Commerce's methodology disregards the reported volume from fully cooperating non-grower suppliers who did not receive a subsidy. These are generally first-tier suppliers who are selling the production of the second-tier and third-tier suppliers below them. However, not all of this production volume is accounted for by this sample of second- and third-tier suppliers collected by Commerce. By ignoring this volume, Commerce dramatically reduces the volume sample collected from cooperating suppliers, and thereby its "total

---

[140] *See* Respondent's Case Brief A at 30-36.
[141] *See* section 771B of the Act

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation   -

production" denominator is based on criteria that have nothing to do with the existence or magnitude of subsidies allegedly present in that disregarded volume.

- Commerce must revise its per-unit subsidy calculation for raw olive purchases. Commerce must take into account reporting non-grower supplier volume not accounted for by their respective reporting grower suppliers.

- Commerce must include non-grower supplier volume in its per-unit calculation after deducting the volume from their reporting grower suppliers. It can then assign a facts available "grower plug" to that net supplier volume. This approach recognizes that the raw olives in question originated with growers who are not themselves part of the volume sample, but are, nonetheless, captured in the volume of the reporting non-grower supplier.

- This approach takes into account the volume reported by cooperating non-grower suppliers who did not report subsidies. It utilizes facts available on the record in a neutral manner, rather than dismissing useable data from cooperating parties. It also creates a larger sample size associated with "total production" than was used by Commerce in its preliminary results, thereby more accurately weighting per-unit benefits.

- Commerce's approach with respect to its "FA plug" was to effectively weight benefits by using an arbitrarily low production volume, because it did not have volume data from suppliers who did not respond. In other words, Commerce's "FA plug" likely over-weighted subsidy benefits because the plug was based on the limited volume of the reporting growers and then applied to non-reporting growers irrespective of their volumes, thereby unreasonably magnifying the per-unit subsidy amount.

- This approach eliminates the need to assign an "FA plug" to suppliers who did not respond, because their volume would be captured through the cooperating non-grower volume data.

- Alternatively, Commerce could create a per-unit subsidy plug for responding non-grower suppliers using a simple average of the per-unit subsidy measured for each of the responding growers. The per-unit subsidy plug could then be considered in the context of total production that includes non-grower volume and then weighted in the same manner as the reporting grower suppliers.

*Petitioner's Rebuttal Comments*[142]

- The respondents agree with the petitioner that Commerce must ensure that its grower subsidy calculations exclude suppliers who are not themselves growers by arguing that Commerce should exclude from its per kilogram subsidy calculation subsidies received by non-grower suppliers.

- The respondents' argument, however, that Commerce should include non-grower supplier volume in the denominator, ignores the subsidies on that olive volume in the numerator of the per kilogram grower benefit calculation in order to achieve more favorable countervailing duty results.

- Commerce must reject this dilutive approach.

- To derive the level of countervailable subsidies benefitting the raw olives to be attributed to the processed product under section 771B of the Act, Commerce required information from actual olive growers, rather than from non-grower suppliers that are merely distributors, because 771B provides for attributing subsidy benefits for a "raw agricultural product" to the processed agricultural product. Commerce, thereby, obtained an incomplete sample of

---

[142] *See* Petitioner's Rebuttal Brief at 20-25.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

data on the benefits provided to olive growers for their olive production.  Commerce calculated an average per-kilogram benefit provided to this small subset of olive growers, which was then used as a proxy for the benefits provide to all olive growers.

- The respondents correctly claim that the methodology used in calculating the countervailing duty rates associated with the grower subsidies in the *Preliminary Determination* distorted the actual benefits.
- However, their analysis, calculation hypotheticals, and proposals depart from a realistic and accurate approach and would lead to a gross undercounting of subsidies.
- The respondents' proposed calculations obscure the fact that olives supplied by non-grower suppliers are subsidized at the grower level, not at the supplier level.  Non-grower suppliers are simply distributors of the olives; the olives that they receive from other distributors and/or growers are subsidized through payments made to the growers, not to the distributors.
- Commerce should disregard the respondents' hypothetical calculations and the corresponding arguments for including non-grower olive volume in the countervailing duty calculations without accounting for the subsidies associated with those olives that were received by the growers by of those olives.
- The respondents' argument that olive volume from non-grower suppliers must be included in the subsidy calculations fails to acknowledge that Commerce actually accounted for these volumes in the purchases by the respondents of olives for processing included in the numerator of the calculation for attributing the grower subsidy.
- The non-grower suppliers, by definition, do not receive grower subsides associated with the olives they sell.  The inclusion of this volume without also including subsidies associated with that volume in the per kilogram benefit calculation would inaccurately deflate the actual level of subsidies benefits associated with the olives included in the purchased volume reported by respondents.
- The respondents further mislead Commerce by relying in on stale data that have been revised and corrected on the record.  Commerce should ensure that only verified, updated data are used in the final determination.

**Commerce's Position:**  We disagree with the respondents that there is no basis to eliminate cooperating supplier volumes from the calculation of the per kilogram benefit under programs provided to olive growers when the supplier is not itself a grower and did not receive a subsidy.  Therefore, upon examination of our calculation, we find it appropriate to revise our methodology for calculating the weighted per kilogram benefit for the BPS-Direct Payment and Greening programs.  Because these programs provide financial assistance only to the growers, it is appropriate to remove the non-producing suppliers from our calculations, regardless of whether they reported receiving a subsidy under these programs.  Whether they were a cooperating non-producing supplier is immaterial to whether their volume of olive sales should be included in the calculation.

Therefore, for purposes of this final determination, we are excluding from our calculation of the per kilogram benefit, the volume of olives sold by suppliers that was not grown by the supplier.  As we stated in our letter limiting the reporting of supplier responses, we intended to include in our calculation the per kilogram benefit the five largest growers, in terms of volume, for each

non-producing supplier to our mandatory respondent.[143] We agree with the petitioner that including a non-producing supplier's total olive volume in the calculation of the per kilogram benefit, without accounting for all the subsidies received by its growers, improperly dilutes the overall weighted average per kilogram benefits.  Furthermore, we are revising the "total sales of all products" and "total sales of raw olives" columns in our BPS direct payment and greening supplier benefit calculations to include only the sales of products that were produced by the grower itself.

However, because eligibility for financial assistance under the CAP Pillar II - Rural Development Program is based on being located in a rural area rather than on production,[144] we are continuing to include in the calculation of the per kilogram benefit the volume of all olives supplied by the suppliers whether or not grown by the supplier, and are we not modifying the "total sales of all products" and "total sales of raw olives" columns.[145]  In addition, for this program, we have used the volume of each supplier's raw olive sales rather than its olive production, in determining the benefit per kilogram of olives.

### Comment 8:   Whether Commerce Should Apply AFA to Agro Sevilla Regarding Cross-Ownership with its First-Tier Suppliers

*Petitioner's Comments*[146]
- Agro Sevilla provided misleading and non-responsive information regarding the structure of the cooperative and its relationships with its member cooperatives.
- Agro Sevilla failed to clarify that the first-tier member cooperatives form and own Agro Sevilla.
- In its January 5, 2018 SQR, Agro Sevilla admitted that second-tier coops are "formed by two or more first-tier agricultural S. Coops," and that second tier S. Coops "serve for the development and fulfillment of common economic purposes of the member first-tier S.Coops," making clear that the first-tier cooperatives formed and *own* Agro Sevilla.
- Agro Sevilla's financial statement demonstrates that the eleven coop members own Agro Sevilla.
- Because cross-ownership exists, countervailable subsidies provided to the first-tier coop members must be attributed to the entire Agro Sevilla cross-owned entity.
- Moreover, non-responsiveness by Agro Sevilla's cross-owned first-tier suppliers must be treated as non-responsiveness by the entire Agro Sevilla cross-owned entity.  Because Agro Sevilla did not disclose the cross-ownership between Agro Sevilla and its first-tier suppliers, Commerce was prevented from conducting a proper CVD investigation of the entire Agro Sevilla entity, under which Agro Sevilla and its first-tier cooperative members would be treated as one and the same for countervailing duty purposes.  Therefore, Commerce should apply AFA to the calculations of Agro Sevilla's subsidy rates.

---

[143] *See* Clarification Memorandum at 1.
[144] *See e.g.*, EU IQR at Exhibit 13, EC November 13, 2017 SQR at Annex 10, and GOS IQR at Exhibits S-8 and S-16.
[145] *See* Aceitunas Guadalquivir Final Calculation Memorandum; Agro Sevilla Final Calculation Memorandum; Angel Camacho Final Calculation Memorandum.
[146] *See* Petitioner's Case Brief A at 18-21.

- At a minimum, Commerce should apply AFA to account for the fact that several of the first-tier suppliers failed to report the required grower information.

*Respondents' Rebuttal Comments*[147]

- The petitioner's claim that Agro Sevilla is cross-owned with its first-tier cooperatives and that it wrongly "denied" such affiliation is incorrect based on the facts and the law.
- The petitioner offers no evidence which would reverse Commerce's *Preliminary Determination* that Agro Sevilla is not cross-owned with its first-tier member cooperatives or Commerce's verification findings confirming this fact.
- The petitioner wrongly asserts that "ownership" is dispositive of cross-ownership.
- In accordance with 19 CFR 351.525(b)(6)(vi), cross-ownership exists "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same way it can use its own assets."
- The petitioner's theory of cross-ownership would lead to absurd results.  Under the petitioner's theory, cross-ownership would exist under all ownership scenarios because there will always be some number of shareholders that jointly hold a majority interest in a company.
- The petitioner's definition of cross-ownership does not speak to the control relationship among the shareholders themselves, and whether one or more could control the other's assets as if they were its own.
- The first-tier member cooperatives do not "own" Agro Sevilla; rather, membership is based on their capital contributions to Agro Sevilla.  Membership in Agro Sevilla is not unconditional.  Any first-tier cooperative can be fined and/or expelled from Agro Sevilla.
- Commerce confirmed at verification that no control relationship exists among the first-tier cooperatives and no control relationship exists between Agro Sevilla and the first-tier cooperatives.

**Commerce's Position:**  We do not agree with petitioner's claim that Agro Sevilla has not fully reported the nature of its relationship with its member cooperatives or has withheld information that would demonstrate there is cross-ownership between Agro Sevilla and its member cooperatives.  While the petitioner correctly recognizes that information of the record shows that each of Agro Sevilla's eleven first-tier member cooperatives owns a share of the cooperative and that Agro Sevilla, as a second-tier cooperative, exists to fulfill the common economic purposes of the member first-tier S. Coops,[148] this does not indicate that Agro Sevilla is cross-owned with any one of its first-tier member cooperatives.  According to 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the corporation(s) in essentially the same ways it can use its own assets.  In keeping with this definition, we have examined whether any one of the eleven individual first-tier cooperatives can use or direct the assets of Agro Sevilla as if they were its own.  For purposes of our examination of control, we do not consider that the relationships between Agro Sevilla and its members differs materially from the relationship between a corporation and its shareholders.  Thus, we considered whether any one of the eleven

---

[147] *See* Respondent's Rebuttal Brief at 14-16.
[148] *See* Letter from Agro Sevilla, "Supplemental Questionnaire Response of Agro Sevilla Aceitunas S.Coop.And. Ripe Olives from Spain (C-469-818)," October 20, 2017, at AS-Exhibit 41 at 34; *see also* Agro Sevilla January 5 Supplier SQR at 6.

members has a sufficient "shareholding," in terms of its capital contribution to the cooperative, to exercise control over Agro Sevilla. However, in the absence of a majority shareholder, and shareholder voting rights that are commensurate with the percentage of shareholding, we would be unable to find that a particular shareholder, or in this case cooperative member, exercises the control required to meet the standard set forth within 19 CFR 351.525(b)(6)(vi). Our examination of Agro Sevilla's financial statements shows that, although the capital contributions vary among the members, no one of the eleven cooperative members has made a capital contribution that represents a majority of the cooperative's capital. Moreover, according to Agro Sevilla's by-laws,[149] and as discussed in its questionnaire response,[150] each cooperative member has one representative who is entitled to one vote on Agro Sevilla's Consejo Rector, or Advisory Council, the functional equivalent of the Board of Directors. In reading Agro Sevilla's by-laws, we find that Advisory Council oversees the management, and makes the high-level decisions, of Agro Sevilla, including investments, acquisitions, and budget approvals.[151]

Furthermore, Agro Sevilla explained that, according to the by-laws, each cooperative member is entitled to a single vote at the General Meeting, the meeting at which the operational decisions are made.[152] Those votes are not commensurate with the percentage of capital contributed by each member. Additionally, Agro Sevilla has explained that there are professional managers below the Consejo Rector, comprised of the chief executive officer, chief financial officer, human resources director, purchasing director, commercial director and industrial production director; these professionals manage the day to day business decisions of Agro Sevilla. Article 5(7) of the by-laws confirms that the CEO cannot be a member of the board.[153] Thus, no cooperative member exercises the control over Agro Sevilla that is required to meet the standard set forth within 19 CFR 351.525(b)(6)(vi).

Likewise, Agro Sevilla has demonstrated that it does not exercise control over its member cooperatives. As stated in the by-laws, if a member cooperative no longer wishes to be part of Agro Sevilla, it is free to leave and its capital contribution will be returned.[154] Each of these first-tier cooperatives represents operational associations of hundreds of individual olive growers, and their management is governed by their own by-laws, implemented by their members. At verification, Agro Sevilla demonstrated that many of its member cooperatives themselves have member farmers who produce agricultural products other than olives, such as wheat, sunflowers, and cotton, and they may belong to other cooperatives that promote the marketing of those other products. Almost all member cooperatives responded that they also sold other products to companies other than Agro Sevilla.[155]

---

[149] See Letter from Agro Sevilla, "Agro Sevilla Aceitunas S.Coop.And.'s Affiliations Questionnaire Response Ripe Olives from Spain (C-469-818)," August 18, 2017 (AS IQR), at Exhibit AS-3 at Article 4(4) and 4(6).
[150] Id., at 6.
[151] Id., at exhibit AS-3 at Article 4(4).
[152] Id., at Exhibit AS-3 at 3(15).
[153] Id., at Exhibit AS-3, Article 5(7).
[154] Id., at 5 and Exhibit AS-3 at 2(11).
[155] See Agro Sevilla January 5 SQR at Exhibit AS-81.

Barcode:3717366-01 C-469-818 INV - Investigation  -

Moreover, Agro Sevilla does not have any voting rights in its member cooperatives; it does not have the power to appoint a member of the governing body of a member cooperative; it has not signed an agreement that allows it to hold the right to vote in a member cooperative; and, none of the members of the governing councils of the member cooperatives has a business or labor relationship with Agro Sevilla.[156]  Moreover, our review of the financial statements of Agro Sevilla's eleven member cooperatives provides no indication that Agro Sevilla can exercise control over them.[157]

Thus, on the basis of the information discussed above, for purposes of this final determination, we continue to find that the relationships between Agro Sevilla and its first-tier cooperatives do not demonstrate either that any one of the member cooperatives can use and control Agro Sevilla's assets as though they are its own assets, or that Agro Sevilla can use and control the assets of its member cooperatives, as required for a finding of cross-ownership under 19 CFR 351.525(b)(6)(vi).  Moreover, there is no indication in the record that any of the eleven members of the cooperative themselves are cross-owned with one another, such that we would treat all eleven members, or any number less than all eleven, as though they are one entity. Only a finding of cross-ownership among the eleven members (or a number less than all that might account for a majority of the capital contributions), together with voting rights commensurate with the percentage of the capital contribution, would possibly permit us, in this situation, to find that there is cross-ownership between Agro Sevilla and its member cooperatives.

Because we have found there is no cross-ownership, we are not relying on 19 CFR 351.525(b)(6) to attribute to Agro Sevilla subsidies received by the member cooperatives. Moreover, in light of a record that we find to be complete with respect to cross-ownership, there is no basis for us to conclude that the provision of incomplete responses by growers that are members of the member cooperatives amounts to non-responsiveness by Agro Sevilla itself. Thus, we find that there is no basis for the broad application of AFA to Agro Sevilla, as argued by the petitioner.

**Comment 9:  Whether Grant Funding Sourced from the ERDF is Regionally Specific**

*European Commission Comments*[158]
- Eligibility criteria for the grants funded by the ERDF budget are based on GDP/GNI ratings and not on designated geographical regions.
- EU Regulation 1303/2013 Article 90 and Annex VII point 1, and EU Regulation 1059/2003 as amended by EU Regulation 105/2007 provide the eligibility criteria.[159]
- Hundreds of regions, and hundreds of thousands of projects, are eligible and funded under the ERDF.

