**2023–1162**

# United States Court of Appeals for the Federal Circuit

**ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO ALIMENTACION, S.L.,**

*Plaintiffs-Appellants*

**ACEITUNAS GUADALQUIVIR, S.L.U.,**

*Plaintiff*

v.

**UNITED STATES, COALITION FOR FAIR TRADE IN RIPE OLIVES**

*Defendants-Appellees*

Appeal from the United States Court of International Trade in
Court No. 1:18-cv-00195-GSK, Judge Gary S. Katzmann

**BRIEF OF DEFENDANT-APPELLEE COALITION FOR FAIR TRADE IN RIPE OLIVES**

David J. Levine
Raymond Paretzky
McDERMOTT WILL & EMERY LLP
500 N. Capitol Street, NW
Washington, DC  20001
(202) 756-8000
*rparetzky@mwe.com*
Counsel for Coalition for Fair Trade in Ripe
Olives

March 27, 2023

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2023-1162

**Short Case Caption** Asociacion de Exportadores e Industriales v. US

**Filing Party/Entity** COALITION FOR FAIR TRADE IN RIPE OLIVES

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/29/2022

Signature: *Raymond Paretzky*

Name: Raymond Paretzky

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| COALITION FOR FAIR TRADE IN RIPE OLIVES | Musco Family Olive Co. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable               ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable               ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable               ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# <u>TABLE OF CONTENTS</u>

**Page**

**STATEMENT OF RELATED CASES** ...........................................................1

**STATEMENT OF THE CASE**........................................................................1

**SUMMARY OF THE ARGUMENT** ................................................................3

**ARGUMENT**...................................................................................................5

**I.     COMMERCE'S ANALYSIS OF SUBSTANTIALLY DEPENDENT DEMAND IS IN ACCORDANCE WITH LAW** ....................................5

**II.    COMMERCE'S ANALYSIS OF SUBSTANTIALLY DEPENDENT DEMAND IS SUPPORTED BY SUBSTANTIAL EVIDENCE**........15

    **A.     The Record Supports Commerce's Findings with Regard to the Relationship Between Table, Dual-Use, and Mill Olives**..........15

    **B.     The Record Supports Commerce's Data Adjustments** ............23

    **C.     Commerce Reasonably Refused to Rely on Certain Data Submitted by Appellants** ..............................................................29

**CONCLUSION AND STATEMENT OF RELIEF SOUGHT**.....................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, 589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) ("*ASEMESA III*")..................................................................*passim*

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ("*ASEMESA II")* ...............................................................8

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States,* 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ("*ASEMESA I*") .................................................................7

**Statutes**

Section 771B(1) of the Tariff Act, 19 U.S.C 1677-2(1)............................*passim*

**Adminstrative Decisions**

*Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097 (June 17, 1985)................................5-7, 11-12

*Rice from Thailand,* 51 Fed. Reg. 12,356 (April 10, 1986) ............................ 5-7

**Other Authorities**

133 Cong. Rec. S8815 (1987)...................................................................6

Black's Law Dictionary (10th ed. 2009) .........................................................8, 10

Merriam-Webster (Jan. 14, 2020, 3:30 PM), https://www.merriamwebster.com/dictionary/substantial .............................8

**STATEMENT OF RELATED CASES**

This case concerns a U.S. Department of Commerce ("Commerce") investigation of countervailable subsidies provided to producers of subject merchandise. As a result of its affirmative final determination in the investigation, the subject of this appeal, Commerce issued a countervailing duty ("CVD") order (the "Order"). During the pendency of this appeal before the United States Court of International Trade (the "Trade Court"), Commerce completed two annual administrative reviews of the Order, the final results of each of which were also appealed to the Trade Court: *Asociacion de Exportadores e Industriales de Aceitunas de Mesa ("ASEMESA") et al v. United States*, CIT Co. No. 1:21-cv-00338, and *Agro Sevilla Aceitunas S. Coop. And. et al v. United States*, CIT Co. No. 1:22-cv-106. Those cases are both currently stayed pending the result of the instant appeal as they involve affirmative findings under 19 U.S.C. §1677-2, the subject matter of this appeal, and which gave rise to the Order. As such, these cases are related within the meaning of Fed. Cir. R. 47.5(b).

**STATEMENT OF THE CASE**

Defendant-Appellee Coalition for Fair Trade in Ripe Olives (the "Coalition") identifies the following specific areas of disagreement with the Statement of the Case set forth by Appellants.

1

1.     The varietal production table provided by Appellants is conflated. *See Appellants' Brief* at 8.  The figures provided for each named variety do come from Spain's Ministry of Agriculture Food Information and Control Agency ("AICA") report for the 2016/2017 harvest season, as Appellants state, *id.* at 7.  The figures for "Other" and "**TOTAL**" in the table, however, come from the AICA report for the 2015/2016 harvest.  *See* Appx011641, Appx011643.

2.     With regard to the same table, Appellants claim:  "The data are further confirmed as data on the volume of these specific varietals consumed to produce table olives." *Appellants' Brief* at 8.  In fact, as discussed in detail in Part II *infra*, these data reflect total table olive production, not consumption volume of table olive varietals used for producing table olives.

3.     Appellants assert that "Commerce found that manzanilla … are only fit for table olive production." *Appellants' Brief* at 8 (emphasis added).  In fact, Commerce said with regard to manzanilla olives, the most significant table olive varietal:  "Because the {Government of Spain ("GOS")} states that almost all manzanilla olives are used as table olives and makes no mention of them being dual-use in its discussion of dual-use olives, we are considering manzanilla as fit for table."  Appx000057.

