No. 2023-1162

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE
MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO
ALIMENTACION, S.L.,
*Plaintiffs-Appellants,*

ACEITUNAS GUADALQUIVIR, S.L.U.,
*Plaintiff*

v.

UNITED STATES and COALITION FOR FAIR TRADE IN RIPE OLIVES
*Defendant-Appellees.*

Appeal from the United States Court of International Trade
in Case No. 1:18-CV-00195, Judge Gary S. Katzmann

**BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES**

<div style="margin-left:40%">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendant-Appellee
United States

</div>

Of Counsel:

ELIO GONZALEZ
Senior Counsel
U.S. Department of Commerce
Office of the Chief Counsel for
    Trade Enforcement and Compliance

March 27, 2023

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................... iii

STATEMENT OF RELATED CASES .................................................. 1

STATEMENT OF THE ISSUE .............................................................2

STATEMENT OF THE CASE ...............................................................2

    I.     Nature Of The Case ..............................................................2

    II.    History And Legal Framework For Countervailable Subsidies On Processed Agricultural Products ..........................................................3

    III.   Commerce's Countervailing Duty Investigation Of Ripe Olives ........6

    IV.   Trial Court Proceedings and Remand Redeterminations ....................7

SUMMARY OF THE ARGUMENT ...................................................12

ARGUMENT ......................................................................................13

    I.     Standard Of Review ...........................................................13

    II.    Commerce's "Substantially Dependent" Analysis Under 19 U.S.C. § 1677-2(1) Is In Accordance With Law ...........................................14

          A.    ASEMESA's Cited Legislative History Does Not Demonstrate An "Almost All" Standard Or "Continuous Line of Production" Requirement ............................................................... 16

          B.    Commerce's Analysis Reflects A Reasonable Interpretation Of The Statute ................................................................. 21

          C.    The Trial Court Did Not Err In Its Discussion Of Commerce's Administrative Proceedings, But If It Did, The Error Was Harmless................................................................. 26

i

III.     Commerce's "Substantially Dependent" Calculation
        Is Supported By Substantial Evidence .................................................28

        A.     Commerce's Analysis That There Are Distinct Biological
               Varietals Of Raw Olives That Are Recognized As Suitable For
               Table Olive Production Is Supported By Substantial Evidence ..
               ....................................................................................................29

        B.     Commerce Made Reasonable Adjustments To Its Consumption
               Ratio Calculation Based On The Available Data ....................35

CONCLUSION ....................................................................................................39

# TABLE OF AUTHORITIES

**CASES**                                                                             **PAGE(S)**

*ABB, Inc. v. United States*,
    920 F.3d 811 (Fed. Cir. 2019) ........................................................22

*Anchem Prod., Inc. v. Coral Chem. Co.*,
    864 F.2d 149 (Fed. Cir. 1988) ........................................................28

*Asociación de Exportadores e Industriales de Mesa v. United States*,
    429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020) ....................................7

*Asociación de Exportadores e Industriales de Mesa v. United States*,
    523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) ....................................8

*Asociación de Exportadores e Industriales de Mesa v. United States*,
    589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) ..................................11

*Avenues In Leather, Inc. v. United States*,
    423 F.3d 1326 (Fed. Cir. 2005) ....................................................28

*Biestek v. Berryhill*,
    139 S. Ct. 1148 (2019)..................................................................14

*Canadian Meat Council v. United States*,
    661 F. Supp. 622 (Ct. Int'l Trade 1987) ................................ 4, 5, 18

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)......................................................................22

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)......................................................................14

*Dayton Board of Education v. Brinkman*,
    433 U.S. 406 (1977)......................................................................21

*Downhole Pipe & Equip., L.P. v. United States*,
    776 F.3d 1369 (Fed. Cir. 2015) ............................................ 29, 33

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ....................................................13

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015) ..................................................25

*Koyo Seiko Co. v. United States*,
    36 F.3d 1535 (Fed. Cir. 1994) ..................................................22

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ..................................................38

*Murphy v. Smith*,
    138 S. Ct. 784 (2018)................................................................17

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) ................................................14

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017)................................................................18

*Pokarna Engineered Stone Ltd. v. United States*,
    56 F.4th 1345 (Fed. Cir. 2023) ................................................21

*Rogero v. Sec'y of Health and Human Services*,
    748 F. Appx 996 (Fed. Cir. 2018) ............................................39

*Russello v. United States*,
    464 U.S. 16 (1983)..................................................................21

*Timex V.I., Inc. v. United States*,
    157 F.3d 879 (Fed. Cir. 1998) ............................................ 15, 27

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)............................................................ 22, 28

## STATUTES AND PUBLIC LAWS

19 U.S.C. § 1516a(b)(1)(B) ...................................................................14

19 U.S.C. § 1677-1................................................................................ 4, 18

19 U.S.C. § 1677-2............................................................................ passim

19 U.S.C. § 1677-2(1) ....................................................................... passim

19 U.S.C. § 1677-2(2) ...............................................................................8

19 U.S.C. § 1677(4)(E) .............................................................................21

Pub. L. No. 100-418 (1988) ........................................................................5

## ADMINISTRATIVE DETERMINATIONS

*Certain Frozen Warmwater Shrimp from China*,
    78 Fed. Reg. 50,391 (Dep't of Commerce Aug. 19, 2013) ...........................23

*Fresh Atlantic Groundfish from Canada*,
    51 Fed. Reg. 10,041 (Dep't of Commerce Mar. 24, 1986) ............................3

*Fresh, Chilled and Frozen Pork from Canada*,
    54 Fed. Reg. 30,774 (Dep't of Commerce July 24, 1989) .................... 23, 26

*Lamb Meat from New Zealand*,
    50 Fed. Reg. 37,708 (Dep't of Commerce Sept. 17, 1985)............................3

*Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*,
    50 Fed. Reg. 25,097 (Dep't of Commerce June 17, 1985).........................3, 4

*Rice from Thailand*,
    51 Fed. Reg. 12,356 (Dep't of Commerce Apr. 10, 1986).............................3

*Rice from Thailand*,
    59 Fed. Reg. 8,906 (Dep't of Commerce Feb. 24, 1994)..............................26

*Ripe Olives from Spain*,
    82 Fed. Reg. 56,218 (Dep't of Commerce Nov. 28, 2017) ............................6

*Ripe Olives from Spain*,
    83 Fed. Reg. 37,469 (Dep't of Commerce Aug. 1, 2018) ..............................2

*Ripe Olives from Spain*,
    83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018)............. 2, 6, 31, 33

## **LEGISLATIVE MATERIALS**

Omnibus Trade and Competitiveness Act of 1988,
    H.R. Rep. No. 100-576 ............................................................ 5, 19

133 Cong. Rec. S. 8815 (June 26, 1987) .................................................. 18, 19, 22

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. Counsel is aware of three related cases before the Court of International Trade: *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,* Ct. Int'l Trade No. 21-00338, *Agro Sevilla Aceitunas S. Coop. And. v. United States,* Ct. Int'l Trade No. 22-0106, and *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,* Ct. Int'l Trade No. 23-00039. The first two cases involve administrative reviews of the same countervailing duty order. The third case involves a determination under 19 U.S.C. § 3538, in response to dispute settlement findings by the World Trade Organization. All three determinations involve affirmative determinations under 19 U.S.C. § 1677-2, which is the subject matter of this appeal. The cases are stayed pending a final and conclusive disposition in this appeal.

