**2023-1162**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

### ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO ALIMENTACION, S.L.,

*Plaintiffs-Appellants*

### ACEITUNAS GUADALQUIVIR, S.L.U.,

*Plaintiff*

v.

### UNITED STATES, COALITION FOR FAIR TRADE IN RIPE OLIVES,

*Defendants-Appellees*

---

Appeal from United States Court of International Trade
Court Nos. 1:18-cv-00195-GSK, Judge Gary S. Katzmann

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS ASOCIACION DE EXPORTADORES E INDUSTRIALES DE ACEITUNAS DE MESA, AGRO SEVILLA ACEITUNAS S. COOP. AND., ANGEL CAMACHO ALIMENTACIÓN, S.L.

---

Matthew P. McCullough
James C. Beaty
CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

May 10, 2023                  *Counsel for ASEMESA et al.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1162 |
| **Short Case Caption** | Asociacion de Exportadores e Industriales v. US |
| **Filing Party/Entity** | Asociacion de Exportadores e Industriales de Aceitunas de Mesa; Agro Sevilla Aceitunas S. Coop. And.; Angel Camacho Alimentacion, S.L. |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 5/10/2023

Signature: /s/ Matthew P. McCullough

Name: Matthew P. McCullough

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Asociacion de Exportadores e Industriales de Aceitunas de Mesa | | |
| Agro Sevilla Aceitunas S. Coop. And. | | |
| Angel Camacho Alimentacion, S.L. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable                 ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**   Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☐   No    ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                 ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ...................................................................................3

I.    COMMERCE'S SUBSTANTIALLY DEPENDENT FINDING IS CONTRARY TO THE STATUTE ................................................3

    A.    The Plain Meaning of "Substantially Dependent" Reaches Well Beyond "More than Half" .....................................................5

    B.    The Statutory Text Embodies Commerce's Rule In *Pork From Canada* ..................................................................................6

    C.    *Pork From Canada* And Related Administrative And Judicial Decisions Evidence A Definitive Commerce Rule, Not Commerce's Case-By-Case Discretion ...............................................10

    D.    "Substantially Dependent" Requires More Than Quantitative Analysis ..........................................................................14

II.    COMMERCE'S AFFIRMATIVE "SUBSTANTIALLY DEPENDENT" FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.........17

    A.    The United States And Musco Fail To Demonstrate How Commerce Supported Its Construction Of The Market With Substantial Evidence ..............................................................................19

    B.    The United States And Musco Fail To Demonstrate How Commerce's Substantially Dependent Calculation Was Not Arbitrary ..................25

CONCLUSION ...............................................................................31

# TABLE OF AUTHORITIES

## Cases

*American Grape Growers v. United States*,
  604 F. Supp. 1245 (Ct. Int'l Trade 1985) ............................................... 13

*Aqua Prods. v. Matal*,
  872 F.3d 1290 (Fed. Cir. 2017) ................................................... 17, 22

*Atlantic Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) .......................................................... 20

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ............................................................................ 30

*Canadian Meat Council v. United States*,
  661 F. Supp. 622 (Ct. Int'l Trade 1987) ........................................ 12, 13

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012) .............................................................................. 8

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................ 17

*Gerald Metals Inc. v. United States*,
  132 F.3d 716 (Fed. Cir. 1997) ............................................................ 21

*GPX Int'l Tire Corp. v. United States*,
  666 F.3d 732 (Fed. Cir. 2011) .............................................................. 3

*In re Cuozzo Speed Techs., LLC*,
  778 F.3d 1271 (Fed. Cir. 2015) ............................................................ 3

*Lorillard v. Pons*,
  434 U.S. 575 (1978) .............................................................................. 3

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ...................................................... 17, 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................. 22

*Perrin v. United States,*
    444 U.S. 37 (1979) .................................................................................9

*RHP Bearings Ltd. v. United States,*
    288 F.3d 1334 (Fed. Cir. 2002)...........................................................28

*Russello v. United States,*
    464 U.S. 16 (1983) .................................................................................8

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ...............................................................................17

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    44 F.3d 978 (Fed. Cir. 1994)........................................................ 20, 21

*Swiff-Train Co. v. United States,*
    793 F.3d 1355 (Fed. Cir. 2015)............................................................17

*Timex V.I. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998) ...............................................................7

*Timken Co. v. United States,*
    699 F. Supp. 300 (1988) ......................................................................29

*Transactive Corp. v. United States,*
    91 F.3d 232 (D.C. Cir. 1996)...............................................................28

*Universal Camera v. NLRB,*
    340 U.S. 474 (1951) ...................................................... 20, 21, 29

*Wis. Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ...........................................................................9

## Statutes

19 U.S.C. § 1677-2 ........................................................................... passim

## Administrative Decisions

*Final Affirmative Countervailing Duty Determination and Countervailing Duty
    Order; Rice from Thailand,* 51 Fed. Reg. 12,356 (Apr. 10, 1986) .................4, 11

*Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled and Frozen Pork Products from Canada*,
   50 Fed. Reg. 25,097 (June 17, 1985)............................................................ passim

*Fresh Atlantic Groundfish from Canada*,
   51 Fed. Reg. 10,041 (Dep't of Commerce Mar. 24, 1986) ...................................11

*Lamb Meat from New Zealand*,
   50 Fed. Reg. 37,708 (Dep't of Commerce Sept. 17, 1985)...................................11

## Other Authorities

133 CONG. REC. 17,764-6 (1987) ...........................................................................7, 9

S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979) .....................................................12

# SUMMARY OF THE ARGUMENT

This Court must decide whether the Department of Commerce ("Commerce") should be held to the standard Congress enacted at 19 U.S.C. § 1677-2, and specifically the meaning of "substantially dependent" as that term is used in the statute. The language itself, particularly when read in light of the extensive and precise legislative history, conclusively resolves the matter.