---

[156] *See* Agro Sevilla January 5 SQR at 6.
[157] *See* AS October 20, 2017 SQR at AS-Exhibit 41.
[158] *See* EC's Case Brief B at 4.
[159] It is noted that neither EU Regulation 1059/2003 nor EU Regulation 105/2007 is on the record of this investigation.  *Id.*

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation   -

*GOS' Comments*[160]

- Commerce incorrectly interpreted granting authority jurisdiction.
- WTO law and its case law require an analysis of both the "granting authority" and its "jurisdiction" in a conjunctive manner.
- The ASCM Article 2(2) describes the conditions for a subsidy to be regionally specific and limits the analysis of the criteria and specificity conditions to the jurisdiction of the granting authority of the aid.
- The Appellate Body Report on *US – Countervailing Measures (China)* states that "{i}f the granting authority was a regional government, a subsidy available to enterprises throughout the territory over which that regional government had jurisdiction would not be specific."
- The specificity analysis of a grant provided by a regional government should be limited to the regional government and not to the funding sources, if the funding sources are not also within the jurisdiction of the granting authority.
- The analysis of the specificity of all three aid programs, Sustainable Energy, IDEA, and PROSOL, should be limited to the Andalusia region.
- Commerce misunderstood the design and distribution of the ERDF funds.
- ERDF funds are intended to reduce the differences between the levels of development throughout the EU through various actions, such as ensuring environmental protection and sustainable development.
- ERDF funds are distributed in almost all EU regions, in accordance with EC Regulation 1083/2006, and in all regions, in accordance with EC Regulation 1303/2013.
- The amount of funds available in each region varies and is based on neutral criteria, such as per capita income and population.
- The funds are widely disseminated, and their distribution is horizontal in nature, and based on legal principles.
- EU regulations establish general principles and the national and regional rules implement the basic criteria and procedure for the granting of ERDF aid.
- Subsidies granted under the ERDF funds are not regional aid according to the WTO rules and are, therefore, not specific.

*Respondents' Comments*[161]

- Budgetary sources should not serve as a basis for the regional specificity finding in the context of local jurisdiction programs.
- Commerce should analyze whether the local jurisdiction administering the program is distinguishing among regions within its jurisdiction.
- All three programs provide benefits to the local jurisdiction of Andalusia without any distinction among the regions within Andalusia.  Therefore, the funds deployed by the GOA are not regionally specific.
- Commerce confuses the EU and the GOS budgetary outlays with the idea that the EU and the GOS are directing funds to recipients within Andalusia and other regions.  The EU and the GOS are not directing funds to the beneficiaries, but funding the GOA and the GOA acts at its own discretion to craft and administer programs under the frameworks provided.  The Post-Preliminary Analysis described this understanding "{t}he GOA implements Spain's

---

[160] *See* GOS' Case Brief B at 17-19.
[161] *See* Respondent's Case Brief B at 7-8.

national energy strategy in its Regional Strategic Framework for Andalusia and specifically implements the ERDF strategy through the Regional Programme ERDF Andalusia 2007-2013."

- Because Commerce determined that the funds provided by the GOA are not regionally specific, Commerce must also find that the funds provided by the EC and the GOS are not regionally specific, because the GOA administered the funds provided by the EC and GOS.

*Petitioner's Rebuttal Comments*[162]

- Each program is an EU regime that targets the subsidies to specific regions in the EU, including Andalusia.
- The administration of these programs by the GOA does not remove the regional specificity of funding for these programs because the administration by the regional authority is overseen and guided by the EC, as described by Commerce in the Post-Preliminary Analysis.
- The EC is the "authority providing the subsidy" under section 771(5A)(D)(iv) of the Act for these programs, not the GOA.
- The respondents implicitly acknowledge that these programs are EC programs with EC funding, but propose an interpretation of the regional specificity provision by arguing that Commerce should analyze only the administration of the programs, regardless of the funding sources, thus eliminating the phrase "authority providing the subsidy."
- Commerce should find that these programs are wholly regionally specific, including portions funded by the GOA, under section 771(5A)(D)(iv) of the Act.

**Commerce's Position:** We disagree with the EC, the GOS, and the respondents. First, as stated previously in Comment 2, we do not find WTO Panel and Appellate Body decisions relevant to the instant investigation. Commerce has conducted this investigation in accordance with the Act and Commerce's regulations, and our CVD laws are consistent with our WTO obligations.[163] Second, the EC has indicated that the aim of the ERDF is to improve provide economic and social cohesion in the European Union by correcting imbalances among different regions.[164] While all regions are ostensibly eligible, certain regions receive more based on their GDP ranking. EU sources maintain that the ERDF budget is part of the European Structural and Investment Funds (ESIF) budget, which is divided into three categories: convergence, regional competitiveness and employment, and European territorial cooperation. In EC Regulation 1083/2006 Article 17 and EC Regulation 1080/2006 Article 3(2), the convergence budget category provides funds based on a region's GDP ranking in comparison to other European countries.[165] Specifically, regions with a GDP that is less than seventy-five percent of the community average are eligible to receive funding from the ERDF budget.[166] Because there is a disparity in the budgetary allocations provided among regions based on their GNP ranking,

---

[162] *See* Petitioner's Rebuttal Brief at 28-29.
[163] *See PSF from India* IDM at Comment 1.
[164] *See* letter from the EU, "Countervailing Duty Investigation of Ripe Olives from Spain-First Supplemental Questionnaire Response (December 26, 2017).
[165] *See* EC December 22 SQR at Exhibit Q3.4.5 Annex 12.
[166] *See* EC December SQR at Exhibit Q3.4.5 Annex 10 and Q3.4.5 Annex 12.

Barcode:3717366-01 C-469-818 INV - Investigation -

we continue to find the program to be regionally specific, as provided in section 771(5A)(D)(iv) of the Act.

### Comment 10: Whether the EU Sustainable Energy Development of Andalusia Scheme Program is Specific

*GOS' Comments*[167]
- The program is managed by the Andalusia Energy Agency and its aim is to promote the development of sustainable energy in Andalusia without imposing any legal obligation on companies or citizens of the region.
- The subsidies granted under this program are not trade distorting, because beneficiaries are not obligated to carry out energy improvement actions and the implementation of energy improvement actions does not allow beneficiaries to increase production or improve the quality of their products.
- The subsidies provided offset the extra costs incurred by companies in adopting environmentally friendly behavior.
- In accordance with Spanish Decree 22/2007 of January 30, 2007, which established the regulatory framework of this program, the grants do not confer an advantage to the beneficiaries because the eligible costs are "limited to the additional cost necessary to achieve the environmental objectives…."
- Funds provided during 2007 through 2013 were a total of €368,266,454 and the EC provided 33 percent, the GOS provided 29 percent, and the GOA provided 37 percent.
- Funds provided during 2014 through 2020 were a total of €460,195,806 and the EC provided 79 percent, the GOS provided 0 percent, and the GOA provided 21 percent.
- The aid provided is not specific in the EU framework and is not specific at Spain's national level because all regions in Spain receive aid under this program without the consideration of a region's GDP.
- The GOA drafts the legislation regarding this program; the reach of the program is limited to the GOA's jurisdiction and authority.
- The aid is provided based on objective criteria and defined in regulations, as contemplated by ASCM Article 2, and is not limited to any sector or area in the region of Andalusia.

*Respondents' Comments*[168]
- Budgetary sources should not serve as the basis for a regional specificity finding in the context of local jurisdiction programs.
- Whether the funding for the local jurisdictional program comes from outside the locality is immaterial. The relevant question is whether or not the local authority administering the program is distinguishing among regions within its jurisdiction.
- In this instance, fund administration is centered in Andalusia for Andalusia without any distinction among regions in Andalusia. Thus, there is no regional specificity.
- Budgetary outlays do not mean that the EU and/or GOS are directing funds to recipients within Andalusia.

---

[167] *See* GOS' Case Brief B at 20-22.
[168] *See* Respondents' Case Brief B at 7-8.

Barcode:3717366-01 C-469-818 INV - Investigation -

*Petitioner's Comments*[169]
- Commerce should have found regional specificity because the estimation of recipients used for the Post-Preliminary Analysis lacked the relevant information on the total value of grants provided under this program, which is key feature to the estimation calculation.
- Relevant information on the program was not translated and therefore Commerce should apply AFA and find that all portions of funding provided to this program are specific.

*GOS' Rebuttal Comments*[170]
- The information provided by the GOS throughout the investigation, and confirmed by Commerce at verification, proves that aid provided under this program is not *de facto* specific or regionally specific.
- Commerce did not consider the factors described in the ASCM Article 2.1.
- The program was not limited to certain enterprises or predominantly used by certain enterprises.
- The granting authority did not exercise discretion when providing aid.

**Commerce's Position:** We disagree that it is the administering of the funds, rather than the source of the funding, upon which specificity is contingent. Section 771(5A)(D)(iv) of the Act states that "where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific." For this program there are three authorities providing the subsidy: (1) the EU, (2) the GOS, and (3) the GOA.[171] These same administering authorities also provide funding for the program. Therefore, the EU and the GOS have elected to provide funds to Andalusia, a designated geographical region, within the jurisdiction of both the EU and the GOS. The fact that these two administering authorities do not ultimately choose who receives the funding is immaterial.

Therefore, we continue to find that the portion of the funding provided by both the EU and the GOS is regionally specific under section 771(5A)(D)(iv) of the Act. We also continue to find that the portion of the funding provided by the GOA is not regionally specific, because the GOA does not limit the eligibility for funding to specific regions of Andalusia, whether designated on a geographic basis or on the basis of GDP ranking.

The GOS argues that in finding portions of the subsidy provided under this program to be specific, Commerce failed to account for the fact that the program recipients were not limited to certain enterprises, nor were the subsidies predominantly used by certain enterprises; these arguments are misplaced and rely upon a misunderstanding of the statute. The specificity criteria referenced by the GOS, number of users and predominant use, are criteria of specificity that are only relevant when Commerce is analyzing whether a subsidy is *de facto* specific within the meaning of section 771(5A)(D)(iii) of the Act. As we stated above, we found this program

---

[169] *See* Petitioner's Case Brief B at 8.
[170] *See* GOS Rebuttal Brief at 14.
[171] *See* EC IQR at 71, *see* EC December 22 SQR at section "reply to question 3,4, and 5;" and *see* EC February 20 SQR at 3. *See also* GOS IQR at 132-140 and Exhibit B12; *see* GOS September SQR at 178-179; *see* GOS December SQR at Appendix 3 and Exhibits 3.1 – 3.11. The GOS did not contribute funds during the 2007 through 2013 period, but does contribute funding for the 2014-2020 period.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

regionally specific under section 771(5A)(D)(iv) of the Act and this section of the Act does not include the specificity criteria that is argued for by the GOS.

The GOS also argues that the program is not specific because the eligibility for the program is based on objective criteria. Here again, the GOS' arguments are misplaced. The factor of "objective criteria" is only part of a *de jure* specificity analysis that is conducted under section 771(5A)(D)(i) and (ii) of the Act. As we stated above, we found this program regionally specific under section 771(5A)(D)(iv) of the Act and this section of the Act does not include the specificity criteria that is argued for by the GOS.

### Comment 11: Whether the PROSOL Program is Specific

*GOS' Comments*[172]

- The PROSOL program ceased to operate in 2005.
- Agro Sevilla was approved for a grant in 2003 and, subsequently, received funds at the beginning of the AUL.
- The program was managed by the former Department of Employment and Technology Development of the Junta de Andalucía and aimed to promote the use of renewable energy.
- The grant provided under this program partially compensated a company for the costs incurred to become more environmentally friendly.
- Agro Sevilla received a grant that partially offset the costs of a biomass boiler, to improve the use of olive pits as a renewable and ecological fuel. Neither the production nor the product quality was affected by the purchase and, therefore, the aid had no trade distorting effects.
- The funds provided during 2003 through 2006 totaled €368,266,454, of which the EU provided 26 percent and the GOA provided 74 percent.
- Because most of the funding was provided by the GOA, Commerce should limit its examination of the jurisdiction of the granting authority to the GOA.
- Commerce's determination that the funds provided by the EC are regionally specific is not justified.
- While unable to provide exact details about the program due to its obsolescence, it can be inferred by the information provided to Commerce at verification that the program was widely used. Because most of the beneficiaries were individuals, it is unrealistic for Commerce to estimate that the program only had 50 beneficiaries.

**Commerce's Position:** We disagree with the GOS' comment that, because most of the financing was provided by the Regional Government of Andalusia, we should limit our examination of the financing to the GOA. Our regulations require us to examine the specificity of each financial contribution. Financing for the PROSOL program was provided from two sources—the ERDF and the Regional Government of Andalusia. As stated above, we find that the assistance provided by the ERDF for this program is regionally specific, given that only selected areas of Spain, those with a lower GDP ranking, are eligible for this assistance.

---

[172] *See* GOS' Case Brief B at 24-25.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

Additionally, we continue to find that the grant that Agro Sevilla received from the GOA is *de facto* specific. While the GOS indicates that it believes that there was a very large number of recipients of the program, the GOS cited to no information on the record to support its assertion. Furthermore, in situations where complete information is not available for a particular program, section 776(a)(1) of the Act requires us to rely on facts available and, based upon facts available, we determined in our Post-Preliminary Analysis that there were a limited number of recipients; thus, the program was specific within the meaning of section 771(5A)(D)iii of the Act.[173] The comments raised by the GOS do not warrant a change of that determination.

## Comment 12: Whether the EU Regional Development Fund and IDEA Program is Specific

*GOS' Comments*[174]

- IDEA is the Regional Development Agency of Andalusia, which is a public body associated with the GOS, and operates in the region of Andalusia.
- The specificity analysis of the benefits provided under this program should be limited to the region for which IDEA is the administrating authority, *i.e.*, the region of Andalusia.
- Aid provided under IDEA is for promoting research and development activities; is not trade-distorting.
- The regional regulations established the criteria and procedures that regulate the "granting" of IDEA support programs.
- IDEA support programs are open to all industrial sectors and companies in Andalusia, along with some entrepreneurial associations. No distinction is made based on a company's location within the region of Andalusia.
- Grants provided under IDEA are based on objectives and criteria which are published in a specific issue of the Regional Official Bulletin.
- Commerce verified that numerous companies from all industrial sectors within the region of Andalusia received benefits under this program and that a small number of these companies belonged to the agri-food sector.
- The IDEA program and its source of funds meet the criteria described in the ASCM Article 2 and it is, therefore, not specific.
- The program is not regionally specific and does not provide countervailable benefits.

**Commerce's Position:** We disagree with the GOS that IDEA is directly and exclusively linked to the GOA. In the GOS' February response, the GOS stated that this program was financed using only ERDF funds during the period 2007 through 2013.[175] Because ERDF funds are available only to regions with a lower GDP ranking, *see* Comment 9, we continue to find this program regionally specific, as provided in section 771(5A)(D)(iv) of the Act.

---

[173] *See* Post-Preliminary Analysis at 20.

[174] *See* GOS' Case Brief B at 22-23.

[175] *See* Letter from the GOS, "The Government of Spain provides the response to the Department's February 12, 2018 clarification of supplemental questionnaire issued on February 06, 2018," February 20, 2018, at 7.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

**Comment 13: Whether the EU Environment and Climate Action (LIFE) Program is Specific**

*European Commission Comments*[176]

- Grants provided under the EU LIFE program are not *de jure* specific within the meaning of Article 2.1(a) and (b) of the ASCM.  Article 2.1 of the ASCM governs the establishment and implementation of the EU LIFE program and does not explicitly limit access EU LIFE grants to certain enterprises.  On the contrary, these grants are automatically available throughout the EU to any EU enterprise which fulfills the objective eligibility and award criteria relating to projects for environmental and climate action as required by point (b) of Article 2.1 of the ASCM.

- Grants provided under the EU LIFE program are not *de facto* specific within the meaning of Article 2.1 (c) of the ASCM, which focuses on the allocation or use of a subsidy.  Commerce's reasoning that the grants are *de facto* specific is incomplete.  Commerce did not take into account the number of industries in the EU that use the grants in order to determine whether the number of industries using the grants is large or small.   Rather, Commerce focused not on the number of industries, but on the number of enterprises only (2,200) which received grants under the EU LIFE program.

- Article 2.1(c) of the ASCM focuses on indicia of *de facto* specificity, stating that, in evaluating *de facto* specificity, account shall be taken of the diversification of economic activities within the jurisdiction of the granting authority and of the length of time that the subsidy program has been in operation.