4.    Appellants contend that "Commerce … claimed the AICA data only reported the volume of varietals grown for table olives, but not used for table olive production, and therefore were not suitable. Appx000078." *Appellants' Brief* at 10.  This statement neither accurately describes Commerce's findings nor is in any way supported by anything on the cited page of Commerce's Second Remand Redetermination.  *See* discussion in Part II *infra*.

## SUMMARY OF THE ARGUMENT

Appellants insist that Congress, in enacting Section 771B(1) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C 1677-2(1), intended to require Commerce to adhere slavishly to every facet of the methodology the agency employed in two cases from the 1980's, regardless of differences in products and industries that may require new approaches consistent with the statutory language.  There is ample evidence, however, that Congressional intent was to the contrary.  Appellants' approach, which would leave numerous agricultural industries without recourse under the US CVD law from unfair foreign subsidies, ignores the uncontroverted evidence that Congress intended for the new provision to ensure that subsidies provided to disparate processed agricultural products would in fact be actionable under the CVD law. Commerce responsibly interpreted the statutory language broadly, in

3

accordance with the statutory intent and within the bounds of the statutory text. Commerce's use of consumption as a proxy for establishing demand, moreover, was consistent with both its past practice and the statutory language and legislative history, as was Commerce's rejection of Appellants' baseless insistence that there must be a "single continuous line of production" for a substantial dependence finding to be valid.

Furthermore, notwithstanding Appellants' highly attenuated attempts to massage the data on the record to support their arguments, substantial evidence supports Commerce's finding of substantial dependence.  Commerce, unlike Appellants, correctly interpreted the information on the record regarding the various categories of olive varietals and the relationships among them, and properly reflected this information in making its substantial dependence finding in the Second Remand Redetermination.  The record does not support Appellants' claim that table olive and mill olive varietals are grown interchangeably, but rather demonstrates that there is in practice little crossover between these categories.  Commerce reasonably relied on abundant official Spanish government data tracking production of each olive varietal by end use, and calculated a substantial dependence percentage of 55%.  Appellants fundamentally misrepresent these data.  Commerce's treatment of certain data

relied upon by Appellants, finally, was reasonable and supported by substantial evidence.

## ARGUMENT

## I.    COMMERCE'S ANALYSIS OF SUBSTANTIALLY DEPENDENT DEMAND IS IN ACCORDANCE WITH LAW

As the Trade Court correctly found, Commerce's substantial dependence determination is in accordance with law.  Appellant's contrary contentions are groundless.

Appellants' principal argument is that Commerce cannot lawfully find that a 55% substantial dependence ratio satisfies Section 771B(1) because Congress's only purpose in enacting this provision was to enshrine into law every nuance of Commerce's practice in two nearly forty-year-old administrative decisions that preceded the enactment of the statutory provision. *Appellants' Brief* at 21-32.  This contention, made repeatedly by Appellants in every segment of this proceeding, is manifestly incorrect.

The two prior Commerce decisions that Appellants insist are "codified" in Section 771B(1), and from which Commerce is consequently not permitted to deviate in any respect, are *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097 (June 17, 1985) ("*Pork from Canada*") and *Rice from Thailand,* 51 Fed. Reg. 12,356 (April 10, 1986) ("*Rice from Thailand*").  In fact, there is no evidence that Congress considered

5

Commerce's methodologies in *Pork from Canada* and *Rice from Thailand*, which the agency adopted to handle the specific facts of those cases, to be so perfect and so final that the agency would not have the discretion to adopt different methodologies in cases on other products.

Indeed, the evidence is to the contrary. Before enacting Section 771B, Congress referenced raspberries as an example of an agricultural crop for which the CVD law could be circumvented if subsidies provided to farmers were not attributed to a further processed product, such as frozen raspberries, and noted that foreign producers could avoid a duty on raspberries by freezing them before shipment to the United States. 133 Cong. Rec. S8815 (1987); *see also* Appx000082; Appx000154. Besides raspberries, Congress also referenced CVD cases on fish, lamb, "and many other products." 133 Cong. Rec. S8815 (1987); Appx000155.

Raspberries and fish differ from pork and rice (and each other) in many ways, and by referencing these distinctly different agricultural products, Congress demonstrated its expectation and intent that Commerce would not slavishly apply every aspect of its practice in *Pork from Canada* and *Rice from Thailand* to every agricultural case that followed, no matter how different the product. Most saliently for the current inquiry, demand for a product such as fresh raspberries is plainly dependent on the demand for several end-use

products, such as frozen raspberries.  The "substantially dependent" criterion could not be satisfied for <u>any</u> processed raspberry product if it required Commerce to find that "almost all," or even a majority, of fresh raspberry production were dedicated to any particular downstream product.  To treat the facts in *Pork from Canada* and *Rice from Thailand* as having established a rigidly high minimum threshold for substantial dependence is not only faulty policy, leaving industries such as raspberry and olive processors without the recourse from unfair foreign subsidies that Congress intended to grant them, but also faulty statutory interpretation, ignoring the uncontroverted evidence that Congress intended for subsidies provided to disparate products such as raspberries and fish--and olives--to be actionable under the new provision.