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's decision under 19 U.S.C. § 1677-2 to treat subsidies to olive growers as though they were provided with respect to the manufacture, production, or exportation of the processed agricultural product subject to this investigation is supported by substantial evidence, and in accordance with law.

## STATEMENT OF THE CASE[1]

### I.    Nature Of The Case

This appeal concerns Commerce's final determination in the countervailing duty (CVD) investigation of ripe olives from Spain. *See Ripe Olives from Spain*, 83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018) (final determ.), and accompanying Issues and Decision Memorandum (IDM), as amended by *Ripe Olives from Spain*, 83 Fed. Reg. 37,469 (Dep't of Commerce Aug. 1, 2018) (amended final determ. and order).

The United States Court of International Trade sustained Commerce's substantial dependence determination under 19 U.S.C. § 1677-2(1) as supported by

---

[1]  Pursuant to Federal Rule of Appellate Procedure 28(b), and Federal Circuit Rule 28(b), we include a statement of the case because we disagree with the statement of the case provided by Asociación de Exportadores e Industriales de Aceitunas de Mesa, Agro Sevilla Aceitunas S. Coop. And., and Angel Camacho Alimentacion, S.L. (collectively, ASEMESA) in the opening brief, dated January 17, 2023, ECF No. 15 (Applnt. Br.).

substantial evidence and in accordance with law and entered judgment in favor of

the United States.

## II.   History And Legal Framework For Countervailable Subsidies On Processed Agricultural Products

To prevent foreign governments from evading countervailing duties by

subsidizing agricultural products that undergo minor processing before exportation

to the United States, Congress has enacted 19 U.S.C. § 1677-2.  Prior to its

enactment, Commerce recognized the unique nature of agricultural products in its

administrative proceedings.  Where appropriate, Commerce considered benefits to

the producers of a raw agricultural product when determining whether benefits

were conferred upon producers of the later-stage processed agricultural product.

*See, e.g., Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*,

50 Fed. Reg. 25,097 (Dep't of Commerce June 17, 1985) (final determ.) (*Pork*

*from Canada*); *see also Fresh Atlantic Groundfish from Canada*, 51 Fed. Reg.

10,041 (Dep't of Commerce Mar. 24, 1986) (final determ.); *Rice from Thailand*, 51

Fed. Reg. 12,356 (Dep't of Commerce Apr. 10, 1986) (final determ.); *Lamb Meat*

*from New Zealand*, 50 Fed. Reg. 37,708 (Dep't of Commerce Sept. 17, 1985) (final

determ. and order).

In *Pork from Canada*, for example, Commerce considered subsidies to

producers of live swine for purposes of determining the benefit to producers of

fresh, chilled, and frozen pork products.  50 Fed. Reg. at 25,098-100.  Interested

3

parties argued that Commerce was required to conduct an upstream subsidy analysis pursuant to 19 U.S.C. § 1677-1, to determine the amount of the benefit received by producers of live swine that is passed through to producers for products at later stages of production.  *Id*.  Commerce disagreed, explaining that an upstream subsidy analysis is, by definition, conducted with respect to subsidies bestowed on "input products," and that live swine cannot be considered an input product based on consideration of two characteristics:  the level of value added and the role of the producer.  *Id*. at 25,098.  Commerce considered subsidies that benefitted hog producers to provide an equal benefit to the next-stage product and declined to treat live swine as an input product for which Commerce would conduct an upstream subsidy analysis.  *Id.* at 25,099-100.

The Court of International Trade held that Commerce's determination in *Pork from Canada* was not in accordance with law.  *See Canadian Meat Council v. United States*, 661 F. Supp. 622, 623-29 (Ct. Int'l Trade 1987).  The court held that Commerce's determination did not comport with the 19 U.S.C. § 1677-1's definition of "input product," which is a product that is "used in the manufacture or production . . . of merchandise that is the subject of a countervailing duty proceeding."  *Id.* at 625.  The court explained that, in declining to undertake an upstream subsidy analysis, Commerce "fail{ed} to answer the pertinent inquiry whether swine are used in the manufacture or production of fresh chilled or frozen

pork." *Id*.

The court reasoned that, through the upstream subsidy provision, "Congress intended to provide a statutory mechanism for dealing with allegations that producers of products subject to investigation were benefitting from subsidy practices taking place at earlier stages of manufacture or production." *Id*. at 627. It concluded that, "{i}f the statutory approach to upstream subsidies is inadequate, it is not the role of Commerce or the Court, but of Congress to remedy any deficiency." *Id*. at 629.

Congress remedied that deficiency in 1988 by adding 19 U.S.C. § 1677-2 to provide for the special treatment of subsidies with respect to processed agricultural products. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988).  In doing so, Congress "codifie{d} and clarifie{d}" Commerce's administrative practice regarding agricultural products.  See Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 588 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1621.

Section 1677-2 provides:

In the case of an agricultural product processed from a raw
agricultural product in which--
      (1)  the demand for the prior stage product is substantially
            dependent on the demand for the latter stage product, and
      (2)  the processing operation adds only limited value to the raw
            commodity,
countervailable subsidies found to be provided to either producers or
processors of the product shall be deemed to be provided with respect

to the manufacture, production, or exportation of the processed
product.

If the criteria in 19 U.S.C. § 1677-2 are satisfied, subsidies to the producers

of raw agricultural products are to be treated as though the subsidies have been

provided with respect to the processed agricultural product.

## III.  Commerce's Countervailing Duty Investigation Of Ripe Olives

On November 28, 2017, Commerce published its preliminary determination

in the CVD investigation of ripe olives from Spain, in which it determined that the

statutory criteria of 19 U.S.C. § 1677-2 had been satisfied.  *Ripe Olives from Spain*,

82 Fed. Reg. 56,218 (Dep't of Commerce Nov. 28, 2017) (prelim. determ.); *see*

*also* Appx1018-1023.  In its final determination, Commerce continued to

determine that the statutory criteria required to apply 19 U.S.C. § 1677-2 were

satisfied.  *Ripe Olives from Spain*, 83 Fed. Reg. at 28,186 (final determ.).

With respect to § 1677-2(1), Commerce determined that the demand for raw

olives (the prior stage product) is substantially dependent on the demand for table

olives (the latter stage product, which includes ripe olives, the processed

agricultural product under investigation).  Appx274-275; Appx289-292.