The statute requires both qualitative and quantitative examination of dependence, not simple use. An affirmative finding of "substantially dependent" requires that Commerce demonstrate by substantial evidence an inextricable linkage between prior- and latter-stage products where all or substantially all of the prior-stage product is demanded by the latter stage product along a single continuous line of production. Commerce's reliance on, and the United States' and Musco's defense of a lesser, quantitative analysis in which Commerce need only establish that "more than half" of the prior-stage product is consumed in any given year to produce the latter-stage product cannot be reconciled with the statute and its legislative history. Thus, Commerce's finding in the underlying redetermination that, merely because 55.28 percent of its defined prior-stage product was used to produce its latter-stage product the "substantially dependent" standard is met, is contrary to law.

Even if Commerce can apply the lesser standard the United States and Musco seek to defend, the calculation that gave rise to its "substantially dependent" finding also fails as a matter of substantial evidence. Commerce adopted an analytic framework in which dependence for "table" and "mill" olive varietals was defined by biological distinction, and for dual-use olives it was defined by cultivation practices. But once it set the foundations of its analysis on a qualitative basis, it then proceeded to ignore those foundations for its quantitative analysis when the data and evidence could not be reconciled with the desired outcome. Already barely meeting its "more than half" threshold, Commerce would have never met that threshold if it performed its quantitative analysis consistent with its qualitative findings. The result was arbitrary, results-oriented decision-making that Commerce, the United States, and Musco fail to justify. As such, Commerce's finding is not supported by substantial evidence.

# ARGUMENT

## I.    COMMERCE'S SUBSTANTIALLY DEPENDENT FINDING IS CONTRARY TO THE STATUTE

This Court must resolve the meaning of "substantially dependent" as that term is used in 19 U.S.C. § 1677-2(1).  In its affirmative brief, ASEMESA discussed that statutory term and laid out the extensive legislative history that gives comprehensive meaning to the term beyond its own plain meaning.  That history included very detailed and deliberate Commerce administrative decisions, Commerce's defense of the rationale underlying those decisions before the Trade Court, the Trade Court's judgement in response to that defense, and finally Congress' own statements codifying the "rule" set forth in Commerce's administrative determinations.  "The principle of legislative ratification is well established.  In the case of a widely known judicial decision or agency practice, 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute . . . .'"  *GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 739 (Fed. Cir. 2011) (*quoting Lorillard v. Pons*, 434 U.S. 575, 580 (1978)) *see also In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1280 (Fed. Cir. 2015).  In this case Congress' subsequent act was not mere ratification through reenactment without change.  It was a swift and direct amendment expressly designed to codify a known and expressly identified Commerce "rule," set forth in *Pork from Canada. See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh,*

*Chilled and Frozen Pork Products from Canada*, 50 Fed. Reg. 25,097, 25,100
(June 17, 1985) ("*Pork from Canada*").  A rule applied again shortly thereafter in
*Rice from Thailand.  See Final Affirmative Countervailing Duty Determination and
Countervailing Duty Order; Rice from Thailand*, 51 Fed. Reg. 12,356, 12,358
(Apr. 10, 1986) ("*Rice from Thailand*").

The United States' and Musco's response is part predictable and part
remarkable:  Congress did not mean what it said.  But if Congress did mean what it
said, then Commerce did not mean what it said.  And even if Commerce and
Congress both meant what they said, the legislative history is too old to be
determinative here.  The United States and Musco then attempt to justify a highly
deferential and simplistic interpretation of "substantially dependent" in which
Commerce need only reach the quantitative conclusion that "more than half" of its
defined "prior stage product" is used to produce the "latter stage product" as those
terms are used in the statute.  But the United States' and Musco's formulation is so
divorced from the plain meaning of "substantially dependent" and the rule in *Pork
from Canada* as to be unrecognizable.

"More than half" is an insufficient basis to find "substantially dependent"
under the statute.  Rather, the statute requires both qualitative and quantitative
examination, and an affirmative "substantially dependent" finding demands an
inextricable linkage between prior- and latter-stage products where all or

- 4 -

substantially all of the prior-stage product is demanded by the latter-stage product along a single continuous line of production.  The United States' and Musco's claims to the contrary do not overcome the statute and its legislative history.