- Commerce failed to address the length of time during which the program has been in operation.  The EU LIFE program is still ongoing and will be operational until 2020.  Between 2014 and 2016, out of the €3.5 billion which were allocated for this program, only €680 million was committed to projects which involve the 2,200 enterprises, which represent a broad spectrum of EU industries. [177]

- In sum, Commerce failed to provide sufficient evidence as required by Article 2.4 of the ASCM to substantiate its *Preliminary Determination* that the grants available under the EU LIFE program are *de facto* specific within the meaning of Article 2.1(c) of the ASCM.  Specifically, Commerce failed to explain why, given the diversification of the EU economy and the length of time the EU Life program has been in operation, the grants in question were found to be used by a "limited number of certain enterprises."

- Commerce failed to establish that the EU LIFE program grants were bestowed directly or indirectly to the manufacture, production, or export of Spanish ripe olives.  As such, Commerce is not permitted under the ASCM to impose countervailing duties on the mandatory respondents.

*Respondents' Comments*[178]

- Commerce's finding that the EU LIFE program is *de facto* specific within the meaning of 771(5A)(D)(iii)(I) of the Act because "2,200 projects, provided in an economy the size of the EU, does not demonstrate that the subsidies provided under this program are widely used throughout the EU," is not supported by substantial evidence.

---

[176] *See* EC's Case Brief B at 1-4.
[177] *See* Annex 1 to the EU Supplemental Questionnaire Response submitted on February 20, 2018.
[178] *See* Respondent's Case Brief B at 5-7.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

- Commerce makes no effort to place the 2,200 projects in context.  The SAA states that Commerce can take into account the number of industries in the economy in question in determining whether the number of industries using a subsidy is large or small.  However, the statute requires Commerce to take into account "the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy."
- However, Commerce has provided only a simple assertion that "2,200 projects, provided in an economy the size of the EU, does not demonstrate that the subsidies provided under this program are widely used throughout the EU."  This is an insufficient analysis of whether the number of recipients is small among the industries within the EU economy and it is not supported by substantial evidence.
- The statute directs Commerce to consider "the length of time during which the subsidy program has been in operation."  Commerce failed to take this factor into account.  This is important, because the program has been operating only since 2014; as a new program, it is, perhaps, not yet fully deployed across all sectors and industries.  Commerce's failure to consider this factor is a legal error.
- Commerce must reverse its preliminary finding and conclude that the EU LIFE program is not specific within the meaning of the statute.

**Commerce's Position:**  Commerce's determination here is consistent with U.S. law, which, in turn, is consistent with U.S. WTO obligations.  It is the Act and Commerce's regulations that have direct legal effect under U.S. law, and not the ASCM.[179]  Commerce determines *de facto* specificity in accordance with section 771(5A)(D)(iii) of the Act, which states that a subsidy may be specific if:

> (I)  The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number;
> (II) An enterprise or industry is a predominant user of the subsidy;
> (III) An enterprise or industry receives a disproportionately large amount of the subsidy; or
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

In the case of EU Life, we continue to find that 2,200 projects across the whole of the EU economy, which is very large, represents a limited number of recipients.[180]  Having satisfied that factor, which alone establishes *de facto* specificity, we need not address the other factors, as the parties contend.  Thus, contrary to the EC's arguments, because we have already found the number of recipients on an enterprises basis to be limited, there is no need to consider the whether the breadth of industry sectors represented by the recipients is indicative of *de facto* specificity or not.  This approach is codified in the language of section 771(5A)(D)(iii) of the Act, which provides that a subsidy "may be specific if *one or more*" of the factors above exist.  This sequential application of the *de facto* specificity factors is also directly addressed in the

---

[179] *See PSF from India* IDM at Comment 1.
[180] *See* Post-Preliminary Analysis at 11.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

SAA, which states that "where the number of enterprises or industries using a subsidy is not large, the first factor alone would justify a finding of specificity…."[181]

The SAA also addresses how Commerce will consider the additional factors cited by the parties in the arguments: the extent of diversification of economic activities in the economy in question and the length of time the subsidy program is in operation.  The SAA states that "these additional criteria serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors.  (That is, while they are not additional indicators of whether specificity exists, these criteria may provide a clearer context within which the *de facto* factors would be analyzed.)  Thus, in determining whether the number of industries using a subsidy is small or large, Commerce could take account of the number of industries in the economy in question."[182]

The industry sector information provided by the EU was very broad, and showed that there was a wide diversification of industries that conducted projects funded by EU Life.  However, in light of the limited number of projects receiving funding under this program, the fact that the range of recipients represents a diverse set of industries, across the highly diversified EU economy, does not detract from our finding that the number of recipients, as represented by the 2,200 projects funded, is limited.  Moreover, in considering the length of time that the program is in operation, when we examine the limited number of users in the context of the three-year period that this program has been in operation (out of the seven-year period that the program is authorized to operate) we do not find that the limited number of users is a consequence of the length of time the program has been in operation.  Because there were only 2,200 recipients of the subsidy within the entire EU during the three-year period in which the program has been in use, we continue to find, for purposes of this final determination, that the EU Life program is *de facto* specific within the meaning of section 771(5A)(iii)(I) of the Act.

## Comment 14: Whether the SAIS Program is Specific

*GOS' Comments*[183]

- The subsidy provided by the regional government may be supplemented by additional amounts granted by the central government.  Together, the amount cannot exceed a cap established by the EU Guidelines.  For crop insurance, the cap is 65 percent of the total cost.[184]

- SAIS does not cover market risks, it only covers losses caused by natural disasters; therefore, the subsidy is independent of the market price applying to the insured production and of the inputs used by the farmer.

- The GOS also does not grant disaster relief payments to the farmers affected by losses caused by risks that are insurable under SAIS.  Damages covered by SAIS are not compensated otherwise.  Therefore, SAIS is not a support program but, rather, a risk management policy.

---

[181] *See* SAA at 931.

[182] *Id.*

[183] *See* GOS' Case Brief B at 3-8; *see also* GOS Rebuttal Brief at 12.

[184] *See* Letter from the GOS, "The Government of Spain provides Comments on the Verification Report," May 2, 2018, at 5.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation -

- The subsidy is not automatically provided to the farmers.
- The subsidy provided in the form of an insurance premium discount does not provide a benefit, because it excludes the disaster relief payments that could otherwise be made to the farmers affected by natural disasters.
- SAIS is also not specific. It is available to all farmers for all agricultural and livestock production. It is not limited to certain types of crops or production.
- There are different insurance lines under SAIS, because it is a public/private system. The differentiating of insurance lines enables the insurance companies to identify clearly the goods covered by the contract; it does not equate to specificity, it is an administrative necessity.
- All farmers have access to the aid, regardless of the type of crop.
- Most insurance lines for plant crops have an "increasing" modular structure, under which each line offers different insurance modules (1, 2, 3, P). For each line, a subsidy level is established in the annual Agricultural Insurance Plans for each available module. The subsidy for a certain module is generally the same among the different insurance lines. However, five insurance lines did have different rates for the same module.
- The budget available for the insurance subsidies is not managed in a way that is sector specific. The budget is not allocated to any specific crops or productions.
- Because the insurance is voluntary, the total amount of subsidies paid at the end of the year and the distribution among subsectors will depend on the number of policies in place.
- Commerce must demonstrate that a transfer of a subsidy has occurred. The insurance subsidy is provided to the olive growers and not to the respondent companies; a pass-through analysis is required.
- SAIS does not confer a benefit, is not specific and is only given to farmers, not producers or exporters of the subject merchandise.
- Only one mandatory respondent and some cross-owned affiliates received insurance subsidies related to olives.

**Commerce Position:** We continue to find that this program is *de jure* specific under section 771(5A)(D)(i) of the Act, because the State Entity for Agricultural Insurance (ENESA) establishes a different base subsidy and insurance premium discount for each insurance line.

As stated in the Post-Preliminary Analysis, the Combined Agricultural Insurance Plan (AIP) establishes the subsidy levels applicable to the various insurance lines.[185] The AIP for the year 2015 covers the 2016 harvest, the harvest during the POI. The annex to the AIP lists the various insurance lines by product and the base grant applicable to each line.[186] The GOS argues that, within each line, there are various insurance "modules" and that modules across all lines are allocated the same base grant. However, this is both immaterial and incorrect. First, as the GOS itself says in its case brief and as is demonstrated by the AIP, several insurance lines did have different base rates for the same modules.[187] The GOS also overlooks the 2015 amendments to the Annex to the AIP that establishes the base grant rates.[188] This amendment

---

[185] *See* Post-Preliminary Analysis at 7-8.
[186] *See* Letter from the GOS, "Response of the Government of Spain to the Department's October 25, 2017 Supplemental Questionnaire," November 7, 2017 at Exhibit S-23 (GOS November 7 SQR).
[187] *See* GOS Case Brief B at 6, *see also* GOS November 7 SQR at Exhibit S-23.
[188] *See* GOS IQR at Exhibit A-057.

resulted in increases in the base grant for only nine insurance lines (out of more than 27 lines overall), and the line that covers insurance for olive grove holdings was among the nine. This selective increasing of the subsidy available to certain lines demonstrates that the assistance provided under this program is provided in a manner that renders it *de jure* specific.

Second, the GOS' claim does not negate the fact that the AIP has different base grant subsidies and insurance premium discounts for each insurance line. For example, the base subsidy available to pomegranates ranges from 17 to 29 percent, and the base subsidy available to wine grapes ranges from 17 to 40 percent.[189] There are also additional modules, SB+GA1, GA2, GA3, each of which is associated with different base subsidies that are not consistent.[190] When we asked the GOS how the base grants were originally derived, it responded that they are established in the AIP on the basis of several factors including farm policy priorities, availability of budget, and insurance penetration in the different farm sectors. The GOS also stated that "a company may receive different base grants only in case it contracts different insurance policies for different production."[191] This indicates that there are, indeed, as shown in the AIP, different base grants for each insurance line. Therefore, we continue to find that this program is *de jure* specific under section 771(5A)(D)(i) of the Act.

The GOS also argues that because these insurance premium discounts are provided to the olive farmers and not to the olive processors, we cannot find that there is a benefit to the mandatory respondents. As discussed in our response to Comment 1, because we find that section 771B of the Act is applicable in this investigation, we need not conduct a pass-through analysis or any other analysis to find that olive processors benefit from subsidies provided to olive growers.

### Comment 15: Whether Financing Sourced from the Spanish Official Credit Institute (ICO) is Countervailable

*GOS' Comments*[192]
- Loans provided by the ICO are not a direct transfer of funds to the beneficiaries of the loan.
- The ICO is a credit entity with management autonomy, legal status, and its own assets and treasury.
- The ICO's General Board is comprised of ten members with six members sourced from the public sector. The four non-public sector members hold a double vote in the assets and liability operations. The head of the ICO also has a vote and is selected by the Council of Ministers.
- The ICO is ascribed to the Ministry of Economy, Industry and Competitiveness but is not part of the ministry because it has a separate legal identity and separate assets.
- The ICO does not receive funds from the Ministry of Economy, Industry and Competitiveness but sources funding from the domestic and international market. The ICO references Royal Decree 706/1999 Article 24, the ICO's by-laws, and its 2016 annual report.

---

[189] *See* GOS November 7 SQR at Exhibit S-23.
[190] *Id.*
[191] *See* GOS December 22 SQR at 24-25.
[192] *See* GOS' Case Brief B at 8-11.

- The GOS does not transfer funds to the ICO to grant financing and, therefore, financing provided by ICO should not be considered subsidies or countervailable aid.
- The GOS did not have access to the short-term commercial loans provided by the respondents as a benchmark referenced in the Post-Preliminary Analysis.
- ICO loans are granted to the final client through private banks at interest rates that are based on market conditions.
- Interest rates provided to the borrowers by private bank may be lower than the maximum interest rate determined by ICO. The private bank pays ICO the interest rate that corresponds to the 6-month Euribor plus a short-term differential.
- The beneficiaries of the ICO loans did not receive a benefit and if a profit was made, then it was from the private bank that managed the ICO financing program.

**Commerce's Position:** As we stated in the Post-Preliminary Analysis, the Spanish Official Credit Institute (ICO) is a public business entity attached to the Ministry of Economy, Industry, and Competitiveness via the State Secretariat for Economics and Business Affairs. The ICO is legally considered a credit institution and is treated as a State Financial Agency.[193] Regardless of ICO's separate legal identity, we continue to find that it is a government entity that operates to further GOS economic goals by making financing available consistent with those goals. As such, loans that are provided under ICO-funded programs constitute a financial contribution within the meaning of section 771(5)(D)(i) of the Act.

The GOS argues that there is no subsidy, because ICO sources its funding on international capital markets, and makes its funding available through intermediary banks in accordance with market principles; however, these arguments are unavailing. There is no requirement in CVD law that a government must provide the direct transfer of funds from its own treasury accounts. ICO's access to the international capital market allows it to borrow with the backing of the GOS, and to make financing available to achieve the GOS' objectives. That ICO's operations are not funded from the treasury, and that the interest rates charged on its loans are greater that its cost of funds, does not remove the potential that ICO loans may provide countervailable benefits to the recipients.

Our standard for evaluating a countervailable benefit is not the cost to the government, as the GOS argues, but, rather, the benefit to the recipient. As stated in section 771(5)(E) of the Act, "a benefit shall normally be treated as being conferred where there is a benefit to the recipient…." That ICO is required to adhere to lending principles in making financing available to borrowers through intermediary banks does not eliminate the benefit to the recipient of loans at interest rates that are lower than comparable commercial rates. The involvement of private banks in making available to borrowers funds that originate with ICO also does not eliminate the benefit to the recipient if the loans are provided to borrowers at interest rates that are lower than the interest rates on comparable commercial loans (obtained through banking institutions that are not sourcing their funds from ICO). The GOS does not allow for the possibility that ICO itself can make the financing available at terms that are favorable to itself, and the intermediary banks can do the same, while at the same time, providing financing to the individual borrower at terms that are more favorable than the terms available from a commercial

---

[193] *See* Post-Preliminary Analysis at 8.

Barcode:3717366-01 C-469-818 INV - Investigation    -

bank.  Consistent with section 771(5)(E)(ii) of the Act and 19 CFR 351.505(a)(1), our determination of whether ICO loans provide countervailable benefits is based on a comparison of the interest that the company paid on ICO loans during the POI and the interest the company would have paid on comparable commercial loans.

### Comment 16: Whether Commerce Should Adjust the Interest Rate Used in Certain Long-Term ICO Financing to Angel Camacho

*Petitioner's Comments*[194]
- The benefit calculation for the financing provided to Angel Camacho used an incorrect interest rate for certain loans financed through two ICO-Other programs.  The loan calculation should use a benchmark rate from 2014 and not from 2015.
- The result of this correction calculates a measurable benefit.

*GOS' Rebuttal Comments*[195]
- Submissions and verification show that ICO financing is not a subsidy and not countervailable, because it is an independent entity.

**Commerce's Position:**  We agree with the petitioner that we erred in selecting the interest rate benchmark for the calculation of loan benefits under the ICO loan programs.  Correcting the interest rate benchmark renders the benefits measurable for Angel Camacho.  As such, we have examined the two ICO loan programs under which Angel Camacho had loans outstanding during the POI.  We have determined that ICO International Financing is countervailable, because it is specific as an export subsidy, and that ICO Companies and Entrepreneurs Financing is not countervailable because it is not *de jure* specific, it is not an export subsidy, and it is not *de facto* specific.[196]  These findings are discussed above in the sections, "Programs Determined to be Countervailable," and "Programs Determined to be Not Countervailable."  The GOS' argument that, because ICO is an "independent entity," the loans it provides are not a subsidy, is conclusory, and overlooks the analysis required by the statute regarding financial contribution and benefit, as discussed more fully in Comment 15, above.

### Comment 17: Whether Commerce Should Adjust the Calculation of European Investment Bank (EIB) Financing Received by Agro Sevilla

*Petitioner's Comments*[197]
- In the Post-Preliminary Analysis, Commerce calculated a subsidy rate for loans received by Agro Sevilla from the EIB, but preliminarily found that the benefits received by Agro Sevilla under this program were not measurable.
- However, in reaching this conclusion, Commerce mistakenly relied on figures in the "Interest Rate Reported" column rather than the "Benchmark Rate" column when calculating the "Benchmark Payments" amount.

---

[194] *See* Petitioner's Case Brief B at 5.
[195] *See* GOS Rebuttal Brief at 13.
[196] *See* Post-Preliminary Analysis at 8-9.
[197] *See* Petitioner's Case Brief B at 5.

Barcode:3717366-01 C-469-818 INV - Investigation  -

- Commerce should correct this mistake.  Correction of this error results in a measurable countervailable benefit of 0.01 percent.