In its initial opinion in this matter, *Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ("ASEMESA I"), the Trade Court found based on dictionary analysis that the plain meaning of the statute requires that demand for the prior stage product must be "largely" contingent on demand for the latter stage product:

> The court begins with the statute's plain meaning and, accordingly looks to the dictionary definition of "substantially" and "dependent" and the structure of the phrase where "substantially" modifies the adjective "dependent." "Substantial" is defined as "[o]f, relating to, or involving substance," "[i]mportant, essential, and material,"

> and "[c]onsiderable in amount or value." Substantial,
> BLACK'S LAW DICTIONARY (10th ed. 2009).
> "Substantial" is also defined as "being largely but not
> wholly that which is specified." Substantial, MERRIAM-
> WEBSTER (Jan. 14, 2020, 3:30 PM),
> https://www.merriamwebster.com/dictionary/substantial.
> …<u>The plain meaning thus requires the demand for the prior
> stage product must be "largely, but not wholly,"
> "contingent" on the demand for the latter stage product.</u>

Appx000241-000242 (emphasis added).  The Court then considered the

legislative history of the provision, finding support for its interpretation and

thus reversing Commerce's original finding that eight percent substantial

dependence was sufficient to satisfy the statutory test.  Appx000245-000246.

In its opinion reviewing Commerce's First Remand Redetermination,

*Asociacion de Exportadores e Industriales de Mesa et al. v. United States,* 523

F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ("*ASEMESA II*") , the Trade Court did

not reach Commerce's revised substantial dependence determination, but

ordered a second remand on a separate issue, Commerce's definition of "prior

stage product."  In response, Commerce in the Second Remand

Redetermination reconsidered the definition of "prior stage product" in

compliance with the Trade Court's opinion, and then found that, because 55.28

percent of particular biological varietals of olives (the revised prior stage

product) were processed into table olives (the latter stage product), the demand

for these varietals is substantially dependent on the demand for table olives.

8

*See* Appx000062.  In its final opinion, *Asociacion de Exportadores e Industriales de Mesa et al. v. United States*, 589 F. Supp. 3d 1346, 1357 (Ct. Int'l Trade 2022) ("*ASEMESA III*"), the Trade Court upheld Commerce's revised redetermination, stating:

> As a threshold matter, the court reiterates its conclusions in *Asemesa I*, where it determined that the plain meaning of 19 U.S.C. § 1677-2 requires a finding of substantial dependence where the demand for raw olives is "'largely, but not wholly,' 'contingent' on the demand for table olives." The court further determined that Commerce's practice is to treat as substantially dependent any raw agricultural product for which at least half of the demand depends on the relevant latter stage product.
>
> <u>In light of the plain meaning of the statute and Commerce's established past practice,</u> Plaintiffs are not correct that Commerce's 55.28 percent consumption ratio cannot reflect substantial dependence. Where more than half of a prior stage product is dedicated to the production of a latter stage product, demand for the prior stage product is largely but not wholly dependent on the latter stage product. Indeed, Commerce has expressly concluded that where "most" of a prior stage product is dedicated to the production of a latter stage product, demand for each is "inextricably linked" such that a finding of substantial dependence is appropriate.

Appx000018-000019 (citations omitted; emphasis added).[1]

---

[1] Indeed, the record in this case demonstrates that growers of raw table olives of certain varietals (the prior stage product) intend for <u>all</u> of these olives to be used to make processed table olives (the latter stage product).  The same is equally true for growers of dual-use varietals who farm in areas with environmental conditions, such as water availability, that allow for the growing of table olives; growers of these olives consistently apply table olive production cultural practices and aim to channel their olives into table olive production.  As discussed in Part II *infra*, this is inevitable in light of the higher value (and

Appellants fault the Trade Court for allegedly relying on "post-codification" administrative proceedings to sustain Commerce's redetermination. *Appellants' Brief* at 33-39. As demonstrated above, however, there was no "codification" by Congress of prior Commerce decisions to begin with, and thus it was entirely proper for the Trade Court to consider Commerce's prior implementation of Section 771B in assessing the lawfulness of the agency's actions in this case. Moreover, contrary to Appellants' contentions, there is no *Chevron* contradiction between the first and second parts of the sentence of the Trade Court's decision highlighted above. Rather, both statements are true; the statute, interpreted based on dictionary analysis and in line with its legislative history, unambiguously supports a reading that more than 50% substantial dependence is enough to satisfy the statutory test, and Commerce's practice demonstrates that Commerce in its past decisions has correctly interpreted the statute in exactly that way.

Furthermore, it is the Coalition's view that the statute and legislative history do not support the establishment of even a strict 50% requirement for substantial dependence. As noted by the Trade Court, "substantial" is defined

---

profit) of olives used for table compared to those used to make industrial olive oil. Thus, while Commerce did not address this point, the record shows that even if the substantial dependence standard were as high as Appellants assert, it would still be met based on the record here.

in Black's Law Dictionary as "{c}onsiderable in amount or value"; an amount

less than 50%, depending on the context, can still be considerable.  Congress,

moreover, in referencing products such as raspberries, fish, and lamb as

examples of agricultural raw products for which the CVD law could be

circumvented if subsidies provided to farmers and growers were not attributed

to a further processed product, made clear that the substantial dependence factor

could be satisfied even when the demand for the prior stage product is

dependent on the demand for two or more end-use products.  That the

Congressional drafters prominently showcased how the new law would apply to

frozen raspberries, for example -- when the frozen category is only one of

several outlets for that raw product (fresh, frozen, dried, jams and jellies, puree,

concentrate) -- makes clear that they had no intention of creating high

numerical hurdles, but wanted to prevent lightly processed next-stage

agricultural products that have been subsidized at the prior stage from escaping

the reach of the US CVD law merely through that limited processing.