Commerce observed that the statute did not "provide a statutory threshold"

for "substantial dependence."  Appx290.  Based on "the facts and circumstances

present," including record information demonstrating that eight percent of raw

olives grown in Spain are processed into table olives, Commerce concluded that the demand for ripe olives is "substantially dependent on the demand for both table and ripe olives."  Appx290.

With respect to section 1667-2(2), Commerce determined that the processing operation adds only limited value to the raw olives.  Appx290.  Accordingly, Commerce deemed countervailable subsidies provided to raw olive growers to have been provided with respect to producers of ripe olives and were included in the *ad valorem* subsidy rates.  Appx275.

## IV.   Trial Court Proceedings and Remand Redeterminations

Several producers and exporters of ripe olives filed suit challenging the final affirmative determination.  On January 17, 2020, the trial court remanded certain aspects of the final determination, including Commerce's "substantially dependent" analysis under 19 U.S.C. § 1677-2(1).  *Asociación de Exportadores e Industriales de Mesa v. United States*, 429 F. Supp. 3d 1325 (Ct. Int'l Trade 2020); Appx221-261.  Relying upon dictionary definitions, the court found the meaning of "substantially dependent" to require "the demand for the prior stage product" to be "largely, but not wholly contingent" on the demand for the latter stage product. Appx241-242.  The court also found that the legislative history "illuminates Congress's unambiguous intent for the meaning of 'substantially dependent.'" Appx243.  The court held that Commerce's interpretation was impermissible,

7

deviated from past practice, and remanded the issue for further proceedings. Appx248; Appx260.[2]

On remand, Commerce collected additional information from interested parties and reevaluated its "substantially dependent" analysis. Commerce reconsidered the "prior stage product" to be those raw olives principally suitable for use in the production of the "latter stage product," *i.e.,* table olives. Appx140-146. Commerce determined that the demand for the "prior stage product" is substantially dependent on the demand for the "latter stage product" because 96 percent of raw olives principally suitable for use in the prior stage of producing table olives were processed into table olives. Appx146-150.

On June 17, 2021, the trial court remanded Commerce's first redetermination. *Asociación de Exportadores e Industriales de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021), Appx94-114. The court held that defining the "prior stage product" as a subset of the "raw agricultural product" "render{s} the requirements under Section 1677-2 largely self-fulfilling, insofar as raw olives principally suitable for use in table olive production are likely processed into table olives…." Appx112.

Commerce again reevaluated its 19 U.S.C. § 1677-2(1) analysis. This time,

---

[2]   The court sustained Commerce's finding under section 1677-2(2) that the processing of ripe olives added only limited value to raw olives. Appx250-253. ASEMESA does not challenge this finding on appeal.

Commerce found the relevant raw agricultural product to be certain distinct biological varietals of raw olives that the government of Spain and the Spanish olive industry recognize as table or dual-use varietals. Appx55.

Specifically, Spain categorizes manzanilla, gordal, and carrasquena as table olive varietals, and hojiblanca and cacerena as dual-use olive varietals. Appx57-58; *see* Appx1076. These five raw olive varietals that are fit for table olive production accounted for 95 percent of total table olive production during the 2016 harvest year. Appx56. These five varietals have differences in physical characteristics (*e.g.*, size, shape, and oil content), cultivation practices (*e.g.*, pruning and geographic location of orchards to maximize water content and size for table olives), and quality requirements (*e.g.*, raw olives for table olive production must meet specific industry standards) that distinguish raw olive varietals fit for table olive production from raw olive varietals fit for olive oil production. Appx57-58. Based on this information, Commerce reconsidered the meaning of "raw agricultural product" and the "prior stage product" to be these five distinct biological raw olive varietals. Appx55. Commerce continued to identify table olives, which include ripe olives, as the "latter stage product." *Id.*

To determine whether section 1677-2(1) is satisfied, Commerce examined record evidence including production and consumption statistics collected and published by the government of Spain. Commerce formulated a calculation

9

method that used the total tonnage of table olives processed from biologically

distinct table and dual-use raw olive varietals as the numerator (latter stage

product), and the total tonnage of biologically distinct table and dual-use raw olive

varietals produced as the denominator (prior stage product).  Appx56-62.

Commerce relied on official statistics published by the government of Spain to

track raw olive production by varietal, classify the varietals of raw olives into

either the "table" or "mill" category, and indicate whether the raw olive was

actually used for table olive or olive oil production.  Appx58-62.

Because the government of Spain does not track some of the information

that Commerce needed for its calculation, certain data was not available on the

record.  Therefore, Commerce made some adjustments to the calculation, including

eliminating data concerning the cacerena varietal.  Commerce then performed the

calculation:

$$\frac{\text{564,058 tons}}{\text{(manzanilla, gordal, hojiblanca, and carrasquena varietals processed into table olives)}}{\text{1,020,426 tons}}$$

564,058 tons
(manzanilla, gordal, hojiblanca, and carrasquena varietals processed
into table olives)
—————————————————————————————————————
1,020,426 tons
(manzanilla, gordal, hojiblanca, and carrasquena varietals grown in
2016)

Appx62.  Based on this calculation, Commerce determined that 55.28 percent of

the biologically distinct table and dual-use raw olive varietals were processed into

table olives.  Appx11892.  Commerce therefore concluded that the demand for the

prior stage product is substantially dependent on the demand for the latter stage

10

product.  Appx62.

The trial court sustained Commerce's second redetermination.  *Asociación de Exportadores e Industriales de Mesa v. United States*, 589 F. Supp. 3d 1346, 1357 (Ct. Int'l Trade 2022), Appx2-24.  The court "reiterate{d} its" earlier conclusion that "the plain meaning of 19 U.S.C. § 1677-2 requires a finding of substantial dependence where the demand for raw olives is largely, but not wholly, contingent on the demand for table olives."  Appx18 (quotations omitted).  The court held that "{w}here more than half of a prior stage product is dedicated to the production of a latter stage product, demand for the prior stage product is largely but not wholly dependent on the latter stage product," thereby satisfying the criteria of 19 U.S.C. § 1677-2.  Appx19 (quotations omitted).  The court further held that Commerce's calculation of a 55.28 percent consumption ratio is supported by substantial evidence and in accordance with law.  Appx19-24.  Finally, the court sustained Commerce's determination that certain agricultural subsidies to olive growers were *de facto* specific.   Appx13.[3]  This appeal followed.

---

[3]  ASEMESA does not challenge this finding on appeal.

11

## SUMMARY OF THE ARGUMENT

This Court should affirm the judgment of the Court of International Trade. Commerce lawfully determined that the statutory requirement of "substantial dependence" on the latter stage product is met where 55.28% of certain raw olive varietals grown are processed into table olives. Relying upon dictionary definitions, the trial court found that the plain meaning of "substantially dependent" requires that the demand for the prior stage product must be "largely, but not wholly" contingent on the demand for the latter stage product.