### A.  The Plain Meaning of "Substantially Dependent" Reaches Well Beyond "More than Half"

The United States and Musco claim that Commerce met its statutory obligation under 19 U.S.C. § 1677-2 in rendering its affirmative  "substantially dependent" finding because it calculated that 55.28 percent of a prior-stage product was consumed by a latter-stage product.  U.S. Br. at 14-15; Musco Br. at 5-8. Their defense of a "more than half" standard, however, fails in the face of the meaning of "substantially dependent" as that term is used in the statute.  Indeed, the Trade Court below correctly found that "{t}he plain meaning thus requires the demand for the prior stage product must be 'largely, but not wholly,' 'contingent' on the demand for the latter stage product."  Appx000241-000242.  Whatever errors the Trade Court later committed in applying that plain meaning in upholding Commerce's second remand redetermination, it is not possible to reconcile "more than half", or in this case more precisely "barely half", with either "substantially" or "largely but not wholly".  A bank lending $100 would never concede that it was "substantially" or "largely, but not wholly" repaid if the borrower only paid back $55.  Whatever the lower limit of "substantially", it is not 55 percent.  The

expansive interpretation of Commerce's authority under 19 U.S.C. § 1677-2 now advanced by the United States and Musco is simply inconsistent with the statutory terms.

## B.    The Statutory Text Embodies Commerce's Rule In *Pork From Canada*

According to the United States, because the statutory text does not include the terms "all or substantially all" or "single, continuous line of production," Congress could not have possibly intended to incorporate those concepts into the law.  U.S. Br. at 17-20.  But as discussed above, the plain meaning of the term "substantially" does incorporate the idea of "substantially all" or, as the Trade Court identified, "largely but not wholly."

The United States otherwise ignores ASEMESA's specific treatment of the term "substantially dependent," which all the parties agree is part of the statutory text, in terms of the legislative history.  That term is plainly derived from Commerce's rule set forth in *Pork From Canada*.  In that decision, Commerce identified the "salient criterion" as "the degree to which the demand for the prior stage product is dependent on the demand for the latter stage product." *Pork from Canada* at 25,098.  Commerce would go on to explain in great detail the degree of dependence that must be shown, where both "all or substantially all" and "single

continuous line of production" are addressed and incorporated. *Id*. at 25,098-25,099.

The United States argues about whether Congress intended to enact Commerce's rule from *Pork from Canada*, U.S. Br. at 17, but that is precisely what the legislative history shows. *See* 133 CONG. REC. 17,765 (1987) (Statement of Sen. Grassley). To be certain, the legislative history refers to the applied rule in two specific cases. For all of the United States' and Musco's arguments, Senator Grassley was not speculating about raspberries or other industries that might or might not trigger the analysis and findings present in *Pork from Canada* and *Rice from Thailand*. *Id.* To the extent there was such speculation in the legislative history, any conclusion can only be definitively resolved through the rule painstakingly set forth in those two administrative decisions that were the specific impetus of 19 U.S.C. § 1677-2.

Under *Chevron* step-one, this Court can use traditional tools of statutory interpretation which "include the statute's structure, canons of statutory construction, and legislative history" to determine whether Commerce's interpretation of 19 U.S.C. § 1677-2 was lawful. *Timex V.I. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). A proper Chevron step-one analysis points to an examination of *Pork from Canada* and related administrative and judicial decisions to discern Congressional intent and the meaning of "substantially dependent."

That examination shows that the statutory term "substantially dependent" unambiguously embodies the concepts of "all or substantially all" and "single continuous line of production."

Although the United States claims that the absence of "single continuous line of production" in 19 U.S.C. § 1677-2(1) and its inclusion elsewhere in the statute proves Congress chose not to codify the requirement for Commerce's purposes. U.S. Br. at 20-21, *citing Russello v. United States*, 464 U.S. 16, 23 (1983), that canon of construction has limits. "{T}he mere possibility of clearer phrasing cannot defeat the most natural reading of a statute; if it could (with all due respect to Congress), we would interpret a great many statutes differently than we do*." Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2012). The most natural reading of 19 U.S.C. § 1677-2(1) is built upon the rule articulated by Commerce in *Pork from Canada* and expressly codified by Congress. On the other hand, noticeably absent from the statute and the rule articulated by Commerce is any mention of "more than half", which appeared for the first time in the Trade Court's opinion upholding Commerce's second remand redetermination. Appx000019, Appx000022. Neither the United States nor Musco reconcile this fact with their own arguments about what the law does or does not say.

For its part, Musco argues that this Court should ignore the references to *Pork from Canada* and *Rice from Thailand* because it was not Congress's intent

"to enshrine into law every nuance of Commerce's practice in two nearly forty-year-old administrative decisions that preceded the enactment of the statutory provision."  Musco Br. at 5.  Again, the legislative history reveals that is exactly what Congress intended to do.  *See* 133 CONG. REC. 17764-5 (1987) (Statement of Sen. Baucus).  Indeed, while there may have been nearly forty years between that administrative determination and this appeal, there were slightly more than 30 days separating the Trade Court's decision in *Canadian Meat Council v. United States*, and the introduction of the amendment in reaction to that decision that would become 19 U.S.C. § 1677-2.

Musco's argument that the legislative history has less force today because it occurred a long time ago merely sanctions the kind of agency discretion creep that is evident in this case, contrary to the authority Congress granted.  It is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.'"  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (*quoting Perrin v. United States*, 444 U.S. 37, 42 (1979)) (emphasis supplied).  That is why legislative history, which is necessarily tied to the same time period as the provision, is reviewed to determine whether the legal basis offered by an agency is sound, whether that determination is made months or years after the legislative provision is signed into law.  The narrow grant of

authority provided by 19 U.S.C. § 1677-2 does not suddenly morph into broad

discretion because the provision is forty years old.