**Commerce's Position:**  We agree with the petitioner that we erred in our calculation of the benefits received by Agro Sevilla under the EIB loan program.  Correcting the calculation results in benefits that are measurable.  However, as discussed in the "Analysis of Programs" section above, we are deferring our examination of this this program until a subsequent administrative review, should this investigation result in the issuing of a CVD order.

### Comment 18: Whether to Apply AFA to the CDTI Program

*Petitioner's Comments*[198]
- Aceitunas Guadalquivir failed to report all required information, and this prevented Commerce from fully accounting for benefits received under the CDTI loan program.  Specifically, Aceitunas Guadalquivir failed to provide information relating to certain commercial loans that could have served as a benchmark loan interest rate for comparison to its CDTI loan.
- As a result, Commerce should apply AFA to address Aceitunas Guadalquivir's failure to report all loans completely.

*Respondents' Rebuttal Comments*[199]
- The purpose of reporting additional commercial loans is to provide the possibility of a benchmark.
- Comparable commercial loans, according to Commerce's regulations and in the context of CDTI, are long-term loans, the terms of which were established during, or immediately before, the year in which the terms of the government-provided loan were established.  Commerce routinely rejects as benchmarks interest rates from loans that do not meet this standard.
- Commerce's loan appendix asks the respondents to report "commercial debt with principal and interest outstanding during the POI that was obtained contemporaneously with and that is comparable to the loan(s) in question."  Aceitunas Guadalquivir had no such contemporaneous loan.
- The terms of the CDTI loan were established in 2013, while the additional loans reviewed by Commerce at verification were granted in 2014 and 2016.  Furthermore, Commerce did not reach any conclusions at verification that the loans were "comparable" – an express qualification before respondents have a reporting requirement.
- Contrary to the petitioner's contention, these loans could not serve as benchmarks under Commerce's regulations and were not required to be reported.

**Commerce's Position:**  We disagree with the petitioner's claims that Aceitunas Guadalquivir did not fully report its CDTI loans and that we should apply AFA when calculating a rate for this program.  As stated in the verification report for Aceitunas Guadalquivir, we were able to

---

[198] *See* Petitioner's Case Brief A at 25-26; *see* Petitioner's Case Brief B at 9.
[199] *See* Respondent's Rebuttal Brief at 19-20, 22.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation   -

trace in Aceitunas Guadalquivir's accounting system both the loan and grant portion of the CDTI loan, as well as all interest payments made.[200]  We also reviewed Aceitunas Guadalquivir's short- and long-term loan accounts, and we traced the totals in these accounts to the balance sheet.[201]  Although we did find that there were additional commercial bank loans that Aceitunas Guadalquivir had not reported, because these loans were provided in 2014 and 2016, the interest rates on these loans do not meet the requirements of 19 CFR 351.505(a)(2)(iii) for use as benchmarks for measuring the benefits from the CDTI loan to Aceitunas Guadalquivir, because the terms of these loans were established after the initial CDTI loan agreement, which was signed in 2013.[202]  Contrary to the petitioner's contention, the verification report shows that Aceitunas Guadalquivir did fully respond to our request to report "commercial debt with principal and interest outstanding during the POI that was obtained contemporaneously with and that is comparable to the loans(s) in question."[203]  Because the additional loans were not provided under the CDTI program, and because they were not contemporaneous with the CDTI loans under investigation, by not reporting them, Aceitunas Guadalquivir did not fail to cooperate with respect to this program.  As such, we find no basis to rely on AFA, for purposes of this final determination, in determining a rate for this program.

**Comment 19: Whether the CDTI Program is Export Specific**

*GOS' Comments*[204]
- This program is not specific under section 771(5A)(A) of the Act, because it is not contingent upon export performance.
- CDTI loans promote research and development and are available to all companies, in any industry or sector.  Export performance is not considered in determining eligibility for the receipt of assistance.
- The five eligibility criteria include: the applicant is a company registered in Spain; the applicant is not in financial difficulties; the project is a research and development project; the project meets budget standards; and, the aid will have an incentive effect.
- Non-compliance with any of the eligibility criteria results in the rejection of the proposal.  Moreover, because export performance is not one of the criteria, a company may qualify for assistance that is not going to export or has no export capacity.
- If a company meets all of the eligibility criteria, it is subject to a technical and financial evaluation.  The technical evaluation criteria and the financial evaluation criteria are further broken down into sub-criteria.  A company must have a positive evaluation for both the technical and financial evaluation for the project to be approved.
- Potential export performance is only one of the 34 technical sub-criteria; thus, it has a relatively small impact in the whole technical evaluation process.
- Aceitunas Guadalquivir's technical evaluation indicates that its potential export performance is "low."  Despite the expected low export performance, Aceitunas

---

[200] *See* Aceitunas Guadalquivir Verification Report at 11.
[201] *Id.*
[202] *See* Letter from Aceitunas Guadalquivir, "Initial Questionnaire Response of Aceitunas Guadalquivir S.L.U.: Ripe Olives from Spain (C-469-818)," September 19, 2017, at 58.
[203] *See* IQR at Section III Loan Benchmark and Loan Guarantee Appendix.
[204] *See* GOS' Case Brief B at 12-16.

Barcode:3717366-01 C-469-818 INV - Investigation -

Guadalquivir was approved for the loan based on its total technical evaluation score and a good financial evaluation.

*Respondents' Comments*[205]

- In its Post-Preliminary Analysis, Commerce found CDTI to be specific based on section 771(5A)(A) of the Act, because it is contingent upon export performance as one of two or more conditions of eligibility the GOS considers. Commerce also stated that "{a}mong the criteria the GOS considers are several items relating to the impact on exports. However, there are hardly "several items," as Commerce only indicated two.
- Furthermore, these are not export contingencies; rather, they are evaluation factors.
- The GOS has five eligibility criteria, and the technical and financial evaluations are carried out only after verifying that a company has complied with all five criteria. Those two evaluations are not part of the eligibility criteria.
- The GOS also identified "selection criteria" applied in selecting eligible candidates, including the technical quality of the project and degree of innovation, the financial and technical capacity of the company to implement the project, the capacity of the company to exploit the output, and the social, economic and environmental impact of the project. Export performance or export potential are not taken into account in determining eligibility.
- Commerce's verification report noted no discrepancies with the GOS' responses and did not indicate that there was a discussion concerning export contingency.

*Petitioner's Rebuttal Comments*[206]

- The respondents and the GOS contend that Commerce based its determination on an incomplete examination of the record and a mistaken interpretation of facts, and that this program is not export specific. However, this argument ignores the ample evidence on the record suggesting this program is export specific.
- The GOS itself states, "potential export performance" is one of the "technical subcriteria" considered for obtaining a CDTI loan.[207]

**Commerce's Position:** In the Post-Preliminary Analysis, Commerce found the loans provided by the CDTI to be specific under sections 771(5A)(A) and (B) of the Act, because they are contingent upon export performance as one of two or more conditions that the GOS considers. The GOS and Aceitunas Guadalquivir contend that Commerce erred in this export subsidy specificity finding because CDTI loans are not contingent upon export performance. The GOS and Aceitunas Guadalquivir assert that there are only five criteria upon which eligibility is evaluated and export performance or capacity is not among them.

However, both the GOS and Aceitunas Guadalquivir fail to address the record information indicating that these five criteria are only the *threshold* criteria for CDTI loans.[208] Only a company that successfully fulfills these criteria will be considered in the second stage of the evaluation process, which addresses a technical and financial evaluation. These evaluations are

---

[205] *See* Respondent's Case Brief B at 3-5.
[206] *See* Petitioner's Rebuttal Brief at 27.
[207] *See* GOS Case Brief B at 14.
[208] *See* GOS December 22 SQR, at Appendix TQ-7 at 10.

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

made on a numerical basis, the details of which neither the GOS nor Aceitunas Guadalquivir provided,[209] and several of the 34 subcriteria used to "grade" the technical evaluation refer to exports. These include criteria such as "export possibilities," and other criteria that remain proprietary.[210] The GOS reported that if the technical and financial assessment "proves to be successful," then the application is submitted to a Board of Directors which may approve the assistance. Additionally, the GOS stated that, if the company "does not meet the eligibility *or* the selection criteria," the application is rejected.[211] This indicates that the company must comply with the five eligibility criteria and pass the technical and financial evaluations. Thus, there are more than five eligibility criteria, and at least one criterion includes export contingency.

Further, as we noted in the Post-Preliminary Analysis, Royal Decree 1407/1986, which approves and promulgates the regulations of the CDTI, states that one of the functions of the CDTI is to "promote industrial use of the technologies developed on the initiative of the Centre itself or of other public or private Centres and to support the manufacture of pre-series and the commercialization of new products and processes, *especially, in overseas markets*" (emphasis added).[212] On this basis we continue to find this program specific under section 771(5A)(A) and (B) of the Act.

### Comment 20: Whether Commerce Should Apply AFA to Angel Camacho's Unreported Grant Presented at Verification

*Petitioner's Comments*[213]
- Commerce rejected the information presented by the GOS and Angel Camacho at verification regarding additional grants under the Rural Development Program and in 2008 under the Andalusia Energy Program, because the information was not previously reported.
- The verification reports' description of the unreported grant information presented by the GOS and Angel Camacho clearly show that the respondents did not provide to Commerce information regarding additional programs.

*GOS' Rebuttal Comments*[214]
- The grant presented by the GOS, and rejected by Commerce before verification, was not provided under the Rural Development program.
- The grant was provided under the State Research Agency (AEI) and information regarding this agency was provided to Commerce in GOS September 18 SQR.
- The grant was not initially reported due to the age of the file.
- Angel Camacho located the grant and AEI was able to find related information.

---

[209] Although the GOS provided Aceitunas Guadalquivir's evaluation, there was no explanation as to the scoring system, or the weight each criterion carries. *See* GOS December 22 SQR at Exhibit 7.4.
[210] *See* Aceitunas Guadalquivir Final Calculation Memorandum for a discussion of all criteria.
[211] *See* GOS December 22 SQR at Appendix TQ-7 at 9.
[212] *Id.*, at Exhibit TQ-7.2 at Article 3.3.
[213] *See* Petitioner's Case Brief B at 7.
[214] *See* GOS' Rebuttal Brief at 14-15.

- The grant was for an R+D+I project and the potential beneficiaries of the program varied and, therefore, the grant should not be considered specific or countervailable.

*Respondents' Rebuttal Comments*[215]
- Commerce should reject the petitioner's argument regarding the application of AFA to Angel Camacho for the Andalusia Energy Program.
- The statute states that AFA may only be applied where "necessary information" is not provided by the responding party, and information about subsidies not related to initiated programs is not "necessary" to Commerce's determination and is beyond Commerce's inquiry.
- Commerce should defer any action if it lacks sufficient time to examine the discovered subsidy.

**Commerce's Position:**  As an initial matter, we have separately addressed the first rejection of factual information referenced by the petitioner, relating to the unreported grants to Angel Camacho's cross-owned suppliers under Rural Development, described in Angel Camacho Verification Report under "Corrections Not Accepted."[216]  This issue is addressed in Comment 23.

Regarding the other factual information that we declined to accept at verification, the information described the same unreported grant.  The GOS and Angel Camacho verification reports describe that we did not accept information regarding an unreported grant provided to Angel Camacho in 2008.[217]  In the GOS verification report, the unreported 2008 grant is also described as being a grant to fund research project that was provided by the Andalusia Energy Agency.[218]  The verification report for Angel Camacho describes a previously unreported grant that was provided in 2008 and that was overlooked in preparing the questionnaire responses due to the age of the grant.[219]

While the respondents argue that Commerce should defer action regarding this grant and not apply AFA, we disagree.  The deadlines for providing factual information, as delineated in 19 CFR 351.301, are in place to provide Commerce sufficient time to review and analyze information provided by interested parties.  Therefore, it is critical that parties provide information by the established deadline or timely request an extension of such a deadline.  Timely filings and timely extension requests contribute to Commerce's efficient administration of the numerous cases before it.  Conversely, untimely-filed information hinders the efficient conduct of our proceedings, and the Federal Circuit has upheld Commerce's discretion to reject or refuse to consider information that is submitted late in the proceeding.[220]  Accordingly, for the efficient conduct of its proceedings, it is critical that parties adhere to the deadlines established by Commerce.  When it becomes apparent that respondents have not cooperated to

---

[215] *See* Respondent's Rebuttal Brief at 21.
[216] *See* Letter to the GOS, "Countervailing Duty Investigation on Ripe Olives from Spain:  Rejection of the GOS Submission of January 29, 2018," February 2, 2018.
[217] *See* Angel Camacho Verification Report at 4; *see* GOS Verification Report at 2.
[218] *See* GOS Verification Report at 2.
[219] *See* Angel Camacho Verification Report at 4.
[220] *See Dongtai Peak Honey Industry Co., Ltd. v. United States of America*, 777 F.3d 1343 (Fed. Cir. 2015).

69

Barcode:3717366-01 C-469-818 INV - Investigation  -

the best of their ability to timely and fully respond to our requests for information, and this lack of cooperation has impeded our investigation, section 776 of the Act provides for the reliance on facts available with the application of adverse inferences.  As discussed above in the section "Application of Facts Available with Adverse Inferences," we find, for purposes of this final determination, that it is appropriate to rely on AFA for purposes of determining a subsidy rate for this unreported grant.

### Comment 21: Whether Commerce Should Rely on "Unverified" Information

*Petitioner's Comments*[221]
- The statute and the regulations require Commerce to verify all information relied on for the final determination.
- In the Post-Preliminary Analysis, Commerce relied on information provided by the GOS after the completion of verification, too late to be verified.
- Commerce has not justified its decision to find no regional specificity, on the basis of unverified information, for the portion of funding provided by the Government of Andalusia under the EU Sustainable Energy Development of Andalusia Scheme.

*GOS' Rebuttal Comments*[222]
- Commerce was able to conduct verification of this program, and the PROSOL program, at which GOS provided explanations of how the programs operate.

*Respondents' Rebuttal Comments*[223]
- The petitioner, remarkably, lays blame on with the GOS for the timing of the provision of the information.
- The petitioner overlooks the timing of Commerce's supplemental questionnaire, which was issued in the midst of verification, and is procedurally unfair.
- Commerce should forgo any findings on programs for which information was not verified due to a lack of time.

**Commerce Position:**  We reject the petitioner's, the GOS' and the respondents' arguments calling for either the reviewing of our post-preliminary decision or the deferral of the decisions on programs for which we received information after the completion of verification.  In issuing the supplemental questionnaire of February 6, 2018, we exercised our authority to gather information we find necessary for purposes of conducting the investigation.  We relied on the information provided by the GOS in response to this supplemental questionnaire to develop the decisions in the Post-Preliminary Analysis.  Contrary to the petitioner's interpretation, the requirement to verify information relied on for the final determination does not obligate Commerce to verify *all* of the factual information provided in the record; Commerce simply does not have the resources to implement the statutory requirement in this manner, and must choose the programs and the information it seeks to verify.  In addition, when we determined not to verify certain information, this did not constitute a finding that it was unreliable, absent other factors that may call into question the reliability of the information; nor do we determine

---

[221] *See* Petitioner's Case Brief A at 6.
[222] *See* GOS Rebuttal Brief at 11.
[223] *See* Respondents' Rebuttal Brief at 21.

Barcode:3717366-01 C-469-818 INV - Investigation -

that our decision not to verify information regarding a particular program renders any information about that program insufficient to support our analysis and decision-making such that we must defer a decision on the program. As such, we continue to examine the EU Sustainable Energy Development of Andalusia Scheme and the PROSOL program, on the basis of the information provided in response to the February 6, 2018 supplemental questionnaire.

### Comment 22: Whether Commerce Should Adjust the Volume of Raw Olives Purchased to Account for Waste Loss

*Petitioner's Comments*[224]
- Information on the record indicates that the olive suppliers and the olive processors are not recording their olive volumes on the same basis.
- The olive suppliers' production data includes the weight of the harvested raw olives, as well as debris, waste, and unusable olives, including olives not used for processing into black or green olives.
- The respondents reported their olive purchase volumes net of debris, as confirmed at verification.
- Because the un-useable olives and debris would not be stored in a solution for further processing, the waste quantities would not be captured in the respondents' olive purchase data.
- Therefore, a "yield loss" adjustment must be made to account for this volume of olives reported by the suppliers, but not by the respondents.
- Aceitunas Guadalquivir is the only respondent for which there is information on the record (in a whose verification exhibit) relating to yield loss. As such, the yield loss information in this exhibit should be applied to all respondents to make an appropriate adjustment.
- Information in Aceitunas Guadalquivir's verification exhibits demonstrates that Guadalquivir's net purchase weight, as indicated on its invoices, contains not only olives destined for processing, but also unusable olives and debris, such as leaves and stems.