Appellants' next argument centers on their claim, also repeatedly made

and rejected in earlier stages of this proceeding, that the prior and latter stage

products must be part of a "single continuous line of production." *Appellants'*

*Brief* at 40-45.  In fact, as the Trade Court noted in *ASEMESA III*, the statute

nowhere requires there to be a single, continuous line of production from the

prior stage product to the latter stage product.  Appx000019 n.3.  In *Pork from Canada*, Commerce referenced the two-part test used by the International Trade Commission ("ITC") for determining whether to collapse producers and processors of a raw agricultural product into a single industry, a test that includes the continuous line of production criterion, because the ITC had more experience with agricultural products.  *Pork from Canada*, 50 Fed. Reg. at 25,099.  Commerce and the ITC, however, operate independently and pursuant to distinct statutory mandates and authorities.  The ITC's analysis provided support for Commerce' analysis, but Commerce made clear that the ITC's test had a purpose entirely distinct from Commerce's task of determining whether subsidies provided to raw product producers should be considered in determining the benefit to processors of that product.  *Id.*   While Congress, moreover, "codified, as a distinct injury provision, the ITC's single continuous line of production framework in the same legislation that enacted section 1677-2 … the single continuous line of production framework is not mentioned at any point in the legislative history for section 1677-2."  Appx000186.  There is no support in the statute or legislative history, nor in Commerce's practice before or after enactment of Section 771B, *see* Appx000084-000085, for Appellants' claim that a single continuous line of production is a precondition to a substantial dependence finding.

Appellants claim that a "single continuous line of production" finding is required because

> The notion of something that is dependent or "contingent" suggests a unitary capacity of use—<u>that a prior stage product would not exist</u> but for demand for the latter stage product. That is the very definition of "dependent."

*Appellants' Brief* at 43 (emphasis added). Just as in their attempt to redefine "substantial dependence" as "substantially all," Appellants are attempting here to establish so high a standard for demand to be considered substantially dependent that it could hardly ever be satisfied. The standard is not whether the prior stage varietal product would "exist" if demand for the latter stage product were eliminated, but rather whether the level of demand for the prior stage product is substantially dependent on the demand for the latter stage product. In this case, as discussed in Part II *infra,* Commerce found ample record evidence demonstrating that it is.

Lastly, Appellants criticize Commerce's analysis of consumption ratios as a reasonable method to determine whether section 771B(1) of the Act is satisfied. *Appellants' Brief* at 43-44. In fact, Commerce's use of consumption as a proxy for establishing demand is consistent with both its past practice and the statutory language and legislative history. As Commerce stated:

> The usage of products is driven by the demand of its consumers; therefore, it is fair to use consumption as a measure of a product's demand. The degree to which the

> prior stage product is used in the production of the latter stage product is a corollary of the prior stage product's dependence on the latter stage product. This argument is, once again, an attempt by ASEMESA to establish an extraordinarily high standard for demand to be considered "substantially dependent," an attempt with no basis in the statute or legislative history.

Appx000085. Appellants fail to offer any alternative suggestion as to how Commerce is supposed to satisfy the statutory directive that it determine whether the demand for the prior stage product is substantially dependent on the demand for the latter stage product if it is unable to use consumption as a proxy for demand.

Furthermore, as discussed in more detail in Part II *infra*, based on abundant supporting evidence, much of it published by the Government of Spain itself, Commerce found that (1) in every year prior to and including the period of investigation, only one or two percent of olives grown for milling were sent to table olive use; and (2) only after trade remedies were imposed, disincentivizing ripe table olive production, was a still relatively modest percentage of varietals intended for table olive production diverted into olive oil production. (And even then, mill olive varietals continued to produce tiny amounts of table olives each year.)  In light of these facts, it was eminently reasonable for Commerce to base its substantial dependence determination on consumption data. Indeed, the Trade Court in *ASEMESA III* considered

Appellants' same arguments and reached the same conclusion, noting three

reasons why Appellants' consumption ratio contentions are invalid:

> First, the statute requires that "demand for the prior stage
> product {be} substantially dependent on the demand for the
> latter stage product," not that a prior stage product could
> only ever be employed to produce the latter stage product at
> issue.… Second, where -- as here -- a prior stage product is
> used almost exclusively in the production of latter stage
> products, and not sold in its raw form, it is not apparent on
> what basis "demand" is distinct from "use" for purposes of a
> substantial dependence analysis. Finally, … "Commerce's
> use of consumption as a proxy for … demand is consistent
> with … its past practice."… Commerce's use of a
> consumption ratio to assess substantial dependence is thus in
> accordance with law.

Appx000022.

For all of these reasons, this Court should find that Commerce's

substantial dependence finding was made in accordance with law.

## II.     COMMERCE'S ANALYSIS OF SUBSTANTIALLY DEPENDENT DEMAND IS SUPPORTED BY SUBSTANTIAL EVIDENCE

As the Trade Court correctly found, substantial evidence supported

Commerce's substantial dependence determination.  There is no merit to any of

Appellants' claims to the contrary.

### A.     The Record Supports Commerce's Findings with Regard to the Relationship Between Table, Dual-Use, and Mill Olives

At the root of Appellants' evidentiary objections to Commerce's

substantial evidence finding is a fundamental misunderstanding (or intentional

obfuscation) of the relationships between the various categories of Spanish olive varietals.  In fact, based on substantial record evidence, Commerce properly evaluated these relationships and reached a determination supported by this evidence.