Commerce's determination that a consumption rate of 55.28 percent demonstrates that the demand for the prior stage product is substantially dependent on the demand for the latter stage product satisfies the statutory term "substantially dependent" and the trial court's holding that the demand for the prior stage product must be "largely, but not wholly," "contingent" on the demand for the latter stage product is reasonable and supported by law.

While agreeing with the trial court that the term "substantially dependent" is unambiguous, ASEMESA contends that the term means "almost all." It seeks to replace the words Congress chose – "substantially dependent" – with an unreasonably high standard. To adopt ASEMESA's reading would require the Court to graft a number of concepts into the statutory analysis that find no basis in the text or the legislative history. Moreover, when Congress enacted section 1677-

12

2, it was to provide Commerce with additional authority to remedy subsidies; it did not intend to replace one statutory constraint with another. This Court should sustain Commerce's determination as reasonable.

ASEMESA's challenge to Commerce's actual reasoning and the substantial evidence that supports its calculation fares no better. Substantial evidence supports Commerce's conclusion that there are distinct biological varietals of raw olives and that table or dual-use olive varietals have differences in physical characteristics, cultivation practices and quality requirements that distinguish raw olive varietals fit for table olive production from raw olive varietals fit for olive oil production. Accordingly, there was a rational basis for Commerce to identify the relevant prior stage and latter stage products. ASEMESA's arguments, which either seek to reweigh the record evidence or pick lint off of Commerce's methodological choices, are unpersuasive.

## ARGUMENT

### I.    Standard Of Review

This Court reviews the Court of International Trade's decisions *de novo*, "applying anew the same standard of review applied by that court." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1272 (Fed. Cir. 2012). Accordingly, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Id.;*

*see* 19 U.S.C. § 1516a(b)(1)(B). "{T}he threshold for" substantial evidence is "not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

This Court gives "great weight to the informed opinion of the Court of International Trade . . . {and} it is nearly always the starting point of {its} analysis." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009).

## II. Commerce's "Substantially Dependent" Analysis Under 19 U.S.C. § 1677-2(1) Is In Accordance With Law

The trial court correctly held that Commerce's analysis satisfied the legal standard for "substantially dependent" under 19 U.S.C. § 1677-2(1). The statute requires Commerce to evaluate whether "the demand for the prior stage product is substantially dependent on the demand for the latter stage product." Thus, Commerce evaluated whether the demand for table and dual-use raw olive varietals that are biologically distinct from other raw olive varietals (*i.e.,* the prior stage product) is substantially dependent on the demand for table olives, which includes ripe olives (*i.e.,* the latter stage product). Commerce calculated a 55.28 percent consumption ratio, and concluded that this percentage demonstrates that the demand for the prior stage product is substantially dependent on the demand for

14

the latter stage product.  Appx62.

In its first opinion, the trial court considered "traditional tools of statutory construction" to determine that the statutory term "substantially dependent" is unambiguous.  Appx241-243 (citing *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998)).  Examining dictionary definitions, the court held that the term "substantially dependent" requires that the demand for the prior stage product to be "largely, but not wholly," "contingent" on the demand for the latter stage product to satisfy the statutory standard.  Appx242; *see also* Appx18.

The trial court also found that the legislative history "illuminates Congress's unambiguous intent for the meaning of 'substantially dependent.'"  Appx243.  The court found that the enactment of 19 U.S.C. § 1677-2 affirmed Commerce's practice as applied in *Pork from Canada* and *Rice from Thailand*, and that these determinations were persuasive in understanding congressional intent.  *Id.*  For example, the court considered *Rice from Thailand*, where "Commerce attributed subsidies for growers of paddy rice to producers of milled rice because almost all of the raw agricultural product, paddy rice, is dedicated to the production of milled rice."  Appx245.  It also considered *Pork from Canada*, where Commerce found that the demand for the prior stage product was derived almost exclusively from the demand for the latter stage product.  *Id.*  The trial court observed that in *Pork from Canada,* "Commerce focused on two criteria: (1) the degree to which the

15

demand for the prior stage product is dependent on the demand for the latter stage product and (2) whether the processed product contributes significantly to the value of the raw product." *Id.* (quotations omitted). Notably, these two criteria (*i.e.,* demand for the prior stage product on the demand for the latter stage product, and the value added by processing the raw product), with some variations in the statutory text, are what Congress codified in 19 U.S.C. § 1677-2.

In the second redetermination, Commerce conducted the substantial dependence analysis, which resulted in a consumption ratio of 55.28 percent, and concluded that the demand for the prior stage product is substantially dependent on the demand for the latter stage product. Appx62. Commerce's analysis reflects a reasonable interpretation of the statute and is consistent with the trial court's holding. This Court should sustain the trial court's decision.

### A.    ASEMESA's Cited Legislative History Does Not Demonstrate An "Almost All" Standard Or A "Continuous Line of Production" Requirement

The trial court concluded that the "substantially dependent" requirement was satisfied "{w}here more than half of a prior stage product is dedicated to the production of the latter stage product{.}" Appx19. ASEMESA argues that "substantially dependent" has a higher threshold. Applnt. Br. at 23-32. In its view, the demand for the prior stage product must be "almost exclusively," "substantially all," or "almost all" of the demand for the latter stage product. Nothing in the

statute or legislative history establishes a minimum threshold of demand as high as this, or any specific percentage threshold whatsoever.

At the outset, this argument ignores the language that Congress used. Congress did not choose the term "all or substantially all," but rather, "substantially dependent." When Congress uses specific words, the Court must "carefully attend{} to the words it chose rather than replacing them with others of our own." *Murphy v. Smith*, 138 S. Ct. 784, 787-88 (2018).

Rather than confronting the language Congress used, ASEMESA argues that Congress intended to incorporate Commerce's pre-1988 practice, which, in its view, required a showing that the demand for the prior stage product was "almost exclusively" or "completely devoted to" the latter stage product. While Commerce used similar phrases in narrative explanations in *Pork from Canada* and *Rice from Thailand*, Congress did *not* adopt a statutory standard that mimicked the words Commerce used in those two administrative cases. Rather, Congress used the term "substantially dependent," which the trial court determined means that the demand for the prior stage product is largely, but not wholly contingent on the demand for the latter stage product.

ASEMESA also cites floor statements by Senators Baucus and Grassley. Applnt. Br. at 26-28. ASEMESA concedes that "floor statements by individual legislators rank among the least illuminating forms of legislative history" and are

not afforded great weight.  *See* Applnt. Br. at 26, n.1 (*citing NLRB v. SW Gen., Inc.,* 580 U.S. 288, 307 (2017)).  In any event, the floor statements do not show that Congress required "substantially dependent" to be read as "almost all" or "almost exclusively."