### C. *Pork From Canada* And Related Administrative And Judicial Decisions Evidence A Definitive Commerce Rule, Not Commerce's Case-By-Case Discretion

Recognizing the limits of its statutory arguments, the United States and

Musco struggle to diminish or simply disavow Commerce's lengthy and

purposeful articulation of its rule in *Pork from Canada* that Congress codified.

First, the United States attempts to lump *Pork from Canada* in with other

administrative decisions stating, "where appropriate, Commerce considered

benefits to the producers of a raw agricultural product when determining whether

benefits were conferred upon producers of the later-stage processed agricultural

product." U.S. Br. at 3. Likening *Pork from Canada* to other administrative

decisions and treating it as a simple case-by-case exercise of Commerce discretion

ignores its importance.

The United States cites to four such administrative determinations, including

*Pork from Canada* and *Rice from Thailand*, with the latter simply confirming

Commerce's rule as articulated in *Pork from Canada*, as well as *Fresh Atlantic*

*Groundfish from Canada* and *Lamb Meat from New Zealand*. U.S. Br. at 3. But

these two other cases reveal no Commerce consideration of the "appropriateness"

of attributing benefits to the producers of a raw agricultural product to the

- 10 -

producers of the latter stage product at all. Commerce simply performed the

attribution without discussion. There is no rule, practice, or rationale, case-specific

or otherwise, seen in those determinations. This is because the respondents in

those cases never challenged the attribution. *See generally, Fresh Atlantic*

*Groundfish from Canada*, 51 Fed. Reg. 10,041 (Dep't of Commerce Mar. 24,

1986); *Lamb Meat from New Zealand*, 50 Fed. Reg. 37,708 (Dep't of Commerce

Sept. 17, 1985). The respondents in *Pork from Canada* and *Rice from Thailand*,

however, did challenge the attribution. This forced Commerce to actually confront

the law and try to offer a defensible rationale. *See Pork from Canada* at 25,908

("Upstream Issue") and *Rice from Thailand* at 12,357 ("Upstream Issue"). Thus,

the meaning of "substantially dependent" is squarely grounded in *Pork from*

*Canada* and *Rice from Thailand*. Other administrative decisions cited by the

United States have no bearing on the question.

Second, the United States argues that ASEMESA misconstrues factual

circumstances identified by Commerce in *Pork from Canada* and *Rice from*

*Thailand* into a substantive standard that Commerce did not intend to erect. U.S.

Br. at 19. Contrary to the United States' argument, this is not some unfortunate

coincidence in which "all or substantially all" or "single continuous line of

production" just happened to fit the factual circumstances present in *Pork form*

*Canada* and *Rice from Thailand*. Rather, it is because these very specific

- 11 -

circumstances were present that Commerce resolved it could attribute subsidies received by producers of the prior-stage product to producers of the latter stage product.  In its affirmative brief, ASEMESA already addressed Commerce's very deliberate articulation of the standard.  ASEMESA Br. at 27-32.

Commerce's true intent, and therefore the intent of Congress in enacting 19 U.S.C. § 1677-2, is revealed in how Commerce rationalized its attribution authority articulated in *Pork from Canada* before the Trade Court in *Canadian Meat Council*.  Commerce did not defend its statutory authority to fashion a distinct attribution rule for upstream agriculture subsidies in case-by-case, discretionary terms, but on broader governing principles applicable to every case.  As recognized by the Trade Court in *Canadian Meat Council*, Commerce based its authority on special legislative concern it borrowed from the legislative history of the 1979 Trade Agreements Act dealing with special problems involving injury determinations in agricultural cases.  *See Canadian Meat Council v. United States,* 661 F. Supp. 622, 627 (Ct. Int'l Trade 1987) (*citing* S. Rep. No. 249, 96th Cong., 1st Sess. 88 (1979)).  This is confirmed by Commerce's preoccupation in *Pork from Canada* with the Trade Court's opinion in *American Grape Growers*, which upheld an International Trade Commission ("ITC") formulation in injury cases that permitted collapsing industries where a raw product is sold in one market and "enters a single, continuous line of production resulting in one end product." *See*

- 12 -

*Pork from Canada* at 25,099 (*citing American Grape Growers v. United States*, 604 F. Supp. 1245 (Ct. Int'l Trade 1985)).

The Trade Court in *Canadian Meat Council* recognized Commerce's discussion of the ITC practice for what it was, the adoption of that practice for itself: "According to Commerce, the satisfaction of the same test provides grounds for determining that the subsidies bestowed on a raw agricultural product are bestowed equally on later stage products." *Canadian Meat Council,* 661 F. Supp. at 628. This was not some pork-specific test narrowly confined to the facts of that case—it was the enunciation of a rule. More importantly, Commerce expressly identified the outer contours of the standard. "The logic of the legislative concern…extends only to agricultural products which are completely devoted to the production of the more advanced product under investigation." *Pork from Canada* at 25,099 (*quoting American Grape Growers*, 604 F. Supp. at 1247-1248).