*Respondents' Rebuttal Comments*[225]
- The petitioner's argument for a volume adjustment to account for waste loss must be rejected. The petitioner's attempt to suggest a discrepancy between reported sales and purchases is grossly inaccurate and misunderstands the record.
- No "yield loss" adjustment is required and none can be supported by the record.
- The petitioners suggest that Guadalquivir's reported purchases were net of "unusable" olives. This is incorrect.
- Aceitunas Guadalquivir's verification report demonstrates that non-prime olives are included in its purchase totals: "{t}he totals for each olive type correspond to Guadalquivir's ultimate invoices and the amount that was paid…Volumes recorded on the truck list are broken down according to olive type, but then further divided among the categories that are included in the total reported volume: smallest, hail, bruised, 'molino'…."
- These lower quality olives are used in processing as is noted in the verification report.

---

[224] *See* Petitioner's Case Brief A at 22-23.
[225] *See* Respondent's Rebuttal Brief at 16-17.

- The petitioners have not established that the production and sales volumes reported by the suppliers are reported on a gross basis, only that the truck invoices issued in the case of Aceitunas Guadalquivir are issued on a gross basis.
- Finally, no yield loss adjustment should apply, even if supplier production data are reported on a gross basis. The production figure reflects all aspects of the supplier production process and product sold by the supplier. Any subsidy benefit is properly attributed to the entire gross volume.
- The fact that the respondents in question do not purchase certain aspects of that gross unit is purely an attribution issue.
- Commerce should not attribute subsidies to the respondents based on alleged subsidized units they did not purchase. This would wrongly overstate any attributed benefit.

**Commerce's Position:** We do not agree with the petitioner that it is necessary to adjust the volume of olives sold by each supplier to account for a yield loss attributable to the inclusion of debris and poor quality or damaged olives. The record does not establish that the volumes sold included debris; to the contrary, the record demonstrates that the olive volumes sold by the growers are net of such debris. At verification of Agro Sevilla, the verification team asked the cooperative on what basis the weight of its olives is recorded.[226] Agro Sevilla verified that "only olives are included in the weight."[227] Similarly, at the verification of Angel Camacho, company officials indicated that that "all raw olives are purchased and booked 'clean'," meaning without stems, leaves, stones etc. The company officials explained that the weight after the initial cleaning of sticks and stones is the first weight entered into their accounting system and is the weight used in calculating the payment to the supplier."[228]

Likewise, at the verification of Aceitunas Guadalquivir, the verification team asked the same question. Aceitunas Guadalquivir explained that the weight recorded for their purchases of raw olives is net of debris, sticks, leaves, etc.[229] Aceitunas Guadalquivir, for example, explained how a supplier's invoices can be linked to Aceitunas Guadalquivir's truck list that is created for each truck coming into its facility.[230] This truck list accounts for each truck load received by the supplier and type of olive. Aceitunas Guadalquivir explained that the suppliers' "invoices can be linked to the truck list created by {Aceitunas Guadalquivir}."[231] The totals on the supplier's invoice for each olive type correspond to Guadalquivir's payment documentation. As shown by the Aceitunas Guadalquivir documents reviewed at verification, the volumes recorded on the truck list are broken down according to olive type, but then further divided among the categories that are included in the total reported volume: smallest, hail, bruised, "molino" (mill/press); as well as the categories that are not included in the total reported volume, such as, the smallest olives, rocks, insects, and leaves.

As such, the record shows that the volume of olives purchased by each mandatory respondent is recorded on the same basis as the volume of olives sold by any supplier; the record also shows

---

[226] *See* Agro Sevilla Verification Report at 12.
[227] *Id.*
[228] *See* Angel Camacho Verification Report at 9.
[229] *See* Aceitunas Guadalquivir Verification Report at 8.
[230] *Id.*
[231] *Id.*

Barcode:3717366-01 C-469-818 INV - Investigation  -

that the reported volumes sold by the suppliers are not because they do not include debris and un-useable olives. Therefore, there is no basis for making a "yield loss" adjustment, as the petitioner advocates, for purposes of this final determination.

### Comment 23: Whether Commerce Should Accept Rejected Submission from the GOS and the Respondents

*European Commission Comments*[232]

- Commerce was incorrect in rejecting the additional information that the GOS submitted at the beginning of verification.
- Commerce's rejection of this information is not justified in light of its obligations under the WTO ASCM. The GOS acted to the best of its ability to cooperate and explained that it found the information later, because it was contained in a database that which was not easily accessible and not comprehensively searchable, that was very old, largely unused, and archived in remote locations.
- Article 12.11 of the ASCM clearly states that "*The authorities shall take due account of any difficulties experienced by interested parties…in supplying information requested, and shall provide any assistance practicable.*" In *US –Hot-Rolled Steel,* the Appellate Body clarified that Article 6.13 of the WTO Antidumping Agreement, whose wording is equivalent to Article 12.11 of the ASCM, underscores that 'cooperation' is a two-way process involving joint effort. This provision requires investigating authorities to make allowances for, or take action to assist, interested parties in supplying information.
- The GOS verification report clearly demonstrates that Commerce failed to take account of the genuine difficulties experienced by the GOS with respect to the requested information.
- Contrary to Commerce's claims, the magnitude of the corrections was minor because they did not relate to any new subsidy program and they represented only a minor adjustment of the benefit information.
- Even though the corrections were submitted after the deadline, Commerce should recognize that, despite this delay they were still submitted within a reasonable period of time: 1) the rejected corrections were submitted before verification; 2) the process of collecting the information in the investigation was not completed at this time; and, 3) in the *US-Anti-Dumping and Countervailing Duties (China)*, the Panel observed that "*pursuant to the plain language of Article 12.7 of the SCM Agreement, recourse to facts available is permissible only under the limited circumstances where an interested Member or interested party: (i) refuses access to necessary information within a reasonable period; (ii) otherwise fails to provide such information within a reasonable period; or (iii) significantly impedes the investigation. Our interpretation is also consistent with that of prior panels and Appellate Body's that have considered this provision.*"[233] These circumstances clearly demonstrate that Commerce did not have lawful grounds under Article 12.7 of the ASCM to reject the corrected information. The conditions envisaged by this Article were not fulfilled, in

---

[232] *See* EC's Case Brief A at 16-17.

[233] *See* Appellate Body Reports on Japan—DRAMS (Korea), para. 235 and Mexico-Anti-Dumping Measures on Rice, para. 291; Panel Reports on Japan -DRAMS (Korea), para. 7.383 and EC – Countervailing Measures on DRAM Chips, para. 7.245; see also Panel Report, US- Anti-Dumping and Countervailing Duties (China), paras. 16.9, 16.16.

particular those under (ii) and (iii) above, which provide not only the grounds for the rejection of the submitted information, but also for the application of facts available, to replace such rejected information.

*GOS' Comments*[234]

- Commerce's decision not to accept the Pillar II rural development program information that had not been reported was incorrect. This information was detected by a complete involuntary error.
- This information was provided to Commerce before the GOS was aware of verification. Most of the additional Pillar II information was contained in old databases that were no longer in use and, or there was no digital information available, and some files were archived in remote locations.
- Under Article 12 of the ASCM, Commerce is required to take into account these difficulties and accept this information.
- Commerce's decision to reject this information is unjustified and, Commerce cannot rely on these circumstances to base its final determination on "adverse facts available."

*Respondents' Comments*[235]

- Commerce requested a substantial amount of data and information from numerous parties which spanned a 12-year period and required governmental authorities to consult older databases and records that have not been in use for years.
- The GOS recognized that it was missing certain benefit data which was inadvertently omitted because of its aging databases. The GOS and the three mandatory respondents attempted to supplement the record by submitting the revised supplier subsidy data.
- The information submitted by the GOS and the mandatory respondents related to the CAP programs, which had been fully analyzed by Commerce. The revisions were just additional data points that could have easily been incorporated in the Commerce's analysis.
- This scenario in this case is very different from others when an entirely new program is discovered late in an investigation, and Commerce has no information about how the program operates. The data submitted on January 29, 2018, and on February 2, 2018, corrected benefit information and did not alter or change the substance of the program.
- Since this was not a new program, Commerce had no basis for rejecting the data submitted. Commerce had more than ample time to verify the revised data, because none of the verifications had begun.
- The revisions were provided to Commerce more than seven days in advance of verification of the GOS and more than two weeks before any of the suppliers of raw olives were verified. There is no basis to conclude that the information was not reliable, could not be verified, or that it could not be used by Commerce. Commerce should exercise its discretion and incorporate the revised benefit data into its analysis rather than resort to facts available or AFA.
- Rejecting these data is at odds with the posture adopted by Commerce during verification with the GOS. Commerce issued a supplemental questionnaire to the GOS on the same day

---

[234] *See* GOS Case Brief A at 4-5.
[235] *See* Respondent's Case Brief A at 45-50.

on which verification of the GOS commenced, in order to clarify the operation of some programs.  The deadline for responding to the questionnaire was after verification.

*Petitioner's Comments*[236]

- In the *Preliminary Determination,* Commerce correctly found that Pillar II, the Agricultural Fund for Rural Development, is a countervailable program.  Commerce also found that the growers and the suppliers of the three respondents received benefits under this program during the POI and the AUL.
- Based on incomplete GOS, respondent, and supplier responses, Commerce preliminarily determined subsidy rates that significantly understate the actual benefits received by respondents and their growers under the rural development program.
- Commerce was correct in rejecting the new information, filed just prior to verification, which disclosed that the GOS made significant Rural Development Fund payments to a number of respondents' suppliers.
- In rejecting the late submissions, Commerce clarified that the submissions were untimely and that the factual information was not properly explained and did not constitute minor corrections that could be acceptable before verification.
- What is left on the record is a clear indication that the corrections were not minor and that rural development benefits, separate and in addition to those previously reported, were received by respondents and/or their suppliers and growers.
- Because the level of these rural development benefits is unclear, and unverified, Commerce must apply AFA to determine a countervailing duty rate applicable to these benefits to ensure that the respondents are neither rewarded for failing to respond timely with relevant subsidy information, nor induced to the same in the future.
- Commerce should add to the verified rural development benefits for each respondent an additional rural development rate equal to the highest countervailable subsidy rate found for any similar program, including the BPS program.

*European Commission Rebuttal Comments*[237]

- Commerce is not entitled to reject the corrected/revised information, which was submitted by the respondents within a reasonable period and not verified during Commerce's verification.
- Article 12.6 and Article 12.6 and Annex VI of the ASCM provide that the investigating authorities may carry out verification visits in order to verify provided information.  However, they are not obliged to do so.
- Article 12.7 of the ASCM explains that Commerce is not entitled to reject information that was submitted within a reasonable period.
- Commerce should refrain from applying AFA in a WTO-inconsistent manner which would punish the mandatory respondents with excessive and unjustified subsidy margins.  If it determines that facts available are required, Commerce should respect the provisions of Annex II to the WTO Antidumping Agreement, meaning that Commerce is obliged to fill in the potential gaps caused by missing/rejected data only with the information that is best, not

---

[236] *See* Petitioner's Case Brief A at 23-25.
[237] *See* EC's Rebuttal Brief at 2.

simply useful, but most fitting or most appropriate information available for the case at hand.

**Commerce's Position:**  Commerce conducts its investigations in accordance with regulations that establish time limits for the provision of factual information.  The time limits are implemented to ensure transparency in the investigation by establishing the timing of the opportunity for parties to provide information.  During an investigation, respondent parties have an obligation to ensure that they have provided Commerce with complete information because we make our determinations based on the information timely provided.  At verification, we examined the information provided by the GOS and the respondents to determine whether they constituted minor corrections and determined that the information could not be so considered.  The information identified a large number of additional grants, substantially increasing the total value of the Pillar II grants received by the respondents' suppliers.  For example, as indicated in the GOS verification report,[238] the GOS identified additional CAP Pillar II grants to Agro Sevilla's first-tier member cooperatives amounting to an additional 40 percent, by value, in reported benefits.  Additionally, Aceitunas Guadalquivir presented information regarding additional grants to their unaffiliated growers and Angel Camacho presented information regarding additional Pillar II grants to their cross-owned input suppliers.[239]  In all cases, we rejected this information, because we considered it not to represent minor corrections and to represent a sizeable increase in the total Pillar II benefits that were reported.

Because the information at issue could not properly be considered minor corrections to previously submitted information, the additional Pillar II payments reported by the GOS and the respondents represented new factual information.  As new factual information, it is subject to the time limits established by 19 CFR 351.301, which is the regulatory provision that governs the time limits for the submission of factual information.  Section 351.301(c)(1) of Commerce's regulations states that "the Secretary will not consider or retain in the official record of the proceeding unsolicited questionnaire responses or untimely filed questionnaire responses.  The Secretary will reject any untimely filed or unsolicited questionnaire response …."  Given that the GOS and respondents did not submit the information at issue (requested in previous questionnaires) until January 29, 2018, and February 2, 2018, respectively – well after November 20, 2017, when Commerce issued its *Preliminary Determination* – the deadline for filing such information clearly had expired.

We find the parties' arguments concerning the ASCM unavailing.  It is the Act and the Commerce's regulations that have direct legal effect under U.S. law, and not the ASCM.[240]  The fact that the new factual information was related to the Pillar II program, which was under investigation, is immaterial to the fact that this new factual information was submitted months after it was requested and, therefore, outside the time limits of our regulations for accepting new factual information.  Moreover, the fact that we issued an additional questionnaire, limited to specific grant and loan programs that were not included in the initial questionnaire issued to parties, concurrent with verification does not require us to accept the new factual information on

---

[238] *See* GOS Verification Report at Minor Corrections at 2.
[239] *See* Aceitunas Guadalquivir Verification Report at 3; see also Angel Camacho Verification Report at 4.
[240] *See PSF from India* IDM at Comment 1.

Pillar II benefits.[241]  The supplemental questionnaire sought, for the first time, additional information on discrete programs that we identified as necessary to the investigation.  The new factual information that we rejected at verification was information that should have been provided in response to the initial questionnaire or supplemental questionnaires, by the applicable deadline.

As a result, we consider unreliable the Pillar II benefits reported by Agro Sevilla for the first-tier suppliers, and consistent with sections 776(a) and (b) of the Act, we have applied AFA in our calculations for the Pillar II program, as described above under "Application of Facts Otherwise Available and Use of Adverse Inferences."  For Agro Sevilla, we have relied on AFA to identify a proxy for the weighted per kilogram Pillar II benefits provided to its member cooperatives.  For Angel Camacho, because the incomplete reporting relates to its cross-owned suppliers, and we treat a respondent and its cross-owned input suppliers as one entity for purposes of calculating countervailable subsidy rates, for purposes of this final determination, we are relying on our AFA hierarchy to identify a rate applicable to Angel Camacho.[242]  In accordance with the hierarchy, we are relying on the rate calculated for Agro Sevilla as AFA for Angel Camacho.  Finally, for Aceitunas Guadalquivir, because the circumstances of the Pillar II calculations do not permit the reliance on AFA to identify a proxy for the weighted per kilogram Pillar II benefits provided to its unaffiliated suppliers, we have used the countervailable subsidy rate calculated for Agro Sevilla as the countervailable subsidy rate for Angel Camacho.[243]

## Comment 24: Comments on the Verification Reports

Both the EC and the GOS provided comments regarding the verification reports, identifying areas where, they contend, the reports did not fully or accurately convey the information provided at verification.  The comments addressed the following programs:

- EU CAP Pillar I – BPS. Topics included: market intervention measures, decoupled, entitlements, timeline of previous programs, convergence, EU CAP budget, co-efficients used in entitlement calculations, and financial discipline calculation.[244]
- EU CAP Pillar I – Greening. Topics included: Differences between this program and BPS, the EU budget for the program, decoupled and national programs are determined by Member State.[245]
- EU CAP Pillar I – SPS. Topics included: discontinuation of the program, SIGPAC system, application process, crop declarations.[246]
- Rural Development. Topics included: shared management, implementation, and budget allocation.[247]

---

[241] *See e.g.*, Letter to the GOS, "Countervailing Duty (CVD) Investigation of Ripe Olives from Spain: Supplemental Questionnaire to the Government of Spain," February 6, 2018.
[242] *See* Angel Camacho Final Calculation Memorandum.
[243] *See* Guadalquivir Final Calculation Memorandum; *see also* Agro Sevilla Final Calculation Memorandum.
[244] *See* EC Case Brief B at 5-9; *see* GOS Case Brief B at 2-4.
[245] *See* EC Case Brief B at 9.
[246] *See* GOS Case Brief B at 1.
[247] *See* EC Case Brief B at 10; *see* GOS Case Brief B at 4-5.