Appellants' principal contention is that Commerce's analysis is invalid because the record shows that table and mill olives are essentially interchangeable, featuring large annual movements between categories. *Appellants' Brief* at 47-51.  Commerce, however, relying on record evidence, found that this assertion is simply untrue:

> We also disagree with ASEMESA that there are massive shifts in the volume of raw table olive production over the years, rather, we find the data to be stable. <u>As can be seen from the published GOS statistics, from harvest year 2010 through harvest year 2016, only one or two percent of olives grown for the mill were sent to table olive use,</u> and that from year to year, farmers tend to continue to harvest olives for the same end use. This is largely because, as we have established elsewhere in this remand redetermination, mill olives do not meet IOC standards, and at their source, dual-use olives are grown for one purpose or other. <u>We also note that only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill</u>.

> The data that ASEMESA uses from the GOS's Survey (to purportedly demonstrate that there are far more hectares of dual-use olives and, therefore, there is much opportunity for the olive grower to alter production from table to mill olives or vice versa) is incorrect.

Appx000089 (emphasis added; footnotes omitted); *see also* further discussion at

Appx000089-000091. As Commerce found, the record shows that only after

Spanish processors faced potential AD and CVD tariffs on their ripe olive

exports did they switch some production of table olives to ordinarily less

profitable olive oil.[2] The complete figures for 2010-2018, sourced from official

GOS data, strongly support Commerce's AD/CVD theory, showing that prior to

the investigations there was very little shift in the volumes of raw table olives

sent to oil and vice versa. *See* Appx011241. Even in 2017, moreover, an

aberrational year in which a lower proportion of raw olives intended for table

was used to produce table olives than any other that decade, *see id.*, the volumes

are still more than sufficient to support Commerce's substantially dependent

finding.

The record data thus make abundantly clear that the higher-quality land

suitable for table olive production on which table and dual-use varietals are

grown would not be farmed for olives if the demand for the finished table olives

---

[2] Even then, the data cited by Appellants, which allegedly demonstrate
"substantial volumes of table and mill raw olives being cross-purposed in table
and oil applications," *Appellants' Brief* at 10, actually show that the vast
majority (344,147/505,046 = 68% in 2017; 431,898/555,033 = 78% in 2018) of
harvested "Table Olives" (including dual-use olives) were used to make table
olives, while the mill olive varietals excluded from Commerce's substantial
dependence calculation continued to produce only tiny amounts of table olives
(226,148/6,044,453 = 3.7% in 2017; 172,208/9,264,536 = 1.9% in 2018) each
year. *See id.* at 11.

were to disappear.  The only reason that these cultivated hectares (concentrated in environmentally suitable areas, e.g., with good water availability) are farmed as they are is their purpose as a source of table olives, since their high cultivation costs and their low industrial yield for oil make them profitable only for production of table olives.  Mobility of raw table and dual-use olives for an alternative industrial purpose goes in one direction only: raw olives that are discarded during the industrial process because of factors such as small size, blemishes, or shriveling are diverted into olive oil production.  Pretending that this volume of olives, or the tiny volume used for producing artisanal manzanilla olive oil, has any significance for the Spanish table olive industry would be like determining that table olives are farmed for the intended purpose of energy generation because olive pits resulting from production of pitted table olives are used for biomass electricity cogeneration.  Indeed, Appellants admit that data from Spain's AICA agency show that there are five main varietals used to produce table olives for which data are tracked, accounting for 95 percent of table olive production.  *Appellants' Brief* at 7-8.  The reason that data for table olive production are tracked for only these five varietals by name is that activities such as milling some substandard raw table olives, or making table olives from some high achieving raw mill olives, have no impact on the

business dynamics of the industrial (non-boutique) Spanish table olive and olive oil industries.

Notably, the Trade Court considered and rejected Appellants' argument that Commerce's substantial dependence finding is undermined by the existence of some mobility between the intended use of olive varietals and their eventual end use.  The Trade Court stated in *ASEMESA III*:

> That there is a degree of fungibility between table and mill olives does not invalidate Commerce's determination. As Plaintiffs acknowledge, it is an undisputed fact that "almost all" of certain varietals are used for either mill or table olive production.  Furthermore, Commerce directly addresses the risk that fungibility might muddy the waters of its substantial-dependence analysis by adjusting the raw numbers of manzanilla, gordal, hojiblanca, and carrasquena olives incorporated in the numerator and denominator of its consumption ratio to avoid distorting that ratio by overestimating the dependence of dual-use olives (like hojiblanca) on table olive production. Accordingly, the court concludes that Commerce's reevaluation of the appropriate prior stage product is supported by substantial evidence and complies with the court's determination ….

Appx000021 (citations omitted).

Appellants contend that Commerce depicted the raw olive market as featuring "siloed end uses based on category designations," a formulation that Appellants then rebut by showing that some subset of production of the table and mill varietals is used for the opposite purpose.  *Appellants' Brief* at 49.  This is a straw man argument.  Commerce did not in fact conclude that the table

and mill varietals are exclusively used for their principal purposes.  Rather, Commerce "conclude{d} that table and mill varietals are fit for one use or the other and are generally not interchangeable, and growers of dual-use varietals also determine whether their olives are to be used for table or mill at the beginning of the growing season."  Appx000077-000078.  In other words, the growers of dual-use olives determine the <u>intended use</u> at the beginning of the growing season.  This finding is supported by a wealth of supporting evidence, much of it published by the GOS itself, *see* Appx000056-000058 and record evidence cited therein, none of which is refuted or even addressed by Appellants.[3]  It does not follow, however, that all of these dual-use olives <u>end up</u> being used for their intended purpose.