Specifically, Senator Baucus was concerned with *Canadian Meat Council*, the Court of International Trade decision that held that the upstream subsidy provision (19 U.S.C. § 1677-1) was the mechanism through which Congress intended to address subsidies provided at earlier stages of production.  Appx1255; 133 Cong. Rec. S. 8815 (June 26, 1987) (Statement of Sen. Baucus).  In response to the *Canadian Meat Council* court's suggestion that it was up to Congress to address subsidies on processed agricultural products, Senator Baucus sought to amend the statute to add 19 U.S.C. § 1677-2.  *Id.*  Similarly, Senator Grassley supported the amendment to allow for "duties {to} be imposed on the processed product when first the processing operation added relatively little value-added to the product; and second, where the demand for the raw product was dependent upon the demand for the processed product."  *Id.*  These floor statements do not demonstrate that Congress intended "substantially dependent" to be read as "almost all."[4]

---

[4] In fact, as the trial court recognized, Senator Baucus was concerned that "a foreign nation could avoid a U.S. countervailing duty on an agricultural product

18

ASEMESA argues that, because Senator Grassley's floor statement referenced *Pork from Canada* and *Rice from Thailand*, in which Commerce used the words "almost exclusively" or "almost all" to describe the specific factual scenarios present in that case, that "substantially dependent" must require that higher standard.  Applnt. Br. at 27-32.  While Senator Grassley cited *Pork from Canada* and *Rice from Thailand*, ultimately Congress amended the statute to "codif{y} and *clarif{y}* Commerce practice…"  Omnibus Trade and Competitive Act of 1988, H.R. Rep. No. 100-576, at 588 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1621 (emphasis added).

Congress adopted the term "substantially dependent" and not a higher standard, such as "substantially all," "almost all," or "almost exclusively," which significantly undercuts ASEMESA's argument.  While the decisions in *Pork from Canada* and *Rice from Thailand* provide helpful context in discerning Congress's

---

merely by doing some minor processing of the agricultural product before it is exported to the United States."  Appx231 n.9.  Senator Baucus posed the example of a government subsidizing raspberries and a foreign producer avoiding countervailing duties simply by freezing the raspberries.  Appx1255; 133 Cong. Rec. S. 8815 (June 26, 1987) (Statement of Sen. Baucus).  Senator Baucus went on to state that "{w}e're talking about fish, rice, lamb, pork, and many other products that right now are subject to countervailing duties.  These duties will soon either be lifted or left open to easy foreign circumvention."  *Id*.  This concern that the *Canadian Meat Council* decision could contribute to circumvention of a countervailing duty on an agricultural product is fundamentally at odds with ASEMESA's position that Congress intended to impose an unreasonably high standard when it adopted the term "substantially dependent" in 19 U.S.C. § 1677-2(1).

intent, the language of the enacted statute does not establish a minimum threshold of demand nor limit § 1677-2's use to the unique circumstances of the pork processing or rice milling industries.

Next, ASEMESA argues that Commerce is required to identify a "single, continuous line of production" between the prior and latter stage products. Applnt. Br. at 29-30, 44-45. This requirement is found nowhere in the statute and the legislative history confirms that such a requirement should not be inferred.

Prior to the enactment of 19 U.S.C. § 1677-2, Commerce occasionally referenced the International Trade Commission's (ITC's) "single, continuous line of production" framework that ITC uses to identify the relevant domestic industry. Under that framework, the ITC considers whether producers of the raw agricultural product and the processed product could be collapsed into a single industry where the raw product enters a "single, continuous line of production" that resulted in one end product. Appx245. While, prior to 1988, Commerce sometimes referenced the ITC's framework in its analysis, Congress did not codify the concept of a "single, continuous line of production" in 19 U.S.C. § 1677-2. Nor is there any mention of a "single, continuous line of production" framework in 19 U.S.C. § 1677-2's legislative history.

Congress' decision *not* to adopt a "single, continuous line of production" requirement in § 1677-2 is significant. In the same legislation that enacted 19

20

U.S.C. § 1677-2, Congress also codified, as a distinct injury provision, the ITC's "single, continuous line of production" framework in 19 U.S.C. § 1677(4)(E), the statute that the ITC administers. "{W}here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Commerce and the ITC have different statutory responsibilities and roles, and can even reach different conclusions on the same issues. *See Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1352 (Fed. Cir. 2023). Accordingly, Congress' decision not to codify a "single, continuous line of production" requirement for purposes of Commerce's analysis disposes of ASESEMA's argument.

### B.     Commerce's Analysis Reflects A Reasonable Interpretation Of The Statute

Alternatively, and should the Court find that the meaning of "substantially dependent" is not resolved using traditional tools of statutory construction, the Court should nonetheless affirm the judgment because the trial court reached the correct result in sustaining Commerce's determination.[5]  Commerce's finding with

---

[5]  An appellate court can affirm a trial court judgment on the basis of "any grounds which . . . support [it]." *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 419 (1977).

21

respect to 19 U.S.C. § 1677-2(1) is based on a permissible construction of the statute and should be sustained.

"{I}f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *ABB, Inc. v. United States*, 920 F.3d 811, 824 (Fed. Cir. 2019) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)). "Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the {trade remedy}laws." *Koyo Seiko Co. v. United States*, 36 F.3d 1535, 1570 (Fed. Cir. 1994). Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous. *United States v. Eurodif S.A.,* 555 U.S. 305, 316 (2009).

Congress enacted 19 U.S.C. § 1677-2 to grant Commerce the authority to impose CVDs on processed agricultural products when countervailable subsidies are provided to producers of the raw agricultural product. The provision was intended to remedy a gap in the subsidy law, and to give Commerce the authority to impose CVDs on processed agricultural products that account for subsidization of the raw agricultural product. 133 Cong. Rec. S. 8815 (June 26, 1987) (Statements of Sen. Baucus and Sen. Grassley) (discussing the need for a statutory amendment adding 19 U.S.C. § 1677-2).

The adverbial adjective "substantially" imparts a quantitative limitation, but also avoids strict numerical parameters. Had Congress intended a minimum threshold for the demand criteria, it could have set one. Instead, Congress left to Commerce to determine when the first criterion under the statute is satisfied. Because what is substantially dependent naturally differs based on facts and circumstances unique to a particular agricultural product or industry, Commerce has interpreted and applied the statute on a case-by-case basis.

For example, in *Pork from Canada 1989*, Commerce determined that the "substantially dependent" criterion was met because "{p}ork constitutes the primary product of the slaughtered pig" and "the demand for pork and for live swine are inextricably linked." *Fresh, Chilled and Frozen Pork from Canada*, 54 Fed. Reg. 30,774 (Dep't of Commerce July 24, 1989) (final determ.). Conversely, in *Shrimp from China*, Commerce found that 44.7 percent satisfied the requirements of 19 U.S.C. § 1677-2(1). *Certain Frozen Warmwater Shrimp from China*, 78 Fed. Reg. 50,391 (Dep't of Commerce Aug. 19, 2013) (final determ.). In neither case did Commerce specify a minimum threshold for what it considered to be "substantially dependent."