Commerce's second remand redetermination could not survive scrutiny under the dependence standard that Commerce announced in *Pork from Canada* and *Rice from Thailand*. Thus, the United States and Musco each focus on why this Court should ignore those decisions in gauging Commerce's current compliance with the law. But Commerce cannot amend the statute through later administrative determinations. Its practice must comport with the law as codified.

- 13 -

**D.     "Substantially Dependent" Requires More Than Quantitative Analysis**

In this concluding section, ASEMESA wishes to bring the matter back to the statutory terms and aspects of those terms both the United States and Musco appear to neglect or dismiss in making their case. Both contend that because "Commerce calculated a 55.28 percent consumption ratio," it could conclude that "this percentage demonstrates that the demand for the prior stage product is substantially dependent on the demand for the latter stage product." U.S. Br. at 14-15; Musco Br. at 5-8. By this statement, they appear to disavow any real analysis beyond a computation of use. But by its plain terms and the concepts those terms embody, that is not what the statute requires.

The Trade Court's initial *Chevron* step-one analysis is instructive here. In its original opinion the Trade Court found that substantially modifies dependent. Appx000242. The statute directs Commerce to attribute subsidies only in situations where there is a certain level of <u>dependence</u> between the demand for the prior-stage product and the market for the latter-stage product, consistent with the statutory text. That analysis is not purely quantitative. One of the core criticisms the United States and Musco level at ASEMESA's statutory argument is that "{n}othing in the statute or legislative history establishes a minimum threshold of demand as high as this, or any specific percentage threshold whatsoever." U.S. Br. at 16-17; Musco Br. at 5 ("{a}ppellants' principal argument is that Commerce

- 14 -

cannot lawfully find that a 55% substantial dependence ratio satisfies {the statute}"). ASEMESA disagrees that the statutory terms and legislative history do not set some lower quantitative boundary that is decidedly more than "more than half." But ASEMESA has never argued for any specific percentage – only that there must be both quantitative and qualitative analysis underlying the finding. In any event, the United States' and Musco's argument does little to rehabilitate Commerce's analysis. It only serves to underline the gap in Commerce's efforts to probe whether growers of certain olive varietals in Spain are dependent on their customers processing table olives.

In reviewing the statutory terms, the Trade Court below found that "{t}he plain meaning thus requires the demand for the prior stage product must be 'largely, but not wholly,' 'contingent' on the demand for the latter stage product." Appx000241-000242. The balance of the Trade Court's analysis, however, focused entirely on the calculated consumption ratio with little attention paid to the idea that the demand for the prior-stage product must be <u>contingent</u> on the latter-stage product. But the Court had previously recognized that how Commerce went about the analysis, including how it defined the market as between its prior- and latter-stage products, was critical to a lawful analysis of dependence.

Specifically, in response to Commerce's first remand redetermination, the Trade Court rejected Commerce's definition of the "prior stage product" as those

olives "principally suitable" for table olive production since it would

impermissibly "render the requirements of Section 1677-2 largely self-fulfilling,"

causing "the statute as a whole to become superfluous." Appx000112. The same

concern could apply equally to how one defines latter-stage product, which

explains the role single continuous line of production plays in the analysis.

Commerce in *Pork from Canada* clearly understood the ITC's single continuous

line logic to be a central part of understanding which market participants to analyze

in the context of making subsidy attribution decisions. As pointed out in

ASEMESA's affirmative brief, absent the discipline of that concept imbedded in

the law, the door is open to definitions of latter-stage product that are equally self-

fulfilling and unlawful, such as simply finding the latter stage product to be all

processed forms of the prior-stage product. ASEMESA Br. at 44-45. The United

States and Musco never respond to this point. But this point underscores the

statutory need to ground and substantiate findings in both qualitative and

quantitative terms or risk analyses that do not comport with the types of market

situations Congress sought to address. Citing a 55.28 percent consumption ratio

and concluding that this percentage demonstrates that the demand for the prior-

stage product is substantially dependent on the demand for the latter-stage product

does not meet the statutory standard.

## II. COMMERCE'S AFFIRMATIVE "SUBSTANTIALLY DEPENDENT" FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

"{T}he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *Aqua Prods. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017). While the role of the reviewing court is not to substitute its judgment for that of the agency, the court's review must adequately examine and confirm that Commerce's conclusions are supported by "evidence that a 'reasonable mind might accept as adequate to support a conclusion'". *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)); *see also Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (the agency must point to "evidence which could reasonably lead to the {the agency}'s conclusion."). The Trade Court fell short in its role in reviewing Commerce's second remand redetermination. Commerce's second remand redetermination does not survive scrutiny under the substantial evidence standard and must be remanded.

The core problem in Commerce's rationale is the disconnect between its construction of the raw olive market and the data it relied upon to perform its "substantially dependent" analysis under 19 U.S.C. § 1677-2(1). Commerce's construction of the raw olive market reflects its own apparent recognition that,

given the statutory term "substantially dependent", it could not merely count tons of raw olives consumed to produce table olives in performing its dependence analysis. Thus, Commerce created an analytic framework in which, for practical purposes, certain olive varietals are only used for oil and certain other olive varietals are only used for table olives. Appx000077. But at this point Commerce's dependence framework unravels when tested against the record as a whole.