- SAIS. Topics included: regional government involvement and subsidy cap.[248]
- ICO Financing. Topics included: organization, decision making body, interest rates, financing conditions, and blended funding.[249]

**Commerce's Position:**  We reviewed the comments the EC and the GOS submitted regarding the verification reports.  The verification reports are final documents that represent the discussions at verification and are based on the reporting of the verification team.  Although Commerce does not revise verification reports based on comments from interested parties, parties have the opportunity to use the information provided in the verification report to make arguments that Commerce must consider for the final determination.  Accordingly, we have not revised the verification reports, but we have considered all of the arguments that the EC and the GOS have made in their case briefs with regard to all of the programs under investigation, including those identified above.

**Comment 25: Whether Commerce's Conduct of this Investigation Meets the Requirements of the ASCM**

*GOS' Comments*[250]
- Commerce issued six questionnaires, one during verification; each requested an enormous quantity of information within very tight deadlines.
- The number of companies for which information was requested increased over time. Initially limited to the respondents and affiliates, later, the GOS had to provide information for a large number of raw olive suppliers.  This was especially burdensome for mandatory respondents that were obliged to present information about companies over which they had no control and, therefore, any deficiencies related to that information should not lead to the use of AFA.
- The complaint presented by the petitioner was limited to the subsidies under Pillar I and Pillar II of the CAP, as well as the Agricultural Insurance System of Spain.  However, Commerce required that the GOS provide extensive information on aid and loans granted to mandatory respondents that are outside the purview of this investigation.
- The GOS considers this approach to be excessive in light of Article 13 the of the ASCM, which requires investigating authorities to give to the government of the affected country the opportunity for consultations before investigating aid.
- Nevertheless, the GOS has shown maximum cooperation and transparency and provided detailed information on these "other aid programs."

*European Commission Comments*[251]
- Commerce failed to prove the following:
  o that the benefits received by the Spanish olive farmers were countervailable under Article 1.2 of the ASCM;
  o that the benefits received by the Spanish olive farmers in 2016 under SPS, BPS and Greening programs were specific under Article 2.1 of the ASCM.

---

[248] *See* GOS Case Brief B at 5.
[249] *Id.*, at 5-6.
[250] *See* GOS Case Brief at 2-5.
[251] *See* EC's Case Brief A at 2-3.

Barcode:3717366-01 C-469-818 INV - Investigation -

- o The benefits received by the Spanish olive farmers were passed-through to the mandatory respondents in light of the relevant provisions of the ASCM, with which the U.S. is obliged to comply.
- o That the conditions envisaged by Article 12.7 of the ASCM were met when it rejected the corrected information submitted by the GOS on February 2, 2018.

*Respondents' Comments*[252]

- Article 11 of the ASCM establishes most of the basic requirements for initiation of a countervailing duty investigation.
- Article 13 of the ASCM places an important obligation on investigating authorities, in that "as soon as possible after an application under Article 11 is accepted, and in any event before the initiation of any investigation, Members of the WTO that produce merchandise subject to such investigation, shall be invited for consultations with the aim of clarifying the situation as to matters referred to in paragraph 2 of Article 11…."

**Commerce's Position:** We disagree with the GOS and the respondents' claim that our requests for information were excessive and that we asked for information that was outside the purview of this investigation. Although parties argue that Commerce's requests for information were incongruent with the United States' international obligations, our investigation is governed by U.S. law, which is consistent with our WTO obligations. Moreover, the GOS' and the respondents' reading of the ASCM, in this context, has no bearing upon these proceedings because it is the Act and Commerce's regulations that have direct legal effect under U.S. law.[253] Contrary to the GOS' claim, Commerce did conduct consultations with the EC and the GOS prior to initiation of this investigation.[254] Further, this investigation was initiated on the basis of a petition filed by a U.S. industry that Commerce found met the requirements of the Act for initiation, as explained in our initiation checklist.[255]

Additionally, under section 775 of the Act, Commerce is obligated to investigate potential subsidies it discovers in the course of the proceeding. Specifically, in the course of an investigation, Commerce may "discover {} a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in the countervailing duty petition."[256] In such a case, Commerce "shall include the practice, subsidy, or subsidy program in the proceeding."[257] Thus, section 775 of the Act imposes an affirmative obligation on Commerce to "consolidate in one investigation…all subsidies known by petitioning parties to the investigation or by {Commerce} relating to {subject} merchandise" to ensure "proper aggregation of subsidization practices."[258]

---

[252] *See* Respondent's Case Brief A at 40-42.
[253] *See PSF from India* IDM at Comment 1.
[254] *See* Memorandum, "Ripe Olives from Spain Countervailing Duty Petition:  Consultations with Officials from Spain and European Union," July 11, 2017.
[255] *See* Initiation Checklist
[256] *See* section 775 of the Act.
[257] *Id.* (emphasis added).
[258] *See* S. Rep. No. 96-249, at 98 (1979); *see also* Allegheny I, 112 F. Supp. 2d at 1150 n.12 ("Congress clearly intended that all potentially countervailable program regardless of when evidence on these programs became reasonably available.").

Thus, our questionnaires to the growers and suppliers, as well as the questionnaires to the respondents regarding other assistance they received, were necessary for us to effectuate our obligation to investigate practices "that appear to be a countervailable subsidy."  Moreover, our issuance of such questionnaires is consistent with our authority to seek information we deem relevant to our investigation.

### Comment 26: Whether Other Subsidies Should be Included in this Investigation and Whether Other Assistance Can Form the Basis for Applying AFA

*Respondents' Comments*[259]

- Commerce has employed a practice in countervailing duty investigations, including this one, of requesting its respondents to disclose all "other subsidies."  These "other" subsidies are not the subject of an allegation by the petitioner, of any formal initiation, nor are they defined by Commerce.
- This "other" subsidy request has been used by Commerce as a basis to apply AFA and to impose additional countervailing duties at punitive rates when Commerce discovers what appears to be a subsidy has not been disclosed by the respondent in response to the request.
- Article 11 of the ASCM establishes most of the basic requirements for the initiation of countervailing duty investigation.  Article 11.1 states that "an investigation to determine the existence, degree and effect of any alleged subsidy shall be initiated upon a written application by or on behalf of the domestic industry."  Further to this requirement, Article 11.2 states that "an application under paragraph 1 shall include sufficient evidence of the existence of (a) a subsidy…Simple assertion, unsubstantiated by relevant evidence, cannot be considered sufficient to meet the requirements of this paragraph."  Article 11.3 states that "the authorities shall review the accuracy and adequacy of the evidence provided in the application to determine whether the evidence is sufficient to justify the initiation of an investigation."  Finally, Article 11.6 states that in "special circumstances," an authority may self-initiate an investigation, but "they shall proceed only if they have sufficient evidence of the subsidy."  Additionally, Article 13 obligates investigating authorities to invite the affected government for consultations, "with the aim of clarifying the situation as to the matters referred to in paragraph 2 of Article 11 and arriving at a mutually agreed solution."  Such consultations are to be held before an investigation is initiated.
- The provisions demonstrate that a specific process must be followed before an investigation may occur.  Under Article 11.1, allegations and investigations are subsidy-specific.  Evidence presented to support the investigation of one alleged subsidy does not permit an authority to engage in a wide-ranging investigation beyond that alleged subsidy.  Each investigation must be justified by sufficient evidence and be preceded by consultations and formal initiation.
- The U.S. statute, regulations, and Commerce practice mirror the obligations found in Articles 11 and 13 of the ASCM.  Under section 702 of the Act, investigations may only begin after sufficient evidence of financial contribution, specificity and benefit is found or presented.  Commerce also engages in an allegation-by-allegation review to establish whether each allegation is properly framed and supported by sufficient evidence.  This is reflected in the initiation checklist which clearly shows that each allegation is met with an

---

[259] *See* Respondent's Case Brief A at 42-45.

Barcode:3717366-01 C-469-818 INV - Investigation  -

allegation-specific examination.  Initiation in response to an allegation is not a doorway into open-ended inquiries.

- These provisions and practices do not preclude Commerce from incorporating additional subsidy findings in the final determination.  The petitioners are permitted to raise new subsidy allegations within an applicable time limit.  Commerce's practice is to examine each allegation and determine whether the allegation and supporting information warrants initiation consistent with the requirements of section 702 of the Act.

- Commerce will examine apparent subsidy practices "discovered" during the course of an investigation and will include in its investigation a discovered practice that appears to provide a countervailable subsidy if it concludes that "sufficient time remains before the scheduled date for the final determination."  However, if "insufficient time remains before the date for the final determination" Commerce will (1) "allow the petitioner to withdraw the petition without prejudice and resubmit it with an allegation with regard to the newly discovered practice; or (2) "defer consideration of the newly discovered practice, subsidy, or subsidy program until a subsequent administrative review, if any."

- Commerce's regulations reinforce that the discovery of an apparent subsidy practice is not determinative of either a subsidy or whether it is countervailable.  There must be evidence to give rise to the appearance of a subsidy.

- Moreover, the discovery does not permit the application of AFA, findings of countervailability, or the imposition of additional countervailing duty deposits or duties.

- Such a discovery must be followed by "examination."  If the discovery occurs late in the proceeding, such that no examination may occur, Commerce must either give petitioners an opportunity to resubmit an amended petition, or defer a determination until a subsequent review.

- Subsidies discovered by Commerce that were not disclosed in response to the "other" subsidies question cannot be subject to the application of AFA.  AFA may only be applied where "necessary information" is not provided by the responding party.[260]  Commerce may not deem information on undisclosed subsidies not related to initiated programs as "necessary" to its determination, as such information is beyond the reach of Commerce's inquiry.  Consistent with its regulations, Commerce must defer any action if it lacks sufficient time to examine the discovered subsidy.[261]

*GOS' Comments*[262]

- Commerce has required extensive information related to all types of aid and loans granted to the mandatory respondents, including those outside the framework of agriculture and, therefore, also outside the bounds of this investigation.  This approach is excessive in light of the requirements of the ASCM.

- In particular, Article 13 establishes that, before investigating a certain type of aid, the investigating authority must provide the opportunity for consultations.  With regard to the "other aid programs," Commerce has not satisfied the obligation for consultations.

---

[260] *See* section 776 of the Act.
[261] *See* 19 CFR 351.311.
[262] *See* GOS Case Brief A at 2.

- Nevertheless, the GOS has shown maximum cooperation and transparency on these "other aid programs." The information provided clearly demonstrates that they are non-specific, non-distorting aid schemes and they are also *de minimis* aid (as referred under the ASCM), because the benefit amounts are not meaningful.

*AFI Rebuttal Comments*[263]

- Commerce should not apply AFA to this case, as the GOS and mandatory respondents fully participated and cooperated and provided the necessary information requested by Commerce.
- The application of AFA against respondents is inconsistent with U.S. international obligations under the ASCM and U.S. law.
- AFI agrees with the respondents that there is no legal basis for Commerce to investigate these programs.

**Commerce's Position:** We disagree with the respondents and the GOS that our requests for information regarding "Other Assistance" is outside the purview of this investigation. Although parties argue that Commerce's requests for information are inconsistent with U.S. obligations under the ASCM, our investigation is governed by U.S. law, is consistent with our WTO obligations. Moreover, the respondents' and the GOS' reading of the ASCM, in this context, has no bearing upon these proceedings, because it is the Act and Commerce's regulations that have direct legal effect under U.S. law.[264]

This investigation was initiated on the basis of a petition filed by a U.S. industry that Commerce found met the requirements of the Act for initiation. However, as explained above, the CVD law, in section 775 of the Act, requires Commerce to investigate potential subsidies it discovers in the course of the proceeding. Specifically, in the course of an investigation, Commerce may "discover {} a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in the countervailing duty petition."[265] In such a case, Commerce "shall include the practice, subsidy, or subsidy program in the proceeding."[266] Thus, section 775 of the Act imposes an affirmative obligation on Commerce to "consolidate in one investigation…all subsidies known by petitioning parties to the investigation or by {Commerce} relating to {subject} merchandise" to ensure "proper aggregation of subsidization practices."[267] Thus, our questionnaires to respondents regarding other assistance they received are necessary for us to effectuate our obligation to investigate practices "that appear to be a countervailable subsidy."

At verification of Agro Sevilla, the team reviewed Agro Sevilla's tax return, which indicated that Agro Sevilla received a tax credit for expenses incurred for attending international trade

---

[263] *See* AFI Rebuttal Brief.
[264] *See PSF from India* IDM at Comment 1.
[265] *See* section 775 of the Act.
[266] *Id.* (emphasis added).
[267] *See* S. Rep. No. 96-249, at 98 (1979); *see also* Allegheny I, 112 F. Supp. 2d at 1150 n.12 ("Congress clearly intended that all potentially countervailable program regardless of when evidence on these programs became reasonably available.").

Barcode:3717366-01 C-469-818 INV - Investigation  -

fairs and for the cost of international marketing.  In their initial questionnaire responses, the respondents identified assistance they had received over the AUL under the "other assistance" section of the questionnaire.[268]  Commerce followed its normal practice for investigating this other assistance identified by the respondents, including issuing supplemental questionnaires and including appropriate programs in our analysis for the Post-Preliminary Analysis.  For example, Agro Sevilla reported its use of PROSOL under other assistance.[269]  Commerce requested additional information, and in the Post-Preliminary Analysis, based on the record evidence, Commerce determined a countervailable subsidy rate for this program.[270]  However, Commerce was only able to reach a determination because the record contained all of the necessary information required to examine the countervailability of this program as well as the necessary benefit information  When an interested party has failed to cooperate by not acting to the best of its ability to comply with Commerce's requests for information, including with respect to programs that would be reported as other assistance, section 776 of the Act directs Commerce to apply AFA, as appropriate.  Commerce has continued to follow our practice in this investigation regarding other assistance programs.

For example, during verification at Agro Sevilla, the team reviewed Agro Sevilla's tax return which indicated that Agro Sevilla received a tax credit for expenses incurred for attending international trade fairs and for the cost of international marketing.  This tax credit is clearly shown on Agro Sevilla's tax return which was provided in its initial questionnaire response.[271]  In accordance with section 775 of the Act, we are including this program in our investigation.  *See* the discussion of this program under "Programs Determined to Be Countervailable."

### Comment 27: Whether Commerce Should Include the Corrections of the Alleged Ministerial Errors

*Respondents' Comment*[272]
- Commerce should include in the final determination the corrections addressed in the Ministerial Error Memorandum, especially the correction to Angel Camacho's sales denominator.

**Commerce's Position:**  We agree with the respondents, and consistent with our findings in our Ministerial Error Memorandum, we have made corrections to our preliminary subsidy rate calculations to correct instances in which we made ministerial errors.

### Comment 28:  Commerce Must Use Corrected and Revised Data in the Calculations

*Petitioner's Comments*[273]
- The respondents and their suppliers have submitted a number of significant corrections and revisions to the data previously submitted.

---

[268] *See e.g.*, Agro Sevilla IQR at 30-41.
[269] *Id.*

[271] *Id.*, at Exhibit AS-12.
[272] *See* Respondent's Case Brief A at 50.
[273] *See* Petitioner's Case Brief A at 15.

- The corrections and revisions are confirmations that several responding suppliers are not olive growers or their olive production volume is substantially different than previously reported and used in the *Preliminary Determination*.

**Commerce's Position:**  We have used the corrected and revised data in our calculations for the final determination.

### Comment 29: Whether to Clarify the Scope of the Investigation to Include Ripe Olives Contained in Cocktail Mixes

*Respondents' Comments*
- AG and Camacho accept the scope clarification language in Commerce's Post-Preliminary Scope Decision Memorandum regarding the classification of cocktail mixes.
- However, Commerce's language may be confusing to interpreters of the scope with respect to cocktail mixes consisting of less than 50 percent ripe olives and, therefore, the scope may not be interpreted in accordance with Commerce's intention.
- AG's and Camacho's concern arises from Commerce's statement in the Post-Preliminary Scope Decision Memorandum that "{w}e preliminarily find that ripe olives contained in cocktail mixes are in the scope, but that the remaining ingredients are not in the scope,"[274] and this statement can be read to include cocktail mixes that have any amount of ripe olives in them, regardless of quantity.  For this reason, AG and Camacho argue that Commerce should add the following language to further clarify the scope:  *The scope does not include ripe olives that otherwise meet the definition above that are packaged together with non-subject products, where the smallest individual packaging unit (e.g., can, pouch, jar, etc.) of any such product contains less than 50 percent ripe olives by net drained weight.*

*AFI Comments*
- Commerce should include the additional scope language proposed by AG and Camacho.
- Including the proposed scope language will prevent confusion by U.S. Border Patrol and Protection and is consistent with Commerce's scope.