As Commerce found, "{r}ecord evidence indicates that it is less feasible from an economic standpoint for farmers to bear the additional expense to grow larger, lower oil content hojiblanca that are free of blemishes and use them for mill olives when they could be sold for a higher price as table olives."  Appx000091.  Olives are grown in nature, not manufactured in a precision factory.  Inevitably, some of the dual-use olives grown for table use will be

---

[3] Commerce noted, moreover, that "{f}or Harvest 2016 (corresponding to the 2015/2016 campaign), only 1 percent of mill varietals were processed into table olives."  Appx000058, *citing* Appx011241.  This fact alone would fully justify Commerce's decision not to include these mill varietals in the "raw agricultural product" and "prior stage product."

blemished, or of substandard size, or otherwise unsuitable for table use; the

grower will naturally repurpose these for lower profit mill use rather than throw

them away.  A minor amount of dual-use olives grown for mill use, likewise,

will turn out to be large and unblemished and suitable for table use despite the

grower's having cultivated them without the extra, more costly cultivation

practices normally undertaken for dual-use olives intended for table use.  The

grower will naturally repurpose these olives for higher profit table use.  That in

no way contradicts Commerce's finding that dual-use olives are grown for one

particular intended use, mill or table, at the start of the growing season.

Appellants argue next that Commerce erred in its treatment of dual-use

olives.  *Appellants' Brief* at 52-54.  Appellants allege that "{d}ual-use varietals

are, by definition, equally suited to either table or olive oil applications," *id.* at

52, and that "{g}iven an oil market consuming as much as 9 million tons of

olives a year it is implausible to expect these dual-use volumes would not

simply be absorbed in that market if the table market evaporated," *id.* at 53.

These claims are belied by the record.  Commerce's substantial dependence

calculations specifically took into account <u>all</u> Spanish production (including

hectares cultivated for mill) of hojiblanca olives, by far the most significant

dual-use varietal, and still concluded that more than 50% of the demand for the

distinct varietals of raw olives that are grown for table use (including both table and dual-use varietals) is dependent on the demand for table olives.

Commerce's findings were supported by its careful examination of Spanish cultivation and insurance practices and the data that reflect how certain varietals are used. In this case, the record shows that growers find it economical to grow certain varietals that have lower oil content and/or require extra cultivation expenditures because there is demand for higher-profit table olives. If table olive demand were to collapse, growers would grow varietals that are higher in oil content and/or cheaper to cultivate; consequently, demand for the table and dual-use varietals would decline substantially. *See* Appx000086. Thus, it is not true that dual-use varietals are equally suited to either table or olive oil applications; if they are grown in the right conditions with the right care, Commerce found, dual-use varietals are better suited to higher-profit table olive use.

Likewise, with regard to Appellants' contention that a decline in the table market would direct dual-use tons now used in table applications into oil use, the conclusion does not follow from the premise. The fact that so much oil is already produced does not mean that yet more oil would be produced if table olive demand were to cease; if anything, that so much oil is currently produced shows that the vast majority of oil demand is already being met by the many

22

hectares of mill olives varietals and of dual-use varietals cheaply cultivated for

oil production.  If table olive demand were to disappear, there is no reason to

think that the hectares currently producing table olives would all suddenly be

diverted to yet more lower-profit oil production for which there might be no

additional demand.  It is equally or more likely that these hectares would be

repurposed for other profitable crops or redirected to other uses.

### B.    The Record Supports Commerce's Data Adjustments

Appellants second guess several of Commerce's computational decisions

in calculating a consumption ratio for purposes of its analysis.  *Appellants'*

*Brief* at 55-62.  Each of these critiques is flawed.

First, Appellants fault Commerce for its inclusion in the numerator of the

substantial dependence calculation the derived total of 71,814 tons of hojiblanca

olives that were grown for mill but ultimately used for table.  *Appellants' Brief*

at 55-57.  This argument is meritless both conceptually and mathematically.

Conceptually, based on the record evidence that a mere 14% (71,814 / 509,304)

of total olive tonnage produced from hojiblanca olives grown for mill was

ultimately used for table, *see* Appx011895 Steps 3-4, it is not reasonable to

conclude that the distinction between dual-use olives grown for table and dual-

use olives grown for mill is not real.  On the contrary, the reality and

significance of this distinction is proven by multiple items of record evidence,

including data maintained by the Government of Spain itself.  *See* Appx000056-000058, Appx000077-000078.  The fact that a small percentage of dual-use varietal olives intended for one purpose winds up in a different one does not demonstrate that Commerce "threw out its entire depiction of the raw olive market and the restraints it found on end use," *Appellants' Brief* at 55, nor does it warrant a conclusion that there is no dependence between demand for the varietal and demand for the intended purpose.

Mathematically, there can be no justification for Appellants' argument that Commerce "should not add the 71,814 tons it finds to be dual-use hojiblanca grown for oil in the numerator of its substantial dependence calculation," *Appellants' Brief* at 57, but still keep all other things equal, when 100% of the finished hojiblanca olive tonnage (table olives and mill olives combined) is included in the denominator.  *See* Appx011895 Step 3.  For the substantial dependence numerator and denominator to be on an apples-to-apples basis, if the denominator includes all tonnage (including mill tonnage) produced from the three table olive varietals and the principal dual-use varietal, as it does, then the numerator must include all table olive tonnage of those same four varietals.  The published figures for table olive tonnage include all table olives produced from the three table olive varietals, but only hojiblanca table olives that were produced from hojiblanca hectares grown for table olive use.

Commerce therefore reasonably added to the published figure for table olive
tonnage the additional hojiblanca table olive tonnage that was made from
hojiblanca olives grown for mill.