Commerce set forth a permissible construction of 19 U.S.C. § 1677-2(1). In its original determination, Commerce stated:

> {Title 19 U.S.C. § 1677-2} does not provide a statutory threshold, nor
> does it provide the analysis to be applied by Commerce in

23

determining whether the demand for the prior stage product is
substantially dependent on the demand for the latter stage product.
The legislative history demonstrates that Congress enacted {19 U.S.C.
§ 1677-2} to ensure that Commerce can place duties on processed
agricultural products if the raw agricultural product is subsidized....
With respect to the raw olives at issue here, we find based on the facts
and the circumstances present, that the demand for those olives is
substantially dependent on the demand for both table and ripe olives.

Appx290 (citations omitted).

In the second redetermination, Commerce reconsidered its analysis, and as
discussed above, found that a 55.28 percent consumption ratio corresponding to the
biologically distinct raw olives varietals processed into table olives satisfied the
"substantially dependent" standard.  Appx62.  In the absence of a clear statutory
threshold for "substantial dependence" with respect to agricultural subsidies
analyzed under 19 U.S.C. § 1677-2, Commerce devised a calculation methodology
that is a reasonable means of effectuating the statutory objective of measuring the
countervailable subsidies conferred upon the subject merchandise.

Congress also did not speak directly as to the methodology that Commerce
should use in determining substantial dependence.  ASEMESA argues that
Commerce's use of a consumption ratio as a proxy for the relationship between
demand and dependence misconstrues the statute.  Applnt. Br. at 43-44.
According to ASEMESA, the term "dependent" suggests that a prior stage product
would not exist "but for" demand for the latter stage product, and that finding a
given level of use is not sufficient unless it is also demonstrated that demand is

24

practically confined to that use. *Id*. The trial court correctly rejected this argument. Appx22. The statute only "requires that 'demand for the prior stage product {be} substantially dependent on the demand for the latter stage product,' not that a prior stage product could only ever be employed to produce the latter stage product at issue." *Id.* (citing 19 U.S.C. § 1677-2).

Section 1677-2(1) does not mandate a particular method for how Commerce must determine whether demand for the prior stage product is "substantially dependent." When "a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quotations omitted). As a practical matter, "where – as here – a prior stage product is used almost exclusively in the production of latter stage products, and not sold in its raw form, it is not apparent on what basis 'demand' is distinct from 'use' for purposes of a substantial dependence analysis." Appx22.

Here, Commerce found that a consumption ratio is a reasonable method to determine whether 19 U.S.C. § 1677-2(1) is satisfied because demand hinges on use. Appx85. When "{t}he usage of products is driven by the demand of its consumers," "it is fair to use consumption as a measure of a product's demand." Appx85. Accordingly, the trial court sustained the use of a consumption ratio as in

accordance with law; this Court should likewise find ASEMESA's contention of legal error to be unpersuasive.

### C. The Trial Court Did Not Err In Its Discussion Of Commerce's Administrative Proceedings, But If It Did, The Error Was Harmless

Finally, ASEMESA argues that the trial court erred by discussing post-codification administrative proceedings. Applnt. Br. at 33-39 (referring to *Pork from Canada 1989* and *Rice from Thailand*, 59 Fed. Reg. 8,906 (Dep't of Commerce Feb. 24, 1994) (final determ.) (*Rice from Thailand 1994*)). ASEMESA argues that, because the statute is unambiguous, Commerce's practice after the enactment of 19 U.S.C. § 1677-2 is irrelevant. Even assuming that the Court finds the statute to be unambiguous, ASEMESA has failed to demonstrate any error.

As we explained *supra* pp. 13-14, the trial court determined that "substantially dependent" "requires the demand for the prior stage product must be 'largely, but not wholly,' 'contingent' on the demand for the latter stage product." Appx242. In reaching this conclusion, the court considered dictionary definitions and the legislative history of 19 U.S.C. § 1677-2(1), which the court found *affirmed* Commerce's practice prior to the enactment of 19 U.S.C. § 1677-2. Appx242-244. The court's consideration of these "traditional tools of statutory construction" is consistent with a *Chevron* step one analysis where a court focuses on "determin{ing} whether Congress's purpose and intent on the question at issue

26

is judicially ascertainable." *Timex*, 157 F.3d at 881-82 (quotations omitted).

Although the trial court found Section 1677-2(1) to be unambiguous, it nonetheless considered "the Government's arguments pursuant to *Chevron* step two." Appx243 n.11. In a section entitled "Commerce's Deviation From its Past Practice Was Arbitrary and Thus Not In Accordance With Law," the court considered Commerce's determinations both pre- and post-codification. Appx246-248. This analysis was separate from its *Chevron* step one analysis; the court was instead evaluating whether Commerce acted arbitrarily in treating similar situations differently.

In its third opinion, the trial court "reiterate{d}" its prior conclusion that "substantially dependent" means that the demand for the prior stage product must be "largely, but not wholly," "contingent" on the demand for the latter stage product. Appx18. It upheld Commerce's substantial dependence analysis "{i}n light of the plain meaning of the statute and Commerce's established past practice," which included the legislative history and pre-codification administrative proceedings that the trial court referenced in its earlier opinion. *Id*. The trial court's references to post-codification administrative proceedings were only to confirm that Commerce acted consistently with past practice and, therefore, not arbitrarily. The trial court did not consider Commerce's post-1988 administrative determinations when determining the statute's meaning.

27

Any citation to post-codification administrative proceedings would be harmless error in light of the court's holding that, where more than half of a prior stage product is dedicated to the production of a latter stage product, as it was here, demand for the prior stage product is "largely but not wholly dependent on the latter stage product." Appx19. *See Avenues In Leather, Inc. v. United States*, 423 F.3d 1326, 1334 (Fed. Cir. 2005) ("since the trial court reached the correct result, mis-steps in its reasoning in arriving there are harmless errors"); *Anchem Prod., Inc. v. Coral Chem. Co.*, 864 F.2d 149 (Fed. Cir. 1988) ("{t}o the extent the district court committed error by referring, in passing, to the now antiquated 'invention' standard…, we view such error as harmless").[6]

## III.    Commerce's "Substantially Dependent" Calculation Is Supported By Substantial Evidence

Commerce determined that the demand for certain biologically distinct varietals of raw olives (prior stage product) is substantially dependent on the demand for table olives (latter stage product). Commerce reached this conclusion after calculating that 55.28 percent of biologically distinct table and dual-use raw olive varietals were processed into table olives. Appx62. The trial court held that Commerce "reasonably supported its calculation of the 55.28 percent consumption

---

[6] Moreover, should the Court agree that the statute is ambiguous or silent, the trial court's consideration of Commerce's interpretation of the statute through formal administrative determinations would be entirely permissible. *E.g., Eurodif*, 555 U.S. at 316.

ratio with record evidence." Appx24.