ASEMESA is not relying on "highly technical arguments" to make its case. U.S. Br. at 29. ASEMESA's point is straight forward: As a matter of substantial evidence, if Commerce wants to defend certain characterizations about how the raw olive market works, then it must reasonably explain how those characterizations are factually proven and legally relevant. *Matsushita Elec.,* 750 F.2d at 933. It must also demonstrate how its characterization is reflected in the data it relies upon to perform its dependence analysis. At the very least, if Commerce wants to stand by its characterization of the market, then it must be true to that characterization when it performs calculations to determine the degree of dependence of its prior-stage product, consistent with 19 U.S.C. § 1677-2(1). Neither the United States nor Musco has shown how Commerce satisfied this obligation.

**A. The United States And Musco Fail To Demonstrate How Commerce Supported Its Construction Of The Market With Substantial Evidence**

In its response brief, the United States offers its own explanation of Commerce's dependence framework and acknowledges the major conceptual problem Commerce confronted: Whatever limits might be claimed about how "mill" varietals or "table" varietals can be used, certain other olive varietals are "dual-use" varietals equally suited to oil or table olive production. U.S. Br. at 28-31. But much like Commerce in its redetermination, the United States and Musco avoid the quantitative significance of the problem. However measured, the record shows that dual-use varietal olives such as hojiblanca and cacerena represent a significant majority of Commerce's defined prior stage product. *See* ASEMESA Brief at 52-53.

The much larger dual-use varietal volume explains why Commerce departed from a true varietal analysis. Indeed, the United States' contention that "Commerce determined that the demand for certain biologically distinct varietals of raw olives (prior stage product) is substantially dependent on the demand for table olives (latter stage product)," U.S. Br. at 28, is misleading. Under Commerce's analytic framework, biological distinction defined demand and dependence only for mill and table olive varietals. But for the much larger volume of dual-use olives, Commerce distinguished demand and dependence based on

- 19 -

cultivation practices, i.e., "at their source, dual-use olives are grown for one purpose or another." U.S. Br. at 31 (*citing* Appx000088). This distinction, alone, permitted Commerce to just barely achieve its "more than half" outcome. But Commerce must "take into account whatever in the record fairly detracts from its weight." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (*quoting Universal Camera v. NLRB*, 340 U.S. 474, 488(1951)); *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). For such a critical distinction, Commerce did not ground its finding in substantial evidence based on the whole record.

First, the United States and Musco defend Commerce's distinct treatment of dual-use olives on the basis of Commerce's explanation that dual-use olives "grown for" table applications are subject to different cost structures and pricing given more intense cultivation practices. U.S. Brief. at 31-32; Musco Br. at 17-19. As Commerce found, this made cross-purposing dual-use olives grown for table applications "less economically viable." Appx000084-000085. But the United States and Musco point to nowhere in the record where Commerce explains how "less economically viable" is equivalent to "substantially dependent" as that term is used in the statute. On their face, these are not the same concepts.

Remaining true to the meaning of the statutory terms, "less economically viable" would effectively need to mean prohibitive. But Commerce's own data

demonstrate no such prohibition.  The record evidence shows significant mobility for raw olives grown for one purpose or another, into either oil or table applications.  ASEMESA's Brief at 48-49 (*citing* Appx011241).  While Commerce remained silent on what types of varietals grown for table applications were then used for oil (an equally important consideration), it expressly found that those olives grown for oil but used in table applications were dual-use varietals.  *See* Appx000059.  And while the parties may dispute the degree to which mill or table varietals may be cross-purposed, the overall data do not align with Commerce's framework.  Commerce did not reconcile this disconnect.  When making a determination on substantial evidence, this Court has stated that it cannot evaluate the substantiality of the evidence "merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica De Aleaciones Laminadas*, 44 F.3d at 985 (*citing Universal Camera*, 340 U.S. at 487); *see also Gerald Metals Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).  Commerce did not reasonably take into account the contradictory evidence reflected in its data, contrary to standards of substantial evidence.

Second, and in response to the first point, the United States and Musco embrace Commerce's misleading claim that the volume of cross-applied olives is extremely small, repeating Commerce's observation that between 2010 and 2016

"only one or two percent of olives grown for the mill . . . sent to table olive use." U.S. Br. at 34; Musco Br. at 16-17 (*citing* Appx000089). But this observation ignores the market construction Commerce is trying to defend in performing its dependence analysis. In a market that consists of between <u>six and nine million tons</u> of olives grown for oil use, including dual-use varietals, one to two percent of that figure is a very substantial number when compared to Commerce's prior- or latter-stage products in this case, which amount to no more than <u>500,000 to 600,000 tons</u>. *See* Appx011241. Combined with what the United States admits is a very material volume of "table" raw olives cross-purposed for oil, U.S. Br. at 34 (described as "less than 10 percent"), these numbers are hardly small. No reasonable observer would claim 120,000 (2 percent of 6,000,000) is an immaterial component of 500,000.

Commerce cannot hide behind small single digit percentages in the abstract to obscure objectively large absolute volumes. It must give a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Aqua Prods.,* 872 F.3d at 1325. The prior- and latter-stage products are the focal points of the analysis, not oil. The data show that cross-purposing of olives is real, substantial, and contrary to Commerce's general depiction of siloed end uses.