*Petitioner's Comments*
- The preliminary scope language is perfectly clear and, therefore, should be retained without addition.
- AG and Camacho's recommended additional scope language is redundant and adding another sentence that means the same thing as the previous sentence will confuse future interpreters of the scope.

**Commerce's Position:**  We continue to find that ripe olives contained in cocktail mixes are subject to the scope of this proceeding, and that the remaining ingredients are not within the scope of this proceeding.  As discussed in Post-Preliminary Scope Decision Memorandum, it is our normal practice to provide ample deference to the petitioner with respect to products for

---

[274] Citing to Post-Preliminary Scope Decision Memorandum at 5.

which it seeks relief in the investigation,[275] and we find no reason to depart from this practice in this investigation. The petitioner expressed concern that, by not including ripe olives in cocktail mixes as part of the scope, there is a risk for circumvention and, therefore, cocktail mixes containing ripe olives should be included in the scope.[276] After analyzing information submitted by interested parties concerning cocktail mixes, we find that ripe olives contained in cocktail mixes, which otherwise meet the plain language of the scope as it appeared in the *Initiation Notice*, are in-scope merchandise and, therefore, it is appropriate to add language clarifying the scope with respect to cocktail mixes to prevent potential circumvention.

We also find that the scope clarification language proposed in the Post-Preliminary Scope Decision Memorandum[277] is clear and, therefore, does not require changes or additions for the final determination. Specifically, we find that the scope language appropriately captures our intent, as agreed to by interested parties, to include in the scope the ripe olives in cocktail mixes where ripe olives comprise the majority (*i.e.*, more than 50 percent) of the net drained weight of the cocktail mix. Moreover, we find that, because the scope language affirmatively states what is included in the scope, *i.e.*, ripe olives in cocktail mixes where the ripe olives comprise the majority (*i.e.*, more than 50 percent) of the cocktail mix by net drained weight, the scope language at the same time clearly qualifies what is excluded from the scope, *i.e.*, ripe olives in cocktail mixes where the ripe olives comprise 50 percent or less of the cocktail mix by net drained weight, as well as non-ripe olives.

We disagree with AG, Camacho and AFI that the current scope may be confusing to interpreters of the scope as written unless language is added to affirmatively state that cocktail mixes that do not have a majority (*i.e.*, more than 50 percent) ripe olive content are excluded from the scope. In fact, as the petitioner argues correctly, adding the language AG and Camacho propose would itself be confusing because it is redundant and adds no further substantial directive to interpreters of the scope. AG and Camacho's concern with our recommendation in Comment 1 of the Post-Preliminary Scope Decision Memorandum, *i.e.*, "{w}e preliminarily find that ripe olives contained in cocktail mixes are in the scope, but that the remaining ingredients are not in the scope," is inapposite, as this recommendation does not pertain directly to the language of the scope but, rather, a general discussion of it, *i.e.*, whether cocktail mixes containing ripe olives should be considered in-scope merchandise. We clarify that our recommendation in Comment 1 was not intended to modify the scope of this investigation. Moreover, in Comment 2, we provided the scope clarification language with respect to ripe olives in cocktail mixes (which, notably, does not include the language of the recommendation in Comment 1). We further clarify that our recommendation in Comment 1 should not be construed to mean that "cocktail mixes that have any amount of ripe olives in them, regardless of quantity, are included in the

---

[275] *See*, *e.g.*, *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) and accompanying IDM at Comment 90 ("While {Commerce} possesses the authority to determine the scope of an investigation, {Commerce's} standard practice is to provide ample deference to the petitioner with respect to the definition of the product(s) for which it seeks relief during the investigation phase of an AD or CVD proceeding."); *see also Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers from the Republic of Korea*, 77 FR 75988 (November 26, 2012) and accompanying IDM at Comment 1 (same).
[276] *See* the petitioner's Letters, "Re: Ripe Olives from Spain Comments regarding Cocktail Mixes," dated January 29, 2018 (Petitioner Cocktail Mix Comments), at 3
[277] *See* Attachment to Post-Preliminary Scope Decision Memorandum.

Barcode:3717366-01 C-469-818 INV - Investigation -

scope." Instead, as discussed above, the current scope clarification language affirmatively states what is included in the scope with respect to cocktail mixes and, at the same time, it clearly qualifies what is excluded from the scope with respect to cocktail mixes and, thus, requires no further modification to that end.

Accordingly, because we determine that ripe olives contained in cocktail mixes are in the scope, and that the scope clarification language proposed appropriately captures our intent, as agreed to by interested parties, to include in the scope the ripe olives in cocktail mixes where ripe olives comprise the majority (*i.e.*, more than 50 percent) of the net drained weight of the cocktail mix, we have added to the scope of this investigation the scope clarification language we proposed in the Post-Preliminary Decision Memorandum, without modification.[278]

### Comment 30: The Products to Which the Countervailing Duty Applies

*GOS' Comments*[279]
- With reference to the HTSUS subheadings under which the merchandise subject to this investigation is classified, green (fermented) olives cannot be used to produce ripe olives, which is the subject merchandise. Green olives should be excluded from any subsidy calculation as being tied to the production of non-subject merchandise.

**Commerce's Position:** As an initial matter, if we understand the GOS comment as a concern about the definition of the product covered by this investigation, and therefore potentially subject to countervailing duties, in the Post-Preliminary Scope Decision Memorandum, we provided interested parties an opportunity to comment on the scope of this investigation. The deadline for providing such comments was April 16, 2018, and the GOS had an opportunity to comment on the scope of the proceeding at that time. Regardless, with regard to the HTSUS subheadings, as referenced by the GOS, we emphasize that HTSUS subheadings are provided for convenience and U.S. Customs purposes and that they do not define the scope of the investigation; rather, the written description of the subject merchandise is dispositive. Finally, if we understand the GOS concern as relating to the calculation methodologies we are using to calculate the countervailable subsidy rates, we have identified the appropriate sales denominators to use for purposes of calculating the rates based on whether the subsidies are tied to the production and sales of a particular product or tied to export sales. The bases for selecting a particular denominator for a particular program are discussed throughout this memorandum.

---

[278] *See* Appendix I to the *Federal Register* notice.
[279] *See* GOS' Case Brief A at 6.

Filed By: Mary Kolberg, Filed Date: 6/11/18 2:35 PM, Submission Status: Approved

Barcode:3717366-01 C-469-818 INV - Investigation  -

## X.    Recommendation

We recommend approving all of the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                            ☐
_____          _____
Agree                      Disagree

6/11/2018

X  *Gary Taverman*
_____

Signed by: GARY TAVERMAN

Gary Taverman
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance

Filed By: Mary Kolberg, Filed Date: 6/12/18 2:35 PM, Submission Status: Approved

ADDENDUM 10

# U.S. Court of International Trade
## LIVE Database (New York)
### CIT DOCKET FOR CASE #: 1:18-cv-00195-GSK

Asociacion de Exportadores e Industriales de Aceitunas de Mesa et
al v. United States
**Assigned to:** Gary S. Katzmann
**Lead Docket:**
Related Cases:    1:21-cv-00338-GSK
                  1:22-cv-00106-GSK

**Date Filed:** 08/30/2018
**Jury Demand:** No

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Date Terminated:** 09/14/2022

**Date Reopened:**

**Category:**
Final Affirmative Determinations: Investigations 19USC §
1516a(a)(2)(B)(i)

**Does this action raise an issue of
constitutionality?:** N

**Agency:**
U.S. Department of Commerce

**Product Description:**
Ripe Olives

**Export Country:**
Spain/Canary Islands/Spanish Africa

| Date Filed | # | Docket Text |
|---|---|---|
| 08/30/2018 | 1 | Summons . Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Certificate of Service) (McCullough, Matthew) (Entered: 08/30/2018) |
| 08/30/2018 | 2 | Form 5 Information Statement *of Asociacin de Exportadores e Industriales de Aceitunas de Mesa (ASEMESA), Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacin, S.L.*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 08/30/2018) |
| 08/30/2018 | 3 | Form 11 Notice of Appearance *of Matthew P. McCullough, Daniel L. Porter, James P. Durling, Christopher A. Dunn, Valerie Ellis and Tung Nguyen*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 08/30/2018) |
| 08/30/2018 | 4 | Form 13 Corporate Disclosure Statement *of Asociacin de Exportadores e Industriales de* |

| | | Aceitunas de Mesa (ASEMESA), Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacin, S.L.. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 08/30/2018) |
|---|---|---|
| 08/30/2018 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of Matthew P. McCullough, Daniel L. Porter, James P. Durling, Christopher A. Dunn, Valerie Ellis and Tung Nguyen as Attorney/Consultant(s) of Asociacin de Exportadores e Industriales de Aceitunas de Mesa (ASEMESA), Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacin, S.L.. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 08/30/2018) |
| 08/31/2018 | 6 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 08/31/2018) |
| 09/28/2018 | 7 | Complaint against All Defendants. Administrative Record due by 11/7/2018. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Certificate of Service)(McCullough, Matthew) (Entered: 09/28/2018) |
| 10/02/2018 | 8 | Form 11 Notice of Appearance . Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) (Entered: 10/02/2018) |
| 10/03/2018 | 9 | Form 11 Notice of Appearance . Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States.(Chalchal, Saad) (Entered: 10/03/2018) |
| 10/17/2018 | 10 | Consent Motion to Intervene as defendant intervenor . Responses due by 11/7/2018. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives.(Paretzky, Raymond) (Entered: 10/17/2018) |
| 10/17/2018 | 11 | Form 11 Notice of Appearance . Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives.(Paretzky, Raymond) (Entered: 10/17/2018) |
| 10/17/2018 | 12 | Form 13 Corporate Disclosure Statement . Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 10/17/2018) |
| 10/17/2018 | 13 | Form 17 Business Proprietary Information Certification filed on behalf of Raymond Paretzky, David J. Levine, Carolyn B. Gleason as Attorney/Consultant(s) . Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 10/17/2018) |
| 10/17/2018 | 14 | Order entered on 10/17/2018 Granting Coalition for Fair Trade in Ripe Olives Consent Motion to intervene as Defendant-Intervenor (Related Doc # 10 ).. (Benbow, Troy) (Entered: 10/17/2018) |
| 10/18/2018 | 15 | Order entered on 10/18/2018 assigning action to Judge Gary S. Katzmann.(Goell, Geoffrey) (Entered: 10/18/2018) |
| 11/07/2018 | 16 | Administrative record for U.S. Department of Commerce filed . Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Record Index (Public), # 2 Record Index (BPI), # 3 Record Declaration, # 4 Final Determination FR Notice, # 5 Amended Final Determination FR Notice, # 6 Issues and Decision Memorandum)(Chalchal, Saad) (Entered: 11/07/2018) |
| 11/29/2018 | 17 | Unopposed Motion to alter/amend/correct Plaintiffs Complaint (related document(s) 7 ). Responses due by 12/20/2018. Filed by Matthew Paul McCullough of Curtis, Mallet- |

**Appx000357**

| | | |
|---|---|---|
| | | Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Proposed Amended Complaint, # 2 Proposed Order) (McCullough, Matthew) (Entered: 11/29/2018) |
| 12/04/2018 | 18 | Order entered on 12/4/2018 granting Motion to amend complaint (Related Doc # 17 ). (Demb, Rebecca) (Entered: 12/04/2018) |
| 12/04/2018 | 19 | Amended complaint *deemed filed as per order dated 12/4/2018.* against United States (related document(s) 7 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs.(Demb, Rebecca) (Entered: 12/04/2018) |
| 12/07/2018 | 20 | Joint status report and proposed briefing schedule. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Proposed Order) (McCullough, Matthew) (Entered: 12/07/2018) |
| 12/12/2018 | 21 | Order entered on 12/12/2018 Scheduling Order: Plaintiffs' 56.2 motion & brief due by 2/14/2019. Defendant and Defendant-Intervenor's Response briefs due by 4/24/2019. Plaintiffs' Reply brief due by 5/22/2019. Joint Appendix due by 6/5/2019. Any motion for oral argument due by 6/12/2019..(Goell, Geoffrey) (Entered: 12/12/2018) |
| 02/07/2019 | 22 | Joint Motion to Amend Scheduling Order . Responses due by 2/28/2019. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (McCullough, Matthew) (Entered: 02/07/2019) |
| 02/07/2019 | 23 | Order entered on 2/7/2019 granting Joint Motion to Amend Scheduling Order. Plaintiffs shall file their Rule 56.2 motion for judgment upon the agency record and accompanying opening brief on or before February 28, 2019. Defendant and Defendant-Intervenor shall file their respective response briefs on or before May 17, 2019. Plaintiffs shall file their reply brief on or before June 17, 2019. Plaintiffs shall file the joint appendix on or before July 1, 2019. Any motion for oral argument shall be filed on or before July 8, 2019. (Related Doc # 22 ). (Goell, Geoffrey) (Entered: 02/07/2019) |
| 02/28/2019 | 24 | Confidential Motion for judgment on agency record 56.2 *and supporting opening brief*. Response to 56.2 Motion due by 5/17/2019. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa.(McCullough, Matthew) Modified on 3/1/2019 (Goell, Geoffrey). (Entered: 02/28/2019) |
| 02/28/2019 | 25 | Motion for judgment on agency record 56.2 *and supporting opening brief*. Response to 56.2 Motion due by 5/17/2019. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa.(McCullough, Matthew) Modified on 3/1/2019 (Goell, Geoffrey). (Entered: 02/28/2019) |
| 05/13/2019 | 26 | Partial Consent Motion to Amend Scheduling Order . Responses due by 6/3/2019. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) (Entered: 05/13/2019) |
| 05/14/2019 | 27 | Response *of Plaintiffs Asociacion de Exportadores e Industriales de Aceitunas de Mesa, Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacion, S.L.* to motion *to amend scheduling order by Defendant* (related document(s) 26 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Proposed Order) (McCullough, Matthew) (Entered: 05/14/2019) |

| 05/15/2019 | 28 | Order entered on 5/15/2019 granting in part Motion to Amend Scheduling Order (Related Doc # 26 ). Responses to Dispositive Motion due by 5/31/2019. Replies due by 7/1/2019. Joint appendix due by 7/15/2019. Any motion for oral argument due by 7/22/2019. Absent extraordinary circumstances, the parties should not expect that further extensions will be granted. (Demb, Rebecca) (Entered: 05/15/2019) |
| --- | --- | --- |
| 05/31/2019 | 29 | Response *of Defendant-Intervenor* to motion *for Judgment upon the Agency Record* (related document(s) 24 , 25 ). Reply due by 7/1/2019. Filed by David John Levine of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Levine, David) Modified on 5/31/2019 (Demb, Rebecca). (Entered: 05/31/2019) |
| 05/31/2019 | 30 | Response *of the United States* to motion *for judgment on the agency record* (related document(s) 24 , 25 ). Reply due by 7/1/2019. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) Modified on 6/3/2019 (Cheevers, Casey). (Entered: 05/31/2019) |
| 07/01/2019 | 31 | Reply *of Plaintiffs in support of Rule 56.2 Motion for Judgement on the Agency Record* (related document(s) 29 , 30 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa.(McCullough, Matthew) (Entered: 07/01/2019) |
| 07/15/2019 | 32 | Joint Appendix *to Parties' Briefs (Non-Confidential Version)* (related document(s) 24 , 29 , 30 , 31 , 25 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (Attachments: # 1 Appendix Tab 1-20, # 2 Appendix Tab 21-30, # 3 Appendix Tab 31-51)(McCullough, Matthew) (Entered: 07/15/2019) |
| 07/15/2019 | 33 | Confidential Joint Appendix *to Parties' Briefs* (related document(s) 24 , 29 , 30 , 31 , 25 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (Attachments: # 1 Appendix Tab 1-13)(McCullough, Matthew) (Entered: 07/15/2019) |
| 07/22/2019 | 34 | Unopposed Motion for oral argument on Plaintiffs' motion for judgement on the agency record under Rule 56.2 . Responses due by 8/12/2019. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (McCullough, Matthew) Modified on 7/22/2019 (Goell, Geoffrey). (Entered: 07/22/2019) |
| 09/11/2019 | 35 | Order entered on 9/11/2019 granting Unopposed Motion for oral argument (Related Doc # 34 ). An oral argument is scheduled for 11/6/2019 at 10:30 AM in Courtroom No. 2 before Gary S. Katzmann. (Goell, Geoffrey) (Entered: 09/11/2019) |
| 10/21/2019 | 36 | Letter issued by The Honorable Gary S. Katzmann concerning *questions for Oral Argument*. (Goell, Geoffrey). (Entered: 10/21/2019) |
| 10/22/2019 | 37 | Form 11 Notice of Appearance . Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States.(Hogan, Tara) (Entered: 10/22/2019) |
| 11/06/2019 | 38 | Oral Argument held on 11/6/2019 at 10:30 a.m. in Courtroom 2. *The parties have until 11/13/2019 to submit any additional citations*. (Goell, Geoffrey) (Entered: 11/06/2019) |
| 11/13/2019 | 39 | Letter *re Supplemental Authorities and Comments on the Prospect of a Limited Initial* |