Second, Appellants assert that the mechanics of Commerce's exclusions
of cacerena olives are faulty. *Appellants' Brief* at 57-60. The only basis
Appellants cite for this claim, however, is a perceived disproportion in
Commerce's calculation between the 90,404 tons of olives grown for mill but
used to produce table olives and other data showing that 41,250 tons of
cacerena olives were grown for table olive use. *Id.* at 58. It is Appellants'
understanding that is faulty, however, not Commerce's calculation; Appellants
are comparing apples and oranges. As Commerce noted, *see* Appx000077-
Appx000079, *see also* Appx000205, Appx010833, Appx011241, the GOS data
report in the row for "Table" only those hectares of dual-use varietals that are
cultivated for table use. The hectares of dual-use varietals that are cultivated
for mill use are included in the "Mill" category. Thus, the 90,404 tons figure
for "Mill" olives used to produce table olives does not include the tonnage of
cacerena olives grown for table cited by Appellants; those tons are already
included in the row for "Table." Rather, the 90,404 tons figure for "Mill"
olives used to produce table olives includes only the much smaller tonnage of
cacerena table olives that were grown on cacerena hectares cultivated for mill

25

use. The record does not contain a breakdown of the varietals that constitute these 90,404 tons. Knowing that hojiblanca olives constitute the vast majority of dual-use olives grown in Spain, Commerce reasonably calculated that just as table olives produced from cacerena olives grown for table comprised 12.41% of total table olive production from dual-use olives grown for table, cacerena olives could be estimated to have comprised 12.41% of the 90,404 tons of dual-use olives grown for mill but ultimately used as table, i.e., 11,215 tons. *See* Appx011895 Step 4.

Appellants claim "that excluding cacerena has a disproportionate impact on Commerce's denominator, and thus inflates Commerce's consumption ratio." *Appellants' Brief* at 59. Appellants, however, ignore the fact that Commerce also excluded cacerena olives from the numerator, thereby ensuring that the results are apples-to-apples and not inflated. As Commerce noted, moreover, whereas information on the record allowed it to estimate volumes of hojiblancas (the dominant dual-use Spanish olive) sufficiently to include these volumes in both the numerator and denominator of the substantial evidence calculation, "the record does not contain sufficient information regarding the total production volumes, mill production volumes, or the total hectares dedicated to the production of cacerena that would allow us to include this varietal in the substantial dependence calculation." Appx000058.

"Furthermore," Commerce continued, "the evidence on the record suggests that the production volume of cacerena comprises a small percentage of the total volume of olive varietals grown for table." *Id.* Indeed, that this is true is borne out by Appellants' own submitted data, which show that cacerena olives comprised only 7.5% of total table olive production in 2016. *See* Appx011643 (45,420 tons of cacerena table olives / 602,020 tons of total table olives).

The Trade Court in *ASEMESA III* carefully considered these same arguments and determined that Commerce's calculation adjustments were both necessary and reasonable:

> First, … Commerce excluded the cacerena olives from its analysis because, while it had access to data conveying "the total tonnage of cacerena olives used to produce table olives," it lacked any information regarding the amount of cacerena olives not used to produce table olives. Thus, inclusion of the cacerena data would have inflated the numerator of the consumption ratio (amount of table and dual-use varietals used for table olive production) without similarly accurately increasing the denominator (total amount of such varietals produced). Second, Commerce adequately explained its inclusion of the hojiblanca data and its adjustment of that data to include in the ratio denominator hojiblanca grown for both table and mill. Plaintiffs' argument that the hojiblanca grown for mill but used for table should nevertheless be subtracted from the ratio numerator would render Commerce's inclusion of the hojiblanca olives grown for mill in the ratio numerator unnecessary and inaccurate.

Appx000023. Thus, it was reasonable for Commerce to exclude this varietal in light of its scant significance and the absence of relevant data.

Third, Appellants claim that Commerce's varietal analysis was based on "generic, category-based data where it did not have data for specific varietals." *Appellants' Brief* at 60-61. This contention is groundless. Commerce specifically found, based on data from AICA and from Interaceituna, a Spanish interprofessional organization for the table olive industry, that the five principal raw olive varietals (manzanilla, gordal, hojiblanca, cacerena, and carrasquena) accounted for "95 percent of total table olive production during the 2015/2016 campaign, which most closely corresponds with the POI." Appx000056. Furthermore, Commerce's calculations for the numerator were based on "record evidence showing the actual volume the prior stage product used for table olives {on which Commerce relied} and found that 582,648 tons of manzanilla, gordal, carrasquena, and hojiblanca varietals were processed into table olives during Harvest 2016," Appx000059, while Commerce's calculations for the denominator were based on "record evidence show{ing} that 511,122 tons of manzanilla, gordal, carrasquena, and hojiblanca olives are grown for table olives," *id*. Thus, it is apparent that Commerce's substantial evidence calculation is based on data on the record showing actual production figures for the varietals identified by the agency.

### C.    Commerce Reasonably Refused to Rely on Certain Data Submitted by Appellants

Appellants' final argument is that Commerce arbitrarily refused to rely upon certain alternative data submitted by Appellants, specifically GOS hectare varietal production data and AICA "consumption" data. *Appellants' Brief* at 53, 62-64.  Appellants' contentions are unavailing.

With regard to the hectare varietal production data, Commerce noted in the Second Remand Redetermination that it rejected this data for no fewer than five reasons:  (i) it was unpublished, (ii) it was extrapolated from different sources; (iii) it was from 2008 and 2018-19, before and after the POI; (iv) Appellants did not provide the underlying source data; and (v) Appellants did not provide supporting documentation.  Appx000092.  While it may be that no single one of these reasons would have been dispositive, taken in concert they certainly provide substantial evidence in support of Commerce's determination, especially in light of the presence on the record of direct, contemporaneous alternative evidence from official Spanish sources.  Indeed, as Commerce documented in the First Remand Redetermination, "ASEMESA acknowledged that the data {relied upon by Appellants} were incomplete, had been extrapolated, and are not published."  Appx000213 (citations omitted).