ASEMESA's challenges to Commerce's substantially dependent calculation center on the data Commerce used and certain adjustments Commerce made. At their core, these highly technical arguments invite the Court to reweigh the factual record, which this Court may not do. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015). As we demonstrate below, Commerce provided reasonable explanations for its calculation, which is supported by substantial evidence.

### A. Commerce's Analysis That There Are Distinct Biological Varietals Of Raw Olives That Are Recognized As Suitable For Table Olive Production Is Supported By Substantial Evidence

ASEMESA first challenges Commerce's categorization of olive varietals into those grown primarily for table olives and those grown for mill. ASEMESA argues that table and mill olive varietals have cross-applications, such that olives fit for table olive production can be used for oil production, and vice-versa. Applnt. Br. at 46-51. Commerce never found, however, that table and mill olive varietals could never *under any circumstances* be used to produce table olives or olive oil. And the fact that raw olive varietals fit for one use *could* be used to produce either product does not undermine the reasonableness of Commerce's categorization based on the important differences that exist between raw olives fit for table olive production and those fit for olive oil production.

29

Notably, Commerce observed that there are key differences in the size, shape, and quality requirements in table olive production standards that mill olive varietals generally are unable to meet. Appx57-58. For example, record evidence, including information from the government of Spain, demonstrated that the table olive varietals "manzanilla, gordal, and carrasquena are considered solely fit for table use and not fit for use as olive oil" because "{t}hese varietals tend to have lower oil content and are larger than mill olives." Appx56-58; Appx86. The government of Spain tracks table olive production by varietal because the production process and marketing differ, whereas this is not the case for varietals grown for olive oil. Appx56. Commerce also considered that "{i}nformation from the {government of Spain} website and industry sources indicate that table olive varietals tend to be larger than mill olive varietals." Appx56.

Commerce examined that "dual-use olives grown for one application generally are not used for another." Appx86. Dual-use olives grown for table production are not *per se* interchangeably used for olive oil production because such olives "would tend to be larger, free of blemishes unlike {their} mill counterparts, and represent a greater investment in resources to produce table-olive quality olives." *Id.* Although Commerce acknowledged that dual-use olives grown for table olive production could possibly be used for olive oil production, Commerce reasonably determined that "a farmer would generally seek to sell such

30

olives as table olives to recuperate the greater growing costs and maximize profits." *Id.* By contrast, Commerce determined that dual-use olives grown for olive oil production generally would not be used for table olive production "because they would be smaller, most likely be of a higher oil content, have more blemishes, and would not meet {table olive} standards." Appx91.

Next, ASEMESA argues that dual-use olive varietals, by definition, are equally suited to either table or olive oil production. Applnt. Br. at 52-54. It argues that dual-use olives would simply be absorbed into the olive oil market if the table olive market evaporated, which they contend does not permit an affirmative substantially dependent finding. Commerce acknowledged that dual-use varietals can be used for both table and oil production; however, it found that "record evidence demonstrates that, at their source, dual-use olives are grown for one purpose or another." Appx88. While the largest varietal grown for table olives in harvest year 2016 was hojiblanca, a dual-use varietal, this does not impact Commerce's substantial dependence analysis. The record demonstrated that "dual-use olives, such as hojiblanca, grown for use as table olives require different cultivation practices than hojiblanca grown for mill use. Olive growers of hojiblanca and cacerena grown for use as table olives, for example, will spend more resources on their orchards, installing more irrigation systems, spending more resources on pruning, and pest management than olive growers of hojiblanca

grown for use as mill olives." Appx88-89.

In addition, farmers purchasing insurance for dual-use olives, such as hojiblanca, must establish in advance the number of hectares dedicated to mill versus table olive production because separate premiums are established for each, with generally higher premiums paid for dual-use olives grown for table olives than for mill. Appx89. Varietals grown for mill also have lower farmgate prices than varietals grown for table olives; for example, in 2016, the price of one ton of hojiblanca grown for mill was €428.70, whereas the price of one ton of table olive hojiblanca was €570. Appx1082. Given this record evidence of market conditions, Commerce reasonably determined that dual-use olives are grown for one purpose or another, and there is little interchangeability once that purpose is determined. Appx88.

In any event, Commerce considered dual-use olives in its calculation. While some portion of dual-use olives are eventually processed into olive oil, Commerce's determination that 55.28 percent of the biologically distinct olive varietals (including table olive and dual-use varietals) were processed into table olives supports its substantial dependence determination.

Substantial evidence supports Commerce's determination. During the 2016 harvest year, 99 percent of mill olives (mill raw olive varietals and dual-use raw olive varietals grown for oil production) were used to produce olive oil, and 96

percent of table olives (table raw olive varietals and dual-use raw olive varietals grown for table olive production) were used to produce table olives. *Id*. at 32-33. This evidence demonstrates that there is little to no difference between a raw olive's fitness and its actual use, and that the amount of raw olive varietals fit for table olive production that are ultimately used for olive oil represent an incidental use. Thus, the existence of some interchangeability does not undermine Commerce's determination regarding the differences that exist between the olive varietals fit for table use or oil use.

ASEMESA faults the trial court for "not appearing to perform its own analysis," Applnt. Br. at 51; the trial court's role, however, is to assess whether substantial record evidence supports Commerce's determination and not to substitute its reasoning for that of Commerce. *See Downhole Pipe*, 776 F.3d at 1379. The trial court considered Commerce's explanation "that the table olive varietals it identified have a lower oil content, are larger in size, are more symmetrical in shape, and generally are characterized as having a higher pulp-to-bone ratio," and reasonably held that Commerce's revised explanation "is supported by record evidence, including the submissions of the {government of Spain}." Appx21. Moreover, the trial court found it "undisputed" that "'almost all' of certain varietals are used for either mill or table olive production." *Id.* Accordingly, "a degree of fungibility between table and mill olives" "does not

33

invalidate Commerce's determination." *Id.*

Next, ASEMESA claims that there are "massive shifts" in the volume of raw table olive production that show a very fluid market where olives grown for one use are cross-purposed for another use at high levels. Applnt. Br. at 48-50. This assertion is not supported by the record. Commerce found little to no shift in volumes in all the years leading up to and including the period of investigation. Appx89. Commerce found that the data is stable from harvest year 2010 through harvest year 2016 with "only one or two percent of olives grown for the mill…sent to table olive use" and that "farmers tend to continue to harvest olives for the same end use." Appx89.

Similarly, raw olives fit for table olive production that were used for olive oil remained at less than ten percent from harvest year 2010 through harvest year 2016. Appx1620. While there was an increase of raw olives fit for table olive production that were used for olive oil production after harvest year 2017, Commerce reasonably inferred that increased use could be due to the antidumping and countervailing duty investigations and the duties imposed. Appx89. The fact that the petitions were filed in July 2017 does not undermine Commerce's reasoning that the increase could be a reaction to the investigations and imposition of duties. *See* Applnt. Br. at 49-50. Moreover, even after harvest year 2016, only four percent and two percent of total raw olives fit for olive oil production were

34

used for table olives in harvest years 2017 and 2018, respectively.  Appx89.  The

data for harvest year 2018 demonstrate a shift in the opposite direction, with

numbers for raw olives fit for table olive production trending back to

circumstances that existed from harvest year 2010 through harvest year 2016.  *Id*.