Third, realizing that the record shows an even greater capacity to cross-purpose raw olives than the averages shown over 2010-2016 period when looking at the 2016-2018 period, the United States and Musco lean on the only explanation Commerce offered to diminish the relevance of that capacity. Commerce dismissed what the data reveal by arguing "only after 2016, when CVD and antidumping orders were imposed, were there greater shifts in table olives being sent to the mill." U.S. Br. at 34; Musco Br. at 16 (*citing* Appx000089). The United States in turn claims that, by this statement, "Commerce reasonably inferred that increased use could be due to the antidumping and countervailing duty investigations and the duties imposed," arguing that "the fact that the petitions were filed in July 2017 does not undermine Commerce's reasoning that the increase could be a reaction to the investigations and imposition of duties." U.S. Br. at 34. But Commerce did not address alleged investigation effects, just the AD/CVD orders, which were not imposed until August 2018. Appx000265-000268. Moreover, Commerce only emphasized "greater shifts in table olives being sent to mill." It avoided any mention of the even larger volumes of mill olives being sent to table applications that Commerce elsewhere determined were dual-use varietals. *See* Appx011241; Appx000059. There otherwise remains no explanation of how the market for dual-use olives can react to petitions filed in July 2017 (or orders imposed in August 2018) when, according to Commerce, the

end-use of dual-use olives is determined at the beginning of the growing season, which began in September 2016.[1]

Commerce, the United States, and Musco offer no other explanation for the trends seen in 2016-2018. Nor is there any response to ASEMESA's point that the cause of any shift is not relevant; it is the ability to cross-purpose in large volumes in any given year that disproves Commerce's construction of the market, with siloed end uses, and any finding of dependence as envisioned by the statute. *See* ASEMESA Brief at 49-50. The Trade Court tried to resolve this contradiction between Commerce's dependence framework and the data it relied upon to find substantial dependence by simply observing that "a degree of fungibility between table and mill olives does not invalidate Commerce's determination." Appx000021. While the United States also quotes the Trade Court's finding that it is "undisputed" that "'almost all' of certain varietals are used for either mill or table olive production, U.S. Br. at 33 (*citing* Appx000021), neither finding by the Trade Court addresses the orders of magnitude seen in the data or Commerce's own recognition that such observation does not apply to dual-use olives. Commerce's failure to adequately explain and resolve the obvious contradiction renders its determination not supported by substantial evidence. What the record

---

[1] The campaign year for olives takes place between September and August of the following year. Appx010637.

showed and continues to show, at a minimum, is that dual-use varietals represent the majority of table olive production, are not subject to any use limitations, and are therefore not dependent on table olive demand.

**B.    The United States And Musco Fail To Demonstrate How Commerce's Substantially Dependent Calculation Was Not Arbitrary**

Setting aside the serious substantial evidence shortcomings in Commerce's dependence framework, if that framework should be applied then Commerce must remain consistent with its terms. It cannot reach qualitative findings about use and dependence, and then ignore those findings when it comes time to quantify dependence. Without any reasonable justification, that is exactly what Commerce did. The United States and Musco do not prove otherwise.

In its redetermination, Commerce performed a new analysis and calculated that 55.28 percent of its defined prior-stage product was used to produce the latter-stage product, table olives. Appx000062. Thus, by the slimmest of margins Commerce asserted that the demand for its prior-stage product was substantially dependent on the demand for the latter-stage product, within the meaning of 19 U.S.C. § 1677-2(1), based on its erroneous "more than half" standard. But Commerce could not achieve even this narrow margin beyond 50 percent without resorting to computations and data adjustments that ignored its own dependence framework and the significance, in particular, of dual-use varietals. The United

States responds that ASEMESA is mischaracterizing Commerce's articulation of that framework, misunderstands the calculations, or is attacking reasonable inferences to which Commerce is entitled.  But the United States' arguments are easily dismissed.

First, in response to arguments that Commerce should not have included 71,814 tons of dual-use olives grown for mill use in its numerator, the United States claims that failing to do so "would lead to an incorrect calculation" since Commerce's calculation "sought to determine how many biologically distinct olive varietals producers were processed into table olives." U.S. Br. at 36.  Musco makes similar arguments premised on the idea that counting tons is all that matters, rather than measuring dependent tons.  Musco Br. at 24.  The arguments only demonstrate the gross distortion in Commerce's calculation.

Taking into account Commerce's findings about use limitations among different varietals, the numerator in Commerce's calculation should be viewed as a quantification of dependent volume, and not simply use.  Commerce, the United States and Musco all agree that biological distinction is not the determining factor for how dual-use olives are used, and therefore their dependence.  Rather, it is cultivation practices.  As a matter of logic, dual-use olives grown for mill use and therefore not subject to the limiting cultivation practices Commerce identified cannot be said to be dependent on use in table applications, even if so used.

Indeed, they should not really exist under Commerce's market construction in such materially significant volumes. If Commerce ignores this purported restraint and instead emphasizes use, then there is no basis to exclude from its calculation the volume of olives grown for table but used to produce oil. *See* Appx011241. But at that point, Commerce's entire dependence framework and its definition of the prior-stage product utterly dissolves.