| | | |
|---|---|---|
| | | *Ruling*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (McCullough, Matthew) (Entered: 11/13/2019) |
| 11/13/2019 | [40](#) | Response to Court's Request/Order *for supplemental authorities*. Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States. (Hogan, Tara) (Entered: 11/13/2019) |
| 11/13/2019 | [41](#) | Response to Court's Request/Order . Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 11/13/2019) |
| 01/17/2020 | [42](#) | Order entered on 1/17/2020, Slip Op. 20-8; Plaintiffs motion for judgment on the agency record is granted in part and Commerces Final Determination is remanded consistent with this opinion. Remand results due by 4/16/2020. Comments on remand due by 5/18/2020. Reply comments due by 6/17/2020.(related document(s) [24](#) , [29](#) , [31](#) , [32](#) , [25](#) ) (Attachments: # [1](#) Web Pages Cited in Opinion).(Goell, Geoffrey) (Entered: 01/17/2020) |
| 04/08/2020 | [43](#) | Partial Consent Motion for extension of time until 6/1/2020 to *File Remand Redetermination*. Responses due by 4/29/2020. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) (Entered: 04/08/2020) |
| 04/08/2020 | [44](#) | Response *in opposition of Plaintiffs* to motion *for extension of time for Commerce to file the final remand redetermination* (related document(s) [43](#) ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (McCullough, Matthew) (Entered: 04/08/2020) |
| 04/09/2020 | [45](#) | Teleconference held on 4/9/2020 at 4:00 p.m.. . (Goell, Geoffrey) (Entered: 04/09/2020) |
| 04/09/2020 | [46](#) | Order entered on 4/9/2020 granting Motion for extension of time to file remand redetermination. ORDERED that Commerce shall file the remand redetermination no later than June 1, 2020; it is further ORDERED that Commerce shall file the remand record on or before June 15, 2020; it isfurther ORDERED that the parties shall file comments addressing the remand redetermination on or before July 1, 2020; it is further ORDERED that the parties shall file reply briefs on or before July 31, 2020; and it isfurther ORDERED that the parties shall file the joint appendix on or before August 14, 2020. (Related Doc # [43](#) ). (Goell, Geoffrey) (Entered: 04/09/2020) |
| 06/01/2020 | [47](#) | Remand results filed by U.S. Department of Commerce . Comments on Remand due by 7/1/2020. Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # [1](#) Remand Redetermination)(Chalchal, Saad) Modified on 6/1/2020 (Goell, Geoffrey). (Entered: 06/01/2020) |
| 06/10/2020 | [48](#) | Administrative Record Index for U.S. Department of Commerce filed . Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # [1](#) Remand Record Index, # [2](#) Kolberg Declaration)(Chalchal, Saad) (Entered: 06/10/2020) |
| 06/30/2020 | [49](#) | Comments on remand results *of Plaintiffs* (related document(s) [47](#) ). Reply Comments on Remand Due 7/31/2020. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) Modified on 7/1/2020 (Goell, Geoffrey). (Entered: 06/30/2020) |
| 07/01/2020 | [50](#) | Comments on remand results . Reply Comments on Remand Due 7/31/2020. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for |

| | | Fair Trade in Ripe Olives. (Paretzky, Raymond) Modified on 7/1/2020 (Goell, Geoffrey). (Entered: 07/01/2020) |
|---|---|---|
| 07/31/2020 | 51 | Reply to comments on remand results (related document(s) 49 ). Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 07/31/2020) |
| 07/31/2020 | 52 | Reply to comments on remand results (related document(s) 47 , 49 ). Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) (Entered: 07/31/2020) |
| 08/14/2020 | 53 | Joint Appendix *to Parties' Comments on Remand Results* (related document(s) 50 , 52 , 51 , 49 ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Appendix)(McCullough, Matthew) (Entered: 08/14/2020) |
| 08/14/2020 | 54 | Consent Motion for errata to correct *Plaintiffs' Comments on the Commerce Department's Final Results of Remand Redetermination*. Filed with the Court electronically on 06/30/2020 as document number 49 (related document(s) 49 ). Responses due by 9/4/2020. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs.(McCullough, Matthew) (Entered: 08/14/2020) |
| 08/17/2020 | 55 | Order entered on 8/17/2020 granting Consent Motion for errata. ORDERED that the Motion is granted and minor corrections to the revised Comments on the Commerce Departments Final Results of Remand Redetermination are permitted without physical substitution (Related Doc # 54 ). (Goell, Geoffrey) (Entered: 08/17/2020) |
| 10/05/2020 | 56 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Tung A. Nguyen*. Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Porter, Daniel) (Entered: 10/05/2020) |
| 10/06/2020 | 57 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Tung A. Nguyen*. Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Porter, Daniel) (Entered: 10/06/2020) |
| 10/29/2020 | 58 | Order entered on 10/29/2020; ORDERED that a remote oral argument in this case is scheduled for 11:00 a.m. on the 21st day of January, 2021. (Goell, Geoffrey) (Entered: 10/29/2020) |
| 01/06/2021 | 59 | Letter issued by The Honorable Gary S. Katzmann concerning *questions for oral argument. SEE LETTER*. (Goell, Geoffrey) (Entered: 01/06/2021) |
| 01/08/2021 | 60 | Consent Motion to *Reschedule Remote Oral Argument*. Responses due by 1/29/2021. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) Modified on 1/11/2021 (Goell, Geoffrey) (Entered: 01/08/2021) |
| 01/11/2021 | | Order entered on 1/11/2021 granting Consent Motion to reschedule oral argument. Oral argument is rescheduled for Tuesday February 9, 2021 at 11:00 AM (Related Doc # 60 ). (Goell, Geoffrey) (Entered: 01/11/2021) |
| 01/19/2021 | 61 | Response to Court's Request/Order *regarding Questions for Oral Argument*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 01/19/2021) |
| 01/19/2021 | 62 | Consent Application/Motion for statutory injunction *to enjoin liquidation*. Responses due by 2/9/2021. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Attachments: # 1 Draft Order)(McCullough, Matthew) (Entered: 01/19/2021) |

| 01/19/2021 | 63 | Response to Court's Request/Order *regarding Questions for Oral Argument*. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 01/19/2021) |
|---|---|---|
| 01/19/2021 | 64 | Response to Court's Request/Order *Regarding Questions In Advance Of Oral Argument*. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) (Entered: 01/19/2021) |
| 01/19/2021 | 65 | Order entered on 1/19/2021 granting Consent Motion for statutory injunction. Order for Statutory Injunction Upon Consent entered (Related Doc # 62 ). (Goell, Geoffrey) (Entered: 01/19/2021) |
| 02/09/2021 | 66 | Oral Argument via Webex held on February 9, 2021 at 11:00 AM. *The parties may file a post argument submission (of no more than 2000 words) by close of business on Friday February 19, 2021.* (Goell, Geoffrey) (Entered: 02/09/2021) |
| 02/19/2021 | 67 | Response to Court's Request/Order *for Post-Argument Submission*. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 02/19/2021) |
| 02/19/2021 | 68 | Response to Court's Request/Order *regarding Comments after Oral Argument*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 02/19/2021) |
| 02/19/2021 | 69 | Response to Court's Request/Order *For Post Argument Submission*. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) (Entered: 02/19/2021) |
| 06/17/2021 | 70 | Order entered on 6/17/2021, Slip Op. 21-76; The court declines to affirm Commerce's Remand Results and remands for further action. Commerce shall file with this court and provide to the parties its remand results within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised remand determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court. (related document(s) 47 , 50 , 52 , 53 , 51 , 49 ) (Attachments: # 1 Cited Web Pages) Remand Results due by 9/15/2021. (Goell, Geoffrey) (Entered: 06/17/2021) |
| 09/03/2021 | 71 | Consent Motion for extension of time until 11/3/2021 to *File Remand Redetermination*. Responses due by 9/24/2021. Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) (Entered: 09/03/2021) |
| 09/03/2021 | 72 | Order entered on 9/3/2021 granting Consent Motion for extension of time to file remand results and amend scheduling order. (Related Doc # 71 ). Remand Results due by 11/3/2021. The parties shall file comments addressing the remand redetermination on or before 12/8/2021. The parties shall file reply briefs on or before 1/12/2022. Joint Appendix due by 1/26/2022. (Goell, Geoffrey) (Entered: 09/03/2021) |
| 11/03/2021 | 73 | Confidential Remand results filed by U.S. Department of Commerce . Comments on Remand due by 12/8/2021. Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Confidential Remand Redetermination)(Chalchal, Saad) Modified on 11/3/2021 (Goell, Geoffrey). (Entered: 11/03/2021) |
| 11/03/2021 | 74 | Public Remand results filed by U.S. Department of Commerce . Comments on Remand due by 12/8/2021. Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Public Remand Redetermination)(Chalchal, Saad) Modified on 11/3/2021 (Goell, Geoffrey). (Entered: 11/03/2021) |
| 11/15/2021 | 75 | Administrative Record Index for U.S. Department of Commerce filed . Filed by Saad |

| | | Younus Chalchal of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Remand Record Index (Public), # 2 Remand Record Index (BPI), # 3 Kolberg Declaration)(Chalchal, Saad) (Entered: 11/15/2021) |
|---|---|---|
| 12/03/2021 | 76 | Comments on remand results (related document(s) 74 , 73 ). Reply Comments on Remand due by 1/12/2022. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) Modified on 12/5/2021 (Goell, Geoffrey). (Entered: 12/03/2021) |
| 12/31/2021 | 77 | Form 11 Notice of Appearance *James C. Beaty, Ana M. Amador Gil*. Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (Porter, Daniel) (Entered: 12/31/2021) |
| 12/31/2021 | 78 | Form 17 Business Proprietary Information Certification filed on behalf of James C. Beaty; Ana M. Amador Gil as Attorney/Consultant(s) . Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (Porter, Daniel) (Entered: 12/31/2021) |
| 01/12/2022 | 79 | Confidential Reply to comments on remand results (related document(s) 76 ). Joint Appendix due by 1/26/2022 Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) Modified on 1/13/2022 (Goell, Geoffrey). (Entered: 01/12/2022) |
| 01/12/2022 | 80 | Public Reply to comments on remand results (related document(s) 76 ). Joint Appendix due by 1/26/2022 Filed by Sonia W. Murphy of U.S. Department of Justice on behalf of United States. (Murphy, Sonia) Modified on 1/13/2022 (Goell, Geoffrey). (Entered: 01/12/2022) |
| 01/12/2022 | 81 | Reply to comments on remand results (related document(s) 76 , 74 , 73 ). Joint Appendix due by 1/26/2022. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) Modified on 1/13/2022 (Goell, Geoffrey). (Entered: 01/12/2022) |
| 01/13/2022 | 82 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of . Filed by Saad Younus Chalchal of U.S. Department of Commerce on behalf of United States, United States Department of Commerce (Chalchal, Saad) (Entered: 01/13/2022) |
| 01/13/2022 | 83 | Form 11 Notice of Appearance . Filed by Elio Gonzalez of U.S. Department of Commerce on behalf of United States.(Gonzalez, Elio) (Entered: 01/13/2022) |
| 01/26/2022 | 84 | Joint Appendix *Second Remand Redetermination* (related document(s) 72 ). Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (Attachments: # 1 Appendix Tabs 1-19)(Porter, Daniel) (Entered: 01/26/2022) |
| 01/26/2022 | 85 | Motion for oral argument on Second Remand Redetermination . Responses due by 2/16/2022. Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa.(Porter, Daniel) (Entered: 01/26/2022) |
| 02/02/2022 | 86 | Response to motion *for oral argument* (related document(s) 85 ). Filed by Sonia W. |

Appx000363

| | | |
|---|---|---|
| | | Murphy of U.S. Department of Justice on behalf of United States.(Murphy, Sonia) (Entered: 02/02/2022) |
| 03/16/2022 | 87 | Order entered on 3/16/2022 granting Motion for oral argument (Related Doc # 85 ). An oral argument is scheduled for 5/11/2022 11:00 AM in Courtroom 2 at the Court of International Trade. Any party that needs to appear remotely should notify the court. (Goell, Geoffrey) Modified on 3/16/2022 (Goell, Geoffrey). (Entered: 03/16/2022) |
| 04/01/2022 | 88 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Valerie S. Ellis*. Filed by Daniel Lewis Porter of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (Porter, Daniel) (Entered: 04/01/2022) |
| 04/26/2022 | 89 | Letter issued by The Honorable Gary S. Katzmann concerning *questions for oral argument. See Letter*. (Goell, Geoffrey) (Entered: 04/26/2022) |
| 05/03/2022 | 90 | Unopposed Motion for leave to *appear remotely for oral argument* (related document(s) 87 ). Responses due by 5/24/2022. Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States.(Hogan, Tara) (Entered: 05/03/2022) |
| 05/04/2022 | 91 | Order entered on 5/4/2022 granting Unopposed Motion for leave for Government Counsel to appear remotely at oral argument scheduled for May 11, 2022 at 11:00 AM (Related Doc # 90 ). (Goell, Geoffrey) (Entered: 05/04/2022) |
| 05/06/2022 | 92 | Response to Court's Request/Order *questions before the oral argument*. Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of All Plaintiffs. (McCullough, Matthew) (Entered: 05/06/2022) |
| 05/06/2022 | 93 | Confidential Response to Court's Request/Order *re: oral argument questions*. Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States. (Hogan, Tara) (Entered: 05/06/2022) |
| 05/06/2022 | 94 | Response to Court's Request/Order *Questions for Oral Argument*. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 05/06/2022) |
| 05/10/2022 | 95 | Public Response to Court's Request/Order *re: oral argument questions*. Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States. (Hogan, Tara) (Entered: 05/10/2022) |
| 05/11/2022 | 96 | Oral Argument held on May 11, 2022 at 11:00 AM in Courtroom 1 & via Webex. *The parties may file a post argument submission (of no more than 1,250 words) by close of business on Thursday, May 19, 2002*. (Goell, Geoffrey) (Entered: 05/11/2022) |
| 05/19/2022 | 97 | Response to Court's Request/Order . Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Aceitunas Guadalquivir, S.L.U., Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa. (McCullough, Matthew) (Entered: 05/19/2022) |
| 05/19/2022 | 98 | Response to Court's Request/Order *Final Comments*. Filed by Raymond Paul Paretzky of McDermott, Will & Emery, LLC on behalf of Coalition for Fair Trade in Ripe Olives. (Paretzky, Raymond) (Entered: 05/19/2022) |
| 05/19/2022 | 99 | Response to Court's Request/Order *post-hearing comments*. Filed by Tara Kathleen Hogan of U.S. Department of Justice on behalf of United States. (Hogan, Tara) (Entered: 05/19/2022) |
| 09/14/2022 | 100 | Confidential Order entered on 9/14/2022, Confidential Slip Op. 22-108; Commerce's Second Remand Results are sustained (related document(s) 84 , 79 , 80 , 75 , 81 , 76 , 74 |

Appx000364

| 09/14/2022 | [101](#) | ). (Goell, Geoffrey) (Entered: 09/14/2022) Order entered on 9/14/2022, Slip Op. 22-108; Public Version issued (related document(s) [84](#) , [79](#) , [80](#) , [75](#) , [81](#) , [76](#) , [74](#) ). (Goell, Geoffrey) (Entered: 09/14/2022) |
| --- | --- | --- |
| 09/14/2022 | [102](#) | Order entered on 9/14/2022; Judgment issued (related document(s) [101](#) , [100](#) ). (Goell, Geoffrey) (Entered: 09/14/2022) |
| 11/10/2022 | [103](#) | Notice of Appeal of 22-108 filed. (related document(s) [101](#) , [100](#) , [102](#) ). Filed by Matthew Paul McCullough of Curtis, Mallet-Prevost, Colt & Mosle LLP on behalf of Agro Sevilla Aceitunas S. Coop. And., Angel Camacho Alimentacion, S.L., Asociacion de Exportadores e Industriales de Aceitunas de Mesa.(McCullough, Matthew) (Entered: 11/10/2022) |
| 11/18/2022 | [104](#) | *Plaintiffs' Appeal of Slip Op. 22-108* docketed on 11/18/2022 by the CAFC as appeal no. 2023-1162 (related document(s) [103](#) ). (Cheevers, Casey) (Entered: 11/18/2022) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 12/15/2022 14:33:00 | | |
| **PACER Login:** | Cu158282 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00195-GSK |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**Appx000365**