Commerce found no evidence on the record, moreover, to support Appellants' highly speculative extrapolations with regard to the number of

hectares dedicated to production of varietals of hojiblanca olives and the

amount of production of table olives and olive oil attributable to that acreage:

> Both the GOS and Musco confirmed that the GOS does not
> publish information on mill olive varietals, which would
> include the portion of hojiblanca varietals that are identified
> as for the mill. Therefore, we had no manner in which to
> verify the area in hectares, by varietal, identified as for
> processing into olive oil. The GOS publishes production
> data, by varietal, only for table olive varietals identified as
> for table use.

Appx000214-000215 (citations omitted).  Commerce reasonably chose to rely

upon GOS data rather than the self-serving data cited by Appellants, finding

that Appellants' calculations were based on a highly attenuated analysis of

extrapolated data concerning planted olive area in Spain that Appellants had

sliced and diced in order to minimize artificially the production volume of table

olives processed from all table and dual-use varieties.  Commerce carefully

studied and rejected Appellants' approach as both illogical and inconsistent

with actual published GOS data.  Among the flaws cited by Commerce were the

following:

- The underlying data, which Appellants did not provide, were

  extrapolated from two different sources, one concerning a 2018/2019

  grower subsidy program and the other a 2008 internal report.

  Appx000213-000214.

- Appellants based their calculation on an unsupported estimate that the surface area dedicated to the production of table and dual-use olive varietals was well over <u>twice as large</u> as the area published by the GOS. Appx000092, Appx000147, Appx000218-000219.

- Appellants wrongly included all production data for table and dual-use olive varieties in its estimation of total table olive production. Appx000147-000148.

On the basis of these serious data issues, Commerce justifiably concluded that Appellants had vastly overestimated the production volume of the prior stage product in a way that was favorable to their argument but inconsistent with other, more reliable data, some of which they themselves had placed on the record and some of which had been published by the GOS.

Commerce's reasoned approach to this data issue, finally, was examined and approved by the Trade Court in *ASEMESA III*:

> {W}ith respect to Plaintiffs' arguments that Commerce was obligated to rely upon specific record data -- namely the GOS's hectare production data and the GOS agency (AICA) consumption data -- Commerce reasonably declined to rely on both the GOS hectare data and AICA data to adjust its consumption ratio. The GOS hectare data was considered by Commerce, but ultimately rejected because it was unpublished, non-contemporaneous, and lacked any supporting documentation.

Appx000023-000024.

With regard to the AICA "consumption" data, Appellants falsely claim that "neither Commerce nor the Trade Court addressed evidence from the AICA data demonstrating that the AICA data was consumption data." In fact, as Commerce repeatedly, and correctly, found, it is not Commerce but rather Appellants that incorrectly interpreted these data. *See, e.g.,* Appx000092 ("ASEMESA incorrectly titles the table olive production data from Spain's AICA as production used for table instead of total table production."). The AICA reports show incoming raw table olives received by the table olive industry and reported by table olives cooperatives and companies to the AICA agency, i.e., total table olives <u>produced</u>, not total olives grown for table and consumed in the production of table olives. These data are listed in clear Spanish as "Production" in all of AICA's charts and tables, and so used by other official organizations such as Interaceituna, as well as by other GOS agencies, in the various reports that are on the record. The Trade Court in *ASEMESA III* carefully analyzed and approved Commerce's approach to this data issue, as well:

> Similarly, the AICA data could not have been used (as Plaintiffs argue) to alter Commerce's consumption ratio because it represents olive production data only, and would therefore require Commerce to make the unsupported assumption that all olives grown for table are ultimately consumed in the production of table olives.

Appx000024. The truth of the Trade Court's observation is confirmed by Appellant's own figures: "Production of 596,110 tons shown in the varietal-specific data corresponds to production of 358,220 tons of green and 237,900 of ripe olives, which also totals 596,110." *Appellants' Brief* at 8. This equation works only if the AICA data reflect total table olives produced from these varietals, disregarding olives grown for table use but – whether due to small size, surface blemish, or other reasons – ultimately consumed in the production of olive oil.[4]

Commerce thus fully considered all of the reliable information on the record in making its determination that demand for table olives is substantially dependent on demand for the varietals of olives that the GOS and the Spanish olive industry recognize as principally suitable for use in the production of table olives.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons provided above, we respectfully request that this Court hold Commerce's determination lawful and consistent with the record, affirm the Trade Court's decision affirming the Second Remand Redetermination, and order dismissal of this action.

---

[4] It is ironic, moreover, that Appellants base their calculations on conflated production/consumption data even as they criticize Commerce for using consumption data as a proxy for establishing demand.

Respectfully submitted,

___*/s/ Raymond Paretzky*_____.

David J. Levine
Raymond Paretzky
McDERMOTT WILL & EMERY LLP
500 N. Capitol Street, NW
Washington, DC  20001
(202) 756-8000
*rparetzky@mwe.com*
Counsel for Coalition for Fair Trade in Ripe
Olives

*Dated:*  March 27, 2023

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1162

**Short Case Caption:** Asociacion de Exportadores e Industriales v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [✓] the filing has been prepared using a proportionally-spaced typeface and includes 7,388 words.

- [ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- [ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/27/2023

Signature: *Raymond Paretzky*

Name: Raymond Paretzky