Commerce considered the data holistically and its determinations are supported by

substantial evidence.

**B.     Commerce Made Reasonable Adjustments To Its Consumption Ratio Calculation Based On The Available Data**

ASEMESA next challenges certain adjustments to the calculation that

Commerce made based on data availability.  Applnt. Br. at 55-62.  First,

ASEMESA challenges, as arbitrary, that Commerce's inclusion of 71,814 tons of

the dual-use hojiblanca varietal grown for mill but used for table olive production

in the numerator of the substantial dependence calculation.  *Id*. at 55-57.

According to ASEMESA, by including this figure in the numerator, Commerce

"threw out its entire depiction of the raw olive market and the restraints it found on

end use." *Id*.

ASEMESA has not shown that Commerce's inclusion of the hojiblanca

varietal in the calculation was unreasonable.  Commerce considered table olive and

dual-use olive varietals, including hojiblanca, to be a key component of its

substantial dependence analysis.  While dual-use varietals grown for one purpose

are generally not used interchangeably, Commerce never claimed that such

35

situations could *never* take place.

Commerce's calculation sought to determine how many of the biologically distinct olive varietals produced were processed into table olives. Accordingly, Commerce considered that the 71,814 tons of hojiblanca olives were grown for mill, but were used as table olives, and thus, it included them in the numerator. Appx79. Correspondingly, it included in the denominator all hojiblanca olives produced, regardless of whether they were used for table or mill olives. Appx60. Removing those tons from the numerator would lead to an incorrect calculation and would not be an apples-to-apples comparison. Commerce's substantially dependent analysis percentage represents the percentage of manzanilla, gordal, carrasquena, and hojiblanca varietals that were actually used to produce table olives, and because these hojiblanca mill olives were used as table olives, Commerce reasonably determined they should be included in the numerator.

Second, ASEMESA challenges Commerce's determination to exclude cacerena olives from its calculation. Applnt. Br. at 57-60. Commerce made this adjustment to the calculation based on limited information available on the record evidence. Although the total tonnage of cacerena olives used to produce table olives is on the record and ideally would have been included in the numerator of the calculation, the total tonnage of production for cacerena olives regardless of end use needed for the denominator is not on the record. Appx58. "{T}he Spanish

36

government does not track production of olives grown for mill by varietal and the production information needed to include the cacerena varietal in the analysis is not available on the record." Appx78.  Total tonnage of production for hojiblanca olives also is not on the record, but other production and hectare data reasonably allowed Commerce to derive an estimate to use in the calculation.  Appx60-61. The same could not be done for cacerena olives.  Commerce sought to avoid creating a mismatch in the numerator and denominator, which would distort the analysis.  In addition, the fact that the production volume of cacerena comprises a small percentage of the total volume of olive varietals grown for table production further supports Commerce's determination to exclude cacerena olives from the calculation.  Appx58.

ASEMESA argues that Commerce did not explain how the 41,250 tons of cacerena olives is addressed in its deduction of 18,590 tons from the numerator. Applnt. Br. at 58.  We assume that ASEMESA is referring to the 45,420 tons of cacerena olives that were grown for table.  *See* Appx1981.  The 45,420 tons of cacerena olives grown for table are already accounted for in the table category from the published government of Spain statistics.  Appx214-216.  That number does not represent cacerena olives that were grown for table and also used for table olive production.  Commerce reasonably estimated the portion of cacerena olives (and other dual-use varietals) that should be deducted from the 90,404 tons of mill

37

olives, which Commerce explained are dual-use olives grown for olive oil

production but used for table olives.  Appx77-78.  This estimate relied on an

inference that the proportion of each dual-use olive varietal grown and used for

table olive production is comparable to the proportion of the same varietal grown

for olive oil and used for table olives.  Appx78.  While ASEMESA complains that

"Commerce has merely performed math" and "never substantiates why it is

reasonable to assume proportionality{,}" Applnt. Br. at 58, such "reasonabl{e}

inferences from the record" are permissible.  *See Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Third, ASEMESA asserts that Commerce did not engage in a varietal

analysis to determine substantial dependence, but instead, relied on "category-

based" data where it did not have data for specific varietals.  Applnt. Br. at 60-62.

Commerce relied upon published statistics from the government of Spain that do

not contain specific breakdowns by varietal.  However, the published statistics are

based on data collected by the government of Spain on a varietal basis, the

production numbers are tabulated and totaled separately for raw olives identified as

for table or mill, and then the raw olives are classified according to whether the

actual end use was for table or for mill.  Appx1620.  Commerce reasonably relied

on Spain's varietal-based official published statistics.  Moreover, Commerce

satisfied itself of the data's reliability and accuracy with other data on the record.

Appx90; *see also* Appx148-149; Appx215-216.

Finally, ASEMESA argues that Commerce declined to use the data from Spain's Ministry of Agriculture Food Information and Control Agency (AICA), which, ASEMESA argues, is the only data set permitting a varietal-specific analysis.  Applnt. Br. at 62-64.  Commerce used the AICA data for certain aspects of its analysis, such as determining the production volume of hojiblanca table olive production.  However, the AICA data provides only varietal-specific production data, but not the ultimate end use of the production.  Appx147-149; Appx92.  Thus, relying on the AICA data to conduct the analysis would require presuming that *all* olives fit for table olive production were, in fact, processed into table olives.[7]  Commerce, therefore, chose to rely primarily on other published official statistics from the government of Spain to conduct its analysis.  "Determinations of relative weight of different evidence are generally for the trier of fact."  *Rogero v. Sec'y of Health and Human Services*, 748 F. Appx 996, 1001 (Fed. Cir. 2018).

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

---

[7]  Moreover, this argument in favor of the AICA data is inconsistent with ASEMESA's other arguments that challenge the notion that an olive fit for table olive production must be used to produce table olives.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
OF COUNSEL:                        Department of Justice
                                   P.O. Box 480, Ben Franklin Station
ELIO GONZALEZ                      Washington, D.C. 20044
Senior Counsel                     Tele: (202) 616-2228
Office of the Chief Counsel        Email: Tara.Hogan@usdoj.gov
   for Trade Enforcement and Compliance
U.S. Department of Commerce

March 27, 2023                     Attorneys for Defendant-Appellee,
                                   United States

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 23-1162

**Short Case Caption:** Asociacion de Exportadores e Industriales v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8614 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/27/2023

Signature: /s/Tara K. Hogan

Name: Tara K. Hogan

Save for Filing