The United States and Musco also try to discredit ASEMESA's claim that Commerce's inclusion of the 71,814 tons in the numerator of its calculation contradicts Commerce's finding that end use for dual-use varietals is determined at the beginning of the growing season. Musco argues that the volume of dual-use olives grown for mill and used for table is small and do not belie Commerce's finding. Musco Br. at 23-24. Similarly, the United States argues that Commerce's position reflects a generalization and that "Commerce never claimed that such situations could *never* take place." U.S. Br. at 35-36 (emphasis in original). Perhaps, but the data show that such situations <u>always</u> take place every year. S*ee* Appx011241. As already discussed the volumes are substantial relative to the prior- and latter-stage products.

To put it into perspective, the 71,814 tons of dual-use olives grown for mill that Commerce placed in the numerator of its dependence calculation contributed 7 percentage points to Commerce's result of 55.28 percent. Commerce could not

achieve an affirmative substantially dependent finding without including that volume – an inclusion that simply ignored its dependence framework.  In other words, "dual-use olives grown for one application generally are not used for another," Appx000086, except when it interferes with Commerce's desired outcome.  This is the essence of arbitrary decision making.  "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).  Commerce is treating the same dual-use olive differently between its qualitative conception of the market and its quantitative analysis based on that same conception without any reasonable justification.

Second, concerning dual-use cacerena olives, the United States excuses Commerce's decision to exclude cacerena from the analysis on the basis that the volume of cacerena grown for table olives is small and the total tonnage of production for cacerena olives regardless of end use needed for the denominator is not on the record." U.S. Br. at 36.  It further claims that Commerce fully accounted for and excluded cacerena from its analysis by deducting volume from the 90,404 tons of olives grown for mill but used for table.  According to the United States, this exclusion was based on a "reasonable inference" that the proportion of each dual-use olive varietal grown for and used for table applications

- 28 -

would also be the same for dual-use varietals grown for mill use but then ultimately used for table applications.  U.S.  Brief at 37-38.  Musco makes similar arguments.  Musco Br. at 25-27.  But like Commerce's own treatment of this issue, or lack thereof, these arguments do not address the crux of the problem. Cacerena's contribution to table production is not the issue, the issue is its contribution to oil production as a dual-use varietal and evidence that overall production of cacerena is much larger than the volume grown for table use.  *See* ASEMESA Brief at 59-60.  Further evidence regarding dual-use hojiblanca and its own contribution to oil production demonstrates the materiality of that volume and the distortions caused by excluding dual-use cacerena from the denominator of the analysis, not the numerator.  Claiming that cacerena is a small part (but still larger than other included varietals) of table production (i.e., the numerator) does not resolve the problem.  The claim fails to meet Commerce's obligation to review the record as a whole not just the disaggregated parts that fit its desired outcome.  "The 'whole record' means that the Court must consider both sides of the record.  It is not sufficient to merely examine the evidence that sustains the agency's conclusion."  *Timken Co. v. United States*, 699 F. Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990) (*citing Universal Camera*, 340 U.S. at 474).

The claim that cacerena volume is fully accounted for by the adjustment to the 90,404 tons of grown for mill olives that were used for table is also false.  The

bulk of Commerce's numerator is derived from olives grown for and used as table use, which would necessarily include cacerena volume.  The Unites States and Musco do not address the fact that Commerce made no cacerena adjustment to that volume.  *See* ASEMESA Brief at 11-12.  Thus, by failing to fully account for cacerena used for oil in its denominator the calculation is necessarily imbalanced and distorted.

Finally, by simply asserting that it is reasonable to infer certain proportionality for purposes of an incomplete exclusion is not the same as demonstrating that reasonableness.  There must be "a rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  Commerce offered no such connection here.  It just asserted the reasonableness.  It is otherwise remarkable that Commerce can claim such a reasonable inference and thereby ascertain certain volumes of olives to fill gaps in incomplete data yet conveniently claim defeat when lacking complete information on cacerena olives.  The record easily permits the same types of reasonable inferences to derive dual-use cacerena's contribution to oil production, such as relying on the proportionality of dual-use Hojiblanca's contribution to table and oil production.

# CONCLUSION

For the foregoing reasons ASEMESA submits that this case must be remanded for further proceedings consistent with the unambiguous terms of the statute and the record before the agency in this proceeding. Commerce cannot lawfully apply a purely quantitative "more than half" standard in determining whether its subsidy attribution authority under 19 U.S.C. § 1677-2 has been triggered. The statute requires more and guardrails must be place on Commerce's practice under this provision to ensure that it comports with the substantial linkage between prior- and latter-stage products that Congress wrote into the statute.

To the extent that this Court reaches the substantial evidence questions presented in this case, it must remand Commerce's findings for further proceedings consistent with the record. Commerce's current factual analysis is an outcome in search of a factual basis. Commerce's findings are arbitrary, contain internal contradictions, and ignore key aspects of the record that detract from its findings. This results in a distorted analysis of the Spanish table olives industry that does not rise to the level of substantial evidence.

Respectfully submitted,

/s/ Matthew P. McCullough

Matthew P. McCullough
James C. Beaty

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

*Counsel for ASEMESA et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  2023-1162

**Short Case Caption:**  Asociacion de Exportadores e Industriales v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  6,951  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 5/10/2023

Signature:  /s/ Matthew P. McCullough

Name:  Matthew P. McCullough